IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO._____

| | | |
|---|---|---|
| TRACFONE WIRELESS, INC. | ) | **06-22942** |
| | ) | |
| Plaintiff, | ) | **CIV-GRAHAM** |
| | ) | MAGISTRATE JUDGE |
| v. | ) | O'SULLIVAN |
| | ) | |
| JAMES H. BILLINGTON, LIBRARIAN OF | ) | |
| CONGRESS and MARYBETH PETERS, | ) | |
| REGISTER OF COPYRIGHTS, | ) | |
| | ) | |
| Defendants. | ) | |

FILED by _____ D.C.
INTAKE

**DEC 0 5 2006**

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. – MIAMI

## COMPLAINT

Plaintiff TRACFONE WIRELESS, INC. ("TracFone"), through undersigned counsel, hereby sues Defendants JAMES H. BILLINGTON, LIBRARIAN OF CONGRESS ("Librarian") and MARYBETH PETERS, REGISTER OF COPYRIGHTS ("Register") (collectively, "Defendants"), and states as follows:

### PRELIMINARY STATEMENT

TracFone seeks relief to prevent the implementation, application or enforcement of a one-sentence exemption entitled "EXEMPTION TO PROHIBITION ON CIRCUMVENTION OF COPYRIGHT PROTECTION SYSTEMS FOR ACCESS CONTROL TECHNOLOGIES" codified at 37 C.F.R. § 201.40(b)(5) ("the Exemption"). The Exemption is the product of a regulatory process in which the Register and the Librarian are charged by statute with ruling on petitions for exemptions to the Digital Millennium Copyright Act, 17 U.S.C. § 1201 ("DMCA"). The Exemption resulted from a flawed process in which TracFone was improperly and unlawfully denied an opportunity to present argument and evidence, despite complying with the

MIA#2548238.2

**CARLTON FIELDS, P.A.**
Bank of America Tower at International Place - Suite 4000 - 100 Southeast Second Street - Miami, Florida 33131-9101 - (305) 530-0050

applicable procedures for doing so. Accordingly, the Exemption was adopted in a manner inconsistent with the Copyright Act, the Administrative Procedure Act ("APA") and TracFone's due process rights as guaranteed by the Fifth Amendment to the Constitution, in that TracFone was not given proper notice and an opportunity to comment on the Exemption. In addition, the DMCA's exemption procedure is unconstitutional, either because it constitutes an improper delegation of Congress' legislative responsibilities, or because it is an exercise of administrative and regulatory powers by the Library of Congress and the Copyright Office, both of which are part of the legislative branch of government.

TracFone, which sells cellular telephones, has in the past successfully invoked the DMCA to prevent purchasers from "hacking" proprietary software from TracFone handsets and reselling them here and abroad for a substantial profit. TracFone and its competitors have obtained injunctive relief under the DMCA in a number of courts, including this one. While the scope and application of the Exemption are not entirely clear, the breadth of the Exemption's language is such that it could be misconstrued to allow this conduct to be carried on with impunity (at least under the DMCA), which could have adverse consequences for TracFone's ability to prevent hacking, and potentially impact TracFone's practice of offering low-cost wireless telephone service to a large number of consumers who otherwise may not afford it.

## PARTIES, JURISDICTION, AND VENUE

1.       TracFone is a Florida corporation with its principal place of business in Miami-Dade County, Florida.

2.       Defendant Register, as the Register of Copyrights of the United States of America, is the director of the Copyright Office of the Library of Congress. She is sued in her official capacity. Under the Register's direction, the Copyright Office is charged with all

**CARLTON FIELDS, P.A.**
Bank of America Tower at International Place - Suite 4000 - 100 Southeast Second Street - Miami, Florida 33131-9101 - (305) 530-0050

administrative functions and duties pursuant to the Copyright Act. *See* 17 U.S.C. § 701. The Register is responsible for establishing, promulgating and publishing regulations to administer the Copyright Act. *See* 17 U.S.C. § 702. All actions taken by the Register under the Copyright Act are subject to the provisions of the APA.

3.      Defendant Librarian is the librarian of the Library of Congress, and is sued in his official capacity. Pursuant to 17 U.S.C. § 702, regulations established or promulgated by the Register are subject to approval by the Librarian. Pursuant to 17 U.S.C. § 1201(c), the Librarian is charged with determining, upon recommendation of the Register, the scope of exemptions to the DMCA such as the Exemption at issue in this action.

4.      This case arises under Articles I and II of the United States Constitution, the Fifth Amendment to the United States Constitution, 28 U.S.C. §§ 1331, 2201 and 2202, and 5 U.S.C. §§ 702 and 706,

5.      Subject matter jurisdiction is proper pursuant to 28 U.S.C. §§ 1331.

6.      Venue and personal jurisdiction in this District are proper pursuant to 28 U.S.C. § 1391(e).

## FACTUAL BACKGROUND

7.      TracFone Wireless, Inc., ("TracFone") is America's largest prepaid wireless company and provides a "pay-as-you-go" wireless service with no term contracts and no monthly bills. To use TracFone's service, a customer purchases a TracFone wireless handset and Prepaid Wireless Airtime cards.

8.      TracFone's business model allows it to provide wireless telephone service to people who cannot afford or otherwise qualify for traditional wireless service. TracFone subsidizes the cost of the prepaid telephone handsets it sells, selling them at prices below its own

costs, and recoups this investment as consumers purchase and add airtime minutes from TracFone in order to use the handsets.

9.      TracFone is able to provide the service it provides because it incorporates certain "software locks" into the handsets it sells to prohibit illicit tampering.  The first of these locks limits access to the prepaid TracFone software on the handsets, and the second prevents access to the operating system, prohibiting third parties from re-programming, or "reflashing," the handsets, disabling the prepaid TracFone software.

10.     The Register of Copyrights is the director of the Copyright Office of the Library of Congress and performs all administrative functions and duties of the Copyright Office. *See* 17 U.S.C. § 701(a).

11.     In accordance with the DMCA, 17 U.S.C. § 1201(a)(1)(C), the Copyright Office is authorized to conduct a rulemaking proceeding through which the Librarian of Congress may exempt certain classes of works from the prohibition against circumvention of technological measures that control access to copyrighted works.

12.     The Register of Copyrights is specifically charged with advising the Librarian of Congress and conducting the rulemaking proceeding for the determination of potential exempted classes of works, under 17 U.S.C. § 1201(a)(1)(C).

13.     In late 2005, the Copyright Office commenced the third round of exemption proceedings under the DMCA, as set forth in the Federal Register: October 3, 2005 (Volume 70, Number 190), Pages 57526-57531. Written comments proposing exemptions were due by December 1, 2005, and reply comments were due by February 2, 2006.

MIA#2548238.2                                          4

**CARLTON FIELDS, P.A.**
Bank of America Tower at International Place - Suite 4000 - 100 Southeast Second Street - Miami, Florida 33131-9101 - (305) 530-0050

Commenters." Ms. Granick is the Executive Director of the Stanford Law School Center for Internet and Society, teaches at the Stanford Law School Cyberlaw Clinic, and is a board member and Chief Legal Counsel of the Hacker Foundation, an organization supporting computer hacking. The requested comments of the Copyright Office specifically concerned "whether software locks described in the comments and testimony of the Wireless Alliance are technological measures that effectively control access to works protected under [17 U.S.C. §1201(a)(3)(B)]." A true and correct copy of the request from the Copyright Office is attached hereto as Exhibit "B."

19.    The request for additional comments was not published in the Federal Register, and TracFone was not aware of the proposed Rulemaking, the proposed exemption or the request for additional comments until August, 2006, when an e-mail from CTIA, the international association for the wireless industry, informed its members of the above events and the proposed exemption, in its then-current form after the hearing (which was different from that originally filed and noticed).

20.    Upon learning of the Exemption for the first time in August of 2006, TracFone was greatly concerned that the Exemption, then defined as being for "software locks that enable wireless telecommunications' handsets to connect to a wireless communication network," could be misconstrued to encompass the specific security locks TracFone utilizes to secure its handsets.

21.    TracFone has had persistent problems with persons and organizations removing the software lock of its handsets. The illicit removal of the software lock allows such individuals to manipulate, modify or remove software from the handset's computer platform, rendering the handset a "blank" that can have a new operating system installed unlawfully and can be resold

14. In the initial comments to the third exemption proceeding, The Wireless Alliance and Robert Pinkerton proposed an exemption from the DMCA for the class of works comprised of "[c]omputer programs that operate wireless communications handsets."

15. After the period for written comments had closed, the Copyright Office held a public hearing on the Exemption on March 23, 2006, at Stanford Law School in Palo Alto, California, where the proponent of the Exemption is located. All three other public hearings, which addressed other proposed exemptions under the third rulemaking proceeding, were conducted in Washington, D.C., on March 29, March 31, and April 3, 2006.

16. At the public hearing at Stanford Law School, debate was had on the merits of the proposed exemption for handset computer programs, and the focus of the potential exemption was changed to "Computer firmware that enables wireless telecommunications' handsets to connect to a wireless communication network." See Hearing Transcript, attached hereto as Exhibit "A," at 45, 48.

17. A discussion was had at the Stanford hearing regarding the case of *TracFone Wireless, Inc. v. Sol Wireless*, 05-CV-23279 (S.D. Fla), with the proponents of the Exemption citing that case as proof that harm was being caused by the enforcement of the anti-circumvention rule. Indeed, the proponents' counsel specifically stated that she did "not think that TracFone is entitled to DMCA anti-circumvention protection for the way they do things []." The functionality of the TracFone prepaid handsets was also discussed at the hearing. Hearing Transcript, at 54.

18. After the hearings, the Copyright Office solicited further additional comments through a written request made August 14, 2006, to Jennifer Stisa Granick, Esq., representing The Wireless Alliance, and Steven Metalitz, Esq., representing numerous "Joint Reply

**CARLTON FIELDS, P.A.**
Bank of America Tower at International Place - Suite 4000 - 100 Southeast Second Street - Miami, Florida 33131-9101 - (305) 530-0050

for a premium. Once rendered "blank," these handsets are incapable of being serviced by TracFone.

22.     This behavior has created an illicit trade in blank phones, which has required legal action by TracFone under the DMCA. Additionally, TracFone has been informed that this illicit trade supports terrorism. TracFone and other mobile technology companies have brought actions alleging violations of the DCMA and have obtained injunctive relief in this and other District Courts.

23.     At the Stanford hearing, the Copyright Office itself expressed concern over the harm the Exemption might cause to the TracFone business model and to consumers if the affordable phones offered by TracFone are no longer available. Hearing Transcript at p. 80. As the Copyright Office noted, to help make wireless service accessible to all consumers, the TracFone prepared handsets are sold at a discount and the investment is recouped from the subsequent sale and addition of airtime minutes to be prepaid handsets.

