IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 06-cv-22942-GRAHAM/O'SULLIVAN

TRACFONE WIRELESS, INC.         )
                                )
    Plaintiff,                  )
                                )
v.                              )
                                )
JAMES H. BILLINGTON, LIBRARIAN OF )
CONGRESS and MARYBETH PETERS,   )
REGISTER OF COPYRIGHTS,         )
                                )
    Defendants.                 )
_____)

**PLAINTIFF'S NOTICE OF FILING RELEVANT LEGISLATIVE HISTORY**

Plaintiff, TracFone Wireless, Inc., pursuant to the Court's request at the April 11 motion hearing, directs the Court to the following legislative history materials relevant to the issues before the Court. Copies of the materials are attached. Because they are voluminous, the materials are summarized below. TracFone would also be glad to submit a legal memorandum addressing these materials or any other issues should the Court wish.

**A.   The following legislative history is relevant to TracFone's argument that its interests are protected by the Act.**

The following legislative history of the Act is relevant to the issue whether TracFone's interests are protected by the Act, and TracFone was given a right of action by the Act. These materials show that the prohibition on circumvention was

intended to be very broad, applicable to "any and all works" and would apply across the board "until and unless" a specific exemption were created by rulemaking proceedings such as the flawed proceedings at issue in this lawsuit. As the legislative history summarized below shows that the interests to be protected by the Act were extremely broad, indeed broader than the protections previously provided under copyright law, it shows that TracFone's interests are within the zone of interests protected by the Act.

The Digital Millennium Copyright Act was created to implement the United States' treaty obligations.  The Act had a broad goal: "The 'Digital Millennium Copyright Act of 1998' is designed to facilitate the robust development and world-wide expansion of electronic commerce, communications, research, development, and education in the digital age."  S. Rep. No. 105-190 (1998), 1998 WL 239623 at *1-2.

To implement the Act's broad goals, the Act, as originally introduced in both houses, contained a flat prohibition on circumventing technological measures that controlled access to copyrighted works.  Id. at *36, 86.  The bill that emerged from the Senate included this prohibition, with only limited express exceptions.  Id. at *86.  Meanwhile, the bill was referred to the House Judiciary and Commerce Committees.  Id. at *6-7.

It was widely recognized throughout the legislative process by both opponents and proponents of the bill, as well as members of Congress, that the prohibition on circumvention went beyond the protections accorded copyright owners under copyright law, and would prohibit circumvention even where the ultimate use made of the copyrighted material was lawful.

Thus, the Senate Judiciary Committee recognized that the Act's anticircumvention protections were intended to go beyond merely protecting traditional copyright interests of owners, such as prohibiting the copying of a copyrighted work.  Id. at *11.  Instead, the Act also aimed at protecting measures that prevented even the access to a copyrighted work.  Id. at *12.  This was new to the law.  While infringement has always been unlawful, "prior to this Act, the conduct of circumvention was never before made unlawful."  Id.

Thus, even if it was anticipated by Congress that "most" of the acts of circumvention would occur in the course of conduct that implicated the copyright owners' rights under copyright law, the Act's prohibition was by design not limited to such conduct, but instead remained a "general" prohibition on gaining unauthorized access to a work by circumventing technological measures that control access to the work.  See id. at *29-30.  Accordingly, as originally proposed, the Act contained a broad, flat, general prohibition on circumvention, together with

limited express exceptions.  It did not contain a provision for rulemaking.  See id. at *86-88.

Critics in committee testimony urged Congress to water down the prohibition by limiting its scope to acts of circumvention that contemplated infringement, in order to protect the rights of users of copyrighted material.

For example, Allan R. Adler, Vice President for Legal and Governmental Affairs of the Association of American Publishers, testified before the House Judiciary Committee's Subcommittee on Courts and Intellectual Property in 1997.  See WIPO Copyright Treaties Implementation Act (H.R. 2281): Before the Subcomm. on Courts and Intellectual Property, Comm. on the Judiciary, 105th Cong. (1997) (statement of Allan R. Adler), 1997 WL 575034.  Mr. Adler responded to the criticism that the bill as proposed protects circumvention technologies that are not tied to infringement of copyright.  He pointed out that such broad protection is consistent with the United States' treaty obligations, which, by their terms, do not limit their protections to technological measures that prevent infringement.  As he explained, the Diplomatic Conference "clearly expected that circumvention would be treated, not as an infringement of copyright, but as a separate and distinct offense, for which effective legal remedies are required."  1997 WL 575034 at *7.