24.     TracFone submitted a Petition for Consideration and Entry of Reply Comments ("Petition") for consideration by the Copyright Office Pursuant to Guidelines set forth in the 70 Fed. Reg. 57526 (2005), in opposition to the Exemption. A true and correct copy of TracFone's Petition, with exhibits, is attached hereto as Exhibit "C."

25.     TracFone's Petition was filed in accordance with the process allowing for submissions after the specified deadlines, which provided that an interested party would have an opportunity to petition the Register for consideration of additional information after the deadlines.

26.     The Register admits that TracFone's Petition was in "substantial compliance" with the rule. See Recommendation of the Register of Copyrights in RM 2005-11; Rulemaking

on Exemptions from Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, dated November 17, 2006, from Register of Copyrights Marybeth Peters to James H. Billington, Librarian of Congress ("Recommendation"), attached hereto as Exhibit "D," at 43.

27.     The Librarian of Congress, on the recommendation of the Register of Copyrights, announced late on November 22, 2006 the classes of works subject to the exemption from the prohibition against circumvention of technological measures that control access to copyrighted works and made available on the Internet the text of its proposed Final Rule, for 37 CFR Part 201 [Docket No. RM 2005-11], Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies.  A true and correct copy of the Final Rule is attached hereto as Exhibit "E."

28.     The Final Rule contains an exemption for "Computer programs in the form of firmware that enable wireless telephone handsets to connect to a wireless telephone communication network, when circumvention is accomplished for the sole purpose of lawfully connecting to a wireless telephone communication network."

29.     The precise language of the Final Rule was not disclosed by Defendants until late in the day on November 22, 2006 and was published in the Federal Register on November 27, 2006.   The Exemption went into effect immediately upon publication in the Federal Register on November 27, 2006, and is scheduled to remain in effect through October 27, 2009. Final Rule, at 1.

30.     In the Recommendation, which was also made available on the Internet by the Copyright Office late on November 22, 2006, the Register stated that it had refused to consider TracFone's Petition and supporting evidence as being untimely.  Recommendation, at 44-48.

**CARLTON FIELDS, P.A.**
Bank of America Tower at International Place - Suite 4000 - 100 Southeast Second Street - Miami, Florida  33131-9101 - (305) 530-0050

31.     In refusing to consider TracFone's petition, the Register stated:   "[I]t is not necessary to determine when TracFone itself first learned of the proposed exemption, in either its form or in the slightly amended form that was discussed at the hearing.  It is sufficient to note that TracFone's trade association – CTIA – was aware of the proposal in late January or early February," imputing CTIA's knowledge and conduct to TracFone. *Id.* at 45.

32.     In the Recommendation, the Register also conceded that the proposed exemption was substantially altered from the form in which it was initially proposed after the Stanford hearing but criticizes TracFone for not anticipating the change: "TracFone correctly notes that at the hearing, there was discussion of narrowing the description of the proposed exempted class to 'Computer firmware that enables wireless telecommunications' handsets to connect to a wireless communication network.'"  *Id.*  The Register went on to state, "However, that suggested new language simply reflected the nature of what was in the proponents' proposal, and does not appear to give rise to a valid excuse for TracFone's failure to recognize the significance of the proposal at an earlier stage." *Id.*

33.     The Register's Recommendation further notes that during the Register's consultation with the Acting Assistant Secretary of Commerce for Communications and Information ("Secretary"), the Secretary shared his concern that the record on this proposal appeared to be incomplete and stated that he was "pleased that the Register had sought additional information" to supplement the record. *Id.* at 47.

34.     According to the Recommendation, the Secretary expressed to the Register his view that the CTIA and TracFone comments "afford you a complete record in which the views of both users and creators of content are currently represented" and urged the Register to consider those submissions in making her recommendation. *Id.* at 47-48.

**CARLTON FIELDS, P.A.**
Bank of America Tower at International Place - Suite 4000 - 100 Southeast Second Street - Miami, Florida 33131-9101 - (305) 530-0050

35. Despite the Secretary's advice (which the Register admitted was "understandable"), the Register refused to consider TracFone's petition, stating that "complying with the Assistant Secretary's request and accepting the last-minute submissions of CTIA and TracFone would undermine the procedural requirements of this proceeding and of the rulemaking process in general." *Id.* at 48.

## COUNT I – VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT

36. TracFone incorporates and realleges the allegations of Paragraphs 1 through 35 as though fully set forth herein.

37. As set forth above, Defendants have promulgated the Exemption in violation of the APA, as follows: (i) TracFone was not provided with adequate notice and opportunity to comment on the Exemption; (ii) the Register has acted in a manner that is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law; and (iii) the Register took these actions against TracFone without factual or legal basis.

38. The result of Defendants' violations of the APA is the promulgation and publication of an exemption that is vague and overly broad and is subject to a misconstruction that unlawfully encompasses TracFone's prepaid wireless service.

39. TracFone has exhausted its administrative remedies.

40. In view of Defendants' publication and imminent enforcement of the Exemption, and TracFone's contention that the publication of the regulation and its enforcement are void, there is an actual controversy within the jurisdiction of this court. Declaratory and injunctive relief will effectively adjudicate the rights of the parties.

MIA#2548238.2

10

**CARLTON FIELDS, P.A.**
Bank of America Tower at International Place - Suite 4000 - 100 Southeast Second Street - Miami, Florida 33131-9101 - (305) 530-0050

## COUNT II – VIOLATION OF FIFTH AMENDMENT DUE PROCESS

41.     TracFone incorporates and realleges the allegations of Paragraphs 1 through 35 as though fully set forth herein.

42.     As the facts set forth herein demonstrate, Defendants have deprived TracFone of due process of law, as guaranteed by the Fifth Amendment to the United States Constitution, as follows:  (i) TracFone was not provided with adequate notice and opportunity to comment on the Exemption; (ii) the Register has acted in manner that is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law; (iii) the Register has taken these actions against TracFone without factual or legal basis; and (iv) the Librarian has issued, published or otherwise enacted the Exemption despite the Register's failure to promulgate the Exemption in accordance with due process of law.

43.     TracFone has exhausted its administrative remedies.

## COUNT III – VIOLATION OF SEPARATION OF POWERS

44.     TracFone incorporates and realleges the allegations of Paragraphs 1 through 35 as though fully set forth herein.

45.     The Library of Congress and the Copyright Office are part of the United States Congress, and therefore part of the legislative branch of government.

46.     The DMCA's delegation of rulemaking authority to the Library of Congress and the Copyright Office is an unconstitutional intra-branch delegation of Congress' legislative responsibilities.

47.     Alternatively, the DMCA's delegation of rulemaking authority to the Library of Congress and the Copyright Office is an unconstitutional exercise by the legislative branch of an executive function to make regulations to interpret and implement legislation.

CARLTON FIELDS, P.A.
Bank of America Tower at International Place - Suite 4000 - 100 Southeast Second Street - Miami, Florida 33131-9101 - (305) 530-0050

## PRAYER FOR RELIEF

WHEREFORE, TracFone respectfully requests this Court to enter declaratory relief in favor

of TracFone, and more specifically, requests:

(a)    that this Court declare the Exemption contrary to law, null, void, and of no effect;

(b)    that this Court restrain and enjoin the implementation, enforcement or application

of the Exemption;

(c)    that this Court order Defendants to repeal the Exemption;

(e)    that this Court advance this case on the docket and order a speedy hearing; and

(f)    that this Court grant such other and further relief it deems necessary and proper.

Dated: December ≤ᵗⁿ, 2006

Respectfully submitted,

**CARLTON FIELDS, P.A.**
*Counsel for Plaintiff TracFone Wireless, Inc.*

By: _____
Steven J. Brodie
Florida Bar No. 333069
John A. Camp
Florida Bar No. 848115
Bank of America Tower at International Place
100 Southeast Second Street, Suite 4000
Miami, FL 33131
Telephone: 305 530-0050
Facsimile: 305 530-0055
E-Mail: sbrodie@carltonfields.com,
      jcamp@carltonfields.com

James B. Baldinger
Florida Bar No. 869899
222 Lakeview Avenue, Suite 1400
West Palm Beach, FL 33401
Telephone:561 659-7070
Facsimile: 561-659-7368
E-Mail: jbaldinger@carltonfields.com

MIA#2548238.2          12
**CARLTON FIELDS, P.A.**
Bank of America Tower at International Place - Suite 4000 - 100 Southeast Second Street - Miami, Florida 33131-9101 - (305) 530-0050



# EXHIBIT "A"

1

LIBRARY OF CONGRESS

+ + + + +

UNITED STATES COPYRIGHT OFFICE

+ + + + +

PUBLIC HEARING
ON
EXEMPTION TO PROHIBITION ON
CIRCUMVENTION OF COPYRIGHT PROTECTION SYSTEMS
FOR ACCESS CONTROL TECHNOLOGIES

+ + + + +

37 CRF PARTS 201
DOCKET NO. RM 2005-11A

+ + + + +

THURSDAY
MARCH 23, 2006

+ + + + +

MOOT COURTROOM (ROOM 80)
CROWN QUADRANGLE
559 NATHAN ABBOTT WAY
STANFORD LAW SCHOOL
PALO ALTO, CALIFORNIA

+ + + + +

PRESENT FROM THE U.S. COPYRIGHT OFFICE:

        DAVID O. CARSON, General Counsel
        ROBERT KASUNIC, Principal Legal Advisor, OGC
        MARYBETH PETERS, U.S. Register of Copyrights
        JULE L. SIGALL, Associate Register for Policy
                and International Affairs

COMMENTERS:

        JENNIFER STISA GRANICK, The Wireless Alliance
        STEVEN METALITZ, Joint Reply Commenters
        BREWSTER KAHLE, The Internet Archive

1          GENERAL COUNSEL CARSON:  Let me ask then

2    both of you whether it would be of assistance to maybe

3    narrow the scope of what's being proposed here like

4    whether this makes you any happier, whether this makes

5    you any unhappier.  But if we said "Computer programs

6    in the form of firmware," and I guess one question

7    would be is it always firmware, if it is that's safe

8    I suppose, "that enable wireless telecommunications'

9    handsets  to  connect  to  a  wireless  communication

10   network."

11          Let me start with you, Mr. Metalitz, and

12   I'll repeat it just to make sure you get it.  But the

13   question would be would that allay your concerns and

14   again "Computer programs in the form of firmware that

15   enable  wireless  telecommunications'  handsets  to

16   connect to a wireless communication network."