Critics of the bill expressed a similar understanding of its scope. See Statement of Gary J. Shapiro, on behalf of the Home Recording Rights Coalition and Consumer Electronics Manufacturer's Association before the same subcommittee, 1997 WL 586052 at *1-3 (Sept. 17, 1997) (proposed section 1201 would give copyright proprietors new rights beyond those conferred by the copyright law and "does not even require that the 'circumvention' be in aid of copyright infringement"); testimony of Douglas Bennett, President, Earlham College before the same subcommittee, 1997 WL 586041 at *3 (Sept. 17, 1997) ("violations of Section 1201 are not tied to infringement of any intellectual property right held by a copyright owner . . . H.R. 2281 criminalizes activities that are not necessarily related in any way to copyright infringement").

Similar views were expressed by both proponents and critics before the House Commerce Committee in 1998. For example, Steven J. Metalitz on behalf of the Motion Picture Association of America stated that the anticircumvention provision is not itself a copyright protection provision, even though the law would be codified in Title 17. Instead, it protects the technological measures that control access themselves. See H.R. 2281, WIPO Copyright Treaties Implementation Act: Before the Subcomm. on Telecommunications, Trade and Consumer Protection, Commerce Comm., U.S. House of Reps., 105th Cong.

5

(1998) (written testimony of Steven J. Metalitz on behalf of the MPAA), 1998 WL 300239, at *6. Mr. Metalitz argued that Congress should reject attempts to water down the bill in various ways, such as limiting the prohibition to acts that are in furtherance of an act of infringement. Id. at *7.

Once again, critics who voiced their concerns revealed the same understanding of the broad scope of the prohibition, as prohibiting virtually any circumvention of technological measures controlling access to copyrighted works. See, e.g., Copyright Treaties Implementation Act: Before the Subcomm. on Telecommunications, Trade and Consumer Protection, Commerce Comm., U.S. House of Reps., 105th Cong. (1998) (testimony of Jonathan Callas, Chief Technology Officer, Network Associates, Inc.), 1998 WL 310011 at *2 (H.R. 2281 would prohibit virtually any circumvention of technological protection measures controlling access to copyrighted works, regardless of the purpose of such circumvention); Testimony and Statement for the Record of Marc Rotenberg, Director, Electronic Privacy Information Center, 1998 WL 296460 at *5-6 (June 5, 1998) (noting that the Act's prohibition against circumvention was "very broad," both with respect to what a "technological protection mechanism is" and as to what "circumvention" is, that "simply 'removing' or 'deactivating' a bit of software would be considered circumvention," and suggesting language should be

6

changed to limit the prohibition to acts done in furtherance of an act of infringement).

The House Commerce Committee also recognized the broad nature of the prohibition in the bill as originally proposed, as well as the concerns of critics. See H.R. Rep. No. 105-551, part 2 (1998), 1998 WL 414916. Thus, its Report recognizes that HR 2281 was "about much more than intellectual property. It defines whether consumers and business may engage in certain conduct, or use certain devices, in the course of transacting electronic commerce." Id. at *22.

The Committee recognized that liability under the anticircumvention provisions would prohibit conduct regardless whether it had anything to do with infringement, but believed that such new prohibitions were necessary to counter the unique threats posed to copyright owners by the digital environment. Id. at *24-25. To provide that protection, the prohibition on circumvention was "broad" and implicated specific conduct even if the ultimate use intended by the circumventer would not be actionable under the copyright law. Id. at *25-26.

The Committee had held hearings in which it became apparent that numerous interests had opposed the bill. The Committee was also concerned about the implications of the bill on fair use. In response to these concerns, the Committee suggested a number of different qualifications on the protection against

circumvention. One such suggestion, which was ultimately adopted by Congress, was to provide for a periodic rulemaking proceeding in which exemptions from the broad prohibition could be created for users who could be adversely affected in their ability to make lawful uses of copyrighted works. Id. at *2-3, *36. But the Committee Report concluded, "[U]nless and until" the Secretary makes a determination in that regard, "the regulatory prohibition is presumed to apply to any and all kinds of works . . . ." Id.

Ultimately, in keeping with the Commerce Committee's suggestion, Congress chose not to water down the express prohibition on circumvention by tying it to acts of copyright infringement. Instead, as suggested by the Commerce Committee, Congress engrafted onto the provision prohibiting circumvention another provision for the creation of exceptions by rulemaking by the Librarian of Congress, upon recommendation of the Register and in consultation with the Assistant Secretary of Commerce.