17          MR. METALITZ:  It certainly would if the

18   word "solely" were placed before "enable."  I think

19   we're concerned about software that may have multiple

20   capabilities, one of which is to give you the dial

21   tone and another of which is to integrate it into that

22   is that capability to access all this other material.

23   So certainly if it were solely to enable that, then I

24   think the concern we have about the impact of this on

25   access to unrelated video games and music and so forth

1   about how access to their material was managed.

2   GENERAL COUNSEL CARSON:  So let me repeat

3   what my language is to you, Ms. Granick, and get your

4   reaction.  "Computer programs in the form of firmware

5   that enable wireless telecommunications' handsets to

6   connect to a wireless communication network."  Would

7   that do it for you?

8   MS. GRANICK:  Yes, it would.  I don't know

9   the answer first to the question of whether this

10  always comes in the form of firmware.

11  GENERAL COUNSEL CARSON:  Okay.

12  MS. GRANICK:  I believe it does because I

13  think you're flashing the software onto the chip in

14  the phone, but I'm not sure.  But we're talking about

15  accessing computer programs that enable the wireless

16  handset  to  connect  to  a  wireless  communication

17  network.  I think that does address my issue.

18  The  problem  with  including  the  word

19  "solely" is exactly as I think you were suggesting and

20  if I can elaborate on that a little bit.  If we could

21  look at the last exhibit to my testimony, I think this

22  will show a bit about why it is that "solely" won't

23  work.  So this exhibit is a diagram of the Open Mobile

24  Alliance's 2.0 client architecture and what it shows

25  is that there's the operating system for the phone,

1        MS. GRANICK:  I had talked about how the

2    FCC as part of its number portability rulemaking had

3    indicated how important competition in the wireless

4    market is to United States telecom policy.  But I'm

5    not familiar with any actual FCC activity around the

6    area of unlocking.

7        GENERAL COUNSEL CARSON:  Okay.  I probably

8    misread that or misrecalled it anyway.  One moment

9    please.  All right.  You pointed out, Ms. Granick,

10   that with your typical cell phone provider, I may be

11   putting words in your mouth but I think I'm just

12   rephrasing what you said, that the cell phone provider

13   already has a contractual relationship requiring you

14   to continue service for maybe one year, maybe two

15   years and so on and that's how they recoup the

16   discount from their price at which they're selling you

17   the cell phone.

18       MS. GRANICK:  And then some.

19       GENERAL COUNSEL CARSON:  Okay.  TracFone,

20   of course, is a little different as I understand it

21   from the allegations in that at least the allegations

22   of the *TracFone* case were that TracFone actually sells

23   you the cell phone for less than they paid and the

24   only way they make money is if you elect to continue

25   using their service because there is absolutely no

1    minimum   requirement   with   TracFone.    That's   my

2    understanding of the allegations.

3           I guess a two-part question.  (A) Is that

4    your understanding of how TracFone works and (B) if

5    that's the case, isn't there some reason to be more

6    concerned that there's at least one cell phone company

7    that doesn't adopt the model that the others have and

8    really does arguably rely upon this device to ensure

9    that it ultimately does make its money back and also

10   as a means of giving customers cell phones at a very

11   reasonable price, but ultimately making enough money

12   off the transaction that it's a meaningful transaction

13   for TracFone?

14           MS. GRANICK:  I agree that this is what

15   the *TracFone* case is about.  I do not think that

16   TracFone   is   entitled   to   DMCA   anti-circumvention

17   protection for the way they do things because nothing

18   that Sol Wireless did was infringing and the DMCA is

19   protecting   copyrighted   works,   not   people   from,

20   protecting and controlling circumvention of DRM and

21   technological   measures   that   control   access   to

22   copyrighted works.

23           Here, the exemption is permitted if it

24   furthers a public interest and it is noninfringing and

25   it's   not   illegal   behavior   and   the   simple   fact   of

1    Sprint store and buy minutes there and that would be

2    the only way to do it.

3              LEGAL ADVISOR KASUNIC:  One last thing and

4    I may end up lying too, but in the TracFone situation,

5    the way this model was set up to work, wasn't there

6    something about that system?  We're ultimately looking

7    in the exemption at trying to benefit consumers in

8    noninfringing activity.  Wasn't TracFone's business

9    model really advantageous to consumers in some way

10   where they were buying expensive phones, offering them

11   at a deep discount to consumers and then selling as

12   much service, as much prepaid service, or as little

13   prepaid service as the consumer wanted?  If we end

14   that type of what Congress might have called "use

15   facilitating business model" might we not be harming

16   consumers where that what we would be incentivizing by

17   eliminating that potential would be that maybe the

18   contracts the carriers give are just going to be more

19   uniform and you won't have more variation and more

20   opportunities for different types of business models?

21             MS. GRANICK:   To say I'm agnostic on

22   whether the TracFone business models benefits or harms

23   consumers, but I do not think that this exemption will

24   harm that business model.   TracFone still has

25   Trademark law, Unfair Competition law, Contract law to



# EXHIBIT "B"

August 14, 2006

Jennifer Granick, Esq.
Stanford Law School Center for Internet & Society
Cyberlaw Clinic
559 Nathan Abbott Way
Stanford, CA 94305

Steven Metalitz, Esq.
Mitchell Silberberg & Knupp LLP
2300 M Street, N.W., Suite 800
Washington, D.C. 20037

Dear Ms. Granick and Mr. Metalitz:

I am writing to follow-up on your participation in the Copyright Office's March 23 public hearings of the DMCA Section 1201 Rulemaking relating to The Wireless Alliance's proposed exemption: "Computer programs that operate wireless communications handsets."

Having reviewed the record, we seek additional and more detailed information relating to whether the software locks described in the comments and testimony of The Wireless Alliance are technological measures that effectively control access to works protected under title 17, as defined in 17 U.S.C. §1201(a)(3)(B). Section 1201(a)(3)(B) provides:

> a technological measure "effectively controls access to a work" if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work.

Please provide us with any information you have relating to the following questions. Please provide the following information, separately for each of the four types of software locks described in the comments and testimony of the Wireless Alliance -- SPC locking, SOC locking, band order locking, and SIM locking:

(1)     Explain how each of the types of software locks controls access to a copyrighted work.
(2)     Identify and describe the copyrighted work (or works) with respect to which access is controlled by the software lock.
   a.  Who is the copyright owner of that copyrighted work?
   b.  If the software lock controls access to only a portion of the work(s), identify both the work(s) and the portion(s) of the work(s).

Jennifer Granick, Esq.                     Page 2                          August 14, 2006
Steven Metalitz, Esq.

     (3)     What information, process or treatment must be applied in order to gain access to that copyrighted work(s) (or the identified portion(s) of the work(s)).

     (4)     In what respect is access to that copyrighted work controlled by the software lock, including (but not confined to):
         a.  what is the nature of the access to the copyrighted work that is controlled by the software lock

     (5)     How does the software lock control such access to the copyrighted work?

     (6)     Describe whether and how the authority of the copyright owner of the copyrighted work is implicated in the operation of the software lock, including (but not confined to):
         a.  who (e.g., the firmware manufacturer, the handset manufacturer, or the telecommunications service provider) installs and/or activates the software locks on the cellular phone handsets;
         b.  whether the software locks are applied "with the authority of the copyright owner";
         c.  if the software locks are not installed by the copyright owner,
            i. what is the relationship between the copyright owner and the person who installs the software locks;
            ii. are (and if so, in what respect are) the software locks applied with the permission of the copyright owner; and
         d.  In what respect has the copyright owner authorized the application of information, or a process or a treatment, to gain access to the work.

     (7)     In what circumstances, if any, is access to the copyrighted work authorized by the copyright owner.

To the extent that the answer to any of these questions varies depending upon the telecommunications service provider, handset manufacturer, handset model, firmware producer, or other parties who are involved, please provide explanations in your responses.

In addition to providing us with the requested information, we solicit your views on whether the software locks in question are technological measures that "effectively control access to a work" as defined in §1201(a)(3)(B).

We recognize that the comments and testimony of The Wireless Alliance have touched upon some of these questions, but the record on these questions is rather thin and we require more detailed information in order to complete our evaluation of the proposed exemption. We also recognize that Mr. Metalitz is not a proponent of the proposed exemption and does not represent handset manufacturers, telecommunications service providers or others directly involved in the activity that is the subject of the proposed exemption  However, because it is our practice, when submitting questions to witnesses, to submit those questions to all persons who have testified on the proposed exemption, we wish to provide him with an opportunity to consider and respond to our questions.

Jennifer Granick, Esq.                     Page 3                          August 14, 2006
Steven Metalitz, Esq.

Because these questions have arisen at a fairly late point in this rulemaking proceeding, we would be grateful if we could receive your responses promptly, and in any event no later than August 28.

Thank you for your assistance in this rulemaking proceeding.

Sincerely,


David O. Carson
General Counsel



# EXHIBIT "C"

**LIBRARY OF CONGRESS**

**UNITED STATES COPYRIGHT OFFICE**

**EXEMPTION TO PROHIBITION ON CIRCUMVENTION OF COPYRIGHT
PROTECTION SYSTEMS FOR ACCESS CONTROL TECHNOLOGIES**

**37 CFR Part 201
Docket No. RM 2005-11**

**PETITION FOR CONSIDERATION AND ENTRY OF REPLY COMMENTS**

**OF**

**TRACFONE WIRELESS, INC.**

Represented by:

James B. Baldinger, Esq.
CARLTON FIELDS, P.A.
222 Lakeview Avenue, Suite 1400
West Palm Beach, FL 33401-6149
Telephone: (561) 659-7070
Facsimile: (561) 659-7368
e-mail: jbaldinger@carltonfields.com

Lance D. Reich, Esq.
CARLTON FIELDS, P.A.
1201 West Peachtree Street, Suite 3000
Atlanta, GA 30309-3455
Telephone: (404) 815-3400
Facsimile: (404) 815-3415
e-mail: ldreich@carltonfields.com

## TABLE OF CONTENTS

I. Introduction and Summary .     .     .     .     .     .     .     1

II. Statement Regarding TracFone Wireless, Inc.     .     .     .     .     2

III. Petition for Consideration of Reply Comments     .     .     .     .     3

        A. TracFone only recently learned of the proposed exemption
        in its current form     .     .     .     .     .     .     .     3

        B. The proposed exemption was narrowed after the
        Public Hearing from a general class to a narrow exemption
        for "software locks" that would specifically harm TracFone .     .     3

        C. The proposed exemption, as currently contemplated, would
        have a significant adverse impact particularly on
        TracFone's business model     .     .     .     .     .     4