Senator Ashcroft summarized this result when the bill emerged from the conference committee by noting that:

> [The] conferees adopted an alternative to section 1201(a)(1) that would authorize the Librarian of Congress to selectively waive the prohibition against the act of circumvention to prevent a diminution in the availability to individual users . .. of a particular category of copyrighted materials. As originally proposed by the Administration and adopted

8

>       by the Senate, this section would have established a
>       flat prohibition on the circumvention of technological
>       protection measures to gain access to works for any
>       purpose, and thus raised the specter of moving our
>       Nation towards a 'pay per use' society.  Under the
>       compromise embodied in the conference report, the
>       Librarian of Congress would have authority to address
>       the concerns of libraries, educational institutions,
>       and other information consumers potentially threatened
>       with a denial of access to categories of works in
>       circumstances that otherwise would be lawful today.  .
>       . ."

See 144 Cong. Rec. S11,887-01 (Oct. 2, 1998), 1998 WL 716423.

In short, the operative provision broadly prohibiting the act of circumvention of technological protection measures that control access to copyrighted material, section 1201(a)(1), emerged from the legislative process unchanged from when it was originally introduced.  See remarks filed by Hon. Howard L. Berman of California in the House of Representatives, Nov. 12, 1998, 144 Cong. Rec. E23,15-01, 1998 WL 785708.

**B.    The following legislative history is relevant to TracFone's argument that the APA governs Defendants' conduct.**

The Act's legislative history is also relevant to whether the rulemaking proceedings conducted by the Librarian and the Register of Copyrights are subject to the procedural requirements of the APA.  In describing the Exemption rulemaking, which was initially intended to be conducted by the Secretary of Commerce, the Report states:

>    Subparagraph (B) sets forth the parameters of the
> Secretary's second responsibility:  the convening of a
> rulemaking proceeding, consistent with the
> requirements of the Administrative Procedures Act.

9

> The goal of the proceeding is to assess whether the implementation of technological protection measures that effectively control access to copyrighted works is adversely affecting the ability of individual users to make lawful uses of copyrighted works.

H.R. Rep. No. 105-551, part 2 (1998), 1998 WL 414916 at * 37

We have found no legislative history explaining the shift in responsibility for the rulemaking proceeding from the Secretary of Commerce to the Librarian and the Copyright Register, nor any legislative history suggesting that Congress decided that the procedural protections of the APA should not apply as a result of that shift in responsibility.

The House Conference Report for the bill explains that the Librarian's determination will be based on the Register's recommendation, and expresses Congressional intent that the Register would conduct the rulemaking proceeding because of the expertise of the Copyright Office, that notice of proposed rulemaking would be published, that the rulemaking proceeding would be on the record, and that the Register would seek comments from the public.  H.R. Conf. Rep. No. 105-796 (1998), 1998 WL 703961, at *64.  The same Report also recognizes that the Librarian and Copyright Office perform some functions that are executive in nature, addressed in 17 U.S.C. § 701(a).  1998 WL 703961, at *77.

Respectfully submitted,

| | |
|---|---|
| /s/ James B. Baldinger<br>James B. Baldinger<br>Florida Bar No. 869899<br>CARLTON FIELDS, P.A.<br>222 Lakeview Avenue<br>Suite 1400<br>West Palm Beach, FL 33401<br>Telephone:  561 659-7070<br>Facsimile:  561-659-7368<br>E-Mail:<br>jbaldinger@carltonfields.com | Steven J. Brodie<br>Florida Bar No. 333069<br>John A. Camp<br>Florida Bar No. 848115<br>CARLTON FIELDS, P.A.<br>Bank of America Tower at<br>International Place<br>100 Southeast Second Street<br>Suite 4000<br>Miami, FL  33131<br>Telephone: 305 530-0050<br>Facsimile: 305 530-0055<br>E-Mail:<br>sbrodie@carltonfields.com<br>jcamp@carltonfields.com |

Counsel for Plaintiff TracFone Wireless, Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that on April 18, 2007, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to James C. Luh, Trial Attorney, United States Department of Justice, Civil Division, Federal Programs Branch 20 Massachusetts Ave. NW  Washington, DC  20530

/s/ James B. Baldinger
James B. Baldinger
Attorney