IV. Opposition to Proposed Exemption from Section 1201(a)(1) for
   "Computer programs that operate wireless telecommunications handsets" .     .     5

        A. Proposed Exemption for "Computer programs that operate wireless
        telecommunications handsets"     .     .     .     .     .     5

        B. Summary of the Argument in Opposition .     .     .     .     .     5

        C. Factual Basis Supporting the Opposition .     .     .     .     .     5

            i. The TracFone Prepaid Handsets     .     .     .     .     5

            ii. Cellular Telecommunication Carriers and Their Network Locks .     9

            iii. Unlocked Cellphones are Available to the Public .     .     9

        D. Argument in Opposition to the Proposed Exemption     .     .     10

            i. TracFone could be put out of business if cellular device system
            locks are legally circumventable     .     .     .     .     10

                a. The complete removal of the system lock allows
                copyright infringement     .     .     .     .     11

                b. TracFone would have to dramatically increase
                the price of the TracFone handset to the public     .     .     11

ii. The Proponents for the Exemption Have Not Met
Their Burden to Show a Substantial Adverse Effect upon
Noninfringing Uses   .   .   .   .   .   .   .   11

    a. The proponents do not address the TracFone
    devices and business model, or the specific harm
    that TracFone would suffer   .   .   .   .   .   12

    b. The proposed exemption is unnecessary to
    advance the interests of cellular customers   .   .   .   12

    c. The isolated incidents cited by the proponents
    are insufficient to warrant the requested exemption
    of all cellular device software locking mechanisms   .   .   13

    d.  The case law cited by the proponents fail to
    establish any harm caused by application of the DMCA   .   13

iii. Public Policy Strongly Disfavors the Removal of
TracFone's Software from Cellular Devices .   .   .   .   14

    a. The proposed exemption simply allows members of
    the public to avoid paying the full price for
    an unlocked cellphone.   .   .   .   .   .   14

    b. There are many criminal enterprises that engage
    in the removal of the TracFone software   .   .   .   14

V. Conclusion .   .   .   .   .   .   .   .   .   .   15

## APPENDIX

Exhibit A-   TracFone Handset Price List (Web page capture, 9/3/2006)
Exhibit B-   "Profiteers Reselling Cell Phones Rankle Industry," *Houston Chronicle*, Bus.
    Sect., Aug. 16, 2006.
Exhibit C-   "Cell Phones are New Terror Gadgets," *Newsday.com*, Nation Sect., August 17,
    2006.
Exhibit D-   1-800MOBILES.COM, Unlocked Cellphone Price List (Web page capture,
    9/3/2006).
Exhibit E-   Crayton Electronics New and Used Unlocked Cellphone Price List (Web page
    capture, 9/3/2006).

I. Introduction and Summary

TracFone Wireless, Inc.("TracFone"), submits this Petition for Consideration and Entry of Reply Comments for consideration by the Copyright Office in determination of the proposed exemption for "Computer programs that operate wireless telecommunications handsets. (Mobile firmware)" from Section 1201 of the Digital Millennium Copyright Act (DMCA). Written comments were due by December 1, 2005, and reply comments were due by February 2, 2006. Pursuant to Guidelines set forth in the 70 Fed. Reg. 57526 (2005), TracFone petitions to have its reply comments entered in opposition to the proposed exemption based upon the grounds more fully set forth herein.

A Public Hearing was held on March 23, 2006, at Stanford Law School, in Palo Alto, California. At the Public Hearing, debate was had on the merits of the proposed exemption which was initially titled "Computer programs that operate wireless telecommunications handsets. (Mobile firmware)."  At that hearing, the focus of the potential exemption was made to "Computer firmware that enables wireless telecommunications' handsets to connect to a wireless communication network." [Hearing Transcript, pp. 45, 48]. Much discussion was also made in the hearing about the case of *TracFone Wireless, Inc. v. SOL Wireless*, 05-CV-23279 (S.D. Fla), and the functionality of the TracFone prepaid handsets.  [See, e.g. Hearing Transcript, p. 54]

The Copyright Office solicited further additional comments through written request made August 14, 2006, to Jennifer Stisa Granick, Esq., representing The Wireless Alliance, and Steven Metalitz, Esq., representing numerous "Joint Reply Commenters."[1] The requested comments of the Copyright Office specifically concern "whether software locks described in the comments and testimony of the Wireless Alliance are technological measures that effectively control access to works protected under [17 U.S.C. §1201(a)(3)(B)]."

TracFone was not aware of the proposed Rulemaking and the proposed exemption in its current form until August, 2006, when an e-mail from CTIA, the international association for the wireless industry, informed its members of the above events.  Given the specific discussion of TracFone's technology and severe impact upon TracFone's business that the proposed exemption would have, TracFone seeks entry of these reply comments and evidence in opposition to the proposed exemption.

---

[1] Specifically, the ASSOCIATION OF AMERICAN PUBLISHERS, ASSOCIATION OF AMERICAN UNIVERSITY PRESSES, AMERICAN SOCIETY OF MEDIA PHOTOGRAPHERS, THE AUTHORS GUILD, INC., BUSINESS SOFTWARE ALLIANCE, DIRECTORS GUILD OF AMERICA, ENTERTAINMENT SOFTWARE ASSOCIATION, INDEPENDENT FILM & TELEVISION ALLIANCE, MOTION PICTURE ASSOCIATION OF AMERICA, NATIONAL MUSIC PUBLISHERS' ASSOCIATION, PROFESSIONAL PHOTOGRAPHERS OF AMERICA, RECORDING INDUSTRY ASSOCIATION OF AMERICA, SCREEN ACTORS GUILD, and the SOFTWARE AND INFORMATION INDUSTRY ASSOCIATION.

## II. Statement Regarding TracFone Wireless, Inc.

TracFone Wireless, Inc., is America's largest prepaid wireless company[2]. Established in 1996, the company was the first to introduce a "pay-as-you-go" wireless service with no term contracts and no monthly bills. TracFone Wireless, Inc. is a subsidiary of América Móvil (NYSE: AMX, Nasdaq: AMOV), Latin America's largest wireless company with over 100 million subscribers around the world.

To use TracFone's service, a customer purchases a TracFone wireless phone and Prepaid Wireless Airtime cards on-line or from any of 60,000 retailers nationwide. The wireless phone is locked down such that it can only operate using TracFone's billing software that is loaded on the phone. The customer activates the wireless phone either online or by calling a toll free number, and then can buy more TracFone prepaid wireless airtime cards as desired. To keep the TracFone service active, the customer must periodically purchase and add airtime.

TracFone provides an extremely valuable service to the community by making wireless service available to consumers who cannot meet the credit criteria for obtaining service from a traditional "post-paid" wireless provider, or who otherwise cannot afford such service. TracFone does not bill its customers and does not require its customers to remain on service for any length of time, and therefore does not need to impose any minimum credit standards or obtain a credit report on its customers. TracFone subsidizes the initial cost of its handsets, allowing them to be purchased for as little as $19.99. See Ex. A. TracFone does not own a wireless network, but instead operates as a reseller or Mobile Virtual Network Operator ("MVNO"), reselling wireless service provided by more than 25 wireless carriers. TracFone is thus able to provide its customers with nationwide coverage on a variety of carriers, utilizing all of the commonly available wireless standards (GSM, CDMA, and TDMA).

TracFone's provision of this valuable service at an accessible price is only possible because of the protections afforded by its proprietary software loaded into every handset it sells. The exemption proposed in this proceeding would prevent TracFone from protecting its proprietary software from tampering, deletion, or unlocking, and poses a threat to the continued operation of TracFone's business.

---

[2] According to the Ovum, a leading analyst firm that specializes in the wireless industry.

### III. Petition for Consideration of Late Reply Comments

As set forth the in the Notice of Inquiry in the 70 Fed. Reg. 57526 (2005), "in the event that unforeseen developments occur that would significantly affect the Register's recommendation, an opportunity to petition the Register for consideration of new information will be made available after the deadlines specified. A petition, including proposed new classes of works to be exempted, must be in writing and must set forth the reasons why the information could not have been made available earlier and why it should be considered by the Register after the deadline." While this rule does not state whether the right to petition applies to reply comments, the clear intent of this petition mechanism is to accommodate situations like the current one where TracFone learned of the proposed exemption and discussion surrounding the TracFone handsets far beyond the time limit to reply. TracFone therefore petitions and seeks entry of these late reply comments and evidence in opposition to the proposed exemption for "Computer programs that operate wireless telecommunications handsets. (Mobile firmware)," and its subsequent proposed modifications advocated at the Public Hearing on March 23, 2006.

### A. TracFone only recently learned of the proposed exemption in its current form

TracFone was not aware of the proposed Rulemaking and the proposed exemption in its current form until August, 2006, when CTIA, the international association for the wireless industry, informed its members of the above events.   TracFone relies upon its industry organizations to timely inform it of governmental developments, and especially rulemaking that affects the wireless communication industry.  Before the CTIA email, TracFone was unaware of the proposed exemption made by The Wireless Alliance.  Consequently, once TracFone learned of the proposed exemption and researched the substance and commentary regarding TracFone's handsets and actions, TracFone feels compelled to prepare and file these reply comments and evidence to have its official opposition to the proposed exemption made of record and provide correct information to the Copyright Office to better determine the merits of the sought exemption.

### B. The proposed exemption was narrowed after the Public Hearing from a general class to a narrow exemption for "software locks" that would specifically harm TracFone

In its current proposed form, the sought exemption appears to be for "software locks that enable wireless telecommunications' handsets to connect to a wireless communication network." The initial proposed exemption was for "Computer programs that operate wireless telecommunications handsets. (Mobile firmware)," which is a very general and ambiguous statement.  Moreover, the pure manipulation of the "computer program" that operates the handset would be copyright infringement.  TracFone's main concern is the removal of the "locks" that will allow persons to manipulate or modify the computer code resident on the software platform, and which also permits wholesale removal of the code such that the handset becomes a "blank" that can have a new operating system installed. This deprives TracFone the recoupment of their initial investment in subsidizing the sale of the phone, and also causes an illicit trade in blank phones that some have linked to supporting terrorism.

At the Public Hearing, during questioning of the Commenters, the Copyright Office expressly focused of the potential exemption for "Computer firmware that enables wireless telecommunications' handsets to connect to a wireless communication network." [Hearing Transcript, pp. 45, 48].  Even with the narrower definition, the proponents' counsel Granick specifically stated that she did "not think that TracFone is entitled to DMCA anti-circumvention protection for the way they do things []." Hearing Transcript, p. 55.  Furthermore, the Copyright Office solicited additional information on August 14, 2006, from the Commenters concerning "whether software locks described in the comments and testimony of the Wireless Alliance are technological measures that effectively control access to works protected under [17 U.S.C. §1201(a)(3)(B)]."  The letter requesting additional information also noted that Mr. Metalitz did not represent "handset manufacturers, telecommunication service providers, or others directly involved in the activity that is the subject of the proposed exemption."  TracFone is exactly one of those delineated parties who would be directly affected by the proposed exemption.

As is more fully shown below in the description about the TracFone prepaid wireless handset, there are two "software locks" employed in the TracFone handset, one to limit access to the TracFone software resident on the handset, and the other to prevent access to the operating system.  The latter is akin to what has been referred to as the "system operator code" (SOC) lock that prevents third parties from reprogramming the handset. On TracFone's handset, there is no specific software lock that only controls access to the carrier's wireless network. Therefore, even the proposed narrowed exception could permit removal of the system lock, which is the main defense TracFone has against phone "reflashers" such as SOL Wireless.

It should also be noted that much discussion was made during the Public Hearing about the case of *TracFone Wireless, Inc. v. SOL Wireless*, 05-CV-23279 (S.D. Fla), and the functionality of the TracFone prepaid handsets.  [See, e.g. Hearing Transcript, p. 54]. TracFone seeks to correct the administrative record and clarify how TracFone's prepaid handsets operate, how TracFone's business model operates, and the substance surrounding TracFone's litigation under 17 U.S.C. 1201.

### C. The proposed exemption, as currently contemplated, would have a significant adverse impact particularly on TracFone's business model

In its current form, the proposed exemption for "computer programs that operate wireless telecommunications handsets. (mobile firmware)," and its more narrowly discussed exemption of "computer firmware that enables wireless telecommunications' handsets to connect to a wireless communication network," if enacted, could essentially put TracFone out of business. The Copyright Office expressed concern over the harm the proposed exemption might have to the TracFone business model and to consumers if the choice TracFone offers is eliminated.  Hearing Transcript, p. 80.  As the Copyright Office noted, to entice customers to the wireless prepaid system, the handsets are sold at a discount and return is made from later prepaid airtime minutes. If TracFone cannot subsidize the initial purchase of the device because of the concern over hacking and reselling of the phone, they will undoubtedly suffer a significant business decline as there is no longer a competitive advantage to the prepaid cellular service.  The increased cost of the handset would also hurt consumers unable to qualify for or afford contracts with the post-paid cellular carriers as even prepaid wireless would have a high barrier to entry.

IV. Opposition to Proposed Exemption from Section 1201(a)(1) for "Computer programs that operate wireless telecommunications handsets"

### A. Proposed Exemption for "Computer programs that operate wireless telecommunications handsets"

The proposed exemption as filed by The Wireless Alliance and Robert Pinkerton was initially titled "Computer programs that operate wireless telecommunications handsets. (Mobile firmware)." The proposed exemption has since been modified to be for "Computer firmware that enables wireless telecommunications' handsets to connect to a wireless communication network." [Hearing Transcript, pp. 45, 48]. As is more fully set forth herein, TracFone opposes the proposed exemption in any form.

### B. Summary of the Argument in Opposition

TracFone opposes the proposed exemption because of the harm that allowing persons to circumvent TracFone handset system locks would do to TracFone's business. The complete removal of the system lock allows copyright infringement through alteration and selective deletion of TracFone's software. Because of the initial subsidy for purchase of the TracFone handset, TracFone would have to dramatically increase the price of the TracFone handset to the public which would destroy sales to the target market of TracFone. Moreover, the proponents for the exemption admit their arguments do not apply to TracFone, and do not address the specific harm the sought exemption could have to the prepaid model. Finally, the proponents have not shown any adverse effect here--unlocked cellphones are readily available to the public, and carriers will unlock cellphones for their customers, as the proponents admit. The proposed exemption simply allows members of the public to avoid paying the full price for an unlocked cellphone through the alteration of copyrighted software, at TracFone's expense.

### C. Factual Basis Supporting the Opposition

#### i. The TracFone Prepaid Handsets

TracFone's prepaid handsets are identical to a standard cellular service carrier's except that the TracFone handset is loaded with TracFone's billing software. That is, the amount of airtime based upon the available balance of prepaid time is stored on the computer platform of the handset. Basically, TracFone has accounts with the major cellular carriers and is billed for the TracFone prepaid handsets' collective air time on those networks. The actual method of controlling the access of the individual TracFone handset to a specific cellular network can occur at the handset in a CDMA or TDMA configuration, or is set by the TracFone SIM in a GSM configuration. Consequently, it is critical to TracFone that the TracFone billing software remain intact at the handset or else the possibility for fraud from unbilled usage of TracFone airtime becomes significant.

At the time of sale to the consumer, the TracFone handset normally has two discrete computer programs resident on the computer platform: the TracFone billing software and the operating system code of the handset. The TracFone software is integrated into the operating

system at the time of manufacture. For purposes of copyright ownership, TracFone is the copyright holder of the billing software and any associated modules, and the operating system code is owed by the manufacturer, e.g. Nokia.

There are typically two "locks" on the TracFone handset, one is a lock that can be in software, firmware, or hardware, or a combination of these, that prevents access to the computer platform of the handset (akin to what the commenters refer to as a "system operator code" (SOC) lock). The other is a software lock that prevents access to the specific billing and control software of TracFone resident on the computer platform of the handset. In the TracFone handset, there is no specific lock that would meet the definition of "Computer firmware that enables [the] wireless telecommunications handset to connect to a wireless communication network." In fact, the TracFone can change carrier networks the handset prefers via the customer inputting specific codes into the handset. To provide access to the network connection feature of a TracFone handset, one would have to remove the system lock.

The main concern of TracFone is the circumvention of the system lock to access the computer platform of the handset. Once circumvented, a person can "reflash" the memory of the computer platform of the phone and wipe away any portion of both TracFone's software and the resident operating system. If all software is totally wiped from the handset, the person then reinstalls an operating system, and the "blank" cellphone can be resold for a profit above the subsidized initial cost of the phone. As the articles attached hereto as Exhibits B,C show, many illegal enterprises, to possibly include terror organizations, routinely engage in this practice.

Moreover, the TracFone handset cannot have the system lock removed such that access to another carriers network is possible. The TracFone billing software does not allow the handset to add an additional billing identification functionality, such as adding another carrier's SIM card. Thus, the only way for a purchaser of a TracFone handset to purposely access a wireless network without TracFone billing software control is to reflash the handset and remove all of the initial software.

TracFone also wishes to address the specific questions asked of Ms. Granick and Mr. Metalitz in the August 14, 2006, letter in terms of the specific software locks of the TracFone handset. Below are the questions asked and TracFone's responses:

**(1) Explain how each of the types of software locks controls access to a copyrighted work.**

For the two locks typically involved on the TracFone handset computer platform, as stated above, there is a "system lock" that prevents access to the computer platform of the handset. The other is a software lock that prevents access to the specific billing and control software of TracFone resident on the computer platform of the handset. In the TracFone handset, there is no specific lock that would meet the definition of "Computer firmware that enables [the] wireless telecommunications handset to connect to a wireless communication network."

**(2) Identify and describe the copyrighted work (or works) with respect to which access is controlled by the software lock.**

At the time of sale to the consumer, the TracFone handset normally has at least two discrete computer programs which are integrated and resident on the computer platform: the TracFone billing software and the operating system code of the handset. For purposes of copyright ownership, TracFone is the copyright holder of the billing software which is integrated into the operating system code on the handset.

**a. Who is the copyright owner of that copyrighted work?**

The handset manufacturer typically is the owner of the operating system code. TracFone is the owner of the copyright in its proprietary billing and control code that is ultimately integrated on the handset.

**b. If the software lock controls access to only a portion of the work(s), identify both the work(s) and the portion(s) of the work(s).**

The system lock allows access to operating system of the handset, and not specifically to the TracFone billing program. However, the removal of the system lock does allow a person to remove some or all of the TracFone software. The TracFone billing software lock prevents specific programming access to the TracFone code.

**(3) What information, process or treatment must be applied in order to gain access to that copyrighted work(s) (or the identified portion(s) of the work(s)).**

The system lock must be circumvented, often via a computer serial connection or other hard electrical connection. Persons often do this with tools used to legitimately service handsets. Once access is had to the computer platform, the software lock of the TracFone software is typically an encryption lock.

**(4) In what respect is access to that copyrighted work controlled by the software lock, including (but not confined to):**

There is full access to the underlying software with removal of the system lock. Specific access to the TracFone billing software is only had by removal of the TracFone software lock. The only exception is that removal of the system lock does allow partial or full deletion of the TracFone code.

**a. what is the nature of the access to the copyrighted work that is controlled by the software lock**

Once the system lock is removed, one will have full access to the respective underlying code on the computer platform.

**(5) How does the software lock control such access to the copyrighted work?**

The system lock prevents any access to the computer code resident on the computer platform at all, to include access to the TracFone software lock. The TracFone software lock controls access only to TracFone's proprietary code.

**(6) Describe whether and how the authority of the copyright owner of the copyrighted work is implicated in the operation of the software lock, including (but not confined to):**

**a. who (e.g., the firmware manufacturer, the handset manufacturer, or the telecommunications service provider) installs and/or activates the software locks on the cellular phone handsets;**

The manufacturer installs the system locks on the handset at the time of installation of the operating system, and the software lock of the TracFone billing software is inherent with installation of billing software on the computer platform.

**b. whether the software locks are applied "with the authority of the copyright owner";**

The system lock and TracFone software lock are applied with the full authority of the respective copyright owners.

**c. if the software locks are not installed by the copyright owner,**

**i. what is the relationship between the copyright owner and the person who installs the software locks;**

In the TracFone handset, the manufacturer makes the handset under contract to TracFone. TracFone is the ultimate owner of the copyright of the handset-resident software.

***ii. are (and if so, in what respect are) the software locks applied with the permission of the copyright owner; and***

TracFone insists that the system lock be installed by the handset manufacturer. The software lock is put on the handset with the installation of the TracFone billing software.

**d. In what respect has the copyright owner authorized the application of information, or a process or a treatment, to gain access to the work.**

TracFone typically does not give access to third parties to the computer platform or TracFone billing code. Programming changes in the handset software can be made on the handset, if necessary.

**(7) In what circumstances, if any, is access to the copyrighted work authorized by the copyright owner.**

TracFone does not allow its customers to access either the operating system or the TracFone software resident on the TracFone handsets. This is because the possibilities of reflashing the handset or committing fraud through purposeful alteration of the TracFone billing software.

*ii. Cellular Telecommunication Carriers and Their Network Locks*

The proponents have stated that there are basically 4 classes of software locks on handsets they seek to have exempted. (1) "SPC"(service provider code) locks which are a number derived from an algorithm that uses the handset's ESN (electronic serial number); (2) "SOC" (system operator code) locks which are a number assigned to a carrier and programmed into the handset that must match the code of the carrier providing service to the phone; (3) **"Band Order Locking"** that restricts the frequencies on which handsets will operate; and (4) "SIM" (subscriber identity module), where a SIM card is a small device that stores a customer's identifying information in some handsets, especially GSM handsets and the card is easily removed and replaced to allow customers to select service providers by placing the appropriate card in the handset. These locks typically control access to the programs resident on the computer platform of the handset, and do not necessarily prevent "flashing" of the handset in the same manner that the TracFone system lock does.

TracFone agrees with the Proponent's statement that "All these technological measures control access to the copyrighted software inside the mobile handset. Either these measures prevent the owner from reprogramming the firmware in his handset, or they stop the owner from operating the firmware inside the phone when he inserts a different SIM card." Comments of Wireless Alliance, p. 13. The TracFone handsets are similar to the handsets sold by the carriers in that once the locks are removed, or in the case of the TracFone handset the "system lock," access to the copyrighted software inside the handset is possible. But, TracFone also notes that the access is full access to the resident code, and not necessarily to any specific layer or module of software. While discussion has been given to a limited exemption of firmware or software that "enables wireless telecommunications' handsets to connect to a wireless communication network," such limited access is not possible as that functionality is not independently accessible through a separate "lock."

*iii. Unlocked Cellphones are Available to the Public*

As shown in Exhibits hereto, the public is able to buy unlocked new and used cellular devices. Should a person want to own a phone that can be used in Europe or on different cellular networks, he or she can simply spend more on the unlocked cellular device than they would on a TracFone or other contract-purchased cellular device as an unlocked cellular device is not subsidized by the carriers or TracFone because they are not guaranteed any future income from the use of the cellular device. For example, as shown in the TracFone pricelist [Ex. A] the price for a Motorola V176 cellphone is $59.99; a comparable unlocked cellphone, such as the Motorola V180, is available for purchase at $129.99. [Ex. D] For very high-end cellular devices,

such as the Nokia 8800 or Palm TREO, the cost of an unlocked device can be well over $500.00. [Ex. D] Therefore, the proposition that unlocked cellphones are unavailable to the public for domestic or international usage is simply untrue.

### D. Argument in Opposition to the Proposed Exemption

*i. TracFone could be put out of business if cellular device system locks are legally circumventable*

The proponents of the proposed exemption argue that unlocked cellular handsets will serve the public interest by allowing consumers to switch carriers freely. TracFone suggests that this policy argument simply does not apply to TracFone's handsets—the network carrier for the cellular service is simply not chosen by the user of the phone. Instead, TracFone allows its handset to utilize a carrier's network as determined by TracFone, such network connectivity typically set by TracFone based upon where the handset is sold, the handset technology (e.g. CDMA, GSM, etc.), and other rate agreements with carriers. As the customer pre-pays TracFone for the airtime used, it is a fixed price to the customer regardless of which network the phone actually uses. Therefore, the main thrust of the proponents' arguments do not apply to TracFone. However, TracFone's handsets would fall within the language of the proposed exemption as it could permit removal of the system lock, and thus the proposed exemption is overbroad. TracFone provides a valuable service for its customers and provides a choice versus the post-paid cellular carriers, which is exactly what the proponents are seeking. Yet the proposed exemption's effects would be catastrophic for TracFone.

TracFone's business model relies on providing low-cost handsets to its customers. TracFone's target market includes college students, the elderly, and other individuals who are unwilling or unable to pay large, up-front costs associated with buying a cellular telephone. To keep these initial costs to the customer low, TracFone greatly subsidizes the cost of the handset and thereby allows the customer to purchase a TracFone handset for far less than its fair market value. TracFone subsidizes a handset's fair market value to entice customers into the TracFone system, with an average of a $40-$50 subsidy per phone. While this forces TracFone to accept an initial loss on the sale of that handset, TracFone anticipates that the customer will also purchase airtime from TracFone to operate the handset, and that the service fees and airtime purchases that the customer pays over the life of the handset will allow TracFone to recoup its initial subsidy.

TracFone faces a growing trend of individuals attempting to exploit its initial subsidy of its handsets. In a popular scheme, individuals purchase a TracFone handset at its subsidized, lower cost, and then defeat the security software that protects the handset's operating system from tampering. They delete the operating system from the handset ("reflashing") and then install another operating system onto the device. In this manner, an individual can create an unlocked, blank handset at the discounted cost of a subsidized TracFone handset. Because the subsidized cost is far less than the retail cost of an unlocked, blank handset, the individual conducting this scheme can resell the handset and reap an immediate windfall. By engaging in this scheme on a large scale, often involving hundreds or thousands of individual handsets, those engaging in this scheme can derive significant amounts of money at TracFone's expense. The

resale of these handsets is particularly popular in the Far East and Latin America because the handsets are compatible with local cellular networks and there is a significant demand for low-cost, unlocked handsets.

In short, the DMCA provides TracFone with recourse against those seeking to buy, remove the system lock, and them modify the handset, or reflash and resell its handsets. For this reason, TracFone brought a claim under the DMCA (among other claims) against a company conducting this type of operation in *TracFone v. Sol Enterprises*, a civil action filed in the Southern District of Florida. If the proposed exemption is granted, however, and TracFone is left without a significant tool to prevent this illicit conduct, TracFone will be forced to charge full retail value for its handsets. As stated above, this will significantly increase the cost of TracFone's handsets to customers. This will make TracFone's handsets prohibitively expensive for its target customers, and could effectively end TracFone's business.

### a. The complete removal of the system lock allows copyright infringement

Once the system lock is removed, the components resident on the computer platform of the TracFone handset are all accessible, a person can then either remove one or more programs, flash the entire phone to make a "blank," or can alter the software or firmware to change the functionality of the phone. The proponents admit that full access to the resident software is needed to achieve their goals, as stated in their comments: "[c]ustomers who want to use their handsets on a different network must circumvent the locking software to access the computer program that allows the phone to operate." (emphasis added) [Comments of Wireless Alliance, p. 3].   Once the system lock is removed, full access the copyrighted code can be had, and the TracFone billing software and operating system components can be copied, altered, or partially or fully deleted, in violation of the TracFone's copyright. See, e.g. US v Manzer, 69 F.3d 222, 227 (8th Cir. 1995)(derivative computer program having 70% of copyrighted code held to be infringing).

### b. TracFone would have to dramatically increase the price of the handset to the public

As shown above, TracFone subsidizes the cost of the TracFone handset to the consumer, such subsidy often exceeding $100. (*See, e.g.* prices in Ex. A compared with prices in Exs. D,E) Without the ability to stop purchasers of the TracFone from altering the TracFone software and making blank handsets, TracFone could no longer afford to subsidize the initial sale of the handset.

### ii. The Proponents for the Exemption Have Not Met Their Burden to Show a Substantial Adverse Effect upon Noninfringing Uses

To meet their burden to exempt a class of works from the prohibition on circumvention, the proponents must make a "a showing that the prohibition has or is likely to have a substantial adverse effect on noninfringing uses of a particular class of works." Notice of Inquiry, Federal Register: October 3, 2005 (Volume 70, Number 190). Further, "proponents of an exemption must provide evidence either that actual harm exists or that it is 'likely' to occur in the ensuing 3-year period. Actual instances of verifiable problems occurring in the marketplace are generally

necessary in order to prove actual harm." *Id.* Here, the proponents have not shown any evidence of actual harm, and only made a general statement of harm to consumers and the environment. The proponents have simply not met their burden to support the requested exemption.

### a. The proponents do not address the TracFone devices and business model, or the specific harm that TracFone would suffer

As discussed above, the arguments advanced by those supporting the proposed exemption simply to not apply to TracFone. During the Hearing, it was admitted by the Copyright Office that TracFone model "is a little different," and the proponents counsel agreed. Hearing Transcript, pp. 54-55. TracFone does not limit its customers to obtaining cellular service from any particular carrier--the carrier is selected by TracFone and is unknown to the customer. TracFone merely restricts its customers by requiring that they purchase their cellular airtime from TracFone and, in exchange, TracFone subsidizes the cost of its handsets to make them affordable to its customers. The customer receives a handset at an artificially low cost; TracFone receives a potential customer for its services. The freedom of the prepaid model distinguishes TracFone from the contract based, post-paid cellular carriers telecommunications model who are the source of proponents' complaints.

### b. The proposed exemption is unnecessary to advance the interests of cellular customers.

Consumers of cellular services simply do not need the proposed exemption to obtain the freedoms that they seek. Instead, they currently have two available means at their disposal – (1) they can ask their carrier to unlock their handset; or (2) they can purchase an unlocked handset at full retail price.

The proponents of the proposed exemption have argued that the exemption is necessary to allow cellular customers to use their cellular handsets with a cellular carrier other than that which sold them the handset. Therefore, they argue, they should be allowed to defeat the security device that prevents the handset from accessing a competing carrier's network at the customer's sole discretion (which is something the TracFone handset cannot do because of the resident billing software). During the hearing on this proposed exemption, the proponents of the exemption conceded that cellular carriers will unlock their handsets at the customer's request. See Hearing Transcript, pp. 18, 30. The customer might not know that cellular carriers make this option available to them, but no customer provided any evidence to suggest that carriers are unwilling to provide this service to their customers if asked. While TracFone does not unlock its handsets for customers due to its prepaid business model, many major carriers undisputedly do.

Additionally, unlocked cellular handsets are readily available to customers. If customers truly wish to obtain cellular handsets that allow the customer to change cellular carriers at will, the customer need only purchase an unlocked handset at full retail value. Numerous companies sell cellular handsets without limitations on the customer's network choice in any way. See Exs. D,E. These handsets are not prohibitively expensive, however, and often require the customer to take the handset to a cellular carrier to gain access to the carrier's network or purchase a separate SIM card. Most consumers ignore this option because they wish to avoid the high cost of the device, it requires the consumer to make an additional trip to the cellular carrier to activate the device, and, since the consumer will pay the service fees and rates for using the cellular carrier's

12

network regardless of where the consumer obtained his handset, the consumer generally prefers to get the carrier-offered discount on the cost of the handset.

The proponents of the proposed exemption are being disingenuous. They do not truly seek freedom of choice in purchasing cellular handsets and service. They merely wish to obtain this freedom without paying for it. They argue that they should be able to take advantage of the subsidies and discounts made available by cellular carriers without assuming the corresponding obligations to the carriers that make those subsidies and discounts possible. The proponents wish to get something for nothing, and this desire does not justify an exemption from the prohibition.

### c. The isolated incidents cited by the proponents are insufficient to warrant the requested exemption of all cellular device software locking mechanisms

The incidents cited by the proponents do not show actual harm. For example, the fact that commentator Pinkerton was unaware that unlocked GSM phones are available for purchase specifically for international usage does not show harm from handset software locks. Furthermore, the purported poor customer service of the carriers to unlock the handsets of their customers hardly is evidence of the carrier's refusing to do so. This evidence is insufficient to show either that actual harm exists or that it is likely to occur in the ensuing 3-year period after this rulemaking such that handset locks must be legally circumventable.

### d. The case law cited by the proponents fail to establish any harm caused by application of the DMCA

Additionally, the case law cited by the proponents of the proposed exemption does not support the proponents' argument that the DMCA places the public at risk of legal liability. Confusingly, the proponents attempt to demonstrate this alleged harm by citing several cases in which courts have found that the defendant's conduct did not violate the DMCA. [Comments of Wireless Alliance, p. 9] *See* Chamberlain Group, Inc. v. Skylink Tech., Inc., 381 F.3d 1178 (Fed. Cir. 2004) (upholding the district court's grant of summary judgment in favor of the defendant on plaintiff's claim under the DMCA); Lexmark Int'l, Inc. v. Static Control Components, Inc., 387 F.3d 522, 554 (vacating the district court's grant of a preliminary injunction to the plaintiff because the plaintiff "failed to establish a likelihood of success on any of its claims, whether under the general copyright statute or under the DMCA."); Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc., 421 F.3d 1307, 1319 (Fed. Cir. 2005) (vacating the district court's grant of a preliminary injunction to the plaintiff because "[w]e conclude that it is unlikely that [plaintiff] will prevail on its claim" under the DMCA.). Because these cases did not involve violations of the DMCA, the court's application of the DMCA did not cause any defendant to suffer harm. At most, these cases might demonstrate that litigants assert claims under the DMCA in litigation. But they fail to show any actual harm suffered by any defendant as a result of claims under the DMCA that the courts have ultimately found to be meritless.

*iii. Public Policy Strongly Disfavors the Removal of TracFone's Software from
Cellular Devices*

As described above, the proposed exemption would hinder TracFone in preventing those engaged in a scheme to buy TracFone handsets, defeat the security software contained on those handsets, reflash the handsets, and install a new operating system on them. The public has a clear interest in declaring this type of behavior illegal.

*a. The proposed exemption simply allows members of the public
to avoid paying the full price for an unlocked cellphone*

Additionally, the public has an interest in ensuring the continued availability of TracFone's products. TracFone provides additional choices to consumers of cellular services. If consumers wish to pay the full retail cost of an unlocked, blank handset and use it on the network of their choosing, they may do so. See Exs. D,E. But if consumers wish to pay a lower, subsidized rate for a TracFone handset, and purchase airtime from TracFone, they may do that also. TracFone's business model thereby increases the options available to consumers. But if the proposed exemption is granted, and individuals are free to exploit TracFone's subsidy at will, TracFone will no longer be able to operate under its current business model, and consumers will lose the choice that TracFone currently provides.

*b. There are many criminal enterprises that engage in the removal
of the TracFone software*

The reselling of "blank" TracFone handset creates a large black market and supports illegal endeavors. As several authorities have already identified, this scheme to unlock and resell TracFone's handsets represents an excellent method to raise illicit funds from the in blank handset trafficking. This particular funding mechanism has been implicated in supporting terrorism concerns. As with any black-market enterprise involving large amounts of unreported income, law-enforcement agencies have become increasingly suspicious of groups obtaining money through this scheme. See generally, Exs. B,C. This particular scheme is uniquely troublesome for law enforcement because the groups conducting it are not only deriving substantial funding through the black market, but also engaged in trafficking black-market goods across U.S. borders. The Department of Justice has already arrested several participants to identify whether they are connected to terrorist organizations or whether the illicit profits generated through their enterprises support terrorist activities. *Id.*

V. Conclusion

An exemption from the DMCA for "Computer programs that operate wireless telecommunications handsets. (Mobile firmware)," is not warranted.  The proposed exemption simply allows persons to make an unlocked cellphone at the expense of TracFone or a carrier.  Furthermore, allowing persons to circumvent the TracFone handset system locks would seriously harm TracFone's business model and it's customers.  The proponents for the exemption have not met their burden and shown any substantial adverse effect upon noninfringing uses from the handset software locks, and requested exemption should not be granted.

Respectfully submitted:

_____/s/_____          Date: September 11, 2006
Lance D. Reich, Esq.
CARLTON FIELDS, P.A.
1201 West Peachtree Street, Suite 3000
Atlanta, GA 30309-3455
Telephone: (404) 815-3400
Facsimile: (404) 815-3415
e-mail: ldreich@carltonfields.com

James B. Baldinger, Esq.
CARLTON FIELDS, P.A.
222 Lakeview Avenue, Suite 1400
West Palm Beach, FL 33401-6149
Telephone: (561) 659-7070
Facsimile: (561) 659-7368
e-mail: jbaldinger@carltonfields.com

TracFone Product Listing                    http://www.tracfone-c⌣s.com/direct/tr/phonelist.jsp?tech=GSM4&tec...

 **TRACF⦿NE**
nationwide prepaid wireless   **TracFone Store**        **Help   Shopping Cart**

`<IMG SRC="http://ad.doubleclick.net/activity;src=1133416;type=traff680;cat=tracf369;ord=1;num=1?" WIDTH=1 HEIGHT=1 BORDER=0>`

 **On Any Order of $19.99 or More**
*Restrictions may apply

**no contracts   no monthly bills   no credit checks   nationwide service   pay as you go**







| | | | |
|---|---|---|---|
|  **Motorola C139** [$19.99<br>Compact, ergonomic and stylish<br>Color display with screen savers and wallpaper<br>20 pre-loaded ringtones<br>**details**  **add to cart** | | **Motorola C155** [$29.99<br>Compact, ergonomic and stylish<br>Vivid color screen<br>20 pre-loaded ringtones<br> **details**  **add to cart** |
| **Nokia 2600** [$39.99<br>Color display<br>Screen savers & wallpapers<br>34 pre-loaded ringtones<br>**details**  **add to cart** | | **Motorola V170** [$49.99<br>Vivid color screen<br>Compact, flip phone design<br>20 pre-loaded ringtones<br> **details**  **add to cart** |
| **Motorola V176** [$59.99<br>Full color display<br>Hands-free speakerphone<br>20 ringtones plus downloadable ringtones<br>Pre-loaded games, pictures, wallpapers and screensavers<br>**details**  **add to cart** | | **Motorola C261** [$79.99<br>Camera phone with 4X zoom<br>Take & send pictures in seconds<br>Full color display<br>Built in hands-free speakerphone<br>Downloadable ringtones<br> **details**  **add to cart** |

†If you are not satisfied with your phone and/or accessory purchase, simply return it to us within 30 days and we will replace it or give you your money back. It's that simple. TRACFONE Prepaid Wireless Airtime Cards, 1 year prepaid wireless service cards, or unused minutes are non-refundable.

[†]The 200 Bonus Minute Offer is valid through September 28, 2006. To receive your 200 Bonus Minutes, use Promotional Code 50809 when adding your 1 Year Prepaid Wireless Service Card to your TracFone at www.tracfone.com or by calling us at 1-800-867-7183 by September 28, 2006.

[†]Free Ground (3 Day) Shipping when you buy a phone, phone bundle (phone + airtime card), or any add-on accessory. This offer is only available with the purchase of any phones, accessories, and/or phone and airtime card combination during August 1, 2006 – September 30, 2006.

Refunds will not be provided for any purchases of airtime, prepaid plans or annual service cards which include a phone.

[†]TRACFONE will repair or replace your phone and/or accessory that contains a manufacturer's defect that hinders or prevents its proper operation for up to one year (90 days on all accessories) from date of purchase (proof of purchase required).

All offers are subject to change or discontinuance by TRACFONE Wireless, Inc. at any time without further notice. TRACFONE Wireless, Inc. reserves the right to limit quantities and to reject or cancel orders in its sole discretion. Product not for resale or distribution. Airtime valid only with handset purchased.

© 2006, TracFone Wireless, Inc. All Rights Reserved

```
<a
href="http://oascentral.chron.com/RealMedia/ads/click_lx.ads/chron.com/news/story/956493364/Top/chron/20
target="_blank"><img
src="http://images.chron.com/banners/l/legalnotice/public_posting/legalnotice_post_728x90.gif" width=728
height=90 alt="Click Here" border=0></a>
```

HoustonChronicle.com -- http://www.HoustonChronicle.com | Section: Business

*Aug. 16, 2006, 7:36AM*

# Profiteers reselling cell phones rankle industry

**By JAMIE STENGLE**
**Associated Press**

DALLAS -- People who buy prepaid cell phones in bulk to resell for profit are raising terrorism suspicions for law enforcement officials and causing big problems for wireless providers.

"Very simply, what's going on here is you can buy a prepaid phone in Wal-Mart or Kmart for X and sell it across the border for Y, and Y is more than X," said Joe Farren, director of public affairs for CTIA-The Wireless Association.

Three Texas men were arrested last week in Michigan with about 1,000 cell phones, mostly prepaid TracFones, in their vehicle. Local prosecutors charged them with collecting or providing materials for terrorist acts and surveillance of a vulnerable target for terrorist purposes and said investigators believed the men were targeting the 5-mile-long Mackinac Bridge.

However, the FBI said it had no information to indicate the men had any direct connection to known terrorist groups and the men themselves told a magistrate they were simply buying the phones to resell them for a profit.

One man's wife told The Associated Press that the men went to Michigan because so many people in the Dallas area were making the same types of purchases that they had to travel long distances to find the phones in stock.

Such profiteering hurts cell phone companies, said Roger Entner, an analyst for Ovum, a technology, research and consulting firm.

He said that such prepaid phones cost the companies that make them around $80 to $100. They then sell the phones for less — $20 to $70 — in hopes that customers will continue to load more minutes onto the phone, making the company money.

"The reason they subsidize the handset is to make it easier for people to buy the phones," said Entner, who

added that such phones are oftentimes bought by people who don't have a lot of money. "They want you to get the phone and then use it."

But there are those who buy the phones in bulk, strip out the software and load them with software that will work in other countries, most likely Latin America because the systems are similar, he said.

"It's a huge problem," Entner said. "It can bankrupt wireless carriers."

Therefore, he said, companies often try to restrict the number of phones that a person can buy.

That includes TracFone, the leading provider of prepaid wireless service in the U.S., which says it works with retail outlets to enforce limits on the sale of the phones.

"TracFone is aware of instances where individuals are purchasing the lowest-priced TracFone models in bulk, with no intention of activating these handsets with TracFone wireless service, but to remove the TracFone software and resell the altered handsets at a profit," Derek Hewitt, senior vice president for marketing at TracFone said in a statement. "Sales to these individuals cause extensive losses to TracFone..."

Cingular spokesman Mark Siegel said that their outlets limit the purchase of such prepaid cell phones to no more than three, "ensuring that it's used for what it's designed to do."

"We are in business to have people use our network," he said. "That's what we want people to do."

FBI spokesman Stephen Kodak said that the only issue with such enterprises is where the profits from the resale are going, whether profits are being used to generate money for terrorism.

"We haven't seen any nexus at this time," Kodak said.

A Dallas Police Department spokeswoman said that they have been alerted by clerks from time to time because of large prepaid cell purchases, but there is nothing illegal about that in itself.

Still, untraceable prepaid cell phones at least have the potential for illegal use, said Bob Jarvis, a professor of constitutional law at Nova Southeastern University in Fort Lauderdale, Fla.

"Because prepaid cell phones are untraceable it has become a very favored means of communication for organized crime and other people who are up to no good, including terrorists," Jarvis said.

He also points out that while the person buying the phones in bulk might not be involved in any criminal activity, the third party buying the phones could be using the profits for illegal purposes.

"If you're reselling them and reselling to a drug dealer, you are facilitating a criminal organization," Jarvis said.

"It used to be that cell phones were just for communication purposes, now we know they can be used for a detonator for a bomb," he said.

Earlier this year, the FBI and the U.S. Department of Homeland Security sent out joint bulletins to police departments nationwide warning about the bulk purchase of phones for personal profit or financing terrorism.

The focus on people buying cell phones in bulk concerns 26-year-old New Yorker Michael Vargas, who said he buys and resells the phones.

Vargas, who contacted The Associated Press, said the widespread trade in TracFones is legal, adding that he had been questioned multiple times by police during his buying trips but always let go.

HoustonChronicle.com - Profiteers reselling cell phones rankle industry          http://www.chron.com/cs/CDA/printstory.mpl/headline/biz/4120493

———

*AP writer Sarah Karush in Detroit contributed to this report.*

HoustonChronicle.com -- http://www.HoustonChronicle.com | Section: Business
This article is: http://www.chron.com/disp/story.mpl/headline/biz/4120493.html

# Newsday.com

## Cell phones are new terror gadgets

BY LOU DOLINAR
Newsday Special Correspondent

August 17, 2006, 6:17 PM EDT

In recent months, both the FBI and the Homeland Security department have issued alerts to local police departments to watch out for suspicious bulk purchases of thousands of cheap prepaid cell phones. Those alerts in turn have triggered a spate of investigations and arrests -- many of them later quietly dropped.

Anti-terrorism officials fear, and have documented, the use of cell phones as bomb detonators in Madrid, Bali, Saudi Arabia, and Iraq, according to counter-terrorism expert Vincent Cannistraro. And the devices are popular with terrorists, drug traffickers and other criminals, since their ownership can't be established. Some bloggers have theorized these purchases, many by Mideastern men, point to a massive upcoming wave of bombing attacks in the United States.

But in the most recent case, in Bay City, Mich., terror charges against three Palestinian-American suspects were dropped and replaced with federal fraud indictments.

Telecommunications experts say the case is typical of what's actually going on with most of the mysterious phone purchases that have featured prominently in Internet conspiracy theories.



LONG ISLAND **PLASTIC SURGICAL** GROUP, PC

www.lipsg.com

The majority are part of a profitable black market, a sort of electronic chop shop that can involves hacking cell phones and components for resale -- sometimes legally, sometimes not. Complicating matters for the police: In some cases, they suspect that terror cells have bootlegged cell phones to raise cash, just as they engage in credit card fraud and cigarette smuggling.

In the Michigan case, after terrorism charges were dropped, Maruan Muhareb, 18; Adham Othman, 21; and Louai Othman, 23, all of the Dallas area, were charged Wednesday in Bay City with conspiracy to defraud consumers and telephone providers by trafficking in counterfeit goods. They also were charged with money-laundering. Prosecutors say that they used proceeds from the cell phone transactions to buy more phones.

Police investigated after a Wal-Mart clerk alerted them to the purchase of dozens of cell phones. More than a thousand were found in the van they were driving.

There's nothing illegal about buying huge quantities of cell phones at retail. It's what may happen next that's the problem: some schemes involve altering the programming of a phone. That can violate federal law, including the Digital Milennium Copyright Act, as well as contractual obligations by the buyer. And reselling an improperly authorized phone may run afoul of the law in foreign lands that carefully protect their local phone monopoly.

According to Ryan Reith, an analyst for the IDC technology company, the scamsters take advantage of a hole in the economics of pre-paid phones. All cell phone vendors subsidize the purchase price of their phones to some degree because the phone is set up to work only on the network of the vendor. For those with contracts, this locks the buyer in for a year or more, which allows the provider to recoup the investment. In the case of pre-paid phones, sold by firms like TracFone, Cingular Wireless, Sprint Nextel Corp. and Deutsche Telekom AG's T-Mobile USA, there's no requirement for continuing to use the service, though most people continue to use the phone and the vendor usually makes back his investment as they buy more pre-paid minutes.

Black marketeers electronically unlock these phones so they can be used on other phone networks, a process known as "reflashing," using personal computers, interfaces, and programs that are widely available over the Internet. They then resell the phones. This give the buyers a new phone, and they can switch carriers at will, and find cheaper rates. In

some cases, the unlocked phones have features that aren't available on phones native to a network.

In a legal variation, the phone is discarded, and the batteries, charger and included minutes of air time are broken down and sold separately -- invariably for more than the phone.

Reflashed and unlocked phones may be exported to Mexico, the Mideast and China, where local companies aren't willing to subsidize users as heavily as do American firms that sell spanking new phones for $19.95. "It's a huge market in Africa, too," said Reith. "You go to the back of a store, and there's a guy selling all kinds of phones out of a suitcase." Once outside the country, the phones are equipped with a local SIM (subscriber identity module) that assigns a legal number and identifies the phone to the network. Homeland security officials say that these phones may be sold for as much as $300, although Reith doubted they were that expensive. Only some GSM-model U.S. phones have the right frequencies to do this.

Just last week, Saudi Arabia announced a crackdown on black market vendors who have been selling unauthorized phones for cash, then equipping them with legitimate SIMs, though it's unclear where the phones originated. More than 40 people were arrested. Alarmed by both widespread hacking of the local phone system, as well as use of cell phone detonators in several local bomb plots, Saudi officials are attempting to require that all cell phones, prepaid or not, be registered with the government. A spokesman one of the local cell phone companies, SAWA, said that phone bootleggers were so blatant they were putting legitimate dealers out of business. Unlike U.S. customers, who usually sign for long-term plans, most Mideastern cell phone buyers use prepaid certificates.

Here in the United States, all the major prepaid carriers, including TracFone and Virgin Mobile USA, say they've been hit hard by these black market operators. F.J. Pollak, president and CEO of TracFone, one of the firms that was said to have been defrauded in the indictment, told Newsday that "TracFone has sued and prosecuted people who are engaged in this kind of activity. People who are buying these phones from retailers and modifying them are committing a crime and committing a conspiracy." He was referring to a February 2006 case that TracFone brought against one reseller, the Sol Wireless Group, for claimed violation of the Digital Millennium Copyright Act.

Besides suing and pressing for official prosecutions, cell phone vendors struggle in other ways to limit the resale of their phones. TrackFone, for example, has been tweaking its programming to make reflashing more difficult. Pollak says that TracFone only sells its packages to "big box" stores like Walmart that are able to control the number of phones sold to individual buyers. Others limit individual purchases, usually to no more than three phones at a time, and advise their resellers accordingly. A security official at one major prepaid phone company has been quoted as saying that 90 percent of buys that exceed that number never are used on the company's network and end up on the black market.

Investigations of suspected cell phone pirates, many of them Muslim, have provoked charges of racial profiling from civil rights groups. But according to Pollak, while the police may be interested in terrorists, the clerk who alerted them was merely following standard operating procedure to protect TracFone, a valued Wal-Mart supplier. And he says that unless cell phone banditry is stopped, prepaid phone companies are going to have to raise their purchase prices to make it uneconomical -- hurting students, low-income people, and the elderly who are their biggest customers.

Copyright 2006 Newsday Inc.

International Cell Phones, Unlocked Phones     http://www.1800mobiles.com/incelsolclic.html

Browse and compare T-Mobile, Nextel, Verizon cell phones, Cingular phones & cell phone accessories.

Free Shipping! No Sales Tax*



Wireless, Mobile & Beyond...

my account    customer care    view cart



SHOP BY CARRIER     Authorized Dealer  **NEXTEL**    **Sprint**  Corporate Accounts

 | Cell Phone Accessories | Bluetooth Accessories | **Camera Phones** | **Free Phones** | **Family Plans** | **International Cell Phones** | **PDA Phones**

HOME PAGE                   Enter Your Search    **Go**    **Cellular Accessories Finder** **Go**

∴ **Sign up & Save!** Join the 1800mobiles.com Newsletter! |

**You are here:** International Cell Phones, Unlocked Phones



**email to a friend**

# International Cell Phones: Unlocked World Phones

Any of the world phones below are network unlocked and without service agreement. They can be used on all GSM frequencies in the US, Europe and Asia. You can also use these international cell phones (world phones) in the US with any North American GSM carrier and abroad with European/Asian/Latin American GSM carriers either in "international roaming" with your US carrier or using local prepaid minutes.
Most European carriers such as Telecom Italia, Vodafone etc offer prepaid cards that can be purchased in airports, news-stands and used with your international cell phone.

These unlocked phones are not available for service activation with AT&T Wireless Service.

**Click Here to buy an international cell phone with T-Mobile Service**
**Click Here to buy an international cell phone with Cingular Service**









**Samsung SGH-X200 Tri-Band Wolrd Phone (Network Unlocked)**

**Regular price: $199.99**
Our price: $134.95

**Motorola E550 Quad-Band Camera Phone (Network Unlocked)**

**Regular price: $229.95**
Our price: $184.95

**Motorola Silver V3 RAZR Cell Phone - Network Unlocked**

**Regular price: $279.99**
Our price: $224.95

**Motorola Black RAZR V3 - Network Unlocked**

**Regular price: $269.99**
Our price: $219.95