**Westlaw Download Summary Report for BALDINGER,JAMES 4451592**

| | |
|---|---|
| Date/Time of Request: | Wednesday, April 18, 2007 18:11:00 Central |
| Client Identifier: | 50649-29958-005 |
| Database: | LH |
| Citation Text: | S. REP. 105-190 |
| Lines: | 4555 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

Westlaw.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

             P.L. 105-304, **\*1** THE DIGITAL MILLENNIUM COPYRIGHT ACT OF 1998

                    DATES OF CONSIDERATION AND PASSAGE

                 House: August 4, September 23, 1998
              Senate: May 14, August 31, September 17, 1998
                       Cong. Record Vol. 144 (1998)
              House Report (Judiciary Committee) No. 105-551(I),
                             May 22, 1998
                        (To accompany H.R. 2281)
              House Report (Commerce Committee) No. 105-551(II),
                             July 22, 1998
                        (To accompany H.R. 2281)
               Senate Report (Judiciary Committee) No. 105-190,
                             May 6, 1998
                        (To accompany S. 2037)
                  House Conference Report No. 105-796,
                           October 8, 1998
                        (To accompany H.R. 2281)

                          SENATE REPORT NO. 105-190
                               May 11, 1998

        Mr. Hatch, from the Committee on the Judiciary, submitted the following

                                  REPORT

                               together with

                              ADDITIONAL VIEWS

                          [To accompany S. 2037]

   The Committee on the Judiciary reported an original bill (S. 2037), to amend title
17, United States Code, to implement the WIPO Copyright Treaty and the WIPO Perform-
ances and Phonograms Treaty, to provide limitations on copyright liability relating
to material online, and for other purposes, having considered the same, reports fa-
vorably thereon and recommends that the bill do pass.

                         CONTENTS
                                              Page
   I. Purpose .......................... 1
  II. Legislative history .............. 2
 III. Discussion ....................... 8
  IV. Vote of the committee ........... 24

             © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

   V. Section-by-section analysis ...... 25
  VI. Cost estimate .................... 62
 VII. Regulatory impact statement ...... 64
VIII. Additional views of Mr. Leahy .... 65
  IX. Changes in existing law ......... 70

## I. PURPOSE

The "Digital Millennium Copyright Act of 1998" is designed to facilitate the ro-
bust development and world-wide expansion of electronic commerce, communications,
research, development, and education **\*2** in the digital age. Title I will implement
the new World Intellectual Property Organization (WIPO) Copyright Treaty and the
WIPO Performances and Phonograms Treaty, thereby bringing U.S. copyright law
squarely into the digital age and setting a marker for other nations who must also
implement these treaties. Title II will provide certainty for copyright owners and
Internet service providers with respect to copyright infringement liability online.
Title III will provide a clarifying exemption in the Copyright Act to ensure that
the lawful owner or lessee of a computer machine May authorize an independent ser-
vice technician to activate the computer in order to service its hardware compon-
ents. Finally, Title IV will begin to update our nation's copyright laws with re-
spect to library, archive, and educational uses of copyrighted works in the digital
age.

## II. LEGISLATIVE HISTORY

Copyright laws have struggled through the years to keep pace with emerging techno-
logy from the struggle over music played on a player piano roll in the 1900's [FN1]
to the introduction of the VCR in the 1980's. [FN2] With this constant evolution in
technology, the law must adapt in order to make digital networks safe places to dis-
seminate and exploit copyrighted materials. The legislation implementing the treat-
ies, Title I of this bill, provides this protection and creates the legal platform
for launching the global digital on-line marketplace for copyrighted works. It will
also make available via the Internet the movies, music, software, and literary works
that are the fruit of American creative genius. Title II clarifies the liability
faced by service providers who transmit potentially infringing material over their
networks. In short, Title II ensures that the efficiency of the Internet will con-
tinue to improve and that the variety and quality of services on the Internet will
expand.

The process to update U.S. copyright law with respect to digital transmissions
began in February, 1993, with the formation of the Information Infrastructure Task
Force (IITF) to implement the Administration's vision for the National Information
Infrastructure (NII). [FN3] The IITF then established the Working Group on Intellec-
tual Property Rights to investigate the effects of emerging digital technology on
intellectual property rights and make recommendations on any appropriate changes to
U.S. intellectual property law and policy. This task force issued a report in 1995
known as the White Paper, which discussed the application of existing copyright law
to the NII and recommended changes to keep copyright law current with new techno-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**


logy. [FN4]

   To prepare the report, the Working Group held a public hearing in November 1993,
at which 30 witnesses testified reflecting the views of copyright industries, lib-
raries, educators, and beneficiaries of the public domain. The Working Group also
solicited written comments and received some 70 statements during a public comment
**3** period. [FN5] Following the Working Group's review of the public comments and
analysis of the issues, it released a "Green Paper" on July 7, 1994. [FN6] Following
the release of the Green Paper, the Working Group again heard testimony from the
public in four days of hearings in Chicago, Los Angeles, and Washington, D.C., in
September 1994. More than 1,500 pages of written comments were filed during the
four-month comment period by more than 150 individuals and organizations. [FN7]

   The Working Group also convened a Conference on Fair Use (CONFU) to explore the
particularly complex issue of fair use in a digital environment and to develop
guidelines for uses of copyrighted works by librarians and educators. [FN8] CONFU
issued an Interim Report in December, 1996, and a report in September, 1997, that
concluded the first phase of CONFU. [FN9] The 1997 report addressed the issues of
digital images, distance learning, educational multimedia, electronic reserve sys-
tems, and use of computer software in libraries.

   Interested parties had numerous opportunities to submit their views on the intel-
lectual property implications of the development and use of the NII and on the Work-
ing Group's Green Paper. This open process resulted in a voluminous record indicat-
ing the views of a wide variety of interested parties including service providers,
libraries, copyright owners, and the entertainment industries. [FN10]

   On September 28, 1995, Chairman Hatch, with Senator Leahy, introduced the National
Information Infrastructure (NII) Copyright Protection Act of 1995 (S. 1284), which
embodied the legislative recommendations of the White Paper. Congressman Moorhead
introduced identical legislation (H.R. 2441) in the House on September 29, 1995,
with Congresswoman Schroeder as an original cosponsor. [FN11] The Senate Judiciary
Committee and the Subcommittee on Courts and Intellectual Property of the House Ju-
diciary Committee held a joint hearing on November 15, 1995, to consider the NII le-
gislation. Dr. Mihaly Ficsor, Assistant Director General, World Intellectual Prop-
erty Organization; Bruce A. Lehman, Assistant Secretary of Commerce and Commissioner
of Patents and Trademarks; and Marybeth Peters, Register of Copyrights and Associate
Librarian for Copyright Services testified at the hearing.

   The House Subcommittee on Courts and Intellectual Property held a second set of
hearings to consider H.R. 2441 on February 7 and 8, 1996. On February 7, the Subcom-
mittee heard testimony from Jack Valenti, Chairman and CEO, Motion Picture Associ-
ation of America; Frances W. Preston, President and CEO, Broadcast **4** Music, Inc.
(BMI); Edward P. Murphy, President and CEO, National Music Publishers Association;
Robert Holleyman, II, President, Business Software Alliance; Edward J. Black, Com-
puter & Communications Industry Association; Barbara A. Munder, Senior Vice Presid-
ent, Corporate Affairs, McGraw Hill Co. and on behalf of the Information Industry
Association; Gary L. Shapiro, Chairman, Home Recording Rights Coalition and Presid-
ent, Consumer Electronics Manufacturers Association; Garry L. McDaniels, President,
Skills Bank Corporation; and David M. Ostfeld, Vice Chairman, U.S. Activities Board
Institute for Electrical and Electronics Engineers, and Vice Chairman, United States
Intellectual Property Committee.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**


   On February 8, the Subcommittee heard testimony from Jeanne Hurley Simon, Chair,
U.S. National Commission on Libraries and Information Science; Dr. Tuck Tinsley III,
President, American Printing House for the Blind, Inc.; Richard Robinson, Chair,
President & CEO, Scholastic Corp., for the Association of American Publishers; Cor-
nelius Pings, President, Association of American Universities; Stephen M. Heaton,
Secretary and General Counsel, CompuServe, Inc.; Scott Purcell, President, HLC-
Internet, Inc.; William J. Cook, Partner, William, Brinks, Hofer, Gilson & Lione;
Catherine Simmons-Gill, President, International Trademark Association.

   On May 7, 1996, the Senate Judiciary Committee also an additional hearing to con-
sider S. 1284. The Committee heard testimony from John Bettis of the American Soci-
ety of Composers, Authors, and Publishers (ASCAP); William W. Burrington, Assistant
General Counsel and Director of Public Policy, America Online, Inc.; Robert L.
Oakley, Professor of Law and Director of the Law Library, Georgetown University Law
Center, on behalf of the Digital Future Coalition; and Daniel Burton, Vice President
of Government Relations, Novell, Inc.

   These hearings were supplemented by a series of negotiations overseen by Congress-
man Goodlatte of the House Subcommittee on Courts and Intellectual Property in which
representatives of copyright owners and Internet and online service providers sought
to resolve the contentious issue of the scope of liability of service providers for
the infringing acts of their users. Agreement was reached on some issues, but many
of the core issues reMained unresolved. Negotiations resumed under the auspices of
the Patent and Trademark Office in the summer of 1996, but produced no resolution of
those issues. Ultimately, the NII Copyright Protection Act stalled in the 104th Con-
gress due largely to the unsettled nature of these and other issues.

   Meanwhile, parallel efforts to ensure protection of copyrighted works in the di-
gital age proceeded on the international front. These efforts originated shortly
after the United States ratified the Berne Convention in 1989, when the governing
body of the Berne Union called upon WIPO to form a Committee of Experts concerning a
possible supplementary agreement to the Berne Convention to clarify the existing
provisions and explore the scope of the treaty. [FN12] The **5 result was the intro-
duction of formal proposals to update the Berne Convention to reflect the challenges
of the digital age ("Protocol") and to supplement that instrument with enhanced pro-
tections for performers and producers of phonograms ("New Instrument"). In December,
1996, the World Intellectual Property Organization held a diplomatic conference in
Geneva, Switzerland, which culminated with the adoption of two treaties, the "WIPO
Copyright Treaty" and the "WIPO Performances and Phonograms Treaty," which were
agreed to by consensus of 160 countries.

   The WIPO Copyright Treaty originally contained a provision, article 7, which would
have defined the term "reproduction" of a copyrighted work to include any direct or
indirect reproduction whether permanent or temporary, in any manner or form. [FN13]
This article proved to be too controversial and was deleted from the treaty prior to
its adoption. Instead, the treaty was accompanied by an agreed upon statement that
simply confirmed that the reproduction right in Article 9 of the Berne Convention
applies fully in the digital environment. The treaty also originally contained lan-
guage that banned circumvention devices. Again, controversy resulted in a milder de-
claration that member countries "shall provide adequate legal protection and effect-
ive legal remedies against the circumvention of effective technological measures

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

that are used by authors in connection with the exercise of their rights under this
Treaty." [FN14] The end result is that the treaty shifted the debate over technolo-
gical circumvention measures and on-line service provider liability back to the na-
tional level, where each nation will determine how to best conform with the treaty.

  The President submitted the WIPO treaties to the U.S. Senate on July 29, 1997,
where they were referred to the Foreign Relations Committee. The Administration also
submitted draft implementing legislation, which Chairman Hatch introduced by request
as S. 1121 on July 31, 1997. Senators Leahy, Thompson, and Kohl joined as original
cosponsors. Congressman Coble introduced identical legislation in the House as H.R.
2281 on July 29, 1997. [FN15] S. 1121 later became the basis for Title I of the Di-
gital Millennium Copyright Act in the Senate Judiciary Committee.

  With respect to the issue of service provider liability, two bills were introduced
in the first session of the 105th Congress. Congressman Coble introduced H.R. 2180
on July 17, 1997, with Congressman Hyde as a cosponsor. Senator Ashcroft introduced
S. 1146 on September 3, 1997, which proposed limitations on copyright liability re-
lating to material on-line service providers as well as amendments to the Copy-
right Act to implement the WIPO Treaties and make certain changes to accommodate
libraries and educators in the digital environment.

  The Senate Judiciary Committee conducted hearings on September 4, 1997, to con-
sider the issues surrounding service provider liability. **6** Testimony was heard from
Fritz Attaway, Senior Vice President, Government Relations and Washington General
Counsel, Motion Picture Association of America; Cary Sherman, General Counsel, Re-
cording Industry Association of America; Daniel F. Burton, Vice President, Govern-
ment Relations, Novell; George Vradenburg, Senior Vice President and General Coun-
sel, America Online, Inc.; Roy Neel, President and C.E.O., U.S. Telephone Associ-
ation; and Professor Robert L. Oakley, Director of Law Library and Professor Law,
Georgetown University Law Center. At this hearing, parties on all sides were urged
by Chairman Hatch and the Ranking Member, Senator Leahy, to resolve the remaining
issues prior to the end of the year.

  Shortly thereafter, a series of hearings were held in the House on these issues as
well as on the issue of WIPO implementation. The Subcommittee on Courts and Intel-
lectual Property of the House Judiciary Committee held two days of hearings on H.R.
2281, the WIPO Copyright Treaties Implementation Act, and H.R. 2180, the Online
Copyright Liability Limitation Act, on September 16 and 17, 1997. Bruce Lehman, As-
sistant Secretary of Commerce and Commissioner of Patents and Trademarks, Patent and
Trademark Office, and Marybeth Peters, Register of Copyrights, Copyright Office of
the United States, Library of Congress testified on behalf of the Administration.
The Subcommittee also heard testimony from Roy Neel, President and Chief Executive
Officer, United States Telephone Association; Jack Valenti, President and Chief Ex-
ecutive Officer, Motion Picture Association of America; Robert Holleyman, II, Pres-
ident, Business Software Alliance; M.R.C. Greenwood, Chancellor, University of Cali-
fornia, Santa Cruz, on behalf of the Association of American Universities and the
National Association of State Universities and Land Grant Colleges; Tushar Patel,
Vice President and Managing Director, USWeb, Lawrence Kenswil, Executive Vice Pres-
ident, Business and Legal Affairs, Universal Music Group; Marc Jacobson, General
Counsel, Prodigy Services, Inc.; Ken Wasch, President, Software Publishers Associ-
ation; Ronald G. Dunn, President, Information Industry Association; John Bettis,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**


Songwriter, on behalf of the American Society of Composers, Authors, and Publishers;
Allee Willis, Songwriter, on behalf of Broadcast Music, Inc. (BMI); Robert L.
Oakley, Professor of Law, Georgetown University Law Center and Director, Georgetown
Law Library, on behalf of a Coalition of Library and Educational Organizations;
Johnny Cash, Vocal Artist, with Hilary Rosen, President and Chief Executive Officer,
Recording Industry Association of America; Allan Adler, Vice President, Legal and
Governmental Affairs, Association of American Publishers; Gail Markels, General
Counsel and Senior Vice President, Interactive Digital Software Association; Mike
Kirk, Executive Director, American Intellectual Property Law Association; Thomas Ry-
an, President, SciTech Software, Inc.; Mark Belinsky, Vice President Copy Protection
Group, Macrovision, Inc.; Douglas Bennett, President, Earlham College, Vice Presid-
ent, American Council of Learned Societies, on behalf of the Digital Futures Coali-
tion; Edward J. Black, President, Computer and Communications Industry Association;
Christopher Byrne, Director of Intellectual Property, Silicon Graphics, Inc., on be-
half of the Information Technology Industry Council; and Gary **\*7** Shapiro, President,
Consumer Electronics Manufacturer's Association, and Chairman, Home Recording Rights
Coalition.

In January, 1998, Chairman Hatch initiated comprehensive negotiations within the
Judiciary Committee among copyright owners and Internet and online service providers
to resolve the issue of service provider liability. These negotiations centered
around a draft proposal put forth by Chairman Hatch, which built upon the efforts
over the previous two years. These negotiations continued under the supervision of
the Chairman for three months, from January to April, 1998.

On February 26, 1998, the House Subcommittee on Courts and Intellectual Property
conducted a markup of H.R. 2281, the WIPO Copyright Treaties Implementation Act, and
of H.R. 3209, the On-Line Copyright Infringement Liability Limitation Act. H.R. 2281
and H.R. 3209 were reported favorably by voice vote to the House Judiciary Commit-
tee. On April 1, 1998, the full Committee adopted a substitute amendment to H.R.
2281, offered by Congressmen Coble, Hyde, Conyers, and Goodlatte, which incorporated
both the provisions of H.R. 2281 and provisions regarding service provider liability
in anticipation of a resolution of this issue that appeared to be close in the Sen-
ate Judiciary Committee. H.R. 2281 was then favorably reported to the House of Rep-
resentatives.

On April 2, 1998, Chairman Hatch offered the "Digital Millennium Copyright Act of
1998" at an executive business meeting of the Committee. This bill incorporated the
text of S. 1121, a proposal for resolving the issue of service provider liability
for copyright infringement, and a provision that had been agreed to by the House Ju-
diciary Committee with respect to computer maintenance and repair.

On April 23, 1998, the Committee met again in executive session to consider the
bill. At that meeting, the Committee considered and accepted two amendments offered
by Chairman Hatch, with Senators Leahy and Ashcroft, and one amendment offered by
Senator Ashcroft, with Senators Leahy and Hatch, en bloc, by unanimous consent.
These amendments dealt with reverse engineering of computer programs for interoper-
ability purposes, ephemeral recordings, and an exemption for libraries and archives
from copyright infringement liability.

On April 30, 1998, the Judiciary Committee resumed consideration of the bill and
accepted the following ten amendments en bloc, by unanimous consent: an amendment by

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

the Chairman (for himself, Mr. Leahy and Mr. Ashcroft), with respect to ephemeral
recordings; an amendment by the Chairman (for himself, Mr. Leahy and Mr. Ashcroft),
with respect to the use of copyright management information in the course of certain
analog and digital transmissions; an amendment by the Chairman (for himself and Mr.
Leahy), to make certain clarifying amendments; an amendment by Mr. Ashcroft (for
himself, Mr. Leahy and Mr. Hatch), with respect to protection of subscribers of on-
line and Internet service providers; an amendment by Mr. Ashcroft (for himself, Mr.
Hatch and Mr. Leahy), with respect to the accommodation of particular technological
protection measures; an amendment by Mr. Ashcroft (for himself, Mr. Hatch and Mr.
Leahy), with respect to protection of personal privacy interests; an amendment by
Mr. Ashcroft (for **8** himself, Mr. Hatch and Mr. Leahy), with respect to the preser-
vation of the ability to control minors' access to material on the Internet; an
amendment by Mr. Ashcroft (for himself, Mr. Leahy and Mr. Hatch), with respect to
distance education through digital technologies; an amendment by Mr. Grassley (for
himself and Mr. Kyl), with respect to law enforcement and intelligence activities;
and an amendment by Mrs. Feinstein, with respect to the liability of nonprofit edu-
cational institutions for copyright infringement online. The Committee then unanim-
ously ordered the Digital Millennium Copyright Act of 1998 reported favorably, as
amended.


                              III.  DISCUSSION


   The Digital Millennium Copyright Act (DMCA) in Title I implements the World Intel-
lectual Property (WIPO) treaties on copyright and on performers and phonograms, and
in Title II limits the copyright infringement liability of on-line and Internet ser-
vice providers (OSPs and ISPs) under certain circumstances. The DMCA also provides
in Title III a minor but important clarification of copyright law that the lawful
owner or lessee of a computer may authorize someone to turn on their computer for
the purposes of maintenance or repair. Title IV addresses the issues of ephemeral
recordings, distance education, and digital preservation for libraries and archives.
   Due to the ease with which digital works can be copied and distributed worldwide
virtually instantaneously, copyright owners will hesitate to make their works read-
ily available on the Internet without reasonable assurance that they will be protec-
ted against massive piracy. Legislation implementing the treaties provides this pro-
tection and creates the legal platform for launching the global digital on-line mar-
ketplace for copyrighted works. It will facilitate making available quickly and con-
veniently via the Internet the movies, music, software, and literary works that are
the fruit of American creative genius. It will also encourage the continued growth
of the existing off-line global marketplace for copyrighted works in digital format
by setting strong international copyright standards.
   At the same time, without clarification of their liability, service providers may
hesitate to make the necessary investment in the expansion of the speed and capacity
of the Internet. In the ordinary course of their operations service providers must
engage in all kinds of acts that expose them to potential copyright infringement li-
ability. For example, service providers must make innumerable electronic copies by
simply transmitting information over the Internet. Certain electronic copies are
made to speed up the delivery of information to users. Other electronic copies are

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

made in order to host World Wide Web sites. Many service providers engage in direct-
ing users to sites in response to inquiries by users or they volunteer sites that
users may find attractive. Some of these sites might contain infringing material. In
short, by limiting the liability of service providers, the DMCA ensures that the ef-
ficiency of the Internet will continue to improve and that the variety and quality
of services on the Internet will continue to expand.

Besides the major copyright owners and the major OSP's and ISP's (e.g., the local
telephone companies, the long distance carriers, **\*9** America OnLine, etc.), the Com-
mittee heard from representatives of individual copyright owners and small ISP's,
from representatives of libraries, archives and educational institutions, from rep-
resentatives of broadcasters, computer hardware manufacturers, and consumers. Title
II, for example, reflects 3 months of negotiations supervised by Chairman Hatch and
assisted by Senator Ashcroft among the major copyright owners and the major OSP's
and ISP's. Intense discussions took place on distance education too, with the parti-
cipation of representatives of libraries, teachers, and educational institutions,
under the supervision of Chairman Hatch, Senator Leahy, Senator Ashcroft, and the
Copyright Office.

As a result, the Committee took substantial steps to refine the discussion draft
that Chairman Hatch laid down before the Committee through a series of amendments,
each of which was adopted unanimously. For example, the current legislation con-
tains: (1) a provision to ensure that parents will be able to protect their children
from pornography and other inappropriate material on the Internet; (2) provisions to
provide for the updating of the copyright laws so that educators, libraries, and
archives will be able to take advantage of the promise of digital technology; (3)
important procedural protections for individual Internet users to ensure that they
will not be mistakenly denied access to the World Wide Web; (4) provisions to ensure
that the current practice of legitimate reverse engineering for software interoper-
ability may continue; and (5) provisions to accommodate the needs of broadcasters
for ephemeral recordings and regarding copyright management information. These pro-
visions are in addition to provisions Chairman Hatch had already incorporated into
the discussion draft, such as provisions on library browsing, provisions addressing
the special needs of individual creators regarding copyright management information,
and provisions exempting nonprofit archives, nonprofit educational institutions, and
nonprofit libraries from criminal penalties and, in the case of civil penalties, re-
mitting damages entirely when such an institution was not aware and had no reason to
believe that its acts constituted a violation.

Consequently, the DMCA enjoys widespread support from the motion picture, record-
ing, software, and publishing industries, as well as the telephone companies, long
distance carriers, and other OSP's and ISP's. It is also supported by the Informa-
tion Technology Industry Council, which includes the leading computer hardware manu-
facturers, and by representatives of individual creators, such as the Writers Guild,
the Directors Guild, the Screen Actors Guild, and the American Federation of Televi-
sion and Radio Artists. The breadth of support for this bill is reflected in the un-
animous roll call vote (18-0) by which the DMCA was reported out of Committee.

TITLE I

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)

**(Cite as: S. REP. 105-190)**


   Title I implements the WIPO Copyright Treaty and the WIPO Performances and Phono-
grams Treaty. These treaties were concluded by the Clinton administration in Decem-
ber 1996. The treaties are best understood as supplements to the Berne Convention
for the Protection of Literary and Artistic Works. The Berne Convention is the lead-
ing multilateral treaty on copyright and related **10** rights, with 130 countries ad-
hering to it. The United States ratified the Berne Convention in 1989. The two new
WIPO treaties were adopted at a diplomatic conference by a consensus of over 150
countries. In general, the Copyright Treaty updates the Berne Convention for digital
works and the growth of the Internet and other digital communications networks, and
the Performances and Phonograms Treaty supplements the Berne Convention with compre-
hensive copyright protection for performances and sound recordings (called "phono-
grams" in international parlance).

   The importance of the treaties to the protection of American copyrighted works
abroad cannot be overestimated. The treaties, as well as the Berne Convention, are
based on the principle of national treatment; that is, that adhering countries are
obliged to grant the same protection to foreign works that they grant to domestic
works. Even more importantly, the Berne Convention and the treaties set minimum
standards of protection. Thus, the promise of the treaties is that, in an increasing
global digital marketplace, U.S. copyright owners will be able to rely upon strong,
non-discriminatory copyright protection in most of the countries of the world.

   The copyright industries are one of America's largest and fastest growing economic
assets. According to International Intellectual Property Alliance statistics, in
1996 (when the last full set of figures was available), the U.S. creative industries
accounted for 3.65 percent of the U.S. gross domestic product (GDP)-$278.4 billion.
In the last 20 years (1977-1996), the U.S. copyright industries' share of GDP grew
more than twice as fast as the remainder of the economy-5.5 percent vs. 2.6 percent.
Between 1977 and 1996, employment in the U.S. copyright industries more than doubled
to 3.5 million workers-2.8 percent of total U.S. employment. Between 1977 and 1996
U.S. copyright industry employment grew nearly three times as fast as the annual
rate of the economy as a whole-4.6 percent vs. 1.6 percent. In fact, the copyright
industries contribute more to the U.S. economy and employ more workers than any
single manufacturing sector, including chemicals, industrial equipment, electronics,
food processing, textiles and apparel, and aircraft. More significantly for the WIPO
treaties, in 1996 U.S. copyright industries achieved foreign sales and exports of
$60.18 billion, for the first time leading all major industry sectors, including ag-
riculture, automobiles and auto parts, and the aircraft industry.

   The WIPO treaties contain many important provisions. For example, the Copyright
Treaty contains significant provisions such as: (1) explicit recognition that com-
puter programs are covered by the Berne Convention; (2) recognition of a broad right
of public distribution; (3) recognition of a broad right of communication to the
public that includes the Internet; (4) an official statement that interprets the ex-
isting reproduction right of the Berne Convention to "fully apply in the digital en-
vironment"; [FN16] (5) an obligation to provide "legal protection and effective leg-
al remedies" against circumventing technological measures, e.g. encryption and pass-
word protection, that are used by copyright owners to protect their works **11** from
piracy; [FN17] and (6) an obligation to provide "adequate and effective legal remed-
ies" to preserve the integrity of "rights management information." [FN18] The Per-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190                                                      Page 10
S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

formances and Phonograms Treaty recognizes certain rights of performers over their
performances and basically gives the copyright owners of sound recordings the same
protection for their works as exist in the Berne Convention for other works.

   The Committee believes that in order to adhere to the WIPO treaties, legislation
is necessary in two primary areas-anticircumvention of technological protection
measures and protection of the integrity of rights management information, or "copy-
right management information" (CMI), as it is referred to in the bill. This view is
shared by the Clinton administration. In drafting implementing legislation for the
WIPO treaties, the Committee has sought to address those two areas, as well as avoid
government regulation of the Internet and encourage technological solutions. The
Committee is keenly aware that other countries will use U.S. legislation as a model.

## A. ANTICIRCUMVENTION

   Title I encourages technological solutions, in general, by enforcing private
parties' use of technological protection measures with legal sanctions for circum-
vention and for producing and distributing products or providing services that are
aimed at circumventing technological protection measures that effectively protect
copyrighted works. For example, if unauthorized access to a copyrighted work is ef-
fectively prevented through use of a password, it would be a violation of this sec-
tion to defeat or bypass the password and to make the means to do so, as long as the
primary purpose of the means was to perform this kind of act. [FN19] This is roughly
analogous to making it illegal to break into a house using a tool, the primary pur-
pose of which is to break into houses.

   Legislation prohibiting circumvention devices is not unprecedented. The Copyright
Act in section 1002(c) already protects sound recordings and musical works by pro-
hibiting devices which circumvent any program or circuit that implements a serial
copy management system or similar system included in digital audio recording devices
and digital audio interface devices. The Communications Act in section 605(e)(4)
prohibits devices that are "primarily of assistance in the unauthorized decryption
of satellite cable programming." In addition to the WIPO Copyright Treaty, the NAFTA
in article 1707(b) requires each party to make it a criminal offense to make avail-
able a device or system that is "primarily of assistance in decoding an encrypted
program-carrying **12** satellite signal without the authorization of the lawful dis-
tributor of such signal.'

   Although sections 1201(a)(2) and 1201(b) of the bill are worded similarly and em-
ploy similar tests, they are designed to protect two distinct rights and to target
two distinct classes of devices. Subsection 1201(a)(2) is designed to protect access
to a copyrighted work. Section 1201(b) is designed to protect the traditional copy-
right rights of the copyright owner. As a consequence, subsection 1201(a)(2) prohib-
its devices primarily designed to circumvent effective technological measures that
limit access to a work. Subsection 1201(b), on the other hand, prohibits devices
primarily designed to circumvent effective technological protection measures that
limit the ability of the copyrighted work to be copied, or otherwise protect the
copyright rights of the owner of the copyrighted work. The two sections are not in-
terchangeable, and many devices will be subject to challenge only under one of the
subsections. For example, if an effective technological protection measure does

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

nothing to prevent access to the plain text of the work, but is designed to prevent
that work from being copied, then a potential cause of action against the manufac-
turer of a device designed to circumvent the measure lies under subsection 1201(b),
but not under subsection 1201(a)(2). Conversely, if an effective technological pro-
tection measure limits access to the plain text of a work only to those with author-
ized access, but provides no additional protection against copying, displaying, per-
forming or distributing the work, then a potential cause of action against the manu-
facturer of a device designed to circumvent the measure lies under subsection
1201(a)(2), but not under subsection 1201(b).

   This, in turn, is the reason there is no prohibition on conduct in 1201(b) akin to
the prohibition on circumvention conduct in 1201(a)(1). The prohibition in
1201(a)(1) is necessary because prior to this Act, the conduct of circumvention was
never before made unlawful. The device limitation in 1201(a)(2) enforces this new
prohibition on conduct. The copyright law has long forbidden copyright infringe-
ments, so no new prohibition was necessary. The device limitation in 1201(b) en-
forces the longstanding prohibitions on infringements.

Accommodation of particular technological protection measures

   The Committee was concerned that the provisions of subsections 1201(a)(2) and (b)
might be read to mandate that manufacturers of consumer electronics, telecommunica-
tions, and computing products design their products and components to respond to
particular technological protection measures employed to protect copyrighted works.
Subsection 1201(d)(3) addresses this concern and clarifies that section 1201 does
not impose any affirmative design mandates on manufacturers of consumer electronics,
telecommunications, and computing products. The fact that a product or component
does not respond to any particular technological protection measure, standing alone,
neither creates liability under section 1201 nor immunizes those trafficking in the
product, part or component from liability. This provision recognizes that there may
be legitimate reasons for a product or component's failure to respond to a particu-
lar technological measure-such as design efficiency or ensuring high **\*13** quality
output from the product-as well as illegitimate reasons-such as an unlawful intent
to circumvent the protection measure.

   That a component or part's failure to respond to a technological measure does not
immunize the product or component from further review under section 1201 is made
clear by the following example. Suppose a device expressly intended to circumvent an
effective technological protection measure commonly employed to protect copyrighted
works contained a component that was critical to the effectiveness of the device in
achieving its stated purpose. Suppose further that the product was marketed as a
circumvention device and had no commercially significant purposes or use other than
to circumvent. That component would not provide the desired response to the effect-
ive technological protection measure, but the product would still clearly run afoul
of section 1201 in light of the device manufacturer's unlawful intent, the marketing
strategy and the lack of other commercially significant uses for the product.

   On the other hand, suppose a manufacturer of a state-of-the-art consumer electron-
ics device, which did not circumvent any technological protection measure when it
was introduced into the market and which was designed and marketed for a purpose
other than circumventing any technological protection measures, was sued for violat-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190                                                          Page 12
S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

ing section 1201 because the device did not accommodate a particular technological
protection measure developed after the device was designed and sold. In such a case,
section 1201(d)(3) would make it clear that the device's failure to accommodate this
new protection measure does not render the device unlawful, and in light of the
nature of the product, the manner in which it functions, the way it had been mar-
keted and its obvious legitimate uses (assuming the device continues to be marketed
and produced for the same legitimate uses), there would clearly be no basis for ar-
guing that the device was unlawful under section 1201.

Library browsing

   Section 1201(e) allows nonprofit libraries, archives, and educational institutions
to gain access to a commercially exploited copyrighted work solely to make the de-
termination of whether to acquire a copy of the work.

Reverse engineering

   Sections 1201(g)-(j) are intended to allow legitimate software developers to con-
tinue engaging in certain activities for the purpose of achieving interoperability
to the extent permitted by law prior to the enactment of this chapter. The objective
is to ensure that the effect of current case law interpreting the Copyright Act is
not changed by enactment of this legislation for certain acts of identification and
analysis done in respect of computer programs. See, Sega Enterprises Ltd. v Accol-
ade, Inc., 977 F.2d 1510, 24 U.S.P.Q.2d 1561 (9th Cir. 1992). The purpose of this
section is to foster competition and innovation in the computer and software in-
dustry.

Controlling the access of minors to material on the Internet

   The Committee supports the voluntary efforts underway by a broad group of Internet
users, library groups, publishers and other **14** copyright industry groups, family-
focused organizations, on-line service providers, and civil liberties groups to em-
power parents to supervise and control the material their children access from the
Internet. Nothing in this bill is intended to undercut these efforts.
   To emphasize this point, an amendment (section 1201(k)) sponsored by Senator Ash-
croft, Chairman Hatch and Senator Leahy was adopted unanimously by the Committee to
ensure that the prohibitions in section 1201(a) did not inadvertently make it unlaw-
ful for parents to protect their children from pornography and other inappropriate
material available on the Internet, or have unintended legal consequences for manu-
facturers of products designed solely to enable parents to protect their children in
this fashion. Section 1201(k) makes clear that in a suit brought under section
1201(a), a court may consider the necessity for a challenged component or part's in-
tended and actual incorporation into a technology, product, service or device, which
does not itself violate the provisions of new chapter 12 on Copyright Protection and
Management Systems, and which has the sole purpose of preventing the access of
minors to pornography or other inappropriate material on the Internet. This provi-
sion applies to subsection 1201(a) in its entirety (as opposed to subsection
1201(a)(2) alone) in order to clarify that the bill protects the actions of parents
in ensuring that their children do not have access to inappropriate material on-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190                                                Page 13
S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

line.

  A variety of tools available now allow parents to exercise control in a manner
consistent with their own family values, of their children's access to online mater-
ials. In the event that, in the future, any of these tools incorporates a part or
component which circumvents a technological protection measure effectively con-
trolling access to a copyrighted work solely in order to provide a parent with the
information necessary to ascertain whether that material is appropriate for his or
her child, this provision authorizes a court to take into consideration the neces-
sity for incorporating such part or component in a suit alleging a violation of sec-
tion 1201(a).

  This provision is limited to the application of subsection (a) because the Commit-
tee does not anticipate that it would be necessary for parental empowerment tools to
make copies of questionable material, or to distribute or perform it, in order to
carry out their important function of assisting parents in guiding their children on
the Internet. Accordingly, circumvention of copy controls, or of similar measures,
should never be a necessary capability of a parental empowerment tool. By the same
token, if a technology, product, service or device which (1) has the sole purpose of
preventing the access of minors to certain materials on the Internet, and (2) that
technology, product, service or device circumvents a technological protection meas-
ure that effectively controls access to a work as defined in subsection 1201(a)(3)
only for the purpose of gaining access to the work to ascertain whether it is suit-
able for a minor, but does not otherwise defeat any copy protection for that work,
then that technology, product, service or device is only subject to challenge under
subsection 1201(a)(2) and not subsection 1201(b). In such circumstances, no cause of
action would lie under section 1201(b) and therefore limiting language would be un-
necessary.

  This provision is not to be interpreted to allow the wholesale access to copy-
righted works in their entirety, but merely to allow parents **\*15** to have an ability
to determine whether a work is inappropriate for that parent's child.


Encryption research

  The purpose of the Committee in proposing enactment of section 1201 is to improve
the ability of copyright owners to prevent the theft of their works, including by
applying technological protection measures. The effectiveness of such measures de-
pends in large part on the rapid and dynamic development of better technologies, in-
cluding encryption-based technological protection measures. The development of en-
cryption sciences requires, in part, ongoing research and testing activities by sci-
entists of existing encryption methods, in order to build on those advances, thus
promoting and advancing encryption technology generally.

  The goals of section 1201 would be poorly served if these provisions had the un-
desirable and unintended consequence of chilling legitimate research activities in
the area of encryption. It is the view of the Committee, after having conducted ex-
tensive consultations, and having examined a number of hypothetical situations, that
Section 1201 should not have such an unintended negative effect.

  It is the view of the Committee that generally available encryption testing tools
would not be made illegal by this Act. Each of those tools has a legitimate and sub-
stantial commercial purpose-testing security and effectiveness-and are not prohib-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**


ited by Section 1201. In addition, the testing of specific encryption algorithms
would not fall within the scope of 1201, since mathematical formulas as such are not
protected by copyright. Thus, testing of an encryption algorithm or program that has
multiple uses, including a use as a technical protection measure for copyrighted
works, would not fall within the prohibition of section 1201(a) when that testing is
performed on the encryption when it is in a form not implemented as a technical pro-
tection measure. Similarly, the testing of encryption technologies developed by or
on behalf of the government of the United States, would not violate section 1201
since copyright does not subsist in such subject matter. Finally, there are many
situations in which encryption research will be undertaken with the consent or at
the direction of the copyright owner and therefore will not give rise to any action
under section 1201.

   For these reasons, it is the view of the Committee that the following types of en-
cryption testing are not generally prohibited by section 1201.

   If a cryptographer uses various cryptanalytic research techniques to discover a
flaw in, for example, the U.S. government's Escrowed Encryption Standard (EES) used
in the Clipper Chip and Fortezza cards. The flaw allows users to circumvent essen-
tial features of the algorithm. Since these encryption products are not covered by
copyright, because they are merely mathematical algorithms in addition to being
owned by the U.S. government, these acts do not violate 1201, and the results may be
made available to the public.

   If a company, in the course of developing a new cryptographic product, sponsors a
crypto-cracking contest with cash prizes, contestants would not violate section 1201
since the research acts are specifically authorized.

   **\*16** Significantly, section 1201 does not make illegal cryptographic devices that
have substantial legitimate purposes other than to circumvent technological protec-
tion measures as applied to a work. For example, many popular word processing and
other computer programs include a security feature allowing users to password-pro-
tect documents (employing a low-grade form of encryption.) It is not uncommon for
users of such products to forget or lose their passwords for such documents, making
their own protected works unrecoverable. As a result, many independent programmers
have created utilities designed to assist in the recovery of passwords or password-
protected works. Several of these utilities are distributed over the Internet as
freeware or shareware. Because these utilities have a substantial legitimate use,
and because they would be used by persons to gain access to their own works, these
devices do not violate section 1201.

   The law would also not prohibit certain kinds of commercial "key-cracker"
products, e.g., a computer program optimized to crack certain 40-bit encryption
keys. Such machines are often rented to commercial customers for the purpose of
quick data recovery of encrypted data. So long as these devices would have a sub-
stantial legitimate use, and they do not become principally used to facilitate in-
fringement, they would not be prohibited by section 1201.

   Today, network and web site management and security tools increasingly contain
components that automatically test systems security and identify common vulnerabil-
ities. These programs are valuable tools for systems administrators and web site op-
erators, to use in the course of their regular testing of their systems' security.
Again, because these devices do not meet the test of section 1201, because they are


© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**


good products put to a good use, the devices do not fall within the scope of this
statute.

### B. COPYRIGHT MANAGEMENT INFORMATION

Copyright Management Information (CMI) is an important element in establishing an
efficient Internet marketplace in copyrighted works free from governmental regula-
tion. Such information will assist in tracking and monitoring uses of copyrighted
works, as well as licensing of rights and indicating attribution, creation and own-
ership.

Under the bill, CMI includes such items as the title of the work, the author, the
copyright owner, and in some instances, the writer, performer, and director. CMI
need not be in digital form, but CMI in digital form is expressly included. It is
important to note that the DMCA does not require CMI, but if CMI is provided, the
bill protects it from falsification, removal or alteration. Information that is not
defined as CMI under the bill would not be protected by these provisions, although
its removal or falsification might be protected under other laws, such as unfair
trade. The definition of CMI may be expanded by regulation prescribed by the Re-
gister of Copyrights.

Section 1202(a) prohibits knowingly providing CMI that is false or knowingly dis-
tributing CMI that is false with the intent to induce, enable, facilitate or conceal
infringement. Section 1202(b) prohibits (1) the intentional removal or alteration of
CMI, (2) the distribution of CMI knowing that the information has been removed **\*17**
or altered, and (3) the distribution or public performance of works knowing or hav-
ing reason to know that CMI has been removed or altered, so long as, regarding the
prohibited acts described in section 1202(b), there is knowledge or reasonable
grounds to know that these acts will induce, enable, facilitate or conceal an in-
fringement.

Section 1202(e) recognizes special problems that certain broadcasting entities may
have with the transmission of copyright management information. Under this subsec-
tion, radio and television broadcasters, cable systems, and persons who provide pro-
gramming to such broadcasters or systems, who do not intend to induce, enable, fa-
cilitate or conceal infringement (eligible persons) may be eligible for a limitation
on liability for violation of the copyright management information provisions of
section 1202(b) in certain, limited circumstances.

### C. CIVIL REMEDIES AND CRIMINAL PENALTIES

Section 1203 gives civil remedies and section 1204 imposes criminal penalties for
violations of sections 1201 and 1202.

In addition to an award of damages, section 1203(b) provides for various kinds of
affirmative relief in civil actions such as temporary and permanent injunctions, im-
poundment, and, as part of a final judgment or decree finding a violation, the court
may order remedial modification or destruction of the offending device or product.
Such affirmative relief is currently found in the Copyright Act for copyright in-
fringements.

Regarding monetary relief, section 1203 provides for actual damages, profits de-
rived from the unlawful activity, statutory damages, and treble damages for repeat

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**


offenders. Such monetary relief is available under the current Copyright Act.

  An important feature of section 1203 is the remittitur for innocent violators and
for nonprofit libraries, archives, and educational institutions. In the case of a
violator who was not aware and had no reason to believe that the acts at issue con-
stituted a violation, the court may reduce or remit the total award of damages. In
the cases of nonprofit libraries, archives, and educational institutions the court
must remit damages if the institution was not aware and had no reason to believe
that its acts constituted a violation.

  The current Copyright Act provides for criminal penalties for copyright infringe-
ment. Section 1204 of the bill also provides criminal penalties for violations of
section 1201(a) and (b). Specifically, willful violations of sections 1201 or 1202
for purposes of commercial advantage or private financial gain are punished by up to
$500,000 in fines or imprisonment for up to 5 years. Repeat offenses are punishable
by up to $1,000,000 in fines or imprisonment for up to 10 years. The bill requires
that criminal proceedings be commenced within 5 years after the cause of action
arose. Criminal penalties do not apply to nonprofit libraries, archives, and educa-
tional institutions.


                  D. PROTECTING PERSONAL PRIVACY INTERESTS


  Section 1205 responds to concerns expressed by some that certain technologies used
to gather personally identifiable information **\*18** from Internet users could be char-
acterized as technological protection measures for copyrighted materials, and that
therefore efforts by Internet users to protect their privacy by disabling or by-
passing such technologies could be prohibited by section 1201. The Committee does
not believe that enactment of this legislation will have this effect. No specific
example of such a privacy-invasive technology in use today that would be affected in
this way has been called to the Committee's attention. For example, even if "cookie"
files-which are automatically deposited on the hard drives of computers of users who
visit World Wide Web sites-are considered to be invasive of personal privacy (and
are deemed to be copyrighted works), all commercially significant browser programs
can be readily configured to reject "cookies," and such a configuration raises no
issue of any violation of section 1201.

  In fact, enactment of section 1201 should have a positive impact on the protection
of personal privacy on the Internet. The same technologies that copyright owners use
to control access to and use of their works can and will be used to protect the per-
sonal privacy of Internet users by, for example, encrypting e-mail communications,
or requiring a password for access to personal copyrighted information on an indi-
vidual's web site. By outlawing the activities of those who make it their business
to provide the tools for circumventing these protective technologies, this legisla-
tion will substantially enhance the degree to which individuals may protect their
privacy as they work, play and communicate on the Internet.

  However, because of the privacy concerns expressed that existing or future techno-
logies may evolve in such a way that an individual would have to circumvent a tech-
nological protection measure to protect his or her privacy, the committee concluded
that it was prudent to rule out any scenario in which section 1201 might be relied
upon to make it harder, rather than easier, to protect personal privacy on the In-


                © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190                                              Page 17
S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

ternet. Accordingly, Senator Ashcroft, Chairman Hatch and Senator Leahy proposed a
savings clause to clarify that nothing in the new chapter 12 will abrogate, diminish
or weaken the provisions of any Federal or State law that prevents the violation of
an individual's privacy in connection with the individual's use of the Internet. The
savings clause also specifies that section 1201 cannot be used to provide a defense,
or an element of mitigation, in any civil or criminal action to enforce such a law.
For example, if a valid Federal or State law regulates, on personal privacy grounds,
the use of "cookie" files, which are automatically placed on the computer hard
drives of users as they visit Internet web sites, and a party with standing sues to
enforce the limitations contained in that law, the defendant may not excuse his ac-
tions in violation of those limitations by pointing to anything in chapter 12 of
title 17.

Law enforcement

  Sections 1201(f) and 1202(d) create exceptions for the lawfully authorized invest-
igative, protective, or intelligence activities of an officer, agent, or employee
of, the United States, a State, or a political subdivision of a State, or of persons
acting pursuant to a contract with such an entity. These exceptions will protect of-
ficers, agents, employees, or contractors of, or other persons acting at the **\*19**
direction of, a law enforcement or intelligence agency of the United States, a
State, or a political subdivision of a State, who are performing lawfully authorized
investigative, protective, or intelligence activities. These exceptions will also
protect officers, agents, employees, or contractors of, or other persons acting at
the direction of, elements or divisions of an agency or department of the United
States, a State, or a political subdivision of a State, which does not have law en-
forcement or intelligence as its primary function, but who may nevertheless, in the
course of lawfully authorized protective, intelligence, or criminal investigative
activities, engage in actions otherwise prohibited by this bill. These exceptions
only apply to individuals covered under this section when they are performing in-
vestigative, protective, or intelligence activities, within the scope of their du-
ties and in furtherance of lawfully authorized activities.
  The Committee is concerned that these sections should not be misinterpreted as an
opportunity to circumvent the WIPO Copyright Treaty. It should be clear that this is
a routine law enforcement and intelligence exception. As such, the exceptions under
sections 1201(f) and 1202(d) are to be narrowly construed. In addition, these excep-
tions are to be construed in a manner consistent with similar law enforcement and
intelligence exceptions found elsewhere in U.S. law, such as 18 U.S.C. 1029(f),
1030(f), or 2512(2)(b).

                                  TITLE II

  Although the copyright infringement liability of on-line and Internet service pro-
viders (OSPs and ISPs) is not expressly addressed in the actual provisions of the
WIPO treaties, the Committee is sympathetic to the desire of such service providers
to see the law clarified in this area. There have been several cases relevant to
service provider liability for copyright infringement. [FN20] Most have approached
the issue from the standpoint of contributory and vicarious liability. Rather than

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190                                                          Page 18
S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

embarking upon a wholesale clarification of these doctrines, the Committee decided
to leave current law in its evolving state and, instead, to create a series of "safe
harbors," for certain common activities of service providers. A service provider
which qualifies for a safe harbor, receives the benefit of limited liability.

   In the beginning, the Committee identified the following activities: (1) digital
network communications, (2) system caching, (3) information stored on service pro-
viders, and (4) information location tools. In the end, Title II contains five gen-
eral categories of activities, which are addressed in a newly created section 512 in
Chapter 5 of the Copyright Act. This new section contains limitations on service
providers' liability for five general categories of activity set forth in subsec-
tions (a) through (d) and subsection (f). As provided in subsection (k), Section 512
is not intended to imply that a service provider is or is not liable as an infringer
either for conduct that qualifies for a limitation of liability or for conduct that
fails to so qualify. Rather, the limitations of liability apply if the provider is
found to be liable under existing principles of law.

   **\*20** The limitations in subsections (a) through (d) protect qualifying service pro-
viders from liability for all monetary relief for direct, vicarious and contributory
infringement. Monetary relief is defined in subsection (j)(2) as encompassing dam-
ages, costs, attorneys' fees, and any other form of monetary payment. These subsec-
tions also limit injunctive relief against qualifying service providers to the ex-
tent specified in subsection (I). To qualify for these protections, service pro-
viders must meet the conditions set forth in subsection (h), and service providers'
activities at issue must involve a function described in subsection (a), (b), (c),
(d) or (f), respectively. The liability limitations apply to networks "operated by
or for the service provider," thereby protecting both service providers who offer a
service and subcontractors who may operate parts of, or an entire, system or network
for another service provider.

   Title II preserves strong incentives for service providers and copyright owners to
cooperate to detect and deal with copyright infringements that take place in the di-
gital networked environment. At the same time, it provides greater certainty to ser-
vice providers concerning their legal exposure for infringements that may occur in
the course of their activities.

Particular concerns of educational institutions

   At least two concerns have been raised concerning the applicability of section 512
to educational institutions, such as universities and libraries, when they act as
on-line service providers. The first concerns the extent to which the knowledge of
faculty members using the Internet will be imputed to a college or university as a
whole or the specific department within the college or university responsible for
providing Internet service. To the extent such knowledge is imputed, the on-line
service provider might fail to qualify for certain of the exceptions to liability
included in this section. This is one of the specific questions upon which the Copy-
right Office study authorized in section 204 of this Act will focus. Without pre-
judging any issues to be considered in that study, it seems that the extent to which
knowledge is imputed to the service provider in the case of colleges and universit-
ies, and in other settings in which the service provider and end-user share an em-
ployee-employer or other relationship, is a matter of the relevant State law of re-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

spondeat superior, rather than a matter of Federal copyright law. As a consequence, there may be much that a non-profit educational institution can do to structure the internal relationships between its faculty and its online service provider functions. What is more, nothing in this Act should be read to preclude a Federal court from taking into account the special circumstances of a non-profit educational institution in applying agency law to determine whether knowledge should be imputed to such an institution in its capacity as an online service provider.

The second concern raised about the applicability of section 512 to public universities and libraries, and indeed other public entities which operate as online service providers, is that by complying with the notice and take-down provisions of section 512, the public entities might violate the due process rights of their users. Any such due process objection suffers at least two flaws. In the first place, a prerequisite to any due process claim is a state law property **21 interest. In the case of the relatively new concept of Internet access, the service provider contract, rather than any common law property interest, would appear to be the yardstick of the Internet user's property interest in continued access. The contract for Internet service, therefore, can limit any property interest that would form the basis for a procedural due process claim. Second, and even more important, the procedural protections afforded by the notification requirements of subsection 512(c)(3) and the provisions for the replacement of removed or disabled materials in subsection 512(f) provide all the process that is due. The Committee was acutely concerned that it provide all end-users-whether contracting with private or public sector online service providers-with appropriate procedural protections to ensure that material is not disabled without proper justification. The provisions in the bill balance the need for rapid response to potential infringement with the end-users legitimate interests in not having material removed without recourse.

In order to explore these and other issues more fully, the Committee provides in section 204 for a study to be conducted by the Register of Copyrights.

TITLE III

Computer maintenance or repair

Title III of the bill amends section 117 of the Copyright Act (17 U.S.C. 117) to ensure that independent service organizations do not inadvertently become liable for copyright infringement merely because they have turned on a machine in order to service its hardware components.

When a computer is activated, that is when it is turned on, certain software or parts thereof (generally the machine's operating system software) is automatically copied into the machine's random access memory, or "RAM". During the course of activating the computer, different parts of the operating system may reside in the RAM at different times because the operating system is sometimes larger than the capacity of the RAM. Because such copying has been held to constitute a "reproduction" under section 106 of the Copyright Act (17 U.S.C. 106), [FN21] a person who activated the machine without the authorization of the copyright owner of that software could be liable for copyright infringement. This legislation has the narrow and specific intent of relieving independent service providers, persons unaffiliated with either the owner or lessee of the machine, from liability under the Copyright Act

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

when, solely by virtue of activating the machine in which a computer program
resides, they inadvertently cause an unauthorized copy of that program to be made.

   This title is narrowly crafted to achieve the foregoing objective without preju-
dicing the rights of copyright owners of computer software. Thus, for example,
1201(k) does not relieve from liability persons who make unauthorized adaptations,
modifications, or other changes to the software. This title also does not relieve
from liability **\*22** persons who make any unauthorized copies of software other than
those caused solely by activation of the machine.

                                TITLE IV


                        A. EPHEMERAL RECORDINGS


   Section 401 of the bill amends section 112 of the Copyright Act to address two is-
sues concerning the application of the ephemeral recording exemption in the digital
age.

   The first of these issues is the relationship between the ephemeral recording ex-
emption and the Digital Performance Right in Sound Recordings Act of 1995 ("DPRA").
The DPRA granted sound recording copyright owners the exclusive right to perform
their works publicly by means of digital audio transmission, subject to certain lim-
itations, particularly those set forth in section 114(d). Among those limitations is
an exemption for nonsubscription broadcast transmissions, which are defined as those
made by terrestrial broadcast stations licensed as such by the FCC. 17 U.S.C.
114(d)(1)(A)(iii) and (j)(2). The ephemeral recording exemption presently privileges
certain activities of a transmitting organization when it is entitled to transmit a
performance or display under a license or transfer of copyright ownership or under
the limitations on exclusive rights in sound recordings specified by section 114(a).
The Committee believes that the ephemeral recording exemption should apply to broad-
cast radio and television stations when they make nonsubscription digital broadcasts
permitted by the DPRA. The Committee has therefore changed the existing language of
the ephemeral recording exemption (redesignated as 112(a)(1)) to extend explicitly
to broadcasters the same privilege they already enjoy with respect to analog broad-
casts.

   The second of these issues is the relationship between the ephemeral recording ex-
emption and the anticircumvention provisions that the bill adds as section 1201 of
the Copyright Act. Concerns were expressed that if use of copy protection technolo-
gies became widespread, a transmitting organization might be prevented from engaging
in its traditional activities of assembling transmission programs and making ephem-
eral recordings permitted by section 112 for purposes of its own transmissions with-
in its local service area and of archival preservation and security. To address this
concern, the Committee has added to section 112 a new paragraph that permits trans-
mitting organizations to engage in activities that otherwise would violate section
1201(a)(1) in certain limited circumstances when necessary for the exercise of the
transmitting organization's privilege to make ephemeral recordings under redesig-
nated section 112(a)(1). By way of example, if a radio station could not make a per-
mitted ephemeral recording from a commercially available phonorecord without violat-
ing section 1201(a)(1), then the radio station could request from the copyright own-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

er the necessary means of making a permitted ephemeral recording. If the copyright
owner did not then either provide a phonorecord that could be reproduced or other-
wise provide the necessary means of making a permitted ephemeral recording from the
phonorecord already in the possession of the radio station, the radio station would
not be liable for violating section 1201(a)(1) for taking the steps **\*23** necessary
for engaging in activities permitted under section 112(a)(1). The radio station
would, of course, be liable for violating section 1201(a)(1) if it engaged in activ-
ities prohibited by that section in other than the limited circumstances permitted
by section 112(a)(1).

### B. DISTANCE EDUCATION

   New technology, especially digital technology, is increasingly being used by edu-
cational institutions in their distance learning programs. In the past, distance
learning programs were developed primarily for students who, because of their spe-
cial circumstances, could not be taught in a traditional classroom. Section 110(2)
of the copyright law contains an exemption that accommodates this type of activity.
The current exemption is designed to cover instructional broadcasting, and allows
the use of only certain categories of works. Future distance education, however, may
involve a wider range of activities, including the use of interactive digital trans-
missions, and be designed for a broader audience of students working from personal
computers in their own homes.
   The Committee believes that the scope of the distance education exemption should
be re-examined in light of the range of educational activities made possible by di-
gital technologies. The Committee therefore initiated discussions on distance learn-
ing with representatives of libraries, educational institutions and copyright own-
ers, and asked the Register of Copyrights to recommend any appropriate legislative
language for an updated distance education exemption. In response to this request by
Chairman Hatch, Senator Leahy and Senator Ashcroft, the Register reported the con-
clusion that digital distance education is an evolving field, and the range of
activities contemplated is diverse and potentially far-reaching in impact and scope.
   In light of the complexity, importance and potential scope of the issues implic-
ated by distance education, the Committee has determined that further study of the
issues would be useful. The Committee therefore has directed the Copyright Office to
provide Congress with a report recommending ways to promote distance learning
through digital technologies no later than six months after enactment of this legis-
lation. In conducting this study, the Copyright Office is required to consult with
representatives of copyright owners, nonprofit educational institutions, libraries
and archives. The Committee anticipates that the Copyright Office will also consult
with others with relevant expertise, where appropriate, such as the Department of
Education.
   The Committee underscores the importance to the public of a speedy resolution of
any copyright issues associated with distance learning and commits itself to devel-
oping a fair and effective distance learning regime promptly after receipt of the
Register's Report.

Fair use

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190                                                Page 22
S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**


   The bill does not amend section 107 of the Copyright Act, the fair use provision.
The Committee determined that no change to section 107 was required because section
107, as written, is technologically **\*24** neutral, and therefore, the fair use doc-
trine is fully applicable in the digital world as in the analog world.

                 C. EXEMPTION FOR LIBRARIES AND ARCHIVES

   Section 108 of title 17 permits libraries and archives of the type described in
that section to make and, in some cases, distribute a limited number of copies of
certain types of copyrighted works, without the permission of the copyright holder,
for specified purposes relating to these entities' functions as repositories of such
works for public reference. Section 403 of the bill updates section 108 to allow
these entities to take advantage of digital technologies when engaging in specified
preservation activities.

                      IV. VOTE OF THE COMMITTEE

   Pursuant to paragraph 7 of rule XXVI of the Standing Rules of the Senate, each
Committee is to announce the results of rollcall votes taken in any meeting of the
Committee on any measure or amendment. The Senate Committee on the Judiciary, with a
quorum present, met on Thursday, April 23, 1998, at 10 a.m., to consider the Digital
Millennium Copyright Act of 1998. The Committee considered and accepted the follow-
ing three amendments en bloc, by unanimous consent: an amendment by the Chairman
(for himself, Mr. Leahy, and Mr. Ashcroft), with respect to reverse engineering of
computer programs for interoperability purposes; an amendment by the Chairman (for
himself, Mr. Leahy and Mr. Ashcroft), with respect to ephemeral recordings; and, an
amendment by Mr. Ashcroft (for himself, Mr. Leahy, and Mr. Hatch), with respect to
the exemption from copyright infringement liability for libraries and archives.
   The Committee, with a quorum present, met to resume consideration of the Digital
Millennium Copyright Act on Thursday, April 30, 1998, at 10 a.m. The Committee con-
sidered and accepted the following amendments en bloc, by unanimous consent: an
amendment by the Chairman (for himself, Mr. Leahy, and Mr. Ashcroft), with respect
to ephemeral recordings; an amendment by the Chairman (for himself, Mr. Leahy, and
Mr. Ashcroft), with respect to the use of copyright management information in the
course of certain analog and digital transmissions; an amendment by the Chairman
(for himself and Mr. Leahy), to make certain clarifying amendments; an amendment by
Mr. Ashcroft (for himself, Mr. Leahy, and Mr. Hatch), with respect to protection of
subscribers of online and Internet service providers; an amendment by Mr. Ashcroft
(for himself, Mr. Hatch, and Mr. Leahy), with respect to the accommodation of par-
ticular technological protection measures; an amendment by Mr. Ashcroft (for him-
self, Mr. Hatch, and Mr. Leahy), with respect to protection of personal privacy in-
terests; an amendment by Mr. Ashcroft (for himself, Mr. Hatch, and Mr. Leahy), with
respect to the preservation of the ability to control minors" access to material on
the Internet; an amendment by Mr. Ashcroft (for himself, Mr. Leahy, and Mr. Hatch),
with respect to distance education through digital technologies; an amendment by Mr.
Grassley (for himself and Mr. Kyl), with respect to law enforcement and intelligence
activities; and an amendment by Mrs. Feinstein, with respect **\*25** to the liability of
nonprofit educational institutions for copyright infringement online. The Committee

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**


then ordered the Digital Millennium Copyright Act of 1998 reported favorably, as
amended, with a recommendation that the bill do pass, by a rollcall vote of 18 yeas
to 0 nays.


       YEAS            NAYS
Thurmond (by proxy)
Grassley (by proxy)
Specter (by proxy)
Thompson
Kyl
DeWine
Ashcroft
Abraham (by proxy)
Sessions
Leahy
Kennedy
Biden (by proxy)
Kohl (by proxy)
Feinstein
Feingold
Durbin (by proxy)
Torricelli (by proxy)
Hatch


                    V. SECTION-BY-SECTION ANALYSIS

Section 1. Short title

   This Act may be cited as the "Digital Millennium Copyright Act of 1998.'

Section 2. Table of contents

                TITLE I-WIPO TREATIES IMPLEMENTATION

Section 101. Short title

   This Title may be cited as the "WIPO Copyright and Performances and Phonograms
Treaties Implementation Act of 1998."

Section 102. Technical amendments

   To comply with the obligations of the WIPO Treaties, several technical amendments
to the U.S. Copyright Act are necessary. These amendments are needed to ensure that
works from countries that join the two new WIPO Treaties, including works in exist-
ence on the date each treaty becomes effective for the United States, will be pro-
tected in the United States on a formality-free basis, as required by the provisions
of each treaty. Three sections of the Copyright Act require amendment: (1) section

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190                                                                Page 24
S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**


104, which specifies the conditions on which works from other countries are protec-
ted in the United States; (2) section 104A, which restores protection to certain
preexisting works from other countries that have fallen into the public domain in
the United States; and (3) section 411(a), which makes copyright registration a pre-
condition to bringing suit for infringement for some works. In addition, the amend-
ments made to **26** these sections require some additions to, and changes in, the
definition section of the Copyright Act, section 101.

   Subsection (a)-Amendments to Section 101: Definitions.-The bill amends section 101
of the Copyright Act (17 U.S.C. 101) to define "treaty party" as "any country or in-
tergovernmental organization that is a party to an international agreement" and to
define "international agreement" to include, inter alia, the two new WIPO Treaties.
Definitions of the two new WIPO Treaties are also provided. In addition, a defini-
tion of "United States work" was added for purposes of section 411 of the Copyright
Act (17 U.S.C. 411), as amended by the bill.

   Subsection (b)-Amendments to Section 104: Subject Matter of Copyright: National
Origin.-Section 104 of the Copyright Act (17 U.S.C. 104) identifies the criteria
that must be met for a work to qualify for protection under the U.S. copyright law
(i.e., "points of attachment'). Among those protected under section 104 are nation-
als or domiciliaries of those countries with which we have an appropriate treaty re-
lationship. Section 104, as it is presently written, explicitly identifies those
treaty relationships, but does not refer to the two new WIPO Treaties. Therefore,
section 104 needs to be amended to provide for points of attachment for the two new
WIPO Treaties.

   Subsection (b) amends section 104 so that all countries that have copyright rela-
tions with the United States would be referred to collectively by the term "treaty
parties." This change, in conjunction with the amendments to section 101, which
define "treaty party" and "international agreement," serves to ensure that the two
new WIPO Treaties are covered by section 104. This subsection also amends section
104 to extend protection to foreign works from any treaty party based on four points
of attachment: nationality of the author, place of first publication of the work,
place of fixation of the sounds embodied in a sound recording, and the situs of a
constructed architectural work.

   The way section 104 is presently written requires that it be amended each time
U.S. treaty membership changes. By defining "treaty party" in section 101 and amend-
ing section 104 to refer to "treaty party," future changes in the treaties to which
the U.S. is a party would not require changes to section 104. It is much clearer and
less unwieldy to have a single set of criteria for eligibility in section 104 as
proposed by this bill, rather than multiple, overlapping criteria in a long list of
complex definitions in section 101. If the U.S. joins any future treaties, those
treaties can simply be added to the list of "international agreements" without any
detailed amendments repeating the criteria for eligibility. The amendment to section
104 also makes clear that membership in the Geneva Phonograms Convention and the
WIPO Performances and Phonograms Treaty provides national eligibility for sound re-
cordings only, not other types of works.

   Subsection (c)-Amendments to Section 104A: Copyright in Restored Works.- Subsec-
tion (c) amends section 104A(h) of the Copyright Act (17 U.S.C. 104A(h)) by adding
the two new WIPO Treaties to the definitions of "date of adherence or proclamation"

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190                                                                    Page 25
S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

and "eligible country." It would also add a paragraph to the definition of "restored
work" to ensure that copyrighted works other than **27** sound recordings do not quali-
fy as restored works where the sole basis for protection in the United States is ad-
herence to the WIPO Performances and Phonograms Treaty.

   Subsection (d)-Amendments to Section 411(a): Registration and Infringement Ac-
tions.-In its current form, section 411(a) of the Copyright Act (17 U.S.C. 411(a))
requires works to be registered with the Copyright Office before suit can be brought
for their infringement, but exempts Berne Convention works whose country of origin
is not the United States. Subsection (d) amends section 411(a) of the Copyright Act
to include works from members of the two new WIPO Treaties within the exemption.

   The amendments made by subsection (d) reframe the registration requirement in the
affirmative-essentially the converse of the current section 411(a). In other words,
the provision would state affirmatively that "United States works" must be re-
gistered before suit. Rather than frame an exemption from that requirement for cer-
tain works whose origin is not the United States, section 411(a) would, as amended
by this subsection, merely limit the requirement of registration as a precondition
to suit to those works whose country of origin is the United States. "United States
works" are defined in section 101 of the Copyright Act (17 U.S.C. 101), as amended
by this Title. As discussed with respect to the amendments in subsection (b) to sec-
tion 104 of the Copyright Act, section 411(a), as amended by this subsection, may be
easily updated each time the United States joins another treaty, without the need to
change several interrelated provisions of the Act.

   Subsection (e)-Amendment to section 507(a).-Section 507(a) of the Copyright Act
(17 U.S.C. 507(a)) provides for a 3-year statute of limitations period for all crim-
inal copyright actions. Subsection (e) amends section 507(a) to recognize exceptions
to the 3-year limitations period if expressly provided elsewhere in title 17. This
amendment is necessary in light of the 5-year criminal limitation period contained
in the new chapter 12 of title 17, which is created by this title.

Section 103. Copyright protection systems and copyright management information

   The two new WIPO Treaties include substantively identical provisions on technolo-
gical measures of protection (also commonly referred to as the "black box" or "anti-
circumvention" provisions). These provisions require contracting parties to provide
"adequate legal protection and effective legal remedies against the circumvention of
effective technological measures that are used by authors in connection with the ex-
ercise of their rights under this Treaty or the Berne Convention and that restrict
acts, in respect of their works, which are not authorized by the authors concerned
or permitted by law."

   Both of the new WIPO treaties also include substantively identical provisions re-
quiring contracting parties to protect the integrity of copyright management inform-
ation. The treaties define copyright management information as "information which
identifies the work, the author of the work, the owner of any right in the work, or
information about the terms and conditions of use of the work, and any numbers or
codes that represent such information, **28** when any of these items of information is
attached to a copy of a work or appears in connection with the communication of a
work to the public.'

   Legislation is required to comply with both of these provisions. To accomplish

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

this, the bill adds a new chapter (chapter twelve) to title 17 of the United States
Code. This new chapter twelve includes five sections-(1) section 1201, which prohib-
its the circumvention of technological copyright protection measures; (2) section
1202, which protects the integrity of copyright management information; (3) section
1203, which provides for civil remedies for violations of sections 1201 and 1202;
(4) section 1204, which provides for criminal penalties for violations of sections
1201 and 1202; and (5) section 1205, which provides a savings clause to preserve the
effectiveness of federal and state laws in protecting individual privacy on the In-
ternet.

Section 1201. Circumvention of copyright protection systems

Subsection (a)-Violations regarding circumvention of technological protection
measures.-Subsection (a) applies when a person has not obtained authorized access to
a copy or a phonorecord of a work that is protected under the Copyright Act and for
which the copyright owner has put in place a technological measure that effectively
controls access to his or her work. The relevant terminology is defined in paragraph
(a)(3), as described below.

Paragraph (a)(1) establishes a general prohibition against gaining unauthorized
access to a work by circumventing a technological protection measure put in place by
the copyright owner where such protection measure otherwise effectively controls ac-
cess to a work protected under title 17 of the U.S. Code. This paragraph does not
apply to the subsequent actions of a person once he or she has obtained authorized
access to a copy of a work protected under title 17, even if such actions involve
circumvention of other types of technological protection measures.

In order to provide meaningful protection and enforcement of the copyright owner's
right to control access to his or her copyrighted work, paragraph (a)(2) supplements
the prohibition against the act of circumvention in paragraph (a)(1) with prohibi-
tions on creating and making available certain technologies, products and services
used, developed or advertised to defeat technological protections against unauthor-
ized access to a work. Similar laws have been enacted in related contexts. See,
e.g., 17 U.S.C. 1002(a) (prohibiting the import, manufacture, or distribution of di-
gital audio recording equipment lacking specified characteristics and prohibiting
the import, manufacture, or distribution of any device, or the offer to perform any
service, the primary purpose or effect of which is to circumvent the serial copy
management system required for digital audio equipment); 47 U.S.C. 553(a)(2)
(prohibiting the manufacture or distribution of equipment intended for the unauthor-
ized reception of cable television service); 47 U.S.C. 605(e)(4) (prohibiting the
manufacture, assembly, import, and sale of equipment used in the unauthorized de-
cryption of satellite cable programming.)

Specifically, paragraph (a)(2) prohibits manufacturing, importing, offering to the
public, providing, or otherwise trafficking in certain technologies, products, ser-
vices, devices, components, or parts that **29 can be used to circumvent a technolo-
gical protection measure that otherwise effectively controls access to a work pro-
tected under title 17. It is drafted carefully to target "black boxes," and to en-
sure that legitimate multipurpose devices can continue to be made and sold. For a
technology, product, service, device, component, or part thereof to be prohibited
under this subsection, one of three conditions must be met. It must: (1) be primar-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

ily designed or produced for the purpose of circumventing; (2) have only a limited
commercially significant purpose or use other than to circumvent; or (3) be marketed
by the person who manufactures it, imports it, offers it to the public, provides it
or otherwise traffics in it, or by another person acting in concert with that person
with that person's knowledge, for use in circumventing a technological protection
measure that effectively controls access to a work protected under title 17. This
provision is designed to protect copyright owners, and simultaneously allow the de-
velopment of technology.

Paragraph (a)(3) defines certain terms used throughout paragraph (a). Subparagraph
(1) defines the term "circumvent a technological protection measure" as meaning "to
descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid,
bypass, remove, deactivate, or impair a technological protection measure, without
the authority of the copyright owner." This definition applies to paragraph (a)
only, which covers protections against unauthorized initial access to a copyrighted
work. Subparagraph (2) states that a technological protection measure "effectively
controls access to a work" if the measure, in the ordinary course of its operation,
requires the application of information, or a process or a treatment, with the au-
thority of the copyright owner, to gain access to the work.

Subsection (b)-Additional violations.-Subsection (b) applies to those technologic-
al measures employed by a copyright owner that effectively protect his or her copy-
right rights in a work, as opposed to those technological protection measures
covered by subsection (a), which prevent unauthorized access to a copyrighted work.
Unlike subsection (a), which prohibits the circumvention of access control technolo-
gies, subsection (b) does not, by itself, prohibit the circumvention of effective
technological copyright protection measures. It is anticipated that most acts of
circumventing a technological copyright protection measure will occur in the course
of conduct which itself implicates the copyright owners rights under title 17. This
subsection is not intended in any way to enlarge or diminish those rights. Thus, for
example, where a copy control technology is employed to prevent the unauthorized re-
production of a work, the circumvention of that technology would not itself be ac-
tionable under section 1201, but any reproduction of the work that is thereby facil-
itated would remain subject to the protections embodied in title 17.

Paralleling paragraph (a)(2), above, paragraph (b)(1) seeks to provide meaningful
protection and enforcement of copyright owners' use of technological protection
measures to protect their rights under title 17 by prohibiting the act of making or
selling the technological means to overcome these protections and thereby facilitate
copyright infringement. Paragraph (b)(1) prohibits manufacturing, importing, offer-
ing to the public, providing, or otherwise **\*30** trafficking in certain technologies,
products, services, devices, components, or parts thereof that can be used to cir-
cumvent a technological protection measure that effectively protects a right of a
copyright owner under title 17 in a work or portion thereof. Again, for a techno-
logy, product, service, device, component, or part thereof to be prohibited under
this subsection, one of three conditions must be met. It must: (1) be primarily de-
signed or produced for the purpose of circumventing; (2) have only limited commerci-
ally significant purpose or use other than to circumvent; or (3) be marketed by
the person who manufactures it, imports it, offers it to the public, provides it, or
otherwise traffics in it, or by another person acting in concert with that person

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190                                                    Page 28
S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

with that person's knowledge, for use in circumventing a technological protection
measure that effectively protects the right of a copyright owner under title 17 in a
work or a portion thereof. Like paragraph (a)(2), this provision is designed to pro-
tect copyright owners, and simultaneously allow the development of technology.

 Paragraph (b)(2) defines certain terms used in subsection (b). Subparagraph
(b)(2)(A) defines the term "circumvent protection afforded by a technological pro-
tection measure" as "avoiding, bypassing, removing, deactivating, or otherwise im-
pairing a technological protection measure." Subparagraph (b)(2)(B) provides that a
technological protection measure "effectively protects a right of a copyright owner
under title 17" if the measure, in the ordinary course of its operation, prevents,
restricts, or otherwise limits the exercise of a right under Title 17 of a copyright
owner.

 Subsection (c)-Importation.-Subsection (c) prohibits the importation, sale for im-
portation, or sale within the United States after importation by the owner, importer
or consignee of any technology, product, service, device, component, or part thereof
covered by subsections (a) or (b). This paragraph further provides that violations
of this provision are actionable under section 337 of the Tariff Act (19 U.S.C.
1337), which authorizes actions by the International Trade Commission against unfair
import practices.

 Subsection (d)-Other rights, etc., not affected.-Subsection (d) sets forth several
provisions clarifying the scope of section 1201. Paragraph (d)(1) provides that sec-
tion 1201 shall not have any effect on rights, remedies, limitations, or defenses to
copyright infringement, including fair use, under title 17. Paragraph (d)(2)
provides that section 1201 shall not alter the existing doctrines of contributory or
vicarious liability for copyright infringement in connection with any technology,
product, service, device, component or part thereof. Together, these provisions are
intended to ensure that none of the provisions in section 1201 affect the existing
legal regime established in the Copyright Act and case law interpreting that stat-
ute.

 Paragraph (d)(3) clarifies that nothing in section 1201 creates a mandate requir-
ing manufacturers of consumer electronics, telecommunications, and computing
products to design their products or their parts and components to respond to any
particular technological measure employed to protect a copyrighted work. The provi-
sion also makes clear, however, that while the failure of a product to respond to a
particular technological measure does not in and of itself create liability, neither
does the failure of the product to respond **31** to a particular technological protec-
tion measure immunize those trafficking in the product from liability under section
1201(a)(2) or (b), if the tests of liability in those provisions are met.

 Subsection (e)-Exemption for nonprofit libraries, archives, and educational insti-
tutions.-Subsection (e) provides a limited exemption from the prohibition on circum-
vention of technological protection measures contained in section 1201(a)(1) for
qualified nonprofit libraries, archives, and educational institutions.

 Paragraph (1) of this subsection allows a nonprofit library, nonprofit archives or
nonprofit educational institution to obtain access to a copyrighted work for the
sole purpose of making a good faith determination as to whether it wishes to acquire
a copy, or portion of a copy, of that work in order to engage in conduct permitted
under the Copyright Act, such as a fair use under section 107. A qualifying institu-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

tion may not gain access for a period of time longer than necessary to determine
whether it wishes to obtain a copy, or portion of a copy, for such purposes, and the
right to gain access shall not apply for any other purpose.

Paragraph (2) provides that the right to obtain access under this paragraph only
applies when the nonprofit library, nonprofit archives, or nonprofit educational in-
stitution cannot obtain a copy of an identical work by other means, and such an en-
tity may not use the exemption in this paragraph for commercial advantage or finan-
cial gain without penalty.

Paragraph (3) seeks to protect the legitimate interests of copyright owners by
providing a civil remedy against a library, archive, or educational institution that
violates section 1201(a) by gaining access to a commercially exploited copyrighted
work and willfully and for the purpose of commercial advantage or financial gain
failing to comply with the provisions of paragraph (1)(A) (requiring that a qualify-
ing library, archive, or educational institution not retain the work for longer than
necessary to make a good faith determination as to whether to acquire a copy or por-
tion of the work) or paragraph (1)(B) (requiring that a qualifying library, archive,
or educational institution not use the work to which it has gained access for any
purpose other than to make a good faith determination as to whether to acquire a
copy or portion of the work). Under this paragraph, a violator shall be subject to
civil remedies under section 1203 for the first time it gains access in violation of
section 1201(a) without complying with the requirements of paragraph (1). For sub-
sequent offenses, the violator shall not only be subject to civil remedies under
section 1203, but also lose the benefit of the exemption provided by this subsec-
tion.

Paragraph (4) provides that this subsection may not be used as a defense to the
prohibitions on manufacturing or selling devices contained in sections 1201(a)(2) or
1202(b).

Finally, paragraph (5) provides that a library or archive, to be eligible for the
exemption in paragraph (1), must maintain its collections open to the public and
available, not only to researchers affiliated with the library or archives or with
the institution of which it is a part, but also to other persons doing research in a
specialized field.

Subsection (f)-Law enforcement and intelligence activities.-Subsection (f) creates
an exception for the lawfully authorized investigative,**\*32** protective, or intelli-
gence activities of an officer, agent, or employee of, the United States, a State,
or a political subdivision of a State, or of persons acting pursuant to a contract
with such an entity. This exception will protect officers, agents, employees, or
contractors of, or other persons acting at the direction of, a law enforcement or
intelligence agency of the United States, a State, or a political subdivision of a
State, who are performing lawfully authorized investigative, protective, or intelli-
gence activities. This exception will also protect officers, agents, employees, or
contractors of, or other persons acting at the direction of, elements or divisions
of an agency or department of the United States, a State, or a political subdivision
of a State, which does not have law enforcement or intelligence as its primary func-
tion, but who may nevertheless, in the course of lawfully authorized protective, in-
telligence, or criminal investigative activities, engage in actions otherwise pro-
hibited by this bill. This exception only applies to individuals covered under this

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

section when they are performing investigative, protective, or intelligence activit-
ies, within the scope of their duties and in furtherance of lawfully authorized
activities.

   Subsections (g)-(j)-Interoperability of computer programs.- Subsections (g)
through (j) are intended to allow legitimate software developers to continue enga-
ging in certain activities for the purpose of achieving interoperability to the ex-
tent permitted by law prior to the enactment of this chapter. The objective is to
ensure that the effect of current case law interpreting the Copyright Act is not
changed by enactment of this legislation for certain acts of identification and ana-
lysis done in respect of computer programs. See, Sega Enterprises Ltd. v. Accolade,
Inc., 977 F.2d 1510, 24 U.S.P.Q.2d 1561 (9th Cir. 1992.). The purpose of this sec-
tion is to foster competition and innovation in the computer and software industry.

   Subsection (g) permits the circumvention of access control technologies for the
sole purpose of achieving software interoperability. For example, this subsection
permits a software developer to circumvent an access control technology applied to a
portion or portions of a program in order to perform the necessary steps to identify
and analyze the information necessary to achieve interoperability. Subsection (g)
permits the act of circumvention in only certain instances. First, the copy of the
computer program which is the subject of the analysis must be lawfully acquired.
That is the computer program must be acquired from a legitimate source, along with
any necessary serial codes, passwords, or other such means as may be necessary to be
able to use the program as it was designed to be used by a consumer of the product.
The permitted acts must be limited to those elements of the program which must be
analyzed to achieve the sole permitted purpose, which is interoperability of an in-
dependently created program with other programs. Interoperability is defined in sub-
section (j) as the ability of computer programs to exchange information, and for
such programs mutually to use the information which has been exchanged. The result-
ing product must be a new and original work, in that it may not infringe the origin-
al computer program. In addition, the objective of the analysis must be to identify
and extract such elements as are necessary to achieve interoperability which are not
**33** otherwise available to the person. Finally, the goal of this section is to en-
sure that current law is not changed, and not to encourage or permit infringement.
Thus, each of the acts undertaken must avoid infringing the copyright of the author
of the underlying computer program.

   Subsection (h) recognizes that to accomplish the acts permitted under subsection
(g) a person may, in some instances, have to make and use certain tools. In most in-
stances these will be generally available tools that programmers use in developing
computer programs, such as compilers, trace analyzers and disassemblers, which are
not prohibited by this section. In certain instances, it is possible that a person
may have to develop special tools to achieve the permitted purpose of interoperabil-
ity. Thus, this provision creates an exception to the prohibition on making circum-
vention tools contained in subsections 1201(a)(2) and (b). These tools can be either
software or hardware. Again, this provision is limited by a general admonition not
to act in a way that constitutes infringing activity.

   Subsection (i) recognizes that developing complex computer programs often involves
the efforts of many persons. For example, some of these persons may be hired to de-
velop a specific portion of the final product. For that person to perform these

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190                                                          Page 31
S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

tasks, some of the information acquired through the permitted analysis, and the
tools to accomplish it, may have to be made available to that person. This subsec-
tion allows developers of independently created software to rely on third parties
either to develop the necessary circumvention tools or to identify the necessary in-
formation to achieve interoperability. The ability to rely on third parties is par-
ticularly important for small software developers who do not have the capability of
performing these functions in-house. This provision permits such sharing of informa-
tion and tools. Recognizing, however, that making such circumvention information or
tools generally available would undermine the objectives of this Act, this section
imposes strict limitations. Such acts of sharing information and tools is permitted
solely for the purpose of achieving interoperability of an independently created
computer program with other programs. If a person makes this information available
for a purpose other than to achieve interoperability of an independently created
computer program with other programs, that action is a violation of this Act. In ad-
dition, these acts are permitted only to the extent that doing so does not consti-
tute infringement under this title, or violate applicable law other than this title.

   Subsection (j) defines "interoperability" as the ability of computer programs to
exchange information, and for such programs mutually to use the information which
has been exchanged. The seamless exchange of information is an key element of creat-
ing such an interoperable independently created program. This provision applies to
computer programs as such, regardless of their medium of fixation and not to works
generally, such as music or audiovisual works, which may be fixed and distributed in
digital form. Accordingly, since the goal of interoperability is the touchstone of
the exceptions contained in subsections 1201(g) through (j), nothing in those sub-
sections can be read to authorize the circumvention of any technological protection
measure that controls access to any work other **\*34** than a computer program, or the
trafficking in products or services for that purpose.

   Subsection (k).–The Committee was concerned that section 1201(a) might inadvert-
ently make it unlawful for parents to protect their children from pornography and
other harmful material available on the Internet, or have unintended legal con-
sequences for manufacturers of products designed solely to enable parents to protect
their children in this fashion. Subsection (k) addresses these concerns.

Section 1202: Integrity of copyright management information

   Section 1202 implements the obligation contained in Article 12 of the WIPO Copy-
right Treaty and Article 19 of the WIPO Performances and Phonograms Treaty that Con-
tracting Parties "provide adequate and effective legal remedies" against any person
who knowingly and without authority removes or alters copyright management informa-
tion (CMI), or who distributes, imports, broadcasts, or communicates to the public,
works or copies of works knowing that such information has been removed or altered
without authority. [FN22] This section does not mandate the use of CMI, nor does it
prescribe the choice of any particular type of CMI for those who do use it. It
merely protects the integrity of CMI if a party chooses to use it in connection with
a copyrighted work by prohibiting its deliberate deletion or alteration. Further-
more, this section imposes liability for specified acts. It does not address the
question of liability for persons who manufacture devices or provide services.
   Subsection (a)-False copyright management information.–Subsection (a) establishes

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190                                                      Page 32
S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

a general prohibition against intentionally providing false copyright management in-
formation, as defined in subsection (c), and against distributing or importing for
distribution false copyright management information. There are two prerequisites
that must be met for these prohibitions to be violated: **35** (1) the person provid-
ing, distributing or importing the false CMI must know the CMI is false, and (2) the
person providing, distributing, or importing the false CMI must do so with the in-
tent to induce, enable, facilitate or conceal an infringement of any right under
title 17.

   Subsection (b)-Removal or alteration of copyright management information.- Subsec-
tion (b) establishes general prohibitions against removing or altering CMI, against
distributing or importing for distribution altered CMI, and against distributing,
importing for distribution or publicly performing works in which CMI has been re-
moved. There are three specific acts prohibited if they are committed without the
authority of the copyright owner or the law, and if they are done knowing, or with
respect to civil remedies under section 1203, having reasonable grounds to know,
that they will induce, enable, facilitate or conceal a copyright infringement: (1)
intentionally removing or altering CMI; (2) distributing or importing for distribu-
tion CMI knowing that it has been altered without the authority of the copyright
owner or the law; or (3) distributing, importing for distribution, or publicly per-
forming works, copies of works, or phonorecords knowing that CMI has been removed or
altered without the authority of the copyright owner or the law.

   Subsection (c)-Definition.-Subsection (c) defines "copyright management informa-
tion." To fall within the definition, there is a threshold requirement that the in-
formation be conveyed in connection with copies or phonorecords, performances or
displays of the copyrighted work. The term "conveyed" is used in its broadest sense
and is not meant to require any type of transfer, physical or otherwise, of the in-
formation. It merely requires that the information be accessible in conjunction
with, or appear with, the work being accessed. Such information is "copyright man-
agement information" as defined in this subsection if it falls within the categories
enumerated in paragraphs (1) through (6).

   Paragraph (1) describes information that identifies the copyrighted work, includ-
ing the title of a work. This paragraph makes clear that the information set forth
on a notice of copyright is included within the definition of copyright management
information.

   Paragraph (2) describes information that identifies the author of the work.

   Paragraph (3) describes information that identifies the copyright owner.

   Paragraph (4) describes information that identifies a performer whose performance
is fixed in a work, other than an audiovisual work. Information that identifies such
a performer is excluded from the definition of CMI, however, when such information
is conveyed by a radio or television broadcast station in connection with the public
performance of a work.

   Paragraph (5) describes, in the case of an audiovisual work, information that
identifies the writer, performer, or director who is credited in the work. Parallel-
ing paragraph (4), information that identifies such a writer, performer, or director
is excluded from the definition of CMI when such information is conveyed by a radio
or television broadcast station in connection with the public performance of a work.

   **36** Paragraph (6) describes numbers and symbols which refer to or represent the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

above information. As noted above, both the WIPO Copyright Treaty and the WIPO Per-
formances and Phonograms Treaty require that numbers and symbols be included within
the definition of CMI. Links, such as embedded pointers and hypertext links, to the
above information are also included. The phrase "links to such information" was in-
cluded because removing or altering a link to the information will have the same ad-
verse effect as removing or altering the information itself.

Finally, paragraph (7) permits the Register of Copyrights to prescribe by regula-
tion other information that, if conveyed in connection with a work, is to be protec-
ted as copyright management information. To protect the privacy of users of copy-
righted works, however, the Register of Copyrights may not include within the defin-
ition of CMI any information concerning users of copyrighted works.

Consistent with the proviso contained in paragraph (7), it should be noted that
the definition of "copyright management information" does not encompass, nor is it
intended to encompass, tracking or usage information relating to the identity of
users of the works. The definition of CMI is limited by this subsection to the types
of information listed, and it would be inconsistent with the purpose and construc-
tion of this bill, and contrary to the protection of privacy to include, tracking
and usage information within the definition of CMI.

Subsection (d)-Law enforcement and intelligence activities.-Section 1202(d) cre-
ates an exception for the lawfully authorized investigative, protective, or intelli-
gence activities of an officer, agent, or  employee of, the United States, a State,
or a political subdivision of a State, or of persons acting pursuant to a contract
with such an entity. This exception will protect officers, agents, employees, or
contractors of, or other persons acting at the direction of, a law enforcement or
intelligence agency of the United States, a State, or a political subdivision of a
State, who are performing lawfully authorized investigative, protective, or intelli-
gence activities. This exception will also protect officers, agents, employees, or
contractors of, or other persons acting at the direction of, elements or divisions
of an agency or department of the United States, a State, or a political subdivision
of a State, which does not have law enforcement or intelligence as its primary func-
tion, but who may nevertheless, in the course of lawfully authorized protective, in-
telligence, or criminal investigative activities, engage in actions otherwise pro-
hibited by this section. This exception only applies to individuals covered under
this subsection when they are performing investigative, protective, or intelligence
activities, within the scope of their duties and in furtherance of lawfully author-
ized activities.

Subsection (e)-Limitations on Liability.-Subsection (e) recognizes special prob-
lems that certain broadcasting entities may have with the transmission of copyright
management information. Under this subsection, radio and television broadcasters,
cable systems, and persons who provide programming to such broadcasters or systems,
who do not intend to induce, enable, facilitate or conceal infringement (eligible
persons) may be eligible for a limitation on liability for violation of the copy-
right management information provisions of subsection (b) in certain, limited cir-
cumstances.

**\*37** In the case of an analog transmission, paragraph (1) provides that an eligible
person will not be held liable for violating provisions of subsection (b) if it is
not "technically feasible" for that person to avoid the violation or if avoiding the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

violation would "create an undue financial hardship." Avoiding a violation of sub-
section (b) with respect to the transmission of credits that are of an excessive
duration in relation to standard practice in the relevant industries (for instance,
the motion picture and television broadcast industries) is one example of an activ-
ity that may "create an undue financial hardship" under paragraph (1). As indicated
above, this limitation on liability applies only if such person did not intend, by
engaging in such activity, to induce, enable, facilitate or conceal infringement.

Paragraph (2) provides a limitation on liability in the case of a digital trans-
mission, and contemplates voluntary digital transmission standards for the placement
of copyright management information. Separate standards are likely to be set for the
location of copyright management information in different categories of works. For
instance, the standard(s) for the location of the name of the copyright owner in a
sound recording or musical work to be broadcast by radio stations may differ-and be
set in a separate standard-setting process(es)-from the standard for the location of
such information in a motion picture to be broadcast by television stations.

Paragraph (2)(A) provides that if a digital transmission standard for the place-
ment of copyright management information for a category of works is set in a volun-
tary, consensus standard-setting process involving a representative cross-section of
the relevant copyright owners and relevant transmitting industry, including but not
limited to representatives of radio or television broadcast stations, cable systems,
and copyright owners of a category of works that are intended for public performance
by such stations or systems, an eligible person will not be liable for a violation
of subsection (b) if the copyright management information involved in the violation
was not placed in a location specified by the standard for that information. The
eligible person, however, cannot qualify for this limitation on liability if that
person was responsible for the nonconforming placement.

Paragraph (2)(B)(i) provides that until such a standard is set for a category of
works, an eligible person will not be liable for a violation of subsection (b) if
the transmission of the copyright management information would cause a perceptible
visual or aural degradation of the digital signal. Paragraph (2)(B)(ii) provides
that during this time period before a standard is set, an eligible person also will
not be liable if the digital transmission of the information would conflict with an
applicable government regulation or industry standard relating to transmission of
information in a digital signal, such as the regulation requiring the placement of
closed captioning in line 21 of the vertical blanking interval (47 C.F.R. 79.1, im-
plementing 47 U.S.C. 613). For purposes of this paragraph, however, the applicable
industry-wide standard must be of a type specified in paragraphs (2)(B)(ii)(II) or
(III). The first type, defined in paragraph (2)(B)(ii)(II), includes only those
standards that were adopted by a voluntary, consensus standards body, such as the
Advanced **38 Television Systems Committee, before the effective date of section
1202. The other type, defined in paragraph (2)(B)(ii)(III), includes only those
standards adopted in a voluntary, consensus standards-setting process open to parti-
cipation by groups, including but not limited to a representative cross-section of
radio or television broadcast stations, cable systems, and copyright owners of a
category of works that are intended for public performance by such stations or sys-
tems.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**


Section 1203-Civil remedies

   Subsection (a)-Civil actions.-Subsection (a) sets forth the general proposition
that civil remedies are available for violations of sections 1201 and 1202. This
paragraph establishes the jurisdiction for such civil actions as the "appropriate
U.S. district court" and limits standing to bring a civil action to those persons
injured by a violation of section 1201 or 1202.
   Subsection (b)-Powers of the court.-Subsection (b) sets out the powers of the
court that hears the case. Paragraph (1) authorizes the court to grant temporary and
permanent injunctions on such terms as it deems reasonable to prevent or restrain a
violation of section 1201 or 1202. Paragraph (2) authorizes the court to order the
impounding of any device or product that is in the custody or control of the alleged
violator and that the court has reasonable cause to believe was involved in a viola-
tion. Under paragraph (3), the court may award damages as provided in subsection
(c). Paragraph (4) authorizes the court to allow the recovery of costs by or against
any party other than the United States or an officer thereof. Under paragraph (5),
the court may award reasonable attorneys' fees to the prevailing party. Finally,
paragraph (6) authorizes the court to order the remedial modification or the de-
struction of any device or product involved in a violation of section 1201 or 1202
that is in the custody or control of the violator or has been impounded under para-
graph (2).
   Subsection (c)-Award of damages.-Subsection (c) is divided into five paragraphs,
each of which addresses the awarding of damages to the prevailing party.
   Paragraph (1) establishes the general proposition that a person who violates sec-
tion 1201 or 1202 is liable for either actual damages and any additional profits of
the violator, or statutory damages.
   Paragraphs (2) and (3) specify that the complaining party may finalize a choice
between the two types of damage awards at any time until the final judgment is
entered.
   Paragraph (2) provides that, when the prevailing party opts for actual damages,
the court shall award to that party the actual damages suffered by the party as a
result of the violations, as well as any profits of the violator that are attribut-
able to the violation and are not taken into account in computing the actual dam-
ages.
   Paragraph (3) provides different statutory award amounts depending upon whether
the civil action involves a section 1201 or 1202 violation. When the violation is a
section 1201 violation and the prevailing party opts to recover an award of stat-
utory damages, the prevailing party will be awarded statutory damages of not less
than $200 or more than $2,500 per act of circumvention, device, **39** product, compon-
ent, offer, or performance of service. When the violation is a section 1202 viola-
tion and the prevailing party opts to recover an award of statutory damages, the
prevailing party will be awarded statutory damages of not less than $2,500 or more
than $25,000 for each violation.
   Paragraphs (4) and (5) set forth circumstances in which it would be appropriate to
increase or decrease a damage award.
   Paragraph (4) provides for an increased damage award when the violator is a repeat
offender. Specifically, when the prevailing party establishes that a person violated

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

section 1201 or 1202 within three years after a final judgment was entered against
that person for another such violation, the award of damages may be increased to a
sum of up to triple the amount that would otherwise be awarded.

Paragraph (5)(A) provides that, when a violator of section 1201 or 1202 was not
aware and had no reason to believe that its acts constituted a violation, the damage
award may be reduced or remitted. Paragraph (5)(B) requires the reduction or remis-
sion of damages in certain circumstances by providing that, when a nonprofit lib-
rary, nonprofit archives, or nonprofit educational institution violator of section
1201 or 1202 was not aware and had no reason to believe that its acts constituted a
violation, the damage award shall be remitted entirely.

Section 1204-Criminal offenses and penalties

Subsection (a)-In general.-Subsection (a) provides for the availability of crimin-
al penalties for violations of sections 1201 and 1202. The standard applicable under
this subsection is identical to the standard used in section 506 of the Copyright
Act to establish criminal violations. Subsection (a)(1) sets forth the penalties
available for a criminal violation of sections 1201 and 1202 as "not more than
$500,000 or imprisonment for not more than five years, or both" for the first of-
fense. If the person who is found guilty of criminal violation of sections 1201 or
1202 is a repeat offender, subsection (a)(2) provides that penalties may be in-
creased to "not more than $1,000,000 or imprisonment for not more than ten years, or
both."

Subsection (b)-Limitation for nonprofit library, archives, or educational institu-
tion.-Subsection (b) exempts completely any nonprofit library, nonprofit archives or
nonprofit educational institution from the criminal penalties contained in subsec-
tion (a).

Subsection (c)-Statute of limitations.-Subsection (c) provides for a 5-year stat-
ute of limitations for criminal offenses under chapter 12.

Section 104. Conforming amendment

This section amends the table of chapters for title 17 to reflect the addition of
new chapter 12.

Section 105. Effective date

Subsection (a)-In general.-Subsection (a) establishes the effective date of the
proposed amendments in this bill as the date the bill is enacted into law, subject
to the exceptions enumerated in subsection (b).

**\*40** Subsection (b)-Amendments relating to certain international agree-
ments.-Subsection (b) sets forth several exceptions to the effective date estab-
lished by subsection (a). These exceptions only apply to the technical amendments
that are proposed in section 102 of the bill. Section 105 of the bill changes the
effective date of any provision in section 102 of the bill that specifically refers
to the WIPO Copyright Treaty or the WIPO Performances and Phonograms Treaty from the
date the bill is enacted into law to the date the Treaty enters into force.

These exceptions are necessary because, as of the drafting of this bill, the two
treaties have not entered into force and will not do so until three months after 30

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

States deposit their instruments of ratification or accession with the Director Gen-
eral of WIPO. The exceptions ensure that the amendments that refer specifically to
the two treaties do not become effective until the treaties themselves become ef-
fective. In addition, it was necessary to refer to each treaty separately in this
section, because it is possible that the two treaties may enter into force at dif-
ferent times and the amendments particular to each treaty had to be grouped together
to ensure that the provisions relating specifically to one treaty do not become ef-
fective once the other treaty enters into force. Finally, it was necessary to add
the phrase "with respect to the United States" in paragraphs (1) and (2) to ensure
that, if the Treaties enter into force before the United States deposits its instru-
ment of accession, the United States does not extend benefits to Member States of
these Treaties until the United States becomes party to the Treaties.

### TITLE II-INTERNET COPYRIGHT INFRINGEMENT LIABILITY

   The liability of online service providers and Internet access providers for copy-
right infringements that take place in the online environment has been a controver-
sial issue. Title II of the Digital Millennium Copyright Act, the Internet Copyright
Infringement Liability Clarification Act, addresses this complex issue. Title II
preserves strong incentives for service providers and copyright owners to cooperate
to detect and deal with copyright infringements that take place in the digital net-
worked environment. At the same time, it provides greater certainty to service pro-
viders concerning their legal exposure for infringements that may occur in the
course of their activities.

   New section 512 contains limitations on service providers' liability for five gen-
eral categories of activity set forth in subsections (a) through (d) and subsection
(f). As provided in subsection (k), section 512 is not intended to imply that a ser-
vice provider is or is not liable as an infringer either for conduct that qualifies
for a limitation of liability or for conduct that fails to so qualify. Rather, the
limitations of liability apply if the provider is found to be liable under existing
principles of law.

   The limitations in subsections (a) through (d) protect qualifying service pro-
viders from liability for all monetary relief for direct, vicarious and contributory
infringement. Monetary relief is defined in subsection (j)(2) as encompassing dam-
ages, costs, attorneys' fees, and any other form of monetary payment. These subsec-
tions also limit injunctive relief against qualifying service providers to the ex-
tent **41** specified in subsection (i). To qualify for these protections, service pro-
viders must meet the conditions set forth in subsection (h), and service providers'
activities at issue must involve a function described in subsection (a), (b), (c),
(d) or (f), respectively. The liability limitations apply to networks "operated by
or for the service provider," thereby protecting both service providers who offer a
service and subcontractors who may operate parts of, or an entire, system or network
for another service provider.

Section 201. Short title

   This title may be cited as the "Internet Copyright Infringement Liability Clari-
fication Act of 1998."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)

**(Cite as: S. REP. 105-190)**


Section 202. Limitations on liability for Internet copyright infringement

   This section amends chapter 5 of the Copyright Act (17 U.S.C. 501, et. seq.) to
create a new section 512, titled "Liability of service providers for online in-
fringement of copyright."

   Subsection (a)-Digital network communications.-Subsection (a) applies to communic-
ations functions associated with sending digital communications of others across di-
gital networks, such as the Internet and other online networks. It establishes a
limitation on liability for infringements that may occur in the provision of ser-
vices falling within the definition of subsection (j)(1)(A). The limitations on in-
junctive relief set forth in subsection (i)(1)(B) are applicable when the functions
at issue fall within the provisions of subsection (a), and the service provider
meets the threshold criteria of subsection (h). [FN23]

   Subsection (a) applies to service providers transmitting, routing, or providing
connections for material, and some forms of intermediate and transient storage of
material in the course of performing these functions. For example, in the course of
moving packets of information across digital online networks, many intermediate and
transient copies of the information may be made in routers and servers along the
way. Such copies are created as an automatic consequence of the transmission pro-
cess. In this context, "intermediate and transient" refers to such a copy made and/
or stored in the course of a transmission, not a copy made or stored at the points
where the transmission is initiated or received.

   The use of the term "transmitting" throughout section 512 is not intended to be
limited to transmissions of "a performance or display" of "images or sounds" within
the meaning of section 101 of the Copyright Act.

   Subsections (a)(1) through (5) limit the range of activities that qualify under
this subsection to ones in which a service provider plays the role of a "conduit"
for the communications of others. This limitation on liability applies if: (1) the
communication was initiated by or at the direction of a person other than the ser-
vice provider; (2) it is carried out through an automatic technical process without
selection of the material by the service provider; (3) the service provider does not
select the recipients of the material except as an automatic response to the request
of another; (4) no copy **42** of the material made in the course of intermediate or
transient storage is maintained on the system or network so that it is ordinarily
accessible to other than the anticipated recipients, and no copy is maintained on
the system or network in a manner ordinarily accessible to the anticipated recipi-
ents for a longer period than is reasonably necessary for the communication; and (5)
the content (but not necessarily the form) of the material is not modified in the
course of transmission. Thus, for example, an e-mail transmission may appear to the
recipient without bolding or italics resulting from format codes contained in the
sender's message.

   The Committee intends the term "selection of the material" in subsection (a)(2) to
reflect an editorial function of determining what material to send, or the specific
sources of material to place online (e.g., a radio station), rather than "an auto-
matic technical process" of responding to a command or request, such as one from a
user, an Internet location tool, or another network. The term "automatic response to
the request of another" is intended to encompass a service provider's actions in re-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190                                                    Page 39
S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

sponding to requests by a user or other networks, such as requests to forward e-mail
traffic or to route messages to a mailing list agent (such as a Listserv) or other
discussion group. The Committee intends subsection (a)(4) to cover copies made of
material while it is en route to its destination, such as copies made on a router or
mail server, storage of a web page in the course of transmission to a specific user,
store and forward functions, and other transient copies that occur en route. The
term "ordinarily accessible" is intended to encompass stored material that is
routinely accessible to third parties. For example, the fact that an illegal in-
truder might be able to obtain access to the material would not make it ordinarily
accessible to third parties. Neither, for example, would occasional access in the
course of maintenance by service provider personnel, nor access by law enforcement
officials pursuant to subpoena make the material "ordinarily accessible." However,
the term does not include copies made by a service provider for the purpose of mak-
ing the material available to other users. Such copying is addressed in subsection
(b).

  Subsection (b)-System caching.-Subsection (b) applies to a different form of in-
termediate and temporary storage than is addressed in subsection (a). In terminology
describing current technology, this storage is a form of "caching," which is used on
some networks to increase network performance and to reduce network congestion gen-
erally, as well as to reduce congestion and delays to popular sites. This storage is
intermediate in the sense that the service provider serves as an intermediary
between the originating site and ultimate user. The material in question is stored
on the service provider's system or network for some period of time to facilitate
access by users subsequent to the one who previously sought access to it.

  For subsection (b) to apply, the material must be made available on an originating
site, transmitted at the direction of another person through the system or network
operated by or for the service provider to a different person, and stored through an
automatic technical process so that users of the system or network who subsequently
request access to the material from the originating site may obtain access to the
material from the system or network.

  **\*43** Subsections (b)(1) through (b)(5) further refine the circumstances under which
subsection (b) applies. Subsection (b)(1) provides that the material must be trans-
mitted to subsequent users without modification to its content in comparison to the
way it was originally transmitted from the originating site. The Committee intends
that this restriction apply, for example, so that a service provider who caches ma-
terial from another site does not change the advertising associated with the cached
material on the originating site without authorization from the originating site.

  Subsection (b)(2) limits the applicability of the subsection to circumstances
where the service provider complies with certain updating commands.

  Subsection (b)(3) provides that the service provider shall not interfere with the
ability of certain technology that is associated with the work by the operator of
the originating site to return to the originating site information, such as user
"hit" counts, that would have been available to the site had it not been cached. The
technology must: (i) not significantly interfere with the performance of the storing
provider's system or network or with intermediate storage of the material; (ii) be
consistent with generally accepted industry standard communications protocols ap-
plicable to Internet and online communications, such as those approved by the Inter-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190                                                    Page 40
S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

net Engineering Task Force and the World Wide Web Consortium; and (iii) not extract
information beyond that which would have been obtained had the subsequent users ob-
tained access to the material directly on the originating site.

Subsection (b)(4) applies to circumstances in which the originating site imposes a
prior condition on access.

Subsection (b)(5) establishes a notification and take down procedure for cached
material modeled on the procedure under subsection (c). However, this take down ob-
ligation does not apply unless the material has previously been removed from the
originating site, or the party submitting the notification has obtained a court or-
der for it to be removed from the originating site and notifies the service pro-
vider's designated agent of that order. This proviso has been added to subsection
(b)(5) because storage under subsection (b) occurs automatically and unless in-
fringing material has been removed from the originating site, the infringing materi-
al would ordinarily simply be re-cached.

Subsection (c)-Information stored on service providers.-Subsection (c) limits the
liability of qualifying service providers for claims of direct, vicarious and con-
tributory infringement for storage at the direction of a user of material that
resides on a system or network controlled or operated by or for the service pro-
vider. Examples of such storage include providing server space for a user's web
site, for a chatroom, or other forum in which material may be posted at the direc-
tion of users. Subsection (c) defines the scope of this limitation on liability. It
also sets forth procedural requirements that copyright owners or their agents and
service providers must follow with respect to notifications of claimed infringement
under subsection (c)(3). Information that resides on the system or network operated
by or for the service provider through its own acts or decisions and not at the dir-
ection of a user does not fall within the liability limitation of subsection (c).

**\*44** Subsection (c)(1)-In general.-Subsection (c)(1)(A) sets forth the applicable
knowledge standard. This standard is met either by actual knowledge of infringement
or in the absence of such knowledge by awareness of facts or circumstances from
which infringing activity is apparent. The term "activity" is intended to mean
activity using the material on the system or network. The Committee intends such
activity to refer to wrongful activity that is occurring at the site on the pro-
vider's system or network at which the material resides, regardless of whether copy-
right infringement is technically deemed to occur at that site or at the location
where the material is received. For example, the activity at an online site offering
audio or video may be unauthorized public performance of a musical composition, a
sound recording, or an audio-visual work, rather than (or in addition to) the cre-
ation of an unauthorized copy of any of these works.

Subsection (c)(1)(A)(ii) can best be described as a "red flag" test. As stated in
subsection (l), a service provider need not monitor its service or affirmatively
seek facts indicating infringing activity (except to the extent consistent with a
standard technical measure complying with subsection (h)), in order to claim this
limitation on liability (or, indeed any other limitation provided by the legisla-
tion). However, if the service provider becomes aware of a "red flag" from which in-
fringing activity is apparent, it will lose the limitation of liability if it takes
no action. The "red flag" test has both a subjective and an objective element. In
determining whether the service provider was aware of a "red flag," the subjective

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

awareness of the service provider of the facts or circumstances in question must be
determined. However, in deciding whether those facts or circumstances constitute a
"red flag"-in other words, whether infringing activity would have been apparent to a
reasonable person operating under the same or similar circumstances-an objective
standard should be used.

  Subsection (c)(1)(A)(iii) provides that once a service provider obtains actual
knowledge or awareness of facts or circumstances from which infringing material or
activity on the service provider's system or network is apparent, the service pro-
vider does not lose the limitation of liability set forth in subsection (c) if it
acts expeditiously to remove or disable access to the infringing material. Because
the factual circumstances and technical parameters may vary from case to case, it is
not possible to identify a uniform time limit for expeditious action.

  Subsection (c)(1)(B) sets forth the circumstances under which a service provider
would lose the protection of subsection (c) by virtue of its benefit from and con-
trol over infringing activity. In determining whether the financial benefit cri-
terion is satisfied, courts should take a common-sense, fact-based approach, not a
formalistic one. In general, a service provider conducting a legitimate business
would not be considered to receive a "financial benefit directly attributable to the
infringing activity" where the infringer makes the same kind of payment as non-
infringing users of the provider's service. Thus, receiving a one-time set-up fee
and flat periodic payments for service from a person engaging in infringing activit-
ies would not constitute receiving a "financial benefit directly attributable to the
infringing activity." Nor is subparagraph (B) intended **\*45** to cover fees based on
the length of the message (per number of bytes, for example) or by connect time. It
would however, include any such fees where the value of the service lies in provid-
ing access to infringing material.

  Subsection (c)(1)(C) establishes that in cases where a service provider is noti-
fied of infringing activity by a copyright owner or its authorized agent, in accord-
ance with the notification procedures of subsection (c)(3), the limitation on the
service provider's liability shall be maintained only if the service provider acts
expeditiously either to remove the infringing material from its system or to prevent
further access to the infringing material on the system or network. This "notice and
takedown" procedure is a formalization and refinement of a cooperative process that
has been employed to deal efficiently with network-based copyright infringement.

  Section 512 does not require use of the notice and take-down procedure. A service
provider wishing to benefit from the limitation on liability under subsection (c)
must "take down" or disable access to infringing material residing on its system or
network of which it has actual knowledge or that meets the "red flag" test, even if
the copyright owner or its agent does not notify it of a claimed infringement. On
the other hand, the service provider is free to refuse to "take down" the material
or site, even after receiving a notification of claimed infringement from the copy-
right owner; in such a situation, the service provider's liability, if any, will be
decided without reference to section 512(c). For their part, copyright owners are
not obligated to give notification of claimed infringement in order to enforce their
rights. However, neither actual knowledge nor awareness of a red flag may be imputed
to a service provider based on information from a copyright owner or its agent that
does not comply with the notification provisions of subsection (c)(3), and the lim-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190                                                          Page 42
S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**


itation of liability set forth in subsection (c) may apply.

   Subsection (c)(2)-Designated agent.-Subsection (c)(2) provides that to qualify for
the liability limitation of subsection (c), the service provider must designate an
agent to receive notifications under subsection (c)(1)(C). The designation, provided
to the Register of Copyrights, and made available on the service provider's web site
is to contain certain information necessary to communicate with the service provider
concerning allegedly infringing material or activity. The Register of Copyrights is
directed to maintain a directory of designated agents available for inspection by
the public, both on the web site of the Library of Congress, and in hard copy format
on file at the Copyright Office. The Committee does not intend or anticipate that
the Register will publish hard copies of the directory. The directory shall have
entries for the name, address, telephone number and electronic mail address of an
agent designated by service providers. The service provider's designation shall sub-
stantially comply with these elements.

   Subsection (c)(3)-Elements of notification.-Subsection (c)(3) sets forth the pro-
cedures under which copyright owners and their agents may provide effective notific-
ation to a service provider of allegations of infringement on the provider's system
or network. Subsection (c)(3)(A) requires that to count as an effective notifica-
tion, the notification must be in writing and submitted to the service provider's
designated agent.

   **\*46** Subsections (c)(3)(A)(i)-(vi) then set forth the information to be included in
an effective notification. The standard against which a notification is to be judged
is one of substantial compliance. Subsection (c)(3)(A)(i) provides that the notific-
ation must be signed by the copyright owner or its authorized agent to be effective.
The requirement for signature, either physical or electronic, relates to the veri-
fication requirements of subsections (c)(3)(A)(v) and (vi). Subsection (c)(3)(A)(ii)
requires that the copyright owner identify the copyrighted work alleged to be in-
fringed. Where multiple works at a single online site are covered by a single noti-
fication, a representative list of such works at that site is sufficient. Thus,
where a party is operating an unauthorized Internet jukebox from a particular site,
it is not necessary for a compliant notification to list every musical composition
or sound recording that has been or could be infringed at that site, so long as a
representative list of those compositions or recordings is provided so that the ser-
vice provider can understand the nature and scope of the infringement being claimed.

   Subsection (c)(3)(A)(iii) requires that the copyright owner or its authorized
agent provide the service provider with information reasonably sufficient to permit
the service provider to identify and locate the allegedly infringing material. An
example of such sufficient information would be a copy or description of the al-
legedly infringing material and the URL address of the location (web page) which is
alleged to contain the infringing material. The goal of this provision is to provide
the service provider with adequate information to find and address the allegedly in-
fringing material expeditiously.

   Subsection (c)(3)(A)(iv) requires that the copyright owner or its authorized agent
provide reasonably sufficient identifying information concerning the owner or its
agent who submits the notification, such as an address, telephone number, and if
available an electronic mail address so that the service provider may contact the
complaining party.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

   Subsection (c)(3)(A)(v) makes clear that the notification from complaining parties
must contain a statement that the complaining party has a good faith belief that the
use of the material in the manner complained of is not authorized by the copyright
owner, or its agent, or the law.

   Subsection (c)(3)(A)(vi) specifies that the notification must contain a statement
that the information contained therein is accurate. The complaining party-whether
the copyright owner, or an authorized representative-also must confirm under penalty
of perjury, that it has authority to act on behalf of the owner of the exclusive
right that is alleged to be infringed. The term "perjury" is used in the sense found
elsewhere in the United States Code. See 28 U.S.C. 1746; 18 U.S.C. 1621.

   Subsection (c)(3)(B) addresses the effect of notifications that do not substan-
tially comply with the requirements of subsection (c)(3). Under this subsection, the
court shall not consider such notifications as  evidence of whether the service pro-
vider has actual knowledge, is aware of facts or circumstances, or has received a
notification for purposes of subsection (c)(1)(A). However, a defective notice
provided to the designated agent may be considered in evaluating **\*47** the service
provider's knowledge or awareness of facts and circumstances, if (i) the complaining
party has provided the requisite information concerning the identification of the
copyrighted work, identification of the allegedly infringing material, and informa-
tion sufficient for the service provider to contact the complaining party, and (ii)
the service provider does not promptly attempt to contact the person making the no-
tification or take other reasonable steps to assist in the receipt of notification
that substantially complies with paragraph (3)(A). If the service provider sub-
sequently receives a substantially compliant notice, the provisions of paragraph
(1)(C) would then apply upon receipt of the notice.

   The Committee intends that the substantial compliance standard in subsections
(c)(2) and (c)(3) be applied so that technical errors (such as misspelling a name,
supplying an outdated area code if the phone number is accompanied by an accurate
address, or supplying an outdated name if accompanied by an e-mail address that re-
mains valid for the successor of the prior designated agent or agent of a copyright
owner) do not disqualify service providers and copyright owners from the protections
afforded under subsection (c). The Committee expects that the parties will comply
with the functional requirements of the notification provisions-such as providing
sufficient information so that a designated agent or the complaining party submit-
ting a notification may be contacted efficiently-in order to ensure that the noti-
fication and take down procedures set forth in this subsection operate smoothly.

   Subsection (d)-Information location tools.-Subsection (d) applies to referring or
linking users to an online location containing infringing material or infringing
activity using information location tools. The reference to "infringing activity" is
intended to refer to wrongful activity that is occurring at the location to which
the link or reference refers, without regard to whether copyright infringement is
technically deemed to occur at that location or at the location where the material
is received. The term information location tools includes, for example: a directory
or index of online sites or material such as a search engine that identifies pages
by specified criteria, a reference to other online material such as a list of recom-
mended sites, a pointer that stands for an Internet location or address, or a hyper-
text link which allows users to access material without entering its address.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

  Subsection (d) incorporates the notification and take down structure of subsection
(c) and applies it to the provision of references and links to infringing sites. A
service provider is entitled to the liability limitations of subsection (d) if it:
(1) lacks actual knowledge of infringement on the other site, and is not aware of
facts or circumstances from which infringing activity in that location is apparent;
(2) does not receive a financial benefit directly attributable to the infringing
activity on the site, where the service provider has the right and ability to con-
trol the infringing activity; and (3) responds expeditiously to remove or disable
the reference or link upon receiving a notification of claimed infringement as de-
scribed in subsection (c)(3). The notification procedures under subsection (d) fol-
low those set forth in subsection (c). However, the information submitted by the
complaining party under subsection (c)(3)(A)(iii) is identification of the reference
or link to infringing **48** material or activity, and information reasonably suffi-
cient to permit the service provider to locate that reference or link.

  Section 512(d) provides a safe harbor that would limit the liability of a service
provider that refers or links users to an online location containing infringing ma-
terial or activity by using "information location tools," such as hyperlink direct-
ories and indexes. A question has been raised as to whether a service provider would
be disqualified from the safe harbor based solely on evidence that it had viewed the
infringing Internet site. If so, there is concern that online directories prepared
by human editors and reviewers, who view and classify various Internet sites, would
be denied eligibility to the information location tools safe harbor, in an uninten-
ded number of cases and circumstances. This is an important concern because such on-
line directories play a valuable role in assisting Internet users to identify and
locate the information they seek on the decentralized and dynamic networks of the
Internet.

  Like the information storage safe harbor in section 512(c), a service provider
would qualify for this safe harbor if, among other requirements, it "does not have
actual knowledge that the material or activity is infringing" or, in the absence of
such actual knowledge, it is "not aware of facts or circumstances from which in-
fringing activity is apparent." Under this standard, a service provider would have
no obligation to seek out copyright infringement, but it would not qualify for the
safe harbor if it had turned a blind eye to "red flags" of obvious infringement.

  For instance, the copyright owner could show that the provider was aware of facts
from which infringing activity was apparent if the copyright owner could prove that
the location was clearly, at the time the directory provider viewed it, a "pirate"
site of the type described below, where sound recordings, software, movies or books
were available for unauthorized downloading, public performance or public display.
Absent such "red flags" or actual knowledge, a directory provider would not be sim-
ilarly aware merely because it saw one or more well known photographs of a celebrity
at a site devoted to that person. The provider could not be expected, during the
course of its brief cataloguing visit, to determine whether the photograph was still
protected by copyright or was in the public domain; if the photograph was still pro-
tected by copyright, whether the use was licensed; and if the use was not licensed,
whether it was permitted under the fair use doctrine.

  The important intended objective of this standard is to exclude sophisticated "pir-
ate" directories-which refer Internet users to other selected Internet sites where

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190                                                    Page 45
S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

pirate software, books, movies, and music can be downloaded or transmitted-from the
safe harbor. Such pirate directories refer Internet users to sites that are obvi-
ously infringing because they typically use words such as "pirate," "bootleg," or
slang terms in their uniform resource locator (URL) and header information to make
their illegal purpose obvious to the pirate directories and other Internet users.
Because the infringing nature of such sites would be apparent from even a brief and
casual viewing, safe harbor status for a provider that views such a site and then
establishes a link to it would not be appropriate. Pirate directories do not follow
the routine business practices of legitimate service providers preparing directo-
ries, and thus **\*49** evidence that they have viewed the infringing site may be all that
is available for copyright owners to rebut their claim to a safe harbor.

In this way, the "red flag" test in section 512(d) strikes the right balance. The
common-sense result of this "red flag" test is that on-line editors and catalogers
would not be required to make discriminating judgments about potential copyright in-
fringement. If, however, an Internet site is obviously pirate, then seeing it may be
all that is needed for the service provider to encounter a "red flag." A provider
proceeding in the face of such a red flag must do so without the benefit of a safe
harbor.

Information location tools are essential to the operation of the Internet; without
them, users would not be able to find the information they need. Directories are
particularly helpful in conducting effective searches by filtering out irrelevant
and offensive material. The Yahoo! directory, for example, currently categorizes
over 800,000 online locations and serves as a "card catalogue" to the World Wide
Web, which over 35,000,000 different users visit each month. Directories such as Ya-
hoo!'s usually are created by people visiting sites to categorize them. It is pre-
cisely the human judgment and editorial discretion exercised by these cataloguers
which makes directories valuable.

This provision is intended to promote the development of information location
tools generally, and Internet directories such as Yahoo!'s in particular, by estab-
lishing a safe-harbor from copyright infringement liability for information location
tool providers if they comply with the notice and takedown procedures and other re-
quirements of subsection (d). The knowledge or awareness standard should not be ap-
plied in a manner which would create a disincentive to the development of director-
ies which involve human intervention. Absent actual knowledge, awareness of in-
fringement as provided in subsection (d) should typically be imputed to a directory
provider only with respect to pirate sites or in similarly obvious and conspicuous
circumstances, and not simply because the provider viewed an infringing site during
the course of assembling the directory.

Subsection (e)-Misrepresentations.-Subsection (e) establishes a right of action
against any person who knowingly misrepresents that material or activity online is
infringing, or that material or activity was removed or disabled by mistake or
misidentification under the "put back" procedure set forth in subsection (f). Ac-
tions may be brought under subsection (e) by any copyright owner, copyright owner's
licensee, or by a service provider, who is injured by such misrepresentation, as a
result of the service provider relying upon the misrepresentation in either taking
down material or putting material back online. Defendants who make such a knowing
misrepresentation are liable for any damages, including costs and attorneys" fees,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

incurred by any of these parties as a result of the service provider's reliance upon
the misrepresentation. This subsection is intended to deter knowingly false allega-
tions to service providers in recognition that such misrepresentations are detri-
mental to rights holders, service providers, and Internet users.

  Subsection (f)-Immunity for take downs and user put back procedure.- Subsection
(f) provides immunity to service providers for **50 taking down infringing material,
and establishes a "put back" procedure under which subscribers may contest a com-
plaining party's notification of infringement provided under subsection (c)(3). The
put back procedures were added as an amendment to this title in order to address the
concerns of several members of the Committee that other provisions of this title es-
tablished strong incentives for service providers to take down material, but insuf-
ficient protections for third parties whose material would be taken down.

  Subsection (f)(1) immunizes service providers from any claim based on the service
provider's good faith disabling of access to, or removal of, material or activity
claimed to be infringing. The immunity also applies to material or activity that a
service provider disables access to or removes based on facts or circumstances from
which infringing activity is apparent. This immunity applies even if the material or
activity is ultimately determined not to be infringing. The purpose of this subsec-
tion is to protect service providers from liability to third parties whose material
service providers take down in a good faith effort to comply with the requirements
of subsection (c)(1).

  Subsection (f)(2) establishes a "put back" procedure through an exception to the
immunity set forth in subsection (f)(1). The exception applies in a case in which
the service provider, pursuant to a notification provided under subsection (c)(1)(C)
in accordance with subsection (c)(3), takes down material that a subscriber has pos-
ted to the system or network. In such instances, to retain the immunity set forth in
subsection (f)(1) with respect to the subscriber whose content is taken down, the
service provider is to follow up to three steps.

  Under subsection (f)(2)(A), the service provider is to take reasonable steps to
notify the subscriber promptly of the removal or disabling of access to the sub-
scriber's material. The Committee intends that "reasonable steps" include, for ex-
ample, sending an e-mail notice to an e-mail address associated with a posting, or
if only the subscriber's name is identified in the posting, sending an e-mail to an
e-mail address that the subscriber submitted with its subscription. The Committee
does not intend that this subsection impose any obligation on service providers to
search beyond the four corners of a subscriber's posting or their own records for
that subscriber in order to obtain contact information. Nor does the Committee in-
tend to create any right on the part of subscribers who submit falsified information
in their postings or subscriptions to complain if a service provider relies upon the
information submitted by the subscriber.

  The subscriber may then file a counter notification, in accordance with the re-
quirements of subsection (f)(3), contesting the original take down on grounds of
mistake or misidentification of the material and requesting "put back" of the mater-
ial that the service provider has taken down. If a subscriber files a counter noti-
fication with the service provider's designated agent, subparagraph (f)(2) calls for
the service provider to promptly forward a copy to the complaining party who submit-
ted the take down request. Finally, under subsection (f)(2)(C), the service provider

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190                                                    Page 47
S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**


is to place the subscriber's material back online or cease disabling access to it
between 10 and 14 business days after receiving the counter notification **\*51** unless
the designated agent receives a further notice from the complaining party that the
complaining party has filed an action seeking a court order to restrain the sub-
scriber from engaging in infringing activity on the service provider's system or
network with regard to the material in question.

  Subscriber counter notifications must substantially comply with defined require-
ments set forth in subsection (f)(3). Notifications shall be signed by the sub-
scriber physically or by electronic signature; identify the material taken down and
the location from which it was taken down; include a statement under penalty of per-
jury that the subscriber has a good faith belief that the material was taken down as
a result of mistake or misidentification of the material; and include the sub-
scriber's contact information, as well as a statement consenting to the jurisdiction
of a Federal district court and to accept service of process from the complaining
party or the complaining party's agent. The substantial compliance standard is the
same as that set forth in subsections (c)(2) and (3).

  Subsection (f)(4) is included to make clear the obvious proposition that a service
provider's compliance with the put back procedure does not subject it to liability
for copyright infringement or cause it to lose its liability limitation with respect
to the replaced material.

  Subsection (g)-Identification of direct infringer.-Subsection (g) creates a pro-
cedure by which copyright owners or their authorized agents who have submitted or
will submit a request for notification satisfying the requirements of subsection
(c)(3)(A) may obtain an order for identification of alleged infringers who are users
of a service provider's system or network. Under this procedure, the copyright owner
or agent files three documents with the clerk of any U.S. District Court: a copy of
the notification, a proposed order, and a sworn declaration that the purpose of the
order is to obtain the identity of an alleged infringer and that the information ob-
tained will only be used to protect the owner's rights under this Title.

  Orders issued under subsection (g) shall authorize and order the service provider
expeditiously to disclose to the person seeking the order information sufficient to
identify the alleged infringer to the extent such information is available to the
service provider. The Committee intends that an order for disclosure be interpreted
as requiring disclosure of information in the possession of the service provider,
rather than obliging the service provider to conduct searches for information that
is available from other systems or networks. The Committee intends that such orders
be expeditiously issued if the notification meets the provisions of subsection
(c)(3)(A) and the declaration is properly executed. The issuing of the order should
be a ministerial function performed quickly for this provision to have its intended
effect. After receiving the order, the service provider shall expeditiously disclose
to the copyright owner or its agent the information required by the order to the ex-
tent that the information is available to the service provider, regardless of wheth-
er the service provider responds to the notification of claimed infringement.

  Subsection (h)-Conditions for eligibility.-Subsection (h) sets forth two condi-
tions that a service provider must satisfy to be eligible **\*52** for the limitations of
liability provided in subsections (a) through (d).

  First, the service provider is expected to adopt and reasonably implement a policy


© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

for the termination in appropriate circumstances of the accounts of subscribers
[FN24] of the provider's service who are repeat online infringers of copyright. The
Committee recognizes that there are different degrees of online copyright infringe-
ment, from the inadvertent to the noncommercial, to the willful and commercial. In
addition, the Committee does not intend this provision to undermine the principles
of subsection (l) or the knowledge standard of subsection (c) by suggesting that a
provider must investigate possible infringements, monitor its service, or make dif-
ficult judgments as to whether conduct is or is not infringing. However, those who
repeatedly or flagrantly abuse their access to the Internet through disrespect for
the intellectual property rights of others should know that there is a realistic
threat of losing that access.

  Second, a provider's system must accommodate, and not interfere with, standard
technical measures used to identify or protect copyrighted works. The Committee be-
lieves that technology is likely to be the solution to many of the issues facing
copyright owners and service providers in this digital age. For that reason, we have
included subsection (h)(1)(B), which is intended to encourage appropriate technolo-
gical solutions to protect copyrighted works. The Committee strongly urges all of
the affected parties expeditiously to commence voluntary, interindustry discussions
to agree upon and implement the best technological solutions available to achieve
these goals.

  Subsection (h)(1)(B) is explicitly limited to "standard technical measures" that
have been developed pursuant to a broad consensus of both copyright owners and ser-
vice providers in an open, fair, voluntary, multi-industry standards process. The
Committee anticipates that these provisions could be developed both in recognized
open standards bodies or in ad hoc groups, as long as the process used is open,
fair, voluntary, and multi-industry and the measures developed otherwise conform to
the requirements of the definition of standard technical measures set forth in para-
graph (h)(2). A number of recognized open standards bodies have substantial experi-
ence with Internet issues. The Committee also notes that an ad-hoc approach has been
successful in developing standards in other contexts, such as the process that has
developed copy protection technology for use in connection with DVD.

  Subsection (i)-Injunctions.-Subsection (i) defines the terms and conditions under
which an injunction may be issued against a service provider that qualifies for the
limitations of liability set forth in subsections (a) through (d), but is otherwise
subject to an injunction under existing principles of law. Subsection (i)(1) limits
the scope of injunctive relief that may be ordered against a qualifying **53** pro-
vider. Subsection (i)(2) identifies factors a court must consider in deciding wheth-
er to grant injunctive relief and in determining the appropriate scope of injunctive
relief.

  Subsection (i)(1)-Scope of relief.-Subsection (i)(1) is divided into two subpara-
graphs. Subparagraph (A) defines the scope of injunctive relief available against
service providers who qualify for the limitations of liability set forth in subsec-
tions (b), (c) or (d). Only three forms of injunctive relief may be granted. First,
the court may provide for the removal or blocking of infringing material or activity
that is residing at a specific location on the provider's system or network. This is
essentially an order to take the actions identified in subsection (c)(1)(C) to "re-
move, or disable access" to the material that is claimed to be infringing or to be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190                                                    Page 49
S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

the subject of infringing activity.

   Second, the court may order the provider to terminate the accounts of a subscriber
[FN25] of the provider's service who is engaging in infringing activity.

   Subsection (i)(1)(A) permits the court, under appropriate circumstances, to enter
a different form of injunction if the court considers it necessary to prevent or re-
strain infringement of specific copyrighted material that resides at an identified
online location. If a court enters an injunction other than that contemplated in the
first two clauses of subparagraph (A), the court must determine that the injunctive
relief is the least burdensome to the service provider among those forms of relief
that are comparably effective.

   Subsection (i)(1)(B) sets forth a different set of remedies available for injunc-
tions against service providers qualifying for the limitation on remedies set forth
in subsection (a). In such cases, if a court determines that injunctive relief is
appropriate, it may only grant injunctive relief in one or both of two specified
forms. The first is an order to the service provider to terminate subscriber ac-
counts that are specified in the order. The second form of relief, available in
cases in which a provider is engaging in infringing activity relating to a foreign
online location, is an order to take reasonable steps to block access to a specific,
identified foreign online location. Such blocking orders are not available against a
service provider qualifying under subsection (a) in the case of infringing activity
on a site within the United States or its territories.

   Subsection (i)(2)-Considerations.-Subsection (i)(2) sets forth mandatory consider-
ations for the court beyond those that exist under current law. These additional
considerations require the court to consider factors of particular significance in
the digital online environment.

   Subsection (i)(3)-Notice and ex parte orders.-Subsection (i)(3) prohibits most
forms of ex parte injunctive relief (including temporary and preliminary relief)
against a service provider qualifying for a liability limitation under section 512.
A court may issue an order to ensure the preservation of evidence or where the order
will have no material adverse effect on the operation of the provider's network.

   Subsection (j)-Definitions.-Subsection (j) sets forth two definitions of the term
"service provider" as used in this title, as well as **54** a definition of the term
"monetary relief." Only an entity that is performing  the functions of a "service
provider" is eligible for the limitations on liability set forth in section 512 with
respect to those functions.

   The first definition of a service provider, set forth in subsection  (j)(1)(A),
defines a narrower range of functions and applies to use of the term in subsection
(a). As used in that subsection the term "service provider" means any entity offer-
ing the transmission, routing or providing of connections for digital online commu-
nications, between or among points specified by a user, of material of a user's
choosing without modification to the content of the material as sent or received.
This freestanding definition is derived from the definition of "telecommunications"
found in 47 U.S.C. 153(48) in recognition of the fact that the functions covered by
this definition are conduit activities, but the Committee has reworked the defini-
tion and written subsection (j)(1)(A) to make it appropriate for the Internet and
online media. Thus, the subsection (j)(1)(A) definition includes the offering of
transmission, routing or providing of connections. Although the transmission, rout-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

ing or providing of connections may occur over digital or analog networks, the ser-
vice provider must be providing such services for communications that are both di-
gital and online. By online communications, the Committee intends to refer to commu-
nications over an interactive computer network, such as the Internet. Thus, over-
the-air broadcasting, whether in analog or digital form, or a cable television sys-
tem, or a satellite television service would not qualify, except to the extent it
provides users with online access to a digital network such as the Internet, or it
provides transmission, routing or connections to connect material to such a network,
and then only with respect to those functions. An entity is not disqualified from
being a "service provider" because it alters the form of the material, so long as it
does not alter the content of the material. As a threshold matter, a service pro-
vider's performance of a particular function with respect to allegedly infringing
activity falls within the (j)(1)(A) definition of service provider if and only if
such function is within the range of functions set forth in subsection (j)(1)(A).
For example, hosting a World Wide Web site does not fall within the subsection
(j)(1)(A) definition; providing connectivity for a world wide web site does fall
within that definition. The subparagraph (A) definition of service provider is not
intended to exclude providers that perform other functions in addition to those set
forth in subparagraph (A), including the functions identified in subsection
(j)(1)(B). Conversely, the fact that a provider performs some functions that fall
within the definition of subparagraph (A) does not imply that its other functions
that do not fall within the definition of subparagraph (A) qualify for the limita-
tion of liability under subsection (a).

   The second definition of "service provider," set forth in subsection  (j)(1)(B),
applies to the term as used in any other subsection of section 512. This definition
is broader than the first, covering providers of online services or network access,
or the operator of facilities therefor. This definition includes, for example, ser-
vices such as providing Internet access, e-mail, chat room and web page hosting ser-
vices. The (j)(1)(B) definition of service provider, for example, includes uni-
versities and schools to the extent they perform the functions **\*55** identified in
subsection (j)(1)(B). The definition also specifically includes any entity that
falls within the first definition of service provider. A broadcaster or cable tele-
vision system or satellite television service would not qualify, except to the ex-
tent it performs functions covered by (j)(1)(B).

   Finally, subsection (j)(2) defines the term "monetary relief" broadly for purposes
of this section as encompassing damages, costs, attorneys' fees and any other form
of monetary payment.

   Subsection (k)-Other defenses not affected.-Subsection (k) clarifies that other
defenses under copyright law are not affected and codifies several important prin-
ciples.

   New section 512 does not define what is actionable copyright infringement in the
online environment, and does not create any new exceptions to the exclusive rights
under copyright law. The rest of the Copyright Act sets those rules. Similarly, new
section 512 does not create any new liabilities for service providers or affect any
defense available to a service provider. Enactment of section 512 does not bear upon
whether a service provider is or is not an infringer when its conduct falls within
the scope of section 512. Even if a service provider's activities fall outside the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

limitations on liability specified in the bill, the service provider is not neces-
sarily an infringer; liability in these circumstances would be adjudicated based on
the doctrines of direct, vicarious or contributory liability for infringement as
they are articulated in the Copyright Act and in the court decisions interpreting
and applying that statute, which are unchanged by section 512. In the event that a
service provider does not qualify for the limitation on liability, it still may
claim all of the defenses available to it under current law. New section 512 simply
defines the circumstances under which a service provider, as defined in this Sec-
tion, may enjoy a limitation on liability for copyright infringement.

  Subsection (l)-Protection of privacy.-Subsection (l) is designed to protect the
privacy of Internet users. This subsection makes clear that the applicability of
subsections (a) through (d) is no way conditioned on a service provider: (1) monit-
oring its service or affirmatively seeking facts indicating infringing activity ex-
cept to the extent consistent with implementing a standard technical measure under
subsection (h); or (2) accessing, removing or disabling access to material if such
conduct is prohibited by law, such as the Electronic Communications Privacy Act.

  Subsection (m)-Rule of construction.-Subsection (m) establishes a rule of con-
struction applicable to subsections (a) through (d). Section 512's limitations on
liability are based on functions, and each limitation is intended to describe a sep-
arate and distinct function. Consider, for example, a service provider that provides
a hyperlink to a site containing infringing material which it then caches on its
system in order to facilitate access to it by its users. This service provider is
engaging in at least three functions that may be subject to the limitation on liab-
ility: transitory digital network communications under subsection (a), system cach-
ing under subsection (b), and information location tools under subsection (d). If
this service provider (as defined in subsection (j)(1)(A) in the case of transitory
digital communications, or as defined in subsection (j)(1)(B) in the case of system
caching or information location tools) meets the **56** threshold criteria spelled out
in subsection (h)(1), then for its acts of system caching defined in subsection (b),
it may avail itself of the liability limitations stated in subsection (b), which in-
corporate the limitations on injunctive relief described in subsection (i)(1)(B) and
(i)(3). If it is claimed that the same company is committing an infringement by us-
ing information location tools to link its users to infringing material, as defined
in subsection (d), then its fulfillment of the requirements to claim the system
caching liability limitation does not affect whether it qualifies for the liability
limitation for information location tools; the criteria in subsection (d), rather
than those in subsection (b), are applicable. Section 512(m) codifies this principle
by providing that the determination of whether a service provider qualifies for one
liability limitation has no effect on the determination of whether it qualifies for
a separate and distinct liability limitation under another subsection of section
512.


Section 203. Conforming amendment

  This section amends the table of sections for chapter 5 of the Copyright Act (17
U.S.C. 501 et. seq.) to reflect the new section 512, as created by this title.

Section 204. Liability of educational institutions for online infringement of copy-

S. REP. 105-190                                                          Page 52
S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

right

   Subsection 204(a) directs the Register of Copyrights to consult with representat-
ives of copyright owners and nonprofit educational institutions and to submit to the
Congress within 6 months after enactment of the bill recommendations regarding the
liability of nonprofit educational institutions for copyright infringements that
take place through the use of the institution's computer system or network, where
the institution qualifies as a "service provider" under the provisions of this
Title. Included in the Register's report are to be any recommendations for legisla-
tion that the Register considers appropriate.
   Subsection 204(b) sets forth specific considerations that the Register shall take
into account, where relevant, in formulating her recommendations to the Congress.

                  TITLE III-COMPUTER MAINTENANCE OR REPAIR

Section 301. Limitation on exclusive rights; computer programs

   This section effects a minor, yet important clarification in section 117 of the
Copyright Act (17 U.S.C. 117) to ensure that the lawful owner or lessee of a com-
puter machine may authorize an independent service provider-a person unaffiliated
with either the owner or lessee of the machine-to activate the machine for the sole
purpose of servicing its hardware components. When a computer is activated, certain
software or parts thereof is automatically copied into the machine's random access
memory, or "RAM". A clarification in the Copyright Act is necessary in light of ju-
dicial decisions holding that such copying is a "reproduction" under section 106 of
the Copyright Act (17 U.S.C. 106), [FN26] thereby calling into question the right
of an independent service provider who is not the licensee of **57 the computer pro-
gram resident on the client's machine to even activate that machine for the purpose
of servicing the hardware components. This section does not in any way alter the law
with respect to the scope of the term "reproduction" as it is used in the Copyright
Act. Rather, this section it is narrowly crafted to achieve the objectives just de-
scribed-namely, ensuring that an independent service provider may turn on a client's
computer machine in order to service its hardware components, provided that such
service provider complies with the provisions of this section designed to protect
the rights of copyright owners of computer software.
   Paragraphs (1) and (2) make technical changes to the structure of section 117, di-
viding the existing provisions between two subsections, the first entitled "(a) Mak-
ing of Additional Copy or Adaptation by Owner of Copy" and the second entitled "(b)
Lease, Sale, or Other Transfer of Additional Copy or Adaptation." The operative pro-
visions, and limitations, are in paragraph (3), which creates two new subsections in
section 117, subsections (c) and (d).
   Subsection (c)-Machine maintenance or repair.-The bill creates a new subsection
(c) in section 117 of the Copyright Act (17 U.S.C. 117), which delineates the spe-
cific circumstances under which a reproduction of a computer program would not con-
stitute infringement of copyright. The goal is to maintain undiminished copyright
protection afforded under the Copyright Act to authors of computer programs, while
making it possible for third parties to perform servicing of the hardware. This new
subsection states that it is not an infringement of copyright for the owner or less-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

ee of a machine to make or authorize the making of a copy of a computer program
provided that the following conditions are met:

First, subsection (c) itself makes clear that the copy of the computer program
must have been made solely and automatically by virtue of turning on the machine in
order to perform repairs or maintenance on the hardware components of the machine.
Moreover, the copy of the computer program which is reproduced as a direct and sole
consequence of activation must be an authorized copy that has lawfully been in-
stalled in the machine. Authorized copies of computer programs are only those copies
that have been made available with the consent of the copyright owner. Also, the
acts performed by the service provider must be authorized by the owner or lessee of
the machine.

Second, in accordance with paragraph (c)(1), the resulting copy may not be used by
the person performing repairs or maintenance of the hardware components of the ma-
chine in any manner other than to effectuate the repair or maintenance of the ma-
chine. Once these tasks are completed, the copy of the program must be destroyed,
which generally will happen automatically once the machine is turned off.

Third, as is made clear in paragraph (c)(2), the amendment is not intended to di-
minish the rights of copyright owners of those computer programs, or parts thereof,
that also may be loaded into RAM when the computer is turned on, but which did not
need to be so loaded in order for the machine to be turned on. A hardware manufac-
turer or **\*58** software developer might, for example, provide diagnostic and utility
programs that load into RAM along with or as part of the operating system, even
though they market those programs as separate products-either as freestanding pro-
grams, or pursuant to separate licensing agreements. Indeed, a password or other
technical access device is sometimes required for the owner of the machine to be
able to gain access to such programs. In other cases, it is not the hardware or
software developer that has arranged for certain programs automatically to be repro-
duced when the machine is turned on; rather, the owner of the machine may have con-
figured its computer to load certain applications programs into RAM as part of the
boot-up process (such as a word processing program on a personal computer). This
subsection is not intended to derogate from the rights of the copyright owners of
such programs. In order to avoid inadvertent copyright infringement, these programs
need to be covered by subsection (c), but only to the extent that they are automat-
ically reproduced when the machine is turned on. This subsection is not intended to
legitimize unauthorized access to and use of such programs just because they happen
to be resident in the machine itself and are reproduced with or as a part of the op-
erating system when the machine is turned on. According to paragraph (c)(2), if such
a program is accessed or used without the authorization of the copyright owner, the
initial reproduction of the program shall not be deemed exempt from infringement by
this subsection.

Subsection (d)-Definitions.-Subsection (d) defines two terms not previously
defined by the Copyright Act. Paragraph (1) defines the term "maintenance" as the
servicing of the machine in order to make it work in accordance with its original
specifications and any changes to those specifications authorized for that machine.
These acts can include, but are not limited to, cleaning the machine, tightening
connections, installing new components such as memory chips, circuit boards and hard
disks, checking the proper functioning of these components, and other similar acts.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**


Paragraph (2) defines the term "repair" as the restoring of the machine to the
state of working in accordance with its original specifications and any changes to
those specifications authorized for that machine. These acts of repairing the hard-
ware include, but are not limited to, replacing worn or defective components such as
memory chips, circuit boards and hard disks, correcting the improper installation of
new components, and other similar acts.

Both paragraphs (1) and (2) of this subsection are subject to the same limita-
tions, which are intended to clarify that activating a machine in order to perform
maintenance or repair does not constitute infringement as provided in subsection (c)
if the maintenance or repair is undertaken to make the machine work in accordance
with the parameters specified for such a machine and its component parts. Because
technological improvements may lead customers to upgrade their machines, the lan-
guage of both definitions authorizes service providers to maintain those components
of the hardware that have been installed since the time the machine was **\*59** origin-
ally acquired, or to install new components. But their acts shall be noninfringing
under subsection (c) only if the components being serviced have been lawfully ac-
quired and installed. Finally, the terms "maintenance" and "repair" do not include
unauthorized adaptations, modifications, error corrections or any other changes to
any software which may be in the machine being serviced.


TITLE IV-EPHEMERAL RECORDINGS; DISTANCE EDUCATION; EXEMPTION FOR LIBRARIES AND
ARCHIVES

Section 401. Ephemeral recordings

Section 401 amends section 112 of the Copyright Act (17 U.S.C. 112) to address two
issues concerning the application of the ephemeral recording exemption in the digit-
al age.

The first of these issues is the relationship between the ephemeral recording ex-
emption and the Digital Performance Right in Sound Recordings Act of 1995 ("DPRA").
The DPRA granted sound recording copyright owners the exclusive right to perform
their works publicly by means of digital audio transmission, subject to certain lim-
itations, particularly those set forth in section 114(d). Among those limitations is
an exemption for nonsubscription broadcast transmissions, which are defined as those
made by terrestrial broadcast stations licensed as such by the FCC. 17 U.S.C.
114(d)(1)(A)(iii) and (j)(2). The ephemeral recording exemption presently privileges
certain activities of a transmitting organization when it is entitled to transmit a
performance or display under a license or transfer of copyright ownership or under
the limitations on exclusive rights in sound recordings specified by section 114(a).
The Committee believes that the ephemeral recording exemption should apply to broad-
cast radio and television stations when they make nonsubscription digital broadcasts
permitted by the DPRA. The Committee has therefore changed the existing language of
the ephemeral recording exemption (redesignated as 112(a)(1)) to extend explicitly
to broadcasters the same privilege they already enjoy with respect to analog broad-
casts.

The second of these issues is the relationship between the ephemeral recording ex-
emption and the anticircumvention provisions that the bill adds as section 1201 of
the Copyright Act. Concerns were expressed that if use of copy protection technolo-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

gies became widespread, a transmitting organization might be prevented from engaging
in its traditional activities of assembling transmission programs and making ephem-
eral recordings permitted by section 112 for purposes of its own transmissions with-
in its local service area and of archival preservation and security. To address this
concern, the Committee has added to section 112 a new paragraph that permits trans-
mitting organizations to engage in activities that otherwise would violate section
1201(a)(1) in certain limited circumstances when necessary for the exercise of the
transmitting organization's privilege to make ephemeral recordings under redesig-
nated section 112(a)(1). By way of example, if a radio station could not make a per-
mitted ephemeral recording from a commercially available phonorecord without viola-
ting section 1201(a)(1), then the radio station could request from the copyright own-
er the necessary means of making a permitted ephemeral recording. If the **60** copy-
right owner did not then either provide a phonorecord that could be reproduced or
otherwise provide the necessary means of making a permitted ephemeral recording from
the phonorecord already in the possession of the radio station, the radio station
would not be liable for violating section 1201(a)(1) for taking the steps necessary
for engaging in activities permitted under section 112(a)(1). The radio station
would, of course, be liable for violating section 1201(a)(1) if it engaged in activ-
ities prohibited by that section in other than the limited circumstances permitted
by section 112(a)(1).

Section 402. Limitation on exclusive rights; distance education

  Section 402(a) directs the Register of Copyrights to consult with representatives
of copyright owners, nonprofit educational institutions, and nonprofit libraries and
archives and to submit recommendations to the Congress no later than 6 months after
the date of enactment of the bill on how to promote distance education through di-
gital technologies, including interactive digital networks, while maintaining an ap-
propriate balance between the rights of copyright owners and the needs of users.
Where appropriate, the Register shall include legislative recommendations to achieve
those objectives.
  Section 402(b) specifies considerations which the Register shall take into account
in formulating such recommendations.

Section 403. Exemption for libraries and archives

  Section 108 of the Copyright Act (17 U.S.C. 108) permits libraries and archives of
the type described in that section to make and, in some cases, distribute a limited
number of copies of certain types of copyrighted works, without the permission of
the copyright holder, for specified purposes relating to these entities' functions
as repositories of such works for public reference. Section 403 of the bill updates
section 108 to allow these entities to take advantage of digital technologies when
engaging in specified preservation activities.
  Except for the amendment to paragraph (a)(3), which deals with the inclusion of
copyright notice on all copies or phonorecords of works made or distributed pursuant
to section 108, the amendments revise either subsection (b), which addresses the re-
production and distribution of a copy or phonorecord of an unpublished work for pur-
poses of preservation and security or for deposit for research use in another lib-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

rary or archive of the type described; or subsection (c), which addresses the repro-
duction of a copy or phonorecord of a published work for the purpose of replacement
of a copy of that work that is damaged, deteriorating, lost, or stolen, if an unused
replacement copy cannot be obtained at a fair price.

   The amendment to paragraph (a)(3) of section 108 is intended to ease the burden on
libraries and archives of the current law's requirement that a notice of copyright
be included on copies that are reproduced under section 108. Under this amendment,
such notice would be required only where the particular copy that is reproduced by
the library or archives itself bears a notice. In other words, a notice appearing on
the material copied would still need to be maintained, and could not be deleted. On
the other hand, if **61** the copy being reproduced does not bear a copyright notice,
the library or archives would fully satisfy its obligation under this section by
simply placing on the reproduction a legend that states "This work may be protected
by copyright," or words to that effect. This minimal obligation is similar to those
found in subsections (e) and (f) of existing section 108, which condition the exemp-
tion in those subsections on the display of a general notice or warning of potential
copyright protection.

   Subsection (b) currently permits a library or archive under this section to make
and distribute one copy or phonorecord of an unpublished work solely for purposes of
preservation and security or for deposit for research use in another library or
archives, provided that the duplication of the work occurs "in facsimile form." The
legislative history to that section makes clear that, when this language was enacted
more than twenty years ago, Congress intended to permit the copy to be made by mi-
crofilm or electrostatic photocopying process, but not in a computerized form i.e.,
"in machine readable language for storage in an information system." [FN27]

   The amendment to subsection (b) permits a library or archive to make (for itself
or another library or archive of the type described by clause (2) of subsection (a))
up to 3 copies or phonorecords for these purposes, rather than just one, and permits
such copies or phonorecords to be made in digital as well as analog formats. In re-
cognition of the risk that uncontrolled public access to the copies or phonorecords
in digital formats could substantially harm the interests of the copyright owner by
facilitating immediate, flawless and widespread reproduction and distribution of ad-
ditional copies or phonorecords of the work, the amendment provides that any copy of
a work that the library or archive makes in a digital format must not be otherwise
distributed in that format and must not be made available in that format to the pub-
lic outside the premises of the library or archives. In this way, the amendment per-
mits the utilization of digital technologies solely for the purposes of this subsec-
tion.

   Similarly, subsection (c) currently permits a library or archives under this sec-
tion to make one copy or phonorecord of any published work solely for purposes of
replacement of a copy or phonorecord that is damaged, deteriorating, lost or stolen,
provided that the library or archive has determined after a reasonable effort that
an unused replacement cannot be obtained at a fair price, and provided that the du-
plication of the work occurs "in facsimile form."

   As in subsection (b), the amendment to subsection (c) permits a library or archive
to make and use three copies or phonorecords for these purposes, rather than just
one, and permits such copies or phonorecords to be made in digital as well as analog

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

formats, with the proviso that any copy of a work that the library or archive makes
in a digital format must not be made available to the public in that format except
for use on the premises of a library or archives in lawful possession of such copy.
In the view of the Committee, this proviso is necessary to ensure that the amendment
strikes the appropriate balance, permitting the use of digital technology by librar-
ies and archives while guarding against the potential **\*62** harm to the copyright own-
er's market from patrons obtaining unlimited access to digital copies from any loca-
tion.

   The amendment to subsection (c) also broadens its coverage to allow the updating
of obsolete formats. It permits the making of such copies or phonorecords of a work
"if the existing format in which the work is stored has become obsolete." This pro-
vision is intended to permit libraries and archives to ensure that copies of works
in their collections continue to be accessible and useful to their patrons. In order
to ensure that the provision does not inadvertently result in the suppression of on-
going commercial offerings of works in still-usable formats, the amendment expli-
citly provides that, for purposes of this subsection, a format will be considered
obsolete only if the machine or device necessary to render perceptible a work stored
in that format is no longer manufactured or reasonably available in a commercial
marketplace. Under this language, if the needed machine or device can only be pur-
chased in second-hand stores, it should not be considered "reasonably available."

   Finally, the Committee wants to make clear that, just as when section 108 of the
Copyright Act was first enacted, the term "libraries" and "archives" as used and de-
scribed in this provision still refer to such institutions only in the conventional
sense of entities that are established as, and conduct their operations through,
physical premises in which collections of information may be used by researchers and
other members of the public. Although online interactive digital networks have since
given birth to online digital "libraries" and "archives" that exist only in the vir-
tual (rather than physical) sense on websites, bulletin boards and homepages across
the Internet, it is not the Committee's intent that section 108 as revised apply to
such collections of information. The ease with which such sites are established on-
line literally allows anyone to create his or her own digital "library" or
"archives." The extension of the application of section 108 to all such sites would
be tantamount to creating an exception to the exclusive rights of copyright holders
that would permit any person who has an online website, bulletin board or a homepage
to freely reproduce and distribute copyrighted works. Such an exemption would swal-
low the general rule and severely impair the copyright owners' right and ability to
commercially exploit their copyrighted works. Consequently, the Committee intends
that references to "the premises of the library or archives" in amended sections 108
(b)(2) and (c)(2) mean only physical premises.

VI. COST ESTIMATE

     U.S. Congress,

     Congressional Budget Office,

     Washington, DC, May 11, 1998.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190                                                    Page 58
S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**


Hon. Orrin G. Hatch,
Chairman, Committee on the Judiciary, U.S. Senate, Washington, DC.
   Dear Mr. Chairman: The Congressional Budget Office has prepared the enclosed cost
estimate for S. 2037, the Digital Millennium Copyright Act of 1998.
   **\*63** If you wish further details on this estimate, we will be pleased to provide
them. The CBO staff contacts are Kim Cawley (for federal costs), Pepper Santalucia
(for the state and local impact), and Matthew Eyles (for the private-sector impact).


Sincerely,
     James L. Blum

     (For June E. O'Neill, Director).
   Enclosure.

              CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

          S. 2037-DIGITAL MILLENNIUM COPYRIGHT ACT OF 1998


   CBO estimates that enacting S. 2037 would have no significant impact on the feder-
al budget. Enacting the bill would establish new criminal penalties and thus could
affect both receipts and direct spending. hence, pay-as-you-go procedures would ap-
ply, but we expect that any changes in receipts and direct spending would be insig-
nificant. S. 2037 contains an intergovernmental and a private-sector mandate as
defined in the Unfunded Mandates Reform Act of 1995 (UMRA), but the costs of the
mandates would not exceed the thresholds in the law.
   Title I of S. 2037 would amend U.S. copyright law to comply with two treaties pro-
duced by the December 1996 conference of the World Intellectual Property Organiza-
tion-one regarding the use of copyrighted material in digital environments, and the
other dealing with international copyright protection of performers and producers of
phonograms. Section 103 would establish criminal fines of up to $1 million for any-
one attempting to circumvent copyright protection systems or falsifying or altering
copyright management information. Enacting this provision could increase government-
al receipts from the collection of fines, but we estimate that any such increase
would be less than $500,000 annually. Criminal fines are deposited in the Crime Vic-
tims Fund and are spent in the following year. Thus any change in direct spending
from the fund would also amount to less than $500,000 annually.
   Title II would limit the liability for copyright infringement of persons who are
providers of on-line services or network access. Title III would amend copyright law
to allow copies of computer programs to be made for the purpose of repairing or
maintaining a computer. Title IV would require copyright owners that protect their
audio recordings with technical measures to prevent the reproduction of such work,
to make available to transmitting organizations entitled to make a copy of such work
the necessary means of making a copy, provided that it is technologically and eco-
nomically feasible for the copyright owner to do so. The bill would direct the Copy-
right Office to make recommendations to the Congress concerning the liability for
copyright infringement of nonprofit educational institutions when they are providers
of Internet services. The bill also would seek recommendations from the Copyright
Office in using digital technologies to promote distance learning while protecting

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

the rights of copyright owners. Based on information from the Copyright Office, CBO
estimates that preparing these provisions would cost less than $300,000.

**\*64** Section 4 of UMRA excludes from the application of that act any legislative
provisions that are necessary for the ratification or implementation of internation-
al treaty obligations. CBO has determined that Title I of the bill fits within that
exclusion, because it is necessary for the implementation of the WIPO Copyright
Treaty and the WIPO Performances and Phonograms Treaty.

Title IV of S. 2037 would impose a mandate on certain owners of copyrights who ap-
ply technical protections to works that prevent their reproduction. Title IV would
require copyright owners who employ mechanisms that prevent the reproduction of
copyrighted works to make available to federally licensed broadcasters the necessary
means to copy such works. Under current law, federally licensed broadcasters are au-
thorized to reproduce copyright-protected material under specific conditions. Since
this mandate would apply to both public and private entities that own copyrights, it
would be considered both a private-sector and an intergovernmental mandate.

The use of reproduction protections envisioned in the bill is not yet widespread.
Furthermore, copyright owners may claim economic hardship or technical infeasibility
to avoid the new requirement and the costs of providing federally licensed broad-
casters with the means to copy technically protected works would likely be modest.
Therefore, CBO estimates that the direct cost of the new mandates would be well be-
low the statutory thresholds in UMRA.

The CBO staff contacts for this estimate are Kim Cawley (for Federal costs); Pep-
per Santalucia (for the State and local impact); and Matthew Eyles (for the
private-sector impact). This estimate was approved by Paul N. Van de Water, Assist-
ant Director for Budget Analysis.

### VII. REGULATORY IMPACT STATEMENT

In compliance with paragraph 11(b)(1), rule XXVI of the Standing Rules of the Sen-
ate, the Committee, after due consideration, concludes that S. 2037 will not have
significant regulatory impact.

### **\*65** VIII. ADDITIONAL VIEWS OF MR. LEAHY

The successful adoption by the World Intellectual Property Organization (WIPO) in
December 1996 of two new copyright treaties-one on written material and one on sound
recordings-was appropriately lauded in the United States. The WIPO Copyright Treaty
and the WIPO Performances and Phonograms Treaty will give a significant boost to the
protection of intellectual property rights around the world, and stand to benefit
important American creative industries-from movies, recordings, computer software
and many other copyrighted materials that are subject to piracy online.

According to Secretary Daley of the Department of Commerce, for the most part,
"the treaties largely incorporate intellectual property norms that are already part
of U.S. law." What the treaties will do is give American owners of copyrighted ma-
terial an important tool to protect their intellectual property in those countries
that become a party to the treaties. With an ever-expanding global marketplace, such
international protection is critical to protect American companies and, ultimately,
American jobs and the U.S. economy.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190                                                    Page 60
S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**


   The President submitted the two WIPO treaties to the U.S. Senate on July 29, 1997,
as well as draft legislation to implement the two treaties. I was proud to introduce
this draft implementing legislation, S. 1121, with Senators Hatch, Thompson, and
Kohl on July 29, 1997.

   This legislation is the culmination of an effort to ensure that the appropriate
copyright protections are in place around the world to foster the enormous growth of
the Internet and other digital computer networks. Our dependence on interconnected
computers only grows as a means to communicate, manage our personal and business af-
fairs and obtain the goods and services we want. Indeed, computer networks will in-
creasingly become the means of transmitting copyrighted works in the years ahead.
This presents great opportunities but also poses significant risks to authors and
our copyright industries.

   We must make sure that our copyright laws protect the intellectual property rights
of creative works available online in ways that promote the use of the Internet,
both by content providers and users. The future growth of computer networks like the
Internet and of digital, electronic communications requires it. Otherwise, owners of
intellectual property will be unwilling to put their material online. If there is no
content worth reading online, the growth of this medium will be stifled, and public
accessibility will be retarded.

   The Clinton administration showed great foresight when it formed, in 1993, the In-
formation Infrastructure Task Force (IITF), which in turn established the Working
Group on Intellectual Property Rights to examine and recommend changes to keep copy-
right **\*66** law current with new technology. In 1995, the Administration's Working
Group on Intellectual Property Rights released its report, "Intellectual Property
and the National Information Infrastructure," in which it explained the importance
of adequate copyright protection for the future of the Internet:

   The full potential of the NII will not be realized if the education, information
and entertainment products protected by intellectual property laws are not protected
effectively when disseminated via the NII. Creators and other owners of intellectual
property will not be willing to put their interests at risk if appropriate systems-
both in the U.S. and internationally-are not in place to permit them to set and en-
force the terms and conditions under which their works are made available in the NII
environment. Likewise, the public will not use the services available on the NII and
generate the market necessary for its success unless a wide variety of works are
available under equitable and reasonable terms and conditions, and the integrity of
those works is assured. All the computers, telephones, fax machines, scanners, cam-
eras, keyboards, televisions, monitors, printers, switches, routers, wires, cables,
networks, and satellites in the world will not create a successful NII, if there is
no content. What will drive the NII is the content moving through it.

   The same year that report was issued, Senator Hatch and I joined together to in-
troduce "The NII Copyright Protection Act of 1995", S. 1284, which incorporated the
recommendations of the Administration. That legislative proposal confronted funda-
mental questions about the role of copyright in the next century-many of which are
echoed by the Digital Millennium Copyright Act (DMCA), which was reported by the
Senate Judiciary Committee.

   I note that the Report of the Administration's Working Group on Intellectual Prop-
erty also generally supported "the amendments to the copyright law and the criminal

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)

**(Cite as: S. REP. 105-190)**

law (which sets out sanctions for criminal copyright violations) set forth in S.
1122, introduced in the 104th Congress by Senators Leahy and Feingold following con-
sultations with the Justice Department." While the 104th Congress did not act on
this legislation, I revised and reintroduced this bill as S. 1044 in 1997. This im-
portant legislation, the No Electronic Theft Act, to adapt to the emerging digital
environment was finally enacted in this Congress.

Title I of the DMCA is based on the administration's recommendations for legisla-
tion to implement the two WIPO treaties, as reflected in S. 1121. In sum, Title I
makes certain technical changes to conform our copyright laws to the treaties and
substantive amendments to comply with two new treaty obligations. Specifically, the
treaties oblige the signatories to provide legal protections against circumvention
of technological measures used by copyright owners to protect their works, and
against violations of the integrity of copyright management information (CMI), which
identifies a work, its author, the copyright owner and any information about the
terms and conditions of use of the work. The bill adds a new chapter to U.S. copy-
right law to implement the **67** anticircumvention and CMI provisions, along with cor-
responding civil and criminal penalties. Title II of the DMCA provides limitations,
under certain conditions, on copyright infringement liability for Internet service
providers (ISP's) and online service providers (OSP's). Title III provides a stat-
utory exemption in the Copyright Act to ensure that the lawful owner or lessee of a
computer machine may authorize an independent service technician to activate the
computer in order to service its hardware components. Title IV begins the process of
updating our Nation's copyright laws with respect to library, archives, and educa-
tional uses of copyrighted works in the digital age.

Following intensive discussions with a number of interested parties, including
libraries, universities, small businesses, ISP's and OSP's, telephone companies,
computer users, broadcasters, content providers and device manufacturers, the Senate
Judiciary Committee was able to reach unanimous agreement on certain modifications
and additions incorporated into the DMCA.

For example, significant provisions were added to the bill in Title II to clarify
the liability for copyright infringement of online and Internet service providers.
These provisions set forth "safe harbors" from liability for ISP's and OSP's under
clearly defined circumstances, which both encourage responsible behavior and protect
important intellectual property rights. In addition, during the Committee's consid-
eration of this bill, an Ashcroft-Leahy-Hatch amendment was adopted to ensure that
computer users are given reasonable notice of when their Web sites are the subject
of infringement complaints, and to provide procedures for computer users to have ma-
terial that is mistakenly taken down put back online.

This bill contains a number of provisions designed to help libraries and archives.
First, libraries expressed concerns about the possibility of criminal sanctions or
potentially ruinous monetary liability for actions taken in good faith. This bill
makes sure that libraries acting in good faith can never be subject to fines or
civil damages. Specifically, a library is exempt from monetary liability in a civil
suit if it was not aware and had no reason to believe that its acts constituted a
violation. In addition, libraries are completely exempt from the criminal provi-
sions.

Second, the bill contains a "browsing" exception for libraries. Libraries have in-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**


dicated that in an online environment dominated by encrypted works it may be im-
possible for them to gain access to works to decide whether or not to acquire them.
The current version of the bill permits libraries to disregard access prevention
technologies in order to make a good faith determination of whether or not it would
like to buy a copy of a work. If the library decides that it wishes to acquire the
work it must negotiate with the copyright owner just as libraries do today.

Third, Senator Hatch, Senator Ashcroft, and I crafted an amendment to provide for
the preservation of digital works by qualified libraries and archives. The ability
of libraries to preserve legible copies of works in digital form is one I consider
critical. Under present law, libraries are permitted to make a single facsimile copy
of works in their collections for preservation purposes, or to replace lost, damaged
or stolen copies of works that have become commercially unavailable. This law,
however, has become outmoded by **\*68** changing technology and preservation practices.
The bill ensures that libraries' collections will continue to be available to future
generations by permitting libraries to make up to three copies in any format-in-
cluding in digital form. This was one of the proposals in The National Information
Infrastructure (NII) Copyright Protection Act of 1995, which I sponsored in the last
Congress. The Register of Copyrights, among others, has supported that proposal.

In addition, the bill would permit a library to transfer a work from one digital
format to another if the equipment needed to read the earlier format becomes un-
available commercially. This change addresses a problem that should be familiar to
anyone whose office has boxes of eight-inch floppy disks tucked away somewhere.

These provisions go a long way toward meeting the concerns that libraries have ex-
pressed about the original bill, S. 1121.

Another issue that the bill addresses is distance learning. When Congress enacted
the present copyright law it recognized the potential of broadcast and cable techno-
logy to supplement classroom teaching, and to bring the classroom to those who, be-
cause of their disabilities or other special circumstances, are unable to attend
classes. At the same time, Congress also recognized the potential for unauthorized
transmissions of works to harm the markets for educational uses of copyrighted ma-
terials. In the present Copyright Act, we struck a careful balance and crafted a
narrow exemption. But as with so many areas of copyright law, the advent of digital
technology requires us to take another look at the issue.

I recognize that the issue of distance learning has been under consideration for
the past several years by the Conference on Fair Use (CONFU) that was established by
the administration to consider issues relating to fair use in the digital environ-
ment. In spite of the hard work of the participants, CONFU has so far been unable to
forge a comprehensive agreement on guidelines for the application of fair use to di-
gital distance learning.

We made tremendous strides in the Committee to chart the appropriate course for
updating the Copyright Act to permit the use of copyrighted works in valid distance
learning activities. Senator Hatch, Senator Ashcroft, and I joined together to ask
the Copyright Office to facilitate discussions among interested library and educa-
tional groups and content providers with a view toward making recommendations that
could be incorporated into the DMCA at the April 30 markup.

Based on the Copyright Office's recommendations, we incorporated into the DMCA a
new section 122 requiring the Copyright Office to make broader recommendations to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**


Congress on digital distance education within six months. Upon receiving the Copy-
right Office's recommendations, it is my hope that the Senate Judiciary Committee
will promptly commence hearings on the issue and move expeditiously to enact further
legislation on the matter. I know that all members on this Committee are as anxious
as I am to complete the process that we started in Committee of updating the Copy-
right Act to permit the appropriate use of copyrighted works in valid distance
learning activities. This step should be viewed as a beginning-not an end, and we
are committed to reaching that end point as quickly as possible.

  **\*69** Senator Feinstein had sought to clarify when a university would be held re-
sponsible for the actions of its employees in connection with its eligibility for
the safe harbors spelled out in title II of the bill. I and others on the Committee
agreed with Senator Feinstein that, because of the importance, complexity, and im-
plications for other online service providers, including libraries and archives of
this issue, we should have the Copyright Office examine the issue in a comprehensive
fashion as well.

  Amendments sponsored by Senator Ashcroft, Senator Hatch, and I were also crafted
to address the issues of reverse engineering, ephemeral recordings and to clarify
the use of copyright management information in the course of certain analog and di-
gital transmissions in broadcasting. Additional legislative language was incorpor-
ated into the bill to clarify that the law enforcement exemptions apply to all gov-
ernment agencies which conduct law enforcement and intelligence work, as well as to
government contractors engaging in intelligence, investigative, or protective work.

  Finally, to assuage the concerns of the consumer electronics manufacturers and
others that the bill might require them to design their products to respond to any
particular technological protection measure, Senator Hatch, Senator Ashcroft, and I
crafted an amendment that clarified the bill on this issue. We also agreed to incor-
porate provisions into the bill clarifying that nothing in the bill will prevent
parents form controlling their children's access to the Internet or individuals from
protecting personal identifying information.

  The DMCA is a product of the Senate Judiciary Committee's recognition that ours is
a time of unprecedented challenge to copyright protection. Copyright has been the
engine that has traditionally converted the energy of artistic creativity into pub-
licly available arts and entertainment. Historically, the Government's role has been
to encourage creativity and innovation by protecting copyrights that create incent-
ives for the dissemination to the public of new works and forms of expression. That
is the tradition which I have sought to honor and which I intend to continue to pro-
mote.

  Now, with the DMCA, the Senate Judiciary Committee takes another important step
toward protecting American ingenuity and creative expression. This bill is a well-
balanced package of proposals that address the needs of creators, consumers and com-
merce in the digital age and well into the next century.

       Patrick Leahy.


                    **\*70** IX. CHANGES IN EXISTING LAW


  In compliance with paragraph 12 of rule XXVI of the Standing Rules of the Senate,
changes in existing law made by S. 2037, as reported, are shown as follows (existing


© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**


law proposed to be omitted is enclosed in black brackets, new matter is printed in
italic, and existing law in which no change is proposed is shown in roman):

UNITED STATES CODE

* * * * * * *

TITLE 17-COPYRIGHTS

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

CHAPTER 1-SUBJECT MATTER AND SCOPE OF COPYRIGHT

* * * * * * *

  Except as otherwise provided in this title, as used in this title, the following
terms and their variant forms mean the following:

* * * * * * *

  [A work is a "Berne Convention work" if-
    [(1) in the case of an unpublished work, one or more of the authors is a nation-
al of a nation adhering to the Berne Convention, or in the case of a published work,
one of more of the authors is a national of a nation adhering to the Berne Conven-
tion on the date of first publication;
    [(2) the work was first published in a nation adhering to the Berne Convention,
or was simultaneously first published in a nation adhering to the Berne Convention
and in a foreign nation that does not adhere to the Berne Convention;
    [(3) in the case of an audiovisual work-
    [(A) if one or more of the authors is a legal entity, that author has its
headquarters in a nation adhering to the Berne Convention; or
    [(B) if one or more of the authors is an individual, that author is domiciled,
or has his or her habitual residence in a nation adhering to the Berne Convention;
    **\*71** [(4) in the case of a pictorial, graphic, or sculptural work that is incor-
porated in a building or other structure, the building or structure is located in a
nation adhering to the Berne Convention; or
    [(5) in the case of an architectural work embodied in a building, such building
is erected in a country adhering to the Berne Convention.
    [For purposes of paragraph (1), an author who is domiciled in or has his or her
habitual residence in, a nation adhering to the Berne Convention is considered to be
a national of that nation. For purposes of paragraph (2), a work is considered to
have been simultaneously published in two or more nations if its dates of publica-
tion are within 30 days of one another.]

* * * * * * *

  [The "country of origin" of a Berne Convention work, for] For purposes of  section
411, [is the United States] a work is a "United States work" only if-
    (1) in the case of a published work, the work is first published-
    (A) in the United States;
    (B) simultaneously in the United States and another [nation or nations adhering

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

to the Berne Convention] treaty party or parties, whose law grants a term of copy-
right protection that is the same as or longer than the term provided in the United
States;

   (C) simultaneously in the United States and a foreign nation that [does not ad-
here to the Berne Convention] is not a treaty party; or

   (D) in a foreign nation that [does not adhere to the Berne Convention] is not a
treaty party, and all of the authors of the work are nationals, domiciliaries, or
habitual residents of, or in the case of an audiovisual work legal entities with
headquarters in, the United States;

   (2) in the case of an unpublished work, all the authors of the work are nation-
als, domiciliaries, or habitual residents of the United States, or, in the case of
an unpublished audiovisual work, all the authors are legal entities with headquar-
ters in the United States; or

   (3) in the case of a pictorial, graphic, or sculptural work incorporated in a
building or structure, the building or structure is located in the United States.

   [For the purposes of section 411, the "country of origin" of any other Berne
Convention work is not the United States.]

* * * * * * *

   A work is "fixed" in a tangible medium of expression when its embodiment in a copy
or phonorecord, by or under the authority of the author, is sufficiently permanent
or stable to permit it to be perceived, reproduced, or otherwise communicated for a
period of more than transitory duration. A work consisting of sounds, images, or
both, that are being transmitted, is "fixed" for purposes of this title if a fixa-
tion of the work is being made simultaneously with its transmission.

  **\*72** The "Geneva Phonograms Convention" is the Convention for the Protection of
Producers of Phonograms Against Unauthorized Duplication of Their Phonograms, con-
cluded at Geneva, Switzerland on October 29, 1971.

  The terms "including" and "such as" are illustrative and not limitative.

  An "international agreement" is-

   (1) the Universal Copyright Convention;

   (2) the Geneva Phonograms Convention;

   (3) the Berne Convention;

   (4) the WTO Agreement;

   (5) the WIPO Copyright Treaty;

   (6) the WIPO Performances and Phonograms Treaty; and

   (7) any other copyright treaty to which the United States is a party.

* * * * * * *

   To "transmit" a performance or display is to communicate it by any device or pro-
cess whereby images or sounds are received beyond the place from which they are
sent.

   A "treaty party" is a country or intergovernmental organization other than the
United States that is a party to an international agreement.

* * * * * * *

   The author's "widow" or "widower" is the author's surviving spouse under the law
of the author's domicile at the time of his or her death, whether or not the spouse

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190                                                          Page 66
S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**


has later re-married.
   The "WIPO Copyright Treaty" is the WIPO Copyright Treaty concluded at Geneva,
Switzerland, on December 20, 1996.
   The "WIPO Performances and Phonograms Treaty" is the WIPO Performances and Phono-
grams Treaty concluded at Geneva, Switzerland on December 20, 1996.

                               * * * * * * *
   A "work made for hire" is-
      (1) a work prepared by an employee within the scope of his or her employment; or

                               * * * * * * *
   The "WTO Agreement" is the Agreement Establishing the World Trade Organization
entered into on April 15, 1994. The terms "WTO Agreement" and "WTO member country"
have the meanings given those terms in paragraphs (9) and (10) respectively of sec-
tion 2 of the Uruguay Round Agreements Act.


                               * * * * * * *

S 104. Subject matter of copyright: National origin

   (a) Unpublished Works.-The works specified by sections 102 and 103, while unpub-
lished, are subject to protection under this title without regard to the nationality
or domicile of the author.
   (b) Published Works.-The works specified by sections 102 and 103, when published,
are subject to protection under this title if-
      (1) on the date of first publication, one or more of the authors is a national
or domiciliary of the United States, or is a **73 national domiciliary, or sovereign
authority of a [foreign nation that is a party to a copyright treaty to which the
United States is also a party] treaty party, or is a stateless person, wherever that
person may be domiciled; or
      (2) the work is first published in the United States or in a foreign nation
that, on the date of first publication, is a [party to the Universal Copyright Con-
vention] treaty party; or
      (3) the work is a sound recording that was first fixed in a treaty party; or
      (4) the work is a [Berne Convention work] pictorial, graphic or sculptural work
that is incorporated in a building or other structure, or an architectural work that
is embodied in a building and the building or structure is located in the United
States or a treaty party; or
      [(3)] (5) the work is first published by the United Nations or any of its spe-
cialized agencies, or by the Organization of American States; or
      [(5)] (6) the work comes within the scope of a Presidential proclamation.
Whenever the President finds that a particular foreign nation extends, to works by
authors who are nationals or domiciliaries of the United States or to works that are
first published in the United States, copyright protection on substantially the same
basis as that on which the foreign nation extends protection to works of its own na-
tionals and domiciliaries and works first published in that nation, the President
may by proclamation extend protection under this title to works of which one or more
of the authors is, on the date of first publication, a national, domiciliary, or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190                                                     Page 67
S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

sovereign authority of that nation, or which was first published in that nation. The
President may revise, suspend, or revoke any such proclamation or impose any condi-
tions or limitations on protection under a proclamation.

(7) For purposes of paragraph (2), a work that is published in the United States
or a treaty party within thirty days of publication in a foreign nation that is not
a treaty party shall be considered first published in the United States or such
treaty party as the case may be.

* * * * * * *

(d) Effect of Phonograms Treaties.-Notwithstanding the provisions of subsection
(b), no works other than sound recordings shall be eligible for protection under
this title solely by virtue of the adherence of the United States to the Geneva
Phonograms Convention or the WIPO Performances and Phonograms Treaty.

S 104A. Copyright in restored works

(a) Automatic Protection and Term.-
(1) Term.-
(A) Copyright subsists, in accordance with this section, in restored works, and
vests automatically on the date of restoration.

* * * * * * *

(h) Definitions.-For purposes of this section and section 109(a):
**\*74** (1) The term "date of adherence or proclamation" means the earlier of the
date on which a foreign nation which, as of the date the WTO Agreement enters into
force with respect to the United States, is not a nation adhering to the Berne Con-
vention or a WTO member country, becomes-
[(A) a nation adhering to the Berne Convention or a WTO member country; or]
[(B) subject to a Presidential proclamation under subsection (g).]
(A) a nation adhering to the Berne Convention;
(B) a WTO member country;
(C) a nation adhering to the WIPO Copyright Treaty;
(D) a nation adhering to the WIPO Performances and Phonograms Treaty; or
(E) subject to a Presidential proclamation under subsection (g).

* * * * * * *

[(3) The term "eligible country" means a nation, other than the United States,
that is a WTO member country, adheres to the Berne Convention, or is subject to a
proclamation under section 104A(g).]
(3) the term "eligible country" means a nation, other than the United States
that-
(A) becomes a WTO member country after the date of enactment of the Uruguay
Round Agreements Act;
(B) on the date of enactment is, or after the date of enactment becomes, a na-
tion adhering to the Berne Convention;
(C) adheres to the WIPO Copyright Treaty;
(D) adheres to the WIPO Performances and Phonograms Treaty; or
(E) after such date of enactment becomes subject to a proclamation under subsec-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190                                                        Page 68
S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**


tion (g).

                          * * * * * * *

    (6) The term "restored work" means an original work of authorship that-
    (A) is protected under subsection (a);
    (B) is not in the public domain in its source country through expiration of term
of protection;
    (C) is in the public domain in the United States due to-

                          * * * * * * *

    (iii) lack of national eligibility; [and]
    (D) has at least one author or rightholder who was, at the time the work was
created, a national or domiciliary of an eligible country, and if published, was
first published in an eligible country and not published in the United States during
the 30-day period following publication in such eligible country[.]; and
    (E) if the source country for the work is an eligible country solely by virtue
of its adherence to the WIPO Performances and Phonograms Treaty, is a sound record-
ing.

                          * * * * * * *

    (8) The "source country" of a restored work is-
**\*75** (A) a nation other than the United States;
    (B) in the case of an unpublished work-
    (i) the eligible country in which the author or rightholder is a national or
domiciliary, or, if a restored work has more than 1 author or rightholder, of which
the majority of foreign authors or rightholders are nationals or domiciliaries [of
eligible countries]; or

                          * * * * * * *

    [(9) The terms "WTO Agreement" and "WTO member country" have the meanings given
those terms in paragraphs (9) and (10), respectively, of section 2 of the Uruguay
Round Agreements Act.]

                          * * * * * * *

S 108. Limitations on exclusive rights: Reproduction by libraries and archives

    (a) [Notwithstanding] Except as otherwise provided and notwithstanding the provi-
sions of section 106, it is not an infringement of copyright for a library or
archives, or any of its employees acting within the scope of their employment, to
reproduce no more than one copy or phonorecord of a work except as provided in sub-
sections (b) and (c), or to distribute such copy or phonorecord, under the condi-
tions specified by this section, if-

                          * * * * * * *

    (3) the reproduction or distribution of the work includes a notice of copyright
if such notice appears on the copy of phonorecord that is reproduced under the pro-
visions of this section, or a legend stating that the work may be protected by copy-
right if no such notice can be found on the copy or phonorecord that is reproduced

                 © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

under the provisions of this section.

(b) The rights of reproduction and distribution under this section apply to [a
copy or phonorecord] three copies or phonorecords of an unpublished work duplicated
[in facsimile form] solely for purposes of preservation and security or for deposit
for research use in another library or archives of the type described by clause (2)
of subsection (a), [if the copy or phonorecord reproduced is currently in the col-
lections of the library or archives.] if--

(1) the copy or phonorecord reproduced is currently in the collections of the
library or archives; and

(2) any such copy or phonorecord that is reproduced in digital format is not
otherwise distributed in that format and is not made available to the public outside
the premises of the library or archives in that format.

(c) The right of reproduction under this section applies to [a copy or phonore-
cord] three copies or phonorecords of a published work duplicated [in facsimile
form] solely for the purpose of replacement of a copy or phonorecord that is dam-
aged, deteriorating, lost, or stolen, or if the existing format in which the work is
stored has become obsolete, [if the library or archives has, after a reasonable ef-
fort, determined that an unused replacement cannot be obtained at a fair price.] if--

**\*76** (1) the library or archives has, after a reasonable effort, determined that
an unused replacement cannot be obtained at a fair price; and

(2) any such copy or phonorecord that is reproduced in digital format is not
made available to the public in that format except for use on the premises of the
library or archives in lawful possession of such copy.

For purposes of this subsection, a format shall be considered obsolete if the ma-
chine or device necessary to render perceptible a work stored in that format is no
longer manufactured or is no longer reasonably available in the commercial market-
place.

\* \* \* \* \* \* \*

S 112. Limitations on exclusive rights: Ephemeral recordings

[(a)] (a)(1) Notwithstanding the provisions of section 106, and except in the case
of a motion picture or other audiovisual work, it is not an infringement of copy-
right for a transmitting organization entitled to transmit to the public a perform-
ance or display of a work, under a license or transfer of the copyright or under the
limitations on exclusive rights in sound recordings specified by section, 114(a), or
for a transmitting organization that is broadcast radio or television station li-
censed as such by the Federal Communications Commission that broadcasts a perform-
ance of a sound recording in a digital format on a nonsubscription basis. to make no
more than one copy or phonorecord of a particular transmission program embodying the
performance or display, if--

[(1)] (A) the copy of phonorecord is retained and used solely by the transmit-
ting organization that made it, and no further copies or phonorecords are reproduced
from it; and

[(2)] (B) the copy or phonorecord is used solely for the transmitting organiza-
tion's own transmissions within its local service area, or for purposes of archival
preservation or security; and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190                                                      Page 70
S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

    [(3)] (C) unless preserved exclusively for archival purposes, the copy or
phonorecord is destroyed within six months from the date the transmission program
was first transmitted to the public.
    (2) Where a transmitting organization entitled to make a copy or phonorecord under
section 112(a)(1) in connection with the transmission to the public of a performance
or display or a work pursuant to that section is prevented from making such copy or
phonorecord by reason of the application by the copyright owner or technical meas-
ures that prevent the reproduction of the work, such copyright owner shall make
available to the transmitting organization the necessary means for permitting the
making of such copy of phonorecord within the meaning of that section, provided that
it is technologically feasible and economically reasonable for the copyright owner
to do so, and provided further that, if such copyright owner fails to do so in a
timely manner in light of the transmitting organizations' reasonable business re-
quirements, the transmitting organization shall not be liable for a violation of
section 1201(a)(1) of this **77** title for engaging in such activities as are neces-
sary to make such copies or phonorecords as permitted under section 112(a)(1).

                          * * * * * * *

S 117. Limitations on exclusive rights: Computer programs

    [Notwithstanding] (a) Making of Additional Copy or Adaptation by Owner of
Copy.-Notwithstanding the provisions of section 106, it is not an infringement for
the owner of a copy of a computer program to make or authorize the making of another
copy or adaption of that computer program provided:

                          * * * * * * *

    [Any exact] (b) Lease, Sale, or Other Transfer of Additional Copy or Adapta-
tion.-Any exact copies prepared in accordance with the provisions of this section
may be leased, sold, or otherwise transferred, along with the copy from which such
copies were prepared, only as part of the lease, sale, or other transfer of all
rights in the program. Adaptations so prepared may be transferred only with the au-
thorization of the copyright owner.
    (c) Machine Maintenance or Repair.-Notwithstanding the provisions of  section 106,
it is not an infringement for an owner or lessee of a machine to make or authorize
the making of a copy of a computer program if such copy is made solely by virtue of
the activation of a machine that lawfully contains an authorized copy of the com-
puter program, for purposes only of maintenance or repair of that machine, if-
    (1) such new copy is used in no other manner and is destroyed immediately after
the maintenance or repair is completed; and
    (2) with respect to any computer program or part thereof that is not necessary
for that machine to be activated, such program or part thereof is not accessed or
used other than to make such new copy by virtue of the activation of the machine.
    (d) Definitions.-For purposes of this section-
    (1) the "maintenance" of a machine is the servicing of the machine in order to
make it work in accordance with its original specifications and any changes to those
specifications authorized for that machine; and
    (2) the "repair" of a machine is the restoring of the machine to the state of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**


working in accordance with its original specifications and any changes to those spe-
cifications authorized for that machine.

* * * * * * *

CHAPTER 4-COPYRIGHT NOTICE, DEPOSIT, AND REGISTRATION

* * * * * * *

S 411. Registration and infringement actions

   (a) Except for [actions for infringement of copyright in Berne Convention works
whose country of origin is not the United States and] an action brought for a viola-
tion of the rights of the author under section 106A(a), and subject to the provi-
sions of subsection **78 (b), no action for infringement of the copyright in any
United States work shall be instituted until registration of the copyright claim has
been made in accordance with this title. In any case, however, where the deposit,
application, and fee required for registration have been delivered to the Copyright
Office in proper form and registration has been refused, the applicant is entitled
to institute an action for infringement if notice thereof, with a copy of the com-
plaint, is served on the Register of Copyrights. The Register may, at his or her op-
tion, become a party to the action with respect to the issue of registrability of
the copyright claim by entering an appearance within sixty days after such service,
but the Register's failure to become a party shall not deprive the court of juris-
diction to determine that issue.

* * * * * * *

CHAPTER 5-COPYRIGHT INFRINGEMENT AND REMEDIES

   Sec.
  501. Infringement of copyright.

* * * * * * *

  511. Liability of States, instrumentalities of States, and State officials for in-
fringement of copyright.
  512. Liability of service providers for online infringement of copyright.

* * * * * * *

   (a) Criminal Proceedings.-Except as expressly provided elsewhere in this title,
[No] no criminal proceeding shall be maintained under the provisions of this title
unless it is commenced within three years after the cause of action arose.

* * * * * * *

S 512. Liability of service providers for online infringement of copyright

   (a) Digital Network Communications.-A service provider shall not be liable for
monetary relief, or except as provided in subsection (i) for injunctive or other

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**


equitable relief, for infringement for the provider's transmitting, routing, or
providing connections for, material through a system or network controlled or oper-
ated by or for the service provider, or the intermediate and transient storage of
such material in the course of such transmitting, routing or providing connections,
if-
    (1) it was initiated by or at the direction of a person other than the service
provider;
    (2) it is carried out through an automatic technical process without selection
of such material by the service provider;
    (3) the service provider does not select the recipients of such material except
as an automatic response to the request of another;
    (4) no such copy of such material made by the service provider is maintained on
the system or network in a manner ordinarily accessible to anyone other than anti-
cipated recipients, and no such copy is maintained on the system or network in a **\*79**
manner ordinarily accessible to the anticipated recipients for a longer period than
is reasonably necessary for the communication; and
    (5) the material is transmitted without modification to its content.
  (b) System Caching.-A service provider shall not be liable for monetary relief, or
except as provided in subsection (i) for injunctive or other equitable relief, for
infringement for the intermediate and temporary storage of material on the system or
network controlled or operated by or for the service provider, where (i) such mater-
ial is made available online by a person other than such service provider, (ii) such
material is transmitted from the person described in clause (i) through such system
or network to someone other than that person at the direction of such other person,
and (iii) the storage is carried out through an automatic technical process for the
purpose of making such material available to users of such system or network who
subsequently request access to that material from the person described in clause
(i), provided that:
    (1) such material is transmitted to such subsequent users without modification
to its content from the manner in which the material otherwise was transmitted from
the person described in clause (i);
    (2) such service provider complies with rules concerning the refreshing, reload-
ing or other updating of such material when specified by the person making that ma-
terial available online in accordance with an accepted industry standard data commu-
nications protocol for the system or network through which that person makes the ma-
terial available; provided that the rules are not used by the person described in
clause (i) to prevent or unreasonably impair such intermediate storage;
    (3) such service provider does not interfere with the ability of technology as-
sociated with such material that returns to the person described in clause (i) the
information that would have been available to such person if such material had been
obtained by such subsequent users directly from such person, provided that such
technology-
    (A) does not significantly interfere with the performance of the provider's sys-
tem or network or with the intermediate storage of the material;
    (B) is consistent with accepted industry standard communications protocols; and
    (C) does not extract information from the provider's system or network other
than the information that would have been available to such person if such material

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

had been accessed by such users directly from such person;

(4) either-

(A) the person described in clause (i) does not currently condition access to
such material; or

(B) if access to such material is so conditioned by such person, by a current
individual pre-condition, such as a pre-condition based on payment of a fee, or pro-
vision of a password or other information, the service provider permits access to
the stored material in significant part only to **80** users of its system or network
that have been so authorized and only in accordance with those conditions; and

(5) if the person described in clause (i) makes that material available online
without the authorization of the copyright owner, then the service provider responds
expeditiously to remove, or disable access to, the material that is claimed to be
infringing upon notification of claimed infringements described in subsection
(c)(3); provided that the material has previously been removed from the originating
site, and the party giving the notification includes in the notification a statement
confirming that such material has been removed or access to it has been disabled or
ordered to be removed or have access disabled.

(c) Information Stored on Service Providers.-

(1) In general.-A service provider shall not be liable for monetary relief, or
except as provided in subsection (i) for injunctive or other equitable relief, for
infringement for the storage at the direction of a user of material that resides on
a system or network controlled or operated by or for the service provider, if the
service provider-

(A)(i) does not have actual knowledge that the material or activity is in-
fringing,

(ii) in the absence of such actual knowledge, is not aware of facts or circum-
stances from which infringing activity is apparent, or

(iii) if upon obtaining such knowledge or awareness, the service provider acts
expeditiously to remove or disable access to, the material;

(B) does not receive a financial benefit directly attributable to the infringing
activity, where the service provider has the right and ability to control such
activity; and

(C) in the instance of a notification of claimed infringement as described in
paragraph (3), responds expeditiously to remove, or disable access to, the material
that is claimed to be infringing or to be the subject of infringing activity.

(2) Designated agent.-The limitations on liability established in this subsec-
tion apply only if the service provider has designated an agent to receive notifica-
tions of claimed infringement described in paragraph (3), by substantially making
the name, address, phone number, electronic mail address of such agent, and other
contact information deemed appropriate by the Register of Copyrights, available
through its service, including on its website, and by providing such information to
the Copyright Office. The Register of Copyrights shall maintain a current directory
of agents available to the public for inspection, including through the Internet, in
both electronic and hard copy formats.

(3) Elements of notification.-

(A) To be effective under this subsection, a notification of claimed infringe-
ment means any written communication provided to the service provider's designated

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

agent that includes substantially the following:

(i) a physical or electronic signature of a person authorized to act on behalf
of the owner of an exclusive right that is allegedly infringed;

**\*81** (ii) identification of the copyrighted work claimed to have been infringed,
or, if multiple such works at a single online site are covered by a single notifica-
tion, a representative list of such works at that site;

(iii) identification of the material that is claimed to be infringing or to be
the subject of infringing activity that is to be removed or access to which is to be
disabled, and information reasonably sufficient to permit the service provider to
locate the material;

(iv) information reasonably sufficient to permit the service provider to con-
tact the complaining party, such as an address, telephone number, and, if available
an electronic mail address at which the complaining party may be contacted;

(v) a statement that the complaining party has a good faith belief that use of
the material in the manner complained of is not authorized by the copyright owner,
or its agent, or the law; and

(vi) a statement that the information in the notification is accurate, and un-
der penalty of perjury, that the complaining party has the authority to enforce the
owner's rights that are claimed to be infringed.

(B) A notification from the copyright owner or from a person authorized to act
on behalf of the copyright owner that fails substantially to conform to the provi-
sions of paragraph (3)(A) shall not be considered under paragraph (1)(A) in determ-
ining whether a service provider has actual knowledge or is aware of facts or
 circumstances from which infringing activity is apparent, provided that the pro-
vider promptly attempts to contact the complaining party or takes other reasonable
steps to assist in the receipt of notice under paragraph (3)(A) when the notice is
provided to the service provider's designated agent and substantially satisfies the
provisions of subparagraphs (3)(A)(ii), (iii), and (iv).

(d) Information Location Tools.-A service provider shall not be liable for monet-
ary relief, or except as provided in subsection (i) for injunctive or other equit-
able relief, for infringement for the provider referring or linking users to an on-
line location containing infringing material or activity by using information loca-
tion tools, including a directory, index, reference, pointer or hypertext link, if
the provider-

(1) does not have actual knowledge that the material or activity is infringing
or, in the absence of such actual knowledge, is not aware of facts or circumstances
from which infringing activity is apparent;

(2) does not receive a financial benefit directly attributable to the infringing
activity, where the service provider has the right and ability to control such
activity; and

(3) responds expeditiously to remove or disable the reference or link upon noti-
fication of claimed infringement as described in  subsection (c)(3); provided that
for the purposes of this paragraph, the element in subsection (c)(3)(A)(iii) shall
be identification of the reference or link, to material or activity claimed to **\*82**
be infringing, that is to be removed or access to which is to be disabled, and in-
formation reasonably sufficient to permit the service provider to locate such refer-
ence or link.

S. REP. 105-190                                                    Page 75
S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

(e) Misrepresentations.-Any person who knowingly materially misrepresents under
this section (1) that material or activity is infringing, or (2) that material or
activity was removed or disabled by mistake or misidentification, shall be liable
for any damages, including costs and attorneys' fees, incurred by the alleged in-
fringer, by any copyright owner or copyright owner's authorized licensee, or by the
service provider, who is injured by such misrepresentation, as the result of the
service provider relying upon such misrepresentation in removing or disabling access
to the material or activity claimed to be infringing, or in replacing the removed
material or ceasing to disable access to it.

(f) Replacement of Removed or Disabled Material and Limitation on Other Liabil-
ity.-

(1) Subject to paragraph (2) of this subsection, a service provider shall not be
liable to any person for any claim based on the service provider's good faith dis-
abling of access to, or removal of, material or activity claimed to be infringing or
based on facts or circumstances from which infringing activity is apparent, regard-
less or whether the material or activity is ultimately determined to be infringing.

(2) Paragraph (1) of this subsection shall not apply with respect to material
residing at the direction of a subscriber of the service provider on a system or
network controlled or operated by or for the service provider that is removed, or
provided under subsection (c)(1)(C), unless the service provider:-

(A) takes reasonable steps promptly to notify the subscriber that it has removed
or disabled access to the material;

(B) upon receipt of a counter notice as described in paragraph (3), promptly
provides the person who provided the notice under subsection (c)(1)(C) with a copy
of the counter notice, and informs such person that it will replace the removed ma-
terial or cease disabling access to it in ten business days; and

(C) replaces the removed material and ceases disabling access to it not less
than ten, nor more than fourteen, business days following receipt of the counter no-
tice, unless its designated agent first receives notice from the person who submit-
ted the notification under subsection (c)(1)(C) that such person has filed an action
seeking a court order to restrain the subscriber from engaging in infringing activ-
ity relating to the material on the service provider's system or network.

(3) To be effective under this subsection, a counter notification means any
written communication provided to the service provider's designated agent that in-
cludes substantially the following:

(A) a physical or electronic signature of the subscriber;

(B) identification of the material that has been removed or to which access has
been disabled and the location at **83** which such material appeared before it was re-
moved or access was disabled;

(C) a statement under penalty of perjury that the subscriber has a good faith
belief that the material was removed or disabled as a result of mistake or misiden-
tification of the material to be removed or disabled;

(D) the subscriber's name, address and telephone number, and a statement that
the subscriber consents to the jurisdiction of Federal Court for the judicial dis-
trict in which the address is located, or if the subscriber's address is outside of
the United States, for any judicial district in which the service provider may be
found, and that the subscriber will accept service of process from the person who

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

provided notice under subsection (c)(1)(C) or agent of such person.

(4) A service provider's compliance with paragraph (2) shall not subject the service provider to liability for copyright infringement with respect to the material identified in the notice provided under subsection (c)(1)(C).

(g) Identification of Direct Infringer.-The copyright owner or a person authorized to act on the owner's behalf may request an order for release of identification of an alleged infringer by filing (i) a copy of a notification described in subsection (c)(3)(A), including a proposed order, and (ii) a sworn declaration that the purpose of the order is to obtain the identity of an alleged infringer and that such information will only be used for the purpose of this title, with the clerk of any United States district court. The order shall authorize and order the service provider receiving the notification to disclose expeditiously to the copyright owner or person authorized by the copyright owner information sufficient to identify the alleged direct infringer of the material described in the notification to the extent such information is available to the service provider. The order shall be expeditiously issued if the accompanying notification satisfies the provisions of subsection (c)(3)(A) and the accompanying declaration is properly executed. Upon receipt of the order, either accompanying or subsequent to the receipt of a notification described in subsection (c)(3)(A), a service provider shall expeditiously give to the copyright owner or person authorized by the copyright owner the information required by the order, notwithstanding any other provision of law and regardless of whether the service provider responds to the notification.

(h) Conditions for Eligibility.-

(1) Accommodation of technology.-The limitations on liability established by this section shall apply only if the service provider-

(A) has adopted and reasonably implemented, and informs subscribers of the service of, a policy for the termination of subscribers of the service who are repeat infringers; and

(B) accommodates and does not interfere with standard technical measures as defined in this subsection.

(2) Definition.-As used in this section, "standard technical measures" are technical measures, used by copyright owners to identify or protect copyrighted works, that-

**\*84** (A) have been developed pursuant to a broad consensus of copyright owners and service providers in an open, fair, voluntary, multi-industry standards process;

(B) are available to any person on reasonable and nondiscriminatory terms; and

(C) do not impose substantial costs on service providers or substantial burdens on their systems or networks.

(i) Injunctions.-The following rules shall apply in the case of any application for an injunction under section 502 against a service provider that is not subject to monetary remedies by operation of this section:

(1) Scope of relief.-

(A) With respect to conduct other than that which qualifies for the limitation on remedies as set forth in subsection (a), the court may only grant injunctive relief with respect to a service provider in one or more of the following forms:

(i) an order restraining it from providing access to infringing material or activity residing at a particular online site on the provider's system or network;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

   (ii) an order restraining it from providing access to an identified subscriber
of the service provider's system or network who is engaging in infringing activity
by terminating the specified accounts of such subscriber; or

   (iii) such other injunctive remedies as the court may consider necessary to
prevent or restrain infringement of specified copyrighted material at a particular
online location, provided that such remedies are the least burdensome to the service
provider that are comparably effective for that purpose.

   (B) If the service provider qualifies for the limitation on remedies described
in subsection (a), the court may only grant injunctive relief in one or both of the
following forms:

   (i) an order restraining it from providing access to an identified subscriber
of the service provider's system or network who is using the provider's service to
engage in infringing activity by terminating the specified accounts of such sub-
scriber; or

   (ii) an order restraining it from providing access, by taking specified reason-
able steps to block access, to a specific, identified, foreign online location.

   (2) Considerations.-The court, in considering the relevant criteria for injunct-
ive relief under applicable law, shall consider:

   (A) whether such an injunction, either alone or in combination with other such
injunctions issued against the same service provider under this subsection, would
significantly burden either the provider or the operation of the provider's system
or network;

   (B) the magnitude of the harm likely to be suffered by the copyright owner in
the digital network environment if steps are not taken to prevent or restrain the
infringement;

   (C) whether implementation of such an injunction would be technically feasible
and effective, and would not interfere **85** with access to noninfringing material at
other online locations; and

   (D) whether other less burdensome and comparably effective means of preventing
or restraining access to the infringing material are available.

   (3) Notice and ex parte orders.-Injunctive relief under this subsection shall
not be available without notice to the service provider and an opportunity for such
provider to appear, except for orders ensuring the preservation of evidence or other
orders having no material adverse effect on the operation of the service provider's
communications network.

  (j) Definitions.-

  (1)(A) As used in subsection (a), the term "service provider" means an entity
offering the transmission, routing or providing of connections for digital online
communications, between or among points specified by a user, of material of the
user's choosing, without modification to the content of the material as sent or re-
ceived.

   (B) As used in any other subsection of this section, the term "service provider"
means a provider of online services or network access, or the operator of facilities
therefor, and includes an entity described in the preceding paragraph of this sub-
section.

   (2) As used in this section, the term "monetary relief" means damages, costs,
attorneys' fees, and any other form of monetary payment.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**


   (k) Other Defenses Not Affected.-The failure of a service provider's conduct to
qualify for limitation of liability under this section shall not bear adversely upon
the consideration of a defense by the service provider that the service provider's
conduct is not infringing under this title or any other defense.
   (l) Protection of Privacy.-Nothing in this section shall be construed to condition
the applicability of subsections (a) through (d) on-
   (1) a service provider monitoring its service or affirmatively seeking facts in-
dicating infringing activity except to the extent consistent with a standard tech-
nical measure complying with the provisions of subsection (h); or
   (2) a service provider accessing, removing, or disabling access to material
where such conduct is prohibited by law.
   (m) Rule of Construction.-Subsections (a), (b), (c), and (d) are intended to de-
scribe separate and distinct functions for purposes of analysis under this section.
Whether a service provider qualifies for the limitation on liability in any one such
subsection and shall be based solely on the criteria in each such subsection and
shall not affect a determination of whether such service provider qualifies for the
limitations on liability under any other such subsection.

                          * * * * * * *

           CHAPTER 12-COPYRIGHT PROTECTION AND MANAGEMENT SYSTEMS

     Sec.
   1201. Circumvention of copyright protection systems.
   **\*86** 1202. Integrity of copyright management information.
   1203. Civil remedies.
   1204. Criminal offenses and penalties.

S 1201. Circumvention of copyright protection systems

   (a) Violations Regarding Circumvention of Technological Protection Measures.- (1)
No person shall circumvent a technological protection measure that effectively con-
trols access to a work protected under this title.
   (2) No person shall manufacture, import, offer to the public, provide or otherwise
traffic in any technology, product, service, device, component, or part thereof
that-
   (A) is primarily designed or produced for the purpose of circumventing a techno-
logical protection measure that effectively controls access to a work protected un-
der this title;
   (B) has only limited commercially significant purpose or use other than to cir-
cumvent a technological protection measure that effectively controls access to a
work protected under this title; or
   (C) is marketed by that person or another acting in concert with that person
with that person's knowledge for use in circumventing a technological protection
measure that effectively controls access to a work protected under this title.
   (3) As used in this subsection-
   (A) to "circumvent a technological protection measure" means to descramble a
work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactiv-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

ate, or impair a technological protection measure, without the authority of the
copyright owner; and

(B) a technological protection measure "effectively controls access to a work"
if the measure, in the ordinary course of its operation, requires the application of
information, or a process or a treatment, with the authority of the copyright owner,
to gain access to the work.

(b) Additional Violations.-(1) No person shall manufacture, import, offer to the
public, provide, or otherwise traffic in any technology, product, service, device,
component, or part thereof that-

(A) is primarily designed or produced for the purpose of circumventing protec-
tion afforded by a technological protection measure that effectively protects a
right of a copyright owner under this title in a work or a portion thereof;

(B) has only limited commercially significant purpose or use other than to cir-
cumvent protection afforded by a technological protection measure that effectively
protects a right of a copyright owner under this title in a work or a portion there-
of; or

(C) is marketed by that person or another acting in concert with that person
with that person's knowledge for use in circumventing protection afforded by a tech-
nological protection measure that effectively protects a right of a copyright owner
under this title in a work or a portion thereof.

(2) As used in this subsection-

(A) to "circumvent protection afforded by a technological protection measure"
means avoiding, bypassing, removing, deactivating, **\*87** or otherwise impairing a
technological protection measure; and

(B) a technological protection measure "effectively protects a right of a copy-
right owner under this title" if the measure, in the ordinary course of its opera-
tion, prevents, restricts, or otherwise limits the exercise of a right of a copy-
right owner under this title.

(c) Importation.-The importation into the United States, the sale for importation,
or the sale within the United States after importation by the owner, importer, or
consignee of any technology, product, service, device, component, or part thereof as
described in subsection (a) or (b) shall be actionable under section 337 of the Tar-
iff Act of 1930 (19 U.S.C. 1337).

(d) Other Rights, Etc., Not Affected.-(1) Nothing in this section shall affect
rights, remedies, limitations, or defenses to copyright infringement, including fair
use, under this title.

(2) Nothing in this section shall enlarge or diminish vicarious or contributory
liability for copyright infringement in connection with any technology, product,
service, device, component or part thereof.

(3) Nothing in this section shall require that the design of, or design and selec-
tion of parts and components for, a consumer electronics, telecommunications, or
computing product provide for a response to any particular technological protection
measure, so long as such part or component or the product, in which such part or
component is integrated, does not otherwise fall within the prohibitions of subsec-
tions (a)(2) or (b)(1).

(e) Exemption for Nonprofit Libraries, Archives, and Educational Institutions.-(1)
A nonprofit library, archives, or educational institution which gains access to a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**


commercially exploited copyrighted work solely in order to make a good faith determ-
ination of whether to acquire a copy of that work for the sole purpose of engaging
in conduct permitted under this title shall not be in violation of subsection
(a)(1). A copy of a work to which access has been gained under this paragraph-

    (A) may not be retained longer than necessary to make such good faith determina-
tion; and

    (B) may not be used for any other purpose.

  (2) The exemption made available under paragraph (1) shall only apply with respect
to a work when an identical copy of that work is not reasonably available in another
form.

  (3) A nonprofit library, archives, or educational institution that willfully for
the purpose of commercial advantage or financial gain violates paragraph (1)-

    (A) shall, for the first offense, be subject to the civil remedies under section
1203; and

    (B) shall, for repeated or subsequent offenses, in addition to the

  (4) This subsection may not be used as a defense to a claim under subsection
(a)(2) or (b), nor may this subsection permit a nonprofit library, archives, or edu-
cational institution to manufacture, import, offer to the public, provide or other-
wise traffic in any technology which circumvents a technological protection measure.

  **\*88** (5) In order for a library or archives to qualify for the exemption under this
subsection, the collections of that library or archives shall be-

    (A) open to the public;

    (B) available not only to researchers affiliated with the library or archives or
with the institution of which it is a part, but also to other persons doing research
in a specialized field.

  (f) Law Enforcement and Intelligence Activities.-This section does not prohibit
any lawfully authorized investigative, protective, or intelligence activity of an
officer, agent or employee of the United States, a State, or a political subdivision
of a State, or a person acting pursuant to a contract with such entities.

  (g) Notwithstanding the provisions of subsection 1201(a)(1), a person who has law-
fully obtained the right to use a copy of a computer program may circumvent a tech-
nological protection measure that effectively controls access to a particular por-
tion of that program for the sole purpose of identifying and analyzing those ele-
ments of the program that are necessary to achieve interoperability of an independ-
ently created computer program with other programs, and that have not previously
been readily available to the person engaging in the circumvention, to the extent
any such acts of identification and analysis do not constitute infringement under
this title.

  (h) Notwithstanding the provisions of subsections 1201(a)(2) and (b), a person may
develop and employ technological means to circumvent for the identification and ana-
lysis described in subsection (g), or for the limited purpose of achieving interop-
erability of an independently created computer program with other programs, where
such means are necessary to achieve such interoperability, to the extent that doing
so does not constitute infringement under this title.

  (i) The information acquired through the acts permitted under subsection (g), and
the means permitted under subsection (h), may be made available to others if the
person referred to in subsections (g) or (h) provides such information or means

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

solely for the purpose of achieving interoperability of an independently created
computer program with other programs, and to the extent that doing so does not con-
stitute infringement under this title, or violate applicable law other than this
title.

(j) For purposes of subsections (g), (h) and (i), the term "interoperability"
means the ability of computer programs to exchange information, and for such pro-
grams mutually to use the information which has been exchanged.

(k) In applying subsection (a) to a component or part, the court may consider the
necessity for its intended and actual incorporation in a technology, product, ser-
vice or device, which (i) does not itself violate the provisions of this chapter and
(ii) has the sole purpose to prevent the access of minors to material on the Inter-
net.

S 1202. Integrity of copyright management information

(a) False Copyright Management Information.-No person shall knowingly-
(1) provide copyright management information that is false, or
(2) distribute or import for distribution copyright management information that
is false, with the intent to induce, enable, facilitate or conceal infringement.
(b) Removal or Alteration of Copyright Management Information.-No person shall,
without the authority of the copyright owner or the law-
(1) intentionally remove or alter any copyright management information,
**\*89** (2) distribute or import for distribution copyright management information
knowing that the copyright management information has been removed or altered
without authority of the copyright owner or the law, or
(3) distribute, import for distribution, or publicly perform works, copies of
works, or phonorecords, knowing that copyright management information has been re-
moved or altered without authority of the copyright owner or the law, knowing, or,
with respect to civil remedies under section 1203, having reasonable grounds to
know, that it will induce, enable, facilitate or conceal an infringement of any
right under this title.
(c) Definition.-As used in this chapter, copyright management information means
the following information conveyed in connection with copies or phonorecords of a
work or performances or displays of a work, including in digital form-
(1) the title and other information identifying the work, including the informa-
tion set forth on a notice of copyright;
(2) the name of, and other identifying information about, the author of a work;
(3) the name of, and other identifying information about, the copyright owner of
the work, including the information set forth in a notice of copyright;
(4) with the exception of public performances of works by radio and television
broadcast stations the name of, and other identifying information about, a performer
whose performance is fixed in a work other than an audiovisual work;
(5) with the exception of public performances of works by radio and television
broadcast stations, in the case of an audiovisual work, the name of, and other
identifying information about, a writer, performer, or director who is credited in
the audiovisual work;
(6) identifying numbers of symbols referring to such information or links to
such information; or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

(7) such other information as the Register of Copyrights may prescribe by regulation, except that the Register of Copyrights may not require the provision of any information concerning the user of a copyrighted work.

(d) Law Enforcement and Intelligence Activities.-This section does not prohibit any lawfully authorized investigative, protective, or intelligence activity of an officer, agent, or employee of the United States, a State, or a political subdivision of a State, or a person acting pursuant to a contract with such entities.

(e) Limitations on Liability.-

(1) Analog transmissions.-In the case of an analog transmission, a person who is making transmissions in its capacity as a radio or television broadcast station, or as a cable system, **\*90** or someone who provides programming to such station or system, shall not be liable for a violation of subsection (b) if-

(A) avoiding the activity that constitutes such violation is not technically feasible or would create an undue financial hardship on such person; and

(B) such person did not intend, by engaging in such activity, to induce, enable, facilitate or conceal infringement.

(2) Digital transmissions.-

(A) If a digital transmission standard for the placement of copyright management information for a category of works is set in a voluntary, consensus standard-setting process involving a representative cross-section or radio or television broadcast stations or cable systems and copyright owners of a category of works that are intended for public performance by such stations or systems, a person identified in subsection (e)(1) shall not be liable for a violation of subsection (b) with respect to the particular copyright management information addressed by such standard if-

(i) the placement of such information by someone other than such person is not in accordance with such standard; and

(ii) the activity that constitutes such violation is not intended to induce, enable, facilitate or conceal infringement.

(B) Until a digital transmission standard has been set pursuant to subparagraph (A) with respect to the placement of copyright management information for a category or works, a person identified in subsection (e)(1) shall not be liable for a violation of subsection (b) with respect to such copyright management information, where the activity that constitutes such violation is not intended to induce, enable, facilitate or conceal infringement, if-

(i) the transmission of such information by such person would result in a perceptible visual or aural degradation of the digital signal; or

(ii) the transmission of such information by such person would conflict with

(I) an applicable government regulation relating to

(II) an applicable industry-wide standard relating to the transmission of information in a digital signal that was adopted by a voluntary consensus standards body prior to the effective date of this section; or

(III) an applicable industry-wide standard relating to the transmission of information in a digital signal that was adopted in a voluntary, consensus standards-setting process open to participation by a representative cross-section of radio or television broadcast stations or cable systems and copyright owners of a category of works that are intended for public performance by such stations or systems.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**


**\*91** S 1203. Civil remedies

   (a) Civil Actions.-Any person injured by a violation of section 1201 or 1202 may
bring a civil action in an appropriate United States district court for such viola-
tion.
   (b) Powers of the Court.-In an action brought under subsection (a), the court-
   (1) may grant temporary and permanent injunctions on such terms as it deems
reasonable to prevent or restrain a violation;
   (2) at any time while an action is pending, may order the impounding, on such
terms as it deems reasonable, or any device or product that is in the custody or
control of the alleged violator and that the court has reasonable cause to believe
was involved in a violation;
   (3) may award damages under subsection(c);
   (4) in its discretion may allow the recovery of costs by or against any party
other than the United States or an officer thereof;
   (5) in its discretion may award reasonable attorney's fees to the prevailing
party; and
   (6) may, as part of a final judgment or decree finding a violation, order the
remedial modification or the destruction of any device or product involved in the
violation that is in the custody or control of the violator or has been impounded
under paragraph (2).
   (c) Award of Damages.-
   (1) In general.-Except as otherwise provided in this chapter, a person commit-
ting a violation of section 1201 or 1202 is liable for either-
   (A) the actual damages and any additional profits of the violator, as provided
in paragraph (2), or
   (B) statutory damages, as provided in paragraph (3).
   (2) Actual damages.-The court shall award to the complaining party the actual
damages suffered by the party as a result of the violation, and any profits of the
violator that are attributable to the violation and are not taken into account in
computing the actual damages, if the complaining party elects such damages at any
time before final judgment is entered.
   (3) Statutory damages.-
   (A) At any time before final judgment is entered, a complaining party may elect
to recover an award of statutory damages for each violation of section 1201 in the
sum of not less than $200 or more than $2,500 per act of circumvention, device,
product, component, offer, or performance of service, as the court considers just.
   (B) At any time before final judgment is entered, a complaining party may elect
to recover an award of statutory damages for each violation of section 1202 in the
sum of not less than $2,500 or more than $25,000.
   (4) Repeated violations.-In any case in which the injured party sustains the
burden of proving, and the court finds, that a person has violated section 1201 or
1202 within three years after a final judgment was entered against the person for
another such violation, the court may increase the award of damages **\*92** up to triple
the amount that would otherwise be awarded, as the court considers just.
   (5) Innocent violations.-
   (A) In general.-The court in its discretion may reduce or remit the total award

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

of damages in any case in which the violator sustains the burden of proving, and the
court finds, that the violator was not aware and had no reason to believe that its
acts constituted a violation.

(B) Nonprofit library, archives, or educational institutions.-In the case of a
nonprofit library, archives, or educational institution, the court shall remit dam-
ages in any case in which the library archives, or educational institution sustains
the burden of proving, and the court finds, that the library, archives, or educa-
tional institution was not aware and had no reason to believe that its acts consti-
tuted  a violation.

S 1204. Criminal offenses and penalties

(a) In General.-Any person who violates section 1201 or 1202 willfully and for
purposes of commercial advantage or private financial gain-

(1) shall be fined not more than $500,000 or imprisoned for not more than 5
years, or both for the first offense; and

(2) shall be fined not more than $1,000,000 or imprisoned for not more than 10
years, or both for any or subsequent offense.

(b) Limitation for Nonprofit Library, Archives, or Educational Institution.- Sub-
section (a) shall not apply to a nonprofit library, archives, or educational insti-
tution.

(c) Statute of Limitations.-Notwithstanding section 507(a) of this title, no crim-
inal proceeding shall be brought under this section unless such proceeding is com-
menced within five years after the cause of action arose.

S 1205. Savings Clause

Nothing in this chapter abrogates, diminishes or weakens the provisions of, nor
provides any defense or element or mitigation in a criminal prosecution or civil ac-
tion under, any federal or state law that prevents the violation of the privacy of
an individual in connection with the individual's use of the Internet.

FN1 White-Smith Music Publishing Co. v. Apollo Co., 209 U.S. 1 (1908).

FN2 Sony Corporation of America v. Universal City Studios, Inc., 464 U.S. 417
(1984).

FN3 Information Infrastructure Task Force, Intellectual Property and the National
Information Infrastructure: The Report of the Working Group on Intellectual Property
Rights 1 (1995). The "National Information Infrastructure" encompasses digital, in-
teractive services now available, such as the Internet, as well as those contem-
plated for the future.

FN4 Id. at 2.

FN5 See Request for Comments on Intellectual Property Issues Involved in the Na-
tional Information Infrastructure Initiative, 58 Fed. Reg. 53,917 (Oct. 19, 1993).

FN6 See Information Infrastructure Task Force, Working Group on Intellectual Prop-
erty Rights, Intellectual Property and the National Information Infrastructure: A

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**

Preliminary Draft of the Report of the Working Group on Intellectual Property Rights
(July 1994).

FN7 See Notice of Hearings and Request for Comments on Preliminary Draft of the
Report of the Working Group on Intellectual Property Rights, 59 Fed. Reg. 42,819
(Aug. 19, 1994); Extension of Deadline for Comments on Preliminary Draft of the Re-
port of the Working Group on Intellectual Property Rights, 59 Fed. Reg. 50,222 (Oct.
3, 1994).

FN8 See, supra note 3, at 4 (1995).

FN9 See The Conference on Fair Use; An Interim Report to the Commissioner
(December 1996); Report to the Commissioner on the Conclusion of the First Phase of
the Conference on Fair Use (September 1997).

FN10 See, supra note 3, at 5 (1995).

FN11 Representatives Coble, Bono, Burr, Minge, Luther, and Jacobs cosponsored H.R.
2241.

FN12 Basic Proposal for the Substantive Provisions of the Treaty on Certain Ques-
tions Concerning the Protection of Literary and Artistic Works to Be Considered by
the Diplomatic Conference on Certain Copyright and Neighboring Rights Questions,
WIPO Document AB/XX/2, Annex A, item PRG.02(2), paragraph 1 (Aug. 30, 1996).

FN13 World Intellectual Property Organization, Basic Proposal for the Substantive
Provisions of the Treaty on Certain Questions Concerning the Protection of Literary
and Artistic Works to Be Considered by the Diplomatic Conference, art. 7(1) (Aug.
30, 1996).

FN14 Diplomatic Conference on Certain Copyright and Neighboring Rights Questions,
WIPO Copyright Treaty, art. 11, WIPO Document CRNR/DC/94 (December 20, 1996).

FN15 Representatives Hyde, Conyers, Frank, Bono, McCullum, and Berman cosponsored
the bill.

FN16 Concerning Art. 1(4).

FN17 Art. 11.
18 Rights management information is "information which identifies the work, the
author of the work, the owner of any right in the work, or information about the
terms and conditions of use of the work . . . which is attached to a copy of a work
or appears in connection with communication of the work to the public." Art. 12.
Rights management information is more commonly referred to in the U.S. as copyright
management information (CMI). The purpose of CMI is to facilitate licensing of copy-
right for use on the Internet and to discourage piracy.

FN19 Note that even if a device does not have circumvention as its primary purpose
or design, that is, that it does not fall within the prohibition of section
1201(a)(2)(A), the device would still be illegal if it fell within the prohibitions

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**


of either 1201 (a)(2)(B) and (C).

FN20 For example, Religious Technology Center v. Netcom On-line Communications Services, 907 F. Supp. 1361 (N.D. Cal. 1995); Playboy Enterprises v. Frena, 839 F. Supp. 1552 (M.D. Fla. 1993); and Marobie-FL v. Nat. Assn. Of Fire Equipment Distributors, 983 F. Supp. 1167 (N.D. Ill. 1997).

FN21 See MAI Sys. Corp. v. Peak Computer, 991 F.2d 511 (9th Cir. 1993), cert. denied, 114 S.Ct. 671 (1994).

FN22 Article 12 of the WIPO Copyright Treaty provides:
(1) Contracting Parties shall provide adequate and effective legal remedies against any person knowingly performing any of the following acts knowing, or with respect to civil remedies having reasonable grounds to know, that it will induce, enable, facilitate or conceal an infringement of any right covered by this Treaty or the Berne Convention:
(i) to remove or alter any electronic rights management information without authority;
(ii) to distribute, import for distribution, broadcast or communicate to the public, without authority, works or copies of works knowing that electronic rights management information has been removed or altered without authority.
(2) As used in this Article, "rights management information" means information which identifies the work, the author of the work, the owner of any right in the work, or information about the terms and conditions of use of the work, and any numbers or codes that represent such information, when any of these items of information is attached to a copy of a work or appears in connection with the communication of the work to the public.
Article 19 of the WIPO Performances and Phonograms Treaty provides:
(1) Contracting Parties shall provide adequate and effective legal remedies against any person knowingly performing any of the following acts knowing, or with respect to civil remedies having reasonable grounds to know, that it will induce, enable, facilitate or conceal an infringement of any right covered by this Treaty:
(i) to remove or alter any electronic rights management information without authority;
(ii) to distribute, import for distribution, broadcast, communicate or make available to the public, without authority, performances, copies of fixed performances or phonograms knowing that electronic rights management information has been removed or altered without authority.
(2) As used in this Article, "rights management information" means information which identifies the performer, the performance of the performer, the producer of the phonogram, the phonogram, the owner of any right in the performance or phonogram, or information about the terms and conditions of use of the performance or phonogram, and any numbers or codes that represent such information, when any of these items of information is attached to a copy of a fixed performance or a phonogram or appears in connection with the communication or making available of a fixed performance or a phonogram to the public.

FN23 These threshold criteria apply to all of the liability limitations contained

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 105-190                                                    Page 87
S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)
**(Cite as: S. REP. 105-190)**


in section 512.

   FN24 By "subscribers,"the Committee intends to include account holders who are
parties with a business relationship to the service provider that justifies treating
them as subscribers, for the purposes of section 512, even if no formal subscription
agreement exists. Examples include students who are granted access to a university's
system or network for digital online communications; employees who have access to
their employer's system or network; or household members with access to a consumer
online service by virtue of a subscription agreement between the service provider
and another member of that household.

   25 See footnote 24.

   FN26 See MAI Sys. Corp. v. Peak Computer, 991 F.2d 511 (9th Cir. 1993), cert.
denied, 114 S.Ct. 671 (1994).

   FN27 See H.R. Rep. No. 1476, 94th Cong., 2d Sess. (1976).

 S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623
(Leg.Hist.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw Download Summary Report for BALDINGER,JAMES 4451592**

| | |
|---|---|
| Date/Time of Request: | Wednesday, April 18, 2007 18:11:00 Central |
| Client Identifier: | 50649-29958-005 |
| Database: | USTESTIMONY |
| Citation Text: | 1997 WL 575034 (F.D.C.H.) |
| Lines: | 567 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

Westlaw.

1997 WL 575034 (F.D.C.H.)                                        Page 1
1997 WL 575034 (F.D.C.H.)


                      Federal Document Clearing House
           Copyright (c) 1997 Federal Document Clearing House, Inc.

                               Testimony
                          September 17, 1997

                         House of Representatives
                               Judiciary
                    Courts and Intellectual Property

Copyright Legislation

STATEMENT OF ALLAN R. ADLER
VICE PRESIDENT FOR LEGAL AND GOVERNMENTAL AFFAIRS
ASSOCIATION OF AMERICAN PUBLISHERS
BEFORE THE
SUBCOMMITTEE ON COURTS AND INTELLECTUAL PROPERTY
COMMITTEE ON THE JUDICIARY
U.S. HOUSE OF REPRESENTATIVES
CONCERNING THE
PROPOSED "WIPO COPYRIGHT TREATIES IMPLEMENTATION ACT"
(H.R.2281)
SEPTEMBER 17, 1997
Summary of Testimony Presented by
Allan R. Adler
on behalf of the
Association of American Publishers
concerning
Proposed "WIPO Copyright Treaties Implementation Act"
(H.R.2281)
September 17, 1997
* The power of digital media and the demands of competition
in the global marketplace are transforming the book and journal
publishing industries, creating opportunities in new markets and
in old markets once served primarily through the printed page.
* Content will drive the future of the Internet.
* Without adequate safeguards, the extraordinary
capabilities for reproducing, distributing and displaying
copyrighted works through the Internet can exacerbate current
problems of online infringement and global piracy.
* AAP believes effective safeguards against online
infringement will be found in some combination of technological
protection measures, appropriate business practices, and the
continuing viability of copyright law.
* Ratification and implementation of the WIPO copyright

                © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 575034 (F.D.C.H.)

treaties will ensure effective application of legal protections
for copyright in the digital environment and the global
marketplace.
* AAP supports Congressional enactment of H.R. 2281 without
amendment.
* Congress should reject baseless criticism and extraneous
proposals directed at H.R. 2281 by a coalition of library,
educational, scholarly and consumer groups. In particular,
Congress should note that Section 1201 of H.R. 2281, which would
implement treaty provisions prohibiting circumvention of
technological protection measures, would not stifle innovation,
negate fair use, damage education and research, prevent
legitimate "reverse engineering," overrule the Supreme Court's
Sony decision, or outlaw or force redesigns in legitimate devices
with substantial non-infringing uses.
* Congress should not burden implementation of the WIPO
treaties with extraneous issues concerning fair use, first sale,
library preservation, distance education and non-negotiated
license terms.
Mr. Chairman and Members of the Subcommittee:
I want to thank the Subcommittee for inviting me here today
to testify on behalf of the Association of American Publishers
(AAP) concerning H.R.2281, the proposed "WIPO Copyright Treaties
Implementation Act."
AAP is the principal trade association of the U.S. book and
journal publishing industries. Members of AAP and its affiliated
publisher associations together publish hardcover and paperback
books in every field of human interest. A number of AAP members
are predominantly educational publishers, producing a broad
assortment of textbooks and other instructional materials to
serve the needs of elementary, secondary, postsecondary and
professional schools. In addition to hard-copy print materials,
AAP members also produce computer software and a variety of
multimedia digital products, including online journals,
interactive databases and CD-ROMs.
The power of digital media and the demands of competition in
an increasingly global marketplace are transforming the book and
journal publishing industries. New opportunities for creating,
presenting and distributing text, images and sound have greatly
expanded the horizons for publishers, both in new markets and in
old markets they once served primarily through the printed page.
As the public becomes comfortable with the means to exploit
the potentially limitless abundance of the Internet, publishers
are working to adapt their traditional products and business
models to new technologies and a rapidly evolving universe of
consumer tastes and needs. But the task is costly and
complicated, especially when the marketplace expects that many

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 575034 (F.D.C.H.)

publishing products will continue to be produced in traditional
hard-copy formats to afford consumers choice and serve those who
cannot or will not utilize the new media. In a period of
uncertain transitions, publishers must take into account the
extent to which the old and new media formats will coexist in the
marketplace.

Still, the transition to digital formats has significance
beyond the publishers' own stakes; indeed, it is of critical
importance to all who expect to benefit from "going online."
Whatever else may be said about this celebrated expanse of
cyberspace, it is clear that content will drive the future of the
Internet. However one may get there, the promise of the Internet
as a classroom, forum or marketplace -- as a global gateway for
education, entertainment and commerce -- is wholly dependent on
its ability to establish and sustain the availability of rich,
diverse and valuable content for those who surf the 'Net in
pursuit of their interests.

Of course, the ways in which "digital is different" from
analog communications and distribution media create risks, as
well as opportunities'. for book and journal publishers who
create or distribute their products online. As has been noted by
other witnesses, the extraordinary capabilities for flawlessly
reproducing, instantly distributing and universally displaying
copyrighted works through the Internet can greatly exacerbate
current problems of online infringement and, consequently, global
piracy. Without adequate safeguards for copyright, the promise of
the Internet will never be fulfilled.

AAP believes that the most effective safeguards against
online infringement will be found in some combination of
technological protection measures, appropriate business
practices, and the continuing viability of copyright law.

As AAP and its members pursue the development of
technological protection measures and appropriate business
practices, we look to Congress to ensure the effective
application of legal protections for copyright in the digital
environment and the global marketplace. Both of these goals will
be significantly advanced through ratification and implementation
of the WIPO copyright treaties.

Proposed "WIPO Copyright Treaties Implementation Act"
(H.R.2281)

In the Chairman's statement upon introduction of H.R.2281,
he succinctly summarized the important ways in which the WIPO
treaties will benefit the U.S. economy by ensuring effective
protection for U.S. copyrighted works in the digital environment
and the global marketplace. In that same statement the Chairman
explained the significance of the proposed implementing
legislation and provided a cogent section-by-section analysis of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 575034 (F.D.C.H.)

its individual provisions.

Since much of this ground has again been covered by several
of the witnesses in the Subcommittee's hearings, I will simply
note that AAP concurs in the views of those who have applauded
the treaties and testified in strong support of enacting H.R.2281
without amendment.

However, on behalf of AAP and for the Subcommittee's record,
I would like to take this opportunity to factually respond to
some of the baseless criticism and extraneous proposals that have
been directed at the proposed implementing legislation by a
coalition of library, educational, scholarly, and consumer
groups.[1] Specifically:

[1] AAP is indebted to Steven Metalitz of the law firm of
Smith & Metalitz for his hard work and expertise in preparing the
following analysis and response.

CLAIM: "Section 1201 of the proposed Act attempts to ban all
devices that could be used to circumvent technological measures."

FACT: Section 1201 does not ban any device that could
conceivably be used to circumvent technological protections. It
only affects devices that are intended for circumvention, based
on direct or indirect proof of intent under any of 3 statutory
standards:

- If the device is "primarily designed or produced for the
purpose of circumventing," the intent is obvious.

- If the device is "marketed.. for use in circumventing,"
again the intent is clear. Note that a manufacturer can be liable
under this standard only if the manufacturer itself, or someone
"acting in concert with it," is marketing the device "for use in
circumventing..."'

- If the device has "only limited commercially significant
purpose or use other than to circumvent" this strongly suggests
that its intended purpose is to circumvent.

The legitimate manufacturer or distributor of a computer,
home entertainment, or other equipment won't have much problem
avoiding liability under Section 1201 - unless it is producing or
marketing a device that is intended to be used for circumvention.
These three paragraphs in the legislation spell out how that
intent can be proven.

CLAIM: Section 1201 "threatens to stifle innovation."

FACT: That depends on what kind of "innovation" is at issue.
With regard to innovations that help consumers and promote
electronic commerce by making the transmission of copyrighted
materials over networks more secure, Section 1201 will provide
legal protections that will promote innovation. Such protections
will encourage even more investment in developing technologies
like encryption, scrambling, "smart cards," and copyright
management systems that will make authorized use of copyrighted

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 575034 (F.D.C.H.)

materials on the network cheaper, easier and safer.
However, with regard to innovations in the development of
better and less detectable ways to break encryption, descramble
signals, steal access codes, hack into private databases, and get
away with it - yes, Section 1201 will stifle such innovation.
It all depends on what business you are in. If you are
supplying equipment and technology to legitimate, law-abiding
persons, Section 1201 will help you. If, however, your market
consists of hackers, cyber-burglars and pirates, Section 1201
will hurt you.

CLAIM: Section 1201 would "effectively negate" fair use.

FACT: H.R.2281 would have no impact whatsoever on fair use.
That doctrine, codified in section 107 of the Copyright Act is an
important and well-established part of our copyright law. This
legislation leaves that section of the law untouched and the
"fair use"doctrine undisturbed.

The fair use doctrine gives researchers, teachers, students,
library users, and others a limited privilege to copy works (and
exercise other exclusive rights) without the permission of the
copyright owner. It has always been applied on a case-by-case
basis, using criteria set out in the Copyright Act, and it will
be applied 'in exactly the same way once this legislation is
enacted.

Of course, the fair use doctrine has never given anyone a
right to break other laws for the stated purpose of exercising
the fair use privilege. Fair use doesn't allow you to break into
a locked library in order to make "fair use" copies of the books
in it, or steal newspapers from a vending machine 'in order to
copy articles and share them with a friend. In the same way, it
is a distortion of the "fair use" doctrine to assert it to
justify encryption-hacking, unauthorized descrambling, or other
acts of circumvention, even if the stated purpose is to engage in
"fair use" activities. In fact it is an insult to the millions of
Americans who depend upon the fair use doctrine - students,
teachers, and regular consumers to suggest that they cannot
exercise their legal privileges without breaking some other law
and trampling on rights of creators and copyright owners.

CLAIM: H.R.2281 "'would damage education and research by
allowing copyright owners to 'lock up' public domain materials
...."

FACT: Public domain materials - for example, older works in
which copyright has expired, or very simple compilations like
white pages telephone directories --- are not protected by
copyright. But this does not mean that any member of the public
has the right to break and enter, pick locks, or break other laws
in order to get access to a particular copy of something that
falls into one of these categories. The Declaration of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 575034 (F.D.C.H.)
1997 WL 575034 (F.D.C.H.)

Independence is in the public domain, but there is nothing wrong with the National Archives keeping it in a vault and punishing anyone who tries to break through security to get hold of that copy.

In the same way, there is absolutely nothing sinister about using encryption or other technological means to control access to any given copy of public domain materials; and there is no reason to change the law to give people the privilege of circumventing these protections without authorization. Public domain material is widely available 'in a variety of forms, most Of it without encryption or access controls, and nothing in this legislation will change that.

CLAIM: Section 1201 will impede encryption research which helps ensure secure networks.

FACT: It is not uncommon for companies and other institutions to employ computer hackers to test their security systems and identify vulnerabilities. Some of the steps these testers take may technically violate computer crime statutes. However, as a practical matter, that has not proven to be a legal problem - rarely, if ever, has anyone been prosecuted for authorized activity that was aimed at improving, not destroying, computer security.

The same will be true with regard to circumvention technology. A legitimate researcher seeking to break encryption to demonstrate the flaws of a particular system is highly unlikely either to be sued or prosecuted after this legislation becomes law. Of course, if the researcher is part of a law enforcement investigative or protective activity, his actions are specifically excluded from liability under Section 1201 (e).

Of course, many criminal hackers have offered up this "research" defense as a bogus excuse for their behavior. The legal system is fully capable of identifying legitimate "research" claims and distinguishing them from post hoc rationalizations of illicit conduct.

CLAIM: Section 1201 will "prevent legitimate 'reverse engineering' in the development of new software..."

FACT: In a few court decisions, unauthorized copying of all or a part of a computer program as a step in decompiling the program into a higher level language has been permitted under the Copyright Act. Where this has happened, the courts have applied to the specific circumstances of the case the traditional fair use analysis that is codified in section 107 of the Copyright Act - a provision of current law that this legislation leaves unchanged and untouched. The courts will continue to apply the same fair use analysis, based on the same factors, to cases of decompilation. or (.4 reverse engineering" after this legislation is enacted.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 575034 (F.D.C.H.)                                    Page 7
1997 WL 575034 (F.D.C.H.)

What is really being sought here is not the right to
"reverse engineer," but the "right" to break through encryption
or other technological protections for the stated purpose of
copying in order to reverse engineer. That argument has no
support in the above-referenced fair use decisions. On the
contrary, it is a radical and troubling distortion of the fair
use doctrine.

CLAIM: Section 1201 will "outlaw, or force the redesign of,
perfectly legitimate devices with substantial non-infringing
uses."

FACT: A wide range of devices -- like a VCR, a general
purpose computer, or a host of other kinds of home computer or
entertainment hardware -- are neither designed, produced, or
marketed as descramblers, decrypters, or for the purpose of
circumventing any technology controls. Those devices cannot
possibly fall within the scope of Section 1201 unless, without
regard to their design or their marketing, they have "only
limited commercially significant purpose or use other than to
circumvent." Any product or service that meets a legitimate
consumer need will pass this test; the only ones that will fail
it are those that are not good for much else besides
circumvention. Certainly, the nightmare scenario of outlawing
VCRs, home computers and similar devices is a fantasy, since it
would be impossible to prove that any of these well-established
products has "only limited commercially significant purpose or
use 115 other than circumvention.

CLAIM: Section 1201 would "effectively overrule" the Supreme
Court's Sony decision.

FACT: This claim ignores the facts of the Sony case, which
involved use of VCRs for home-taping of free, over-the-air,
unscrambled, and unencrypted broadcast television programs for
time-shifting purposes, where many of the copyright owners
involved consented to such taping. Section 1201 addresses a
totally different factual situation because, by definition, it
does not affect information that is freely available for all uses
to all network users. Instead, it only applies when the copyright
owner has decided to use encryption, scrambling or some other
kind of protection technology. Furthermore, if the copyright
owner consents to or authorizes disabling of the Protection,
section 1201 is inapplicable.

To use an analogy, the VCRs involved in the Sony case
allowed people to walk through an open doorway. The devices and
services targeted by Section 1201 would instead allow People to
pick locks, break and enter, and haul away the booty. Outlawing
the latter has no impact on the former.

The Sony case would remain good law even after enactment of
Section 1201 because it concerned whether sales of VCRs could be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

considered contributory copyright infringement of the free, over-the-air broadcasts that people copied at home for time-shifting. The Supreme Court said "No," and nothing in this legislation would change that. in fact, nothing in this legislation makes any changes to the doctrine of contributory copyright infringement. It is the Proponents of H.R.2180 and similar legislation who seek to do that, by making it impossible for network service Providers to be held contributorily responsible for their role in copyright infringements taking place over their systems.

CLAIM: Section 1201 "gives judges the authority to second-guess manufacturers" decisions about the best design for new generations of computer electronic equipment and computers."

FACT: The image of federal judges looking over the shoulders of workers in assembly lines in Indonesia or Thailand, or even the design workshops in Japan, is ludicrous. Hardware manufacturers can obviate any possibility of judicial second-guessing if they simply refrain from designing or producing products that are intended for, or don't do much else besides, circumventing technological protections.

The only way manufacturers can be totally free of the possibility of judicial review is for Congress to say that Matsushita and Compaq are totally above the law. That should not and will not happen.

CLAIM: Section 1201 will "frustrate efforts to provide parents with the capability to monitor and control children's on-line activities."

FACT: Although it is unclear what provision of this legislation would purportedly have this effect, it should be evident that enactment of this legislation would have exactly the opposite effect where an adult entertainment provider uses encryption or scrambling to try to ensure that only adult subscribers have access to this service - a business decision that Congress would certainly want to encourage. Section 1201 would make it illegal to circumvent such technological protections and put that material "in the clear" for further distribution over a network - including distribution to children who otherwise could not get access. It would complement existing legal prohibitions and outlaw pirate "smart cards" and similar access devices that, in the hands of children, could give them unauthorized access to adult programming. In fact, it's hard to imagine how any technology-based regime of parental control could function successfully without something like Section 1201 in the statute.

CLAIM: Section 1201 will "threaten the personal privacy rights of electronic consumers ...".

FACT: The opposite is true. The same technologies of encryption, electronic envelopes, etc. that are used to construct

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 575034 (F.D.C.H.)

access controls and anti-copying protocols will also be used to secure communications across the network, authenticate transactions, and generally promote confidentiality in electronic commerce. Section 1201 provides legal protections for these technologies and for the integrity of systems on which they are based. Weakening or eliminating these protections will be a big setback for efforts to enhance privacy on the Internet.

CLAIM: Creating a legally-distinct protection for circumvention technologies that is not tied to a specific-infringement of copyright is 66 unprecedented under copyright law" and "an extreme approach not required by the WIPO treaties."

FACT: Precedents in U. S.law include the Audio Home Recording Act [17 USC 1002(c)] and the cable and satellite signal theft provisions of the Communications Act [47 USC 553(a) and 605(e)]. In each of these instances, the manufacturer or distributor of devices that circumvent technological protections can be held liable without the necessity to prove the infringement of any specific exclusive right under the Copyright Act.

What is, in fact, "unprecedented" is the assertion that picking electronic locks is okay if done for a stated purpose that would constitute a defense to a claim of infringement. It is doubtful that cable or satellite signal pirates ever thought of this imaginative defense, but if they had, it would clearly be unavailing in court.

Moreover, it is clear that the approach taken by Section 1201 is fully consistent with the text of Article II of the WIPO Copyright Treaty and Article 18 of the WIPO Performance and Phonograms Treaty. The effective technological measures that treaty signatories must protect include all of those "that restrict acts in respect of ... works." If the drafters had meant to limit the scope of the required protection to acts that constitute infringement, they would have said so. General language in the Preamble to the Treaties cannot trump this specific requirement.

By placing the technological protection articles outside the framework of the exclusive rights spelled out in the text of the treaties, the Diplomatic Conference clearly expected that circumvention would be treated, not as an infringement of copyright, but as a separate and distinct offense, for which effective legal remedies are required. While it might conceivably be possible for a country to tie its technological protection provisions directly to copyright infringement, that approach runs a real risk of failing to meet the full obligations of these Articles, and clearly was not the approach contemplated by the Diplomatic Conference.

CLAIM: "Section 1201... will ... preclude the exercise of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

these limitations and exceptions [to copyright] by preventing the
manufacture and use of the technologies necessary for their
existence."

FACT: The technologies restricted by Section 1201 are only
those intended to be used for unauthorized decryption,
descrambling, and other circumventions, as shown by their
designed purpose, their marketing, or the fact that they are not
good for much else. To suggest that the exceptions and
limitations to copyright -- including fair use, library
photocopying, educational exceptions, and the like -- can no
longer exist without ready access to these electronic "burglar's
implements" is hysteria, not argument. Fair use and these other
exceptions are alive and well; the legislation does not touch
them; and scholarship, research, criticism, comment, and the
myriad other enterprises that depend on fair use will neither
wither nor wilt in the absence of access to "black boxes" that
circumvent technological protections.

CLAIM: "Ratification of the treaties should await agreement
on legislation" that addresses fair use, first sale, library
preservation, distance education, and "non-negotiated license
terms".

FACT: Adding these "wishlist" items to the mix is a sure
recipe for delay or even failure in the effort for the U.S. to
lead the way in ratification and implementation of the WIPO
treaties. The proponents never state that any of these changes to
U.S. copyright law is required for treaty implementation, because
not a single one of them is required. Many other parties,
including the creative community that supports treaty
ratification and implementation, have their own "wishlist" of
copyright law amendments; however, WIPO implementation
legislation should be kept free of A of these. The implementing
legislation, as proposed by the Administration and introduced on
a bipartisan basis, takes a "minimalist" approach. It would make
only those changes to U. S. law that are necessary to comply with
the standards of the treaties. Any other proposed amendments to
the Copyright Act should be considered on a separate track. That
is how Congress has consistently approached implementing
international copyright agreements in the past, and it is also
plain common sense.

CLAIM: Copyright law must be amended to create a "digital
equivalent" to the first sale doctrine so the potential of
digital information networks can be realized.

FACT: The first sale doctrine says that a consumer can
distribute or dispose of a lawfully acquired copy of a work
without the permission of the copyright owner. That doctrine is
codified in section 109 of the Copyright Act and this legislation
would not change it. The doctrine also says that the consumer

cannot copy the work without permission. That, too, remains
unchanged, though it is particularly important in the digital
environment, where each copy can be perfect and can be duplicated
an infinite number of times. Unfortunately, the ability to make a
large number of perfect and perfectly unauthorized copies may be
exactly what the proponents of this argument have in mind when
talking about fulfilling the "potential of digital information
networks."

Any discussion regarding modification of the first sale
doctrine should, like other extraneous issues discussed above,
occur after Congress concludes the urgent business at hand -
ratifying and implementing the WIPO treaties.

CLAIM: Copyright law must be amended to permit libraries to
44 continue the same sorts of archival activities which they have
relied on in the print environment."

FACT: The Administration's 1995 NII copyright bill would
have extended the relevant exception under current law (section
108) to allow digital copying by libraries for archival and
preservation purposes, but proponents of above-referenced
proposal opposed that legislation.

H.R.2281 would make no change to section 108, and none is
required in order to meet U.S. obligations under the new
treaties. Again, this is an issue that can be discussed after
Congress concludes the urgent business at hand - ratifying and
implementing the WIPO treaties.

CLAIM: Copyright law must be amended to allow educators to
continue distance education activities in the "new communications
environment."

FACT: Nothing in the pending legislation would affect
Section 110 of the Copyright Act, which provides educational
exceptions to copyright (including those supporting distance
education), nor is the U.S. required in order to meet U.S.
obligations under the new treaties. Again, this is an issue that
can be discussed after Congress concludes the urgent business at
hand - ratifying and implementing the WIPO treaties.

CLAIM: Copyright law should he amended to "place limits on
... 'shrink-wrap' and 'click-on' licenses."

FACT: In the absence of a specific proposal, it is unclear
whether such a proposal is even consistent with existing U.S.
treaty obligations (e.g., under the Berne Convention and the WTO
TRIPS Agreement). It is clear, however, that no change of law in
this area is required in order to fulfill U.S. obligations under
the new treaties, and that nothing in the pending legislation
addresses this topic in any way.

AAP hopes that Congress will carefully scrutinize and reject
similar broad, unfounded allegations about the shortcomings of
the proposed implementing legislation. As the Chairman noted upon

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 575034 (F.D.C.H.)

introduction, the proposed legislation is the product of
substantial negotiation and compromise within the Administration
and among interested outside parties. Although it is not our
"wishlist" bill by any means, it will bring U.S. law into
compliance with the obligations of the WIPO treaties. It should
be enacted without delay and without the burden of serving as a
vehicle for extraneous issues.
Thank you for your courtesy. AAP and its members look
forward to working with the Subcommittee on this legislation and
on other bills affecting copyright protection.

   ALLAN R. ADLER

   Vice President for Legal & Governmental Affairs

   Association of American Publishers

 1997 WL 575034 (F.D.C.H.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw Download Summary Report for BALDINGER,JAMES 4451592**

| | |
|---|---|
| Date/Time of Request: | Wednesday, April 18, 2007 18:11:00 Central |
| Client Identifier: | 50649-29958-005 |
| Database: | USTESTIMONY |
| Citation Text: | 1997 WL 586052 (F.D.C.H.) |
| Lines: | 337 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.



1997 WL 586052 (F.D.C.H.)                                                       Page 1
1997 WL 586052 (F.D.C.H.)


                          Federal Document Clearing House
                Copyright (c) 1997 Federal Document Clearing House, Inc.

                                      Testimony
                                September 17, 1997

                             House of Representatives
                                     Judiciary
                         Courts and Intellectual Property

Copyright Legislation

Before the
HOUSE COMMITTEE ON THE JUDICIARY
SUBCOMMITTEE ON COURTS AND INTELLECTUAL PROPERTY
Hearing on
WIPO Treaty Implementation Legislation
September 17, 1997
STATEMENT of GARY J. SHAPIRO
Chairman Coble and Members of the Subcommittee:
I an pleased to appear today on behalf of the Home Recording
Rights Coalition (HRRC), of which I an Chairman, and the Consumer
Electronics Manufacturers Association (CEMA), which I serve as
President.
CEMA is a sector of the Electronic Industries Association
(EIA). CEMA represents manufacturers of television and stereo
receivers, video and audio recorders and players, personal
computers, multimedia devices, and hundreds of other consumer
electronics products. Our members represent about 250,000 U.S.
manufacturing jobs and about $64 billion in annual sales.
The HRRC was formed in 1981, in response to a court opinion,
and proposed legislation, that would have banned the sale of home
recording devices to consumers. Although the Supreme Court
preserved the right to sell home video recorders in its 1984
"Betamax" opinion, in almost every Congress someone has proposed
killing off, crippling, or taxing this golden goose. HRRC has
therefore remained active and vigilant. It includes consumer
electronics manufacturers and retailers, consumer organizations,
service association, and others interested in the personal, non-
profit use of consumer electronics recording equipment.
Today, on behalf of HRRC and CEMA, I want to add my concerns
over, and criticisms of, H.R. 2281 to those of other industries
and user groups, and focus in particular on its proposed new
Section 1201 of the Copyright Act. This provision would give
copyright proprietors new rights, well beyond those conferred by

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 586052 (F.D.C.H.)
1997 WL 586052 (F.D.C.H.)

the copyright law or necessary to implement the WIPO treaties. Essentially, the new Section 1201 would make designers of new devices, such as computers and VCRs, responsible for compliance with any and all technical anti-copy measures chosen by anyone who transmits a signal or distributes a program irrespective of whether copying the program would constitute copyright infringement. It would invite courts to declare new models unlawful based only on their designs, components, and capabilities.

* It would effectively reverse the Supreme Court's "Betamax" decision, undermining the very foundation of free commerce in high-technology devices.

* It would deny to technical, scholastic, and other creative users the hardware and software tools necessary to do their work, whether or not that work would infringe any copyright right of any proprietor.

* It would toss entirely into the hands of the Federal judiciary the question of when devices can be kept from the market by copyright proprietors, without giving the courts any sensible, useful or workable guidelines as to what to do.

In short, we would be back to the chaos that existed before the Betamax opinion. But at risk would be not only new versions of the familiar VCRs and audio recorders, but also all of the computer and tele-communications hardware and software products that have come on the scene in the past two decades.

Mr. Chairman, I know these are strong criticisms. But I am afraid they are inescapable.

Proponents Should Admit That Section 1201 Nullifies The "Betamax" Case

First, it would be helpful to the debate over this legislation if supporters would candidly acknowledge the obvious -- that it does negate the Supreme Court's 1984 holding in the Betamax case. The Court, confronted for the first time with the challenge of relating the public sale of devices to questions of contributory copyright infringement, ruled that products having any commercially significant non-infringing use may be lawfully sold, and that time-shift home recording is such a lawful use.

But Section 1201(b) would allow a court to ban a new VCR or computer if a jury should decide that any component or part is designed, used, or marketed for the purpose of failing to respond to any anti-copy measure applied to any signal or program. The device would be banned even though it has commercially significant fair, or otherwise non infringing, uses under the Copyright Act. Let's be honest and admit this is a nullification of the Betamax holding.

The fact that this bill would nullify such an important precedent is the beginning, not the end, of this legislative

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 586052 (F.D.C.H.)

debate. But it ought to give one pause. Whether to keep any device off the market because it might be used in objectionable ways is a fundamental question. The courts and the Congress heard many horror stories as to damage the home VCR would do to the entertainment industry. The Supreme Court construed U.S. law, however, as holding individuals primarily responsible for their own conduct. It ruled that we should not lightly keep articles of commerce out of citizens' hands.

We call upon supporters of this legislation to admit that it nullifies the Betamax decision because they should face the responsibility and consequences of causing such a basic shift in American jurisprudence. Even the motion picture industry has recognized that keeping home VCRs off the market would have been an enormous mistake. Have the supporters of this legislation fully considered the implications of so generally inviting the courts to issue edicts against new generations of digital devices?

Section 1201 Outlays Circumvention
Without Regard to Copyright Infringement

Section 1201 goes much further than nullifying the Betamax holding. It does not even require that the "circumvention" be in aid of copyright infringement. Let me repeat that: Section 1201 outlaws devices that do not meet its vague design standards, without any requirement that the so-called "circumventing" use is a copyright infringement. So, while the fair use rights of librarians, scholars, computer software engineers and others are not attacked directly, they are also effectively nullified because these users will not be able to obtain the devices that allow them to exercise these rights.

Coverage Of 'Parts and Components' Puts-the Courts in Charge of
Design of Integrated, Multipurpose Devices

Third, the fact that 1201(b) covers "parts and components" guarantees that the legitimacy of the design of integrated, multipurpose devices such as recorders, computers, players and accessories, will become an issue of fact to be sorted out by courts and juries. Courts would have to decide, after years of fact-finding and argument, whether the selection of components in a recorder or PC design runs afoul of the vague and broad intention and purpose criteria of 1201(b)(1) subparts (A), (B), and (C).

These criteria are difficult enough to interpret as they might apply to the devices themselves; to apply them to the selection of each and every part and component of a device is nothing less than inviting the courts to design these devices from the ground up. The arbiters of new product design should be consumers, not judges.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 586052 (F.D.C.H.)

There Is No Effective Definition of Effective 'Technological
Protection Measure'

The purported definitions of "circumvention" and
"technological protection measure" provide no assistance
whatsoever. Indeed, the definition of "technological protection
measure" in 1201(b)(2)(B) reads as if a line has been dropped by
the printer. It says, in its entirety (emphasis added):

"(B) a technological protection measure 'effectively
protects a right of a copyright owner under Title 17' if the
measure, in the ordinary course of its operation, PREVENTS,
RESTRICTS, OR OTHERWISE LIMITS THE EXERCISE OF A RIGHT OF A
COPYRIGHT OWNER UNDER TITLE 17."

Why is the language so garbled? What in missing? What is
missing is, first, any mention that the measure must protect
against infringement of copyright. That's why the sentence is
constructed as a body without a head.

Second, what's missing is any definition or limitation of
the "effective" technologies protected against "circumvention." A
court must conclude that any measure whatsoever, applied by any
proverbial "Tom, Dick or Harry," for the purpose of protecting
anything owned by a copyright owner, whether infringed or not,
must be acknowledged and responded to in the design of a product.
So this definition is circular: IT MAKES ANY TECHNOLOGY
"EFFECTIVE" BY IMPOSING AN OBLIGATION OVER THE SELECTION OF
DEVICE COMPONENTS so as not to "circumvent" whatever technology
has been applied by literally anybody, for any purpose.

The result, Mr. Chairman, is to impose on hardware and
software designers an open-ended obligation to comply with any
technological marking, alteration, or distortion applied to any
analog or digital signal, whether or not copying would constitute
infringement -- no matter how technically unreasonable,
inefficient, costly, and unfair to consumers compliance would be
under the circumstances.

The effect of this provision is to put designers of new
products into a technological straitjacket. Suppose one of Tom,
Dick or Harry's "technical protection measures" operates by
working on the XYZ circuit of a recorder or computer. A designer
sees a way to make a faster, better, less costly device by
entirely eliminating the XYZ circuit in the next generation
device. Is this "circumvention" under 1201 (b) (1) (A), (B) or
(C) 7 The answer will always be an issue of fact for a jury. The
sore innovative the designer, the more he or she, and the
company's products, will wind up in court.

One thing we have learned is that we should never make
general assumptions about where now product design will go. For
example, the consumer electronics and motion picture industries
just last year worked out a proposed signal "marking" system that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 586052 (F.D.C.H.)

would be useful as part of a limited and balanced copy protection
technology. We learned, however, that computer designers would be
severely constrained if computers were forced to "look" for these
particular marks. We also learned that computers do not, and
cannot easily be made to, respond to Macrovision signals on
analog inputs. So even where several parties sit down together,
with full information and the beat faith in the world, they might
make assumptions that are not valid across the board. To impose
open-ended and unilateral design obligations, as this legislation
would do, would be to court disaster.

Manufacturers, retailers, and ultimately consumers would
remain unsure whether any new hardware or software product would
be available or supported in the marketplace. This would chill
the market for new recorder and computer designs, hurting
everyone -- including the entertainment and computer software
industries. The Congress and courts, together with those in the
private sector who went for the quick fix, could kill an entire
generation of golden geese.

The 1201(d) 'Savings-Clause' Saves Nothing and Nobody

Much has been made of the so-called "savings clause,"
section 1201(d), which purports to preserve existing user rights,
including fair use. This provision is simply irrelevant to the
actual damage done by Section 1201. If a device is banned on the
basis of its use to "circumvent" some technological protection
measure, the user never gets to make any use of it, fair or
otherwise.

Nor does this provision allow "fair use" to be invoked as a
defense for a product design that enables fair uses by consumers.
Since 1201(a) and (b) establish a new right of proprietors to
have devices declared illegal irrespective of their fair uses,
1201(d) does nothing whatever to limit the scope or application
of these subsections.

The WIPO Treaties Clearly Do No Require
The Regulation of Device Design Courts

Mr. Chairman, I can say to you with some assurance that
nothing in the WIPO treaties requires any restrictions whatsoever
on the design of new devices, or the introduction of technology
to the marketplace. I am proud to say that HRRC and CEMA played
an active and constructive role in proposing and crafting the
private sector consensus that resulted in the treaty provision on
circumvention. The U.S. delegation initially had proposed a
device-specific measure, very similar to the one on which this
Subcommittee took no action in the last Congress. When that
proposal attracted little support from other delegations, the
Administration then moved to embrace the provision supported by
the U.S. private sector, which does not impose such obligations.
The treaty provision, unlike Section 1201, also is limited to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 586052 (F.D.C.H.)
1997 WL 586052 (F.D.C.H.)

Page 6

protection from acts that otherwise are not permitted by law.
The treaty provision says that national law should provide
legal remedies, against circumventing conduct, for proprietors
who use "effective technological measures" to guard against
unlawful conduct. Legislation aimed at conduct that infringes
copyright by circumventing defined effective technological
measures would more than satisfy any U.S. obligations under the
treaties, and would show the rest of the world that the United
States takes its obligations seriously and expects others to do
likewise.

Proponents of H.R. 2281, and of the proposal in the last
Congress, have claimed that we and others have exaggerated the
threat to consumers posed by Section 1201. They say it is aimed
only at "black boxes" that circumvent particular copy protection
systems. But that's not what the bill says, nor have I yet heard
any authoritative assurance that it does not cover the design and
component selection of new VCRs, computers, playback and
transmission products, and a host of other devices. In several
years, now, of trying different approaches to drafting
legislative and treaty provisions, proponents have never been
able to cover their target, and only their target, in a few
paragraphs.

Mr. Chairman, I must say that this year the Administration
did do a good job of listening to various points of view. With
the best intentions in the world, however, they were unable to
both satisfy the hopes of some in the content community AND come
up with a two-paragraph "device" provision that works. In my
sixteen years of involvement in these copyright issues, I have
learned that there are no shortcuts, no easy paths.

Trying to Regulate Devices in Implementing
Legislation Should Be Abandoned As A Dry Well

On behalf of HRRC and CEKA we have indeed been willing to
sit down with the entertainment industry representatives and
draft balanced, specific proposals to protect their new products
in the circumstances they most worry about, yet also protect the
legitimate rights and expectations of consumers. In fact, we have
agreed with motion picture industry representatives as to both
the results we would jointly propose, and the means of achieving
them. We are no longer the only fish in this pond, however, and,
as I mentioned, we found that our joint ideas were not acceptable
to representatives of other industries, particularly information
technology companies.

Our private sector, voluntary negotiations with respect to
various technologies have been instructive for everyone. We have
joined in multi-industry standards proceedings to address the
challenges that we jointly acknowledge. I personally hope that
the result will be balanced, carefully considered legislation

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 586052 (F.D.C.H.)

that protects consumers' rights yet provides appropriate legal
support for private sector standards that emerge from this
ongoing process.

In the context of WIPO implementing legislation, we also met
with entertainment industry representatives and tried our very
beat to negotiate a provision that would be acceptable to them,
the computer industry, and us. Anything we could live with,
however, was dismissed as insufficiently helpful to them. When we
asked for interpretations as to whether the provisions they
favored would constrain the design of general purpose products
such as VCRs and computers, they could not give any answer on
which all the entertainment representatives agreed.

It should be clear by now, based on our efforts and
experience, that a two-paragraph treaty implementation provision
is a postage stamp that cannot be stretched to cover both the
entertainment industry's wish to regulate devices, and our own
concerns about the consequences. Our friends' support for
grafting a short, one-sided "device" provision onto the
implementing legislation is understandable opportunism, but
opportunism nevertheless. I believe this Subcommittee would do
everyone involved a service were it now to conclude that the
attempt to regulate general purpose devices by means of Section
1201 has failed and ought to be abandoned.

I appreciate having been invited to appear today, and want
to assure the Subcommittee that CEMA and HRRC stand ready to work
to implement these treaties. We will support unconditionally any
implementing legislation of appropriate scope and balance. We
will continue to work, in other legislative contexts, to address
the needs of copyright proprietors in ways that are appropriately
specific and well considered.

   GARY J. SHAPIRO

   Chairman

   On Behalf of the Home Recording Rights Coalition (Hrrc)

 1997 WL 586052 (F.D.C.H.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw Download Summary Report for BALDINGER,JAMES 4451592**

| | |
|---|---|
| Date/Time of Request: | Wednesday, April 18, 2007 18:11:00 Central |
| Client Identifier: | 50649-29958-005 |
| Database: | USTESTIMONY |
| Citation Text: | 1997 WL 586041 (F.D.C.H.) |
| Lines: | 555 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.



1997 WL 586041 (F.D.C.H.)                                            Page 1
1997 WL 586041 (F.D.C.H.)


                        Federal Document Clearing House
            Copyright (c) 1997 Federal Document Clearing House, Inc.

                                  Testimony
                           September 17, 1997

                          House of Representatives
                                 Judiciary
                     Courts and Intellectual Property

Copyright Legislation

TESTIMONY REGARDING
COMPREHENSIVE IMPLEMENTATION OF THE DECEMBER 1996 WIPO
COPYRIGHT AND PHONOGRAMS TREATIES
UNITED STATES HOUSE OF REPRESENTATIVES
JUDICIARY COMMITTEE
SUBCOMMITTEE ON COURTS AND INTELLECTUAL PROPERTY
PRESENTED BY DOUGLAS BENNETT
PRESIDENT, EARLHAM COLLEGE
RICHMOND, INDIANA
SEPTEMBER 17, 1997
Mr, Chairman, Representative Frank, and Members of the
Subcommittee.  I am honored to appear before the Subcommittee on
behalf of the undersigned members of the Digital Future Coalition
to share with you our large and diverse group is views on
Preserving balance in copyright law for the digital age. The
Digital Future Coalition nation's leading non-profit educational,
scholarly, is comprised of 38 of the library, and consumer
groups, together with major commercial trade associations
representing leaders in the consumer electronics,
telecommunications, computer and network access industries. I am
also especially pleased to be here today, Mr. Chairman, having
served as an advisory member of the United States' delegation to
the WIPO treaty conference last December.
CONGRESS SHOULD ACT ON COMPREHENSIVE AND BALANCED DIGITAL
COPYRIGHT LEGISLATION BEFORE RATIFYING THE WIPO TREATIES.
The Digital Future Coalition (DFC) welcomes President
Clinton's submission of the WIPO Copyright Treaty and the WIPO
Performances and Phonograms Treaty for ratification. That action
presents an important opportunity for the House -- through the
careful crafting of comprehensive legislation concerning
copyright in the digital future -- to ensure the
continuation of balance in copyright law and policy as the nation
moves into the next millennium.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 586041 (F.D.C.H.)

Since its inception. the DFC has urged policy makers
domestically and internationally to recognize the importance of
both information creators and users in the public and private
sectors to the successful development of the emerging digital,
networked environment. Our coalition was extremely pleased.
therefore, that the WIPO treaties adopted after intense debate
and many modifications expressly recognize and endorse the
principle of balancing the interests of copyright owners and
information consumers. Domestic law should do the same.
Regrettably, however, the legislation proposed by the
Administration to implement the WIPO treaties -- introduced at
the President's request in late July -- is seriously defective.
For the reasons detailed below, H.R. 2281 is both more and less
than the WIPO proceedings and sound public policy require it to
be. What the bill contains is gravely flawed and what it omits is
critical to industry and society as a whole. As Congress
undertakes the first major revision of the Copyright Act since
1976, many issues that should be resolved to assure continued
balance in U.S. intellectual property law -- issues such as fair
use, first sale, library preservation, distance education,
service provider liability, and the enforceability of non-
negotiated license terms -- are simply not addressed by the
proposed implementing legislation at all.
Thus, while the DFC supports the WIPO treaties, we strongly
oppose H.R. 2281 in its current form as inimical to maintaining
balance in copyright law and policy as it is updated for the
digital age. Moreover, the DFC believes that the nature and scope
of such implementing legislation must be fully understood before
these treaties are ratified. Upon introduction, this legislation
apparently was presented to you and others, Mr. Chairman, as an
agreement among stakeholders. As articulated in a letter of
August 4 jointly signed by the DFC and five other major
organizations, the DFC wishes to make absolutely clear that it is
not. Indeed, in the Coalition's view, the proposed implementing
legislation would upset the balance that has characterized U.S.
copyright law throughout its history.
Unlike the flawed bills introduced at the Administration's
request, legislation recently offered in the Senate by Senator
John Ashcroft of Missouri (S. 1 146) would ensure that the
copyright-related interests of educators, librarians, high-
technology businesses, and other information consumers -- indeed,
all parts of the private and public sectors -- are balanced with
the protections properly afforded to copyright owners and
proprietors. The DFC urges Members of this Chamber to consider
similar legislation for the reasons set forth in this testimony.
I have noted, Mr. Chairman, that the DFC is deeply concerned
both with what the Administration's legislation contains and what

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

it omits. I would like to take a few moments to address each of
those points in turn.

II. THE ADMINISTRATION'S PROPOSALS ARE ANTI-CONSUMER,
ANTI-TECHNOLOGY, ANTI-COMPETITIVE AND THREATEN PERSONAL
PRIVACY.

The Digital Future Coalition wishes to underscore here three
principal concerns regarding the proposals made by the
Administration to date:

First, not only do proposed new Sections 1201 through 1204
of the Copyright Act threaten to upset the existing balance of
our copyright system, but they go beyond anything that is
required to bring U.S. law into conformity with the WIPO
treaties. With respect to the issue of anti-circumvention, there
is some question as to whether any implementing legislation is
required. Moreover, to the extent that any such provision is
necessary, the mandate of the treaties could be satisfied by non-
criminal provisions which penalize circumvention of technological
safeguards in connection with copyright infringement, rather than
ones which attempt to regulate the evolution of new electronic
technologies.

Second, with regard to Section 1201. this sweeping new
proposed provision of the Copyright Act attempts to ban all
devices that could be used to circumvent technological measures
designed to restrict access or prevent unauthorized reproduction
of copyrighted works. This provision threatens to stifle
innovation. Furthermore, the privileges users and consumers now
enjoy under copyright law, such as fair use, could effectively be
negated by this needlessly overbroad provision.

Third, Section 1202 threatens with liability even
individuals who, without any intention to infringe or promote
infringement, incidentally alter copyright management information
designed to identify copyrighted works. Taken together, Sections
1201 and 1202 -- and the egregious penalties proposed in Sections
1203 and 1204 -- create significant risks to the privacy of
individual users of digital information networks.

While a detailed analysis of proposed new Section 1201 of
the Copyright Act is appended to this testimony, Mr. Chairman,
permit me to elaborate briefly on the DFC's concerns with the
approach and language of the Administration's proposals in H.R.
2281 over all.

Section 1201 - Stifling Innovation and Punishing Consumers
Last year, the Clinton Administration proposed so-called
"black box" legislation that could have had serious consequences
for the design of future general purpose computers, digital VCRs
and other recording products. The DFC helped demonstrate to the
104th Congress that this approach was overly broad and needlessly
anti-innovation and anti- consumer. Congress rejected the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 586041 (F.D.C.H.)

proposal. In December 1996, over 120 nations attending the World
Intellectual Property Organization (WIPO) diplomatic conference
in Geneva rejected the same proposal. Instead, the WIPO nations
adopted a provision that merely requires countries to provide
"adequate legal protection ... against the circumvention of
effective technological measures."

With the introduction of its proposed treaty implementation
legislation, the Administration has again taken a broader
approach that will punish consumers, educators, librarians.
researchers, and others by unreasonably impairing the
availability and capability of multi-purpose devices. This
approach will have far-reaching negative ramifications for the
future development and exploitation of digital information
networks like the Internet.

Specifically, the Administration's proposed implementing
legislation would:

*  damage education and research by allowing copyright
owners to "lock up" public domain materials, and thwart the fair
use privileges of information consumers;

* threaten the security of computer networks by impeding
encryption research;

* prevent legitimate "reverse engineering" in the
development of new software (effectively overturning a series of
judicial decisions recognizing reverse engineering as a
legitimate fair use);

* outlaw, or force the redesign of, legitimate devices with
substantial non-infringing uses (effectively overruling the
Supreme Court's Betamax decision, which spawned the VCR
revolution for the benefit of all American consumers and the
entertainment industry);

* require judges to second-guess manufacturers' decisions
about the best design for new generations of consumer electronic
equipment and computers;

*  frustrate efforts to provide parents with the capability
to monitor and control children's on-line activities; and

* threaten the personal privacy rights of electronic
consumers by preventing them from disabling mechanisms designed
to track their on-line activities in the same way that some
consumers now lawfully may -- and frequently do -- neutralize
telephone "caller id" technology.

Of particular concern to DFC, violations of Section 1201 are
not tied to infringement of any intellectual property right held
by a copyright owner. As a result, liability is imposed even when
the purpose of the activity is permitted by the Copyright Act
today -- as in cases of fair use or access to unprotected
material. Such a provision is unprecedented in copyright law. It
cannot be overemphasized that H.R. 2281 criminalizes activities

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that are not necessarily related in any way to copyright
infringement. Were the proponents of H.R. 2281 interested merely
in combating piracy, Mr. Chairman, they should have no objection
to making infringement an element of the offenses proposed in
Section 1201, yet they have opposed such a statutory formulation.
Furthermore, the WIPO treaties do not require such an
extreme response. In fact, this approach is inconsistent with the
preambles of the WIPO treaties. which call for the recognition of
the need to maintain balance between the rights of copyright
owners and "the larger public interest."
Finally, the "so-called" savings clause in Section 1201 (d)
does nothing to preserve this balance. While Section 1201 will
not as a formal matter restrict existing limitations and excep-
tions to copyright, it will as a practical matter preclude the
exercise of these limitations and exceptions by preventing the
manufacture and use of the technologies necessary for Them to be
meaningful. Nor would the savings clause protect individuals who
gain "access" to works in violation of 1201(a)(1), even if they
do so for entirely lawful purposes.
Section 1202 -- Draconian Fines for Benign Conduct a Threat
to Personal Privacy
The WIPO treaties do require enactment of domestic
legislation to safeguard the integrity of so-called "copyright
management information" -- digitally encoded data about the
title, authorship, and ownership of works. Once again, however,
the proposed implementing legislation goes too far. Section 1202
includes, in addition to criminal penalties protecting CMI, civil
penalties applicable even in cases where no specific intent to
infringe or promote infringement can be shown. In other words,
even someone who alters digital identifiers casually could be
liable for a minimum of $2,500 in damages plus costs and
attorney's fees. Neither the letter nor the spirit of the WIPO
treaties require member nations to enact such a sweeping
provision.
Section 1202 also authorizes the Register of Copyrights to
expand the definition of copyright management information ("CMI")
in the future. In doing so, the Register "may not require the
provision of any information concerning the user of a copyrighted
work." While a step in the right direction of protecting personal
privacy, this language is not adequate to address genuine
concerns about how personal information might be collected and
used on the Internet. The DFC recommends that this provision be
amended to make explicit that the term "copyright management
information" does not include information that could be used (or
misused) to identify the user of a work, interfere with the
public's present rights to receive information anonymously, or
otherwise infringe on personal privacy.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 586041 (F.D.C.H.)


Sections 1203 & 1204 -- Egregious Remedy Provisions
The proposed Act establishes civil and criminal penalties
for violations of Sections 1201 and 1202. Most objectionable,
Section 1204 imposes criminal penalties of up to $500,000 and 5
years of imprisonment for a single, willful violation of Section
1201 or 1202 for commercial advantage or personal financial gain.
A person could be subjected to these severe criminal penalties
simply for exercising fair use rights, if a court deems the
person acted for personal financial gain.
III. PROPOSALS TO UPDATE THE COPYRIGHT ACT WHICH ARE
CRITICAL
TO COMMERCIAL INNOVATORS, EDUCATORS, LIBRARIANS, ARCHIVISTS
AND THE PUBLIC ARE MISSING FROM THE ADMINISTRATION'S
LEGISLATION.
Just as the proposed implementing legislation would do too
much, it also would do too little. Since the release of the
Administration's White Paper on Intellectual Property and the
National Information Infrastructure in 1995, a number of issues
not addressed in the Administration's recent legislation have
emerged during the domestic discussion of how to balance the
rights of copyrights owners with the right to access in copyright
law and policy. The Digital Future Coalition believes that all
such issues should be resolved in connection with Congress'
consideration of the WIPO treaties and appropriate implementing
legislation if balanced copyright policy for the digital future
is to be achieved.
Currently, a good start has been made in resolving the issue
of on-line service provider liability with the introduction of
Representative Coble's bill, H.R. 2180 the "On-Line Copyright
Liability Limitation Act" - and Senator Ashcroft's more
comprehensive bill, S. 1146. DFC members believe that any so-
called "OSP liability" legislation ultimately adopted must take
fully into account the concerns of both commercial and non-
commercial access providers, and we look forward to working with
Chairman Coble, Mr. Frank and other members of the Subcommittee
and their staffs -- as well as with the members of all other
affected industries and professions -- to achieve that result in
the House of Representatives.
In addition to liability considerations, there are five
other issues which the Digital Future Coalition believes can and
should be resolved in this debate in a manner fully consistent
with the WIPO treaties:
1. Fair Use -- The Copyright Act, consistent with unanimous
action by the WIPO delegates, should make clear that this
traditional exception to the rights of copyright owners is fully
applicable in the digital information age.
2. First Sale -- If we are to realize the full potential of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 586041 (F.D.C.H.)

digital information networks, American law should be updated to
permit a lawfully acquired copy of a copyrighted work to be given
away (or otherwise transferred) on-line, provided that the
original is not retained. That is how the law now treats tangible
copies of copyrighted works. A digital equivalent to this
important doctrine should be created to ensure the realization of
the potential of digital information networks.

3. Library Preservation -- The current Copyright Act's
outdated and technology-specific provision upon which libraries
and archives rely to preserve critical genealogical, scholarly
and other cultural materials must be updated to make clear that
preservationists may lawfully use state-of-the-art technology and
protection procedures to continue the same sorts of archival
activities which they have relied on in the print environment.

4. Distance Education -- Just as it did over 20 years ago,
when the copyright act was last modernized comprehensively in the
face of changing technology, Congress should enable educators to
use computers in distance education as robustly as teachers were
authorized to employ conventional and closed circuit television
two decades ago.

5. Non-Negotiated Licenses -- Technology has never before
permitted the mass marketing of products subject to "take-it-or-
leave-it" licenses printed on package labels or displayed on-
line. Limits should be placed on use of such license terms
(including so-called "shrink-wrap" and "click-on" licenses) to
assure that teachers, students, and other users are not forced to
give up their use privileges as a condition of access to works in
digital and non-digital formats.

Fair Use: Balancing-Copyright Law for a Digital Age and
Beyond

It is critical that the copyright law strike an appropriate
balance between protecting the rights of copyright owners and
otherwise promoting "Progress in Science and the useful Arts." In
the scheme of American copyright, fair use safeguards our
collective interest in the flow of information -- which is, in
turn, a source of economically valuable knowledge.

Fair use, in addition to reflecting in copyright law First
Amendment-based principles of free speech, provides the basis for
many of our most important day-to-day activities in scholarship
and education. It is no less vital to American industries, which
lead the world in technological innovation. Moreover, it is also
of tremendous value to the Judiciary in dealing with the
challenge of precisely such innovation, and repeatedly has been
recognized by the Supreme Court as essential to the work of
writers and others who creatively transmogrify the earlier works
of others in the alchemy that we call "Art."

The maintenance of a robust Fair Use Doctrine in the new

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 586041 (F.D.C.H.)
1997 WL 586041 (F.D.C.H.)

legal environment of cyberspace thus remains a high priority of
the Digital Future Coalition and, we respectfully submit, should
rank among Congress' highest priorities, as well.

The Digital Future Coalition believes that a change is
necessary and appropriate in the Fair Use portion of the
Copyright Act in order to assure that the scope of fair use
parallels the scope of the rights to which it relates. Including
such language in pending legislation also will reaffirm Congress'
commitment to the vibrancy of the Fair Use Doctrine in the
digital future.

To those ends, the DFC proposes that Congress amend Section
107 of the Copyright Act to make clear that fair use applies to
all copyrighted works, regardless of the manner in which they are
lawfully distributed or used.

Digital Preservation: Protecting our Heritage

The transformation of the information environment gives rise
to both challenges and opportunities for many important social
institutions, including libraries. A "digital update" to Section
108 of the Copyright Act is required if the needs of libraries
and researchers are to be met. Moreover, such an update is vital
to libraries' ongoing and uphill efforts to solve a preservation
problem which now ranks as nothing short of a national
intellectual and historical crisis.

This update would make Section "technology-neutral"
throughout thus allowing libraries to use the best and newest
technology platform to carry out the activities -- which include
preservation and archiving -- authorized by Section 108.

An update would also add an important new subsection
designed to help the library community meet the special
preservation challenges posed by digital works in obsolete
formats (i.e., works which can no longer be accessed by the
technologies that produced them because such technologies are no
longer reasonably available).

Specifically, the DFC proposes that Section 108 be revised
to make clear that: (1) libraries, archives, and other non-profit
educational institutions may use all appropriate technologies to
preserve deteriorating works; (2) sufficient non-circulating
copies may be made to assure a preserved work's survival; and (3)
copies for research and public use may be made and retained in
multiple technological formats, when necessary.

The First Sale Doctrine:

Applying Common Sense and Fairness in Cyberspace

It has long been recognized in American law that someone who
legally obtains a book or video cassette, for example, may --
without the permission of the owner or fear of liability give,
sell or otherwise transfer possession of that work to someone
else. Library lending, for example, is a direct outgrowth of this

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 586041 (F.D.C.H.)
1997 WL 586041 (F.D.C.H.)

First Sale doctrine now codified at Section 109(a) of the
Copyright Act.

The Digital Future Coalition rejects the suggestion that the
First Sale doctrine applies only to the physical transfer of an
actual object and does not apply to the electronic transmission
of a work under any circumstances. Such analysis, in any event,
misses the critical point that Congress now has the opportunity
to determine whether some digital equivalent to the traditional
first sale doctrine, as it exists in the analog information
environment, should apply in cyberspace. We believe that it
should.

Historically, the ability to pass on lawfully obtained
copies of works has been important to libraries, scholars, and
ordinary information consumers. It has also be a crucial factor
in the emergence of new business models. Just as first sale in
the past has given us everything from lending libraries to video
rental outlets, we believe that the digital equivalent of first
sale could be the basis for important new cultural and economic
developments in cyberspace.

The DFC urges the Subcommittee to amend Section 109 to make
clear that, regardless of the technological format in which a
copyrighted work was lawfully acquired, that copy may be passed
on to another or resold, provided that the transferor does not
retain a copy of that work.

Distance Learning: Technology for Teachers & Children

Since the advent of broadcasting and other means of
electronic communication, educators have striven to use the
latest communications technologies to provide or enhance elemen-
tary, secondary, vocational and university-level schooling to
every comer of the country. Congress has for the past two decades
supported distance learning in Section 110 by expressly
permitting electronically transmitted copyrighted works to be
performed and displayed in classroom-like settings. Specifically,
the carefully-crafted provisions of Section 110(2) of the
Copyright Act of 1976 allows for the "performance or display" of
certain works by means of "transmission" in educational settings.
However, this limited exemption, though appropriate for the
use of traditional broadcast technology, is inadequate to permit
educators and students involved in distance learning to
electronically transmit or access lessons through digital
information networks -- such as the Internet -- that may now be
televised.

Therefore, the Copyright Act should be updated to: (1) grant
educators the right not only to perform and display a transmitted
copyrighted work (under appropriate circumstances), but to
"distribute" the work as well; (2) reflect in the definition of a
"classroom" that education no longer takes place only in a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 586041 (F.D.C.H.)

defined space in which a teacher lectures to a group of students who take notes; and (3) recognize that -- if educators are to reach a generation reared on television, video games and the Internet -- they also should be permitted to use "multimedia" and other new forms of copyrighted material in distance learning lessons under the same terms and conditions under which they now access more traditional works, such as books and sheet music.

Non-Negotiated License Terms: the Collision of Contract, Copyright & Consumers

The current trend toward the use of "shrink-wrap" and "click-on" licenses to define the terms on which information consumers are permitted to use works of which they purchase threatens to undermine decades of work by the Congress and the Courts to define and maintain the vital balance of American copyright law. If the term of a virtual contract of adhesion can dictate to an information consumer that copyright law notwithstanding she waives any fair use privilege as a condition for gaining access to a protected work, our intellectual property law will increasingly be made through contract cases decided under state law.

Unfortunately, recent case law, including the decision in ProCD v. Zeidenberg, suggests that this is no mere possibility, but a current reality. Ongoing efforts to revise the Uniform Commercial Code to provide for the easy enforcement of "shrink-wrap" and "click-on" licenses in sales to consumers threaten to further destabilize the foundations of our national federal intellectual property system. We believe that it is important that before this trend goes farther, the Congress reassert the primacy of federal law.

Obviously, agreements freely negotiated among parties with equivalent bargaining power may sometimes include terms constraining further use or reuse of licensed information. Such agreements, however, do not threaten to become de facto law of intellectual property. By contrast. "shrink-wrap" and "click-on" licenses do. Thus, the DFC urges Congress to amend the existing Section 301 of the Copyright Act, which deals with preemption, to make clear that "non-negotiated" license terms which contravene the provisions of the Copyright Act by restricting the use of unprotected material or abrogating limitations on exclusive rights should be unenforceable.

Conclusion

The issues of circumvention and copyright management information addressed by HR 2281 do not, and cannot, stand alone. If Congress seeks to ensure continued balance in the Copyright Act as it is updated for the digital age, other issues of equal importance must be resolved at the same time. Accordingly, the Digital Future Coalition submits that any legislative package

1997 WL 586041 (F.D.C.H.)

designed to implement the WIPO treaties should address the issues
of service provider liability, fair use, distance learning, first
sale, digital preservation, and non-negotiated license terms.
Moreover, as in the past, formal ratification of the treaties
should await broad agreement on such legislation.
The Digital Future Coalition, itself comprised of
information proprietors and users, recognizes the need to
modernize copyright to apply productively in cyberspace. As
Congress undertakes the first major overhaul of the Copyright Act
in over two decades, the DFC urges all Members to take the time
and care required to honor and reach the Framers' goal of
assuring "Progress in Science and the Useful Arts." The DFC looks
forward to working with this Subcommittee, the full Judiciary
Committee, and the Administration to enact comprehensive
legislation that ensures balance in the Copyright Act into the
next millennium.
American Association of Law Libraries
American Association of Legal Publishers
American Committee for Interoperable Systems
American Council of Learned Societies
American Library Association
Art Libraries Society of North America
Association of Research Libraries
College Art Association
Committee of Concerned IP Educators
Computer Professionals for Social Responsibility
Computer & Communications Industry Assoc.
Consortium for School Networking
Conference on College Composition and Communications
Consortium of Social Science Associations
Consumer Project on Technology
Electronic Frontier Foundation
Electronic Privacy Information Center
International Society for Technology in Education
Home Recording Rights Coalition
Medical Library Association
Modern Language Association
National Association of Independent Schools
National Council of Teachers of English
National Education Association
National Humanities Alliance
National Initiative for a Networked Cultural Heritage
National Writers Union
Society of American Archivists
Special Libraries Association
United States Catholic Conference
United States Distance Learning Association

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 586041 (F.D.C.H.)

1997 WL 586041 (F.D.C.H.)

Visual Resources Association

DOUGLAS BENNETT

President

Earlham College

1997 WL 586041 (F.D.C.H.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw Download Summary Report for BALDINGER,JAMES 4451592**

| | |
|---|---|
| Date/Time of Request: | Wednesday, April 18, 2007 18:11:00 Central |
| Client Identifier: | 50649-29958-005 |
| Database: | USTESTIMONY |
| Citation Text: | 1998 WL 300239 (F.D.C.H.) |
| Lines: | 397 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

Westlaw.

1998 WL 300239 (F.D.C.H.)                                          Page 1
1998 WL 300239 (F.D.C.H.)


Federal Document Clearing House
Copyright (c) 1998 Federal Document Clearing House, Inc.

Testimony
June 05, 1998

House of Representatives
Commerce
Telecommunications, Trade and Consumer Protection

Copyright Treaties Implementation Act

WRITTEN TESTIMONY
Of
STEVEN J. METALITZ
Smith & Metalitz, L.L.P.
Washington, DC
on behalf of
MOTION PICTURE ASSOCIATION OF AMERICA
on
H.R. 2281, WIPO COPYRIGHT TREATIES IMPLEMENTATION ACT
before the
SUBCOMMITTEE ON TELECOMMUNICATIONS, TRADE and
CONSUMER PROTECTION
COMMERCE COMMITTEE
UNITED STATES HOUSE OF REPRESENTATIVES
June 5, 1998
Mr. Chairman, and members of the Subcommittee:
I am Steven J. Metalitz, a partner in the Washington law firm of
Smith & Metalitz, L.L.P. I am pleased to have this opportunity to
appear today to express the strong support of the Motion Picture
Association of America (MPAA) for H.R. 2281, the WIPO Copyright
Treaties Implementation Act.' MPAA urges the House to approve
this legislation speedily, along with the amendments made to the
companion bill by the Senate, so that the United States will be
in a position to ratify these two key treaties as soon as
possible. No task before the Congress is more urgent for the
promotion of a healthy electronic commerce marketplace in the
fruits of American ingenuity and imagination, and for the
realization of the full potential of the Internet in that
marketplace.
The 1998 report on "Copyright Industries in the U.S. Economy,"
released last month by the International Intellectual Property
Alliance, demonstrates once again that the copyright industries
are among our nation's largest and fastest growing economic

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 300239 (F.D.C.H.)                                           Page 2
1998 WL 300239 (F.D.C.H.)

assets, accounting for almost $280 billion of value added to the
U.S. economy in 1996 (the most recent year for which figures are
available). Over the last two decades, this sector has
consistently created new jobs nearly three times faster than the
economy as a whole, and today provides the paychecks for more
than three and one-half million Americans.
Importantly for today's hearing, the 1998 report documents that
the U.S. copyright industries have passed two milestones in their
contribution to U.S. competitiveness in the global economy. In
1996, for the first time, the foreign sales and exports of U.S.
audiovisual material, sound recordings, computer software and
print publications topped the $60 billion mark. And even more
significantly, these core copyright industries have established
themselves as America's leading producer of overseas revenue,
topping agriculture, automotive products, aerospace, and every
other industrial sector in combined foreign sales and exports.
We're especially proud to be Number One in this category, because
we know that a vibrant export sector is the foundation for
national competitiveness in world markets.
The copyright industries generally, and the motion picture
industry specifically, are excited about the explosive growth of
the Internet and other forms of digital distribution of
copyrighted works . We know that this new technology will allow
us to reach more markets faster and more efficiently, with a
greater diversity of products. Sooner than some of us may think,
digital networks will be an incredible bonanza for the American
consumer, and for his or her counterparts around the world, who
will have easy access to more entertainment choices than ever
before. U.S. audio-visual works will be a key element in this
burgeoning electronic commerce in copyrighted materials.
But it is no secret that our excitement about these new frontiers
is tinged with anxiety. The very same technology that facilitates
the legitimate distribution of our creative products around the
world also facilitates copyright piracy: the theft of the
intellectual property that is the basis for the great economic
and cultural success story that our industry represents. It has
never been easier, cheaper or more profitable for pirates to
steal the fruits of American creativity than it is today. And the
growth and proliferation of digital networks will make it even
easier and cheaper to carry out that theft on a worldwide scale.
I don't use the word "theft" here symbolically or as a metaphor.
Motion picture studios own a number of important physical assets,
but by far their most valuable property is intellectual property:
the exclusive rights to reproduce, distribute, and publicly
perform the audio-visual works that all the world wants to see.
Exploiting these exclusive property rights - either by exercising
them, or by licensing someone else to do so - is the main way

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 300239 (F.D.C.H.)

1998 WL 300239 (F.D.C.H.)

that motion picture studios earn revenue. Those exclusive property rights underlie the paychecks for the hundreds of thousands of jobs the motion picture industry generates, directly or indirectly -- everyone from the superstars to the store clerks in the video shop on the comer. So whenever other people, without our permission and without compensation to us, go into the business of exercising these exclusive rights, they are destroying the only real revenue base we have. Pirates, whether on the Internet or elsewhere, are stealing our property, just as surely as a cat burglar is stealing the personal property of a homeowner.

Today, Internet piracy focuses on computer programs, video-games, and, increasingly, recorded music. Movies and videos are not much in evidence     yet. That's because our audio-visual content is so rich in information that it can't yet move easily everywhere in the digital network -- the volume of flow is too great for some of the pipes. We know that the reprieve is temporary, however. The same technology that will smooth the way for legitimate delivery of video on demand over digital networks will also prime the pump for copyright pirates.

MPAA is very familiar with the great video pirate marketplaces of today. In Russia, in China, in Italy, in scores of other countries, video pirates steal more than $2 billion of our intellectual property each year. By spending millions of dollars on anti-piracy campaigns, and with the invaluable help of Congress and of the Executive Branch, we're making great progress in the fight against these physical pirate bazaars. But we know that the next battleground will be in cyberspace: a virtual pirate bazaar that -- in scope, volume and agility of operation - may dwarf those we are fighting today.

We can be certain that the Internet will be the crucial link in the pirate operations of tomorrow. Today, the pirate who obtains, by stealth or malfeasance, a copy of the latest blockbuster picture before it is even released in the theaters must cope with formidable distribution problems. Physical copies must be smuggled across borders, warehoused, and parceled out to distributors before reaching the ultimate consumer. Digital networks will soon make this complex and dangerous undertaking cheap and simple. The pirate master will be digitized, posted on the Web, and made available to Net surfers all over the world. Or, the master will be downloaded over the Internet to a digital video recorder half a world away that can chum out thousands of pristine, perfect copies at the touch of a button, for immediate distribution to customers. By the time those pirate DVD copies hit the street, the pirate web site will have disappeared, to be set up anew tomorrow in a different country, where a different current hit will be available.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 300239 (F.D.C.H.)
1998 WL 300239 (F.D.C.H.)

The nightmare scenario I have described , if it is realized, will drive a stake through the heart of our hopes for the healthy growth of electronic commerce. What can be done to prevent this, and to meet this daunting challenge of pervasive digital piracy? A key part of the answer lies in the legislation before you today.

The U.S. copyright law is a modern, flexible legal instrument that has succeeded in keeping pace even with the rapidly accelerating technological changes that are transforming the marketplace for audio-visual works. Sadly, the same cannot be said about the laws of many other countries around the world, including those in which the threat of piracy is most acute. In the inherently global entertainment marketplace of the immediate future, we need stronger international legal standards for copyright protection, standards that respond to those technological changes. Fortunately, those standards, and the method for implementing them, are at hand.

In December 1996, delegates from over 100 nations, meeting under the auspices of the World Intellectual Property Organization (WIPO), concluded two new treaties aimed at precisely this goal. The U.S. led the way toward the adoption of the WIPO Copyright Treaty, and the WIPO Performances and Phonograms Treaty. That leadership was essential, but it should not be surprising: after all, with its robust copyright industries, the U.S. has the most to gain from stronger international minimum standards, and the most to lose if the momentum toward this goal falters.

The challenge today is to put these enhanced minimum standards into effect as soon as possible, by gaining the ratifications of at least thirty countries to both these treaties. The U.S. must be among the first to ratify, in order to maintain our leadership position in the world copyright community, and to create the momentum needed to encourage other countries to follow in our footsteps.  Before we can ratify, we must make the limited changes to our laws that are needed to meet these new international standards. That's where H.R. 2281 comes in. Those necessary changes do NOT involve either the basic rights of copyright owners, or the limitations or exceptions to those rights. The main change needed to bring our laws into full compliance with the obligations of the two WIPO treaties is to outlaw trafficking in high-tech burglar's tools - products or services designed primarily for the purpose of defeating technologies that control access to or use of copyrighted works. We need to do that in order to fulfill the treaties' directive that we "provide adequate legal protection and effective legal remedies" against the circumvention of technological protections that are used by copyright owners to control access to or use of their works, both on and off the Internet.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 300239 (F.D.C.H.)

1998 WL 300239 (F.D.C.H.)

Mr. Chairman, as it was introduced -- with bipartisan support, and with the full backing of the Administration -- H.R. 2281 was truly a minimalist bill. It made only those changes that absolutely must be made in order to fulfill the treaties' requirements, while leaving everything else - including all the rights and defenses established by the copyright law --- undisturbed and unchanged. In the legislative process, as often happens, reality intervened. While the basic approach of the legislation has not changed, a number of new provisions have been added. None of these changes expands the exclusive rights of copyright owners. Every single one of the changes weighs in on the other side of the balance.

For instance, one of these amendments expands the scope of an existing limitation on the rights of copyright owners, and allows libraries and archives, for the first time, to make digital copies of material in their collections, without the permission of the copyright owner. Another amendment - an extensive and painstakingly negotiated amendment - clarifies the rules on the legal responsibility of Internet access and online service providers for copyright violations that take place over their systems or networks, and limits the liability of these services for such infringements under a number of circumstances. A third amendment updates an existing exception to copyright protection and allows broadcasters to bypass technological controls in order to make temporary copies of copyrighted material in relation to authorized broadcasts. A fourth amendment directs the Register of Copyrights to study and to report back to Congress on any changes to the Copyright Act that are needed to allow schools, colleges and universities to employ the new digital technologies to serve their students through distance learning. And a host of additional amendments --- I count eleven in all - have been made to narrow the anti-circumvention provisions of this legislation, with the goal of foreclosing any unintended adverse impact on libraries, schools, manufacturers of consumer products like PC's and VCR's, competitive computer software developers, or individual Internet users.

As a result of all these changes, H.R. 2281 is no longer a pristine piece of minimalist legislation. It includes a number of provisions which are not absolutely necessary to implement the treaties, and that cut back on the rights of copyright owners. Unsurprisingly, not all of these changes were especially popular with the MPAA or its member companies, and as free-standing bills we might well oppose them. But we are willing to accept them, and to strongly support the entire package, because the goal of raising international copyright standards to keep pace with the digital networked environment is so critical to the future of our industry, and, we believe, to the competitiveness of the U.S.

1998 WL 300239 (F.D.C.H.)

economy as a whole in the global marketplace.

Mr. Chairman, despite all these weakening amendments and compromises, MPAA believes that this legislation, as it passed the Senate by a 99-0 vote three weeks ago, represents a major step toward this goal. The bill still meets the test of providing "adequate legal protections and effective legal remedies" against trafficking in products or services that are aimed at defeating the technologies that will make it possible for the Internet to realize its full potential for electronic commerce. But if these anti-circumvention provisions are weakened any further, the bill would risk slipping below this baseline standard set by the treaties. If that happens, the enormous effort of compromise and cooperation that have brought us this close to implementation of these landmark treaties would be jeopardized.

I would like to conclude my testimony with a few observations about those anti-circumvention provisions. These are not copyright provisions, even though the bill proposes to codify them as section 1201 of Title 17, which is the copyright title of the U.S. Code. Section 1201, unlike copyright, does not give copyright owners any exclusive rights, and (as the legislation provides) it does not "affect rights, remedies, limitations or defenses to copyright infringement, including fair use."

Section 1201, like the treaty provision it implements, reflects the fact that technical protection measure's -- such as encryption, scrambling, or the use of electronic envelopes or watermarks - are key enabling technologies that will make possible a robust electronic commerce in copyrighted materials over the Internet. In that way, enactment of section 1201 will benefit copyright owners, but it will also benefit every Internet user who wants to see the network employed to make available a richer selection of movies and other audiovisual materials - as well as other copyrighted works. The only parties it will hurt are those who wish to go into the business of disseminating the means to hack through encryption, pick digital locks, steam open electronic envelopes, or obliterate digital watermarks, so that valuable intellectual property can be stolen.

The provisions of section 1201 are new, but they are far from being unprecedented. No one knows that better than this Subcommittee. On at least two previous occasions, in 1984 and in 1988, Congress has outlawed the manufacture or distribution of tools -- in common parlance, "black boxes" -- used to circumvent technological controls on access to copyrighted materials. If I am not mistaken, on each occasion the provision originated in this Subcommittee. While these laws are focused on safeguarding access controls for particular distribution mechanisms - cable services in 1984,[2] and satellite distribution services in 1988,[3] -- the Subcommittee should bear these precedents in mind

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 300239 (F.D.C.H.)

as it considers section 120 1, which simply applies the same
principles without regard to distribution media. Virtually every
objection that you will hear raised to section 1201 today either
was, or could have been, raised at the time Congress acted to
outlaw trafficking in the tools of cable or satellite signal
theft. As you prudently turned those objections aside in
outlawing cable and satellite "black boxes" in 1984 and 1988, so
we urge you to reject them today as Congress moves to outlaw
"black boxes for the Internet."
Section 1201 is narrowly drawn to avoid any impact on legitimate
products or services. Even if a device can be used to break
through technological protections, it is only prohibited if the
plaintiff proves that it meets one of three specific tests: that
it --
* was primarily designed or produced for the purpose of
circumvention;
* was knowingly marketed for use in circumvention; or
* has only limited commercially significant uses other than to
circumvent.
These hurdles to liability remain in place in the legislation
before you. I encourage you to line up against this three-part
test the facts of any scenario with which the opponents of
section 1201 may present you. Throughout the months of debate
over Section 1201, its opponents have never been able to identify
a single specific legitimate consumer electronics or personal
computer product that would flunk this test and that would
therefore unfairly expose its manufacturer or distributor to a
risk of liability. Indeed, if the motion picture industry thought
for a moment that enactment of section 1201 would jeopardize the
availability of videocassette recorders, and with it the home
video market that has become such a vital element of the movie
business, MPAA would be among the first to oppose it.
Yet you will hear from some quarters that section 1201 remains
too broad. A host of crippling amendments may be proposed: that
liability be limited to the act of circumvention, exculpating the
commercial traffic in products and services that make these acts
possible'; that liability under section 1201 require proof that
circumvention was carried out in furtherance of an act of
copyright infringement; that liability under section 1201 - a
noncopyright provision - be made subject to the copyright defense
of fair use; that certain specifically named products be granted
blanket exemption from liability; or that a product designed for
the purpose of circumvention be excused if it is proven to have a
substantial non-infringing use. While some of these proposals may
have a superficial attractiveness, on closer examination I
believe you will find that each of them serves mainly to provide
a roadmap to keep the purveyors of "black boxes" and other

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 300239 (F.D.C.H.)

circumvention devices and services in business even after section 1201 is enacted. Their adoption will reduce the legal protection for these key enabling technologies to an inadequate and ineffective level, thus failing short of the WIPO treaties' minimum standards.

The subcommittee should also apply the precedents of the 1984 and 1988 legislation to these proposals. If you do, you will search in vain for a "fair use" defense to distributing tools to decrypt satellite signals, or any requirement to prove the furtherance of copyright infringement (or to disprove "substantial non-infringing uses") in order to prosecute the purveyors of cable "black boxes." And both the 1984 and the 1988 legislation specifically extend, not only to the act of circumventing the technological controls used to protect cable transmissions or satellite signals, but also to acts of manufacture, distribution, and (in the case of the satellite provisions) importation of the devices that make the circumvention possible.

Mr. Chairman, thank you once again for the opportunity to present the views of the MPAA on this critical legislation.

NOTES:

[1] MPAA represents the largest producers and distributors of filmed entertainment. MPAA is also a member of the Creative Incentive Coalition (CIC), a broader umbrella group that also supports implementation of the WIPO treaties. As a matter of disclosure, Smith & Metalitz also represents CIC, although today's testimony is being presented on behalf of MPAA only.

[2] See 47 U.S.C. 553.

[3] See 47 U.S.C. 605(e)(4). A precursor to this provision was enacted in 1984; the provision was also amended in 1996.

[4] This argument is especially troubling, because if adopted it would create an enforcement regime that would not only be "inadequate and ineffective," but also one that would intrude unacceptably on the personal privacy of Internet users and other consumers, since the anti-circumvention prohibition could only be enforced by catching an individual "in the act," quite possibly in his or her home. Americans would (and should) never tolerate this. Proponents of the "conduct-only" approach are either indifferent to personal privacy, or, more likely, have cannily concluded that this limitation would prevent any enforcement of section 1201.

STEVEN J. METALITZ

Esquire

Smith & Metalitz, L.L.P.

1998 WL 300239 (F.D.C.H.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 300239 (F.D.C.H.)

1998 WL 300239 (F.D.C.H.)

Page 9

END OF DOCUMENT

**Westlaw Download Summary Report for BALDINGER,JAMES 4451592**

Date/Time of Request:                Wednesday, April 18, 2007 18:11:00 Central

Client Identifier:                   50649-29958-005

Database:                            USTESTIMONY

Citation Text:                       1998 WL 310011 (F.D.C.H.)

Lines:                               186

Documents:                           1

Images:                              0

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.



1998 WL 310011 (F.D.C.H.)                                                    Page 1
1998 WL 310011 (F.D.C.H.)


                        Federal Document Clearing House
             Copyright (c) 1998 Federal Document Clearing House, Inc.


                                   Testimony
                                June 05, 1998


                           House of Representatives
                                   Commerce
                 Telecommunications, Trade and Consumer Protection

Copyright Treaties Implementation Act

Testimony of Jonathan Callas
Chief Technology Officer
Network Associates, Inc.
June 5, 1998
Chairman Tauzin, Ranking Member Markey, and Members of the
Subcommittee,
Thank you for the opportunity to appear before you today.
Network Associates supports the overall objectives of this bill,
and would advocate its eventual passage. However, we have a
serious concern regarding a key provision of the bill that will
interfere with our ability, and that of other security companies,
to produce more reliable and secure encryption products.
If I do nothing else in my testimony, I would like to make the
following point:
Under this bill, for cryptographers to do what today is standard
operating procedure in encryption research would be punishable by
up to 5 years in jail and a $500,000 fine for the first offense.
Therefore, in the name of security this bill would prevent the
development of better security products. This chilling of
innovation in our industry will necessarily result in the
weakening of security systems that are vital to our nation's
economy, to law enforcement, to our privacy, and to our national
security.
Network Associates, Inc. is the 10th largest independent software
company in the world, and is the world's leading provider of
software for network security and management. We are also one of
only a handful of U.S. companies that produces both encryption
products that we sell directly to end users, and encryption
technology that we license to customers for use in their own
systems and products. Network Associates owns famous name
security software companies Pretty Good Privacy and Trusted
Information Systems. Our products include McAfee Anti Virus
Software, PGP encryption software, and Gauntlet firewalls. The

                © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 310011 (F.D.C.H.)

company has about 2200 employees and anticipated revenues of about $800 million in 1998. Customers for these products include a vast majority of the U.S. Fortune 100 companies, well known flinancial services, aerospace and defense companies. Our customers also include a wide L4n&e of hardware and software companies worldwide that incorporate our technology into their products to ensure their security and protect their intellectual property. The company employs hundreds of engineers and developers in the United States, many of whom are engaged in cryptographic research and product development.

The Computer and Communications Industry Association is pleased to associate itself with my testimony regarding the effect of the bill before us on encryption research in this country.

Network Associates supports the overa]] objectives of H.R. 2281, and would benefit from the enhanced intellectual property protection.s it provides. However, we oppose the current language in Section 1201 of the bill. This provision prohibits virtually any circumvention of technological protection measures that control access to a copyrighted work - regardless of the purpose of such circumvention. It also prohibits the manufacture of software devices used to circumvent such protection measures regardless of the purpose of such circumvention.

H.R. 2281 is very clear on this issue. The bill prohibits circumvention, and the definition of circumvention in the bill as passed by the House Judiciary Committee includes decryption. The bill also prohibits the manufacture of software devices used to circumvent - or decrypt technological protection measures. If Network Associates cannot decrypt we cannot perform necessary encryption research. And if we don't have access to the software tools to decrypt, we cannot do the necessary research.

So, while the intent of Section 1201 is laudable, the current language is so broad that it would have the presumably unintended consequence of undermining our company's legitimate activities which include continually testing the security of our own products and those of our colleagues. These activities are essential for future product development, improvement and innovation. We also believe strongly that others must be able to test our products. As a software developer, I will be the first to admit that I am possibly the least qualified person to correct or test my own creations. Just as a writer needs an editor or proofreader to catch his or her mistakes, software developers need third parties to test their products because often we are blind to our own mistakes.

I would like to talk for a minute about the process of cryptographic testing and research. In order to ensure that a cryptographic system has no weaknesses, either in the cryptography itself or in its application and implementation, it

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 310011 (F.D.C.H.)                                    Page 3
1998 WL 310011 (F.D.C.H.)

is essential that we continually attempt to break that system.
This process can be likened to testing of automobiles for
"crashworthiness." In order to determine whethcr an automobile is
safe, it undergoes various tests to determine whether there are
weaknesses in its structure or components. While these tests may
be done internally by the car company itself, they are also often
done by third parties to ensure that the tests are thorough,
accurate and unbiased.

These third party tests must also occur in cryptography. In fact,
the art of testing a "cryptosystem" is inherently an adversarial
process - the industry calls an individual who tests a system by
attempting to break it "the adversary." This process enables the
art and science of cryptography to advance, and has made the U.S.
a world leader in cryptographic development and implementation.
Our company relies heavily on the testing and tools of third
parties, most often private researchers and academics, whose work
would very likely be chilled by the provisions of this bill.

I would like to offer some specific examples of how such
adversarial research has been used to advance the science of
cryptography and ensure the security of existing products on the
market. In 1995, cryptographer Paul Kocher developed what is
known as timing attack cryptanalysis, a powerful analytic
technique for adversarial encryption research that can be used to
break cryptographic systems by 4nalyzing the amount of time used
to process messages. The attack was discovered through analysis
of actual products and ciphers. As a result of Paul publicizing
his findings, industry has developed strong countermeasures to
ward off this kind of attack. Had Paul been discouraged from
publicizing the technique, the attack could have been instead
discovered - and kept secret -- by criminals attacking electronic
payment systems.

Another good example can be found in the recent successful
attempt by U.C. Berkeley graduate students to crack the
previously secret security system in GSM wireless telephones.
Millions of Americans use these telephones on the assumption that
they are secure. The publication of the students' findings now
allows those individuals to make an informed choice to seek other
wireless security products while the system is improved.

Our company recently benefited from an unauthorized third party
test of a version of our encryption software program, PGP. It was
discovered that, when used in a particular operating system,
users' private keys would be stored in a way that compromised the
system's security. The company was gratefual that the flaw was
reported to us, and we immediately acted to correct the problem
and improve the product.

It is essential to test technology as it is applied -- i.e. when
it is being used to protect something, because most weaknesses in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 310011 (F.D.C.H.)
1998 WL 310011 (F.D.C.H.)

cryptography occur in its application. When researchers found the flaw in PGP mentioned above, the flaw was in a specific application of the product, not in the cryptographic technology itself. To illustrate, consider if Chrysler made a very secure car lock, but it was found that certain Volkswagen keys could open the locks.

The lock may be inherently very strong, but its weakness is found in its application. The only way to discover this weakness is by testing the lock with other keys.

Under the provisions of H.R. 2281, these research and testing activities would only be permitted if the owner of the content protected by the encryption system agrees in advance. It is unrealistic to believe that such permission would be granted because - ironically -- content owners do not recognize their interests in encryption research, though they enjoy the benefits of our research and innovation through enhanced protection for their content.

We do not argue that it should be illegal to circumvent technological protection systems for the purpose of stealing intellectual property. However, as cryptographic developers and researchers we need to continually engage in adversarial testing of existing systems to ensure that our security applications - which are used for copyright protection among other users -are sufficiently strong and correctly implemented to resist and deter attacks. I will repeat what I said earlier, to be discouraged from doing so would chill innovation in our industry and result in the ultimate weakening of security systems that are vital to our nation's economy, law enforcement, individual privacy, and our national security.

Again, thank you for the opportunity to appear before you today, and we at Network Associates look forward to working closely with you to improve upon H.R. 2281.

    JONATHAN CALLAS

    Cheif Technology Officer

    Network Associates, Inc.

 1998 WL 310011 (F.D.C.H.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw Download Summary Report for BALDINGER,JAMES 4451592**

| | |
|---|---|
| Date/Time of Request: | Wednesday, April 18, 2007 18:11:00 Central |
| Client Identifier: | 50649-29958-005 |
| Database: | USTESTIMONY |
| Citation Text: | 1998 WL 296460 (F.D.C.H.) |
| Lines: | 478 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.



1998 WL 296460 (F.D.C.H.)                                                    Page 1
1998 WL 296460 (F.D.C.H.)


                        Federal Document Clearing House
            Copyright (c) 1998 Federal Document Clearing House, Inc.


                                  Testimony
                               June 05, 1998


                           House of Representatives
                                  Commerce
              Telecommunications, Trade and Consumer Protection

Copyright Treaties Implementation Act

Testimony and Statement for the Record of
Marc Rotenberg
Director, Electronic Privacy Information Center
Adjunct Professor, Georgetown University Law Center
Senior Lecturer, Washington College of Law
on
H.R. 2281: The WIPO Copyright Treaties Implementation Act
and Privacy Issues
Before the
Subcommittee on Telecommunications, Trade, & Consumer Protection
Committee on Commerce,
U.S. House of Representatives
June 5, 1998
My name is Marc Rotenberg.  I am the executive director of the
Electronic Privacy Information Center, a public interest research
organization based in Washington, DC.  I am also an adjunct
professor at Georgetown University Law Center and senior lecturer
at the Washington College of Law.  I have taught privacy law for
almost ten years and I have been involved in many debates and
discussions concerning privacy protection.  I appreciate the
opportunity to testify today on the WIPO treaty legislation and
privacy issues.  Privacy is an important concern of Internet
users, and sensible copyright legislation should have minimal
impact on the privacy interests of Internet users.
I also appreciate the efforts of Chairman Tauzin and
Representative Markey and the other members of the Subcommittee
in support of privacy protection.  The Subcommittee has already
shown a strong interest in protecting consumer interests in the
online world.  Consistent with your earlier efforts on this issue
and your ongoing concerns, I believe that certain changes to HR
2281 are crucial to ensure protection of this essential freedom.
PROTECTION OF PRIVACY TODAY
For many years copyright protection and privacy protection have

                © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 296460 (F.D.C.H.)

peacefully coexisted.  Owners of copyrighted workers could
receive compensation for their efforts from users of the works,
while those same users could protect their privacy.  In the
traditional world of print publication and electronic broadcast,
recipients of information had a high expectation of privacy.  You
could read the morning paper, listen to the radio, or watch TV
and no one would know that you were doing any of these particular
things.  This is not simply privacy protection, but the specific
ability to withhold disclosure of your identity -- the right to
remain anonymous.  Copyright protection for authors coupled with
respect for the privacy of the reader, the viewer, and the
listener has produced a vibrant and flourishing information
world.

The need to preserve a high level of privacy is all the more
important as you consider a new copyright regime that will be in
place in the digital world for many years to come.  As you may be
aware, privacy is now the number one concern of Internet users.
A report released this week by the Federal Trade Commission found
that few web sites even have privacy policies.  People are aware
that information is often collected without their knowledge or
consent.  This is not a new problem.  But the WIPO implementing
legislation threatens to fundamentally transform many areas of
life where privacy is routinely protected.

Apart from privacy as an important personal right, there is also
the very real problem that the absence of privacy safeguards in
the new on-line world may have significant economic costs.  In
fact, Commerce Secretary William Daley recently described privacy
protection as a "make or break" issue for electronic commerce.
Studies by consulting groups and others find that public concern
about the loss of privacy contributes to a reluctance to use new
online services.

PROBLEMS CREATED BY COPYRIGHT MANAGEMENT INFORMATION

One of the central problems with H.R. 2281 is section 1202
concerning Copyright Management Information.  CMI is information
related to a digital work.  A CMI system could be used
appropriately to help ensure that copyright holders are able to
clearly establish the ownership of a copyrighted work in a
digital environment.  For example, making sure that a copyright
notice could not be removed.  But CMI could also be used,
inappropriately I believe, to track the activities and interests
of users of copyrighted works.  In this design, it is not just
the information necessary to protect the ownership interests of
the copyright holder that is recorded, but also the specific uses
of the copyrighted work.

As currently drafted, section 1202 defines the type of
information that may be collected in the course of establishing a
system for copyright management information.  The focus is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 296460 (F.D.C.H.)

clearly on protecting ownership, but the section does not preclude the collection of personally identifiable information. As a practical matter, this could mean that every use of a copyrighted work would be linked to a particular user.  This would produce far more detailed information about individual preferences, likes and dislikes that was ever collected in the past.

In our current world, the Washington Post might know that your are a subscriber if you have home delivery, though of course you could still pick up the paper at a newsstand.  But the world created by this legislation will be very different.

The reason for this is that copyright exists at a much higher level of specificity than the purchase information that might generally be known to businesses.  A copyright attaches to a single article, a single photograph, a single piece of music.  It is one thing to say that you are a subscriber to Sports Illustrated, quite another to know that you read articles on gymnastics, but not football, look at pictures of swimmers but not boxers.

That the drafters of HR 2281 were aware of the privacy problem in this section is apparent in the language of 1202(c)(6) which makes clear that the Register of Copyrights, who could otherwise issue regulations, may not collect any information regarding the user of the copyrighted work.  But this provision is far too narrow, and leaves open the opportunity for virtually anyone other than the Register -- including copyright holders, OSPs, and developers of new systems -- to hardwire the collection of personal information into the CMI.

It should be clear first that copyright holders have no special claim on what you or I wish to read, watch, or hear.  Copyright law has never established a right to know the identity of a user of a copyrighted work.  Where identity has been disclosed, it is generally pursuant to a licensing scheme (ASCAP) or some secondary purpose (shipping a product) and not federal legislation.  It may also be necessary to determine the identity of a user of a work to establish infringement.  But there is no general right of a copyright owner to know the identity of the user.  The CMI provision, if left unchanged, could radically alter this fundamental arrangement.

I believe many others are well aware of this problem.  Bruce Lehman made clear that CMI should not include tracking or usage information in testimony before the House Judiciary Committee. He said, "It would be wholly inconsistent with the purpose and construction of this bill to include tracking and usage information within the definition of CMI."]

To create databases that would record each person's use of copyrighted works would be establish the most intrusive and far-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 296460 (F.D.C.H.)
1998 WL 296460 (F.D.C.H.)

reaching data collection systems ever conceived.  We have seen similar proposals to track users private communications.  The Administration tried, by means of the Clipper scheme, to establish an unbreakable technique to track all communications in the digital world.  No proposal has been more widely criticized on the Internet.  Even the Administration conceded that Clipper was ultimately a failure.

It is not enough to note the special circumstances when users may be required to defeat copyright management schemes to further important ends, it is necessary to ask whether it is appropriate and fair for copyright holders to demand disclosure of one's identity as an additional cost of gaining access to a copyrighted work.

If this issue is unresolved, then the other provisions of 1202, notably subsections (a) and (b), become problematic.  I would agree for example, that a user does not generally have the right to alter copyright management information pertaining to the owner of the work.  But if the CMI also includes information about the individual, how could we say presumptively that he could not alter it, if it was for example, inaccurate, incomplete, or out of date.  In such a setting the copyright interest would always trump the privacy interests.  That can't be right and it certainly isn't necessary to achieve the purpose of section 1202.  I believe that a very clear line must be drawn between the information that is necessary to establish the ownership of copyrighted works and the very different information relating to one's personal activities and private preferences.  Without the ability to defeat unreasonable claims on users identity, individuals will face a harsh choice: sacrifice privacy and receive information or protect privacy and be cut off from information world.  There is nothing in the technology or our legal tradition that requires this result.

There is a possible solution.  Section 1202 of the Boucher-Campbell measure treats privacy issues more directly and more sensibly.  It explicitly excludes from the definition of copyright management systems any personally identifiable information relating to the user of the work ("including but not limited to the name, account, address or other contact information of or pertaining to the user.") [new section 1202] In this manner it avoids the very serious problems that could arise if 1202 is left in its current form.

The attempt by the Senate to address privacy concerns through section 1205, while well intended, will simply not do the job.  A sweeping new data collection system which is the essence of CMIs -- must make clear how personal information is to be protected.  Section 1205 fails to establish the privacy rights that are necessary to protect the information that could be collected as a

1998 WL 296460 (F.D.C.H.)                                    Page 5
1998 WL 296460 (F.D.C.H.)

result of passage of this bill.  In effect, it recognizes the
problem, but proposes no solution.

If this is not clarified, then it is necessary before any
copyright management scheme is enacted into law, to establish a
legal right and the technical means to obtain information
anonymously.  Then it is necessary to make clear the privacy
safeguards, established by statutory provisions similar to those
found elsewhere, that will apply when personally identifiable
information is obtained.

THE ISSUE WITH COOKIES

Several of the sponsors of the Senate measure have expressed
concern about the treatment of cookies.  The issue is this: could
a copyright owner use a particular feature of the Internet
protocols to log the activities of a user, by placing a small
file on the user's disk, and effectively by means of this Act
prevent the user from disabling the file.

The Senate wrestled with this problem.  Some expressed concern
about the potential privacy problems.  Others said that there was
in fact no problem.  In the end, I think the Senate may have
misunderstood the cookies problem.  The Senate focused on the
problems that could result if the cookie was encrypted or special
copyright interest attached.  Certain provisions in the bill
suggested that defeating such "hardened" cookies would not be
allowed.

This could well be a problem in the near future.  But the much
clearer problem today is found section 1201(a)(1) which says
simply that "No person shall circumvent a technological
protection measure that effectively controls access to a Work
protected under this title." This prohibition coupled with the
definitions of circumvention and technological protection
mechanism would produce many unintended consequences

For example, a cookie can be used to control access to a web
site.  This is done with many web sites today to make it easier
for people to use web sites without having to remember lots of
passwords.  For example, the New York Times web site requires a
password.  The first time I went to the site, I registered and
was given a password.  The New York Times stored some information
in a file on my computer, called the "cookie" file, so that when
I returned to the New York Times web site my password would be
automatically uploaded and I could get access to the site.

Now, what happens if I decide to delete the cookie file that the
New York Times has placed on my computer? Perhaps I don't want
others who use my computer to have access to the New York Times
web site through my password.  Perhaps I am concerned that the
cookie might also contain some information about my interests
that I don't think the New York Times should be collecting about
me.  Under the terms of HR 2281 as currently drafted, I believe

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 296460 (F.D.C.H.)                                    Page 6
1998 WL 296460 (F.D.C.H.)

it could be argued that this it is an unlawful circumvention of a
technological protection system for me to remove this cookie from
my own computer.

This result is reached for several reasons.  First, the
definition of technological protection mechanism is very broad.
Second, the definition of circumvention is very broad.  The
language is such that it covers far more than extensive
decrypting, reverse engineering, or cracking.  Under the current
language, simply "removing" or "deactivating" a bit of software
would be considered circumvention.  And, of course, the
technology is changing rapidly.

It is very important to narrow the language in sections
1201(a)(1), 1201(a)(3)(A), and 1201 (a)(3)(B) to avoid this
result.  Here again, HR 3048 offers a better approach by making
clear that the circumvention conduct must be done for the
"purpose of facilitating or engaging in an act of infringement,"
of a technological measure used by the copyright owner "to
preclude or limit reproduction of work." Section 1201 (a) in HR 3
048 makes much clearer what the prohibited conduct is and avoids
the many unintended consequences that would likely result from
adoption of the current 1201 (a) language.

IDENTIFICATION OF DIRECT INFRINGER

There is also a significant privacy problem in the way HR 2281
treats the problem of investigating infringement.  The industry
agreement to resolve the problem of OSP liability has,
unfortunately, created new privacy risks for users.

The provision on "Identification of Direct Infringer" (Proposed
Section 512(g) would grant broad new rights to obtain access to
information about the activities of Internet users prior to any
showing of actual infringement.  While this provision may shield
the OSPs from liability, it opens the door to new actions against
users whether or not they are in fact engaging -in infringing
uses of copyrighted works.

Section 512 lacks adequate safeguards to ensure that inaccurate,
incomplete, or outdated information does not result in improper
or unreasonable intrusions on privacy.  It grants too much
latitude to those who might pursue fishing expeditions.  While
the declaration process is useful , there are no means set out to
ensure that this process is not abused.  Particularly in
circumstances involving competitors or critics, it is not
difficult to imagine that copyright holders might use their
rights under 512(g) to investigate and gather information about
the activities of others that would not generally be available in
the off-line world.

Procedural safeguards should be established that would require a
threshold showing of the likelihood of success on the merits, the
opportunity for motion to oppose, and judicial review.  At the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

very least, notice should be provided by the OSP to the
subscriber within some reasonable time after information about
the subscriber is disclosed to a third party.  This perhaps the
surest guarantee that this new authority is not abused.

ABOUT ENCRYPTION

One of the central technologies to protect privacy today is
encryption.  It is the means to hide information and also to
authenticate information.  Encryption research is proceeding at a
fast pace, driven by the need to enable a secure environment for
data transmission and to promote electronic commerce.  We have a
particular interest in the privacy community in ensuring that
techniques to promote confidentiality and to protect identity are
robust and secure.

It is central to the development of encryption, as it is to other
scientific enterprises, that basic research be open,
unrestricted, and subject to comment and criticism.  An excellent
example of the problem with the alternative approach was
presented when the government announced the Clipper encryption
scheme that would have been a standard across the federal
government to protect the security of government information.  A
cryptography expert was able to show that the scheme could be
easily broken.  Efforts to restrict this testing that may even
raise concerns about national security -- attacking the
governments own codes-- could have devastating impact on privacy
and network security.

I believe that 1201 takes the wrong approach in trying to limit
the use of encryption techniques.  The provision casts a long
shadow over efforts to promote interoperatibility, to encourage
innovation, and to strengthen network security.  The simple
problem is the attempt to criminalize a new technique rather than
a bad act.

I urge you to narrow the language in 1201 to focus on the bad act
and not the technology.

LAW ENFORCEMENT ACCESS

Mr. Chairman, I am concerned also about the current language in
1201 (f) and 1202(d) that grants sweeping authority to agents of
the government to engage in acts that would otherwise be
prohibited by this measure.  I appreciate that there are
important circumstances necessary to the protection of the public
and the investigation of crime that requires law enforcement
officials to engage in certain activities.  But these exceptions,
when they are incorporated in law, are typically done by
reference to explicit statutory authority and with the
recognition that our Constitutional form of government places in
between the investegatory authority of the government and the
people an independent judiciary that has the responsibility to
assess the claims of the government against the privacy interests

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 296460 (F.D.C.H.)

of the citizenry.

This bill contemplates many circumstances where personally
identifiable information will be collected and potentially
disclosed.  In the investigation of copyright infringement, for
example, it is clearly the case that information about
individuals could be obtained by law enforcement.  Where such a
search by a government agent occurs, it is appropriate and
necessary to establish some form of judicial review to ensure
that the search is not improper.  Many of our modern privacy
laws, dealing with everything from cable subscriber records to
electronic mail, recognize that there are circumstances where law
enforcement will need to get access to similar personal
information to investigate allegations of wrongdoing.  But all of
these laws establish a requirement for a warrant, subpoena, or
similar lawful process, to ensure that the interests of the
individual are preserved.

No such language is found in HR. 2281. I believe this a serious
omission and I would strongly urge the committee to revise
1202(f) and 1202(d) so as to make clear that when personal
information in the possession of a third party is sought by an
agent of the government, a lawful warrant, subpoena, or other
lawful process is first obtained.  It is not sufficient to say
that the activity is "lawfully authorized." To be consistent with
the core Fourth Amendment principle, that authorization must be
pursuant to a judicial determination.

On this particular point, I am afraid that the Senate measure
goes even further in the wrong direction.  So much so, in fact,
that it even calls into question whether the United States will
be complying with its obligations in the WIPO treaty if it
permits not only agents of the US government but also
"contractors" and "other persons acting at the direction of'
government officials to engage in acts otherwise prohibited by
the Act.  I am not aware of such a sweeping exception in any
other federal statute.  It goes far beyond the "order public"
doctrine in international law that recognizes the special
concerns of law enforcement.

Again, H.R. 3048 takes a more sensible approach.  Relying on
existing legal doctrines that permit law enforcement officials to
engage in acts necessary to investigate crime and protect the
public, it creates no new exemption that could undermine existing
Fourth Amendment safeguards or even raise questions about
compliance with the WIPO Treaty.

ADDITIONAL PRIVACY ISSUE - PROTECTION OF ANONYMITY
Addressing privacy concerns in legislation is often a defensive
measure and raises the concern whether law can ever keep up with
technology.  I'd like to suggest that there may be a way to get
out ahead of the privacy issue with the legislation with a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 296460 (F.D.C.H.)

proactive provision that could enable electronic commerce and
protect privacy interests.  The Subcommittee should consider a
new provision that would explicitly guarantee the right of
individuals to receive information without disclosure of identity
-- a right of anonymity.

Such a provision would follow well established practices in the
off-line world where it is possible for individuals to routinely
buy books in bookstores, read newspapers at newsstands, and view
pictures in museums, without ever disclosing their actual
identity. Anonymity has also been central to the growth of the
Internet and the vibrant intellectual traditions of this country.
The Supreme Court has also recently affirmed that the right to
speak anonymously is protected by the First Amendment.

A similar provision was recently adopted in the German multi-
media law and is specifically intended to promote consumer
confidence in new on-line services. Other governments, including
Canada and the Netherlands are exploring new techniques to
promote anonymity because they also believe that this could be
one of the best ways to develop long-term solutions to the piracy
problem.

I am not proposing any particular product, technical means or
government standards. There may be dozens or hundreds of
companies that could develop new products and services to enable
anonymous payment for digital works and anonymous viewing of
information in the on-line world. The critical point is to take
this opportunity to encourage the creation of these systems by
establishing a right for individuals to gain access to a
copyrighted work without being compelled to disclose their actual
identity. As long as the copyright holder receives value, I do
not see a possible objection.

Such pro-active privacy measures could be the seeds of new
privacy safeguards in the on-line world. Short of a legislative
right, a study examining the prospects for such opportunities
could certainly be pursued by the National Research Council. An
earlier report on encryption has been quite useful for policy
development. A similar report on means to promote anonymity in
the on-line world could be useful.

NEED FOR PRIVACY SAFEGUARDS IN HR 2281

Privacy protection is central to the American tradition. It has
long co-existed with copyright, and by practice, has enabled a
rich and vigorous of information and ideas. It is particularly
important with the development of new information technologies to
ensure that privacy is protected.

Congress has recognized the importance of protecting the privacy
of one's preferences, particularly in new information services.
In 1984 as part of the Cable Act, privacy provisions were
incorporated to protect the privacy of subscriber information.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 296460 (F.D.C.H.)

The Video Privacy Protection Act of 1988 extended safeguards to
customers of video rental stores. Even the Telecommunication
Reforms Act of 1996 makes clear the need to protect privacy in
this new information world.

The combination of a draconian copyright management regime with
an absence of privacy protection enforceable in law, will allow
information owners to extract personal information from consumers
that would never have been disclosed in the off-line world. It is
an unfair choice that no one should have to confront.

As currently drafted, H.R. 2281 will create many privacy problem.
But there are ways to address these problems that still respect
the interests of the copyrights holders. I have proposed several
in my statement. I hope you will give them all full
consideration.

The Internet is still in the very early stages of development.
There is every opportunity to shape the on-line environment to
promote electronic commerce, protect intellectual property and
still preserve privacy. There is no reason to enact provisions
that will sacrifice this essential freedom.

I appreciate your attention. I will be pleased to answer your
questions.

MARC ROTENBERG

Director

Electronic Privacy Information Center

1998 WL 296460 (F.D.C.H.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw Download Summary Report for BALDINGER,JAMES 4451592**

| | |
|---|---|
| Date/Time of Request: | Wednesday, April 18, 2007 18:11:00 Central |
| Client Identifier: | 50649-29958-005 |
| Database: | LH |
| Citation Text: | H.R. REP. 105-551(II) |
| Lines: | 4529 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

Westlaw.

H.R. REP. 105-551(II)                                              Page 1
H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

              P.L. 105-304, DIGITAL MILLENNIUM COPYRIGHT ACT OF 1998

    **\*1** WIPO COPYRIGHT TREATIES IMPLEMENTATION AND ON-LINE COPYRIGHT INFRINGEMENT
                            LIABILITY LIMITATION

                      DATES OF CONSIDERATION AND PASSAGE

                   House: August 4, September 23, 1998
              Senate: May 14, August 31, September 17, 1998
                        Cong. Record Vol. 144 (1998)
              House Report (Judiciary Committee) No. 105-551(I),
                              May 22, 1998
                        (To accompany H.R. 2281)
              House Report (Commerce Committee) No. 105-551(II),
                              July 22, 1998
                        (To accompany H.R. 2281)
               Senate Report (Judiciary Committee) No. 105-190,
                               May 6, 1998
                         (To accompany S. 2037)
                 House Conference Report No. 105-796,
                            October 8, 1998
                        (To accompany H.R. 2281)

                      HOUSE REPORT NO. 105-551(II)
                            July 22, 1998

         Mr. Bliley, from the Committee on Commerce, submitted the following

                               REPORT

                             together with

                           ADDITIONAL VIEWS

                      [To accompany H.R. 2281]

    The Committee on Commerce, to whom was referred the bill (H.R. 2281) to amend
title 17, United States Code, to implement the World Intellectual Property Organiza-
tion Copyright Treaty and Performances and Phonograms Treaty, having considered the
same, report favorably thereon with an amendment and recommend that the bill as
amended do pass.

                               CONTENTS
                                                                 Page
Amendment ........................................................ 2

            © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998, 1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

Purpose and Summary ................................................... 20
Background and Need for Legislation .................................. 21
Hearings ............................................................. 28
Committee Consideration .............................................. 28
Roll Call Votes ...................................................... 28
Committee Oversight Findings ......................................... 32
Committee on Government Reform and Oversight ......................... 32
New Budget Authority, Entitlement Authority, and Tax Expenditures .... 32
Committee Cost Estimate .............................................. 32
Congressional Budget Office Estimate ................................. 32
Federal Mandates Statement ........................................... 34
Advisory Committee Statement ......................................... 35
Constitutional Authority Statement ................................... 35
Applicability to Legislative Branch .................................. 35
Section-by-Section Analysis of the Legislation ....................... 35
Changes in Existing Law Made by the Bill, as Reported ................ 68
Additional Views ..................................................... 85

**\*2** The amendment is as follows:
   Strike out all after the enacting clause and insert in lieu thereof the follow-ing:

SECTION 1. SHORT TITLE.

   This Act may be cited as the "Digital Millennium Copyright Act of 1998".

SEC. 2. TABLE OF CONTENTS.

  Sec. 1. Short title.
  Sec. 2. Table of contents.

                   TITLE I-WIPO TREATIES IMPLEMENTATION

  Sec. 101. Short title.
  Sec. 102. Circumvention of copyright protection systems.
  Sec. 103. Integrity of copyright management information.
  Sec. 104. Civil remedies.
  Sec. 105. Criminal offenses and penalties.
  Sec. 106. Savings clause.
  Sec. 107. Development and implementation of technological protection measures.
  Sec. 108. Technical amendments.
  Sec. 109. Effective date.

             TITLE II-INTERNET COPYRIGHT INFRINGEMENT LIABILITY

  Sec. 201. Short title.
  Sec. 202. Limitations on liability for Internet copyright infringement.
  Sec. 203. Limitations on exclusive rights; computer programs.
  Sec. 204. Liability of educational institutions for online infringement of copy-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**


right.
   Sec. 205. Evaluation of impact of copyright law and amendments on electronic com-
merce and technological development.
   Sec. 206. Effective date.

      TITLE III-EPHEMERAL RECORDINGS; DISTANCE EDUCATION; EXEMPTION FOR LIBRARIES AND
                                      ARCHIVES

   Sec. 301. Ephemeral recordings.
   Sec. 302. Limitations on exclusive rights;  distance education.
   Sec. 303. Exemption for libraries and archives.

                          TITLE IV-RELATED PROVISIONS

   Sec. 401. Report by National Telecommunications and Information Administration.

                      TITLE I-WIPO TREATIES IMPLEMENTATION

SEC. 101. SHORT TITLE.

   This title may be cited as the "WIPO Copyright Treaties Implementation Act".

SEC. 102. CIRCUMVENTION OF COPYRIGHT PROTECTION SYSTEMS.

   (a) Violations Regarding Circumvention of Technological Protection Meas-
ures.-(1)(A) The Secretary of Commerce shall issue regulations prohibiting any per-
son from circumventing a technological protection measure that effectively controls
access to a work protected under title 17, United States Code, to the extent
provided in this subsection, effective at the end of the 2-year period beginning on
the date of the enactment of this Act.
   (B) During the 2-year period described in subparagraph (A), and in each succeed-
ing 2-year period, the Secretary of Commerce, in consultation with the Assistant
Secretary of Commerce for Communications and Information, the Commissioner of Pat-
ents and Trademarks, and the Register of Copyrights, shall conduct a rulemaking on
the record to determine whether users of copyrighted works have been, or are likely
to be in the succeeding 2-year period, adversely affected by the implementation of
technological protection measures that effectively control access to works protected
under title 17, United States Code, in their ability to make lawful uses under title
17, United States Code, of copyrighted works. In conducting such rulemaking, the
Secretary shall examine-
   (i) the availability for use of copyrighted works;
   (ii) the availability for use of works for archival, preservation, and educa-
tional purposes;
   (iii) the impact of the application of technological protection measures to
copyrighted works on criticism, comment, news reporting, teaching, scholarship, or
research;
   (iv) the effect of circumvention of technological protection measures on the
market for or value of copyrighted works; and
   **\*3** (v) such other factors as the Secretary, in consultation with the Assistant

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

Secretary of Commerce for Communications and Information, the Commissioner of Pat-
ents and Trademarks, and the Register of Copyrights, considers appropriate.

(C) The Secretary, with respect to each particular class of copyrighted works
for which the Secretary has determined, pursuant to the rulemaking conducted under
subparagraph (B), that lawful uses have been, or are likely to be, adversely af-
fected, shall waive the applicability of the regulations issued under subparagraph
(A) for the ensuing 2-year period. The determinations made in the rulemaking shall
not be admissible in any action to enforce any provision of this Act other than this
paragraph.

(2) No person shall manufacture, import, offer to the public, provide, or other-
wise traffic in any technology, product, service, device, component, or part there-
of, that-

(A) is primarily designed or produced for the purpose of  circumventing a tech-
nological protection measure that effectively controls access to a work protected
under title 17, United States Code;

(B) has only limited commercially significant purpose or use other than to cir-
cumvent a technological protection measure that effectively controls access to a
work protected under title 17, United States Code; or

(C) is marketed by that person or another acting in concert with that person
with that person's knowledge for use in circumventing a technological protection
measure that effectively controls access to a work protected under title 17, United
States Code.

(3) As used in this subsection-

(A) to "circumvent a technological protection measure" means to descramble a
scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove,
deactivate, or impair a technological protection measure, without the authority of
the copyright owner; and

(B) a technological protection measure "effectively controls access to a work"
if the measure, in the ordinary course of its operation, requires the application of
information, or a process or a treatment, with the authority of the copyright owner,
to gain access to the work.

(b) Additional Violations.-(1) No person shall manufacture, import, offer to the
public, provide, or otherwise traffic in any technology, product, service, device,
component, or part thereof, that-

(A) is primarily designed or produced for the purpose of  circumventing protec-
tion afforded by a technological protection measure that effectively protects a
right of a copyright owner under title 17, United States Code, in a work or a por-
tion thereof;

(B) has only limited commercially significant purpose or use other than to cir-
cumvent protection afforded by a technological protection measure that effectively
protects a right of a copyright owner under title 17, United States Code, in a work
or a portion thereof; or

(C) is marketed by that person or another acting in concert with that person
with that person's knowledge for use in circumventing protection afforded by a tech-
nological protection measure that effectively protects a right of a copyright owner
under title 17, United States Code, in a work or a portion thereof.

(2) As used in this subsection-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

(A) to "circumvent protection afforded by a technological protection measure"
means avoiding, bypassing, removing, deactivating, or otherwise impairing a techno-
logical protection measure; and

(B) a technological protection measure "effectively protects a right of a copy-
right owner under title 17, United States Code" if the measure, in the ordinary
course of its operation, prevents, restricts, or otherwise limits the exercise of a
right of a copyright owner under title 17, United States Code.

(c) Other Rights, Etc., Not Affected.-(1) Nothing in this section shall affect
rights, remedies, limitations, or defenses to copyright infringement, including fair
use, under title 17, United States Code.

(2) Nothing in this section shall enlarge or diminish vicarious or contributory
liability for copyright infringement in connection with any technology, product,
service, device, component, or part thereof.

(3) Nothing in this section shall require that the design of, or design and se-
lection of parts and components for, a consumer electronics, telecommunications, or
computing product provide for a response to any particular technological protection
measure.

(4) Nothing in this section shall enlarge or diminish any rights of free speech
or the press for activities using consumer electronics, telecommunications, or com-
puting products.

**\*4** (d) Exemption for Nonprofit Libraries, Archives, and Educational Institu-
tions.-(1) A nonprofit library, archives, or educational institution which gains ac-
cess to a commercially exploited copyrighted work solely in order to make a good
faith determination of whether to acquire a copy of that work for the sole purpose
of engaging in conduct permitted under title 17, United States Code, shall not be in
violation of the regulations issued under subsection (a)(1)(A).  A copy of a work to
which access has been gained under this paragraph-

(A) may not be retained longer than necessary to make such good faith determina-
tion; and

(B) may not be used for any other purpose.

(2) The exemption made available under paragraph (1) shall only apply with re-
spect to a work when an identical copy of that work is not reasonably available in
another form.

(3) A nonprofit library, archives, or educational institution that willfully for
the purpose of commercial advantage or financial gain violates paragraph (1)-

(A) shall, for the first offense, be subject to the civil remedies under section
104; and

(B) shall, for repeated or subsequent offenses, in addition to the civil remed-
ies under section 104, forfeit the exemption provided under paragraph (1).

(4) This subsection may not be used as a defense to a claim under subsection
(a)(2) or (b), nor may this subsection permit a nonprofit library, archives, or edu-
cational institution to manufacture, import, offer to the public, provide, or other-
wise traffic in any technology, product, service, component, or part thereof, which
circumvents a technological protection measure.

(5) In order for a library or archives to qualify for the exemption under this
subsection, the collections of that library or archives shall be-

(A) open to the public; or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

    (B) available not only to researchers affiliated with the library or archives or
with the institution of which it is a part, but also to other persons doing research
in a specialized field.

    (e) Law Enforcement and Intelligence Activities.-This section does not prohibit
any lawfully authorized  investigative, protective, or intelligence activity of an
officer, agent, or employee of the United States, a State, or a political subdivi-
sion of a State, or a person acting pursuant to a contract with the United States, a
State, or a political subdivision of a State.

    (f) Reverse Engineering.-(1) Notwithstanding the regulations issued under sub-
section (a)(1)(A), a person who has lawfully obtained the right to use a copy of a
computer program may circumvent a technological protection measure that effectively
controls access to a particular portion of that program for the sole purpose of
identifying and analyzing those elements of the program that are necessary to
achieve interoperability of an independently created computer program with other
programs, and that have not previously been readily available to the person engaging
in the circumvention, to the extent any such acts of identification and analysis do
not constitute infringement under title 17, United States Code.

    (2) Notwithstanding the provisions of subsections (a)(2) and (b), a person may
develop and employ technological means to circumvent a technological protection
measure, or to circumvent protection afforded by a technological protection measure,
in order to make the identification and analysis permitted under paragraph (1), or
for the limited purpose of achieving interoperability of an independently created
computer program with other programs, if such means are necessary to achieve such
interoperability, to the extent that doing so does not constitute infringement under
title 17, United States Code.

    (3) The information acquired through the acts permitted under paragraph  (1),
and the means permitted under paragraph (2), may be made available to others if the
person referred to in paragraph (1) or (2), as the case may be, provides such in-
formation or means solely for the purpose of achieving interoperability of an inde-
pendently created computer program with other programs, and to the extent that doing
so does not constitute infringement under title 17, United States Code, or violate
other applicable law.

    (4) For purposes of this subsection, the term "interoperability" means the abil-
ity of computer programs to exchange information, and of such programs mutually to
use the information which has been exchanged.

    (g) Encryption Research.-

    (1) Definitions.-For purposes of this subsection-

    (A) the term "encryption research" means activities necessary to identify and
analyze flaws and vulnerabilities of encryption technologies applied to copyrighted
works, if these activities are conducted to advance the state of **5** knowledge in the
field of encryption technology or to assist in the development of encryption
products; and

    (B) the term "encryption technology" means the scrambling and descrambling of
information using mathematical formulas or algorithms.

    (2) Permissible acts of encryption research.-Notwithstanding the provisions of
subsection (a)(1)(A), it is not a violation of the regulations issued under that
subsection for a person to circumvent a technological protection measure as applied

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

to a copy, phonorecord, performance, or display of a published work in the course of
an act of good faith encryption research if-

(A) the person lawfully obtained the encrypted copy, phonorecord, performance,
or display of the published work;

(B) such act is necessary to conduct such encryption research;

(C) the person made a good faith effort to obtain authorization before the cir-
cumvention; and

(D) such act does not constitute infringement under title 17, United States
Code, or a violation of applicable law other than this section, including section
1030 of title 18, United States Code, and those provisions of title 18, United
States Code, amended by the Computer Fraud and Abuse Act of 1986.

(3) Factors in determining exemption.-In determining whether a person qualifies
for the exemption under paragraph (2), the factors to be considered shall include-

(A) whether the information derived from the encryption research was dissemin-
ated, and if so, whether it was disseminated in a manner reasonably calculated to
advance the state of knowledge or development of encryption technology, versus
whether it was disseminated in a manner that facilitates infringement under title
17, United States Code, or a violation of applicable law other than this section,
including a violation of privacy or breach of security;

(B) whether the person is engaged in a legitimate course of study, is employed,
or is appropriately trained or experienced, in the field of encryption technology;
and

(C) whether the person provides the copyright owner of the work to which the
technological protection measure is applied with notice of the findings and docu-
mentation of the research, and the time when such notice is provided.

(4) Use of technological means for research activities.-Notwithstanding the pro-
visions of subsection (a)(2), it is not a violation of that subsection for a person
to-

(A) develop and employ technological means to circumvent a technological protec-
tion measure for the sole purpose of performing the acts of good faith encryption
research described in paragraph (2); and

(B) provide the technological means to another person with whom he or she is
working collaboratively for the purpose of conducting the acts of good faith encryp-
tion research described in paragraph (2) or for the purpose of having that other
person verify his or her acts of good faith encryption research described in para-
graph (2).

(5) Report to congress.-Not later than 1 year after the date of the enactment of
this Act, the Assistant Secretary of Commerce for Communications and Information
shall report to the Congress on the effect this subsection has had on-

(A) encryption research and the development of encryption technology;

(B) the adequacy and effectiveness of technological protection for copyrighted
works; and

(C) protection of copyright owners against the unauthorized access to their en-
crypted copyrighted works.

The Assistant Secretary shall include in such report recommendations, if any, on
proposed amendments to this Act.

(h) Components or Parts to Prevent Access of Minors to the Internet.-In applying

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

subsection (a) and the regulations issued under subsection (a)(1)(A) to a component
or part, the court may consider the necessity for its intended and actual incorpora-
tion in a technology, product, service, or device, which-

(1) does not itself violate the provisions of title 17, United States Code; and

(2) has the sole purpose to prevent the access of minors to material on the In-
ternet.

(i) Protection of Personally Identifying Information.-

(1) Circumvention permitted.-Notwithstanding the provisions of subsec-
tion  (a)(1)(A), it is not a violation of the regulations issued under that subsec-
tion **\*6** for a person to circumvent a technological protection measure that effect-
ively controls access to a work protected under title 17, United States Code, if-

(A) the technological protection measure, or the work it protects, contains the
capability of collecting or disseminating personally identifying information re-
flecting the online activities of a natural person who seeks to gain access to the
work protected;

(B) in the normal course of its operation, the technological protection measure,
or the work it protects, collects or disseminates personally identifying information
about the person who seeks to gain access to the work protected, without providing
conspicuous notice of such collection or dissemination to such person, and without
providing such person with the capability to prevent or restrict such collection or
dissemination;

(C) the act of circumvention has the sole effect of identifying and disabling
the capability described in subparagraph (A), and has no other effect on the ability
of any person to gain access to any work; and

(D) the act of circumvention is carried out solely for the purpose of preventing
the collection or dissemination of personally identifying information about a natur-
al person who seeks to gain access to the work protected, and is not in violation of
any other law.

(2) Inapplicability to certain technological protection measures.-This subsec-
tion does not apply to a technological protection measure, or a work it protects,
that does not collect or disseminate personally identifying information and that is
disclosed to a user as not having or using such capability.

SEC. 103. INTEGRITY OF COPYRIGHT MANAGEMENT INFORMATION.

(a) False Copyright Management Information.-No person shall knowingly and with
the intent to induce, enable, facilitate, or conceal infringement-

(1) provide copyright management information that is false, or

(2) distribute or import for distribution copyright management information that
is false.

(b) Removal or Alteration of Copyright Management Information.-No person shall,
without the authority of the copyright owner or the law-

(1) intentionally remove or alter any copyright management information,

(2) distribute or import for distribution copyright management information know-
ing that the copyright management information has been removed or altered without
authority of the copyright owner or the law, or

(3) distribute, import for distribution, or publicly perform works, copies of
works, or phonorecords, knowing that copyright management information has been re-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

moved or altered without authority of the copyright owner or the law,

knowing, or, with respect to civil remedies under section 104, having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under title 17, United States Code.

(c) Definitions.-As used in this section-

(1) the terms "distribute", "publicly perform", "copies", and "phonorecords" have the meanings given those terms in title 17, United States Code; and

(2) the term "copyright management information" means any of the following information conveyed in connection with copies or phonorecords of a work or performances or displays of a work, including in digital form, except that such term does not include any personally identifying information about a user of a work or of a copy, phonorecord, performance, or display of a work:

(A) The title and other information identifying the work, including the information set forth on a notice of copyright.

(B) The name of, and other identifying information about, the author of a work.

(C) The name of, and other identifying information about, the copyright owner of the work, including the information set forth in a notice of copyright.

(D) With the exception of public performances of works by radio and television broadcast stations, the name of, and other identifying information about, a performer whose performance is fixed in a work other than an audiovisual work.

(E) With the exception of public performances of works by radio and television broadcast stations, in the case of an audiovisual work, the name of, and other identifying information about, a writer, performer, or director who is credited in the audiovisual work.

(F) Terms and conditions for use of the work.

**\*7** (G) Identifying numbers or symbols referring to such information or links to such information.

(H) Such other information as the Register of Copyrights may prescribe by regulation, except that the Register of Copyrights may not require the provision of any information concerning the user of a copyrighted work.

(d) Law Enforcement and Intelligence Activities.-This section does not prohibit any lawfully authorized investigative, protective, or intelligence activity of an officer, agent, or employee of the United States, a State, or a political subdivision of a State, or a person acting pursuant to a contract with the United States, a State, or a political subdivision of a State.

(e) Limitations on Liability.-

(1) Analog transmissions.-In the case of an analog transmission, a person who is making transmissions in its capacity as a broadcast station, or as a cable system (as defined in section 602 of the Communications Act of 1934), or someone who provides programming to such station or system, shall not be liable for a violation of subsection (b) if-

(A) avoiding the activity that constitutes such violation is not technically feasible or would create an undue financial hardship on such person; and

(B) such person did not intend, by engaging in such activity, to induce, enable, facilitate, or conceal infringement of a right under title 17, United States Code.

(2) Digital transmissions.-

(A) If a digital transmission standard for the placement of copyright management

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**


information for a category of works is set in a voluntary, consensus standard-set-
ting process involving a representative cross-section of broadcast stations or cable
systems and copyright owners of a category of works that are intended for public
performance by such stations or systems, a person identified in paragraph (1) shall
not be liable for a violation of subsection (b) with respect to the particular copy-
right management information addressed by such standard if-

(i) the placement of such information by someone other than such person is not
in accordance with such standard; and

(ii) the activity that constitutes such violation is not intended to induce,
enable, facilitate, or conceal infringement of a right under title 17, United States
Code.

(B) Until a digital transmission standard has been set pursuant to subparagraph
(A) with respect to the placement of copyright management information for a category
or works, a person identified in paragraph (1) shall not be liable for a violation
of subsection (b) with respect to such copyright management information, if the
activity that constitutes such violation is not intended to induce, enable, facilit-
ate, or conceal infringement of a right under title 17, United States Code, and if-

(i) the transmission of such information by such person would result in a per-
ceptible visual or aural degradation of the digital signal; or

(ii) the transmission of such information by such person would conflict with-

(I) an applicable government regulation relating to transmission of information
in a digital signal;

(II) an applicable industry-wide standard relating to the transmission of in-
formation in a digital signal that was adopted by a voluntary consensus standards
body prior to the effective date of this title; or

(III) an applicable industry-wide standard relating to the transmission of in-
formation in a digital signal that was adopted in a voluntary, consensus standards-
setting process open to participation by a representative cross-section of broadcast
stations or cable systems and copyright owners of a category of works that are in-
tended for public performance by such stations or systems.

(3) Definitions.-As used in this subsection-

(A) the term "broadcast station" has the meaning given that term in section 3 of
the Communications Act of 1934 (47 U.S.C. 153); and

(B) the term "cable system" has the meaning given that term in section 602 of
the Communications Act of 1934 (47 U.S.C. 522).


SEC. 104. CIVIL REMEDIES.

(a) Civil Actions.-Any person injured by a violation of section 102 or 103, or
of any regulation issued under section 102(a)(1), may bring a civil action in an ap-
propriate United States district court for such violation.

**\*8** (b) Powers of the Court.-In an action brought under subsection (a), the
court-

(1) may grant temporary and permanent injunctions on such terms as it deems
reasonable to prevent or restrain a violation, but in no event shall impose a prior
restraint on free speech or the press protected under the 1st amendment to the Con-
stitution;

(2) at any time while an action is pending, may order the impounding, on such

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

terms as it deems reasonable, of any device or product that is in the custody or
control of the alleged violator and that the court has reasonable cause to believe
was involved in a violation;

(3) may award damages under subsection (c);

(4) in its discretion may allow the recovery of costs by or against any party
other than the United States or an officer thereof;

(5) in its discretion may award reasonable attorney's fees to the prevailing
party; and

(6) may, as part of a final judgment or decree finding a violation, order the
remedial modification or the destruction of any device or product involved in the
violation that is in the custody or control of the violator or has been impounded
under paragraph (2).

(c) Award of Damages.-

(1) In general.-Except as otherwise provided in this title, a person committing
a violation of section 102 or 103, or of any regulation issued under section
102(a)(1), is liable for either-

(A) the actual damages and any additional profits of the violator, as provided
in paragraph (2), or

(B) statutory damages, as provided in paragraph (3).

(2) Actual damages.-The court shall award to the complaining party the actual
damages suffered by the party as a result of the violation, and any profits of the
violator that are attributable to the violation and are not taken into account in
computing the actual damages, if the complaining party elects such damages at any
time before final judgment is entered.

(3) Statutory damages.-

(A) At any time before final judgment is entered, a complaining party may elect
to recover an award of statutory damages for each violation of section 102, or of a
regulation issued under section 102(a)(1), in the sum of not less than $200 or more
than $2,500 per act of circumvention, device, product, component, offer, or perform-
ance of service, as the court considers just.

(B) At any time before final judgment is entered, a complaining party may elect
to recover an award of statutory damages for each violation of section 103 in the
sum of not less than $2,500 or more than $25,000.

(4) Repeated violations.-In any case in which the injured party sustains the
burden of proving, and the court finds, that a person has violated section 102 or
103, or any regulation issued under section 102(a)(1), within three years after a
final judgment was entered against the person for another such violation, the court
may increase the award of damages up to triple the amount that would otherwise be
awarded, as the court considers just.

(5) Innocent violations.-

(A) In general.-The court in its discretion may reduce or remit the total award
of damages in any case in which the violator sustains the burden of proving, and the
court finds, that the violator was not aware and had no reason to believe that its
acts constituted a violation.

(B) Nonprofit library, archives, or educational institutions.-In the case of a
nonprofit library, archives, or educational institution, the court shall remit dam-
ages in any case in which the library, archives, or educational institution sustains

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

the burden of proving, and the court finds, that the library, archives, or educa-
tional institution was not aware and had no reason to believe that its acts consti-
tuted a violation.

SEC. 105. CRIMINAL OFFENSES AND PENALTIES.

    (a) In General.-Any person who violates section 102 or 103, or any regulation
issued under section 102(a)(1), willfully and for purposes of commercial advantage
or private financial gain-
    (1) shall be fined not more than $500,000 or imprisoned for not more than 5
years, or both, for the first offense; and
    (2) shall be fined not more than $1,000,000 or imprisoned for not more than 10
years, or both, for any subsequent offense.
    **\*9** (b) Limitation for Nonprofit Library, Archives, or Educational Institu-
tion.-Subsection (a) shall not apply to a nonprofit library, archives, or education-
al institution.
    (c) Statute of Limitations.-No criminal proceeding shall be brought under this
section unless such proceeding is commenced within five years after the cause of ac-
tion arose.

SEC. 106. SAVINGS CLAUSE.

    Nothing in this title abrogates, diminishes, or weakens the provisions of, nor
provides any defense or element of mitigation in a criminal prosecution or civil ac-
tion under, any Federal or State law that prevents the violation of the privacy of
an individual in connection with the individual's use of the Internet.

SEC. 107. DEVELOPMENT AND IMPLEMENTATION OF TECHNOLOGICAL PROTECTION MEASURES.

    (a) Statement of Congressional Policy and Objective.-It is the sense of the Con-
gress that technological protection measures play a crucial role in safeguarding the
interests of both copyright owners and lawful users of copyrighted works in digital
formats, by facilitating lawful uses of such works while protecting the private
property interests of holders of rights under title 17, United States Code. Accord-
ingly, the expeditious implementation of such measures, developed by the private
sector through voluntary industry-led processes, is a key factor in realizing the
full benefits of making available copyrighted works through digital networks, in-
cluding the benefits set forth in this section.
    (b) Technological Protection Measures.-The technological protection measures re-
ferred to in subsection (a) shall include, but not be limited to, those which-
    (1) enable nonprofit libraries, for nonprofit purposes, to continue to lend to
library users copies or phonorecords that such libraries have lawfully acquired, in-
cluding the lending of such copies or phonorecords in digital formats in a manner
that prevents infringement;
    (2) effectively protect against the infringement of exclusive rights un-
der  title 17, United States Code, and facilitate the exercise of those exclusive
rights; and
    (3) promote the development and implementation of diverse methods, mechanisms,
and arrangements in the marketplace for making available copyrighted works in digit-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

al formats which provide opportunities for individual members of the public to make
lawful uses of copyrighted works in digital formats.

(c) Procedures for Developing and Implementing Technological Protection Meas-
ures.-The technological protection measures whose development and implementation the
Congress anticipates are those which-

(1) are developed pursuant to a broad consensus in an open, fair, voluntary, and
multi-industry process;

(2) are made available on reasonable and nondiscriminatory terms; and

(3) do not impose substantial costs or burdens on copyright owners or on manu-
facturers of hardware or software used in conjunction with copyrighted works in di-
gital formats.

(d) Oversight and Reporting.-(1) The Secretary of Commerce, in consultation with
the Assistant Secretary of Commerce for Communications and Information and the Re-
gister of Copyrights, shall review the impact of the enactment of section 102 of
this Act on the access of individual users to copyrighted works in digital formats
and shall report annually thereon to the Committees on Commerce and on the Judiciary
of the House of Representatives and the Committees on Commerce, Science, and Trans-
portation and on the Judiciary of the Senate.

(2) Each report under paragraph (1) shall address the following issues:

(A) The status of the development and implementation of technological protection
measures, including measures that advance the objectives of this section, and the
effectiveness of technological protection measures in protecting the private prop-
erty interests of copyright owners under title 17, United States Code.

(B) The degree to which individual lawful users of copyrighted works-

(i) have access to the Internet and digital networks generally;

(ii) are dependent upon such access for their use of copyrighted works;

(iii) have available to them other channels for obtaining and using copyrighted
works, other than the Internet and digital networks generally;

(iv) are required to pay copyright owners or intermediaries for each lawful use
of copyrighted works in digital formats to which they have access; and

(v) are able to utilize nonprofit libraries to obtain access, through borrowing
without payment by the user, to copyrighted works in digital formats.

(C) The degree to which infringement of copyrighted works in digital formats is
occurring.

**\*10** (D) Whether and the extent to which section 102, and the regulations issued
under section 102(a)(1), are asserted as a basis for liability in claims brought
against persons conducting research and development, including reverse engineering
of copyrighted works, and the extent to which such claims constitute a serious im-
pediment to the development and production of competitive goods and services.

(E) The degree to which individual users of copyrighted materials in digital
formats are able effectively to protect themselves against the use of technological
protection measures to carry out or facilitate the undisclosed collection and dis-
semination of personally identifying information concerning the access to and use of
such materials by such users.

(F) Such other issues as the Secretary of Commerce, in consultation with the As-
sistant Secretary of Commerce for Communications and Information and the Register of
Copyrights, identifies as relevant to the impact of the enactment of section 102 on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**


the access of individual users to copyrighted works in digital formats.

(3) The first report under this subsection shall be submitted not later than one year after the date of the enactment of this Act, and the last such report shall be submitted not later than three years after the date of the enactment of this Act.

(4) The reports under this subsection may include such recommendations for additional legislative action as the Secretary of Commerce and the Register of Copyrights consider advisable in order to further the objectives of this section.

SEC. 108. TECHNICAL AMENDMENTS.

(a) Definitions.- Section 101 of title 17, United States Code, is amended-

(1) by striking the definition of "Berne Convention work";

(2) in the definition  of "The 'country of origin' of a Berne Convention work"-

(A) by striking "The 'country of origin' of a Berne Convention work, for purposes of section 411, is the United States if" and inserting "For purposes of section 411, a work is a 'United States work' only if";

(B) in paragraph (1)-

(i) in subparagraph (B) by striking "nation or nations adhering to the Berne Convention" and inserting "treaty party or parties";

(ii) in subparagraph (C) by striking "does not adhere to the Berne Convention" and inserting "is not a treaty party"; and

(iii) in subparagraph (D) by striking "does not adhere to the Berne Convention" and inserting "is not a treaty party"; and

(C) in the matter following paragraph (3) by striking "For the purposes of section 411, the 'country of origin' of any other Berne Convention work is not the United States.";

(3) by inserting after the definition of "fixed" the following:

"The 'Geneva Phonograms Convention' is the Convention for the Protection of Producers of Phonograms Against Unauthorized Duplication of Their Phonograms, concluded at Geneva, Switzerland, on October 29, 1971.";

(4) by inserting after the definition of "including" the following:

"An 'international agreement' is-

"(1) the Universal Copyright Convention;

"(2) the Geneva Phonograms Convention;

"(3) the Berne Convention;

"(4) the WTO Agreement;

"(5) the WIPO Copyright Treaty;

"(6) the WIPO Performances and Phonograms Treaty; and

"(7) any other copyright treaty to which the United States is a party.";

(5) by inserting after the definition of "transmit" the following:

"A 'treaty party' is a country or intergovernmental organization other than the United States that is a party to an international agreement.";

(6) by inserting after the definition of "widow" the following:

"The 'WIPO Copyright Treaty' is the WIPO Copyright Treaty concluded at Geneva, Switzerland, on December 20, 1996.";

(7) by inserting after the definition of "The 'WIPO Copyright Treaty'" the following:

"The 'WIPO Performances and Phonograms Treaty' is the WIPO Performances and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II)                                                Page 15
H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

Phonograms Treaty concluded at Geneva, Switzerland, on December 20, 1996."; and

(8) by inserting after the definition of "work made for hire" the following:

"The terms 'WTO Agreement' and 'WTO member country' have the meanings given those terms in paragraphs (9) and (10), respectively, of section 2 of the Uruguay Round Agreements Act.".

**\*11** (b) Subject Matter of Copyright; National Origin.-Section 104 of title 17, United States Code, is amended-

(1) in subsection (b)-

(A) in paragraph (1) by striking "foreign nation that is a party to a copyright treaty to which the United States is also a party" and inserting "treaty party";

(B) in paragraph (2) by striking "party to the Universal Copyright Convention" and inserting "treaty party";

(C) by redesignating paragraph (5) as paragraph (6);

(D) by redesignating paragraph (3) as paragraph (5) and inserting it after paragraph (4);

(E) by inserting after paragraph (2) the following:

"(3) the work is a sound recording that was first fixed in a treaty party; or";

(F) in paragraph (4) by striking "Berne Convention work" and inserting "pictorial, graphic, or sculptural work that is incorporated in a building or other structure, or an architectural work that is embodied in a building and the building or structure is located in the United States or a treaty party"; and

(G) by inserting after paragraph (6), as so redesignated, the following:

"For purposes of paragraph (2), a work that is published in the United States or a treaty party within 30 days after publication in a foreign nation that is not a treaty party shall be considered to be first published in the United States or such treaty party, as the case may be."; and

(2) by adding at the end the following new subsection:

"(d) Effect of Phonograms Treaties.-Notwithstanding the provisions of subsection (b), no works other than sound recordings shall be eligible for protection under this title solely by virtue of the adherence of the United States to the Geneva Phonograms Convention or the WIPO Performances and Phonograms Treaty.".

(c) Copyright in Restored Works.-Section 104A(h) of title 17, United States Code, is amended-

(1) in paragraph (1), by striking subparagraphs (A) and (B) and inserting the following:

"(A) a nation adhering to the Berne Convention;

"(B) a WTO member country;

"(C) a nation adhering to the WIPO Copyright Treaty;

"(D) a nation adhering to the WIPO Performances and Phonograms Treaty; or

"(E) subject to a Presidential proclamation under subsection (g).";

(2) by amending paragraph (3) to read as follows:

"(3) The term 'eligible country' means a nation, other than the United States, that-

"(A) becomes a WTO member country after the date of the enactment of the Uruguay Round Agreements Act;

"(B) on such date of enactment is, or after such date of enactment becomes, a nation adhering to the Berne Convention;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

    "(C) adheres to the WIPO Copyright Treaty;
    "(D) adheres to the WIPO Performances and Phonograms Treaty; or
    "(E) after such date of enactment becomes subject to a proclamation under sub-
section (g).";
    (3) in paragraph (6)-
    (A) in subparagraph (C)(iii) by striking "and" after the semicolon;
    (B) at the end of subparagraph (D) by striking the period and inserting  ";
and"; and
    (C) by adding after subparagraph (D) the following:
    "(E) if the source country for the work is an eligible country solely by virtue
of its adherence to the WIPO Performances and Phonograms Treaty, is a sound record-
ing.";
    (4) in paragraph (8)(B)(i)-
    (A) by inserting "of which" before "the majority"; and
    (B) by striking "of eligible countries"; and
    (5) by striking paragraph (9).
    (d) Registration and Infringement Actions.-Section 411(a) of title 17, United
States Code, is amended in the first sentence-
    (1) by striking "actions for infringement of copyright in Berne Convention works
whose country of origin is not the United States and"; and
    (2) by inserting "United States" after "no action for infringement of the copy-
right in any".
    **\*12** (e) Statute of Limitations.-Section 507(a) of title 17, United State Code,
is amended by striking "No" and inserting "Except as expressly provided otherwise in
this title, no".

SEC. 109. EFFECTIVE DATE.

    (a) In General.-Subject to subsection (b), the amendments made by this title
shall take effect on the date of the enactment of this Act.
    (b) Amendments Relating to Certain International Agreements.-(1) The following
shall take effect upon the entry into force of the WIPO Copyright Treaty with re-
spect to the United States:
    (A) Paragraph (5) of the definition of "international agreement" contained in
section 101 of title 17, United States Code, as amended by section 108(a)(4) of this
Act.
    (B) The amendment made by section 108(a)(6) of this Act.
    (C) Subparagraph (C) of section 104A(h)(1) of title 17, United States Code, as
amended by section 108(c)(1) of this Act.
    (D) Subparagraph (C) of section 104A(h)(3) of title 17, United States Code, as
amended by section 108(c)(2) of this Act.
    (2) The following shall take effect upon the entry into force of the WIPO Per-
formances and Phonograms Treaty with respect to the United States:
    (A) Paragraph (6) of the definition of "international agreement" contained in
section 101 of title 17, United States Code, as amended by section 108(a)(4) of this
Act.
    (B) The amendment made by section 108(a)(7) of this Act.
    (C) The amendment made by section 108(b)(2) of this Act.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**


    (D) Subparagraph (D) of section 104A(h)(1) of title 17, United States Code, as
amended by section 108(c)(1) of this Act.
    (E) Subparagraph (D) of section 104A(h)(3) of title 17, United States Code, as
amended by section 108(c)(2) of this Act.
    (F) The amendments made by section 108(c)(3) of this Act.

             TITLE II-INTERNET COPYRIGHT INFRINGEMENT LIABILITY

SEC. 201. SHORT TITLE.

    This title may be cited as the "Internet Copyright Infringement Liability Clari-
fication Act of 1998".

SEC. 202. LIMITATIONS ON LIABILITY FOR INTERNET COPYRIGHT INFRINGEMENT.

    (a) In General.-Chapter 5 of title 17, United States Code, is amended by adding
after section 511 the following new section:

"S 512. Liability of service providers for online infringement of copyright

    "(a) Digital Network Communications.-A service provider shall not be liable for
monetary relief, or except as provided in subsection (i) for injunctive or other
equitable relief, for infringement for the provider's transmitting, routing, or
providing connections for, material through a system or network controlled or oper-
ated by or for the service provider, or the intermediate and transient storage of
such material in the course of such transmitting, routing or providing connections,
if-
    "(1) it was initiated by or at the direction of a person other than the service
provider;
    "(2) it is carried out through an automatic technical process without selection
of such material by the service provider;
    "(3) the service provider does not select the recipients of such material except
as an automatic response to the request of another;
    "(4) no such copy of such material made by the service provider is maintained on
the system or network in a manner ordinarily accessible to anyone other than anti-
cipated recipients, and no such copy is maintained on the system or network in a
manner ordinarily accessible to the anticipated recipients for a longer period than
is reasonably necessary for the communication; and
    "(5) the material is transmitted without modification to its content.
    "(b) System Caching.-A service provider shall not be liable for monetary relief,
or except as provided in subsection (i) for injunctive or other equitable relief,
for infringement for the intermediate and temporary storage of material on the sys-
tem or network controlled or operated by or for the service provider: Provided,
That-
    "(1) such material is made available online by a person other than such service
provider,
    **13 "(2) such material is transmitted from the person described in paragraph (1)
through such system or network to someone other than that person at the direction of
such other person,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**


   "(3) the storage is carried out through an automatic technical process for the
purpose of making such material available to users of such system or network who
subsequently request access to that material from the person described in paragraph
(1):
   Provided further, That-
   "(4) such material is transmitted to such subsequent users without modification
to its content from the manner in which the material otherwise was transmitted from
the person described in paragraph (1);
   "(5) such service provider complies with rules concerning the refreshing, re-
loading or other updating of such material when specified by the person making that
material available online in accordance with an accepted industry standard data com-
munications protocol for the system or network through which that person makes the
material available: Provided further, That the rules are not used by the person de-
scribed in paragraph (1) to prevent or unreasonably impair such intermediate stor-
age;
   "(6) such service provider does not interfere with the ability of technology as-
sociated with such material that returns to the person described in paragraph (1)
the information that would have been available to such person if such material had
been obtained by such subsequent users directly from such person: Provided further,
That such technology-
   "(A) does not significantly interfere with the performance of the provider's
system or network or with the intermediate storage of the material;
   "(B) is consistent with accepted industry standard communications protocols; and
   "(C) does not extract information from the provider's system or network other
than the information that would have been available to such person if such material
had been accessed by such users directly from such person;
   "(7) either-
   "(A) the person described in paragraph (1) does not currently condition access
to such material; or
   "(B) if access to such material is so conditioned by such person, by a current
individual pre-condition, such as a pre-condition based on payment of a fee, or pro-
vision of a password or other information, the service provider permits access to
the stored material in significant part only to users of its system or network that
have been so authorized and only in accordance with those conditions; and
   "(8) if the person described in paragraph (1) makes that material available on-
line without the authorization of the copyright owner, then the service provider re-
sponds expeditiously to remove, or disable access to, the material that is claimed
to be infringing upon notification of claimed infringements described in subsection
(c)(3): Provided further, That the material has previously been removed from the
originating site, and the party giving the notification includes in the notification
a statement confirming that such material has been removed or access to it has been
disabled or ordered to be removed or have access disabled.
   "(c) Information Stored on Service Providers.-
   "(1) In general.-A service provider shall not be liable for monetary relief, or
except as provided in subsection (i) for injunctive or other equitable relief, for
infringement for the storage at the direction of a user of material that resides on
a system or network controlled or operated by or for the service provider, if the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**


service provider-
    "(A)(i) does not have actual knowledge that the material or activity is in-
fringing,
    "(ii) in the absence of such actual knowledge, is not aware of facts or circum-
stances from which infringing activity is apparent, or
    "(iii) if upon obtaining such knowledge or awareness, the service provider acts
expeditiously to remove or disable access to, the material;
    "(B) does not receive a financial benefit directly attributable to the in-
fringing activity, where the service provider has the right and ability to control
such activity; and
    "(C) in the instance of a notification of claimed infringement as described in
paragraph (3), responds expeditiously to remove, or disable access to, the material
that is claimed to be infringing or to be the subject of infringing activity.
    **\*14** "(2) Designated agent.-The limitations on liability established in this sub-
section apply only if the service provider has designated an agent to receive noti-
fications of claimed infringement described in paragraph (3), by substantially mak-
ing the name, address, phone number, electronic mail address of such agent, and oth-
er contact information deemed appropriate by the Register of Copyrights, available
through its service, including on its website, and by providing such information to
the Copyright Office.  The Register of Copyrights shall maintain a current directory
of agents available to the public for inspection, including through the Internet, in
both electronic and hard copy formats.
    "(3) Elements of notification.-
    "(A) To be effective under this subsection, a notification of claimed infringe-
ment means any written communication provided to the service provider's designated
agent that includes substantially the following-
    "(i) a physical or electronic signature of a person authorized to act on behalf
of the owner of an exclusive right that is allegedly infringed;
    "(ii) identification of the copyrighted work claimed to have been infringed,
or, if multiple such works at a single online site are covered by a single notifica-
tion, a representative list of such works at that site;
    "(iii) identification of the material that is claimed to be infringing or to be
the subject of infringing activity that is to be removed or access to which is to be
disabled, and information reasonably sufficient to permit the service provider to
locate the material;
    "(iv) information reasonably sufficient to permit the service provider to con-
tact the complaining party, such as an address, telephone number, and, if available
an electronic mail address at which the complaining party may be contacted;
    "(v) a statement that the complaining party has a good faith belief that use of
the material in the manner complained of is not authorized by the copyright owner,
or its agent, or the law; and
    "(vi) a statement that the information in the notification is accurate, and un-
der penalty of perjury, that the complaining party has the authority to enforce the
owner's rights that are claimed to be infringed.
    "(B) A notification from the copyright owner or from a person authorized to act
on behalf of the copyright owner that fails substantially to conform to the provi-
sions of paragraph (3)(A) shall not be considered under paragraph (1)(A) in determ-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

ining whether a service provider has actual knowledge or is aware of facts or cir-
cumstances from which infringing activity is apparent: Provided, That the provider
promptly attempts to contact the complaining party or takes other reasonable steps
to assist in the receipt of notice under paragraph (3)(A) when the notice is
provided to the service provider's designated agent and substantially satisfies the
provisions of paragraphs (3)(A) (ii), (iii), and (iv).

"(d) Information Location Tools.-A service provider shall not be liable for mon-
etary relief, or except as provided in subsection (i) for injunctive or other equit-
able relief, for infringement for the provider referring or linking users to an on-
line location containing infringing material or activity by using information loca-
tion tools, including a directory, index, reference, pointer or hypertext link, if
the provider-

"(1) does not have actual knowledge that the material or activity is infringing
or, in the absence of such actual knowledge, is not aware of facts or circumstances
from which infringing activity is apparent;

"(2) does not receive a financial benefit directly attributable to the in-
fringing activity, where the service provider has the right and ability to control
such activity; and

"(3) responds expeditiously to remove or disable the reference or link upon no-
tification of claimed infringement as described in subsection (c)(3): Provided, That
for the purposes of this paragraph, the element in subsection (c)(3)(A)(iii) shall
be identification of the reference or link, to material or activity claimed to be
infringing, that is to be removed or access to which is to be disabled, and informa-
tion reasonably sufficient to permit the service provider to locate such reference
or link.

"(e) Misrepresentations.-Any person who knowingly materially misrepresents under
this section-

"(1) that material or activity is infringing, or

"(2) that material or activity was removed or disabled by mistake or misidenti-
fication,

shall be liable for any damages, including costs and attorneys' fees, incurred
by the alleged infringer, by any copyright owner or copyright owner's authorized li-
censee, **15** or by the service provider, who is injured by such misrepresentation, as
the result of the service provider relying upon such misrepresentation in removing
or disabling access to the material or activity claimed to be infringing, or in re-
placing the removed material or ceasing to disable access to it.

"(f) Replacement of Removed or Disabled Material and Limitation on Other Liabil-
ity.-

"(1) Subject to paragraph (2) of this subsection, a service provider shall not
be liable to any person for any claim based on the service provider's good faith
disabling of access to, or removal of, material or activity claimed to be infringing
or based on facts or circumstances from which infringing activity is apparent, re-
gardless of whether the material or activity is ultimately determined to be in-
fringing.

"(2) Paragraph (1) of this subsection shall not apply with respect to material
residing at the direction of a subscriber of the service provider on a system or
network controlled or operated by or for the service provider that is removed, or to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

which access is disabled by the service provider pursuant to a notice provided under
subsection (c)(1)(C), unless the service provider-

"(A) takes reasonable steps promptly to notify the subscriber that it has re-
moved or disabled access to the material;

"(B) upon receipt of a counter notice as described in paragraph (3), promptly
provides the person who provided the notice under subsection (c)(1)(C) with a copy
of the counter notice, and informs such person that it will replace the removed ma-
terial or cease disabling access to it in ten business days; and

"(C) replaces the removed material and ceases disabling access to it not less
than 10, nor more than 14, business days following receipt of the counter notice,
unless its designated agent first receives notice from the person who submitted the
notification under subsection (c)(1)(C) that such person has filed an action seeking
a court order to restrain the subscriber from engaging in infringing activity relat-
ing to the material on the service provider's system or network.

"(3) To be effective under this subsection, a counter notification means any
written communication provided to the service provider's designated agent that in-
cludes substantially the following:

"(A) A physical or electronic signature of the subscriber.

"(B) Identification of the material that has been removed or to which access has
been disabled and the location at which such material appeared before it was removed
or access was disabled.

"(C) A statement under penalty of perjury that the subscriber has a good faith
belief that the material was removed or disabled as a result of mistake or misiden-
tification of the material to be removed or disabled.

"(D) The subscriber's name, address and telephone number, and a statement that
the subscriber consents to the jurisdiction of Federal Court for the judicial dis-
trict in which the address is located, or if the subscriber's address is outside of
the United States, for any judicial district in which the service provider may be
found, and that the subscriber will accept service of process from the person who
provided notice under subsection (c)(1)(C) or agent of such person.

"(4) A service provider's compliance with paragraph (2) shall not subject the
service provider to liability for copyright infringement with respect to the materi-
al identified in the notice provided under subsection (c)(1)(C).

"(g) Identification of Direct Infringer.-The copyright owner or a person author-
ized to act on the owner's behalf may request an order for release of identification
of an alleged infringer by filing-

"(1) a copy of a notification described in subsection (c)(3)(A), including a
proposed order, and

"(2) a sworn declaration that the purpose of the order is to obtain the identity
of an alleged infringer and that such information will only be used for the purpose
of this title, with the clerk of any United States district court.

The order shall authorize and order the service provider receiving the notifica-
tion to disclose expeditiously to the copyright owner or person authorized by the
copyright owner information sufficient to identify the alleged direct infringer of
the material described in the notification to the extent such information is avail-
able to the service provider.  The order shall be expeditiously issued if the accom-
panying notification satisfies the provisions of subsection (c)(3)(A) and the accom-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

panying declaration is properly executed. Upon receipt of the order, either accompa-
nying or subsequent to the receipt of a notification described in subsection
(c)(3)(A), a service provider shall expeditiously give to the copyright owner or
person authorized by the **\*16** copyright owner the information required by the order,
notwithstanding any other provision of law and regardless of whether the service
provider responds to the notification.

   "(h) Conditions for Eligibility.-

   "(1) Accommodation of technology.-The limitations on liability established by
this section shall apply only if the service provider-

   "(A) has adopted and reasonably implemented, and informs subscribers of the ser-
vice of, a policy for the termination of subscribers of the service who are repeat
infringers; and

   "(B) accommodates and does not interfere with standard technical measures as
defined in this subsection.

   "(2) Definition.-As used in this section, 'standard technical measures' are
technical measures, used by copyright owners to identify or protect copyrighted
works, that-

   "(A) have been developed pursuant to a broad consensus of copyright owners and
service providers in an open, fair, voluntary, multi-industry standards process;

   "(B) are available to any person on reasonable and nondiscriminatory terms; and

   "(C) do not impose substantial costs on service providers or substantial burdens
on their systems or networks.

   "(i) Injunctions.-The following rules shall apply in the case of any application
for an injunction under section 502 against a service provider that is not subject
to monetary remedies by operation of this section.

   "(1) Scope of relief.-

   "(A) With respect to conduct other than that which qualifies for the limitation
on remedies as set forth in subsection (a), the court may only grant injunctive re-
lief with respect to a service provider in one or more of the following forms-

      "(i) an order restraining it from providing access to infringing material or
activity residing at a particular online site on the provider's system or network;

      "(ii) an order restraining it from providing access to an identified subscriber
of the service provider's system or network who is engaging in infringing activity
by terminating the specified accounts of such subscriber; or

      "(iii) such other injunctive remedies as the court may consider necessary to
prevent or restrain infringement of specified copyrighted material at a particular
online location: Provided, That such remedies are the least burdensome to the ser-
vice provider that are comparably effective for that purpose.

   "(B) If the service provider qualifies for the limitation on remedies described
in subsection (a), the court may only grant injunctive relief in one or both of the
following forms-

      "(i) an order restraining it from providing access to an identified subscriber
of the service provider's system or network who is using the provider's service to
engage in infringing activity by terminating the specified accounts of such sub-
scriber; or

      "(ii) an order restraining it from providing access, by taking specified reas-
onable steps to block access, to a specific, identified, foreign online location.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

"(2) Considerations.-The court, in considering the relevant criteria for in-
junctive relief under applicable law, shall consider-

"(A) whether such an injunction, either alone or in combination with other such
injunctions issued against the same service provider under this subsection, would
significantly burden either the provider or the operation of the provider's system
or network;

"(B) the magnitude of the harm likely to be suffered by the copyright owner in
the digital network environment if steps are not taken to prevent or restrain the
infringement;

"(C) whether implementation of such an injunction would be technically feasible
and effective, and would not interfere with access to noninfringing material at oth-
er online locations; and

"(D) whether other less burdensome and comparably effective means of preventing
or restraining access to the infringing material are available.

"(3) Notice and ex parte orders.-Injunctive relief under this subsection shall
not be available without notice to the service provider and an opportunity for such
provider to appear, except for orders ensuring the preservation of evidence **\*17** or
other orders having no material adverse effect on the operation of the service pro-
vider's communications network.

"(j) Definitions.-

"(1)(A) As used in subsection (a), the term 'service provider' means an entity
offering the transmission, routing or providing of connections for digital online
communications, between or among points specified by a user, of material of the

"(B) As used in any other subsection of this section, the term 'service pro-
vider' means a provider of online services or network access, or the operator of fa-
cilities therefor, and includes an entity described in the preceding paragraph of
this subsection.

"(2) As used in this section, the term 'monetary relief' means damages, costs,
attorneys' fees, and any other form of monetary payment.

"(k) Other Defenses Not Affected.-The failure of a service provider's conduct to
qualify for limitation of liability under this section shall not bear adversely upon
the consideration of a defense by the service provider that the service provider's
conduct is not infringing under this title or any other defense.

"(l) Protection of Privacy.-Nothing in this section shall be construed to condi-
tion the applicability of subsections (a) through (d) on-

"(1) a service provider monitoring its service or affirmatively seeking facts
indicating infringing activity except to the extent consistent with a standard tech-
nical measure complying with the provisions of subsection (h); or

"(2) a service provider accessing, removing, or disabling access to material
where such conduct is prohibited by law.

"(m) Rule of Construction.-Subsections (a), (b), (c), and (d) are intended to
describe separate and distinct functions for purposes of analysis under this sec-
tion.  Whether a service provider qualifies for the limitation on liability in any
one such subsection shall be based solely on the criteria in each such subsection
and shall not affect a determination of whether such service provider qualifies for
the limitations on liability under any other such subsection.".

(b) Conforming Amendment.-The table of sections for chapter 5 of title 17,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**


United States Code, is amended by adding at the end the following:
  "512. Liability of service providers for online infringement of copyright.".

SEC. 203. LIMITATIONS ON EXCLUSIVE RIGHTS; COMPUTER PROGRAMS.

   Section 117 of title 17, United States Code, is amended-
   (1) by striking "Notwithstanding" and inserting the following:
   "(a) Making of Additional Copy or Adaptation by Owner of Copy.- Notwithstand-
ing";
   (2) by striking "Any exact" and inserting the following:
   "(b) Lease, Sale, or Other Transfer of Additional Copy or Adaptation.-Any ex-
act"; and
   (3) by adding at the end the following:
   "(c) Machine Maintenance or Repair.-Notwithstanding the provisions of section
106, it is not an infringement for the owner or lessee of a machine to make or au-
thorize the making of a copy of a computer program if such copy is made solely by
virtue of the activation of a machine that lawfully contains an authorized copy of
the computer program, for purposes only of maintenance or repair of that machine,
if-
   "(1) such new copy is used in no other manner and is destroyed immediately after
the maintenance or repair is completed; and
   "(2) with respect to any computer program or part thereof that is not necessary
for that machine to be activated, such program or part thereof is not accessed or
used other than to make such new copy by virtue of the activation of the machine.
   "(d) Definitions.-For purposes of this section-
   "(1) the 'maintenance' of a machine is the servicing of the machine in order to
make it work in accordance with its original specifications and any changes to those
specifications authorized for that machine; and
   "(2) the 'repair' of a machine is the restoring of the machine to the state of
working in accordance with its original specifications and any changes to those spe-
cifications authorized for that machine.".

  SEC. 204. LIABILITY OF EDUCATIONAL INSTITUTIONS FOR ONLINE INFRINGEMENT OF COPY-
RIGHT.

   (a) Recommendations by Register of Copyrights.-Not later than six months after
the date of the enactment of this Act, the Register of Copyrights, after consulta-
tion **18 with representatives of copyright owners and nonprofit educational institu-
tions, shall submit to the Congress recommendations regarding the liability of non-
profit educational institutions for copyright infringement committed with the use of
computer systems for which such an institution is a service provider, as that term
is defined in section 512 of title 17, United States Code (as added by section 202
of this Act), including recommendations for legislation that the Register of Copy-
rights considers appropriate regarding such liability, if any.
   (b) Factors.-In formulating recommendations under subsection (a), the Register
of Copyrights shall consider, where relevant-
   (1) current law regarding the direct, vicarious, and contributory liability of
nonprofit educational institutions for infringement by faculty, administrative em-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II)                                                   Page 25
H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

ployees, students, graduate students, and students who are employees of such non-
profit educational institutions;

(2) other users of their computer systems for whom nonprofit educational insti-
tutions may be responsible;

(3) the unique nature of the relationship between nonprofit educational institu-
tions and faculty;

(4) what policies nonprofit educational institutions should adopt regarding
copyright infringement by users of their computer systems;

(5) what technological measures are available to monitor infringing uses;

(6) what monitoring of their computer systems by nonprofit educational institu-
tions is appropriate;

(7) what due process nonprofit educational institutions should afford in dis-
abling access by users of their computer systems who are alleged to have committed
copyright infringement;

(8) what distinctions, if any, should be drawn between computer systems which
may be accessed from outside the nonprofit educational systems, those which may not,
and combinations thereof;

(9) the tradition of academic freedom; and

(10) such other issues relating to the liability of nonprofit educational insti-
tutions for copyright infringement committed with the use of computer systems for
which such an institution is a service provider that the Register considers appro-
priate.

SEC. 205. EVALUATION OF IMPACT OF COPYRIGHT LAW AND AMENDMENTS ON ELECTRONIC COM-
MERCE AND TECHNOLOGICAL DEVELOPMENT.

(a) Findings.-In order to maintain strong protection for intellectual property
and promote the development of electronic commerce and the technologies to support
that commerce, the Congress must have accurate and current information on the ef-
fects of intellectual property protection on electronic commerce and technology. The
emergence of digital technology and the proliferation of copyrighted works in digit-
al media, along with the amendments to copyright law contained in this Act, make it
appropriate for the Congress to review these issues to ensure that neither copyright
law nor electronic commerce inhibits the development of the other.

(b) Evaluation by Secretary of Commerce.-The Secretary of Commerce, in consulta-
tion with the Assistant Secretary of Commerce for Communications and Information and
the Register of Copyrights, shall evaluate-

(1) the effects of this Act and the amendments made by this Act on the develop-
ment of electronic commerce and associated technology; and

(2) the relationship between existing and emergent technology and existing copy-
right law.

(c) Report to Congress.-The Secretary of Commerce shall, not later than 1 year
after the date of the enactment of this Act, submit to the Congress a report on the
evaluation conducted under subsection (b), including any legislative recommendations
the Secretary may have.

SEC. 206.  EFFECTIVE DATE.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**


    This title and the amendments made by this title shall take effect on the date
of the enactment of this Act.

    TITLE III-EPHEMERAL RECORDINGS; DISTANCE EDUCATION; EXEMPTION FOR LIBRARIES AND
                                    ARCHIVES


SEC. 301.  EPHEMERAL RECORDINGS.

    Section 112(a) of title 17, United States Code, is amended-
    **\*19** (1) by redesignating paragraphs (1), (2), and (3) as subparagraphs (A), (B),
and (C), respectively;
    (2) by inserting "(1)" after "(a)"; and
    (3) by inserting after "114(a)," the following: "or for a transmitting organiza-
tion that is a broadcast radio or television station licensed as such by the
    (4) by adding at the end the following:
    "(2) In a case in which a transmitting organization entitled to make a copy or
phonorecord under paragraph (1) in connection with the transmission to the public of
a performance or display of a work described in that paragraph is prevented from
making such copy or phonorecord by reason of the application by the copyright owner
of technical measures that prevent the reproduction of the work, the copyright owner
shall make available to the transmitting organization the necessary means for per-
mitting the making of such copy or phonorecord within the meaning of that paragraph,
if it is technologically feasible and economically reasonable for the copyright own-
er to do so. If the copyright owner fails to do so in a timely manner in light of
the transmitting organization's reasonable business requirements, the transmitting
organization shall not be liable for a violation of the regulations issued under
section 102(a)(1)(A) of the WIPO Copyright Treaties Implementation Act for engaging
in such activities as are necessary to make such copies or phonorecords as permitted
under paragraph (1) of this subsection.".

SEC. 302.  LIMITATIONS ON EXCLUSIVE RIGHTS;  DISTANCE EDUCATION.

    (a) Recommendations by National Telecommunications and Information Administra-
tion.-Not later than 6 months after the date of the enactment of this Act, the As-
sistant Secretary of Commerce for Communications and Information, after consultation
with representatives of copyright owners, nonprofit educational institutions, and
nonprofit libraries and archives, shall submit to the Congress recommendations on
how to promote distance education through digital technologies, including interact-
ive digital networks, while maintaining an appropriate balance between the rights of
copyright owners and the needs of users of copyrighted works.  Such recommendations
shall include any legislation the Assistant Secretary considers appropriate to
achieve the foregoing objective.
    (b) Factors.-In formulating recommendations under subsection (a), the Assistant
Secretary of Commerce for Communications and Information shall consider-
    (1) the need for an exemption from exclusive rights of copyright owners for dis-
tance education through digital networks;
    (2) the categories of works to be included under any distance education exemp-
tion;

                    © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

(3) the extent of appropriate quantitative limitations on the portions of works
that may be used under any distance education exemption;

(4) the parties who should be entitled to the benefits of any distance education
exemption;

(5) the parties who should be designated as eligible recipients of distance edu-
cation materials under any distance education exemption;

(6) whether and what types of technological measures can or should be employed
to safeguard against unauthorized access to, and use or retention of, copyrighted
materials as a condition to eligibility for any distance education exemption, in-
cluding, in light of developing technological capabilities, the exemption set out in
section 110(2) of title 17, United States Code;

(7) the extent to which the availability of licenses for the use of copyrighted
works in distance education through interactive digital networks should be con-
sidered in assessing eligibility for any distance education exemption; and

(8) such other issues relating to distance education through interactive digital
networks that the Assistant Secretary considers appropriate.

SEC. 303. EXEMPTION FOR LIBRARIES AND ARCHIVES.

Section 108 of title 17, United States Code, is amended-

(1) in subsection (a)-

(A) by striking "Notwithstanding" and inserting "Except as otherwise provided in
this title and notwithstanding";

(B) by inserting after "no more than one copy or phonorecord of a work" the fol-
lowing: ", except as provided in subsections (b) and (c)"; and

(C) in paragraph (3) by inserting after "copyright" the following: "that appears
on the copy or phonorecord that is reproduced under the provisions of this section,
or includes a legend stating that the work may be protected by copyright if no such
notice can be found on the copy or phonorecord that is reproduced under the provi-
sions of this section";

**\*20** (2) in subsection (b)-

(A) by striking "a copy or phonorecord" and inserting "three copies or phonore-
cords";

(B) by striking "in facsimile form"; and

(C) by striking "if the copy or phonorecord reproduced is currently in the col-
lections of the library or archives." and inserting "if-

"(1) the copy or phonorecord reproduced is currently in the collections of the
library or archives; and

"(2) any such copy or phonorecord that is reproduced in digital format is not
otherwise distributed in that format and is not made available to the public in that
format outside the premises of the library or archives."; and

(3) in subsection (c)-

(A) by striking "a copy or phonorecord" and inserting "three copies or phonore-
cords";

(B) by striking "in facsimile form";

(C) by inserting "or if the existing format in which the work is stored has be-
come obsolete," after "stolen,"; and

(D) by striking "if the library or archives has, after a reasonable effort, de-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

termined that an unused replacement cannot be obtained at a fair price." and insert-
ing "if-

"(1) the library or archives has, after a reasonable effort, determined that an
unused replacement cannot be obtained at a fair price; and

"(2) any such copy or phonorecord that is reproduced in digital format is not
made available to the public in that format except for use on the premises of the
library or archives in lawful possession of such copy."; and

(E) by adding at the end the following:

"For purposes of this subsection, a format shall be considered obsolete if the
machine or device necessary to render perceptible a work stored in that format is no
longer manufactured or is no longer reasonably available in the commercial market-
place.".

TITLE IV-RELATED PROVISIONS

SEC. 401. REPORT BY NATIONAL TELECOMMUNICATIONS AND INFORMATION ADMINISTRATION.

Not later than 6 months after the date of the enactment of this Act, the Assist-
ant Secretary of Commerce for Communications and Information shall report to the
Congress on appropriate mechanisms to encourage the development of access protocols,
encryption testing methods, and security testing methods which would allow lawful
access to, with appropriate safeguards to prevent the unlawful copying of, encrypted
works. The Assistant Secretary shall include in such report recommendations on pro-
posed amendments to this Act, if any, for achieving such result and for mechanisms
to ensure that such safeguards-

(1) would be developed pursuant to a broad consensus of copyright owners and
cryptographic researchers and security administrators in an open, fair, voluntary
standards-setting process;

(2) to the extent feasible, would protect copyright owners against the unauthor-
ized distribution or reproduction of their encrypted works; and

(3) would not limit encryption research, to the extent such research is permit-
ted by law as of the enactment of this Act.

PURPOSE AND SUMMARY

The purpose of H.R. 2281, the Digital Millennium Copyright Act of 1998, is to im-
plement two international treaties (i.e., the "Copyright Treaty," and the "Perform-
ances and Phonograms Treaty") signed by the United States and more than 125 other
countries before the World Intellectual Property Organization (WIPO). The Clinton
Administration's WIPO Treaties implementing legislation would have amended Title 17
of the United States Code to grant copyright owners a new right against "circumven-
tion" of "technological protection measures," and to establish new provisions deal-
ing with the integrity of "copyright management information." As reported by the
Committee on the Judiciary, H.R. 2281 included **21 two titles: Title I would imple-
ment the two WIPO treaties; and Title II would provide for limitations on copyright
infringement liability for on-line and other service providers.

Title I of H.R. 2281, as reported by the Committee on Commerce, also would imple-
ment the WIPO treaties, but through free-standing provisions of law rather than as

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

amendments to Title 17. Title II, as amended by the Committee on Commerce, includes
comprehensive provisions addressing copyright infringement liability for on-line and
other service providers. Title III, as added by the Committee on Commerce, would ad-
dress ephemeral recordings, the use of computer and other networks to foster dis-
tance learning, and exemptions for libraries and archives to permit them to use the
latest technology to preserve deteriorating manuscripts and other works. With these
proposed revisions, the Committee believes it has appropriately balanced the in-
terests of content owners, on-line and other service providers, and information
users in a way that will foster the continued development of electronic commerce and
the growth of the Internet.

BACKGROUND AND NEED FOR LEGISLATION

LEGISLATIVE HISTORY

   Much like the agricultural and industrial revolutions that preceded it, the digit-
al revolution has unleashed a wave of economic prosperity and job growth. Today, the
information technology industry is developing versatile and robust products to en-
hance the lives of individuals throughout the world, and our telecommunications in-
dustry is developing new means of distributing information to these consumers in
every part of the globe. In this environment, the development of new laws and regu-
lations will have a profound impact on the growth of electronic commerce and the In-
ternet.

   In recognition of these developments, and as part of the effort to begin updating
national laws for the digital era, delegates from over 150 countries (including the
United States) convened in December 1996 to negotiate the Copyright Treaty and the
Performances and Phonograms Treaty under the auspices of the World Intellectual
Property Organization (WIPO). In July 1997, the Clinton Administration submitted the
treaties to the Senate for ratification and submitted proposed implementing legisla-
tion to both the House and the Senate.

   On May 22, 1998, the Committee on the Judiciary reported H.R. 2281, the  "WIPO
Copyright Treaties Implementation Act" to the House. H.R. 2281 was sequentially re-
ferred to the Committee on Commerce for its consideration, initially for a period
not to extend beyond June 19, 1998. Meanwhile, on May 14, 1998, the Senate adopted
S. 2037, the "Digital Millennium Copyright Act." The Senate included provisions to
explicitly authorize reverse engineering for purposes of achieving interoperability
between computer products. The Senate also added a provision to ensure that librari-
ans and archivists could use the latest technology to preserve deteriorating
manuscripts and other works. It also added a so-called "no mandate" provision with
respect to the design of consumer electronics, telecommunications, and computer
products.

   **\*22** On June 5, 1998, the Subcommittee on Telecommunications, Trade, and Consumer
Protection held a legislative hearing on H.R. 2281. The Committee had been advised
that both H.R. 2281, as reported by the Committee on the Judiciary, and S. 2037, as
passed by the Senate, were "compromises" that enjoyed "broad support." But it became
apparent at the hearing that both bills faced significant opposition from many
private and public sector interests, including libraries, institutions of higher

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

learning, consumer electronics and computer product manufacturers, and others with a
vital stake in the growth of electronic commerce and the Internet. In light of the
serious concerns raised at the hearing, and in recognition of the complexity of the
issues posed by the legislation, Chairman Bliley requested that the Committee's re-
ferral be further extended. The Committee's referral was subsequently extended, for
a period not to extend beyond July 22, 1998.

PROMOTING ELECTRONIC COMMERCE

The Committee on Commerce is in the midst of a wide-ranging review of all issues
relating to electronic commerce, including the issues raised by this legislation.
The growth of electronic commerce is having a profound impact on the nation's eco-
nomy. Over the past decade, the information technology sector of our economy has
grown rapidly and is seen by many as playing a leading role in the current economic
expansion. According to The Emerging Digital Economy, a recent Department of Com-
merce report on electronic commerce, the information technology sector now consti-
tutes 8.2 percent of the Nation's gross domestic product, up from 4.5 percent in
1985. At the end of 1997, approximately 7.4 million Americans were employed in this
field. It is expected that estimates of the total value of economic activity conduc-
ted electronically in 2002 will range from $200 billion to more than $500 billion,
compared to just $2.6 billion in 1996.

H.R. 2281 is one of the most important pieces of legislation affecting electronic
commerce that the 105th Congress will consider. It establishes a wide range of rules
that will govern not only copyright owners in the marketplace for electronic com-
merce, but also consumers, manufacturers, distributors, libraries, educators, and
on-line service providers. H.R. 2281, in other words, is about much more than intel-
lectual property. It defines whether consumers and businesses may engage in certain
conduct, or use certain devices, in the course of transacting electronic commerce.
Indeed, many of these rules may determine the extent to which electronic commerce
realizes its potential.

The Committee on Commerce's role in considering this legislation is therefore
critical. The Committee has a long-standing interest in addressing all issues relat-
ing to interstate and foreign commerce, including commerce transacted over all elec-
tronic mediums, such as the Internet, and regulation of interstate and foreign com-
munications. This legislation implicates each of those interests in numerous ways.

**\*23** UNDERSTANDING THE NEXUS BETWEEN ELECTRONIC COMMERCE AND INTELLECTUAL
PROPERTY

The debate on this legislation highlighted two important priorities: promoting the
continued growth and development of electronic commerce; and protecting intellectual
property rights. These goals are mutually supportive. A thriving electronic market-
place provides new and powerful ways for the creators of intellectual property to
make their works available to legitimate consumers in the digital environment. And a
plentiful supply of intellectual property-whether in the form of software, music,
movies, literature, or other works-drives the demand for a more flexible and effi-
cient electronic marketplace.

As electronic commerce and the laws governing intellectual property (especially

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

copyright laws) change, the relationship between them may change as well. To ensure
that Congress continues to enact policies that promote both of the above goals, it
is important to have current information about the effects of these changes. For ex-
ample, many new technologies for distributing real-time audio and video through the
Internet function by storing small parts of copyrighted works in the memory of the
recipient's computer. This technology is increasingly commonplace, but some pro-
viders of the technology are concerned that the making of these transient copies may
subject them or their customers to liability under current copyright law. In another
example, an increasing number of intellectual property works are being distributed
using a "client-server" model, where the work is effectively "borrowed" by the user
(e.g., infrequent users of expensive software purchase a certain number of uses, or
viewers watch a movie on a pay-per-view basis). To operate in this environment, con-
tent providers will need both the technology to make new uses possible and the legal
framework to ensure they can protect their work from piracy.

The Committee on Commerce believes it is important to more precisely define the
relationship between intellectual property and electronic commerce, and to under-
stand the practical implications of this relationship on the development of techno-
logy to be used in promoting electronic commerce. To that end, the Committee adopted
an amendment that directs the Secretary of Commerce (the Secretary) to report on the
effects of this legislation on the development of electronic commerce and the rela-
tionship between technology and copyright law. In the course of preparing the re-
port, the Secretary is directed to consult with both the Assistant Secretary of Com-
merce for Communications and Information (given the Assistant Secretary's expertise
in the area of telecommunications and information services and technologies) and the
Register of Copyrights (given the Register's expertise in the field of copyright).

PROHIBITING CERTAIN DEVICES

H.R. 2281, as reported by the Committee on the Judiciary, would regulate-in the
name of copyright law-the manufacture and sale of devices that can be used to im-
properly circumvent technological protection measures. The Committee on Commerce ad-
opted an amendment that moves the anti-circumvention provisions out of Title 17 and
establishes them as free-standing provisions of law. **24** The Committee believes that
this is the most appropriate way to implement the treaties, in large part because
these regulatory provisions have little, if anything, to do with copyright law. The
anti-circumvention provisions (and the accompanying penalty provisions for viola-
tions of them) would be separate from, and cumulative to, the existing claims avail-
able to copyright owners. In the Committee's judgment, it therefore is more appro-
priate to implement the treaties through free-standing provisions of law rather than
codifying them in Title 17.

Article 1, Section 8, Clause 8 of the United States Constitution authorizes the
Congress to promulgate laws governing the scope of proprietary rights in, and use
privileges with respect to, intangible "works of authorship." As set forth in the
Constitution, the fundamental goal is "[t]o promote the Progress of Science and use-
ful Arts. * * *." In the more than 200 years since enactment of the first Federal
copyright law in 1790, the maintenance of this balance has contributed significantly
to the growth of markets for works of the imagination as well as the industries that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

use such works.

    Congress has historically advanced this constitutional objective by regulating the
use of information-not the devices or means by which the information is delivered or
used by information consumers-and by ensuring an appropriate balance between the in-
terests of copyright owners and information users. For example, Section 106 of the
Copyright Act (17 U.S.C. S 106) establishes certain rights copyright owners have in
their works, including limitations on the use of these works without their authoriz-
ation. Likewise, Sections 107 through 121 of the Copyright Act (17 U.S.C. S S
107-121) set forth the circumstances in which such uses will be deemed permissible,
or otherwise lawful even though unauthorized. And Sections 501 through 511, as well
as Section 602 of the Copyright Act (17 U.S.C. S S 501-511, 602) specify rights of
action for copyright infringement, and prescribe penalties in connection with those
actions.

    In general, all of these provisions are technology neutral. They do not regulate
commerce in information technology, i.e., products and devices for transmitting,
storing, and using information. Instead, they prohibit certain actions and create
exceptions to permit certain conduct deemed to be in the greater public interest,
all in a way that balances the interests of copyright owners and users of copy-
righted works. In a September 16, 1997, letter to Congress, 62 copyright law pro-
fessors expressed their concern about the implications of regulating devices in the
name of copyright law. They said in relevant part:

    Although [they] would be codified in Title 17, [the anti-circumvention provi-
sions] would not be an ordinary copyright provision; liability under the section
would result from conduct separate and independent from any act of copyright in-
fringement or any intent to promote infringement. Thus, enactment of [the anti-
circumvention provisions] would represent an unprecedented departure into the zone
of what might be called paracopyright-an uncharted new domain of legislative provi-
sions designed to strengthen copyright protection by regulating conduct **25** which
traditionally has fallen outside the regulatory sphere of intellectual property law.

    While the Committee on Commerce agrees with these distinguished professors, the
Committee also recognizes that the digital environment poses a unique threat to the
rights of copyright owners, and as such, necessitates protection against devices
that undermine copyright interests. In contrast to the analog experience, digital
technology enables pirates to reproduce and distribute perfect copies of works-at
virtually no cost at all to the pirate. As technology advances, so must our laws.
The Committee thus seeks to protect the interests of copyright owners in the digital
environment, while ensuring that copyright law remain technology neutral. Hence, the
Committee has removed the anti-circumvention provisions from Title 17, and estab-
lished them as free-standing provisions of law.

                    FAIR USE IN THE DIGITAL ENVIRONMENT

    H.R. 2281, as reported by the Committee on the Judiciary, provided that  "[n]o
person shall circumvent a technological protection measure that effectively controls
access to a work protected under Title 17, United States Code." The Committee on
Commerce devoted substantial time and resources to analyzing the implications of
this broad prohibition on the traditional principle of "fair use." A recent editori-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

al by the Richmond Times-Dispatch succinctly states the Committee's dilemma:
   Copyrights traditionally have permitted public access while protecting intellec-
tual property. The U.S. approach-known as "fair use"-benefits consumers and creat-
ors. A computer revolution that has increased access to information also creates op-
portunities for the holders of copyrights to impose fees for, among other things,
research and the use of excerpts from published works. And digital technology-
whatever that means-could be exploited to erode fair use. [FN1]
   The principle of fair use involves a balancing process, whereby the exclusive in-
terests of copyright owners are balanced against the competing needs of users of in-
formation. This balance is deeply embedded in the long history of copyright law. On
the one hand, copyright law for centuries has sought to ensure that authors reap the
rewards of their efforts and, at the same time, advance human knowledge through edu-
cation and access to society's storehouse of knowledge on the other. This critical
balance is now embodied in Section 106 of the Copyright Act (17 U.S.C. S 106), which
grants copyright holders a "bundle" of enumerated rights, and in Section 107, which
codifies the "fair use" doctrine. Under the Copyright Act, "fair use" may be made of
a copyrighted work "for purposes such as criticism, comment, news reporting, teach-
ing * * * scholarship or research" under certain circumstances without the permis-
sion of the author.
   Fair use, thus, provides the basis for many of the most important day-to-day
activities in libraries, as well as in scholarship and education. **\*26** It also is
critical to advancing the personal interests of consumers. Moreover, as many testi-
fied before the Committee, it is no less vital to American industries, which lead
the world in technological innovation. As more and more industries migrate to elec-
tronic commerce, fair use becomes critical to promoting a robust electronic market-
place. The Committee on Commerce is in the midst of a wide-ranging review of all is-
sues relating to electronic commerce, including the issues raised by this legisla-
tion. The digital environment forces this Committee to understand and, where neces-
sary, modernize the rules of commerce as they apply to a digital environment-includ-
ing the rules that ensure that consumers have a stake in the growth in electronic
commerce.
   The Committee was therefore concerned to hear from many private and public in-
terests that H.R. 2281, as reported by the Committee on the Judiciary, would under-
mine Congress' long-standing commitment to the concept of fair use. A June 4, 1998,
letter to the Committee from the Consumers' Union is representative of the concerns
raised by the fair use community in reaction to H.R. 2281, as reported by the Com-
mittee on the Judiciary. The letter states in part:
   These newly-created rights will dramatically diminish public access to informa-
tion, reducing the ability of researchers, authors, critics, scholars, teachers,
students, and consumers to find, to quote for publication and otherwise make fair
use of them. It would be ironic if the great popularization of access to informa-
tion, which is the promise of the electronic age, will be short-changed by legisla-
tion that purports to promote this promise, but in reality puts a monopoly strangle-
hold on information.
   The Committee on Commerce felt compelled to address these risks, including the
risk that enactment of the bill could establish the legal framework that would inex-
orably create a "pay-per-use" society. At the same time, however, the Committee was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

mindful of the need to honor the United States' commitment to effectively implement
the two WIPO treaties, as well as the fact that fair use principles certainly should
not be extended beyond their current formulation. The Committee has struck a balance
that is now embodied in Section 102(a)(1) of the bill, as reported by the Committee
on Commerce. The Committee has endeavored to specify, with as much clarity as pos-
sible, how the right against anti-circumvention would be qualified to maintain bal-
ance between the interests of content creators and information users. The Committee
considers it particularly important to ensure that the concept of fair use remains
firmly established in the law. Consistent with the United States" commitment to im-
plement the two WIPO treaties, H.R. 2281, as reported by the Committee on Commerce,
fully respects and extends into the digital environment the bedrock principle of
"balance" in American intellectual property law for the benefit of both copyright
owners and users.

### PROMOTING ENCRYPTION RESEARCH

   H.R. 2281, as reported by the Committee on the Judiciary, provided no exception
for the field of encryption research to the bill's **27** broad prohibition against the
circumvention of technological protection measures. Recognizing the importance of
the field of encryption research to electronic commerce, the Committee on Commerce
crafted a provision that provides for an exception to the bill's anti-circumvention
provisions.
   The effectiveness of technological protection measures to prevent theft of works
depends, in large part, on the rapid and dynamic development of better technologies,
including encryption-based technological protection measures. The development of en-
cryption sciences requires, in part, ongoing research and testing activities by sci-
entists of existing encryption methods, in order to build on those advances, thus
promoting and advancing encryption technology generally. This testing could involve
attempts to circumvent or defeat encryption systems for the purpose of detecting
flaws and learning how to develop more impregnable systems. The goals of this legis-
lation would be poorly served if these provisions had the undesirable and unintended
consequence of chilling legitimate research activities in the area of encryption.
   In many cases, flaws in cryptography occur when an encryption system is actually
applied. Research of such programs as applied is important both for the advancement
of the field of encryption and for consumer protection. Electronic commerce will
flourish only if legitimate encryption researchers discover, and correct, the flaws
in encryption systems before illegitimate hackers discover and exploit these flaws.
Accordingly, the Committee has fashioned an affirmative defense to permit legitimate
encryption research.

### PROTECTING PERSONAL PRIVACY IN THE DIGITAL ENVIRONMENT

   H.R. 2281, as reported by the Committee on the Judiciary, contains numerous pro-
tections to protect the rights of copyright owners to ensure that they feel secure
in releasing their works in a digital, on-line environment. The Committee on Com-
merce, however, believes that in reaching to protect the rights of copyright owners,
Congress need not encroach upon the privacy interests of consumers.
   Digital technology is robust and versatile enough that it can surreptitiously

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

gather consumers' personal information, and do so through the use of software that
is protected, or "cloaked," by a technological protection measure. And to the extent
a consumer seeks to disable the gathering of such information, he or she may unwit-
tingly violate the provisions of this bill. The Committee regards this as an extreme
result, and believes that consumers must be accorded certain rights to protect their
personal privacy.

The Committee on Commerce adopted an amendment to strike a balance between the in-
terests of copyright owners and the personal privacy of consumers. The amendment
deals with the critical issue of privacy by creating a marketplace incentive for
copyright owners to deal "above board" with consumers on personal data gathering
practices. Indeed, the copyright community itself has expressed a strong desire to
give consumers comfort in knowing that their personal privacy is being protected.
The Committee views consumer confidence as critical to promoting a robust and reli-
able marketplace for electronic commerce. Once consumers are confident that their
personal privacy is protected, this should all but eliminate the **28** need for con-
sumers to circumvent technological protection measures for the purpose of protecting
their privacy. Copyright owners can help consumers to realize confidence in the di-
gital environment by disclosing personal data gathering practices.

HEARINGS

The Subcommittee on Telecommunications, Trade, and Consumer Protection held a
hearing on H.R. 2281 on June 5, 1998. The Subcommittee received testimony from: Mr.
Marc Rotenberg, Director, Electronic Privacy Information Center; Mr. Gary Shapiro,
President, Consumer Electronics Manufacturers Association; Mr. Jonathan Callas,
Chief Technology Officer, Network Associates, Inc.; Mr. Chris Bryne, Director of In-
tellectual Property, Silicon Graphics, Inc., representing Information Technology In-
dustry Council; Mr. Robert Holleyman, CEO, Business Software Alliance; Ms. Hilary
Rosen, President and CEO, Recording Industry Association of America; Mr. Walter H.
Hinton, Vice President, Strategy and Marketing, Storage Technology Corp.; Mr. George
Vradenburg, III, Senior Vice President and General Counsel, America OnLine, Inc.;
Mr. Steve Metalitz, Vice President, International Intellectual Property Alliance,
representing the Motion Picture Association of America; Mr. Seth Greenstein, repres-
enting Digital Media Association [listed on witness list]; Mr. Robert Oakley, Dir-
ector of the Law Library, Georgetown University Law Center; and Mr. Charles E.
Phelps, Provost, University of Rochester.

COMMITTEE CONSIDERATION

The Subcommittee on Telecommunications, Trade, and Consumer Protection met in open
markup session on June 17, 1998, and June 18, 1998, to consider H.R. 2281, a bill to
amend Title 17, United States Code, to implement the World Intellectual Property Or-
ganization Copyright Treaty and Performances and Phonograms Treaty. On June 18,
1998, the Subcommittee approved H.R. 2281, the Digital Millennium Copyright Act of
1998, for Full Committee consideration, amended, by a voice vote. On July 17, 1998,
the Committee on Commerce met in open markup session and ordered H.R. 2281 reported
to the House, amended, by a roll call vote of 41 yeas to 0 nays.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**


ROLL CALL VOTES

   Clause 2(l)(2)(B) of Rule XI of the Rules of the House requires the Committee to
list the recorded votes on the motion to report legislation and amendments thereto.
A motion by Mr. Bliley to order H.R. 2281 reported to the House, amended, was agreed
to by a roll call vote of 41 yeas to 0 nays. The following are the recorded vote on
motion to report H.R. 2281, including the names of those Members voting for and
against, and the voice votes taken on amendments offered to H.R. 2281.

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

**\*32** COMMITTEE OVERSIGHT FINDINGS

   Pursuant to clause 2(l)(3)(A) of Rule XI of the Rules of the House of Representat-
ives, the Committee held a legislative hearing and made findings that are reflected
in this report.

COMMITTEE ON GOVERNMENT REFORM AND OVERSIGHT

   Pursuant to clause 2(l)(3)(D) of Rule XI of the Rules of the House of Representat-
ives, no oversight findings have been submitted to the Committee by the Committee on
Government Reform and Oversight.

NEW BUDGET AUTHORITY, ENTITLEMENT AUTHORITY, AND TAX EXPENDITURES

   In compliance with clause 2(l)(3)(B) of Rule XI of the Rules of the House of Rep-
resentatives, the Committee finds that H.R 2281, the Digital Millennium Copyright
Act of 1998, would result in no new or increased budget authority, entitlement au-
thority, or tax expenditures or revenues.

COMMITTEE COST ESTIMATE

   The Committee adopts as its own the cost estimate prepared by the Director of the
Congressional Budget Office pursuant to section 402 of the Congressional Budget Act
of 1974.

CONGRESSIONAL BUDGET OFFICE ESTIMATE

   Pursuant to clause 2(l)(3)(C) of Rule XI of the Rules of the House of Representat-
ives, the following is the cost estimate provided by the Congressional Budget Office
pursuant to section 402 of the Congressional Budget Act of 1974:

     U.S. Congress,

     Congressional Budget Office,

     Washington, DC, July 22, 1998.

Hon. Tom Bliley,
Chairman, Committee on Commerce,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**


House of Representatives, Washington, DC.
   Dear Mr. Chairman: The Congressional Budget Office has prepared the enclosed cost
estimate for H.R. 2281, Digital Millennium Copyright Act of 1998.
   If you wish further details on this estimate, we will be pleased to provide them.
The CBO staff contact is Mark Hadley (for federal costs), Pepper Santalucia (for the
state and local impact), and Matt Eyles (for the private-sector impact).

Sincerely,
     June E. O'Neill, Director.
   Enclosure.

H.R. 2281-Digital Millennium Copyright Act of 1998

   Summary: H.R. 2281 would amend existing copyright laws to implement two World In-
tellectual Property Organization (WIPO) treaties, limit the liability of Internet
providers for copyright infringement **33** by their customers, clarify the treatment
of ephemeral recordings, and require the study of various issues related to copy-
rights and emerging technologies.
   Assuming the appropriation of the necessary funds, CBO estimates that implementing
H.R. 2281 would result in new federal spending of about $2 million in fiscal year
1999 and less than $250,000 a year over the 2000-2003 period. Enacting the bill
would establish new criminal penalties and thus could affect both receipts and dir-
ect spending. Hence, pay-as-you-go procedures would apply, but CBO expects that any
changes in receipts and direct spending would not be significant.
   H.R. 2281 contains an intergovernmental and a private-sector mandate as defined in
the Unfunded Mandates Reform Act (UMRA), but the costs of the mandates would not ex-
ceed the thresholds in the law. (The thresholds are $50 million and $100 million in
1996, respectively, indexed annually for inflation.)
   Estimated cost to the Federal Government: For the purpose of this estimate, CBO
assumes that H.R. 2281 will be enacted by the end of fiscal year 1998, and that the
estimated amounts will be appropriated by the start of each fiscal year. The costs
of this legislation fall within budget function 370 (commerce and housing credit).
   Title I of H.R. 2281 would amend U.S. copyright law to comply with two treaties
produced by the December 1996 conference of the WIPO-one regarding the use of copy-
righted material in digital environments and the other dealing with international
copyright protection of performers and producers of phonograms. Title II would limit
the liability for copyright infringement of persons who are providers of on-line
services or network access. Title III would clarify the treatment of ephemeral re-
cordings and exempt libraries and archives from some provisions of this bill. Title
IV would require the National Telecommunications and Information Administration
(NTIA) to submit a report on encryption testing methods and mechanisms to encourage
access protocols.
   H.R. 2281 would require the Register of Copyrights, the Secretary of Commerce, the
Assistant Secretary of Commerce for Communications and Information, and the NTIA to
submit six reports on issues related to copyrights in the digital  age, including
encryption, distance learning, liability of educational institutions, personal
identifying information, and electronic commerce. In addition, title I would require
the Secretary of Commerce to issue regulations prohibiting any person from circum-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

venting technological protection measures on copyrighted works. Assuming the appro-
priation of the necessary amounts, producing reports and promulgating regulations
required by H.R. 2281 would increase federal spending by about $2 million in fiscal
year 1999 and less than $250,000 a year over the 2000-2003 period.

   The bill would establish new criminal penalties and thus could affect both re-
ceipts and direct spending; therefore, pay-as-you-go procedures would apply. Section
105 would establish criminal fines of up to $1 million for anyone attempting to cir-
cumvent copyright protection systems, or falsifying or altering copyright management
information. Enacting this provision could increase governmental receipts from the
collection of fines, but we estimate that any such increase would be less than
$500,000 annually. Criminal fines are **34** deposited in the Crime Victims Fund and
are spent in the following year. Thus any change in direct spending from the fund
would also amount to less than $500,000 annually.

   Pay-as-you-go considerations: The Balanced Budget and Emergency Deficit Control
Act specifies pay-as-you-go procedures for legislation affecting direct spending and
receipts. Enacting H.R. 2281 could affect both direct spending and receipts, but CBO
estimates that any such changes would be insignificant.

   Intergovernmental and private-sector impact: Section 4 of UMRA  excludes from the
application of that act any legislative provisions that are necessary for the rati-
fication or implementation of international treaty obligations. CBO has determined
that title I of the bill fits within that exclusion because it is necessary for the
implementation of the WIPO Copyright Treaty and the WIPO Performances and Phonograms
Treaty.

   Title III of H.R. 2281, however, would impose a mandate on certain owners of copy-
rights who apply technical protections to works that prevent their reproduction.
Title III would  require copyright owners who employ mechanisms that prevent  the
reproduction of copyrighted works to make available to federally licensed broad-
casters the necessary means to copy such works. Under current law, federally li-
censed broadcasters are authorized to reproduce copyright-protected material under
specific conditions. Since this mandate would apply to both public and private en-
tities that own copyrights, it would be considered both a private-sector and an in-
tergovernmental mandate.

   However, the use of reproduction protections envisioned in the bill is not yet
widespread. Furthermore, copyright owners may claim economic hardship or technolo-
gical infeasibility to avoid the new requirement, and the costs of providing  feder-
ally licensed broadcasters with the means to copy technically protected works would
likely be modest. Therefore, CBO estimates that the direct cost of the new mandates
would be well below the statutory thresholds in UMRA.

   Previous CBO estimate: On May 12, 1998,  CBO transmitted an estimate of H.R. 2281
as ordered reported by the House Committee on the Judiciary on April 1, 1998. The
Judiciary Committee's version of the bill included the first two titles, but did not
require any of the  reports required by the Commerce Committee's version. CBO estim-
ated that enactment of the Judiciary Committee's version of H.R. 2281 would have no
significant impact on the federal budget.

   Estimate prepared by:  Federal Costs:  Mark Hadley. Impact on State, Local, and
Tribal Governments: Pepper Santalucia. Impact on the Private Sector: Matt Eyles.

   Estimate  approved by: Paul N. Van de Water, Assistant Director for Budget Analys-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II)                                              Page 39
H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**


is.

## FEDERAL MANDATES STATEMENT

   The Committee adopts as its own the estimate of Federal mandates prepared by the
Director of the Congressional Budget Office pursuant to section 423 of the Unfunded
Mandates Reform Act.

## *35 ADVISORY COMMITTEE STATEMENT

   No advisory committees within the meaning of section 5(b) of the Federal Advisory
Committee Act were created by this legislation.

## CONSTITUTIONAL AUTHORITY STATEMENT

   Pursuant to clause 2(1)(4) of Rule XI of the Rules of the House of Representat-
ives, the Committee finds that the Constitutional authority for this legislation is
provided in Article I, section 8, clause 3, which grants Congress the power to regu-
late commerce with foreign nations, among the several States, and with the Indian
tribes.

## APPLICABILITY TO LEGISLATIVE BRANCH

   The Committee finds that the legislation does not relate to the terms and condi-
tions of employment or access to public services or accommodations within the mean-
ing of section 102(b)(3) of the Congressional Accountability Act.

## SECTION-BY-SECTION ANALYSIS OF THE LEGISLATION

Section 1. Short title

   Section 1 establishes that this Act may be cited as the "Digital Millennium Copy-
right Act of 1998."

Section 2. Table of contents

   Section 2 sets out the table of contents.

## TITLE I-WIPO TREATIES IMPLEMENTATION

Section 101. Short title

   Section 101 establishes that the short title of Title I is the "WIPO Copyright
Treaties Implementation Act."

Section 102. Circumvention of copyright protection systems

   As previously discussed in the background section to this report, the Committee
was concerned that H.R. 2281, as reported by the Committee on the Judiciary, would
undermine Congress' long-standing commitment to the principle of fair use.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**


Throughout our history, the ability of individual members of the public to access
and to use copyrighted materials has been a vital factor in the advancement of Amer-
ica's economic dynamism, social development, and educational achievement. In its
consideration of H.R. 2281, the Committee on Commerce paid particular attention to
how changing technologies may affect users' access in the future. Section 102(a)(1)
of the bill responds to this concern.

The growth and development of the Internet has already had a significant positive
impact on the access of American students, researchers, consumers, and the public at
large to informational resources that help them in their efforts to learn, acquire
new skills, broaden their perspectives, entertain themselves, and become more active
and informed citizens. A plethora of information, most of it embodied in materials
subject to copyright protection, is available to individuals, often for free, that
just a few years ago could have been located and acquired only through the expendit-
ure of considerable **36** time, resources, and money. New examples of this greatly ex-
panded availability of copyrighted materials occur every day.

Still, the Committee is concerned that marketplace realities may someday dictate a
different outcome, resulting in less access, rather than more, to copyrighted mater-
ials that are important to education, scholarship, and other socially vital en-
deavors. This result could flow from a confluence of factors, including the elimina-
tion of print or other hard-copy versions, the permanent encryption of all electron-
ic copies, and the adoption of business models that depend upon restricting distri-
bution and availability, rather than upon maximizing it. In this scenario, it could
be appropriate to modify the flat prohibition against the circumvention of effective
technological measures that control access to copyrighted materials, in order to en-
sure that access for lawful purposes is not unjustifiably diminished.

Given the threat of a diminution of otherwise lawful access to works and informa-
tion, the Committee on Commerce believes that a "fail-safe" mechanism is required.
This mechanism would monitor developments in the marketplace for copyrighted materi-
als, and allow the enforceability of the prohibition against the act of circumven-
tion to be selectively waived, for limited time periods, if necessary to prevent a
diminution in the availability to individual users of a particular category of copy-
righted materials.

Section 102(a)(1) of the bill creates such a mechanism. It converts the statutory
prohibition against the act of circumvention into a regulation, and creates a rule-
making proceeding in which the issue of whether enforcement of the regulation should
be temporarily waived with regard to particular categories of works can be fully
considered and fairly decided on the basis of real marketplace developments that may
diminish otherwise lawful access to works.

(a) Violations regarding circumvention of technological protection measures

Section 102(a)(1) gives two responsibilities to the Secretary of Commerce. The
first is to issue regulations against the circumvention of technological protection
measures that effectively control access to a copyrighted work. The second is to
convene a rulemaking proceeding and, in conjunction with other specified officials,
to determine whether to waive the applicability of the regulations for the next two
years with respect to any particular category of copyrighted materials.

The Secretary's responsibility under subparagraph (A) is essentially ministerial.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**


He or she is to simply recast, in the form of a regulation, the statutory prohibi-
tion against the act of circumvention of technological protection measures that ef-
fectively control access to copyrighted materials that was set forth in Section
102(a)(1) prior to its amendment.

   The Committee has chosen a regulatory, rather than a statutory, route for estab-
lishing this prohibition for only one reason: to provide greater flexibility in en-
forcement, through the rulemaking proceeding set forth in the subsequent subpara-
graphs of this subsection 102(a)(1). It does not intend to make any substantive
change in the scope or meaning of the prohibition as it appeared in the bill prior
its amendment, and it is not empowering the Secretary **\*37** of Commerce to do so
either. The regulation should conform in every particular to the provisions of the
statute, which addresses all other relevant aspects of the regulatory prohibition,
including exceptions (such as for privacy or for encryption research) as well as
civil and criminal enforcement mechanisms and penalties. No additional definitions,
limitations, defenses or other provisions may be added. The regulation is to take
effect two years after the enactment of the statute.

   Subparagraph (B) sets forth the parameters of the Secretary's second responsibil-
ity: the convening of a rulemaking proceeding, consistent with the requirements of
the Administrative Procedures Act. The goal of the proceeding is to assess whether
the implementation of technological protection measures that effectively control ac-
cess to copyrighted works is adversely affecting the ability of individual users to
make lawful uses of copyrighted works. Many such technological protection measures
are in effect today: these include the use of "password codes" to control authorized
access to computer programs, for example, or encryption or scrambling of cable pro-
gramming, videocassettes, and CD-ROMs. More such measures can be expected to be in-
troduced in the near future. The primary goal of the rulemaking proceeding is to as-
sess whether the prevalence of these technological protections, with respect to par-
ticular categories of copyrighted materials, is diminishing the ability of individu-
als to use these works in ways that are otherwise lawful.

   The main purpose for delaying for two years the effective date of the prohibition
against circumvention of access control technologies is to allow the development of
a sufficient record as to how the implementation of these technologies is affecting
availability of works in the marketplace for lawful uses. The Committee also intends
that the rulemaking proceeding should focus on distinct, verifiable and measurable
impacts; should not be based upon de minimis impacts; and will solicit input to con-
sider a broad range of evidence of past or likely adverse impacts.

   The criteria listed in subparagraph (B) are illustrative of the questions that the
rulemaking proceeding should ask. In each case, the focus must remain on whether the
implementation of technological protection measures (such as encryption or scram-
bling) has caused adverse impact on the ability of users to make lawful uses. Ad-
verse impacts that flow from other sources, or that are not clearly attributable to
implementation of a technological protection measure, are outside the scope of the
rulemaking. The rulemaking will be repeated on a biennial basis, and on each occa-
sion, the assessment of adverse impacts on particular categories of works is to be
determined de novo. The regulatory prohibition is presumed to apply to any and all
kinds of works, including those as to which a waiver of applicability was previously
in effect, unless, and until, the Secretary makes a new determination that the ad-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

verse impact criteria have been met with respect to a particular class and therefore
issues a new waiver. In conducting the rulemaking proceeding, the Secretary must
consult closely with the National Telecommunications and Information Administration,
as well as with the Patent and Trademark Office and the Register of Copyrights.

  **\*38** Subparagraph (C) spells out the determination that the Secretary must make at
the conclusion of the rulemaking proceeding. If the rulemaking has produced insuffi-
cient evidence to determine whether there have been adverse impacts with respect to
particular classes of copyrighted materials, the circumvention prohibition should go
into effect with respect to those classes. Only in categories as to which the Sec-
retary finds that adverse impacts have occurred, or that such impacts are likely to
occur within the next two years, should he or she waive the applicability of the
regulations for the next two years.

  The issue of defining the scope or boundaries of a "particular class" of copy-
righted works as to which the implementation of technological protection measures
has been shown to have had an adverse impact is an important one to be determined
during the rulemaking proceedings. In assessing whether users of copyrighted works
have been, or are likely to be adversely affected, the Secretary shall assess users'
ability to make lawful uses of works "within each particular class of copyrighted
works specified in the rulemaking." The Committee intends that the "particular class
of copyrighted works" be a narrow and focused subset of the broad categories of
works of authorship than is identified in Section 102 of the Copyright Act (17
U.S.C. S 102). The Secretary's determination is inapplicable in any case seeking to
enforce any other provision of this legislation, including the manufacture or traf-
ficking in circumvention devices that are prohibited by Section 102(a)(2) or
102(b)(1).

  To provide meaningful protection and enforcement of the copyright owner's right to
control access to his or her copyrighted work (as defined under Section 102(a)(1)),
Section 102(a)(2) supplements Section 102(a)(1) with prohibitions on creating and
making available certain technologies, products and services used, developed or ad-
vertised to defeat technological protection measures that protect against unauthor-
ized access. [FN2]

  Specifically, Section 102(a)(2) prohibits any person from manufacturing, import-
ing, offering to the public, providing, or otherwise trafficking in certain techno-
logies, products, services, devices, components, or parts that can be used to cir-
cumvent a technological protection measure that otherwise effectively controls ac-
cess to a copyrighted work. The Committee believes it is very important to emphasize
that Section 102(a)(2) is aimed fundamentally at outlawing so-called "black boxes"
that are expressly intended to facilitate circumvention of technological protection
measures for purposes of gaining access to a work. This provision is not aimed at
products that are capable of commercially significant noninfringing uses, such as
consumer electronics, telecommunications, and computer products-including videocas-
sette recorders, telecommunications switches, personal computers, and servers-used
by businesses and consumers for perfectly legitimate purposes.

  **\*39** Thus, for a technology, product, service, device, component, or part thereof
to be prohibited under this subsection, one of three conditions must be met. It
must: (1) be primarily designed or produced for the purpose of circumventing; (2)
have only a limited commercially significant purpose or use other than to circum-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

vent; or (3) be marketed by the person who manufactures it, imports it, offers it to
the public, provides it or otherwise traffics in it, or by another person acting in
concert with that person with that person's knowledge, for use in circumventing a
technological protection measure that effectively controls access to a copyrighted
work. This provision is designed to protect copyright owners, and simultaneously al-
low the development of technology.

   Section 102(a)(3) defines certain terms used throughout Section 102(a). Subpara-
graph (A) defines the term "circumvent a technological protection measure" as mean-
ing "to descramble a scrambled work, to decrypt an encrypted work, or otherwise to
avoid, bypass, remove, deactivate, or impair a technological protection measure,
without the authority of the copyright owner." This definition applies to subsection
(a) only, which covers protections against unauthorized initial access to a copy-
righted work. Subparagraph (B) states that a technological protection measure "ef-
fectively controls access to a work" if the measure, in the ordinary course of its
operation, requires the application of information, or a process or a treatment,
with the authority of the copyright owner, to gain access to the work. In the Com-
mittee's view, measures that can be deemed to "effectively control access to a work"
would be those based on encryption, scrambling, authentication, or some other meas-
ure which requires the use of a "key" provided by a copyright owner to gain access
to a work.

(b) Additional violations

   Section 102(b) applies to those technological protection measures employed by
copyright owners that effectively protect their copyrights, as opposed to those
technological protection measures covered by Section 102(a), which prevent unauthor-
ized access to a copyrighted work. Unlike subsection (a), which prohibits the cir-
cumvention of access control technologies, subsection (b) does not, by itself, pro-
hibit the circumvention of effective technological copyright protection measures.
   Paralleling Section 102(a)(2), Section 102(b)(1) seeks to provide meaningful pro-
tection and enforcement of copyright owners' use of technological protection meas-
ures to protect their rights by prohibiting the act of making or selling the techno-
logical means to overcome these protections and thereby facilitate copyright in-
fringement. Subsection (b)(1) prohibits manufacturing, importing, offering to the
public, providing, or otherwise trafficking in certain technologies, products, ser-
vices, devices, components, or parts thereof that can be used to circumvent a tech-
nological protection measure that effectively protects a right of a copyright owner.
As previously stated in the discussion of Section 102(a)(2), the Committee believes
it is very important to emphasize that Section 102(b)(1) is aimed fundamentally at
outlawing so-called "black boxes" that are expressly intended to facilitate circum-
vention of technological protection measures for purposes of gaining access to a
work. This provision **40** is not aimed at products that are capable of commercially
significant noninfringing uses, such as consumer electronics, telecommunications,
and computer products-including videocassette recorders, telecommunications
switches, personal computers, and servers-used by businesses and consumers for per-
fectly legitimate purposes.
   Thus, once again, for a technology, product, service, device, component, or part
thereof to be prohibited under this subsection, one of three conditions must be met.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**


It must: (1) be primarily designed or produced for the purpose of circumventing; (2)
have only limited commercially significant purpose or use other than to circumvent;
or (3) be marketed by the person who manufactures it, imports it, offers it to the
public, provides it, or otherwise traffics in it, or by another person acting in
concert with that person with that person's knowledge, for use in circumventing a
technological protection measure that effectively protects the right of a copyright
owner. Like Section 102(a)(2), this provision is designed to protect copyright own-
ers, and simultaneously allow the development of technology.

   Section 102(b)(2) defines certain terms used solely within subsection (b). In par-
ticular, subparagraph (A) defines the term "circumvent protection afforded by a
technological protection measure" as "avoiding, bypassing, removing, deactivating,
or otherwise impairing a technological protection measure." Subparagraph (B)
provides that a technological protection measure "effectively protects a right of a
copyright owner" if the measure, in the ordinary course of its operation, prevents,
restricts, or otherwise limits the exercise of a copyright owner's rights. In the
Committee's view, measures that can be deemed to "effectively control access to a
work" would be those based on encryption, scrambling, authentication, or some other
measure which requires the use of a "key" provided by a copyright owner to gain ac-
cess to a work.

   With respect to the effectiveness of technological protection measures, the Com-
mittee believes it is important to stress as well that those measures that cause no-
ticeable and recurring adverse effects on the authorized display or performance of
works should not be deemed to be effective. Unless product designers are adequately
consulted about the design and implementation of technological protection measures
(and the means of preserving copyright management information), such measures may
cause severe "playability" problems. The Committee on Commerce is particularly con-
cerned that the introduction of such measures not impede the introduction of digital
television monitors or new digital audio playback devices. The Committee has a
strong, long-standing interest in encouraging the introduction in the market of ex-
citing new products. Recently, for example, the Committee learned that, as initially
proposed, a proprietary copy protection scheme that is today widely used to protect
analog motion pictures could have caused significant viewability problems, including
noticeable artifacts, with certain television sets until it was modified with the
cooperation of the consumer electronics industry.

   Under the bill as reported, nothing would make it illegal for a manufacturer of a
product or device (to which Section 102 would otherwise apply) to design or modify
the product or device solely to **41** the extent necessary to mitigate a frequently
occurring and noticeable adverse effect on the authorized performance or display of
a work that is caused by a technological protection measure in the ordinary course
of its design and operation. Similarly, recognizing that a technological protection
measure may cause a problem with a particular device, or combination of devices,
used by a consumer, it is the Committee's view that nothing in the bill should be
interpreted to make it illegal for a retailer or individual consumer to modify a
product or device solely to the extent necessary to mitigate a noticeable adverse
effect on the authorized performance or display of a work that is communicated to or
received by that particular product or device if that adverse effect is caused by a
technological protection measure in the ordinary course of its design and operation.


© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**


   The Committee believes that the affected industries should be able to work togeth-
er to avoid such problems. The Committee is aware that multi-industry efforts to de-
velop copy control technologies that are both effective and avoid such noticeable
and recurring adverse effects have been underway over the past two years. The Com-
mittee strongly encourages the continuation of those efforts, which it views as of-
fering substantial benefits to copyright owners in whose interest it is to achieve
the introduction of effective technological protection (and copyright management in-
formation) measures that do not interfere with the normal operations of affected
products.

(c) Other rights, etc., not affected

   Subsection (c) sets forth several provisions clarifying the scope of  Section 102.
Section 102(c)(1) provides that Section 102 shall not have any effect on rights,
remedies, limitations, or defenses to copyright infringement, including fair use,
under Title 17. Section 102(c)(2) provides that Section 102 shall not alter the ex-
isting doctrines of contributory or vicarious liability for copyright infringement
in connection with any technology, product, service, device, component or part
thereof. Section 102(c)(3) clarifies that nothing in Section 102 creates an affirm-
ative mandate requiring manufacturers of consumer electronics, telecommunications,
and computing products to design their products or their parts and components to af-
firmatively respond to any particular technological protection measure employed to
protect a copyrighted work. Lastly, Section 102(c)(4) makes clear that nothing in
Section 102 enlarges or diminishes any rights of free speech or the press for activ-
ities using consumer electronics, telecommunications, or computing products.

(d) Exemption for nonprofit libraries, archives, and educational institutions

   Section 102(d) provides a limited exemption from the regulations issued pursuant
to Section 102(a)(1)(A) to qualified nonprofit libraries, archives, and educational
institutions. In particular, Section 102(d)(1) allows a nonprofit library, nonprofit
archives or nonprofit educational institution to obtain access to a copyrighted work
for the sole purpose of making a good faith determination as to whether it wishes to
acquire a copy, or portion of a copy, of that work in order to engage in permitted
conduct. A qualifying institution **42** may not gain access for a period of time
longer than necessary to determine whether it wishes to obtain a copy, or portion of
a copy, for such purposes, and the right to gain access shall not apply for any oth-
er purpose. Section 102(d)(2) provides that the right to obtain access under this
paragraph only applies when the nonprofit library, nonprofit archives, or nonprofit
educational institution cannot obtain a copy of an identical work by other means,
and such an entity may not use the exemption in this paragraph for commercial ad-
vantage or financial gain without penalty.
   Section 102(d)(3) seeks to protect the legitimate interests of copyright owners by
providing a civil remedy against a library, archive, or educational institution that
violates Section 102(d)(1). Section 102(d)(4) provides that this subsection may not
be used as a defense to the prohibitions on manufacturing or selling devices con-
tained in Sections 102(a)(2) or 102(b). Finally, Section 102(d)(5) provides that a
library or archive, to be eligible for the exemption in paragraph (1), must maintain

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

its collections open to the public and available, not only to researchers affiliated
with the library or archives or with the institution of which it is a part, but also
to other persons doing research in a specialized field.

(e) Law enforcement and intelligence activities

   Section 102(e) creates an exception for the lawfully authorized investigative,
protective, or intelligence activities of an officer, agent, or employee of, the
United States, a State, or a political subdivision of a State, or of persons acting
pursuant to a contract with such an entity.

(f) Reverse engineering

   Section 102(f) is intended to promote reverse engineering by permitting the cir-
cumvention of access control technologies for the sole purpose of achieving software
interoperability. Section 102(f)(1) permits the act of circumvention in only certain
instances. To begin with, the copy of the computer program which is the subject of
the analysis must be lawfully acquired (i.e., the computer program must be acquired
from a legitimate source, along with any necessary serial codes, passwords, or other
such means as may be necessary to be able to use the program as it was designed to
be used by a consumer of the product). In addition, the acts must be limited to
those elements of the program which must be analyzed to achieve interoperability of
an independently created program with other programs. The resulting product must
also be a new and original work, in that it may not infringe the original computer
program. Moreover, the objective of the analysis must be to identify and extract
such elements as are necessary to achieve interoperability which are not otherwise
available to the person. Finally, the goal of this section is to ensure that current
law is not changed, and not to encourage or permit infringement. Thus, each of the
acts undertaken must avoid infringing the copyright of the author of the underlying
computer program.

   Section 102(f)(2) recognizes that, to accomplish the acts permitted under Section
102(f)(1), a person may need to make and use certain tools. The Committee believes
that such tools are generally available and used by programmers today in developing
computer **43** programs (e.g., compilers, trace analyzers, and disassemblers). Such
tools are not prohibited by this Section. But the Committee also recognizes that, in
certain instances, it is possible that a person may need to develop special tools to
achieve the permitted purpose of interoperability. Thus, Section 102(f)(2) creates
an exception to the prohibition on making circumvention tools contained in Sections
102(a)(2) and 102(b)(1). These excepted tools can be either software or hardware.
Once again, though, Section 102(f)(2) limits any person from acting in a way that
constitutes infringing activity.

   Similarly, Section 102(f)(3) recognizes that developing complex computer programs
often involves the efforts of many persons. For example, some of these persons may
be hired to develop a specific portion of the final product. For that person to per-
form these tasks, some of the information acquired through the permitted analysis,
and the tools to accomplish it, may have to be made available to that person. Sec-
tion 102(f)(3) allows developers of independently created software to rely on third
parties either to develop the necessary circumvention tools, or to identify the ne-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

cessary information to achieve interoperability. The ability to rely on third
parties is particularly important for small software developers who do not have the
capability of performing these functions in-house. This provision permits such shar-
ing of information and tools.

The Committee, however, recognizes that making such information or tools generally
available could undermine the objectives of Section 102. Section 102(f)(3) therefore
imposes strict limitations on the exceptions created in Section 102(f). Acts of
sharing information and tools is permitted solely for the purpose of achieving in-
teroperability of an independently created computer program with other programs. If
a person makes this information available for a purpose other than to achieve inter-
operability of an independently created computer program with other programs, then
such action is a violation of this Act. In addition, these acts are permitted only
to the extent that doing so does not constitute infringement, or violate other ap-
plicable law.

Section 102(f)(4) defines "interoperability" as the ability of computer programs
to exchange information, and for such programs mutually to use the information which
has been exchanged. The seamless exchange of information is a key element of soft-
ware interoperability. Hence, Section 102(f) applies to computer programs as such,
regardless of their medium of fixation and not to works generally, such as music or
audiovisual works, which may be fixed and distributed in digital form. Because the
goal of interoperability is the touchstone of the exceptions contained in Section
102(f), the Committee emphasizes that nothing in those subsections can be read to
authorize the circumvention of any technological protection measure that controls
access to any work other than a computer program, or the trafficking in products or
services for that purpose.

(g) Encryption research

As previously discussed in the background section to this report, the Committee
views encryption research as critical to the growth and vibrancy of electronic com-
merce. Section 102(g) therefore provides **44 statutory clarification for the field
of encryption research, in light of the prohibitions otherwise contained in Section
102. Section 102(g)(1) defines "encryption research" and "encryption technology."
Section 102(g)(2) identifies permissible encryption research activities, notwith-
standing the provisions of Section 102(a)(1)(A), including: whether the person law-
fully obtained the encrypted copy; the necessity of the research; whether the person
made a good faith effort to obtain authorization before circumventing; and whether
the research constitutes infringement or a violation of other applicable law.

The Committee recognizes that courts may be unfamiliar with encryption research
and technology, and may have difficulty distinguishing between a legitimate encryp-
tion research and a so-called "hacker" who seeks to cloak his activities with this
defense. Section 102(g)(3) therefore contains a non-exhaustive list of factors a
court shall consider in determining whether a person properly qualifies for the en-
cryption research defense.

Section 102(g)(4) is concerned with the development and distribution of tools-
typically software-which are needed to conduct permissible encryption research. In
particular, subparagraph (A) provides that it is not a violation of Section
102(a)(2) to develop and employ technological means to circumvent for the sole pur-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

pose of performing acts of good faith encryption research permitted under Section
102(g)(2). Subparagraph (B) permits a person to provide such technological means to
another person with whom the first person is collaborating in good faith encryption
research permitted under Section 102(g)(2). Additionally, a person may provide the
technological means to another person for the purpose of having the second person
verify the results of the first person's good faith encryption research.

The Committee is aware of additional concerns that Section 102 might inadvertently
restrict a systems operator's ability to perform certain functions critical to the
management of sophisticated computer networks. For example, many independent pro-
grammers have created utilities designed to assist in the recovery of passwords or
password-protected works when system users have forgotten their passwords. Because
Section 102 prohibits circumvention without the authorization of the copyright own-
er, circumvention to gain access to one's own work, as a matter of logic, does not
violate Section 102.

The law would also not prohibit certain kinds of commercial "key-cracker"
products, e.g., a computer program optimized to crack certain "40-bit" encryption
keys. Such machines are often rented to commercial customers for the purpose of
quick data recovery of encrypted data. Again, if these products do not meet any of
the three criteria under Section 102(a)(2) because these products facilitate a per-
son's access to his or her own works, they would not be prohibited by Section 102.

In addition, network and web site management programs increasingly contain compon-
ents that test systems security and identify common vulnerabilities. These programs
are valuable tools for systems administrators and web site operators to use in the
course of their regular testing of their systems' security. The testing of such
"firewalls" does not violate Section 102 because in most cases **45 the firewalls are
protecting computer and communications systems and not necessarily the specific
works stored therein. Accordingly, it is the view of the Committee that no special
exception is needed for these types of legitimate products.

Finally, Section 102(g)(5) requires the Assistant Secretary of Commerce for Commu-
nications and Information to report to Congress, within one year of enactment, on
the effect Section 102(g) has had on the field of encryption research, the adequacy
of technological protection for copyrighted works, and protection of copyright own-
ers against unauthorized access.

(h) Components or parts to prevent access of minors to the Internet

The Committee is concerned that Section 102(a) might inadvertently make it unlaw-
ful for parents to protect their children from pornography and other harmful materi-
al available on the Internet, or have unintended legal consequences for manufactur-
ers of products designed solely to enable parents to protect their children in this
fashion. Section 102(h) addresses these concerns.

(i) Protection of personally identifying information

As previously stated in the background section to this report, Section 102(i)(1)
is designed to ensure that if a copyright owner conspicuously discloses that the
technological protection measure, or any work it protects, contains any personal
data gathering capability, and the consumer is given the capability to curtail or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

prohibit effectively any such gathering or dissemination of personal information,
then the consumer could not legally circumvent the technological protection measure.
In addition, under Section 102(i)(2), if the copyright holder conspicuously dis-
closes that the technological protection measure, or any work it protects, does not
contain the capability of collecting or disseminating personally identifying inform-
ation reflecting the on-line activities of a person who seeks to gain access to the
work protected, then (once again) the consumer could not legally circumvent the
technological protection measure.

   In both such circumstances, there would be no need for consumers to circumvent
technological protection measures because conspicuous disclosures indicate whether
data gathering is being conducted and if so, the capability for thwarting such pri-
vacy invasions is extended to consumers. Only if there is no disclosure of privacy-
related practices, or instances where consumers are left without the capability to
disable the gathering of personal information, could a consumer circumvent a techno-
logical protection measure to protect his or her own privacy.

Section 103. Integrity of copyright management information

   Section 103 implements the obligation contained in Article 12 of the Copyright
Treaty and Article 19 of the Performances and Phonograms Treaty that contracting
parties "provide adequate and effective legal remedies" against any person who know-
ingly and without authority removes or alters copyright management information
(CMI), or who distributes, imports, broadcasts, or communicates **46** to the public,
works or copies of works knowing that such information has been removed or altered
without authority.

(a) False copyright management information

   Section 103(a) establishes a general prohibition against intentionally providing
false copyright management information, as defined in subsection (c), and against
distributing, or importing for distribution, false copyright management information.

(b) Removal or alteration of copyright management information

   Section 103(b) establishes general prohibitions against removing or altering CMI,
against distributing or importing for distribution altered CMI, and against distrib-
uting, importing for distribution or publicly performing works in which CMI has been
removed.

(c) Definitions

   Section 103(c) defines "copyright management information." To fall within the
definition, the information must be conveyed in connection with copies or phonore-
cords, performances or displays of the copyrighted work.

(d) Law enforcement and intelligence activities

   Section 103(d) creates an exception for the lawfully authorized investigative,
protective, or intelligence activities of an officer, agent, or employee of, the
United States, a State, or a political subdivision of a State, or of persons acting

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

pursuant to a contract with such an entity.

(e) Limitations on liability

  Section 103(e) recognizes special problems that certain broadcasting or cable en-
tities may have with the transmission of copyright management information. Under
Section 103(e), radio and television broadcasters, cable systems, and persons who
provide programming to such broadcasters or systems, who do not intend to induce,
enable, facilitate or conceal infringement may be eligible for a limitation on liab-
ility for violation of the copyright management information provisions of Section
103(b) in certain, limited situations.
  In the case of an analog transmission, Section 103(e)(1) provides that an eligible
person will not be held liable for violating provisions of subsection (b) if it is
not "technically feasible" for that person to avoid the violation or if avoiding the
violation would "create an undue financial hardship." Avoiding a violation of sub-
section (b) with respect to the transmission of credits that are of an excessive
duration in relation to standard practice in the relevant industries (for instance,
the motion picture and television broadcast industries) is one example of an activ-
ity that may "create an undue financial hardship" under Section 103(e)(1). As indic-
ated above, this limitation on liability applies only if such person did not intend,
by engaging in such activity, to induce, enable, facilitate, or conceal infringe-
ment.
  Section 103(e)(2) provides a limitation on liability in the case of a digital
transmission, and contemplates voluntary digital transmission**47** standards for the
placement of copyright management information. Separate standards are likely to be
set for the location of copyright management information in different categories of
works. For instance, the standard(s) for the location of the name of the copyright
owner in a sound recording or musical work to be broadcast by radio stations may
differ-and be set in a separate standard-setting process-from the standard for the
location of such information in a motion picture to be broadcast by television sta-
tions.
  Paragraph (2)(A) provides that if a digital transmission standard for the place-
ment of copyright management information for a category of works is set in a volun-
tary, consensus standard-setting process involving a representative cross-section of
the relevant copyright owners and relevant transmitting industry, including, but not
limited to, representatives of radio or television broadcast stations, cable sys-
tems, and copyright owners of a category of works that are intended for public per-
formance by such stations or systems, an eligible person will not be liable for a
violation of subsection (b) if the copyright management information involved in the
violation was not placed in a location specified by the standard for that informa-
tion. The eligible person, however, cannot qualify for this limitation on liability
if that person was responsible for the nonconforming placement.
  Section 103(e)(2)(B)(i) provides that until such a standard is set for a category
of works, an eligible person will not be liable for a violation of subsection (b) if
the transmission of the copyright management information would cause a perceptible
visual or aural degradation of the digital signal. Section 103(e)(2)(B)(ii) provides
that during this time period before a standard is set, an eligible person also will
not be liable if the digital transmission of the information would conflict with an

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

applicable government regulation or industry standard relating to transmission of
information in a digital signal, such as the regulation requiring the placement of
closed captioning in line 21 of the vertical blanking interval (47 U.S.C. S 613; 47
C.F.R. S 79.1). For purposes of this paragraph, however, the applicable industry-
wide standard must be of a type specified in subparagraphs (2)(B)(ii) (II) or (III).
The first type, defined in paragraph (2)(B)(ii)(II), includes only those standards
that were adopted by a voluntary, consensus standards body, such as the Advanced
Television Systems Committee, before the effective date of Section 103. The other
type, defined in subparagraph (2)(B)(ii)(III), includes only those standards adopted
in a voluntary, consensus standards-setting process open to participation by groups,
including but not limited to a representative cross-section of radio or television
broadcast stations, cable systems, and copyright owners of a category of works that
are intended for public performance by such stations or systems.

Section 104. Civil remedies

(a) Civil actions

  Section 104(a) sets forth the general proposition that civil remedies are avail-
able for violations of Sections 102 and 103. This provision also establishes the
jurisdiction for such civil actions as the **48** "appropriate U.S. district court" and
limits standing to those persons injured by a violation of Sections 102 or 103.

(b) Powers of the court

  Section 104(b) defines the powers of the court hearing a case brought under Sec-
tion 104(a).

(c) Award of damages

  Section 104(c) is divided into five paragraphs, each of which addresses the award-
ing of damages to a prevailing party in an action brought under Section 104(a).

Section 105. Criminal offenses and penalties

(a) In general

  Section 105(a) provides for criminal penalties for violations of Sections 102 and
103.

(b) Limitation for nonprofit library, archives, or educational institution

  Section 105(b) exempts completely any nonprofit library, nonprofit archives, or
nonprofit educational institution from the criminal penalties contained in subsec-
tion (a).

(c) Statute of limitations

  Section 105(c) provides for a 5-year statute of limitations for criminal offenses.

Section 106. Savings clause

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

  Section 106 establishes that nothing in Title I in any way limits the applicabil-
ity of Federal or State privacy laws relating to the use of the Internet.

Section 107. Development and implementation of technological protection measures

  Section 107 establishes a mechanism for monitoring, evaluating, and informing the
Congress of the impact of this legislation, especially on the key issue of the role
of technological protection measures.

(a) Statement of congressional policy and objective

  Section 107(a) expresses the sense of Congress that technological protection meas-
ures, developed by the private sector through voluntary, industry-led processes,
will play a crucial role in the healthy development of the Internet and other new
paths for dissemination of copyrighted materials. Such measures can facilitate law-
ful uses of such materials, while safeguarding the private property interests that
are recognized by the copyright law. Section 107(a) thus identifies an open, volun-
tary, multi-industry process for expeditious implementation of these technological
protection measures.

**\*49** (b) Technological protection measures

  Section 107(b) mandates at least three technological protection measures for im-
plementation pursuant to Section 107(a) that are especially important in achieving
the full potential of the Internet and other digital media: (1) those that enable
nonprofit libraries to continue in their critical role of lending copyrighted mater-
ials to individual patrons; (2) those that effectively protect against infringement
of copyrighted materials; and (3) those that facilitate a diversity of legitimate
uses, by individual members of the public, of copyrighted works in digital formats.

(c) Procedures for developing and implementing technological protection measures

  Section 107(c) makes clear that Congress anticipates that the technological pro-
tection measures whose development and implementation are mandated pursuant to Sec-
tion 107(a) will: be developed pursuant to a broad, private sector consensus; be
made available on reasonable and non-discriminatory terms; and not impose substan-
tial costs or burdens on copyright owners or on manufacturers of hardware and soft-
ware used in conjunction with copyrighted works in digital formats.

(d) Oversight and reporting

  Section 107(d) establishes an oversight process for monitoring the impact of this
legislation, and specifically its anti-circumvention provisions, on the access of
individuals to copyrighted materials in digital formats. For example, the Secretary
would have to evaluate the extent to which Section 102 and the regulations issued
thereunder pose a serious impediment to the development and production of competit-
ive goods and services. It specifically directs the Secretary of Commerce, in con-
sultation with the Register of Copyrights and the Assistant Secretary of Commerce
for Communications and Information, to report, over the course of the next three
years, annually to the House Committees on Commerce and on the Judiciary, and the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

Senate Committees on Commerce, Science, and Transportation and on the Judiciary on
the extent of that impact.

Section 108. Technical amendments

   Section 108 incorporates numerous technical amendments.
   Section 109. Effective date.
   Section 109 makes the effective date the date of enactment.

           TITLE II-INTERNET COPYRIGHT INFRINGEMENT LIABILITY

   The liability of on-line service providers and Internet access providers for copy-
right infringements that take place in the on-line environment has been a controver-
sial issue. Title II of the Digital Millennium Copyright Act addresses this complex
issue. Title II preserves strong incentives for service providers and copyright own-
ers to cooperate to detect and deal with copyright infringements that take place in
the digital networked environment. At the same time, it provides greater certainty
to service providers concerning*50 their legal exposure for infringements that may
occur in the course of their activities.
   New Section 512 contains limitations on service providers' liability for five gen-
eral categories of activity set forth in subsections (a) through (d) and subsection
(f). As provided in subsection (k), new Section 512 is not intended to imply that a
service provider is or is not liable as an infringer either for conduct that quali-
fies for a limitation of liability or for conduct that fails to so qualify. Rather,
the limitations of liability apply if the provider is found to be liable under ex-
isting principles of law.
   The limitations in subsections (a) through (d) protect qualifying service  pro-
viders from liability for all monetary relief for direct, vicarious and contributory
infringement. Monetary relief is defined in subsection (j)(2) as encompassing dam-
ages, costs, attorneys' fees, and any other form of monetary payment. These subsec-
tions also limit injunctive relief against qualifying service providers to the ex-
tent specified in subsection (i). To qualify for these protections, service pro-
viders must meet the conditions set forth in subsection (h), and service providers'
activities at issue must involve a function described in subsection (a), (b), (c),
(d) or (f), respectively. The liability limitations apply to networks "operated by
or for the service provider," thereby protecting both service providers who offer a
service and subcontractors who may operate parts of, or an entire, system or network
for another service provider.

Section 201. Short title

   Section 201 establishes the short title for Title II as the "Internet Copyright
Infringement Liability Clarification Act of 1998."

Section 202. Limitations on liability for Internet copyright infringement

(a) In general

   Section 202(a) amends chapter 5 of the Copyright Act (17 U.S.C. S 501, et seq.) to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

create a new Section 512, titled "Liability of service providers for on-line in-
fringement of copyright." New Section 512(a) applies to communications functions as-
sociated with sending digital communications of others across digital networks, such
as the Internet and other on-line networks. It establishes a limitation on liability
for infringements that may occur in the provision of services falling within the
definition of subsection (j)(1)(A). The limitations on injunctive relief set forth
in subsection (i)(1)(B) are applicable when the functions at issue fall within the
provisions of subsection (a), and the service provider meets the threshold criteria
of subsection (h). These threshold criteria apply to all of the liability limita-
tions contained in new Section 512.

Subsection (a) applies to service providers transmitting, routing, or providing
connections for material, and some forms of intermediate and transient storage of
material in the course of performing these functions. For example, in the course of
moving packets of information across digital on-line networks, many intermediate and
transient copies of the information may be made in routers and servers along the
way. Such copies are created as an automatic consequence of the transmission pro-
cess. In this context, "intermediate**51 and transient" refers to such a copy made
and/or stored in the course of a transmission, not a copy made or stored at the
points where the transmission is initiated or received. The use of the term "trans-
mitting" throughout new Section 512 is not intended to be limited to transmissions
of "a performance or display" of "images or sounds" within the meaning of Section
101 of the Copyright Act.

Subsections (a)(1) through (5) limit the range of activities that qualify under
this subsection to ones in which a service provider plays the role of a "conduit"
for the communications of others. This limitation on liability applies if: (1) the
communication was initiated by or at the direction of a person other than the ser-
vice provider; (2) it is carried out through an automatic technical process without
selection of the material by the service provider; (3) the service provider does not
select the recipients of the material except as an automatic response to the request
of another; (4) no copy of the material made in the course of intermediate or tran-
sient storage is maintained on the system or network so that it is ordinarily ac-
cessible to anyone other than the anticipated recipients, and no copy is maintained
on the system or network in a manner ordinarily accessible to the anticipated recip-
ients for a longer period than is reasonably necessary for the communication; and
(5) the content (but not necessarily the form) of the material is not modified in
the course of transmission. Thus, for example, an e-mail transmission may appear to
the recipient without bolding or italics resulting from format codes contained in
the sender's message.

The term "selection of the material" in subsection (a)(2) means the editorial
function of determining what material to send, or the specific sources of material
to place on-line (e.g., a radio station), rather than "an automatic technical pro-
cess" of responding to a command or request, such as one from a user, an Internet
location tool, or another network. The term "automatic response to the request of
another" is intended to encompass a service provider's actions in responding to re-
quests by a user or other networks, such as requests to forward e-mail traffic or to
route messages to a mailing list agent (such as a "Listserv") or other discussion
group. The Committee intends subsection (a)(4) to cover copies made of material

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

while it is en route to its destination, such as copies made on a router or mail
server, storage of a web page in the course of transmission to a specific user,
store and forward functions, and other transient copies that occur en route. The
term "ordinarily accessible" is intended to encompass stored material that is
routinely accessible to third parties. For example, the fact that an illegal in-
truder might be able to obtain access to the material would not make it ordinarily
accessible to third parties. Neither, for example, would occasional access in the
course of maintenance by service provider personnel, nor access by law enforcement
officials pursuant to subpoena make the material "ordinarily accessible." However,
the term does not include copies made by a service provider for the purpose of mak-
ing the material available to other users. Such copying is addressed in subsection
(b).

New Section 512(b) applies to a different form of intermediate and temporary stor-
age than is addressed in subsection (a). In terminology**52** describing current tech-
nology, this storage is a form of "caching," which is used on some networks to in-
crease network performance and to reduce network congestion generally, as well as to
reduce congestion and delays to popular sites. This storage is intermediate in the
sense that the service provider serves as an intermediary between the originating
site and the ultimate user. The material in question is stored on the service pro-
vider's system or network for some period of time to facilitate access by users sub-
sequent to the one who previously sought access to it. For subsection (b) to apply,
the material must be made available on an originating site, transmitted at the dir-
ection of another person through the system or network operated by or for the ser-
vice provider to a different person, and stored through an automatic technical pro-
cess so that users of the system or network who subsequently request access to the
material from the originating site may obtain access to the material from the system
or network.

Subsections (b)(1) through (b)(5) clarify the circumstances under which subsection
(b) applies. Subsection (b)(1) provides that the material must be transmitted to
subsequent users without modification to its content in comparison to the way it was
originally transmitted from the originating site. The Committee intends that this
restriction apply, for example, so that a service provider who caches material from
another site does not change the advertising associated with the cached material on
the originating site without authorization from the originating site.

Subsection (b)(2) limits the applicability of the subsection to circumstances
where the service provider complies with certain updating commands.

Subsection (b)(3) provides that the service provider shall not interfere with the
ability of certain technology that is associated with the work by the operator of
the originating site to return to the originating site information, such as user
"hit" counts, that would have been available to the site had it not been cached. The
technology, however, must: (i) not significantly interfere with the performance of
the storing provider's system or network or with intermediate storage of the materi-
al; (ii) be consistent with generally accepted industry standard communications pro-
tocols applicable to Internet and on-line communications, such as those approved by
the Internet Engineering Task Force and the World Wide Web Consortium; and (iii) not
extract information beyond that which would have been obtained had the subsequent
users obtained access to the material directly on the originating site.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**


   Subsection (b)(4) applies to circumstances in which the originating site imposes a
prior condition on access.
   Subsection (b)(5) establishes a notification and take-down procedure for cached
material modeled on the procedure under new Section 512(c). However, this take-down
obligation does not apply unless the material has previously been removed from the
originating site, or the party submitting the notification has obtained a court or-
der for it to be removed from the originating site and notifies the service pro-
vider's designated agent of that order. This proviso has been added to subsection
(b)(5) because storage under subsection (b) occurs automatically, and unless in-
fringing material has been **53** removed from the originating site, the infringing ma-
terial would ordinarily simply be re-cached.
   New Section 512(c) limits the liability of qualifying service providers for claims
of direct, vicarious and contributory infringement for storage at the direction of a
user of material that resides on a system or network controlled or operated by or
for the service provider. Examples of such storage include providing server space
for a user's web site, for a chatroom, or other forum in which material may be pos-
ted at the direction of users. Subsection (c) defines the scope of this limitation
on liability. It also sets forth procedural requirements that copyright owners or
their agents and service providers must follow with respect to notifications of
claimed infringement under subsection (c)(3). Information that resides on the system
or network operated by or for the service provider through its own acts or decisions
and not at the direction of a user does not fall within the liability limitation of
subsection (c).
   New subsection (c)(1)(A) sets forth the applicable knowledge standard. This stand-
ard is met either by actual knowledge of infringement or, in the absence of such
knowledge, by awareness of facts or circumstances from which infringing activity is
apparent. The term "activity" is intended to mean activity using the material on the
system or network. The Committee intends such activity to refer to wrongful activity
that is occurring at the site on the provider's system or network at which the ma-
terial resides, regardless of whether copyright infringement is technically deemed
to occur at that site or at the location where the material is received. For ex-
ample, the activity at an on-line site offering audio or video may be unauthorized
public performance of a musical composition, a sound recording, or an audio-visual
work, rather than (or in addition to) the creation of an unauthorized copy of any of
these works.
   New subsection (c)(1)(A)(ii) can best be described as a "red flag" test. As stated
in new subsection (c)(1), a service provider need not monitor its service or affirm-
atively seek facts indicating infringing activity (except to the extent consistent
with a standard technical measure complying with new subsection (h)), in order to
claim this limitation on liability (or, indeed any other limitation provided by the
legislation). However, if the service provider becomes aware of a "red flag" from
which infringing activity is apparent, it will lose the limitation of liability if
it takes no action. The "red flag" test has both a subjective and an objective ele-
ment. In determining whether the service provider was aware of a "red flag," the
subjective awareness of the service provider of the facts or circumstances in ques-
tion must be determined. However, in deciding whether those facts or circumstances
constitute a "red flag"-in other words, whether infringing activity would have been

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

apparent to a reasonable person operating under the same or similar circumstances-an
objective standard should be used.

New subsection (c)(1)(A)(iii) provides that once a service provider obtains actual
knowledge or awareness of facts or circumstances from which infringing material or
activity on the service provider's system or network is apparent, the service pro-
vider does not lose the limitation of liability set forth in subsection (c) if it
acts expeditiously to remove or disable access to the infringing material. Because
the factual circumstances and technical parameters may vary **54** from case to case,
it is not possible to identify a uniform time limit for expeditious action.

New subsection (c)(1)(B) sets forth the circumstances under which a service pro-
vider would lose the protection of subsection (c) by virtue of its benefit from and
control over infringing activity. In determining whether the financial benefit cri-
terion is satisfied, courts should take a common-sense, fact-based approach, not a
formalistic one. In general, a service provider conducting a legitimate business
would not be considered to receive a "financial benefit directly attributable to the
infringing activity" where the infringer makes the same kind of payment as non-
infringing users of the provider's service. Thus, receiving a one-time set-up fee
and flat, periodic payments for service from a person engaging in infringing activ-
ities would not constitute receiving a "financial benefit directly attributable to
the infringing activity." Nor is subsection (c)(1)(B) intended to cover fees based
on the length of the message (e.g., per number of bytes) or by connect time. It
would however, include any such fees where the value of the service lies in provid-
ing access to infringing material.

New subsection (c)(1)(C) establishes that in cases where a service provider is no-
tified of infringing activity by a copyright owner or its authorized agent, in ac-
cordance with the notification procedures of new subsection (c)(3), the limitation
on the service provider's liability shall be maintained only if the service provider
acts expeditiously either to remove the infringing material from its system or to
prevent further access to the infringing material on the system or network. This "no-
tice and take-down" procedure is a formalization and refinement of a cooperative
process that has been employed to deal efficiently with network-based copyright in-
fringement.

The Committee emphasizes that new Section 512 does not specifically mandate use of
a notice and take-down procedure. Instead, a service provider wishing to benefit
from the limitation on liability under new subsection (c) must "take down" or dis-
able access to infringing material residing on its system or network in cases where
it has actual knowledge or that the criteria for the "red flag" test are met-even if
the copyright owner or its agent does not notify it of a claimed infringement. On
the other hand, the service provider is free to refuse to "take down" the material
or site-even after receiving a notification of claimed infringement from the copy-
right owner. In such a situation, the service provider's liability, if any, will be
decided without reference to new Section 512(c).

At the same time, copyright owners are not obligated to give notification of
claimed infringement in order to enforce their rights. However, neither actual know-
ledge nor awareness of a "red flag" may be imputed to a service provider based on
information from a copyright owner or its agent that does not comply with the noti-
fication provisions of new subsection (c)(3), in which case the limitation on liab-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

ility set forth in new subsection (c) may still apply.

New Section 512(c)(2) provides that to qualify for the limitation on liability in
new subsection (c), the service provider must designate an agent to receive notific-
ations under new subsection (c)(1)(C). The designation, provided to the Register of
Copyrights, and made available on the service provider's web site, is to contain **55
certain information necessary to communicate with the service provider concerning
allegedly infringing material or activity. The Register of Copyrights is directed to
maintain a directory of designated agents available for inspection by the public,
both on the web site of the Library of Congress, and in hard copy format on file at
the Copyright Office. The Committee does not intend or anticipate that the Register
will publish hard copies of the directory. The directory shall have entries for the
name, address, telephone number, and electronic mail address of an agent designated
by service providers. The service provider's designation shall substantially comply
with these elements.

New Section 512(c)(3) sets forth the procedures under which copyright owners and
their agents may provide effective notification to a service provider of allegations
of infringement on the provider's system or network. New subsection (c)(3)(A) re-
quires that to count as an effective notification, the notification must be in writ-
ing and submitted to the service provider's designated agent. New subsections
(c)(3)(A)(i)-(vi) then set forth the information to be included in an effective no-
tification. The standard against which a notification is to be judged is one of sub-
stantial compliance. New subsection (c)(3)(A)(i) provides that the notification must
be signed by the copyright owner, or its authorized agent, to be effective. The re-
quirement for signature, either physical or electronic, relates to the verification
requirements of new subsections (c)(3)(A)(v) and (vi). New subsection (c)(3)(A)(ii)
requires that the copyright owner identify the copyrighted work alleged to have been
infringed. Where multiple works at a single on-line site are covered by a single no-
tification, a representative list of such works at that site is sufficient. Thus,
for example, where a party is operating an unauthorized Internet jukebox from a par-
ticular site, it is not necessary that the notification list every musical composi-
tion or sound recording that has been, may have been, or could be infringed at that
site. Instead, it is sufficient for the copyright owner to provide the service pro-
vider with a representative list of those compositions or recordings in order that
the service provider can understand the nature and scope of the infringement being
claimed.

New subsection (c)(3)(A)(iii) requires that the copyright owner or its authorized
agent provide the service provider with information reasonably sufficient to permit
the service provider to identify and locate the allegedly infringing material. An
example of such sufficient information would be a copy or description of the al-
legedly infringing material and the so-called "uniform resource locator" (URL)
(i.e., web site address) which allegedly contains the infringing material. The goal
of this provision is to provide the service provider with adequate information to
find and examine the allegedly infringing material expeditiously.

New subsection (c)(3)(A)(iv) requires that the copyright owner or its authorized
agent provide reasonably sufficient identifying information concerning the owner or
its agent who submits the notification, such as an address, telephone number, and
(if available) an electronic mail address so that the service provider may contact

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)

**(Cite as: H.R. REP. 105-551(II))**


the complaining party. New subsection (c)(3)(A)(v) makes clear that the notification
from complaining parties must contain a statement that the complaining party has a
good faith belief that the allegedly **56** infringing use is not authorized by the
copyright owner, or its agent, or the law.

New subsection (c)(3)(A)(vi) specifies that the notification must contain a state-
ment that the information contained therein is accurate. The complaining party-be it
the copyright owner, or an authorized representative-also must confirm under penalty
of perjury, that it has authority to act on behalf of the owner of the exclusive
right that is allegedly being infringed. The term "perjury" is used in the sense
found elsewhere in the United States Code. See, e.g., 28 U.S.C. S 1746; 18 U.S.C. S
1621.

New subsection (c)(3)(B) addresses the effect of notifications that do not sub-
stantially comply with the requirements of new subsection (c)(3). Under new subsec-
tion (c)(3)(B), the court shall not consider such notifications as evidence of
whether the service provider has actual knowledge, is aware of facts or circum-
stances, or has received a notification for purposes of new subsection (c)(1)(A).
However, a defective notice provided to the designated agent may be considered in
evaluating the service provider's knowledge or awareness of facts and circumstances,
if: (i) the complaining party has provided the requisite information concerning the
identification of the copyrighted work, identification of the allegedly infringing
material, and information sufficient for the service provider to contact the com-
plaining party; and (ii) the service provider does not promptly attempt to contact
the person making the notification or take other reasonable steps to assist in the
receipt of notification that substantially complies with new subsection (c)(3)(A).
If the service provider subsequently receives a substantially compliant notice, the
provisions of new subsection (c)(1)(C) would then apply upon receipt of such notice.

The Committee intends that the substantial compliance standard in new subsections
(c)(2) and (c)(3) be applied so that technical errors (e.g., misspelling a name,
supplying an outdated area code if the phone number is accompanied by an accurate
address, supplying an outdated name if accompanied by an e-mail address that remains
valid for the successor of the prior designated agent or agent of a copyright owner)
do not disqualify service providers and copyright owners from the protections af-
forded under subsection (c). The Committee expects that the parties will comply with
the functional requirements of the notification provisions-such as providing suffi-
cient information so that a designated agent or the complaining party submitting a
notification may be contacted efficiently-in order to ensure that the notification
and take-down procedures set forth in this subsection operate efficiently.

New Section 512(d) addresses instances where information location tools refer or
link users to an on-line location containing infringing material or infringing
activity. The term "infringing activity" means the wrongful activity that is occur-
ring at the location to which the user is linked or referred by the information loc-
ation tool, without regard to whether copyright infringement is technically deemed
to have occurred at that location or at the location where the material is received.
The term "information location tools" includes: a directory or index of on-line
sites or material, such as a search engine that identifies pages by specified cri-
teria; a reference to other on-line material, such as a list of recommended **57**
sites; a pointer that stands for an Internet location or address; and a hypertext

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**


link which allows users to access material without entering its address.

New subsection (d) incorporates the notification and take-down procedures of new
subsection (c), and applies them to the provision of references and links to in-
fringing sites. A service provider is entitled to the liability limitations of new
subsection (d) if it: (1) lacks actual knowledge of infringement on the other site,
and is not aware of facts or circumstances from which infringing activity in that
location is apparent; (2) does not receive a financial benefit directly attributable
to the infringing activity on the site, where the service provider has the right and
ability to control the infringing activity; and (3) responds expeditiously to remove
or disable the reference or link upon receiving a notification of claimed infringe-
ment as described in new subsection (c)(3). The notification procedures under new
subsection (d) follow those set forth in new subsection (c). However, the informa-
tion submitted by the complaining party under new subsection (c)(3)(A)(iii) is the
identification of the reference or link to infringing material or activity, and the
information reasonably sufficient to permit the service provider to locate that ref-
erence or link.

New Section 512(d) provides a safe harbor that would limit the liability of a ser-
vice provider that refers or links users to an on-line location containing in-
fringing material or activity by using "information location tools," such as hyper-
link directories and indexes. A question has been raised as to whether a service
provider would be disqualified from the safe harbor based solely on evidence that it
had viewed the infringing Internet site. If so, there is concern that on-line dir-
ectories prepared by human editors and reviewers, who view and classify various In-
ternet sites, would be denied eligibility to the information location tools safe
harbor, in an unintended number of cases and circumstances. This is an important
concern because such on-line directories play a valuable role in assisting Internet
users to identify and locate the information they seek on the decentralized and dy-
namic networks of the Internet.

Like the information storage safe harbor in Section 512(c), a service provider
would qualify for this safe harbor if, among other requirements, it "does not have
actual knowledge that the material or activity is infringing" or, in the absence of
such actual knowledge, it is "not aware of facts or circumstances from which in-
fringing activity is apparent." Under this standard, a service provider would have
no obligation to seek out copyright infringement, but it would not qualify for the
safe harbor if it had turned a blind eye to "red flags" of obvious infringement.

For instance, the copyright owner could show that the provider was aware of facts
from which infringing activity was apparent if the copyright owner could prove that
the location was clearly, at the time the directory provider viewed it, a "pirate"
site of the type described below, where sound recordings, software, movies, or books
were available for unauthorized downloading, public performance, or public display.
Absent such "red flags" or actual knowledge, a directory provider would not be sim-
ilarly aware merely because it saw one or more well known photographs of a celebrity
at a site devoted to that person. The provider could not be expected, **58** during the
course of its brief cataloguing visit, to determine whether the photograph was still
protected by copyright or was in the public domain; if the photograph was still pro-
tected by copyright, whether the use was licensed; and if the use was not licensed,
whether it was permitted under the fair use doctrine.


© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**


   The intended objective of this standard is to exclude from the safe harbor soph-
isticated "pirate" directories-which refer Internet users to other selected Internet
sites where pirate software, books, movies, and music can be downloaded or transmit-
ted. Such pirate directories refer Internet users to sites that are obviously in-
fringing because they typically use words such as "pirate," "bootleg," or slang
terms in their URL and header information to make their illegal purpose obvious, in
the first place, to the pirate directories as well as other Internet users. Because
the infringing nature of such sites would be apparent from even a brief and casual
viewing, safe harbor status for a provider that views such a site and then estab-
lishes a link to it would not be appropriate. Pirate directories do not follow the
routine business practices of legitimate service providers preparing directories,
and thus evidence that they have viewed the infringing site may be all that is
available for copyright owners to rebut their claim to a safe harbor.

   In this way, the "red flag" test in new Section 512(d) strikes the right balance.
The common-sense result of this "red flag" test is that on-line editors and cata-
logers would not be required to make discriminating judgments about potential copy-
right infringement. If, however, an Internet site is obviously pirate, then seeing
it may be all that is needed for the service provider to encounter a "red flag." A
provider proceeding in the face of such a "red flag" must do so without the benefit
of a safe harbor.

   Information location tools are essential to the operation of the Internet; without
them, users would not be able to find the information they need. Directories are
particularly helpful in conducting effective searches by filtering out irrelevant
and offensive material. The Yahoo! directory, for example, currently categorizes
over 800,000 on-line locations and serves as a "card catalogue" to the World Wide
Web, which over 35,000,000 different users visit each month. Directories such as Ya-
hoo!'s usually are created by people visiting sites to categorize them. It is pre-
cisely the human judgment and editorial discretion exercised by these cataloguers
which makes directories valuable.

   This provision is intended to promote the development of information location
tools generally, and Internet directories such as Yahoo!'s in particular, by estab-
lishing a safe harbor from copyright infringement liability for information location
tool providers if they comply with the notice and take-down procedures and other re-
quirements of new subsection (d). The knowledge or awareness standard should not be
applied in a manner which would create a disincentive to the development of direct-
ories which involve human intervention. Absent actual knowledge, awareness of in-
fringement as provided in new subsection (d) should typically be imputed to a dir-
ectory provider only with respect to pirate sites or in similarly obvious and con-
spicuous circumstances, and not simply because the provider viewed an infringing
site during the course of assembling the directory.

   **\*59** New Section 512(e) establishes a right of action against any person who know-
ingly misrepresents that material or activity on-line is infringing, or that materi-
al or activity was removed or disabled by mistake or misidentification under the
"put-back" procedure set forth in new subsection (f). Actions may be brought under
new subsection (e) by any copyright owner, a copyright owner's licensee, or by a
service provider, who is injured by such misrepresentation, as a result of the ser-
vice provider relying upon the misrepresentation in either taking down material or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

putting material back on-line. Defendants who make such a knowing misrepresentation
are liable for any damages, including costs and attorneys" fees, incurred by any of
these parties as a result of the service provider's reliance upon the misrepresenta-
tion. This subsection is intended to deter knowingly false allegations to service
providers in recognition that such misrepresentations are detrimental to rights
holders, service providers, and Internet users.

New Section 512(f) provides immunity to service providers for taking down in-
fringing material, and establishes a "put back" procedure under which subscribers
may contest a complaining party's notification of infringement provided under new
subsection (c)(3). The put-back procedures were added to balance the incentives cre-
ated in new Section 512 for service providers to take down material against third
parties' interests in ensuring that material not be taken down. In particular, new
subsection (f)(1) immunizes service providers from any claim based on the service
provider's good-faith disabling of access to, or removal of, material or activity
claimed to be infringing. The immunity also applies where the service provider dis-
ables access to, or removes, material or activity based on facts or circumstances
from which infringing activity is apparent. This immunity is available even if the
material or activity is ultimately determined not to be infringing. The purpose of
this subsection is to protect service providers from liability to third parties
whose material service providers take down in a good faith effort to comply with the
requirements of new subsection (c)(1).

New subsection (f)(2) establishes a "put back" procedure through an exception to
the immunity set forth in new subsection (f)(1). The exception applies in a case in
which the service provider, pursuant to a notification provided under new subsection
(c)(1)(C) in accordance with new subsection (c)(3), takes down material that a sub-
scriber has posted to the system or network. In such instances, to retain the im-
munity set forth in new subsection (f)(1) with respect to the subscriber whose con-
tent is taken down, the service provider must take three steps.

First, under new subsection (f)(2)(A), the service provider is to take reasonable
steps to notify the subscriber promptly of the removal or disabling of access to the
subscriber's material. The Committee intends that "reasonable steps" include, for
example, sending an e-mail notice to an e-mail address associated with a posting, or
if only the subscriber's name is identified in the posting, sending an e-mail to an
e-mail address that the subscriber submitted with its subscription. The Committee
does not intend that this subsection impose any obligation on service providers to
search beyond the four corners of a subscriber's posting or their own records for
that subscriber in order to obtain contact information. Nor does the **\*60** Committee
intend to create any right on the part of subscribers who submit falsified informa-
tion in their postings or subscriptions to complain if a service provider relies
upon the information submitted by the subscriber.

Second, pursuant to new subsection (f)(2)(B), the subscriber may then file a
counter notification, in accordance with the requirements of new subsection (f)(3),
contesting the original take down on grounds of mistake or misidentification of the
material and requesting "put back" of the material that the service provider has
taken down. If a subscriber files a counter notification with the service provider's
designated agent, new subsection (f)(2)(B) calls for the service provider to
promptly forward a copy to the complaining party who submitted the take down re-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

quest.

And third, under new subsection (f)(2)(C), the service provider is to place the subscriber's material back on-line, or cease disabling access to it, between 10 and 14 business days after receiving the counter notification, unless the designated agent receives a further notice from the complaining party that the complaining party has filed an action seeking a court order to restrain the subscriber from engaging in the infringing activity on the service provider's system or network with regard to the material in question.

Subscriber counter notifications must substantially comply with defined requirements set forth in new subsection (f)(3). Notifications shall be signed by the subscriber physically or by electronic signature; identify the material taken down and the location from which it was taken down; include a statement under penalty of perjury that the subscriber has a good faith belief that the material was taken down as a result of mistake or misidentification of the material; and include the subscriber's contact information, as well as a statement consenting to the jurisdiction of a Federal district court and to accept service of process from the complaining party or the complaining party's agent. The substantial compliance standard is the same as that set forth in new subsections (c) (2) and (3).

New subsection (f)(4) is included to make clear the obvious proposition that a service provider's compliance with the put-back procedure does not subject it to liability for copyright infringement or cause it to lose its liability limitation with respect to the replaced material.

New Section 512(g) creates a procedure by which copyright owners or their authorized agents who have submitted or will submit a request for notification satisfying the requirements of new subsection (c)(3)(A) may obtain an order for identification of alleged infringers who are users of a service provider's system or network. Under this procedure, the copyright owner or agent files three documents with the clerk of any Federal district court: a copy of the notification; a proposed order; and a sworn declaration that the purpose of the order is to obtain the identity of an alleged infringer, and that the information obtained will only be used to protect the owner's rights under this Title.

Orders issued under new subsection (g) shall authorize and order the service provider expeditiously to disclose to the person seeking the order information sufficient to identify the alleged infringer to the extent such information is available to the service provider. **61** The Committee intends that an order for disclosure be interpreted as requiring disclosure of information in the possession of the service provider, rather than obliging the service provider to conduct searches for information that is available from other systems or networks. The Committee intends that such orders be expeditiously issued if the notification meets the provisions of new subsection (c)(3)(A) and the declaration is properly executed. The issuing of the order should be a ministerial function performed quickly for this provision to have its intended effect. After receiving the order, the service provider shall expeditiously disclose to the copyright owner or its agent the information required by the order to the extent that the information is available to the service provider, regardless of whether the service provider responds to the notification of claimed infringement.

New Section 512(h) sets forth two conditions that a service provider must satisfy

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

to be eligible for the limitations on liability provided in new subsections (a)
through (d). First, the service provider is expected to adopt and reasonably imple-
ment a policy for the termination in appropriate circumstances of the accounts of
subscribers [FN3] of the provider's service who are repeat on-line infringers of
copyright. The Committee recognizes that there are different degrees of on-line
copyright infringement, from the inadvertent and noncommercial, to the willful and
commercial. In addition, the Committee does not intend this provision to undermine
the principles of new subsection (l) or the knowledge standard of new subsection (c)
by suggesting that a provider must investigate possible infringements, monitor its
service, or make difficult judgments as to whether conduct is or is not infringing.
However, those who repeatedly or flagrantly abuse their access to the Internet
through disrespect for the intellectual property rights of others should know that
there is a realistic threat of losing that access.

   Second, a provider's system must accommodate, and not interfere with, standard
technical measures used to identify or protect copyrighted works. The Committee be-
lieves that technology is likely to be the solution to many of the issues facing
copyright owners and service providers in this digital age. For that reason, the
Committee has included new subsection (h)(1)(B), which is intended to encourage ap-
propriate technological solutions to protect copyrighted works. The Committee
strongly urges all of the affected parties expeditiously to commence voluntary,
inter-industry discussions to agree upon and implement the best technological solu-
tions available to achieve these goals.

   New subsection (h)(1)(B) is explicitly limited to "standard technical measures"
that have been developed pursuant to a broad consensus of both copyright owners and
service providers in an open, fair, voluntary, multi-industry standards process. The
Committee anticipates that these provisions could be developed both in recognized
open standards bodies or in ad hoc groups, as long as the **\*62** process used is open,
fair, voluntary, and multi-industry and the measures developed otherwise conform to
the requirements of the definition of standard technical measures set forth in new
subsection (h)(2). A number of recognized open standards bodies have substantial ex-
perience with Internet issues. The Committee also notes that an ad hoc approach has
been successful in developing standards in other contexts, such as the process that
has developed copy protection technology for use in connection with digital video
disk players.

   New Section 512(i) defines the terms and conditions under which an injunction may
be issued against a service provider that qualifies for the limitations on liability
set forth in new subsections (a) through (d), but is otherwise subject to an injunc-
tion under existing principles of law. New subsection (i)(1) limits the scope of in-
junctive relief that may be ordered against a qualifying provider. New subsection
(i)(2) identifies factors a court must consider in deciding whether to grant in-
junctive relief and in determining the appropriate scope of injunctive relief.

   New subsection (i)(1) is divided into two subparagraphs. New subparagraph (A)
defines the scope of injunctive relief available against service providers who qual-
ify for the limitations of liability set forth in new subsections (b), (c) or (d).
Only three forms of injunctive relief may be granted. First, pursuant to new subsec-
tion (i)(1)(A)(i), the court may provide for the removal or blocking of infringing
material or activity that is residing at a specific location on the provider's sys-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

tem or network. This is essentially an order to take the actions identified in new
subsection (c)(1)(C) to "remove, or disable access" to the material that is claimed
to be infringing or to be the subject of infringing activity.

   Second, under new subsection (i)(1)(A)(ii), the court may order the provider to
terminate the accounts of a subscriber [FN4] of the provider's service who is enga-
ging in infringing activity. And third, pursuant to new subsection (i)(1)(A)(iii),
the court may, under appropriate circumstances, enter a different form of injunction
if the court considers it necessary to prevent or restrain infringement of specific
copyrighted material that resides at an identified on-line location. If a court
enters an injunction other than that contemplated in new subparagraphs (A) (i) or
(ii), the court must determine that the injunctive relief is the least burdensome
relief to the service provider among those forms of relief that are comparably ef-
fective.

   New subsection (i)(1)(B) sets forth a different set of remedies available for in-
junctions against service providers qualifying for the limitation on remedies set
forth in new subsection (a). In such cases, if a court determines that injunctive
relief is appropriate, it may only grant injunctive relief in one or both of two
specified forms. The first, pursuant to new subparagraph (B)(i), is an order to the
service provider to terminate subscriber accounts that are specified in the order.
The second form of relief, pursuant to new subparagraph (B)(ii) and available in
cases in which a provider is engaging in infringing activity relating to a foreign
on-line location, is an order to take reasonable steps to block access to a specif-
ic, **63** identified foreign on-line location. Such blocking orders are not available
against a service provider qualifying under new subsection (a) in the case of in-
fringing activity on a site within the United States or its territories.

   New subsection (i)(2) sets forth mandatory considerations for the court beyond
those that exist under current law. These additional considerations require the
court to consider factors of particular significance in the digital on-line environ-
ment. New subsection (i)(3) prohibits most forms of ex parte injunctive relief
(including temporary and preliminary relief) against a service provider qualifying
for a liability limitation under new Section 512. A court may issue an order to en-
sure the preservation of evidence or where the order will have no material adverse
effect on the operation of the provider's network.

   New Section 512(j) provides definitions of the term "service provider" as used in
this Title, as well as a definition of the term "monetary relief." Only an entity
that is performing the functions of a "service provider" is eligible for the limita-
tions on liability set forth in new Section 512 with respect to those functions.

   The first definition of a "service provider," set forth in new subsection
(j)(1)(A), narrowly defines a range of functions and applies only to use of the term
in new subsection (a). As used in new subsection (a), the term "service provider"
means any entity offering the transmission, routing or providing of connections for
digital on-line communications, between or among points specified by a user, of ma-
terial of a user's choosing without modification to the content of the material as
sent or received. This free-standing definition is derived from the definition of
"telecommunications" found in the Communications Act of 1934 (47 U.S.C. S 153(48))
in recognition of the fact that the functions covered by new subsection (a) are es-
sentially conduit-only functions. The Committee, however, has tweaked the definition

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**


for purposes of new subsection (j)(1)(A) to ensure that it captures offerings over
the Internet and other on-line media. Thus, the definition in new subsection
(j)(1)(A) not only includes "the offering of transmission, routing or providing of
connections," but also requires that the service provider be providing such services
for communications that are both "digital" and "on-line." By "on-line" communica-
tions, the Committee means communications over interactive computer networks, such
as the Internet. Thus, over-the-air broadcasting, whether in analog or digital form,
or a cable television system, or a satellite television service, would not qualify,
except to the extent it provides users with on-line access to a digital network such
as the Internet, or it provides transmission, routing, or connections to connect ma-
terial to such a network, and then only with respect to those functions. An entity
is not disqualified from being a "service provider" because it alters the form of
the material, so long as it does not alter the content of the material. As a
threshold matter, a service provider's performance of a particular function with re-
spect to allegedly infringing activity falls within the "service provider" defini-
tion in new subsection (j)(1)(A) if and only if such function is within the range of
functions defined in new subsection (j)(1)(A). For example, hosting a web site does
not fall within the new subsection (j)(1)(A) definition, whereas the mere provision
of connectivity to a web site does **64 fall within that definition. The new subsec-
tion (j)(1)(A) definition is not intended to exclude providers that perform addi-
tional functions, including the functions identified in new subsection (j)(1)(B).
Conversely, the fact that a provider performs some functions that fall within the
definition of new subparagraph (A) does not imply that its other functions that do
not fall within the definition of new subparagraph (A) qualify for the limitation of
liability under new subsection (a).

  The second definition of "service provider," set forth in new subsection
(j)(1)(B), applies to the term as used in any other new subsection of new Section
512. This definition is broader than the first, covering providers of on-line ser-
vices or network access, or the operator of facilities therefor. This definition in-
cludes, for example, services such as providing Internet access, e-mail, chat room
and web page hosting services. The new subsection (j)(1)(B) definition of service
provider, for example, includes universities and schools to the extent they perform
the functions identified in new subsection (j)(1)(B). The definition also specific-
ally includes any entity that falls within the first definition of service provider.
A broadcaster or cable television system or satellite television service would not
qualify, except to the extent it performs functions covered by (j)(1)(B).

  Finally, new subsection (j)(2) defines the term "monetary relief" broadly for pur-
poses of this Section as encompassing damages, costs, attorneys' fees and any other
form of monetary payment.

  New Section 512(k) clarifies that other defenses under copyright law are not af-
fected and codifies several important principles. In particular, new Section 512
does not define what is actionable copyright infringement in the on-line environ-
ment, and does not create any new exceptions to the exclusive rights under copyright
law. The rest of the Copyright Act sets those rules. Similarly, new Section 512 does
not create any new liabilities for service providers or affect any defense available
to a service provider. Enactment of new Section 512 does not bear upon whether a
service provider is or is not an infringer when its conduct falls within the scope


© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

of new Section 512. Even if a service provider's activities fall outside the limita-
tions on liability specified in the bill, the service provider is not necessarily an
infringer; liability in these circumstances would be adjudicated based on the doc-
trines of direct, vicarious or contributory liability for infringement as they are
articulated in the Copyright Act and in the court decisions interpreting and apply-
ing that statute, which are unchanged by new Section 512. In the event that a ser-
vice provider does not qualify for the limitation on liability, it still may claim
all of the defenses available to it under current law. New section 512 simply
defines the circumstances under which a service provider, as defined in this new
Section, may enjoy a limitation on liability for copyright infringement.

    New Section 512(l) is designed to protect the privacy of Internet users. This new
subsection makes clear that the applicability of new subsections (a) through (d) is
in no way conditioned on a service provider: (1) monitoring its service or affirm-
ively seeking facts indicating infringing activity except to the extent consistent
with implementing a standard technical measure under new subsection (h); or (2) ac-
cessing, removing or disabling access to, material if **65 such conduct is prohibited
by law, such as the Electronic Communications Privacy Act.

    New Section 512(m) establishes a rule of construction applicable to new subsec-
tions (a) through (d). New Section 512's limitations on liability are based on func-
tions, and each limitation is intended to describe a separate and distinct function.
Consider, for example, a service provider that provides a hyperlink to a site con-
taining infringing material which it then caches on its system in order to facilit-
ate access to it by its users. This service provider is engaging in at least three
functions that may be subject to the limitation on liability: transitory digital
network communications under new subsection (a); system caching under new subsection
(b); and information location tools under new subsection (d). If this service pro-
vider (as defined in new subsection (j)(1)(A) in the case of transitory digital com-
munications, or as defined in new subsection (j)(1)(B) in the case of system caching
or information location tools) meets the threshold criteria spelled out in new sub-
section (h)(1), then for its acts of system caching defined in new subsection (b),
it may avail itself of the liability limitations stated in new subsection (b), which
incorporate the limitations on injunctive relief described in new subsection
(i)(1)(B) and (i)(3). If it is claimed that the same company is committing an in-
fringement by using information location tools to link its users to infringing ma-
terial, as defined in new subsection (d), then its fulfillment of the requirements
to claim the system caching liability limitation does not affect whether it quali-
fies for the liability limitation for information location tools; the criteria in
new subsection (d), rather than those in new subsection (b), are applicable. New
Section 512(m) codifies this principle by providing that the determination of wheth-
er a service provider qualifies for one liability limitation has no effect on the
determination of whether it qualifies for a separate and distinct liability limita-
tion under another new subsection of new Section 512.

(a) Conforming amendment

    Section 202(b) amends the table of sections for chapter 5 of the Copyright Act (17
U.S.C. S 501 et seq.) to reflect the new Section 512, as created by this title.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II)                                               Page 68

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

Section 203. Limitation on exclusive rights; computer programs

  Section 203 effects a minor, yet important, clarification in Section 117 of the
Copyright Act (17 U.S.C. S 117) to ensure that the lawful owner or lessee of a com-
puter machine may authorize an independent service provider-a person unaffiliated
with either the owner or lessee of the machine-to activate the machine for the sole
purpose of servicing its hardware components.

Section 204. Liability of educational institutions for online infringement of copy-
right

(a) Recommendations by Register of Copyrights

  Section 204(a) directs the Register of Copyrights to consult with representatives
of copyright owners and nonprofit educational institutions and to submit to the Con-
gress within 6 months after enactment of the bill recommendations regarding the li-
ability of nonprofit **66** educational institutions for copyright infringements that
take place through the use of the institution's computer system or network, where
the institution qualifies as a "service provider" under the provisions of this
Title. Included in the Register's report are to be any recommendations for legisla-
tion that the Register considers appropriate.

(b) Factors

  Section 204(b) sets forth specific considerations that the Register shall take in-
to account, where relevant, in formulating recommendations to the Congress.

Section 205. Evaluation of impact of copyright law and amendments on electronic com-
merce and technological development

  As previously stated in the background section to this report, the Committee be-
lieves it is important to more precisely evaluate the relationship between intellec-
tual property and electronic commerce, and to understand the practical implications
of this relationship on the development of technology to be used in promoting elec-
tronic commerce. Section 205 enables Congress to make that evaluation.

(a) Findings

  Section 205(a) finds that Congress must have accurate and current information on
the effects of intellectual property protection on electronic commerce and techno-
logy.

(b) Evaluation by Secretary of Commerce

  Section 205(b) directs the Secretary of Commerce, in consultation with the Assist-
ant Secretary of Commerce for Communications and Information and the Register of
Copyrights, to evaluate the effects of this legislation on the development of elec-
tronic commerce and associated technology, as well as the relationship between ex-
isting and emergent technology, on the one hand, and existing copyright law, on the
other.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**


(c) Report to Congress

   Section 205(c) directs the Secretary of Commerce to submit a report to Congress,
within one year of enactment, on the evaluation required pursuant to Section 205(b).

Section 206. Effective date

   Section 206 establishes the effective date for Title II as the date of enactment.

   TITLE III-EPHEMERAL RECORDINGS; DISTANCE EDUCATION; EXEMPTION FOR LIBRARIES AND
                                      ARCHIVES

Section 301. Ephemeral recordings

   Section 301 amends Section 112 of the Copyright Act (17 U.S.C. S 112) to address
two issues concerning the application of the ephemeral recording exemption in the
digital age. The first of these issues is the relationship between the ephemeral re-
cording exemption and the Digital Performance Right in Sound Recordings Act of 1995
(DPRA). DPRA granted sound recording copyright owners the **67** exclusive right to
perform their works publicly by means of digital audio transmission, subject to cer-
tain limitations, particularly those set forth in Section 114(d). Among those limit-
ations is an exemption for non-subscription broadcast transmissions, which are
defined as those made by terrestrial broadcast stations licensed as such by the Fed-
eral Communications Commission. (17 U.S.C. S 114(d)(1)(A)(iii), (j)(2)). The ephem-
eral recording exemption presently privileges certain activities of a transmitting
organization when it is entitled to transmit a performance or display under a li-
cense or transfer of copyright ownership or under the limitations on exclusive
rights in sound recordings specified by Section 114(a). The Committee believes that
the ephemeral recording exemption should apply to broadcast radio and television
stations when they make non-subscription digital broadcasts permitted by DPRA. The
Committee has therefore changed the existing language of the ephemeral recording ex-
emption (redesignated as Section 112(a)(1)) to extend explicitly to broadcasters the
same privilege they already enjoy with respect to analog broadcasts.
   The second of these issues is the relationship between the ephemeral recording ex-
emption and the anti-circumvention provisions that the bill adds as Section 102 of
this legislation. Concerns were expressed that if use of copy protection technolo-
gies became widespread, a transmitting organization might be prevented from engaging
in its traditional activities of assembling transmission programs and making ephem-
eral recordings permitted by Section 112 for purposes of its own transmissions with-
in its local service area and of archival preservation and security. To address this
concern, the Committee has added to Section 112 a new paragraph that permits trans-
mitting organizations to engage in activities that otherwise would violate the regu-
lations to be issued under Section 102(a)(1) in certain limited circumstances when
necessary for the exercise of the transmitting organization's privilege to make eph-
emeral recordings under redesignated Section 112(a)(1). By way of example, if a ra-
dio station could not make a permitted ephemeral recording from a commercially
available phonorecord without violating the regulations to be issued under Section
102(a)(1), then the radio station could request from the copyright owner the neces-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

sary means of making a permitted ephemeral recording. If the copyright owner did not
then either provide a phonorecord that could be reproduced or otherwise provide the
necessary means of making a permitted ephemeral recording from the phonorecord
already in the possession of the radio station, the radio station would not be li-
able for violating the regulations to be issued under Section 102(a)(1) for taking
the steps necessary for engaging in activities permitted under Section 112(a)(1).
The radio station would, of course, be liable for violating the regulations to be
issued under Section 102(a)(1) if it engaged in activities prohibited by that Sec-
tion in other than the limited circumstances permitted by Section 112(a)(1).

**\*68** Section 302. Limitation on exclusive rights; distance education

(a) Recommendations by National Telecommunications and Information Administration

   Section 302(a) directs the Assistant Secretary of Commerce for Communications and
Information to consult with representatives of copyright owners, non-profit educa-
tional institutions, and nonprofit libraries and archives and to submit recommenda-
tions to the Congress no later than 6 months after the date of enactment of the bill
on how to promote distance education through digital technologies, including inter-
active digital networks, while maintaining an appropriate balance between the rights
of copyright owners and the needs of users. Where appropriate, the Assistant Secret-
ary shall include legislative recommendations to achieve those objectives.

(b) Factors

   Section 302(b) specifies considerations which the Assistant Secretary of Commerce
for Communications and Information shall take into account in formulating such re-
commendations.

Section 303. Exemption for libraries and archives

   Section 303 allows libraries and archives to take advantage of digital technolo-
gies when engaging in specified preservation activities.

TITLE IV-RELATED PROVISIONS

Section 401. Report by the National Telecommunications and Information Administra-
tion

   Section 401 requires the Assistant Secretary of Commerce for Communications and
Information to submit a report to Congress, within six months on enactment, on ap-
propriate mechanisms to encourage the development of access protocols, encryption
testing methods, and security testing methods which would allow lawful access to,
with appropriate safeguards to prevent the unlawful copying of, encrypted works.

CHANGES IN EXISTING LAW MADE BY THE BILL, AS REPORTED

   In compliance with clause 3 of rule XIII of the Rules of the House of Represent-
atives, changes in existing law made by the bill, as reported, are shown as follows
(existing law proposed to be omitted is enclosed in black brackets, new matter is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**


printed in italic, existing law in which no change is proposed is shown in roman):

TITLE 17, UNITED STATES CODE

* * * * * * *

CHAPTER 1-SUBJECT MATTER AND SCOPE OF COPYRIGHT

* * * * * * *

**\*69** S 101. Definitions

Except as otherwise provided in this title, as used in this title, the following
terms and their variant forms mean the following:
An "anonymous work" is a work on the copies or phonorecords of which no natural
person is identified as author.

* * * * * * *

[A work is a "Berne Convention work" if-
[(1) in the case of an unpublished work, one or more of the authors is a nation-
al of a nation adhering to the Berne Convention, or in the case of a published work,
one or more of the authors is a national of a nation adhering to the Berne Conven-
tion on the date of first publication;
[(2) the work was first published in a nation adhering to the Berne Convention,
or was simultaneously first published in a nation adhering to the Berne Convention
and in a foreign nation that does not adhere to the Berne Convention;
[(3) in the case of an audiovisual work-
 [(A) if one or more of the authors is a legal entity, that author has its
headquarters in a nation adhering to the Berne Convention; or
  [(B) if one or more of the authors is an individual, that author is domiciled,
or has his or her habitual residence in, a nation adhering to the Berne Convention;
[(4) in the case of a pictorial, graphic, or sculptural work that is incorpor-
ated in a building or other structure, the building or structure is located in a na-
tion adhering to the Berne Convention; or
[(5) in the case of an architectural work embodied in a building, such building
is erected in a country adhering to the Berne Convention.
For purposes of paragraph (1), an author who is domiciled in or has his or her
habitual residence in, a nation adhering to the Berne Convention is considered to be
a national of that nation. For purposes of paragraph (2), a work is considered to
have been simultaneously published in two or more nations if its dates of publica-
tion are within 30 days of one another.]

* * * * * * *

[The "country of origin" of a Berne Convention work, for purposes of section
411, is the United States if] For purposes of section 411, a work is a "United
States work" only if-
(1) in the case of a published work, the work is first published-
 (A) in the United States;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

    (B) simultaneously in the United States and another [nation or nations adhering
to the Berne Convention] treaty party or parties, whose law grants a term of copy-
right protection that is the same as or longer than the term provided in the United
States;

    **\*70** (C) simultaneously in the United States and a foreign nation that [does not
adhere to the Berne Convention] is not a treaty party; or

    (D) in a foreign nation that [does not adhere to the Berne Convention] is not a
treaty party, and all of the authors of the work are nationals, domiciliaries, or
habitual residents of, or in the case of an audiovisual work legal entities with
headquarters in, the United States;

                 * * * * * * *

    (3) in the case of a pictorial, graphic, or sculptural work incorporated in a
building or structure, the building or structure is located in the United States.

    [For the purposes of section 411, the "country of origin" of any other Berne
Convention work is not the United States.]

                 * * * * * * *

    A work is "fixed" in a tangible medium of expression when its embodiment in a
copy or phonorecord, by or under the authority of the author, is sufficiently per-
manent or stable to permit it to be perceived, reproduced, or otherwise communicated
for a period of more than transitory duration. A work consisting of sounds, images,
or both, that are being transmitted, is "fixed" for purposes of this title if a fix-
ation of the work is being made simultaneously with its transmission.

    The "Geneva Phonograms Convention" is the Convention for the Protection of Pro-
ducers of Phonograms Against Unauthorized Duplication of Their Phonograms, concluded
at Geneva, Switzerland, on October 29, 1971.

    The terms "including" and "such as" are illustrative and not limitative.

    An "international agreement" is-

    (1) the Universal Copyright Convention;

    (2) the Geneva Phonograms Convention;

    (3) the Berne Convention;

    (4) the WTO Agreement;

    (5) the WIPO Copyright Treaty;

    (6) the WIPO Performances and Phonograms Treaty; and

    (7) any other copyright treaty to which the United States is a party.

                 * * * * * * *

    To "transmit" a performance or display is to communicate it by any device or
process whereby images or sounds are received beyond the place from which they are
sent.

    A "treaty party" is a country or intergovernmental organization other than the
United States that is a party to an international agreement.

                 * * * * * * *

    The author's "widow" or "widower" is the author's surviving spouse under the law
of the author's domicile at the time of his or her death, whether or not the spouse
has later remarried.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**


     The "WIPO Copyright Treaty" is the WIPO Copyright Treaty concluded at Geneva,
Switzerland, on December 20, 1996.
     **\*71** The "WIPO Performances and Phonograms Treaty" is the WIPO Performances and
Phonograms Treaty concluded at Geneva, Switzerland, on December 20, 1996.

                          * * * * * * *

A "work made for hire" is-
(1) * * *

                          * * * * * * *

     The terms "WTO Agreement" and "WTO member country" have the meanings given those
terms in paragraphs (9) and (10), respectively, of section 2 of the Uruguay Round
Agreements Act.

                          * * * * * * *


S 104. Subject matter of copyright: National origin

     (a) Unpublished Works.-The works specified by sections 102 and 103, while unpub-
lished, are subject to protection under this title without regard to the nationality
or domicile of the author.
     (b) Published Works.-The works specified by sections 102 and 103, when pub-
lished, are subject to protection under this title if-
     (1) on the date of first publication, one or more of the authors is a national
or domiciliary of the United States, or is a national, domiciliary, or sovereign au-
thority of a [foreign nation that is a party to a copyright treaty to which the
United States is also a party] treaty party, or is a stateless person, wherever that
person may be domiciled; or
     (2) the work is first published in the United States or in a foreign nation
that, on the date of first publication, is a [party to the Universal Copyright Con-
vention] treaty party; or
     (3) the work is a sound recording that was first fixed in a treaty party; or
     (4) the work is a [Berne Convention work] pictorial, graphic, or sculptural work
that is incorporated in a building or other structure, or an architectural work that
is embodied in a building and the building or structure is located in the United
States or a treaty party; or
     [(3)] (5) the work is first published by the United Nations or any of its spe-
cialized agencies, or by the Organization of American States; or
     [(5)] (6) the work comes within the scope of a Presidential proclamation.
Whenever the President finds that a particular foreign nation extends, to works by
authors who are nationals or domiciliaries of the United States or to works that are
first published in the United States, copyright protection on substantially the same
basis as that on which the foreign nation extends protection to works of its own na-
tionals and domiciliaries and works first published in that nation, the President
may by proclamation extend protection under this title to works of which one or more
of the authors is, on the date of first publication, a national, domiciliary, or
sovereign authority of that nation, or which was first published in that nation. The
President may revise, suspend, or revoke any such proclamation **\*72** or impose any

                    © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

conditions or limitations on protection under a proclamation.

For purposes of paragraph (2), a work that is published in the United States or
a treaty party within 30 days after publication in a foreign nation that is not a
treaty party shall be considered to be first published in the United States or such
treaty party, as the case may be.

* * * * * * *

(d) Effect of Phonograms Treaties.-Notwithstanding the provisions of subsection
(b), no works other than sound recordings shall be eligible for protection under
this title solely by virtue of the adherence of the United States to the Geneva
Phonograms Convention or the WIPO Performances and Phonograms Treaty.

S 104A. Copyright in restored works

(a) * * *

* * * * * * *

(h) Definitions.-For purposes of this section and section 109(a):

(1) The term "date of adherence or proclamation" means the earlier of the date
on which a foreign nation which, as of the date the WTO Agreement enters into force
with respect to the United States, is not a nation adhering to the Berne Convention
or a WTO member country, becomes-

[(A) a nation adhering to the Berne Convention or a WTO member country; or

[(B) subject to a Presidential proclamation under subsection (g).]

(A) a nation adhering to the Berne Convention;

(B) a WTO member country;

(C) a nation adhering to the WIPO Copyright Treaty;

(D) a nation adhering to the WIPO Performances and Phonograms Treaty; or

(E) subject to a Presidential proclamation under subsection (g).

* * * * * * *

[(3) The term "eligible country" means a nation, other than the United States,
that-

[(A) becomes a WTO member country after the date of the enactment of the Uruguay
Round Agreements Act;

**\*73** [(B) on such date of enactment is, or after such date of enactment becomes,
a member of the Berne Convention; or

[(C) after such date of enactment becomes subject to a proclamation under sub-
section (g).

For purposes of this section, a nation that is a member of the Berne Convention
on the date of the enactment of the Uruguay Round Agreements Act shall be construed
to become an eligible country on such date of enactment.]

(3) The term "eligible country" means a nation, other than the United States,
that-

(A) becomes a WTO member country after the date of the enactment of the Uruguay
Round Agreements Act;

(B) on such date of enactment is, or after such date of enactment becomes, a na-
tion adhering to the Berne Convention;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**


    (C) adheres to the WIPO Copyright Treaty;
    (D) adheres to the WIPO Performances and Phonograms Treaty; or
    (E) after such date of enactment becomes subject to a proclamation under subsec-
tion (g).

                        * * * * * * *

    (6) The term "restored work" means an original work of authorship that-
    (A) * * *

                        * * * * * * *

    (C) is in the public domain in the United States due to-
    (i) * * *

                        * * * * * * *

    (iii) lack of national eligibility; [and]
    (D) has at least one author or rightholder who was, at the time the work was
created, a national or domiciliary of an eligible country, and if published, was
first published in an eligible country and not published in the United States during
the 30-day period following publication in such eligible country[.]; and
    (E) if the source country for the work is an eligible country solely by virtue
of its adherence to the WIPO Performances and Phonograms Treaty, is a sound record-
ing.

                        * * * * * * *

    (8) The "source country" of a restored work is-
    (A) a nation other than the United States;
    (B) in the case of an unpublished work-
    (i) the eligible country in which the author or rightholder is a national or
domiciliary, or, if a restored work has more than 1 author or rightholder, of which
the majority of foreign authors or rightholders are nationals or domiciliaries [of
eligible countries]; or

                        * * * * * * *

    [(9) The terms "WTO Agreement" and "WTO member country" have the meanings given
those terms in paragraphs (9) and (10), respectively, of section 2 of the Uruguay
Round Agreements Act.]

                        * * * * * * *


S 108. Limitations on exclusive rights: Reproduction by libraries and archives

    (a) [Notwithstanding] Except as otherwise provided in this title and notwith-
standing the provisions of section 106, it is not an infringement of copyright for a
library or archives, or any of its employees acting within the scope of their em-
ployment, to reproduce no more than one copy or phonorecord of a work, except as
provided in subsections (b) and (c), or to distribute such copy or phonorecord, un-
der the conditions specified by this section, if-
    **\*74** (1) * * *


© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

* * * * * * *

(3) the reproduction or distribution of the work includes a notice of copyright
that appears on the copy or phonorecord that is reproduced under the provisions of
this section, or includes a legend stating that the work may be protected by copy-
right if no such notice can be found on the copy or phonorecord that is reproduced
under the provisions of this section.

(b) The rights of reproduction and distribution under this section apply to [a
copy or phonorecord] three copies or phonorecords of an unpublished work duplicated
[in facsimile form] solely for purposes of preservation and security or for deposit
for research use in another library or archives of the type described by clause (2)
of subsection (a), [if the copy or phonorecord reproduced is currently in the col-
lections of the library or archives.] if-

(1) the copy or phonorecord reproduced is currently in the collections of the
library or archives; and

(2) any such copy or phonorecord that is reproduced in digital format is not
otherwise distributed in that format and is not made available to the public in that
format outside the premises of the library or archives.

(c) The right of reproduction under this section applies to [a copy or phonore-
cord] three copies or phonorecords of a published work duplicated [in facsimile
form] solely for the purpose of replacement of a copy or phonorecord that is dam-
aged, deteriorating, lost, or stolen, or if the existing format in which the work is
stored has become obsolete, [if the library or archives has, after a reasonable ef-
fort, determined that an unused replacement cannot be obtained at a fair price.] if-

(1) the library or archives has, after a reasonable effort, determined that an
unused replacement cannot be obtained at a fair price; and

(2) any such copy or phonorecord that is reproduced in digital format is not
made available to the public in that format except for use on the premises of the
library or archives in lawful possession of such copy.

For purposes of this subsection, a format shall be considered obsolete if the
machine or device necessary to render perceptible a work stored in that format is no
longer manufactured or is no longer reasonably available in the commercial market-
place.

* * * * * * *

S 112. Limitations on exclusive rights: Ephemeral recordings

(a)(1) Notwithstanding the provisions of section 106, and except in the case of
a motion picture or other audiovisual work, it is not an infringement of copyright
for a transmitting organization entitled to transmit to the public a performance or
display of a work, under a license or transfer of the copyright or under the limita-
tions on exclusive rights in sound recordings specified by section 114(a), or for a
transmitting organization that is a broadcast radio or television station licensed
as such by the Federal Communications Commission that broadcasts a performance of a
sound recording in a digital format on a nonsubscription basis, to make no more than
**75** one copy or phonorecord of a particular transmission program embodying the per-
formance or display, if-

[(1)] (A) the copy or phonorecord is retained and used solely by the transmit-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

ting organization that made it, and no further copies or phonorecords are reproduced
from it; and

     [(2)] (B) the copy or phonorecord is used solely for the transmitting organiza-
tion's own transmissions within its local service area, or for purposes of archival
preservation or security; and

     [(3)] (C) unless preserved exclusively for archival purposes, the copy or
phonorecord is destroyed within six months from the date the transmission program
was first transmitted to the public.

     (2) In a case in which a transmitting organization entitled to make a copy or
phonorecord under paragraph (1) in connection with the transmission to the public of
a performance or display of a work described in that paragraph is prevented from
making such copy or phonorecord by reason of the application by the copyright owner
of technical measures that prevent the reproduction of the work, the copyright owner
shall make available to the transmitting organization the necessary means for per-
mitting the making of such copy or phonorecord within the meaning of that paragraph,
if it is technologically feasible and economically reasonable for the copyright own-
er to do so. If the copyright owner fails to do so in a timely manner in light of
the transmitting organization's reasonable business requirements, the transmitting
organization shall not be liable for a violation of section 102(a)(1) of the WIPO
Copyright Treaties Implementation Act for engaging in such activities as are neces-
sary to make such copies or phonorecords as permitted under paragraph (1) of this
subsection.

                          * * * * * * *

S 117. Limitations on exclusive rights: Computer programs

     [Notwithstanding] (a) Making of Additional Copy or Adaptation by Owner of
Copy.-Notwithstanding the provisions of section 106, it is not an infringement for
the owner of a copy of a computer program to make or authorize the making of another
copy or adaptation of that computer program provided:

     (1) * * *

                          * * * * * * *

     [Any exact] (b) Lease, Sale, or Other Transfer of Additional Copy or Adapta-
tion.-Any exact copies prepared in accordance with the provisions of this section
may be leased, sold, or otherwise transferred, along with the copy from which such
copies were prepared, only as part of the lease, sale, or other transfer of all
rights in the program. Adaptations so prepared may be transferred only with the au-
thorization of the copyright owner.

     (c) Machine Maintenance or Repair.-Notwithstanding the provisions of section
106, it is not an infringement for the owner or lessee of a machine to make or au-
thorize the making of a copy of a computer program if such copy is made solely by
virtue of the activation of a machine that lawfully contains an authorized copy of
the **76** computer program, for purposes only of maintenance or repair of that ma-
chine, if-

     (1) such new copy is used in no other manner and is destroyed immediately after
the maintenance or repair is completed; and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II)
H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

    (2) with respect to any computer program or part thereof that is not necessary
for that machine to be activated, such program or part thereof is not accessed or
used other than to make such new copy by virtue of the activation of the machine.
    (d) Definitions.-For purposes of this section-
    (1) the "maintenance" of a machine is the servicing of the machine in order to
make it work in accordance with its original specifications and any changes to those
specifications authorized for that machine; and
    (2) the "repair" of a machine is the restoring of the machine to the state of
working in accordance with its original specifications and any changes to those spe-
cifications authorized for that machine.

                          * * * * * * *

          CHAPTER 4-COPYRIGHT NOTICE, DEPOSIT, AND REGISTRATION

                          * * * * * * *


S 411. Registration and infringement actions

    (a) Except for [actions for infringement of copyright in Berne Convention works
whose country of origin is not the United States and] an action brought for a viola-
tion of the rights of the author under section 106A(a), and subject to the provi-
sions of subsection (b), no action for infringement of the copyright in any United
States work shall be instituted until registration of the copyright claim has been
made in accordance with this title. In any case, however, where the deposit, applic-
ation, and fee required for registration have been delivered to the Copyright Office
in proper form and registration has been refused, the applicant is entitled to in-
stitute an action for infringement if notice thereof, with a copy of the complaint,
is served on the Register of Copyrights. The Register may, at his or her option, be-
come a party to the action with respect to the issue of registrability of the copy-
right claim by entering an appearance within sixty days after such service, but the
Register's failure to become a party shall not deprive the court of jurisdiction to
determine that issue.

                          * * * * * * *


          CHAPTER 5-COPYRIGHT INFRINGEMENT AND REMEDIES

    Sec.
  501.Infringement of copyright.

                          * * * * * * *

  512.Liability of service providers for online infringement of copyright.

                          * * * * * * *

**\*77** S 507. Limitations on actions

    (a) Criminal Proceedings.-[No] Except as expressly provided otherwise in this

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

title, no criminal proceeding shall be maintained under the provisions of this title
unless it is commenced within 5 years after the cause of action arose.

* * * * * * *

S 512. Liability of service providers for online infringement of copyright

(a) Digital Network Communications.-A service provider shall not be liable for
monetary relief, or except as provided in subsection (i) for injunctive or other
equitable relief, for infringement for the provider's transmitting, routing, or
providing connections for, material through a system or network controlled or oper-
ated by or for the service provider, or the intermediate and transient storage of
such material in the course of such transmitting, routing or providing connections,
if-

(1) it was initiated by or at the direction of a person other than the service
provider;

(2) it is carried out through an automatic technical process without selection
of such material by the service provider;

(3) the service provider does not select the recipients of such material except
as an automatic response to the request of another;

(4) no such copy of such material made by the service provider is maintained on
the system or network in a manner ordinarily accessible to anyone other than anti-
cipated recipients, and no such copy is maintained on the system or network in a
manner ordinarily accessible to the anticipated recipients for a longer period than
is reasonably necessary for the communication; and

(5) the material is transmitted without modification to its content.

(b) System Caching.-A service provider shall not be liable for monetary relief,
or except as provided in subsection (i) for injunctive or other equitable relief,
for infringement for the intermediate and temporary storage of material on the sys-
tem or network controlled or operated by or for the service provider: Provided,
That-

(1) such material is made available online by a person other than such service
provider,

(2) such material is transmitted from the person described in paragraph (1)
through such system or network to someone other than that person at the direction of
such other person,

(3) the storage is carried out through an automatic technical process for the
purpose of making such material available to users of such system or network who
subsequently request access to that material from the person described in paragraph
(1):

Provided further, That-

(4) such material is transmitted to such subsequent users without modification
to its content from the manner in which the material otherwise was transmitted from
the person described in paragraph (1);

**\*78** (5) such service provider complies with rules concerning the refreshing, re-
loading or other updating of such material when specified by the person making that
material available online in accordance with an accepted industry standard data com-
munications protocol for the system or network through which that person makes the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

material available: Provided further, That the rules are not used by the person de-
scribed in paragraph (1) to prevent or unreasonably impair such intermediate stor-
age;

(6) such service provider does not interfere with the ability of technology as-
sociated with such material that returns to the person described in paragraph (1)
the information that would have been available to such person if such material had
been obtained by such subsequent users directly from such person: Provided further,
That such technology-

(A) does not significantly interfere with the performance of the provider's sys-
tem or network or with the intermediate storage of the material;

(B) is consistent with accepted industry standard communications protocols; and

(C) does not extract information from the provider's system or network other
than the information that would have been available to such person if such material
had been accessed by such users directly from such person;

(7) either-

(A) the person described in paragraph (1) does not currently condition access to
such material; or

(B) if access to such material is so conditioned by such person, by a current
individual pre-condition, such as a pre-condition based on payment of a fee, or pro-
vision of a

(8) if the person described in paragraph (1) makes that material available on-
line without the authorization of the copyright owner, then the service provider re-
sponds expeditiously to remove, or disable access to, the material that is claimed
to be infringing upon notification of claimed infringements described in subsection
(c)(3): Provided further, That the material has previously been removed from the
originating site, and the party giving the notification includes in the notification
a statement confirming that such material has been removed or access to it has been
disabled or ordered to be removed or have access disabled.

(c) Information Stored on Service Providers.-

(1) In general.-A service provider shall not be liable for monetary relief, or
except as provided in subsection (i) for injunctive or other equitable relief, for
infringement for the storage at the direction of a user of material that resides on
a system or network controlled or operated by or for the service provider, if the
service provider-

(A)(i) does not have actual knowledge that the material or activity is in-
fringing,

**\*79** (ii) in the absence of such actual knowledge, is not aware of facts or cir-
cumstances from which infringing activity is apparent, or

(iii) if upon obtaining such knowledge or awareness, the service provider acts
expeditiously to remove or disable access to, the material;

(B) does not receive a financial benefit directly attributable to the infringing
activity, where the service provider has the right and ability to control such
activity; and

(C) in the instance of a notification of claimed infringement as described in
paragraph (3), responds expeditiously to remove, or disable access to, the material
that is claimed to be infringing or to be the subject of infringing activity.

(2) Designated agent.-The limitations on liability established in this subsec-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

tion apply only if the service provider has designated an agent to receive notifica-
tions of claimed infringement described in paragraph (3), by substantially making
the name, address, phone number, electronic mail address of such agent, and other
contact information deemed appropriate by the Register of Copyrights, available
through its service, including on its website, and by providing such information to
the Copyright Office.  The Register of Copyrights shall maintain a current directory
of agents available to the public for inspection, including through the Internet, in
both electronic and hard copy formats.

(3) Elements of notification.-

(A) To be effective under this subsection, a notification of claimed infringe-
ment means any written communication provided to the service provider's designated
agent that includes substantially the following-

(i) a physical or electronic signature of a person authorized to act on behalf
of the owner of an exclusive right that is allegedly infringed;

(ii) identification of the copyrighted work claimed to have been infringed, or,
if multiple such works at a single online site are covered by a single notification,
a representative list of such works at that site;

(iii) identification of the material that is claimed to be infringing or to be
the subject of infringing activity that is to be removed or access to which is to be
disabled, and information reasonably sufficient to permit the service provider to
locate the material;

(iv) information reasonably sufficient to permit the service provider to con-
tact the complaining party, such as an address, telephone number, and, if available
an electronic mail address at which the complaining party may be contacted;

(v) a statement that the complaining party has a good faith belief that use of
the material in the manner complained of is not authorized by the copyright owner,
or its agent, or the law; and

(vi) a statement that the information in the notification is accurate, and un-
der penalty of perjury, that the **\*80** complaining party has the authority to enforce
the owner's rights that are claimed to be infringed.

(B) A notification from the copyright owner or from a person authorized to act
on behalf of the copyright owner that fails substantially to conform to the provi-
sions of paragraph (3)(A) shall not be considered under paragraph (1)(A) in determ-
ining whether a service provider has actual knowledge or is aware of facts or cir-
cumstances from which infringing activity is apparent: Provided, That the provider
promptly attempts to contact the complaining party or takes other reasonable steps
to assist in the receipt of notice under paragraph (3)(A) when the notice is
provided to the service provider's designated agent and substantially satisfies the
provisions of paragraphs (3)(A) (ii), (iii), and (iv).

(d) Information Location Tools.-A service provider shall not be liable for mon-
etary relief, or except as provided in subsection (i) for injunctive or other equit-
able relief, for infringement for the provider referring or linking users to an on-
line location containing infringing material or activity by using information loca-
tion tools, including a directory, index, reference, pointer or hypertext link, if
the provider-

(1) does not have actual knowledge that the material or activity is infringing
or, in the absence of such actual knowledge, is not aware of facts or circumstances

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

from which infringing activity is apparent;

(2) does not receive a financial benefit directly attributable to the infringing
activity, where the service provider has the right and ability to control such
activity; and

(3) responds expeditiously to remove or disable the reference or link upon noti-
fication of claimed infringement as described in subsection (c)(3): Provided, That
for the purposes of this

(e) Misrepresentations.-Any person who knowingly materially misrepresents under
this section-

(1) that material or activity is infringing, or

(2) that material or activity was removed or disabled by mistake or misidenti-
fication,

shall be liable for any damages, including costs and attorneys' fees, incurred
by the alleged infringer, by any copyright owner or copyright owner's authorized li-
censee, or by the service provider, who is injured by such misrepresentation, as the
result of the service provider relying upon such misrepresentation in removing or
disabling access to the material or activity claimed to be infringing, or in repla-
cing the removed material or ceasing to disable access to it.

(f) Replacement of Removed or Disabled Material and Limitation on Other Liabil-
ity.-

(1) Subject to paragraph (2) of this subsection, a service provider shall not be
liable to any person for any claim based on the service provider's good faith dis-
abling of access to, or removal of, material or activity claimed to be infringing or
based **\*81** on facts or circumstances from which infringing activity is apparent, re-
gardless of whether the material or activity is ultimately determined to be in-
fringing.

(2) Paragraph (1) of this subsection shall not apply with respect to material
residing at the direction of a subscriber of the service provider on a system or
network controlled or operated by or for the service provider that is removed, or to
which access is disabled by the service provider pursuant to a notice provided under
subsection (c)(1)(C), unless the service provider-

(A) takes reasonable steps promptly to notify the subscriber that it has removed
or disabled access to the material;

(B) upon receipt of a counter notice as described in paragraph (3), promptly
provides the person who provided the notice under subsection (c)(1)(C) with a copy
of the counter notice, and informs such person that it will replace the removed ma-
terial or cease disabling access to it in ten business days; and

(C) replaces the removed material and ceases disabling access to it not less
than 10, nor more than 14, business days following receipt of the counter notice,
unless its designated agent first receives notice from the person who submitted the
notification under subsection (c)(1)(C) that such person has filed an action seeking
a court order to restrain the subscriber from engaging in infringing activity relat-
ing to the material on the service provider's system or network.

(3) To be effective under this subsection, a counter notification means any
written communication provided to the service provider's designated agent that in-
cludes substantially the following:

(A) A physical or electronic signature of the subscriber.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

(B) Identification of the material that has been removed or to which access has
been disabled and the location at which such material appeared before it was removed
or access was disabled.

(C) A statement under penalty of perjury that the subscriber has a good faith
belief that the material was removed or disabled as a result of mistake or misiden-
tification of the material to be removed or disabled.

(D) The subscriber's name, address and telephone number, and a statement that
the subscriber consents to the jurisdiction of Federal Court for the judicial dis-
trict in which the address is located, or if the subscriber's address is outside of
the United States, for any judicial district in which the service provider may be
found, and that the subscriber will accept service of process from the person who
provided notice under subsection (c)(1)(C) or agent of such person.

(4) A service provider's compliance with paragraph (2) shall not subject the
service provider to liability for copyright infringement with respect to the materi-
al identified in the notice provided under subsection (c)(1)(C).

(g) Identification of Direct Infringer.-The copyright owner or a person author-
ized to act on the owner's behalf may request an order for release of identification
of an alleged infringer by filing-

**\*82** (1) a copy of a notification described in subsection (c)(3)(A), including a
proposed order, and

(2) a sworn declaration that the purpose of the order is to obtain the identity
of an alleged infringer and that such information will only be used for the purpose
of this title, with the clerk of any United States district court.

The order shall authorize and order the service provider receiving the notifica-
tion to disclose expeditiously to the copyright owner or person authorized by the
copyright owner information sufficient to identify the alleged direct infringer of
the material described in the notification to the extent such information is avail-
able to the service provider.  The order shall be expeditiously issued if the accom-
panying notification satisfies the provisions of subsection (c)(3)(A) and the accom-
panying declaration is properly executed. Upon receipt of the order, either accompa-
nying or subsequent to the receipt of a notification described in subsection
(c)(3)(A), a service provider shall expeditiously give to the copyright owner or
person authorized by the copyright owner the information required by the order, not-
withstanding any other provision of law and regardless of whether the service pro-
vider responds to the notification.

(h) Conditions for Eligibility.-

(1) Accommodation of technology.-The limitations on liability established by
this section shall apply only if the service provider-

(A) has adopted and reasonably implemented, and informs subscribers of the ser-
vice of, a policy for the termination of subscribers of the service who are repeat
infringers; and

(B) accommodates and does not interfere with standard technical measures as
defined in this subsection.

(2) Definition.-As used in this section, "standard technical measures" are tech-
nical measures, used by copyright owners to identify or protect copyrighted works,
that-

(A) have been developed pursuant to a broad consensus of copyright owners and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

service providers in an open, fair, voluntary, multi-industry standards process;

    (B) are available to any person on reasonable and nondiscriminatory terms; and

    (C) do not impose substantial costs on service providers or substantial burdens
on their systems or networks.

    (i) Injunctions.-The following rules shall apply in the case of any application
for an injunction under section 502 against a service provider that is not subject
to monetary remedies by operation of this section.

    (1) Scope of relief.-

    (A) With respect to conduct other than that which qualifies for the limitation
on remedies as set forth in subsection (a), the court may only grant injunctive re-
lief with respect to a service provider in one or more of the following forms-

    (i) an order restraining it from providing access to infringing material or
activity residing at a particular online site on the provider's system or network;

    **\*83** (ii) an order restraining it from providing access to an identified sub-
scriber of the service provider's system or network who is engaging in infringing
activity by terminating the specified accounts of such subscriber; or

    (iii) such other injunctive remedies as the court may consider necessary to
prevent or restrain infringement of specified copyrighted material at a particular
online location: Provided, That such remedies are the least burdensome to the ser-
vice provider that are comparably effective for that purpose.

    (B) If the service provider qualifies for the limitation on remedies described
in subsection (a), the court may only grant injunctive relief in one or both of the
following forms-

    (i) an order restraining it from providing access to an identified subscriber
of the service provider's system or network who is using the provider's service to
engage in infringing activity by terminating the specified accounts of such sub-
scriber; or

    (ii) an order restraining it from providing access, by taking specified reason-
able steps to block access, to a specific, identified, foreign online location.

    (2) Considerations.-The court, in considering the relevant criteria for injunct-
ive relief under applicable law, shall consider-

    (A) whether such an injunction, either alone or in combination with other such
injunctions issued against the same service provider under this subsection, would
significantly burden either the provider or the operation of the provider's system
or network;

    (B) the magnitude of the harm likely to be suffered by the copyright owner in
the digital network environment if steps are not taken to prevent or restrain the
infringement;

    (C) whether implementation of such an injunction would be technically feasible
and effective, and would not interfere with access to noninfringing material at oth-
er online locations; and

    (D) whether other less burdensome and comparably effective means of preventing
or restraining access to the infringing material are available.

    (3) Notice and ex parte orders.-Injunctive relief under this subsection shall
not be available without notice to the service provider and an opportunity for such
provider to appear, except for orders ensuring the preservation of evidence or other
orders having no material adverse effect on the operation of the service provider's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**


communications network.
   (j) Definitions.-
   (1)(A) As used in subsection (a), the term "service provider" means an entity
offering the transmission, routing or providing of connections for digital online
communications, between or among points specified by a user, of material of the
user's choosing, without modification to the content of the material as sent or re-
ceived.
   **\*84** (B) As used in any other subsection of this section, the term  "service pro-
vider" means a provider of online services or network access, or the operator of fa-
cilities therefor, and includes an entity described in the preceding paragraph of
this subsection.
   (2) As used in this section, the term "monetary relief" means damages, costs,
attorneys' fees, and any other form of monetary payment.
   (k) Other Defenses Not Affected.-The failure of a service provider's conduct to
qualify for limitation of liability under this section shall not bear adversely upon
the consideration of a defense by the service provider that the service provider's
conduct is not infringing under this title or any other defense.
   (l) Protection of Privacy.-Nothing in this section shall be construed to condi-
tion the applicability of subsections (a) through (d) on-
   (1) a service provider monitoring its service or affirmatively seeking facts in-
dicating infringing activity except to the extent consistent with a standard tech-
nical measure complying with the provisions of subsection (h); or
   (2) a service provider accessing, removing, or disabling access to material
where such conduct is prohibited by law.
   (m) Rule of Construction.-Subsections (a), (b), (c), and (d) are intended to de-
scribe separate and distinct functions for purposes of analysis under this sec-
tion.  Whether a service provider qualifies for the limitation on liability in any
one such subsection shall be based solely on the criteria in each such subsection
and shall not affect a determination of whether such service provider qualifies for
the limitations on liability under any other such subsection.


                         * * * * * * *


            **\*85** ADDITIONAL VIEWS OF SCOTT KLUG AND RICK BOUCHER


   Although we support the House Commerce Committee's changes and improvements to
H.R. 2281, the Digital Millennium Copyright Act of 1998, we remain troubled by the
implications of this legislation.
   In its original version, H.R. 2281 contained a provision that would have made it
unlawful to circumvent technological protection measures that effectively control
access to a work, for any reason. In other words, the bill, if passed unchanged,
would have given copyright owners the legislative muscle to "lock up" their works in
perpetuity-unless each and every one of us separately negotiated for access. In
short, this provision converted an unobstructed marketplace that tolerates "free"
access in some circumstances to a "pay-per-access" system, no exceptions permitted.
   In our opinion, this not only stands copyright law on its head, it makes a mockery
of our Constitution, Article I, Section 8, Clause 8 is very clear in its directive:


                © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II)                                                        Page 86
H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**


"The Congress shall have Power * * * To Promote the Progress of Science and useful
Arts, by securing for limited Times to Authors and Inventors the exclusive Right to
their respective Writing and Discoveries." (emphasis added). Congress has limited
these rights both in terms of scope and duration. In interpreting the Copyright
Clause, the Supreme Court has said:

     The monopoly privileges that Congress may authorize are neither unlimited nor
primarily designed to provide special private benefit. Rather, the limited grant is
a means by which an important public purpose may be achieved. It is intended to mo-
tivate the creative activity of authors and inventors by the provision of a special
reward, and to allow the public access to the products of their genius after the
limited period of exclusive control has expired. The copyright law, like the patent
statutes, makes reward to the owner a secondary consideration. Sony Corporation v.
Universal City Studios, Inc., 464 U.S. 417, 429 (1984) (emphasis added).

     The anti-circumvention language of H.R. 2281, even as amended, bootstraps the lim-
ited monopoly into a perpetual right. It also fundamentally alters the balance that
has been carefully struck in 200 years of copyright case law, by making the private
incentive of content owners the paramount consideration-at the expense of research,
scholarship, education, literary or political commentary, indeed, the future viabil-
ity of information in the public domain. In so doing, this legislation goes well
beyond the rights contemplated for copyright owners in the Constitution.

     The Klug amendment, representing a compromise between those on the content side
and "fair use" proponents, simply delays this **86** constitutional problem for a peri-
od of two years. Delegating authority to develop anti-circumvention regulations to
the Secretary of Commerce was a means to eliminate the stalemate that existed, but
it is not, by itself a comment on the need for limitations on this anti-
circumvention rights. It also strikes us that Congress is not acting prudently by
passing a law guaranteed to create lifetime employment for attorneys and copyright
specialists, given the constitutional and definitional problems already identified.

     What we set out to do was to restore some balance in the discussion and to place
private incentive in its proper context. We had proposed to do this by legislating
an equivalent fair use defense for the new right to control access. For reasons not
clear to us, and despite the WIPO Treaty language "recognizing the need to maintain
a balance between the rights of authors and the larger public interest, particularly
education, research and access to information * * *," our proposal was met with
strenuous objection. It continued to be criticized even after it had been redrafted,
and extensively tailored, in response to the myriad of piracy concerns that were
raised.

     The compromise amendment that Representative Klug ultimately offered at full com-
mittee is silent on the applicability of traditional copyright limitations and de-
fenses, though it does give "information users" the ability to argue that the ap-
plication of technological protection measures adversely impacts their ability to
access information. This diminution in availability includes both access under li-
cense terms and traditional free access to information. Our expectation is that the
rulemaking will also focus on the extent to which exceptions and limitations to this
prohibition are appropriate and necessary to maintain balance in our copyright laws.

     In view of this legislation's overwhelming attention to the regulation of devices
in other contexts, it should be clearly understood that the Section 102(a)(1) amend-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**

ment addresses conduct only and does not delegate to the Secretary of Commerce the
power to regulate the design of devices.

   Moreover, the bill, by its terms (like the WIPO treaties), covers only those meas-
ures that are "effective." Pursuant to this limitation, an amendment we offered
which was adopted at subcommittee clarified that device and component designers and
manufacturers are not under any legal obligation to respond to or to accommodate any
particular technological protection measure. Without such clarification, the bill
could have been construed as governing not only those technological protection meas-
ures that are already "effective", such as those based on encryption, but also those
that might conceivably be made "effective" through enactment of the legislation.
This result would be a far cry from governing "circumvention." For similar reasons,
it was clearly understood in the full committee consideration that a measure is not
"effective", and consequently not covered by this bill, to the extent that protect-
ing the measure against circumvention would cause degradation of the otherwise law-
ful performance of a device or authorized display of a work.

   In the end, this legislation purports to protect creators. It may well be that ad-
ditional protections are necessary, though we think the 1976 Copyright Act is suffi-
ciently flexible to deal with changing **\*87** technology. Whatever protections Congress
grants should not be wielded as a club to thwart consumer demand for innovative
products, consumer demand for access to information, consumer demand for tools to
exercise their lawful rights, and consumer expectations that the people and expert-
ise will exist to service these products.

       Scott Klug.

       Rick Boucher.

   FN1 Fair Use, Richmond Times-Dispatch, July 13, 1998, at A-6.

   FN2 The Committee has previously reported laws that similarly protect against un-
authorized access to works. See, e.g., 47 U.S.C. S 553(a)(2) (prohibiting the manu-
facture or distribution of equipment intended for the unauthorized reception of
cable television service); 47 U.S.C. S 605(e)(4) (prohibiting the manufacture, as-
sembly, import, and sale of equipment used in the unauthorized decryption of satel-
lite cable programming); see also H. Rep. No. 780, 102d Cong., 2d Sess. (1992)
(report accompanying H.R. 4567, which would have established the Audio Home Record-
ing Act's anti-circumvention provisions as free-standing provisions of law).

   FN3 In using the term "subscribers," the Committee intends to include account
holders that have a business relationship with the service provider that justifies
treating them as subscribers, for the purposes of new Section 512, even if no formal
subscription agreement exists. For example, "subscribers" would include students who
are granted access to a university's system or network for digital on-line communic-
ations; employees who have access to their employer's system or network; or house-
hold members with access to a consumer on-line service by virtue of a subscription
agreement between the service provider and another member of that household.

   FN4 See supra note 3.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998,
1998 WL 414916 (Leg.Hist.)
**(Cite as: H.R. REP. 105-551(II))**


 H.R. REP. 105-551(II), H.R. Rep. No. 551(II), 105TH Cong., 2ND Sess. 1998, 1998 WL
414916 (Leg.Hist.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw Download Summary Report for BALDINGER,JAMES 4451592**

| | |
|---|---|
| Date/Time of Request: | Wednesday, April 18, 2007 18:11:00 Central |
| Client Identifier: | 50649-29958-005 |
| Database: | CR |
| Citation Text: | 144 Cong.Rec. S11887-01 |
| Lines: | 667 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

Westlaw.

144 Cong.Rec. S11887-01                                              Page 1
144 Cong. Rec. S11887-01, 1998 WL 716423 (Cong.Rec.)
**(Cite as: 144 Cong. Rec. S11887-01)**

                    Congressional Record --- Senate
         Proceedings and Debates of the 105th Congress, Second Session
                        Thursday, October 8, 1998

                   **\*S11887** OPENING OF SESSION

                 (Legislative day of Friday, October 2, 1998)

         DIGITAL MILLENNIUM COPYRIGHT ACT-CONFERENCE REPORT

    Mr. HATCH.

    Mr. President, I submit a report of the committee of conference on the
bill (H.R. 2281) amend title 17, United States Code, to implement the World Intel-
lectual Property Organization Copyright Treaty and Performance and Phonograms
Treaty, and for other purposes, and ask for its immediate consideration.

    The PRESIDING OFFICER.

    The report will be stated.

    The assistant legislative clerk read as follows:

    The committee on conference on the disagreeing votes of the two Houses on the
amendment of the Senate to the bill (H.R. 2281), have agreed to recommend and do re-
commend to their respective Houses this report, signed by all of the conferees.

    The PRESIDING OFFICER.

    Without objection, the Senate will proceed to the consideration of the conference
report.

    (The conference report is printed in the House proceedings of the RECORD of Octo-
ber 8, 1998.)

    Mr. KOHL.

    Mr. President, I rise to express my support for the Conference Report on the Di-
gital Millennium Copyright Act (H.R. 2281). In my view, we need this measure to stop
an epidemic of illegal copying of protected works-such as movies, books, musical re-
cordings, and software-and to limit, in a balanced and thoughtful way, the infringe-
ment liability of online service providers. The copyright industry is one of our
most thriving businesses. But we still lose more than $15 billion each year due to
foreign copyright piracy, according to some estimates.

    And foreign piracy is just out of control. For example, one of my staffers in-
vestigating video piracy on a trip to China walked into a Hong Kong arcade and
bought three bootlegged computer games-including "Toy Story" and "NBA '97"- for just

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

144 Cong. Rec. S11887-01, 1998 WL 716423 (Cong.Rec.)

**(Cite as: 144 Cong. Rec. S11887-01)**

$10. These games, combined, normally sell for about $100. Indeed, the manager was so brazen about it, he even agreed to give out a receipt.

Illegal copying has been a longstanding concern to me. I introduced one of the precursors to this bill, the Motion Picture Anti-Piracy Act (in the 101st Congress), which in principle has been incorporated into this measure. And I was one of the co-sponsors of the original proposed WIPO implementing legislation, the preliminary version of this proposal.

In my opinion, this bill achieves a fair balance by taking steps to effectively deter piracy, while still allowing fair use of protected materials. It is the product of intensive negotiations between all of the interested parties-including the copyright industry, telephone companies, libraries, universities and device man-ufacturers. And virtually every major concern raised during that process was ad-dressed.

Unfortunately, however, the Conference dropped what I believe were crucial pro-tections for databases. It is my understanding, though, that the Committee will be "fast tracking" consideration of database protection next Congress. I look forward to working with Chairman HATCH to move forward on this matter early next year.

In sum, Mr. President, I am confident that this bill will reduce piracy and strengthen one of our biggest export industries. It deserves our support and the President's signature.

Mr. ASHCROFT.

Mr. President, I rise in support of the conference report on H.R. 2281, a bill to implement the World Intellectual Property Organization copyright treaties. I am pleased that the final product of the many months of negotiations has produced a bill of appropriate scope and balance, and reflects many of the priorities I estab-lished through the introduction of my own bill to implement the WIPO copyright treaties, to begin updating the Copyright Act for the digital era, and to address the potential problem of on-line servicer liability.

First, with respect to "fair use," the conferees adopted an alternative to sec-tion 1201(a)(1) that would authorize the Librarian of Congress to selectively waive the prohibition against the act of circumvention to prevent a diminution in the availability to individual users (including institutions) of a particular category of copyrighted materials. As originally proposed by the Administration and adopted by the Senate, this section would have established a flat prohibition on the circum-vention of technological protection measures to gain access to works for any pur-pose, and thus raised the specter of moving our Nation towards a "pay-per-use" soci-ety. Under the compromise embodied in the conference report, the Librarian of Con-gress would have authority to address the concerns of libraries, educational insti-tutions, and other information consumers potentially threatened with a denial of ac-cess to categories of works in circumstances that otherwise would be lawful today. I trust that the Librarian of Congress will implement this provision in a way that will ensure information consumers may exercise their centuries-old fair use priv-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ilege to continue to gain access to copyrighted works.

   Second, the conferees made an important contribution by clarifying the "no man-
date" provision of the bill. Because the conference report is silent, I thought that
I should explain this provision in some detail. As my colleagues may recall, I had
been very concerned that S. 2037 could be interpreted as a mandate on product manu-
facturers to design products so as to affirmatively **\*S11888** respond to or accommod-
ate technological protection measures that copyright owners might use to deny access
to or the copying of their works. To address this potential problem, I authored an
amendment providing that nothing in the bill required that the design of, or design
and selection of parts and components for, a consumer electronics, telecommunica-
tions, or computing product provide for a response to any particular technological
protection measure. The amendment reflected my belief that product manufacturers
should remain free to design and produce the best, most advanced consumer electron-
ics, telecommunications, and computing products without the threat of incurring li-
ability for their design decisions. Creative engineers-not risk-averse lawyers-
should be principally responsible for product design. As important, the amendment
reflected the working assumption of all of my colleagues that this bill is aimed
fundamentally at so-called "black boxes" and not at legitimate products that have
substantial noninfringing uses.

   As my colleagues know, there had been some concern expressed that the "so long
as" clause of section 1201(c)(3) made the provision appear to be circular in its lo-
gic. In other words, there was concern that the entire provision could be read to
provide in essence that manufacturers were not under any design mandate to respond
to technological measures, as long as they " otherwise" designed their devices to
respond to existing technological measures. I never shared that perspective. To
eliminate any uncertainty, the House Commerce Committee simply deleted the "so long
as" clause. As I explained on the floor in September, that change merely confirmed
my original conception of the amendment. Now that the conferees have adopted a pro-
vision requiring certain analog videocassette recorders to respond to certain exist-
ing analog protection measures, the "so long as" clause has a meaning that all
should agree is logical: Manufacturers of consumer electronics, telecommunications,
and computer products are not under a design mandate generally, but they are other-
wise subject to a single, very limited, and carefully defined mandate to design cer-
tain analog videocassette recorders to respond to existing analog protection meas-
ures. Quite importantly from my perspective, this provision is limited so as not to
impair the reasonable and accustomed home taping practices of consumers recognized
in the Supreme Court's Betamax decision.

   It thus should be about as clear as can be to a judge or jury that, unless other-
wise specified, nothing in this legislation should be interpreted to limit manufac-
turers of legitimate products with substantial noninfringing uses-such as VCRs and
personal computers-in making fundamental design decision or revisions, whether in
selecting certain components over others or in choosing particular combinations of
parts.

   Third, I am pleased to see that the conferees have addressed the device " playab-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

144 Cong. Rec. S11887-01                                                    Page 4
144 Cong. Rec. S11887-01, 1998 WL 716423 (Cong.Rec.)
**(Cite as: 144 Cong. Rec. S11887-01)**

ility" problem. As I pointed out in my floor speech just prior to final passage of
S. 2037, "playability" problems may arise at two levels. Technological measures may
cause noticeable and recurring adverse effects on the normal operation of products,
and thus adjustments may be necessary at the factory levels to ensure consumers get
what they expect. In addition, adjustments to specific products may be necessary
after sale to a consumer to maintain their normal, authorized functioning. Sub-
sequently, I was pleased to see that the Commerce Committee's report explicitly re-
affirmed my interpretation.

I also was pleased that the conferees shared my perspective on encouraging all
interested parties to strive to work together through a consultative approach before
new technological measures are introduced in the market. As the conferees pointed
out, one of the benefits of such consultations is to allow the testing of proposed
technologies to determine whether they create playability problems, and to have an
opportunity to take steps to eliminate or substantially mitigate such adverse ef-
fects before new technologies are introduced. As the conferees recognized, however,
persons may choose to implement a new technological measure (or copyright management
information system) without vetting it through an inter-industry consultative pro-
cess, or without regard to the input of the affected parties.

Whether introduced unilaterally or developed with the input of experts in the
field, a new protection technology coming to market might materially degrade or oth-
erwise cause recurring appreciable adverse effects on the authorized performance or
display of works. Given the multiplicity of ways in which devices might be intercon-
nected, some playability problems may not be foreseeable. I was thus pleased that
the conference report unambiguously provides that manufacturers and persons servi-
cing popular consumer electronics, telecommunications, or computing products who
make product adjustments solely to mitigate a playability problem-whether or not
taken in combination with other lawful product modifications-shall not be deemed to
have violated either section 1201(a) or section 1201(b). Having heard directly from
a major trade association representing professional servicers, I am pleased we could
include such strong language so that they can go about their business without fear
of facing crippling liability.

Fourth, the conferees adopted specific provisions making it clear that the bill
is not intended to prohibit legitimate encryption research or security systems test-
ing. As my colleagues know, Senators BURNS, LEAHY, and I have lead the effort in the
Senate to ensure that U.S. business can develop and export world-class encryption
products. by explicitly fashioning an affirmative encryption research defense, the
conferees made an important contribution to our overall efforts to ensure that U.S.
industry remains at the forefront in developing secure encryption methods. In addi-
tion, by including a security system testing amendment, the conferees have confirmed
that professional consultants and other well-established, responsible corporate cit-
izens can survey and test IT security systems for vulnerabilities.

Finally, the conferees built on my efforts to ensure that this legislation would
not harm the efforts of consumers to protect their personal privacy by including two
important amendments proposed by the House Commerce Committee. The first amendment

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

144 Cong.Rec. S11887-01                                                      Page 5
144 Cong. Rec. S11887-01, 1998 WL 716423 (Cong.Rec.)
**(Cite as: 144 Cong. Rec. S11887-01)**

would create incentives for website operators to disclose whenever they use techno-
logical measures that have the capability to gather personal data, and to give con-
sumers a means of disabling them. The second amendment strengthened section 1202 of
this legislation by making explicit that the term "copyright management information"
does not include "any personally identifying information about a user of a work or a
copy, phonorecord, performance, or display of a work." In my view, these amendments
will help preserve the critical balance that we must maintain between the interests
of copyright owners and the privacy interests of information users.

We should all be gratified that so much has been done to appropriately calibrate
the WIPO copyright treaties implementing legislation. Each of us, working alone,
would undoubtedly have produced a different bill. But we have a good bill, perhaps
one more balanced and limited in scope than might have been thought possible at
times throughout the debate. I therefore urge my colleagues to vote in favor of the
conference report.

Mr. THURMOND.

Mr. President, I wish to express my strong support for the Conference Report to
the Digital Millennium Copyright Act. As one of the conferees, I believe this bill
represents a fair compromise between the House and Senate versions of this most sig-
nificant legislation.

Intellectual property is an increasingly important part of the American economy.
This bill recognizes the significance of our copyright laws as America and the world
have become increasingly computerized. The Internet is rapidly changing our lives,
and our copyright laws must keep pace.

This legislation implements the WIPO treaties to help protect the property rights
of the creative community in our global environment. It also clarifies the liability
of on-line and Internet service providers regarding their liability for copyright
infringement and permits fair use of works. Together, these provisions do a great
deal **\*S11889** to accommodate the interests of the owners of copyrighted works with
those who use or facilitate the use of those works in the digital age.

A final title of the bill is the Vessel Hull Design Protection Act. Although it
was not part of the Senate version of the legislation, it was accepted at confer-
ence. I share Senator HATCH's concerns about this controversial title. It contains
not only industrial design protection, which itself has created controversy in the
past because of its impact on consumers and others, but it protects functionality of
vessel hulls in addition to aesthetic aspects. It is my understanding that function-
ality is protected from copying through patent, and this title is a significant de-
parture from that principle, although for a specific narrow area.

Also, I wish to note that although data base protection is not included in this
bill, I think it is important that we make every effort to address this significant
issue next year.

In closing, I wish to thank the Chairman of the conference, Senator HATCH, and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

144 Cong. Rec. S11887-01                                          Page 6
144 Cong. Rec. S11887-01, 1998 WL 716423 (Cong.Rec.)

**(Cite as: 144 Cong. Rec. S11887-01)**

all of the other members of the conference for their cooperation in resolving this matter. I am very pleased with the outcome.

The PRESIDING OFFICER.

The Senator from Utah.

Mr. HATCH.

Mr. President, I ask unanimous consent the conference report be agreed to, the motion to reconsider be laid upon the table, and that any statements relating to the conference report be printed in the RECORD.

The PRESIDING OFFICER.

Without objection, it is so ordered.

The conference report was agreed to.

Mr. HATCH.

Mr. President, in the wining days of a Congress, so many important measures need attention that the significance of individual bills is often not appreciated. This is even more true for a bill that has copyright as its subject matter, such as the Digital Millennium Copyright Act, the conference report which passed the Senate today by unanimous consent. But the DMCA is one of the most important bills passed this session, as the distinguished majority leader stated yesterday.

"Digital Millennium" may seem grandiose, but in fact it accurately describes the purpose of the bill-to set copyright law up to meet the promise and the challenge of the digital world in the new millennium. Digital "world" is appropriate here, because the Internet has made it possible for information-including valuable American copyrighted works-to flow around the globe in a matter of hours, and Internet end users can receive copies of movies, music, software, video games and literary and graphic works that are as good as the originals. Indeed, the initial impetus for the DMCA was the implementation of the World Intellectual Property Organization (WIPO) treaties on copyright and on performances and phonorecords.

The WIPO treaties and the DMCA will protect the property rights of Americans in their work as they move in the global, digital marketplace, and, by doing so, continue to encourage the creation of new works to inspire and delight us and to improve the quality of our lives.

In addition to securing copyright in the global, digital environment, the DMCA also clarifies the liability of on-line and Internet service providers-OSPs and ISPs-for copyright infringement liability. The OSPs and ISPs needed more certainty in this area in order to attract the substantial investments necessary to continue the expansion and upgrading of the Internet.

The final component of the DMCA is the Vessel Hull Design Protection,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

144 Cong. Rec. S11887-01, 1998 WL 716423 (Cong.Rec.)

**(Cite as: 144 Cong. Rec. S11887-01)**

Act (VHDPA). This legislation was not part of the Senate-passed version of the DMCA; rather, it was accepted by the Senate conferees in deference to the House of Representatives. Although I support the idea of industrial design protection as a legal regime outside of patent law, I appreciate how controversial it is, and I think that the Senate should act circumspectly. Furthermore, I am concerned that this bill is not like traditional industrial design protection in that the VHDPA protects the functionality of vessel hulls, not only its aesthetic aspects.

But because the VHDPA is limited only to boat hulls, I felt that I could acquiesce in including it in the conference report as a limited experiment in design protection. In order to make it truly experimental, I suggested, and the conferees adopted, modifications that "sunset" the bill two years after enactment and that require two studies of its effect. Therefore, in the future, we will be able to reevaluate the Act, and we will have the benefit of two studies-both of them conducted jointly by the Register of Copyrights and the Commissioner of Patents and Trademarks-to help us make the right decision.

In the nearer future-early in the next session-I intend to focus my attention on database protection legislation. The House bill on this issue, which was attached by the House to the WIPO implementation legislation, was a good start toward tackling the problem of database piracy. It was quite controversial, however, so I asked the parties to sit down with me to work out a compromise bill, so that disagreements on database protection would not jeopardize the DMCA. This effort resulted in a bill draft that attempted to accommodate the diverging interests. The scientific research community, in particular, favored my approach because it allayed many of their fears that recognizing a property right in databases would hamper scientific research.

Neither the House bill nor my proposal was accepted by the conferees, but I am determined to work on this issue in the next Congress. Indeed, I intend to introduce a bill based on my proposal, have a hearing on database protection, and move database legislation as quickly as possible. We need to encourage the substantial investment of money, time and labor that it takes to gather and organize information and at the same time address the reasonable concerns of information users. In our global, high tech era, information will be the coin of the realm, and I see database protection as the next step in moving the law into the digital millennium.

In closing, I would like to recognize the many people who brought this bill to a successful conclusion. First, I would like to thank my colleague, Senator PATRICK LEAHY, the distinguished ranking member of the Judiciary Committee, who was of invaluable assistance in getting this important piece of legislation passed. Two other distinguished colleagues, Senator STORM THURMOND and Senator JOHN ASHCROFT, participated in the refining process that made the DMCA a better bill.

Second, I want to thank the House conferees, especially Congressman HENRY HYDE, the distinguished chairman of the Judiciary Committee, Congressman HOWARD COBLE, the distinguished chairman of the Subcommittee on Courts and Intellectual Property, and Congressman TOM BLILEY, the distinguished chairman of the Commerce Committee for their willingness to consider the Senate's views objectively and dispassionately.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

144 Cong. Rec. S11887-01, 1998 WL 716423 (Cong.Rec.)
**(Cite as: 144 Cong. Rec. S11887-01)**

They too wanted to get this done, and it was the spirit of cooperation on both sides
that produced this admirable result.

Finally, I would like to acknowledge the hard work done by the Senate and House
staffs. There were so many who worked on this bill that it would take a column of
the CONGRESSIONAL RECORD to list them. But I would like to mention just a few. Manus
Cooney, the staff director and chief counsel of the Senate Judiciary Committee, was
the staff pilot for the DMCA. He was ably assisted by Edward Damich, Chief Intellec-
tual Property Counsel of the Committee, and Staff Assistant Troy Dow. Senator THUR-
MOND was ably assisted in the conference committee by his Judiciary Committee Coun-
sel, Garry Malphus.

Bruce Cohen, Minority Chief Counsel and Staff Director of the Judiciary Commit-
tee, Beryl Howell, Minority General Counsel, and Marla Grossman, Minority Counsel,
provided invaluable assistance on all levels. We had superb cooperation from the
minority, and the DMCA is truly a bipartisan bill.

Turning to the House side, I want to express my appreciation for the contribu-
tions of Mitch Glazier, Chief Counsel of the Subcommittee on Courts and Intellectual
Property, Debra Laman, Counsel of the Subcommittee, Robert Raben, Minority Counsel
of the Subcommittee, Justin Lilley, General Counsel of the Commerce Committee, and
Andrew Levin, Minority Counsel of that Committee.

**\*S11890** Mr. President, this bill, the Digital Millennium Copyright Act, is one of
the most important bills in this whole Congress. It has taken a tremendous amount of
effort from all of us to be able to put this together. It is going to make a differ-
ence in so many ways-in the protection of copyrighted works, in digital communica-
tion and otherwise-throughout the world, that I feel very, very happy to be able to
say that this is being enacted into law at this particular point.

I would like to state my agreement with certain important points that Senator
LEAHY made in his remarks about Section 1201(k), "Certain Analog Devices and Certain
Technological Measures." The Senator emphasized that that section establishes re-
quirements only for analog videocassette recorders, analog videocassette camcorders
and professional analog videocassette recorders. It is also my understanding that
the intent of the conferees is that these provisions apply only to analog video re-
cording devices.

In addition, because innovation and technological development thrive in unregu-
lated environments, this section should not be misconstrued as providing any impetus
or precedent for regulating or otherwise dictating to the computer software industry
technological standards. I agree fully with the assessment of the conferees that
technology develops best and most rapidly in response to marketplace forces. For
these reasons, this section applies to analog technologies only, and it is entirely
without prejudice to digital technologies.

Let me just say that I am disappointed that we were not able to include database
protection in this bill this year. There are so many people who would like to have
that done, on the floor and in the business world and elsewhere, but we were unable

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**(Cite as: 144 Cong. Rec. S11887-01)**

to get it done because of objections and because of some dissent. But I would like
to put everybody on notice that, shortly after we get back next year, I will file a
database protection bill. I believe my colleague from Vermont will join me in this.
That, hopefully, will be a bill that everybody can support, because it is absolutely
critical that we get this done.

It will be one of the highest orders of priority that we will have on the Senate
Judiciary Committee next year. It was one of the things that I feel disappointed we
were unable to get done on this particular bill. It just could not be done at this
time. I know there are people who are disappointed, but we will get it done next
year-we will do everything we can to get it done, and I hope we can call upon in-
dustry and everyone else interested in this issue throughout the country to help us
in this matter. I hope our colleagues will, because it is very, very important.

Mr. LEAHY addressed the Chair.

The PRESIDING OFFICER (Mr. HAGEL).

The Senator from Vermont.

Mr. LEAHY.

Mr. President, America's founders recognized and valued the creativity of this
nation's citizens to such an extent that intellectual property rights are rooted in
the Constitution. Article I, Section 8, Clause 8 of the Constitution states that

The Congress shall have power . . . <t>o promote the progress of science and use-
ful arts, by securing for limited times to authors and inventors the exclusive right
to their respective writings and discoveries.

The Continental Congress proclaimed,

Nothing is more properly a man's own than the fruit of his study."

Protecting intellectual property rights is just as important today as it was when
America was a fledgling nation.

It is for this reason I am pleased that the Senate has today passed the Confer-
ence Report on the Digital Millennium Copyright Act (DMCA), H.R. 2281.

Title I of the DMCA will implement the two World Intellectual Property Organiza-
tion (WIPO) copyright treaties. These treaties will fortify intellectual property
rights around the world and will help unleash the full potential of America's most
creative industries, including the computer software, publishing, movie, recording
and other copyrighted industries that are subject to online piracy. By insuring bet-
ter protection of the creative works available online, the DMCA will also encourage
the continued growth of the Internet and the global information infrastructure. It
will encourage the ingenuity of the American people, and will send a powerful mes-
sage to intellectual property pirates that we will not tolerate theft.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

I should note that there are provisions in Title I that address certain technolo-
gies used to control copying of motion pictures in analog form on video cassette re-
corders which were not part of either the original Senate or House DMCA bills. These
provisions establish certain requirements only for analog videocassette recorders,
analog videocassette camcorders and professional analog videocassette recorders. It
is my understanding that these provisions do not establish any obligations with re-
spect to digital technologies, including computers or software.

It is also my understanding that the intent of the conferees is that these provi-
sions neither establish, nor should be interpreted as establishing, a precedent for
Congress to legislate specific standards or specific technologies to be used as
technological protection measures, particularly with respect to computers and soft-
ware. Generally, Congress should not establish technology specific rules; technology
develops best and most rapidly in response to marketplace forces.

Title II of the DMCA will limit the infringement liability of online service pro-
viders. This title is intended to preserve incentives for online service providers
and copyright owners to cooperate to detect and address copyright infringements that
occur in the digital networked environment.

Title III will provide a minor, yet important, clarification in section 117 of
the Copyright Act to ensure that the lawful owner or lessee of a computer machine
may authorize an independent service provider, a person unaffiliated with either the
owner or lessee of the machine, to activate the machine for the sole purpose of ser-
vicing its hardware components.

Title IV will begin to update our nation's copyright laws with respect to lib-
rary, archives, and educational uses of copyrighted works in a digital environment.
It includes provisions relating to the Commissioner of Patents and Trademarks and
the Register of Copyrights, and clarifies the role of the Copyright Office. It also
addresses the assumption of contractual obligations related to the transfer of
rights in motion pictures. Finally, this title creates a fair and efficient licens-
ing mechanism to address the complex issues facing copyright owners and users of
copyrighted materials as a result of the rapid growth of digital audio services.

Title V, the "Vessel Hull Design Protection Act," creates a new form of sui gen-
eris intellectual property protection for vessel hull designs. By adoption of this
title, however, the Conferees wisely took no position on the advisability or propri-
ety of adopting broader design protection for other useful articles. Indeed, when
broad industrial design legislation was considered by the Congress in the late 1980s
and early 1990s, a number of legitimate concerns were raised about the effects such
legislation would have, particularly on the cost of auto repairs. Establishing nar-
row protection for vessel hulls in the conference report should not be interpreted
as signaling support, or setting a precedent, for broader design protection that
could negatively affect the ability of consumers to obtain economical, quality auto
repairs.

The Senate today is passing a balanced and important package. Certain issues that
the House had included in the version it passed on August 4, 1998, were eliminated

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

144 Cong. Rec. S11887-01, 1998 WL 716423 (Cong.Rec.)

**(Cite as: 144 Cong. Rec. S11887-01)**

to allow consideration of the rest of the package in a timely manner.

One of the issues dropped was that of database protection. Title V of the House passed DMCA bill created a new federal prohibition against the misappropriation of databases that are the product of substantial investment, with both civil remedies and criminal penalties. The argument for enhanced database protection is that legal rulings and technological developments have eroded protections against database theft. Companies may be able to copy significant portions of established databases and sell them, avoiding the substantial cost of creating and verifying the databases themselves. I appreciate that the threat to U.S. databases has been magnified because database protection laws recently implemented in European Union countries will not be available to U.S. publishers unless comparable legislation is enacted in the U.S. **\*S11891**

I have therefore been and continue to be supportive of legislation to provide database producers with adequate protection from database piracy.

I am also sensitive, however, to the concerns about the House-passed database bill that were raised by the Administration, the libraries, certain educational institutions, and the scientific community. The Department of Justice, in a memorandum dated July 28, 1998, concluded that the House passed database bill, H.R. 2652, which was later incorporated in Title V of the House DMCA, raised difficult and novel constitutional questions.

The Department of Commerce has also advised me that while the Administration supports legal protection against commercial misappropriation of collections of information, the Administration has a number of concerns with H.R. 2652, including that the Constitution imposes significant constraints upon Congress' power to enact legislation of this sort.

Just this week, the Department of Commerce told me in a letter that:

Given the critical importance of implementing the WIPO treaties, and the short time remaining in the Session, we urge the Conferees to focus on issues germane to these treaties, rather than unrelated matters.

Although there was not enough time before the end of this Congress to give this important issue due consideration, it is my hope that the Senate Judiciary Committee will promptly commence hearings on the issue and move expeditiously to enact further legislation on the matter at the beginning of the 106th Congress. The work that the Committee did this year on the issue should be viewed as a beginning, and we are committed to making more progress as quickly as possible.

The legislation that the Senate passed today is the culmination of several years' work, both domestically and internationally, to ensure that the appropriate copyright protections are in place around the world to foster the enormous growth of the Internet and other digital computer networks.

Much of the credit for this legislation is due to the hard work and dedication of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

144 Cong. Rec. S11887-01, 1998 WL 716423 (Cong.Rec.)

**(Cite as: 144 Cong. Rec. S11887-01)**


the Chairman of the Senate Judiciary Committee, Senator HATCH. This is another ex-
ample of when we work together, we get good things done. It was also a pleasure to
serve on the Conference with Senator THURMOND, former Chairman the Senate Judiciary
Committee and a force in his own right.

The Chairman and Ranking Member of the House Judiciary Committee-Chairman HYDE
and Congressman CONYERS-and the Chairman and Ranking Member of the Subcommittee on
Courts and Intellectual Property-Chairman COBLE and Congressman FRANK-deserve par-
ticular recognition and praise for their fine work. Although Congressman FRANK was
not on the Conference Committee, his tremendous efforts on behalf of the WIPO imple-
menting language as well as on the other matters in the DMCA are very much appreci-
ated. Congressman GOODLATTE and BERMAN also contributed considerable time and talent
to the benefit of all who participated in the process.

Although I had not previously had the pleasure of working on WIPO with the Chair-
man and Ranking Member of the House Commerce Committee-Chairman BLILEY and Congress-
man DINGELL-or the Chairman of the Telecommunications, Trade and Consumer Protection
Subcommittee, Chairman TAUZIN, I would like to acknowledge their significant contri-
butions to the final package.

The staff of all of the Conferees deserve special recognition. Manus Cooney, Ed-
ward Damich, Troy Dow, Garry Malphrus, Mitch Glazier, Debbie Laman, Robert Raben,
Bari Schwartz, David Lehman, Ben Cline, Justin Lilley, Andy Levin, Mike O'Rielly,
and Whitney Fox spent countless hours on this bill, when it was pending in Commit-
tee, on the floor and, finally, in conference. Without their labor and talent, we
would not be here today considering the DMCA.

The DMCA also reflects the recommendations and hard work of the Copyright Office.
Specifically, Marybeth Peters, Shira Perlmutter, David Carson, Jesse Feder, Carolina
Saez, Sayuri Rajapakse, Rachel Goslins and Jule Sigall were invaluable on this le-
gislation. The Copyright Office was there at every step along the way-from the nego-
tiation of the WIPO treaties to the negotiations and the drafting of the implement-
ing legislation and the other issues in the DMCA. Given their expertise in copyright
law, they will play a significant role in the implementation of the legislation,
particularly with regards to the rulemaking on the circumvention of technological
measures that effectively control access to a copyrighted work and the studies man-
dated by the bill.

The Clinton Administration deserves praise for the role it played in making this
legislation a reality. I would especially like to thank Secretary Daley, Andy Pin-
cus, Ellen Bloom, Jennifer Conovitz and Justin Hughes of the Department of Commerce,
as well as Brian Kahin and Thomas Kalil for all of their hard work on the DMCA.

From my perspective, those who deserve the most thanks are my Judiciary Committee
staff who have assisted me during the hearings, debates, negotiations, and confer-
ence on this bill. Bruce Cohen, Beryl Howell and Marla Grossman have worked tire-
lessly to ensure that this bill was well crafted and lived up to its promise.

This legislation is an important step for protecting American ingenuity and cre-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-22942-DLG   Document 41-1   Entered on FLSD Docket 04/18/2007   Page 251 of 344

144 Cong. Rec. S11887-01                                                Page 13
144 Cong. Rec. S11887-01, 1998 WL 716423 (Cong.Rec.)
**(Cite as: 144 Cong. Rec. S11887-01)**

ative expression. It addresses the needs of creators, consumers and commerce in the digital age and well into the next century. I am proud that the Senate has passed this legislation today.

Mr. President, so Senators will know, the distinguished senior Senator from Utah and I spent enormous amounts of time on this piece of legislation working to get us to this point. We both share great concerns about the database part. We understood that we would not be able to get the bill passed had that stayed in the bill.

The distinguished Senator from Utah and I will work between the time we go out and the time we come back in January to put together database legislation. There will be a strong effort, I know, on my side of the aisle, as there will be on his. We hope the Senate will be able to vote on that and the House, too, early next year. I say this because I do not want anybody to think that this has now disappeared because the rest of the legislation has gone through.

With that, I yield the floor.

Mr. DEWINE.

Mr. President, I rise today in support of the conference report to implement the WIPO treaties. I also strongly support the copyright term extension legislation that we recently passed by voice vote.

While I would like to congratulate the conferees and their staff for working out a consensus on so many controversial provisions, I feel it is necessary to express my disappointment that we are unable to pass some form of database protection this year. It is unfortunate that a consensus could not be reached on an issue that is so vital to so many people in our country. Agricultural databases, for example, are relied upon by our farmers and by others in our farming supply industry. While computers and the Internet make access to information available at our fingertips, we need to provide adequate protection for those who compile that information in such a user friendly format. Such easy access is essential to health care workers, for example, who need to have fast access to accurate information about which drugs have adverse reactions to other drugs or which antidotes are most effective in counteracting certain poisons.

I see my friend from Utah, Senator HATCH, the chairman of the Judiciary Committee, is on the floor, and I would like to ask if he would agree that Congress should pass database legislation as early as possible next year to ensure that those who invest their time, money and effort in compiling and updating databases are protected from having their work pirated both domestically and internationally? Would the Senator from Utah agree that without such protections, database creators may decide that the risk of loss from piracy outweighs any potential gains from creating or updating databases.

Mr. HATCH.

Mr. President, as my colleague well knows, I have facilitated a number of meet-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

144 Cong. Rec. S11887-01                                      Page 14
144 Cong. Rec. S11887-01, 1998 WL 716423 (Cong.Rec.)
**(Cite as: 144 Cong. Rec. S11887-01)**

ings with interested parties from all sides of this issue to try to work out a con-
sensus bill. Obviously more work needs to be done to pass a bill that is acceptable
to all sides. This is an important issue, and I **\*S11892** think everyone understands
that. The Senator from Ohio has my assurance that I will continue to work with him
on this issue.

Mr. DEWINE.

I again commend the Senator from Utah and the other WIPO conferees and their
staff, especially Senator LEAHY, for their tireless efforts to reach consensus on so
many complex issues. I would simply like to ask my friend from Utah to work with
those of us on the Judiciary Committee to introduce and seek passage of legislation
early next year that protects our databases.

Mr. HATCH.

Mr. President, let me assure my friend from Ohio that I have spoken to our col-
leagues on the House side, Congressmen HYDE and COBLE, and we have agreed to work
together to introduce and seek passage of database protection legislation early next
year. I will continue to work with the Senator from Ohio and our Senate and House
colleagues and address this issue early next year.

Mr. DEWINE.

I thank the Senator from Utah for his comments.

Several Senators addressed the Chair.

The PRESIDING OFFICER.

The Senator from Virginia has the floor.

Mr. HATCH.

Will the Senator yield?

Mr. WARNER.

Without losing my right to the floor.

Mr. HATCH.

As I understand, the conference report has been agreed to. Mr. President, I move
to reconsider the vote by which the conference report was agreed to.

Mr. LEAHY.

I move to lay that motion on the table.

The motion to lay on the table was agreed to.

Mr. HATCH.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

144 Cong. Rec. S11887-01, 1998 WL 716423 (Cong.Rec.)

**(Cite as: 144 Cong. Rec. S11887-01)**


I thank my friend, the Senator from Virginia.

The PRESIDING OFFICER.

The Senator from Virginia.

Mr. HATCH.

Will my colleague yield for 1 other minute? I promised I would yield to the distinguished Senator from Arizona.

Mr. WARNER.

I will be happy to yield to the distinguished Senator from Arizona, provided I do not lose my right of recognition.

The PRESIDING OFFICER.

The Senator from Arizona.

144 Cong. Rec. S11887-01, 1998 WL 716423 (Cong.Rec.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw Download Summary Report for BALDINGER,JAMES 4451592**

| | |
|---|---|
| Date/Time of Request: | Wednesday, April 18, 2007 18:11:00 Central |
| Client Identifier: | 50649-29958-005 |
| Database: | CR |
| Citation Text: | 144 Cong.Rec. E2315-01 |
| Lines: | 83 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.



144 Cong.Rec. E2315-01                                           Page 1
144 Cong. Rec. E2315-01, 1998 WL 785708 (Cong.Rec.)
**(Cite as: 144 Cong. Rec. E2315-01)**

                  Congressional Record --- Extension of Remarks
            Proceedings and Debates of the 105th Congress, Second Session

        Material in Extension of Remarks was not spoken by a Member on the floor.

                          In the House of Representatives
                          Thursday, November 12, 1998

                  **\*E2315** DIGITAL MILLENIUM COPYRIGHT ACT

                    HON. HOWARD L. BERMAN OF CALIFORNIA

                          Thursday, November 12, 1998

     Mr. BERMAN.

     Mr. Speaker, anyone trying to discern the meaning of the anticircumvention provi-
sions of H.R. 2281 risks bewilderment by the many pages of the CONGRESSIONAL RECORD
that have been devoted to the detailed analyses submitted by one or another Member
of this House. I am a member of the Judiciary Committee, which reviewed this legis-
lation in detail, and which reported the key provisions in a form in which they ul-
timately received the approval of the House and of the conference committee, on
which I also served.

     First, the operative provisions which define the key prohibition of trafficking
in the tools of circumvention of technological protection measures-section
1201(a)(2) and (a)(3), and section 1201(b)(1) and (b)(2), of Title 17- were not
changed throughout the legislative process. They read almost verbatim in the final
version of this legislation, which is on the way to the President's desk, as they
read when the legislation was first introduced, when it was reported by the Judi-
ciary Committee, and when it was unanimously approved by the House. Thus, statements
on the floor that purport to explain how these provisions have been narrowed, or how
implicit exceptions to them-not spelled out in the language of the bill-have been
expanded, deserve little attention. In particular, the three-point test spelled out
in sections 1201(a)(2) and 1201(b)(1) for determining whether a particular product
or service runs afoul of the legislation has never been substantively amended. This
test remains operative, not the test of "no legitimate purpose" imagined by some of
my colleagues.

     Second, the operative provision defining the prohibition on the act of circumven-
tion of technological protection measures that control access to copyrighted materi-
als-contained in section 1201(a)(1)-has also emerged from the legislative process
completely unchanged. It is true that the effective date of this prohibition has
been delayed, and that a rulemaking proceeding has been grafted on to this provision
to determine whether, with regard to particular classes of copyrighted materials,
the applicability of this particular prohibition should be delayed even further. But

                  © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

144 Cong. Rec. E2315-01                                              Page 2
144 Cong. Rec. E2315-01, 1998 WL 785708 (Cong.Rec.)
**(Cite as: 144 Cong. Rec. E2315-01)**

the prohibition itself remains unchanged, and means exactly what it meant when our committee first reported it several months ago.

Third, section 1201(c)(3)-the no mandate provision-in the final text of this legislation is identical to the provision that emerged from the Senate Judiciary Committee over six months ago. The changes proposed by the House Commerce Committee, which threatened to open a huge loophole in the protections afforded by the legislation, were rejected by the conference committee. The no mandate provision means what it says, and what it says is this: there is no design mandate in this legislation, other than the negative mandate to avoid designing a product primarily for the purpose of circumventing an effective technological measure. The addition, by the conference committee, of specific provisions concerning certain protections used to control copying of audiovisual works in analog formats does not change the meaning of section 1201(c)(3) one iota. If the conferees had intended that these new provisions were to have had any impact on the application of the "no mandate" provisions to other technological protection measures, we would have said so. We did not, in fact, we said the opposite.

Fourth, on the much-contested issue of playability, the language adopted in the conference report is the most definitive statement substantively on the circumstances under which product performance adjustment does or does not violate the anticircumvention provisions of this legislation. The conference report, which specifically addresses this issue, has been adopted without recorded dissent in both Houses, and any subsequent inconsistent interpretation should carry no weight.

I do not seek to put a new gloss on the words in the conference report. Those words speak for themselves. I would simply point out that nearly all the fundamental operative provisions of Title 1 of H.R. 2281, and indeed, of much of the rest of the bill as well, simply recapitulate the provisions that have been part of this legislation since it was introduced, that have remained unchanged throughout the complex and protracted legislative process, and that are amply explained by the reports of the respective Judiciary Committees, which first approved them.

144 Cong. Rec. E2315-01, 1998 WL 785708 (Cong.Rec.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw Download Summary Report for BALDINGER,JAMES 4451592**

| | |
|---|---|
| Date/Time of Request: | Wednesday, April 18, 2007 18:11:00 Central |
| Client Identifier: | 50649-29958-005 |
| Database: | LH |
| Citation Text: | H.R. CONF. REP. 105-796 |
| Lines: | 4556 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

Westlaw.

H.R. CONF. REP. 105-796                                              Page 1
H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796, 1998 U.S.C.C.A.N. 639)**
          **639 P.L. 105-304, *1 DIGITAL MILLENNIUM COPYRIGHT ACT

                    DATES OF CONSIDERATION AND PASSAGE

                  House: August 4, September 23, 1998
              Senate: May 14, August 31, September 17, 1998
                      Cong. Record Vol. 144 (1998)
              House Report (Judiciary Committee) No. 105-551(I),
                           May 22, 1998
                      (To accompany H.R. 2281)
              House Report (Commerce Committee) No. 105-551(II),
                           July 22, 1998
                      (To accompany H.R. 2281)
               Senate Report (Judiciary Committee) No. 105-190,
                            May 6, 1998
                      (To accompany S. 2037)
               House Conference Report No. 105-796,
                         October 8, 1998
                      (To accompany H.R. 2281)


                   HOUSE CONFERENCE REPORT NO. 105-796
                           October 8, 1998


          Mr. Coble, from the committee of conference, submitted the following

                          CONFERENCE REPORT

                      [To accompany H.R. 2281]

   The committee of conference on the disagreeing votes of the two Houses on the
amendment of the Senate to the bill (H.R. 2281), to amend title 17, United States
Code, to implement the World Intellectual Property Organization Copyright Treaty and
Performances and Phonograms Treaty, and for other purposes, having met, after full
and free conference, have agreed to recommend and do recommend to their respective
Houses as follows:
   That the House recede from its disagreement to the amendment of the Senate and
agree to the same with an amendment as follows:
   In lieu of the matter proposed to be inserted by the Senate amendment, insert the
following:

SECTION 1. SHORT TITLE.

   This Act may be cited as the "Digital Millennium Copyright Act".

SEC. 2. TABLE OF CONTENTS.

   Sec. 1. Short title.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796, 1998 U.S.C.C.A.N. 639)**

Sec. 2. Table of contents.

### TITLE I-WIPO TREATIES IMPLEMENTATION

Sec. 101. Short title.
Sec. 102. Technical amendments.
Sec. 103. Copyright protection systems and copyright management information.
Sec. 104. Evaluation of impact of copyright law and amendments on electronic com-
merce and technological development.
Sec. 105. Effective date.

### TITLE II-ONLINE COPYRIGHT INFRINGEMENT LIABILITY LIMITATION

Sec. 201. Short title.
Sec. 202. Limitations on liability for copyright infringement.
Sec. 203. Effective date.

### *2 TITLE III-COMPUTER MAINTENANCE OR REPAIR COPYRIGHT EXEMPTION

Sec. 301. Short title.
Sec. 302. Limitations on exclusive rights; computer programs.

### TITLE IV-MISCELLANEOUS PROVISIONS

Sec. 401. Provisions Relating to the Commissioner of Patents and Trademarks and
the Register of Copyrights.
Sec. 402. Ephemeral recordings.
Sec. 403. Limitations on exclusive rights; distance education.
Sec. 404. Exemption for libraries and archives.
Sec. 405. Scope of exclusive rights in sound recordings; ephemeral recordings.
Sec. 406. Assumption of contractual obligations related to transfers of rights in
motion pictures.
Sec. 407. Effective date.

### TITLE V-PROTECTION OF CERTAIN ORIGINAL DESIGNS

Sec. 501. Short title.
Sec. 502. Protection of certain original designs.
Sec. 503. Conforming amendments.
Sec. 504. Joint study of the effect of this title.
Sec. 505. Effective date.

### TITLE I-WIPO TREATIES IMPLEMENTATION

SEC. 101. SHORT TITLE.

This title may be cited as the "WIPO Copyright and Performances and Phonograms
Treaties Implementation Act of 1998".

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)

**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**


SEC. 102. TECHNICAL AMENDMENTS.

   (a) Definitions.-Section 101 of title 17, United States Code, is amended-
   (1) by striking the definition of "Berne Convention work";
   (2) in the definition  of "The 'country of origin' of a Berne Convention work"-
   (A) by striking "The 'country of origin' of a Berne Convention work, for pur-
poses of section 411, is the United States if" and inserting "For purposes of sec-
tion 411, a work is a 'United States work' only if";
   (B) in paragraph (1)-
    (i) in subparagraph (B) by striking "nation or nations adhering to the Berne
Convention" and inserting "treaty party or parties";
    (ii) in subparagraph (C) by striking "does not adhere to the Berne Convention"
and inserting "is not a treaty party"; and
    (iii) in subparagraph (D) by striking "does not adhere to the Berne Convention"
and inserting "is not a treaty party"; and
   (C) in the matter following paragraph (3) by striking "For the purposes of sec-
tion 411, the 'country of origin' of any other Berne Convention work is not the
United States.";
   (3) by inserting after the definition of "fixed" the following:
   "The 'Geneva Phonograms Convention' is the Convention for the Protection of Pro-
ducers of Phonograms Against Unauthorized Duplication of Their Phonograms, concluded
at Geneva, Switzerland, on October 29, 1971.";
   (4) by inserting after the definition of "including" the following:
   "An 'international agreement' is-
   **\*3** "(1) the Universal Copyright Convention;
   "(2) the Geneva Phonograms Convention;
   "(3) the Berne Convention;
   "(4) the WTO Agreement;
   "(5) the WIPO Copyright Treaty;
   "(6) the WIPO Performances and Phonograms Treaty; and
   "(7) any other copyright treaty to which the United States is a party.";
   (5) by inserting after the definition of "transmit" the following:
   "A 'treaty party' is a country or intergovernmental organization other than the
United States that is a party to an international agreement.";
   (6) by inserting after the definition of "widow" the following:
   "The 'WIPO Copyright Treaty' is the WIPO Copyright Treaty concluded at Geneva,
Switzerland, on December 20, 1996.";
   (7) by inserting after the definition of "The 'WIPO Copyright Treaty'" the fol-
lowing:
   "The 'WIPO Performances and Phonograms Treaty' is the WIPO Performances and
Phonograms Treaty concluded at Geneva, Switzerland, on December 20, 1996."; and
   (8) by inserting after the definition of "work made for hire" the following:
   "The terms 'WTO Agreement' and 'WTO member country' have the meanings given
those terms in paragraphs (9) and (10), respectively, of section 2 of the Uruguay
Round Agreements Act.".
   (b) Subject Matter of Copyright; National Origin.-Section 104 of title 17,
United States Code, is amended-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796, 1998 U.S.C.C.A.N. 639)**

(1) in subsection (b)-

(A) in paragraph (1) by striking "foreign nation that is a party to a copyright
treaty to which the United States is also a party" and inserting "treaty party";

(B) in paragraph (2) by striking "party to the Universal Copyright Convention"
and inserting "treaty party";

(C) by redesignating paragraph (5) as paragraph (6);

(D) by redesignating paragraph (3) as paragraph (5) and inserting it after para-
graph (4);

(E) by inserting after paragraph (2) the following:

"(3) the work is a sound recording that was first fixed in a treaty party; or";

(F) in paragraph (4) by striking "Berne Convention work" and insert-
ing "pictorial, graphic, or sculptural work that is incorporated in a building or
other structure, or an architectural work that is embodied in a building and the
building or structure is located in the United States or a treaty party"; and

(G) by inserting after paragraph (6), as so redesignated, the following:

"For purposes of paragraph (2), a work that is published in the United States or
a treaty party within 30 days after publication in a foreign nation that is not a
treaty party shall be considered to be **\*4** first published in the United States or
such treaty party, as the case may be."; and

(2) by adding at the end the following new subsection:

"(d) Effect of Phonograms Treaties.-Notwithstanding the provisions of subsection
(b), no works other than sound recordings shall be eligible for protection under
this title solely by virtue of the adherence of the United States to the Geneva
Phonograms Convention or the WIPO Performances and Phonograms Treaty".

(c) Copyright in Restored Works.-Section 104A(h) of title 17, United States
Code, is amended-

(1) in paragraph (1), by striking subparagraphs (A) and (B) and inserting the
following:

"(A) a nation adhering to the Berne Convention;

"(B) a WTO member country;

"(C) a nation adhering to the WIPO Copyright Treaty;

"(D) a nation adhering to the WIPO Performances and Phonograms Treaty; or

"(E) subject to a Presidential proclamation under subsection (g).";

(2) by amending paragraph (3) to read as follows:

"(3) The term 'eligible country' means a nation, other than the United States,
that-

"(A) becomes a WTO member country after the date of the enactment of the Uruguay
Round Agreements Act;

"(B) on such date of enactment is, or after such date of enactment becomes, a
nation adhering to the Berne Convention;

"(C) adheres to the WIPO Copyright Treaty;

"(D) adheres to the WIPO Performances and Phonograms Treaty; or

"(E) after such date of enactment becomes subject to a proclamation under sub-
section (g).";

(3) in paragraph (6)-

(A) in subparagraph (C)(iii) by striking "and" after the semicolon;

(B) at the end of subparagraph (D) by striking the period and inserting "; ";

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**


and"; and
     (C) by adding after subparagraph (D) the following:
     "(E) if the source country for the work is an eligible country solely by virtue
of its adherence to the WIPO Performances and Phonograms Treaty, is a sound record-
ing.";
     (4) in paragraph (8)(B)(i)-
     (A) by inserting "of which" before "the majority"; and
     (B) by striking "of eligible countries"; and
     (5) by striking paragraph (9).
     (d) Registration and Infringement Actions.-Section 411(a) of title 17, United
States Code, is amended in the first sentence-
     (1) by striking "actions for infringement of copyright in Berne Convention works
whose country of origin is not the United States"; and
     (2) by inserting "United States" after "no action for infringement of the copy-
right in any".
     **\*5** (e) Statute of Limitations.-Section 507(a) of title 17, United State Code, is
amended by striking "No" and inserting "Except as expressly provided otherwise in
this title, no".

SEC. 103. COPYRIGHT PROTECTION SYSTEMS AND COPYRIGHT MANAGEMENT INFORMATION.

     (a) In General.-Title 17, United States Code is amended by adding at the end the
following new chapter:
  "CHAPTER 12-COPYRIGHT PROTECTION AND MANAGEMENT SYSTEMS
  "Sec.
  "1201. Circumvention of copyright protection systems.
  "1202. Integrity of copyright management information.
  "1203. Civil remedies.
  "1204. Criminal offenses and penalties.
  "1205. Savings clause.

"S 1201. Circumvention of copyright protection systems

     "(a) Violations Regarding Circumvention of Technological Measures.-(1)(A) No
person shall circumvent a technological measure that effectively controls access to
a work protected under this title. The prohibition contained in the preceding sen-
tence shall take effect at the end of the 2-year period beginning on the date of the
enactment of this chapter.
     "(B) The prohibition contained in subparagraph (A) shall not apply to persons
who are users of a copyrighted work which is in a particular class of works, if such
persons are, or are likely to be in the succeeding 3-year period, adversely affected
by virtue of such prohibition in their ability to make noninfringing uses of that
particular class of works under this title, as determined under subparagraph (C).
     "(C) During the 2-year period described in subparagraph (A), and during each
succeeding 3-year period, the Librarian of Congress, upon the recommendation of the
Register of Copyrights, who shall consult with the Assistant Secretary for Communic-
ations and Information of the Department of Commerce and report and comment on his
or her views in making such recommendation, shall make the determination in a rule-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**


making proceeding on the record for purposes of subparagraph (B) of whether persons
who are users of a copyrighted work are, or are likely to be in the succeeding
3-year period, adversely affected by the prohibition under subparagraph (A) in their
ability to make noninfringing uses under this title of a particular class of copy-
righted works. In conducting such rulemaking, the Librarian shall examine-

"(i) the availability for use of copyrighted works;

"(ii) the availability for use of works for nonprofit archival, preservation,
and educational purposes;

"(iii) the impact that the prohibition on the circumvention of technological
measures applied to copyrighted works has on criticism, comment, news reporting,
teaching, scholarship, or research;

"(iv) the effect of circumvention of technological measures on the market for or
value of copyrighted works; and

**\*6** "(v) such other factors as the Librarian considers appropriate.

"(D) The Librarian shall publish any class of copyrighted works for which the
Librarian has determined, pursuant to the rulemaking conducted under subparagraph
(C), that noninfringing uses by persons who are users of a copyrighted work are, or
are likely to be, adversely affected, and the prohibition contained in subparagraph
(A) shall not apply to such users with respect to such class of works for the ensu-
ing 3-year period.

"(E) Neither the exception under subparagraph (B) from the applicability of the
prohibition contained in subparagraph (A), nor any determination made in a rulemak-
ing conducted under subparagraph (C), may be used as a defense in any action to en-
force any provision of this title other than this paragraph.

"(2) No person shall manufacture, import, offer to the public, provide, or oth-
erwise traffic in any technology, product, service, device, component, or part
thereof, that-

"(A) is primarily designed or produced for the purpose of  circumventing a tech-
nological measure that effectively controls access to a work protected under this
title;

"(B) has only limited commercially significant purpose or use other than to cir-
cumvent a technological measure that effectively controls access to a work protected
under this title; or

"(C) is marketed by that person or another acting in concert with that person
with that person's knowledge for use in circumventing a technological measure that
effectively controls access to a work protected under this title.

"(3) As used in this subsection-

"(A) to 'circumvent a technological measure' means to descramble a scrambled
work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactiv-
ate, or impair a technological measure, without the authority of the copyright own-
er; and

"(B) a technological measure 'effectively controls access to a work' if the
measure, in the ordinary course of its operation, requires the application of in-
formation, or a process or a treatment, with the authority of the copyright owner,
to gain access to the work.

"(b) Additional Violations.-(1) No person shall manufacture, import, offer to
the public, provide, or otherwise traffic in any technology, product, service,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

device, component, or part thereof, that-

"(A) is primarily designed or produced for the purpose of  circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof;

"(B) has only limited commercially significant purpose or use other than to circumvent protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof; or

"(C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing protection afforded by a technological measure that **\*7** effectively protects a right of a copyright owner under this title in a work or a portion thereof.

"(2) As used in this subsection-

"(A) to 'circumvent protection afforded by a technological measure' means avoiding, bypassing, removing, deactivating, or otherwise impairing a technological measure; and

"(B) a technological measure 'effectively protects a right of a copyright owner under this title' if the measure, in the ordinary course of its operation, prevents, restricts, or otherwise limits the exercise of a right of a copyright owner under this title.

"(c) Other Rights, Etc., Not Affected.-(1) Nothing in this section shall affect rights, remedies, limitations, or defenses to copyright infringement, including fair use, under this title.

"(2) Nothing in this section shall enlarge or diminish vicarious or contributory liability for copyright infringement in connection with any technology, product, service, device, component, or part thereof.

"(3) Nothing in this section shall require that the design of, or design and selection of parts and components for, a consumer electronics, telecommunications, or computing product provide for a response to any particular technological measure, so long as such part or component, or the product in which such part or component is integrated, does not otherwise fall within the prohibitions of subsection (a)(2) or (b)(1).

"(4) Nothing in this section shall enlarge or diminish any rights of free speech or the press for activities using consumer electronics, telecommunications, or computing products.

"(d) Exemption for Nonprofit Libraries, Archives, and Educational Institutions.-(1) A nonprofit library, archives, or educational institution which gains access to a commercially exploited copyrighted work solely in order to make a good faith determination of whether to acquire a copy of that work for the sole purpose of engaging in conduct permitted under this title shall not be in violation of subsection (a)(1)(A).  A copy of a work to which access has been gained under this paragraph-

"(A) may not be retained longer than necessary to make such good faith determination; and

"(B) may not be used for any other purpose.

"(2) The exemption made available under paragraph (1) shall only apply with respect to a work when an identical copy of that work is not reasonably available in another form.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**


    "(3) A nonprofit library, archives, or educational institution that willfully
for the purpose of commercial advantage or financial gain violates paragraph (1)-
    "(A) shall, for the first offense, be subject to the civil remedies under sec-
tion 1203; and
    "(B) shall, for repeated or subsequent offenses, in addition to the civil remed-
ies under section 1203, forfeit the exemption provided under paragraph (1).
    "(4) This subsection may not be used as a defense to a claim under subsection
(a)(2) or (b), nor may this subsection permit a nonprofit library, archives, or edu-
cational institution to manufacture, import, offer to the public, provide, or other-
wise traffic in any technology, **\*8** product, service, component, or part thereof,
which circumvents a technological measure.
    "(5) In order for a library or archives to qualify for the exemption under this
subsection, the collections of that library or archives shall be-
    "(A) open to the public; or
    "(B) available not only to researchers affiliated with the library or archives
or with the institution of which it is a part, but also to other persons doing re-
search in a specialized field.
    "(e) Law Enforcement, Intelligence, and Other Government Activities.-This sec-
tion does not prohibit any lawfully authorized investigative, protective, informa-
tion security, or intelligence activity of an officer, agent, or employee of the
United States, a State, or a political subdivision of a State, or a person acting
pursuant to a contract with the United States, a State, or a political subdivision
of a State. For purposes of this subsection, the term 'information security' means
activities carried out in order to identify and address the vulnerabilities of a
government computer, computer system, or computer network.
    "(f) Reverse Engineering.-(1) Notwithstanding the provisions of subsec-
tion  (a)(1)(A), a person who has lawfully obtained the right to use a copy of a
computer program may circumvent a technological measure that effectively controls
access to a particular portion of that program for the sole purpose of identifying
and analyzing those elements of the program that are necessary to achieve interoper-
ability of an independently created computer program with other programs, and that
have not previously been readily available to the person engaging in the circumven-
tion, to the extent any such acts of identification and analysis do not constitute
infringement under this title.
    "(2) Notwithstanding the provisions of subsections (a)(2) and (b), a person may
develop and employ technological means to circumvent a technological measure, or to
circumvent protection afforded by a technological measure, in order to enable the
identification and analysis under paragraph (1), or for the purpose of enabling in-
teroperability of an independently created computer program with other programs, if
such means are necessary to achieve such interoperability, to the extent that doing
so does not constitute infringement under this title.
    "(3) The information acquired through the acts permitted under paragraph  (1),
and the means permitted under paragraph (2), may be made available to others if the
person referred to in paragraph (1) or (2), as the case may be, provides such in-
formation or means solely for the purpose of enabling interoperability of an inde-
pendently created computer program with other programs, and to the extent that doing
so does not constitute infringement under this title or violate applicable law other

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

than this section.
     "(4) For purposes of this subsection, the term 'interoperability' means the
ability of computer programs to exchange information, and of such programs mutually
to use the information which has been exchanged.
     "(g) Encryption Research.-
     "(1) Definitions.-For purposes of this subsection-
     **\*9** "(A) the term 'encryption research' means activities necessary to identify
and analyze flaws and vulnerabilities of encryption technologies applied to copy-
righted works, if these activities are conducted to advance the state of knowledge
in the field of encryption technology or to assist in the development of encryption
products; and
     "(B) the term 'encryption technology' means the scrambling and descrambling of
information using mathematical formulas or algorithms.
     "(2) Permissible acts of encryption research.-Notwithstanding the provisions of
subsection (a)(1)(A), it is not a violation of that  subsection for a person to cir-
cumvent a technological measure as applied to a copy, phonorecord, performance, or
display of a published work in the course of an act of good faith encryption re-
search if-
     "(A) the person lawfully obtained the encrypted copy, phonorecord, performance,
or display of the published work;
     "(B) such act is necessary to conduct such encryption research;
     "(C) the person made a good faith effort to obtain authorization before the cir-
cumvention; and
     "(D) such act does not constitute infringement under this title or a violation
of applicable law other than this section, including section 1030 of title 18 and
those provisions of title 18 amended by the Computer Fraud and Abuse Act of 1986.
     "(3) Factors in determining exemption.-In determining whether a person qualifies
for the exemption under paragraph (2), the factors to be considered shall include-
     "(A) whether the information derived from the encryption research was dissemin-
ated, and if so, whether it was disseminated in a manner reasonably calculated to
advance the state of knowledge or development of encryption technology, versus
whether it was disseminated in a manner that facilitates infringement under this
title or a violation of applicable law other than this section, including a viola-
tion of privacy or breach of security;
     "(B) whether the person is engaged in a legitimate course of study, is employed,
or is appropriately trained or experienced, in the field of encryption technology;
and
     "(C) whether the person provides the copyright owner of the work to which the
technological measure is applied with notice of the findings and documentation of
the research, and the time when such notice is provided.
     "(4) Use of technological means for research activities.-Notwithstanding the
provisions of subsection (a)(2), it is not a violation of that subsection for a per-
son to-
     "(A) develop and employ technological means to circumvent a technological meas-
ure for the sole purpose of that person performing the acts of good faith encryption
research described in paragraph (2); and
     "(B) provide the technological means to another person with whom he or she is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

working collaboratively for the purpose **\*10** of conducting the acts of good faith en-
cryption research described in paragraph (2) or for the purpose of having that other
person verify his or her acts of good faith encryption research described in para-
graph (2).

"(5) Report to congress.-Not later than 1 year after the date of the enactment
of this chapter, the Register of Copyrights and the Assistant Secretary for Commu-
nications and Information of the Department of Commerce shall jointly report to the
Congress on the effect this subsection has had on-

 (A) encryption research and the development of encryption technology;

 "(B) the adequacy and effectiveness of technological measures designed to pro-
tect copyrighted works; and

 "(C) protection of copyright owners against the unauthorized access to their en-
crypted copyrighted works.

 The report shall include legislative recommendations, if any.

 "(h) Exceptions Regarding Minors.-In applying subsection (a) to a component or
part, the court may consider the necessity for its intended and actual incorporation
in a technology, product, service, or device, which-

 "(1) does not itself violate the provisions of this title; and

 "(2) has the sole purpose to prevent the access of minors to material on the In-
ternet.

 "(i) Protection of Personally Identifying Information.-

 (1) Circumvention permitted.-Notwithstanding the provisions of subsec-
tion  (a)(1)(A), it is not a violation of that subsection for a person to circumvent
a technological measure that effectively controls access to a work protected under
this title, if-

 "(A) the technological measure, or the work it protects, contains the capability
of collecting or disseminating personally identifying information reflecting the on-
line activities of a natural person who seeks to gain access to the work protected;

 "(B) in the normal course of its operation, the technological measure, or the
work it protects, collects or disseminates personally identifying information about
the person who seeks to gain access to the work protected, without providing con-
spicuous notice of such collection or dissemination to such person, and without
providing such person with the capability to prevent or restrict such collection or
dissemination;

 "(C) the act of circumvention has the sole effect of identifying and disabling
the capability described in subparagraph (A), and has no other effect on the ability
of any person to gain access to any work; and

 "(D) the act of circumvention is carried out solely for the purpose of prevent-
ing the collection or dissemination of personally identifying information about a
natural person who seeks to gain access to the work protected, and is not in viola-
tion of any other law.

 "(2) Inapplicability to certain technological measures.-This subsection does not
apply to a technological measure, or a work it protects, that does not collect or
disseminate **\*11** personally identifying information and that is disclosed to a user
as not having or using such capability.

 "(j) Security Testing.-

 "(1) Definition.-For purposes of this subsection, the term 'security testing'

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796, 1998 U.S.C.C.A.N. 639)**

means accessing a computer, computer system, or computer network, solely for the
purpose of good faith testing, investigating, or correcting, a security flaw or vul-
nerability, with the authorization of the owner or operator of such computer, com-
puter system, or computer network.

"(2) Permissible acts of security testing.-Notwithstanding the provisions of
subsection (a)(1)(A), it is not a violation of that subsection for a person to en-
gage in an act of security testing, if such act does not constitute infringement un-
der this title or a violation of applicable law other than this section, including
section 1030 of title 18 and those provisions of title 18 amended by the Computer
Fraud and Abuse Act of 1986.

"(3) Factors in determining exemption.-In determining whether a person qualifies
for the exemption under paragraph (2), the factors to be considered shall include-

"(A) whether the information derived from the security testing was used solely
to promote the security of the owner or operator of such computer, computer system
or computer network, or shared directly with the developer of such computer, com-
puter system, or computer network; and

"(B) whether the information derived from the security testing was used or main-
tained in a manner that does not facilitate infringement under this title or a viol-
ation of applicable law other than this section, including a violation of privacy or
breach of security.

"(4) Use of technological means for security testing.-Notwithstanding the provi-
sions of subsection (a)(2), it is not a violation of that subsection for a person to
develop, produce, distribute or employ technological means for the sole purpose of
performing the acts of security testing described in subsection (2), provided such
technological means does not otherwise violate section (a)(2).

"(k) Certain Analog Devices and Certain Technological Measures.-

"(1) Certain analog devices.-

"(A) Effective 18 months after the date of the enactment of this chapter, no
person shall manufacture, import, offer to the public, provide or otherwise traffic
in any-

"(i) VHS format analog video cassette recorder unless such recorder conforms to
the automatic gain control copy control technology;

"(ii) 8mm format analog video cassette camcorder unless such camcorder conforms
to the automatic gain control technology;

"(iii) Beta format analog video cassette recorder, unless such recorder con-
forms to the automatic gain control copy control technology, except that this re-
quirement shall not apply until there are 1,000 Beta format analog video cassette
recorders sold in the United **12 States in any one calendar year after the date of
the enactment of this chapter;

"(iv) 8mm format analog video cassette recorder that is not an analog video
cassette camcorder, unless such recorder conforms to the automatic gain control copy
control technology, except that this requirement shall not apply until there are
20,000 such recorders sold in the United States in any one calendar year after the
date of the enactment of this chapter; or

"(v) analog video cassette recorder that records using an NTSC format video in-
put and that is not otherwise covered under clauses (i) through (iv), unless such
device conforms to the automatic gain control copy control technology.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

   "(B) Effective on the date of the enactment of this chapter, no person shall
manufacture, import, offer to the public, provide or otherwise traffic in-
   "(i) any VHS format analog video cassette recorder or any 8mm format analog
video cassette recorder if the design of the model of such recorder has been modi-
fied after such date of enactment so that a model of recorder that previously con-
formed to the automatic gain control copy control technology no longer conforms to
such technology; or
   "(ii) any VHS format analog video cassette recorder, or any 8mm format analog
video cassette recorder that is not an 8mm analog video cassette camcorder, if the
design of the model of such recorder has been modified after such date of enactment
so that a model of recorder that previously conformed to the four-line colorstripe
copy control technology no longer conforms to such technology.
   Manufacturers that have not previously manufactured or sold a VHS format analog
video cassette recorder, or an 8mm format analog cassette recorder, shall be re-
quired to conform to the four-line colorstripe copy control technology in the ini-
tial model of any such recorder manufactured after the date of the enactment of this
chapter, and thereafter to continue conforming to the four-line colorstripe copy
control technology.  For purposes of this subparagraph, an analog video cassette re-
corder 'conforms' to the four-line colorstripe copy control technology if it records
a signal that, when played back by the playback function of that recorder in the
normal viewing mode, exhibits, on a reference display device, a display containing
distracting visible lines through portions of the viewable picture.
   "(2) Certain encoding restrictions.-No person shall apply the automatic gain
control copy control technology or colorstripe copy control technology to prevent or
limit consumer copying except such copying-
   "(A) of a single transmission, or specified group of transmissions, of live
events or of audiovisual works for which a member of the public has exercised choice
in selecting the transmissions, including the content of the transmissions **13** or
the time of receipt of such transmissions, or both, and as to which such member is
charged a separate fee for each such transmission or specified group of transmis-
sions;
   "(B) from a copy of a transmission of a live event or an audiovisual work if
such transmission is provided by a channel or service where payment is made by a
member of the public for such channel or service in the form of a subscription fee
that entitles the member of the public to receive all of the programming contained
in such channel or service;
   "(C) from a physical medium containing one or more prerecorded audiovisual
works; or
   "(D) from a copy of a transmission described in subparagraph (A) or from a copy
made from a physical medium described in subparagraph (C).
   In the event that a transmission meets both the conditions set forth in subpara-
graph (A) and those set forth in subparagraph (B), the transmission shall be treated
as a transmission described in subparagraph (A).
   "(3) Inapplicability.-This subsection shall not-
   "(A) require any analog video cassette camcorder to conform to the automatic
gain control copy control technology with respect to any video signal received
through a camera lens;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**


  "(B) apply to the manufacture, importation, offer for sale, provision of, or
other trafficking in, any professional analog video cassette recorder; or
  "(C) apply to the offer for sale or provision of, or other trafficking in, any
previously owned analog video cassette recorder, if such recorder was legally manu-
factured and sold when new and not subsequently modified in violation of paragraph
(1)(B).
  "(4) Definitions.-For purposes of this subsection:
  "(A) An 'analog video cassette recorder' means a device that records, or a
device that includes a function that records, on electromagnetic tape in an analog
format the electronic impulses produced by the video and audio portions of a televi-
sion program, motion picture, or other form of audiovisual work.
  "(B) An 'analog video cassette camcorder' means an analog video cassette record-
er that contains a recording function that operates through a camera lens and
through a video input that may be connected with a television or other video play-
back device.
  "(C) An analog video cassette recorder 'conforms' to the automatic gain control
copy control technology if it-
    "(i) detects one or more of the elements of such technology and does not record
the motion picture or transmission protected by such technology; or
    "(ii) records a signal that, when played back, exhibits a meaningfully distor-
ted or degraded display.
  "(D) The term 'professional analog video cassette recorder' means an analog
video cassette recorder that is designed, **\*14** manufactured, marketed, and intended
for use by a person who regularly employs such a device for a lawful business or in-
dustrial use, including making, performing, displaying, distributing, or transmit-
ting copies of motion pictures on a commercial scale.
  "(E) The terms 'VHS format,' '8mm format,' 'Beta format,' 'automatic gain con-
trol copy control technology,' 'colorstripe copy control technology,' 'four-line
version of the colorstripe copy control technology,' and 'NTSC' have the meanings
that are commonly understood in the consumer electronics and motion picture indus-
tries as of the date of the enactment of this chapter.
  "(5) Violations.-Any violation of paragraph (1) of this subsection shall be
treated as a violation of subsection (b)(1) of this section.  Any violation of para-
graph (2) of this subsection shall be deemed an 'act of circumvention' for the pur-
poses of section 1203(c)(3)(A) of this chapter.

"S 1202. Integrity of copyright management information

  "(a) False Copyright Management Information.-No person shall knowingly and with
the intent to induce, enable, facilitate, or conceal infringement-
  "(1) provide copyright management information that is false, or
  "(2) distribute or import for distribution copyright management information that
is false.
  "(b) Removal or Alteration of Copyright Management Information.-No person shall,
without the authority of the copyright owner or the law-
  "(1) intentionally remove or alter any copyright management information,
  "(2) distribute or import for distribution copyright management information
knowing that the copyright management information has been removed or altered

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796, 1998 U.S.C.C.A.N. 639)**

without authority of the copyright owner or the law, or

"(3) distribute, import for distribution, or publicly perform works, copies of
works, or phonorecords, knowing that copyright management information has been re-
moved or altered without authority of the copyright owner or the law,

knowing, or, with respect to civil remedies under section 1203, having reason-
able grounds to know, that it will induce, enable, facilitate, or conceal an in-
fringement of any right under this title.

"(c) Definition.-As used in this section, the term 'copyright management inform-
ation' means any of the following information conveyed in connection with copies or
phonorecords of a work or performances or displays of a work, including in digital
form, except that such term does not include any personally identifying information
about a user of a work or of a copy, phonorecord, performance, or display of a work:

"(1) The title and other information identifying the work, including the inform-
ation set forth on a notice of copyright.

"(2) The name of, and other identifying information about, the author of a work.

**\*15** "(3) The name of, and other identifying information about, the copyright
owner of the work, including the information set forth in a notice of copyright.

"(4) With the exception of public performances of works by radio and television
broadcast stations, the name of, and other identifying information about, a per-
former whose performance is fixed in a work other than an audiovisual work.

"(5) With the exception of public performances of works by radio and television
broadcast stations, in the case of an audiovisual work, the name of, and other
identifying information about, a writer, performer, or director who is credited in
the audiovisual work.

"(6) Terms and conditions for use of the work.

"(7) Identifying numbers or symbols referring to such information or links to
such information.

"(8) Such other information as the Register of Copyrights may prescribe by regu-
lation, except that the Register of Copyrights may not require the provision of any
information concerning the user of a copyrighted work.

"(d) Law Enforcement, Intelligence, and Other Government Activities.-This sec-
tion does not prohibit any lawfully authorized investigative, protective, informa-
tion security, or intelligence activity of an officer, agent, or employee of the
United States, a State, or a political subdivision of a State, or a person acting
pursuant to a contract with the United States, a State, or a political subdivision
of a State. For purposes of this subsection, the term 'information security' means
activities carried out in order to identify and address the vulnerabilities of a
government computer, computer system, or computer network.

"(e) Limitations on Liability.-

"(1) Analog transmissions.-In the case of an analog transmission, a person who
is making transmissions in its capacity as a broadcast station, or as a cable sys-
tem, or someone who provides programming to such station or system, shall not be li-
able for a violation of subsection (b) if-

"(A) avoiding the activity that constitutes such violation is not technically
feasible or would create an undue financial hardship on such person; and

"(B) such person did not intend, by engaging in such activity, to induce, en-
able, facilitate, or conceal infringement of a right under this title.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

     "(2) Digital transmissions.-
     "(A) If a digital transmission standard for the placement of copyright manage-
ment information for a category of works is set in a voluntary, consensus standard-
setting process involving a representative cross-section of broadcast stations or
cable systems and copyright owners of a category of works that are intended for pub-
lic performance by such stations or systems, a person identified in paragraph (1)
shall not be liable for a violation of subsection (b) with respect to the particular
copyright management information addressed by such standard if-
     **\*16** "(i) the placement of such information by someone other than such person is
not in accordance with such standard; and
     "(ii) the activity that constitutes such violation is not intended to induce,
enable, facilitate, or conceal infringement of a right under this title.
     "(B) Until a digital transmission standard has been set pursuant to subparagraph
(A) with respect to the placement of copyright management information for a category
or works, a person identified in paragraph (1) shall not be liable for a violation
of subsection (b) with respect to such copyright management information, if the
activity that constitutes such violation is not intended to induce, enable, facilit-
ate, or conceal infringement of a right under this title, and if-
     "(i) the transmission of such information by such person would result in a per-
ceptible visual or aural degradation of the digital signal; or
     "(ii) the transmission of such information by such person would conflict with-
     "(I) an applicable government regulation relating to transmission of informa-
tion in a digital signal;
     "(II) an applicable industry-wide standard relating to the transmission of in-
formation in a digital signal that was adopted by a voluntary consensus standards
body prior to the effective date of this chapter; or
     "(III) an applicable industry-wide standard relating to the transmission of in-
formation in a digital signal that was adopted in a voluntary, consensus standards-
setting process open to participation by a representative cross-section of broadcast
stations or cable systems and copyright owners of a category of works that are in-
tended for public performance by such stations or systems.
     "(3) Definitions.-As used in this subsection-
     "(A) the term 'broadcast station' has the meaning given that term in section 3
of the Communications Act of 1934 (47 U.S.C. 153); and
     "(B) the term 'cable system' has the meaning given that term in section 602 of
the Communications Act of 1934 (47 U.S.C. 522).

"S 1203. Civil remedies

     "(a) Civil Actions.-Any person injured by a violation of section 1201 or 1202
may bring a civil action in an appropriate United States district court for such vi-
olation.
     "(b) Powers of the Court.-In an action brought under subsection (a), the court-
     "(1) may grant temporary and permanent injunctions on such terms as it deems
reasonable to prevent or restrain a violation, but in no event shall impose a prior
restraint on free **\*17** speech or the press protected under the 1st amendment to the
Constitution;
     "(2) at any time while an action is pending, may order the impounding, on such

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**


terms as it deems reasonable, of any device or product that is in the custody or
control of the alleged violator and that the court has reasonable cause to believe
was involved in a violation;

"(3) may award damages under subsection (c);

"(4) in its discretion may allow the recovery of costs by or against any party
other than the United States or an officer thereof;

"(5) in its discretion may award reasonable attorney's fees to the prevailing
party; and

"(6) may, as part of a final judgment or decree finding a violation, order the
remedial modification or the destruction of any device or product involved in the
violation that is in the custody or control of the violator or has been impounded
under paragraph (2).

"(c) Award of Damages.-

"(1) In general.-Except as otherwise provided in this title, a person committing
a violation of section 1201 or 1202 is liable for either-

"(A) the actual damages and any additional profits of the violator, as provided
in paragraph (2), or

"(B) statutory damages, as provided in paragraph (3).

"(2) Actual damages.-The court shall award to the complaining party the actual
damages suffered by the party as a result of the violation, and any profits of the
violator that are attributable to the violation and are not taken into account in
computing the actual damages, if the complaining party elects such damages at any
time before final judgment is entered.

"(3) Statutory damages.-(A) At any time before final judgment is entered, a com-
plaining party may elect to recover an award of statutory damages for each violation
of section 1201 in the sum of not less than $200 or more than $2,500 per act of cir-
cumvention, device, product, component, offer, or performance of service, as the
court considers just.

"(B) At any time before final judgment is entered, a complaining party may elect
to recover an award of statutory damages for each violation of section 1202 in the
sum of not less than $2,500 or more than $25,000.

"(4) Repeated violations.-In any case in which the injured party sustains the
burden of proving, and the court finds, that a person has violated section 1201 or
1202 within three years after a final judgment was entered against the person for
another such violation, the court may increase the award of damages up to triple the
amount that would otherwise be awarded, as the court considers just.

"(5) Innocent violations.-

"(A) In general.-The court in its discretion may reduce or remit the total award
of damages in any case in which the violator sustains the burden of proving, and the
court finds, that the violator was not aware and had no reason to believe that its
acts constituted a violation.

**\*18** "(B) Nonprofit library, archives, or educational institutions.-In the case
of a nonprofit library, archives, or educational institution, the court shall remit
damages in any case in which the library, archives, or educational institution sus-
tains the burden of proving, and the court finds, that the library, archives, or
educational institution was not aware and had no reason to believe that its acts
constituted a violation.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**


"S 1204. Criminal offenses and penalties

    "(a) In General.-Any person who violates section 1201 or 1202 willfully and for
purposes of commercial advantage or private financial gain-
    "(1) shall be fined not more than $500,000 or imprisoned for not more than 5
years, or both, for the first offense; and
    "(2) shall be fined not more than $1,000,000 or imprisoned for not more than 10
years, or both, for any subsequent offense.
    "(b) Limitation for Nonprofit Library, Archives, or Educational Institu-
tion.-Subsection (a) shall not apply to a nonprofit library, archives, or education-
al institution.
    "(c) Statute of Limitations.-No criminal proceeding shall be brought under this
section unless such proceeding is commenced within five years after the cause of ac-
tion arose.

"S 1205. Savings clause

    "Nothing in this chapter abrogates, diminishes, or weakens the provisions of,
nor provides any defense or element of mitigation in a criminal prosecution or civil
action under, any Federal or State law that prevents the violation of the privacy of
an individual in connection with the individual's use of the Internet.".
    (b) Conforming Amendment.-The table of chapters for title 17, United States
Code, is amended by adding after the item relating to chapter 11 the following:

    1201".

SEC. 104. EVALUATION OF IMPACT OF COPYRIGHT LAW AND AMENDMENTS ON ELECTRONIC COM-
MERCE AND TECHNOLOGICAL DEVELOPMENT.

    (a) Evaluation by the Register of Copyrights and the Assistant Secretary for
Communications and Information.-The Register of Copyrights and the Assistant Secret-
ary for Communications and Information of the Department of Commerce shall jointly
evaluate-
    (1) the effects of the amendments made by this title and the development of
electronic commerce and associated technology on the operation of sections 109 and
117 of title 17, United States Code; and
    (2) the relationship between existing and emergent technology and the operation
of sections 109 and 117 of title 17, United States Code.
    (b) Report to Congress.-The Register of Copyrights and the Assistant Secretary
for Communications and Information of the Department of Commerce shall, not later
than 24 months after the date of the enactment of this Act, submit to the Congress a
joint report on the evaluation conducted under subsection (a), including **19** any le-
gislative recommendations the Register and the Assistant Secretary may have.

SEC. 105. EFFECTIVE DATE.

    (a) In General.-Except as otherwise provided in this title, this title and the
amendments made by this title shall take effect on the date of the enactment of this
Act.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796, 1998 U.S.C.C.A.N. 639)**

(b) Amendments Relating to Certain International Agreements.-(1) The following
shall take effect upon the entry into force of the WIPO Copyright Treaty with re-
spect to the United States:

(A) Paragraph (5) of the definition of "international agreement" contained in
section 101 of title 17, United States Code, as amended by section 102(a)(4) of this
Act.

(B) The amendment made by section 102(a)(6) of this Act.

(C) Subparagraph (C) of section 104A(h)(1) of title 17, United States Code, as
amended by section 102(c)(1) of this Act.

(D) Subparagraph (C) of section 104A(h)(3) of title 17, United States Code, as
amended by section 102(c)(2) of this Act.

(2) The following shall take effect upon the entry into force of the WIPO Per-
formances and Phonograms Treaty with respect to the United States:

(A) Paragraph (6) of the definition of "international agreement" contained in
section 101 of title 17, United States Code, as amended by section 102(a)(4) of this
Act.

(B) The amendment made by section 102(a)(7) of this Act.

(C) The amendment made by section 102(b)(2) of this Act.

(D) Subparagraph (D) of section 104A(h)(1) of title 17, United States Code, as
amended by section 102(c)(1) of this Act.

(E) Subparagraph (D) of section 104A(h)(3) of title 17, United States Code, as
amended by section 102(c)(2) of this Act.

(F) The amendments made by section 102(c)(3) of this Act.

TITLE II-ONLINE COPYRIGHT INFRINGEMENT LIABILITY LIMITATION

SEC. 201. SHORT TITLE.

This title may be cited as the "Online Copyright Infringement Liability Limita-
tion Act".

SEC. 202. LIMITATIONS ON LIABILITY FOR COPYRIGHT INFRINGEMENT.

(a) In General.-Chapter 5 of title 17, United States Code, is amended by adding
after section 511 the following new section:

"S 512. Limitations on liability relating to material online

"(a) Transitory Digital Network Communications.-A service provider shall not be
liable for monetary relief, or, except as provided in subsection (j), for injunctive
or other equitable relief, for infringement of copyright by reason of the provider's
transmitting, routing, or providing connections for, material through a system or
network controlled or operated by or for the service provider, or by reason of the
intermediate and transient storage of that material in the course of such transmit-
ting, routing, or providing connections, if-

**\*20** "(1) the transmission of the material was initiated by or at the direction
of a person other than the service provider;

"(2) the transmission, routing, provision of connections, or storage is carried
out through an automatic technical process without selection of the material by the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**


service provider;

      "(3) the service provider does not select the recipients of the material except
as an automatic response to the request of another person;

      "(4) no copy of the material made by the service provider in the course of such
intermediate or transient storage is maintained on the system or network in a manner
ordinarily accessible to anyone other than anticipated recipients, and no such copy
is maintained on the system or network in a manner ordinarily accessible to such an-
ticipated recipients for a longer period than is reasonably necessary for the trans-
mission, routing, or provision of connections; and

      "(5) the material is transmitted through the system or network without modifica-
tion of its content.

      "(b) System Caching.-

      "(1) Limitation on liability.-A service provider shall not be liable for monet-
ary relief, or, except as provided in subsection (j), for injunctive or other equit-
able relief, for infringement of copyright by reason of the intermediate and tempor-
ary storage of material on a system or network controlled or operated by or for the
service provider in a case in which-

      "(A) the material is made available online by a person other than the service
provider,

      "(B) the material is transmitted from the person described in subparagraph  (A)
through the system or network to a person other than the person described in sub-
paragraph (A) at the direction of that other person, and

      "(C) the storage is carried out through an automatic technical process for the
purpose of making the material available to users of the system or network who,
after the material is transmitted as described in subparagraph (B), request access
to the material from the person described in subparagraph (A),

      if the conditions set forth in paragraph (2) are met.

      (2) Conditions.-The conditions referred to in paragraph (1) are that-

      "(A) the material described in paragraph (1) is transmitted to the subsequent
users described in paragraph (1)(C) without modification to its content from the
manner in which the material was transmitted from the person described in paragraph
(1)(A);

      "(B) the service provider described in paragraph (1) complies with rules con-
cerning the refreshing, reloading, or other updating of the material when specified
by the person making the material available online in accordance with a generally
accepted industry standard data communications protocol for the system or network
through which that person makes the material available, except that this subpara-
graph applies only if those rules are not used by the person described in paragraph
(1)(A) to prevent or unreasonably **\*21** impair the intermediate storage to which this
subsection applies;

      "(C) the service provider does not interfere with the ability of technology as-
sociated with the material to return to the person described in paragraph (1)(A) the
information that would have been available to that person if the material had been
obtained by the subsequent users described in paragraph (1)(C) directly from that
person, except that this subparagraph applies only if that technology-

      "(i) does not significantly interfere with the performance of the provider's
system or network or with the intermediate storage of the material;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-22942-DLG  Document 41-1  Entered on FLSD Docket 04/18/2007  Page 277 of
344
H.R. CONF. REP. 105-796                                                    Page 20
H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

"(ii) is consistent with generally accepted industry standard communications
protocols; and

"(iii) does not extract information from the provider's system or network other
than the information that would have been available to the person described in para-
graph (1)(A) if the subsequent users had gained access to the material directly from
that person;

"(D) if the person described in paragraph (1)(A) has in effect a condition that
a person must meet prior to having access to the material, such as a condition based
on payment of a fee or provision of a password or other information, the service
provider permits access to the stored material in significant part only to users of
its system or network that have met those conditions and only in accordance with
those conditions; and

"(E) if the person described in paragraph (1)(A) makes that material available
online without the authorization of the copyright owner of the material, the service
provider responds expeditiously to remove, or disable access to, the material that
is claimed to be infringing upon notification of claimed infringement as described
in subsection (c)(3), except that this subparagraph applies only if-

"(i) the material has previously been removed from the originating site or ac-
cess to it has been disabled, or a court has ordered that the material be removed
from the originating site or that access to the material on the originating site be
disabled; and

"(ii) the party giving the notification includes in the notification a state-
ment confirming that the material has been removed from the originating site or ac-
cess to it has been disabled or that a court has ordered that the material be re-
moved from the originating site or that access to the material on the originating
site be disabled.

"(c) Information Residing on Systems or Networks At Direction of Users.-

"(1) In general.-A service provider shall not be liable for monetary relief, or,
except as provided in subsection (j), for injunctive or other equitable relief, for
infringement of copyright by reason of the storage at the direction of a user of ma-
terial that resides on a system or network controlled or operated by or for the ser-
vice provider, if the service provider-

**\*22** "(A)(i) does not have actual knowledge that the material or an activity us-
ing the material on the system or network is infringing;

"(ii) in the absence of such actual knowledge, is not aware of facts or circum-
stances from which infringing activity is apparent; or

"(iii) upon obtaining such knowledge or awareness, acts expeditiously to remove,
or disable access to, the material;

"(B) does not receive a financial benefit directly attributable to the in-
fringing activity, in a case in which the service provider has the right and ability
to control such activity; and

"(C) upon notification of claimed infringement as described in paragraph (3),
responds expeditiously to remove, or disable access to, the material that is claimed
to be infringing or to be the subject of infringing activity.

"(2) Designated agent.-The limitations on liability established in this subsec-
tion apply to a service provider only if the service provider has designated an
agent to receive notifications of claimed infringement described in paragraph (3),

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796, 1998 U.S.C.C.A.N. 639)**

by making available through its service, including on its website in a location ac-
cessible to the public, and by providing to the Copyright Office, substantially the
following information:

   "(A) the name, address, phone number, and electronic mail address of the agent.

   "(B) other contact information which the Register of Copyrights may deem appro-
priate.

   The Register of Copyrights shall maintain a current directory of agents avail-
able to the public for inspection, including through the Internet, in both electron-
ic and hard copy formats, and may require payment of a fee by service providers to
cover the costs of maintaining the directory.

   "(3) Elements of notification.-

   "(A) To be effective under this subsection, a notification of claimed infringe-
ment must be a written communication provided to the designated agent of a service
provider that includes substantially the following:

   "(i) A physical or electronic signature of a person authorized to act on behalf
of the owner of an exclusive right that is allegedly infringed.

   "(ii) Identification of the copyrighted work claimed to have been infringed,
or, if multiple copyrighted works at a single online site are covered by a single
notification, a representative list of such works at that site.

   "(iii) Identification of the material that is claimed to be infringing or to be
the subject of infringing activity and that is to be removed or access to which is
to be disabled, and information reasonably sufficient to permit the service provider
to locate the material.

   "(iv) Information reasonably sufficient to permit the service provider to con-
tact the complaining party, such as an address, telephone number, and, if available,
**\*23** an electronic mail address at which the complaining party may be contacted.

   "(v) A statement that the complaining party has a good faith belief that use of
the material in the manner complained of is not authorized by the copyright owner,
its agent, or the law.

   "(vi) A statement that the information in the notification is accurate, and un-
der penalty of perjury, that the complaining party is authorized to act on behalf of
the owner of an exclusive right that is allegedly infringed.

   "(B)(i) Subject to clause (ii), a notification from a copyright owner or from a
person authorized to act on behalf of the copyright owner that fails to comply sub-
stantially with the provisions of subparagraph (A) shall not be considered under
paragraph (1)(A) in determining whether a service provider has actual knowledge or
is aware of facts or circumstances from which infringing activity is apparent.

   "(ii) In a case in which the notification that is provided to the service pro-
vider's designated agent fails to comply substantially with all the provisions of
subparagraph (A) but substantially complies with clauses (ii), (iii), and (iv) of
subparagraph (A), clause (i) of this subparagraph applies only if the service pro-
vider promptly attempts to contact the person making the notification or takes other
reasonable steps to assist in the receipt of notification that substantially com-
plies with all the provisions of subparagraph (A).

   "(d) Information Location Tools.-A service provider shall not be liable for mon-
etary relief, or, except as provided in subsection (j), for injunctive or other
equitable relief, for infringement of copyright by reason of the provider referring

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

or linking users to an online location containing infringing material or infringing
activity, by using information location tools, including a directory, index, refer-
ence, pointer, or hypertext link, if the service provider-

"(1)(A) does not have actual knowledge that the material or activity is in-
fringing;

"(B) in the absence of such actual knowledge, is not aware of facts or circum-
stances from which infringing activity is apparent; or

"(C) upon obtaining such knowledge or awareness, acts expeditiously to remove,
or disable access to, the material;

"(2) does not receive a financial benefit directly attributable to the in-
fringing activity, in a case in which the service provider has the right and ability
to control such activity; and

"(3) upon notification of claimed infringement as described in subsec-
tion  (c)(3), responds expeditiously to remove, or disable access to, the material
that is claimed to be infringing or to be the subject of infringing activity, except
that, for purposes of this paragraph, the information described in subsection
(c)(3)(A)(iii) shall be identification of the reference or link, to material or
activity claimed to be infringing, that is to be removed or access to which is to be
disabled, and information **\*24** reasonably sufficient to permit the service provider
to locate that reference or link.

"(e) Limitation on liability of nonprofit educational institutions.-(1) When a
public or other nonprofit institution of higher education is a service provider, and
when a faculty member or graduate student who is an employee of such institution is
performing a teaching or research function, for the purposes of subsections (a) and
(b) such faculty member or graduate student shall be considered to be a person other
than the institution, and for the purposes of subsections (c) and (d) such faculty
member's or graduate student's knowledge or awareness of his or her infringing
activities shall not be attributed to the institution, if-

"(A) such faculty member's or graduate student's infringing activities do not
involve the provision of online access to instructional materials that are or were
required or recommended, within the preceding 3-year period, for a course taught at
the institution by such faculty member or graduate student;

"(B) the institution has not, within the preceding 3-year period, received more
than 2 notifications described in subsection (c)(3) of claimed infringement by such
faculty member or graduate student, and such notifications of claimed infringement
were not actionable under subsection (f); and

"(C) the institution provides to all users of its system or network information-
al materials that accurately describe, and promote compliance with, the laws of the
United States relating to copyright.

"(2) Injunctions.-For the purposes of this subsection, the limitations on in-
junctive relief contained in subsections (j)(2) and (j)(3), but not those in (j)(1),
shall apply.

"(f) Misrepresentations.-Any person who knowingly materially misrepresents under
this section-

"(1) that material or activity is infringing, or

"(2) that material or activity was removed or disabled by mistake or misidenti-
fication,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

shall be liable for any damages, including costs and attorneys' fees, incurred
by the alleged infringer, by any copyright owner or copyright owner's authorized li-
censee, or by a service provider, who is injured by such misrepresentation, as the
result of the service provider relying upon such misrepresentation in removing or
disabling access to the material or activity claimed to be infringing, or in repla-
cing the removed material or ceasing to disable access to it.

"(g) Replacement of Removed or Disabled Material and Limitation on Other Liabil-
ity.-

"(1) No liability for taking down generally.-Subject to paragraph (2), a service
provider shall not be liable to any person for any claim based on the service pro-
vider's good faith disabling of access to, or removal of, material or activity
claimed to be infringing or based on facts or circumstances from which infringing
activity is apparent, regardless of whether the material or activity is ultimately
determined to be infringing.

"(2) Exception.-Paragraph (1) shall not apply with respect to material residing
at the direction of a subscriber of the **\*25** service provider on a system or network
controlled or operated by or for the service provider that is removed, or to which
access is disabled by the service provider, pursuant to a notice provided under sub-
section (c)(1)(C), unless the service provider-

"(A) takes reasonable steps promptly to notify the subscriber that it has re-
moved or disabled access to the material;

"(B) upon receipt of a counter notification described in paragraph (3), promptly
provides the  person who provided the notification under subsection (c)(1)(C) with a
copy of the counter notification, and informs that person that it will replace the
removed material or cease disabling access to it in 10 business days; and

"(C) replaces the removed material and ceases disabling access to it not less
than 10, nor more than 14, business days following receipt of the counter notice,
unless its designated agent first receives notice from the person who submitted the
notification under subsection (c)(1)(C) that such person has filed an action seeking
a court order to restrain the subscriber from engaging in infringing activity relat-
ing to the material on the service provider's system or network.

"(3) Contents of counter notification.-To be effective under this subsection, a
counter notification must be a written communication provided to the service pro-
vider's designated agent that includes substantially the following:

"(A) A physical or electronic signature of the subscriber.

"(B) Identification of the material that has been removed or to which access has
been disabled and the location at which the material appeared before it was removed
or access to it was disabled.

"(C) A statement under penalty of perjury that the subscriber has a good faith
belief that the material was removed or disabled as a result of mistake or misiden-
tification of the material to be removed or disabled.

"(D) The subscriber's name, address, and telephone number, and a statement that
the subscriber consents to the jurisdiction of Federal District Court for the judi-
cial district in which the address is located, or if the subscriber's address is
outside of the United States, for any judicial district in which the service pro-
vider may be found, and that the subscriber will accept service of process from the
person who provided notification under subsection (c)(1)(C) or an agent of such per-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

son.

"(4) Limitation on other liability.-A service provider's compliance with paragraph (2) shall not subject the service provider to liability for copyright infringement with respect to the material identified in the notice provided under subsection (c)(1)(C).

"(h) Subpoena To Identify Infringer.-

"(1) Request.-A copyright owner or a person authorized to act on the owner's behalf may request the clerk of any United States district court to issue a subpoena to a service provider **26** for identification of an alleged infringer in accordance with this subsection.

"(2) Contents of request.-The request may be made by filing with the clerk-

"(A) a copy of a notification described in subsection (c)(3)(A);

"(B) a proposed subpoena; and

"(C) a sworn declaration to the effect that the purpose for which the subpoena is sought is to obtain the identity of an alleged infringer and that such information will only be used for the purpose of protecting rights under this title.

"(3) Contents of subpoena.-The subpoena shall authorize and order the service provider receiving the notification and the subpoena to expeditiously disclose to the copyright owner or person authorized by the copyright owner information sufficient to identify the alleged infringer of the material described in the notification to the extent such information is available to the service provider.

"(4) Basis for granting subpoena.-If the notification filed satisfies the provisions of subsection (c)(3)(A), the proposed subpoena is in proper form, and the accompanying declaration is properly executed, the clerk shall expeditiously issue and sign the proposed subpoena and return it to the requester for delivery to the service provider.

"(5) Actions of service provider receiving subpoena.-Upon receipt of the issued subpoena, either accompanying or subsequent to the receipt of a notification described in subsection (c)(3)(A), the service provider shall expeditiously disclose to the copyright owner or person authorized by the copyright owner the information required by the subpoena, notwithstanding any other provision of law and regardless of whether the service provider responds to the notification.

"(6) Rules applicable to subpoena.-Unless otherwise provided by this section or by applicable rules of the court, the procedure for issuance and delivery of the subpoena, and the remedies for noncompliance with the subpoena, shall be governed to the greatest extent practicable by those provisions of the Federal Rules of Civil Procedure governing the issuance, service, and enforcement of a subpoena duces tecum.

"(i) Conditions for Eligibility.-

"(1) Accommodation of technology.-The limitations on liability established by this section shall apply to a service provider only if the service provider-

"(A) has adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers; and

"(B) accommodates and does not interfere with standard technical measures.

"(2) Definition.-As used in this subsection, the term 'standard technical meas-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

ures' means technical measures that **\*27** are used by copyright owners to identify or
protect copyrighted works and-

"(A) have been developed pursuant to a broad consensus of copyright owners and
service providers in an open, fair, voluntary, multi-industry standards process;

"(B) are available to any person on reasonable and nondiscriminatory terms; and

"(C) do not impose substantial costs on service providers or substantial burdens
on their systems or networks.

"(j) Injunctions.-The following rules shall apply in the case of any application
for an injunction under section 502 against a service provider that is not subject
to monetary remedies under this section:

"(1) Scope of relief.-(A) With respect to conduct other than that which quali-
fies for the limitation on remedies set forth in subsection (a), the court may grant
injunctive relief with respect to a service provider only in one or more of the fol-
lowing forms:

"(i) An order restraining the service provider from providing access to in-
fringing material or activity residing at a particular online site on the provider's
system or network.

"(ii) An order restraining the service provider from providing access to a sub-
scriber or account holder of the service provider's system or network who is enga-
ging in infringing activity and is identified in the order, by terminating the ac-
counts of the subscriber or account holder that are specified in the order.

"(iii) Such other injunctive relief as the court may consider necessary to pre-
vent or restrain infringement of copyrighted material specified in the order of the
court at a particular online location, if such relief is the least burdensome to the
service provider among the forms of relief comparably effective for that purpose.

"(B) If the service provider qualifies for the limitation on remedies described
in subsection (a), the court may only grant injunctive relief in one or both of the
following forms:

"(i) An order restraining the service provider from providing access to a sub-
scriber or account holder of the service provider's system or network who is using
the provider's service to engage in infringing activity and is identified in the or-
der, by terminating the accounts of the subscriber or account holder that are spe-
cified in the order.

"(ii) An order restraining the service provider from providing access, by taking
reasonable steps specified in the order to block access, to a specific, identified,
online location outside the United States.

"(2) Considerations.-The court, in considering the relevant criteria for in-
junctive relief under applicable law, shall consider-

"(A) whether such an injunction, either alone or in combination with other such
injunctions issued against the same service provider under this subsection, would
significantly burden either the provider or the operation of the provider's system
or network;

**\*28** "(B) the magnitude of the harm likely to be suffered by the copyright owner
in the digital network environment if steps are not taken to prevent or restrain the
infringement;

"(C) whether implementation of such an injunction would be technically feasible
and effective, and would not interfere with access to noninfringing material at oth-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

er online locations; and

"(D) whether other less burdensome and comparably effective means of preventing
or restraining access to the infringing material are available.

"(3) Notice and Ex Parte Orders.-Injunctive relief under this subsection shall be
available only after notice to the service provider and an opportunity for the
service provider to appear are provided, except for orders ensuring the preservation
of evidence or other orders having no material adverse effect on the operation of
the service provider's communications network.

"(k) Definitions.-

"(1) Service provider.-(A) As used in subsection (a), the term 'service pro-
vider' means an entity offering the transmission, routing, or providing of connec-
tions for digital online communications, between or among points specified by a
user, of material of the user's choosing, without modification to the content of the
material as sent or received.

"(B) As used in this section, other than subsection (a), the term 'service pro-
vider' means a provider of online services or network access, or the operator of fa-
cilities therefor, and includes an entity described in subparagraph (A).

"(2) Monetary relief.-As used in this section, the term 'monetary relief' means
damages, costs, attorneys' fees, and any other form of monetary payment.

"(l) Other Defenses Not Affected.-The failure of a service provider's conduct to
qualify for limitation of liability under this section shall not bear adversely upon
the consideration of a defense by the service provider that the service provider's
conduct is not infringing under this title or any other defense.

"(m) Protection of Privacy.-Nothing in this section shall be construed to condi-
tion the applicability of subsections (a) through (d) on-

"(1) a service provider monitoring its service or affirmatively seeking facts
indicating infringing activity, except to the extent consistent with a standard
technical measure complying with the provisions of subsection (i); or

"(2) a service provider gaining access to, removing, or disabling access to ma-
terial in cases in which such conduct is prohibited by law.

"(n) Construction.-Subsections (a), (b), (c), and (d) describe separate and dis-
tinct functions for purposes of applying this section. Whether a service provider
qualifies for the limitation on liability in any one of those subsections shall be
based solely on the criteria in that subsection, and shall not affect a determina-
tion of whether that service provider qualifies for the limitations on liability un-
der any other such subsection.".

**\*29** (b) Conforming Amendment.-The table of sections for chapter 5 of title 17,
United States Code, is amended by adding at the end the following:

"512. Limitations on liability relating to material online.".

SEC. 203.  EFFECTIVE DATE.

This title and the amendments made by this title shall take effect on the date
of the enactment of this Act.

TITLE III-COMPUTER MAINTENANCE OR REPAIR COPYRIGHT EXEMPTION

SEC. 301. SHORT TITLE.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**


This title may be cited as the "Computer Maintenance Competition Assurance Act".

SEC. 302. LIMITATIONS ON EXCLUSIVE RIGHTS; COMPUTER PROGRAMS.

Section 117 of title 17, United States Code, is amended-
(1) by striking "Notwithstanding" and inserting the following:
"(a) Making of Additional Copy or Adaptation by Owner of Copy.- Notwithstand-
ing";
(2) by striking "Any exact" and inserting the following:
"(b) Lease, Sale, or Other Transfer of Additional Copy or Adaptation.-Any ex-
act"; and
(3) by adding at the end the following:
"(c) Machine Maintenance or Repair.-Notwithstanding the provisions of section
106, it is not an infringement for the owner or lessee of a machine to make or au-
thorize the making of a copy of a computer program if such copy is made solely by
virtue of the activation of a machine that lawfully contains an authorized copy of
the computer program, for purposes only of maintenance or repair of that machine,
if-
"(1) such new copy is used in no other manner and is destroyed immediately after
the maintenance or repair is completed; and
"(2) with respect to any computer program or part thereof that is not necessary
for that machine to be activated, such program or part thereof is not accessed or
used other than to make such new copy by virtue of the activation of the machine.
"(d) Definitions.-For purposes of this section-
"(1) the 'maintenance' of a machine is the servicing of the machine in order to
make it work in accordance with its original specifications and any changes to those
specifications authorized for that machine; and
"(2) the 'repair' of a machine is the restoring of the machine to the state of
working in accordance with its original specifications and any changes to those spe-
cifications authorized for that machine.".


TITLE IV-MISCELLANEOUS PROVISIONS

SEC. 401. PROVISIONS RELATING TO THE COMMISSIONER OF PATENTS AND TRADEMARKS AND THE
REGISTER OF COPYRIGHTS

(a) Compensation.-(1) Section 3(d) of title 35, United States Code, is amended
by striking "prescribed by law for Assistant Secretaries **30** of Commerce" and in-
serting "in effect for level III of the Executive Schedule under section 5314 of
title 5, United States Code".
(2) Section 701(e) of title 17, United States Code, is amended-
(A) by striking "IV" and inserting "III"; and
(B) by striking "5315" and inserting "5314".
(3) Section 5314 of title 5, United States Code, is amended by adding at the end
the following:
"Assistant Secretary of Commerce and Commissioner of Patents and Trademarks.
"Register of Copyrights.".
(b) Clarification of Authority of the Copyright Office.-Section 701 of title 17,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**


United States Code, is amended-
    (1) by redesignating subsections (b) through (e) as subsections (c) through (f),
respectively; and
    (2) by inserting after subsection (a) the following:
    "(b) In addition to the functions and duties set out elsewhere in this chapter,
the Register of Copyrights shall perform the following functions:
    "(1) Advise Congress on national and international issues relating to copyright,
other matters arising under this title, and related matters.
    "(2) Provide information and assistance to Federal departments and agencies and
the Judiciary on national and international issues relating to copyright, other mat-
ters arising under this title, and related matters.
    "(3) Participate in meetings of international intergovernmental organizations
and meetings with foreign government officials relating to copyright, other matters
arising under this title, and related matters, including as a member of United
States delegations as authorized by the appropriate Executive branch authority.
    "(4) Conduct studies and programs regarding copyright, other matters arising un-
der this title, and related matters, the administration of the Copyright Office, or
any function vested in the Copyright Office by law, including educational programs
conducted cooperatively with foreign intellectual property offices and international
intergovernmental organizations.
    "(5) Perform such other functions as Congress may direct, or as may be appropri-
ate in furtherance of the functions and duties specifically set forth in this
title."

SEC. 402.  EPHEMERAL RECORDINGS.

    Section 112(a) of title 17, United States Code, is amended-
    (1) by redesignating paragraphs (1), (2), and (3) as subparagraphs (A),  (B),
and (C), respectively;
    (2) by inserting "(1)" after "(a)";
    (3) by inserting after "under a license" the following: ", including a statutory
license under section 114(f),";
    (4) by inserting after "114(a)," the following: "or for a transmitting organiza-
tion that is a broadcast radio or television station licensed as such by the Federal
Communications Commission and that makes a broadcast transmission of a performance
of a sound recording in a digital format on a nonsubscription basis,"; and
    (5) by adding at the end the following:
    **\*31** "(2) In a case in which a transmitting organization entitled to make a copy
or phonorecord under paragraph (1) in connection with the transmission to the public
of a performance or display of a work is prevented from making such copy or phonore-
cord by reason of the application by the copyright owner of technical measures that
prevent the reproduction of the work, the copyright owner shall make available to
the transmitting organization the necessary means for permitting the making of such
copy or phonorecord as permitted under that paragraph, if it is technologically
feasible and economically reasonable for the copyright owner to do so. If the copy-
right owner fails to do so in a timely manner in light of the transmitting organiza-
tion's reasonable business requirements, the transmitting organization shall not be
liable for a violation of section 1201(a)(1) of this title for engaging in such

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

activities as are necessary to make such copies or phonorecords as permitted under
paragraph (1) of this subsection.".

SEC. 403.  LIMITATIONS ON EXCLUSIVE RIGHTS;  DISTANCE EDUCATION.

    (a) Recommendations by Register of Copyrights.-Not later than 6 months after the
date of the enactment of this Act, the Register of Copyrights, after consultation
with representatives of copyright owners, nonprofit educational institutions, and
nonprofit libraries and archives, shall submit to the Congress recommendations on
how to promote distance education through digital technologies, including interact-
ive digital networks, while maintaining an appropriate balance between the rights of
copyright owners and the needs of users of copyrighted works.  Such recommendations
shall include any legislation the Register of Copyrights considers appropriate to
achieve the objective described in the preceding sentence.
    (b) Factors.-In formulating recommendations under subsection (a), the Register
of Copyrights shall consider-
    (1) the need for an exemption from exclusive rights of copyright owners for dis-
tance education through digital networks;
    (2) the categories of works to be included under any distance education exemp-
tion;
    (3) the extent of appropriate quantitative limitations on the portions of works
that may be used under any distance education exemption;
    (4) the parties who should be entitled to the benefits of any distance education
exemption;
    (5) the parties who should be designated as eligible recipients of distance edu-
cation materials under any distance education exemption;
    (6) whether and what types of technological measures can or should be employed
to safeguard against unauthorized access to, and use or retention of, copyrighted
materials as a condition of eligibility for any distance education exemption, in-
cluding, in light of developing technological capabilities, the exemption set out in
section 110(2) of title 17, United States Code;
    (7) the extent to which the availability of licenses for the use of copyrighted
works in distance education through interactive digital networks should be con-
sidered in assessing eligibility for any distance education exemption; and
    **\*32** (8) such other issues relating to distance education through interactive di-
gital networks that the Register considers appropriate.

SEC. 404. EXEMPTION FOR LIBRARIES AND ARCHIVES.

    Section 108 of title 17, United States Code, is amended-
    (1) in subsection (a)-
    (A) by striking "Notwithstanding" and inserting "Except as otherwise provided in
this title and notwithstanding";
    (B) by inserting after "no more than one copy or phonorecord of a work" the fol-
lowing: ", except as provided in subsections (b) and (c)"; and
    (C) in paragraph (3) by inserting after "copyright" the following: "that appears
on the copy or phonorecord that is reproduced under the provisions of this section,
or includes a legend stating that the work may be protected by copyright if no such

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

notice can be found on the copy or phonorecord that is reproduced under the provi-
sions of this section";

(2) in subsection (b)-

(A) by striking "a copy or phonorecord" and inserting "three copies or phonore-
cords";

(B) by striking "in facsimile form"; and

(C) by striking "if the copy or phonorecord reproduced is currently in the col-
lections of the library or archives." and inserting "if-

"(1) the copy or phonorecord reproduced is currently in the collections of the
library or archives; and

"(2) any such copy or phonorecord that is reproduced in digital format is not
otherwise distributed in that format and is not made available to the public in that
format outside the premises of the library or archives."; and

(3) in subsection (c)-

(A) by striking "a copy or phonorecord" and inserting "three copies or phonore-
cords";

(B) by striking "in facsimile form";

(C) by inserting "or if the existing format in which the work is stored has be-
come obsolete," after "stolen,"; and

(D) by striking "if the library or archives has, after a reasonable effort, de-
termined that an unused replacement cannot be obtained at a fair price." and insert-
ing "if-

"(1) the library or archives has, after a reasonable effort, determined that an
unused replacement cannot be obtained at a fair price; and

"(2) any such copy or phonorecord that is reproduced in digital format is not
made available to the public in that format outside the premises of the library or
archives in lawful possession of such copy."; and

(E) by adding at the end the following:

"For purposes of this subsection, a format shall be considered obsolete if the
machine or device necessary to render perceptible a work stored in that format is no
longer manufactured or is no longer reasonably available in the commercial market-
place.".

**\*33 SEC. 405. SCOPE OF EXCLUSIVE RIGHTS IN SOUND RECORDINGS; EPHEMERAL RECORDINGS.**

(a) Scope of Exclusive Rights in Sound Recordings.-Section 114 of title 17,
United States Code, is amended as follows:

(1) Subsection (d) is amended-

(A) in paragraph (1) by striking subparagraph (A) and inserting the following:

"(A) a nonsubscription broadcast transmission;"; and

(B) by amending paragraph (2) to read as follows:

"(2) Statutory Licensing of Certain Transmissions.-The performance of a sound
recording publicly by means of a subscription digital audio transmission not exempt
under paragraph (1), an eligible nonsubscription transmission, or a transmission not
exempt under paragraph (1) that is made by a preexisting satellite digital audio ra-
dio service shall be subject to statutory licensing, in accordance with subsection
(f) if-

"(A)(i) the transmission is not part of an interactive service;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796, 1998 U.S.C.C.A.N. 639)**

    "(ii) except in the case of a transmission to a business establishment, the
transmitting entity does not automatically and intentionally cause any device re-
ceiving the transmission to switch from one program channel to another; and

    "(iii) except as provided in section 1002(e), the transmission of the sound re-
cording is accompanied, if technically feasible, by the information encoded in that
sound recording, if any, by or under the authority of the copyright owner of that
sound recording, that identifies the title of the sound recording, the featured re-
cording artist who performs on the sound recording, and related information, includ-
ing information concerning the underlying musical work and its writer;

    "(B) in the case of a subscription transmission not exempt under paragraph (1)
that is made by a preexisting subscription service in the same transmission medium
used by such service on July 31, 1998, or in the case of a transmission not exempt
under paragraph (1) that is made by a preexisting satellite digital audio radio ser-
vice-

    "(i) the transmission does not exceed the sound recording performance comple-
ment; and

    "(ii) the transmitting entity does not cause to be published by means of an ad-
vance program schedule or prior announcement the titles of the specific sound re-
cordings or phonorecords embodying such sound recordings to be transmitted; and

    "(C) in the case of an eligible nonsubscription transmission or a subscription
transmission not exempt under paragraph (1) that is made by a new subscription ser-
vice or by a preexisting subscription service other than in the same transmission
medium used by such service on July 31, 1998-

    "(i) the transmission does not exceed the sound recording performance comple-
ment, except that this requirement shall not apply in the case of a retransmission
**34** of a broadcast transmission if the retransmission is made by a transmitting en-
tity that does not have the right or ability to control the programming of the
broadcast station making the broadcast transmission, unless-

    "(I) the broadcast station makes broadcast transmissions-

    "(aa) in digital format that regularly exceed the sound recording performance
complement; or

    "(bb) in analog format, a substantial portion of which, on a weekly basis, ex-
ceed the sound recording performance complement; and

    "(II) the sound recording copyright owner or its representative has notified
the transmitting entity in writing that broadcast transmissions of the copyright
owner's sound recordings exceed the sound recording performance complement as
provided in this clause;

    "(ii) the transmitting entity does not cause to be published, or induce or fa-
cilitate the publication, by means of an advance program schedule or prior announce-
ment, the titles of the specific sound recordings to be transmitted, the phonore-
cords embodying such sound recordings, or, other than for illustrative purposes, the
names of the featured recording artists, except that this clause does not disqualify
a transmitting entity that makes a prior announcement that a particular artist will
be featured within an unspecified future time period, and in the case of a retrans-
mission of a broadcast transmission by a transmitting entity that does not have the
right or ability to control the programming of the broadcast transmission, the re-
quirement of this clause shall not apply to a prior oral announcement by the broad-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

cast station, or to an advance program schedule published, induced, or facilitated
by the broadcast station, if the transmitting entity does not have actual knowledge
and has not received written notice from the copyright owner or its representative
that the broadcast station publishes or induces or facilitates the publication of
such advance program schedule, or if such advance program schedule is a schedule of
classical music programming published by the broadcast station in the same manner as
published by that broadcast station on or before September 30, 1998;

   "(iii) the transmission-

   "(I) is not part of an archived program of less than 5 hours duration;

   "(II) is not part of an archived program of 5 hours or greater in duration that
is made available for a period exceeding 2 weeks;

   "(III) is not part of a continuous program which is of less than 3 hours dura-
tion; or

   **35** "(IV) is not part of an identifiable program in which performances of sound
recordings are rendered in a predetermined order, other than an archived or continu-
ous program, that is transmitted at-

   "(aa) more than 3 times in any 2-week period that have been publicly announced
in advance, in the case of a program of less than 1 hour in duration, or

   "(bb) more than 4 times in any 2-week period that have been publicly announced
in advance, in the case of a program of 1 hour or more in duration,

   except that the requirement of this subclause shall not apply in the case of a
retransmission of a broadcast transmission by a transmitting entity that does not
have the right or ability to control the programming of the broadcast transmission,
unless the transmitting entity is given notice in writing by the copyright owner of
the sound recording that the broadcast station makes broadcast transmissions that
regularly violate such requirement;

   "(iv) the transmitting entity does not knowingly perform the sound recording,
as part of a service that offers transmissions of visual images contemporaneously
with transmissions of sound recordings, in a manner that is likely to cause confu-
sion, to cause mistake, or to deceive, as to the affiliation, connection, or associ-
ation of the copyright owner or featured recording artist with the transmitting en-
tity or a particular product or service advertised by the transmitting entity, or as
to the origin, sponsorship, or approval by the copyright owner or featured recording
artist of the activities of the transmitting entity other than the performance of
the sound recording itself;

   "(v) the transmitting entity cooperates to prevent, to the extent feasible
without imposing substantial costs or burdens, a transmission recipient or any other
person or entity from automatically scanning the transmitting entity's transmissions
alone or together with transmissions by other transmitting entities in order to se-
lect a particular sound recording to be transmitted to the transmission recipient,
except that the requirement of this clause shall not apply to a satellite digital
audio service that is in operation, or that is licensed by the Federal Communica-
tions Commission, on or before July 31, 1998;

   "(vi) the transmitting entity takes no affirmative steps to cause or induce the
making of a phonorecord by the transmission recipient, and if the technology used by
the transmitting entity enables the transmitting entity to limit the making by the
transmission recipient of phonorecords of the transmission directly in **36** a digital

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

format, the transmitting entity sets such technology to limit such making of
phonorecords to the extent permitted by such technology;

   "(vii) phonorecords of the sound recording have been distributed to the public
under the authority of the copyright owner or the copyright owner authorizes the
transmitting entity to transmit the sound recording, and the transmitting entity
makes the transmission from a phonorecord lawfully made under the authority of the
copyright owner, except that the requirement of this clause shall not apply to a re-
transmission of a broadcast transmission by a transmitting entity that does not have
the right or ability to control the programming of the broadcast transmission, un-
less the transmitting entity is given notice in writing by the copyright owner of
the sound recording that the broadcast station makes broadcast transmissions that
regularly violate such requirement;

   "(viii) the transmitting entity accommodates and does not interfere with the
transmission of technical measures that are widely used by sound recording copyright
owners to identify or protect copyrighted works, and that are technically feasible
of being transmitted by the transmitting entity without imposing substantial costs
on the transmitting entity or resulting in perceptible aural or visual degradation
of the digital signal, except that the requirement of this clause shall not apply to
a satellite digital audio service that is in operation, or that is licensed under
the authority of the Federal Communications Commission, on or before July 31, 1998,
to the extent that such service has designed, developed, or made commitments to pro-
cure equipment or technology that is not compatible with such technical measures be-
fore such technical measures are widely adopted by sound recording copyright owners;
and

   "(ix) the transmitting entity identifies in textual data the sound recording
during, but not before, the time it is performed, including the title of the sound
recording, the title of the phonorecord embodying such sound recording, if any, and
the featured recording artist, in a manner to permit it to be displayed to the
transmission recipient by the device or technology intended for receiving the ser-
vice provided by the transmitting entity, except that the obligation in this clause
shall not take effect until 1 year after the date of the enactment of the Digital
Millennium Copyright Act and shall not apply in the case of a retransmission of a
broadcast transmission by a transmitting entity that does not have the right or
ability to control the programming of the broadcast transmission, or in the case in
which devices or technology intended for receiving the service provided by the
transmitting entity that **37** have the capability to display such textual data are
not common in the marketplace.".

   (2) Subsection (f) is amended-

   (A) in the subsection heading by striking "Nonexempt Subscription" and inserting
"Certain Nonexempt";

   (B) in paragraph (1)-

   (i) in the first sentence-

   (I) by striking "(1) No" and inserting "(1)(A) No";

   (II) by striking "the activities" and inserting "subscription transmissions by
preexisting subscription services and transmissions by preexisting satellite digital
audio radio services"; and

   (III) by striking "2000" and inserting "2001"; and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

    (ii) by amending the third sentence to read as follows: "Any copyright owners
of sound recordings, preexisting subscription services, or preexisting satellite di-
gital audio radio services may submit to the Librarian of Congress licenses  cover-
ing such subscription transmissions with respect to such sound recordings."; and

    (C) by striking paragraphs (2), (3), (4), and (5) and inserting the following:

    "(B) In the absence of license agreements negotiated under subparagraph  (A),
during the 60-day period commencing 6 months after publication of the notice spe-
cified in subparagraph (A), and upon the filing of a petition in accordance with
section 803(a)(1), the Librarian of Congress shall, pursuant to chapter 8, convene a
copyright arbitration royalty panel to determine and publish in the Federal Register
a schedule of rates and terms which, subject to paragraph (3), shall be binding on
all copyright owners of sound recordings and entities performing sound recordings
affected by this paragraph. In establishing rates and terms for preexisting sub-
scription services and preexisting satellite digital audio radio services, in addi-
tion to the objectives set forth in section 801(b)(1), the copyright arbitration
royalty panel may consider the rates and terms for comparable types of subscription
digital audio transmission services and comparable circumstances under voluntary li-
cense agreements negotiated as provided in subparagraph (A).

    "(C)(i) Publication of a notice of the initiation of voluntary negotiation pro-
ceedings as specified in subparagraph (A) shall be repeated, in accordance with reg-
ulations that the Librarian of Congress shall prescribe-

    "(I) no later than 30 days after a petition is filed by any copyright owners of
sound recordings, any preexisting subscription services, or any preexisting satel-
lite digital audio radio services indicating that a new type of subscription digital
audio transmission service on which sound recordings are performed is or is about to
become operational; and

    "(II) in the first week of January, 2001, and at 5-year intervals thereafter.

    **\*38** "(ii) The procedures specified in subparagraph (B) shall be repeated, in ac-
cordance with regulations that the Librarian of Congress shall prescribe, upon fil-
ing of a petition in accordance with section 803(a)(1) during a 60-day period com-
mencing-

    "(I) 6 months after publication of a notice of the initiation of voluntary nego-
tiation proceedings under subparagraph (A) pursuant to a petition under clause
(i)(I) of this subparagraph; or

    "(II) on July 1, 2001, and at 5-year intervals thereafter.

    "(iii) The procedures specified in subparagraph (B) shall be concluded in ac-
cordance with section 802.

    "(2)(A) No later than 30 days after the date of the enactment of the Digital
Millennium Copyright Act, the Librarian of Congress shall cause notice to be pub-
lished in the Federal Register of the initiation of voluntary negotiation proceed-
ings for the purpose of determining reasonable terms and rates of royalty payments
for public performances of sound recordings by means of eligible nonsubscription
transmissions and transmissions by new subscription services specified by subsection
(d)(2) during the period beginning on the date of the enactment of such Act and end-
ing on December 31, 2000, or such date as the parties may agree. Such rates and
terms shall distinguish among the different types of eligible nonsubscription trans-
mission services and new subscription services then in operation and shall include a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

minimum fee for each such type of service. Any copyright owners of sound recordings
or any entities performing sound recordings affected by this paragraph may submit to
the Librarian of Congress licenses covering such eligible nonsubscription transmis-
sions and new subscription services with respect to such sound recordings. The
parties to each negotiation proceeding shall bear their own costs.

"(B) In the absence of license agreements negotiated under subparagraph  (A),
during the 60-day period commencing 6 months after publication of the notice spe-
cified in subparagraph (A), and upon the filing of a petition in accordance with
section 803(a)(1), the Librarian of Congress shall, pursuant to chapter 8, convene a
copyright arbitration royalty panel to determine and publish in the Federal Register
a schedule of rates and terms which, subject to paragraph (3), shall be binding on
all copyright owners of sound recordings and entities performing sound recordings
affected by this paragraph during the period beginning on the date of the enactment
of the Digital Millennium Copyright Act and ending on December 31, 2000, or such
other date as the parties may agree. Such rates and terms shall distinguish among
the different types of eligible nonsubscription transmission services then in opera-
tion and shall include a minimum fee for each such type of service, such differences
to be based on criteria including, but not limited to, the quantity and nature of
the use of sound recordings and the degree to which use of the service may substi-
tute for or may promote the purchase of phonorecords by consumers. In establishing
rates and terms for transmissions by eligible nonsubscription services and new sub-
scription services, the copyright arbitration royalty panel shall establish rates
and terms that most clearly represent **\*39** the rates and terms that would have been
negotiated in the marketplace between a willing buyer and a willing seller. In de-
termining such rates and terms, the copyright arbitration royalty panel shall base
its decision on economic, competitive and programming information presented by the
parties, including-

"(i) whether use of the service may substitute for or may promote the sales of
phonorecords or otherwise may interfere with or may enhance the sound recording
copyright owner's other streams of revenue from its sound recordings; and

"(ii) the relative roles of the copyright owner and the transmitting entity in
the copyrighted work and the service made available to the public with respect to
relative creative contribution, technological contribution, capital investment,
cost, and risk.

In establishing such rates and terms, the copyright arbitration royalty panel
may consider the rates and terms for comparable types of digital audio transmission
services and comparable circumstances under voluntary license agreements negotiated
under subparagraph (A).

"(C)(i) Publication of a notice of the initiation of voluntary negotiation pro-
ceedings as specified in subparagraph (A) shall be repeated in accordance with regu-
lations that the Librarian of Congress shall prescribe-

"(I) no later than 30 days after a petition is filed by any copyright owners of
sound recordings or any eligible nonsubscription service or new subscription service
indicating that a new type of eligible nonsubscription service or new subscription
service on which sound recordings are performed is or is about to become operation-
al; and

"(II) in the first week of January 2000, and at 2-year intervals thereafter, ex-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

cept to the extent that different years for the repeating of such proceedings may be
determined in accordance with subparagraph (A).

"(ii) The procedures specified in subparagraph (B) shall be repeated, in accord-
ance with regulations that the Librarian of Congress shall prescribe, upon filing of
a petition in accordance with section 803(a)(1) during a 60- day period commencing-

"(I) 6 months after publication of a notice of the initiation of voluntary nego-
tiation proceedings under subparagraph (A) pursuant to a petition under clause
(i)(I); or

"(II) on July 1, 2000, and at 2-year intervals thereafter, except to the extent
that different years for the repeating of such proceedings may be determined in ac-
cordance with subparagraph (A).

"(iii) The procedures specified in subparagraph (B) shall be concluded in ac-
cordance with section 802.

"(3) License agreements voluntarily negotiated at any time between 1 or more
copyright owners of sound recordings and 1 or more entities performing sound record-
ings shall be given effect in lieu of any determination by a copyright arbitration
royalty panel or decision by the Librarian of Congress.

**\*40** "(4)(A) The Librarian of Congress shall also establish requirements by which
copyright owners may receive reasonable notice of the use of their sound recordings
under this section, and under which records of such use shall be kept and made
available by entities performing sound recordings.

"(B) Any person who wishes to perform a sound recording publicly by means of a
transmission eligible for statutory licensing under this subsection may do so
without infringing the exclusive right of the copyright owner of the sound record-
ing-

"(i) by complying with such notice requirements as the Librarian of Congress
shall prescribe by regulation and by paying royalty fees in accordance with this
subsection; or

"(ii) if such royalty fees have not been set, by agreeing to pay such royalty
fees as shall be determined in accordance with this subsection.

"(C) Any royalty payments in arrears shall be made on or before the twentieth
day of the month next succeeding the month in which the royalty fees are set.".

"(3) Subsection (g) is amended-

"(A) in the subsection heading by striking "Subscription";

"(B) in paragraph (1) in the matter preceding subparagraph (A), by strik-
ing  "subscription transmission licensed" and inserting "transmission licensed under
a statutory license";

"(C) in subparagraphs (A) and (B) by striking "subscription"; and

"(D) in paragraph (2) by striking "subscription".

"(4) Subsection (j) is amended-

"(A) by striking paragraphs (4) and (9) and redesignating paragraphs (2), (3),
(5), (6), (7), and (8) as paragraphs (3), (5), (9), (12), (13), and (14), respect-
ively;

"(B) by inserting after paragraph (1) the following:

"(2) An 'archived program' is a predetermined program that is available re-
peatedly on the demand of the transmission recipient and that is performed in the
same order from the beginning, except that an archived program shall not include a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796, 1998 U.S.C.C.A.N. 639)**

recorded event or broadcast transmission that makes no more than an incidental use
of sound recordings, as long as such recorded event or broadcast transmission does
not contain an entire sound recording or feature a particular sound recording.";

    (C) by inserting after paragraph (3), as so redesignated, the following:

    "(4) A 'continuous program' is a predetermined program that is continuously per-
formed in the same order and that is accessed at a point in the program that is bey-
ond the control of the transmission recipient.";

    (D) by inserting after paragraph (5), as so redesignated, the following:

    "(6) An 'eligible nonsubscription transmission' is a noninteractive nonsubscrip-
tion digital audio transmission not exempt under subsection (d)(1) that is made as
part of a service that provides audio programming consisting, in whole or in part,
of performances of sound recordings, including retransmissions **41** of broadcast
transmissions, if the primary purpose of the service is to provide to the public
such audio or other entertainment programming, and the primary purpose of the ser-
vice is not to sell, advertise, or promote particular products or services other
than sound recordings, live concerts, or other music-related events.

    "(7) An 'interactive service' is one that enables a member of the public to re-
ceive a transmission of a program specially created for the recipient, or on re-
quest, a transmission of a particular sound recording, whether or not as part of a
program, which is selected by or on behalf of the recipient. The ability of indi-
viduals to request that particular sound recordings be performed for reception by
the public at large, or in the case of a subscription service, by all subscribers of
the service, does not make a service interactive, if the programming on each channel
of the service does not substantially consist of sound recordings that are performed
within 1 hour of the request or at a time designated by either the transmitting en-
tity or the individual making such request. If an entity offers both interactive and
noninteractive services (either concurrently or at different times), the noninter-
active component shall not be treated as part of an interactive service.

    "(8) A 'new subscription service' is a service that performs sound recordings by
means of noninteractive subscription digital audio transmissions and that is not a
preexisting subscription service or a preexisting satellite digital audio radio ser-
vice.";

    (E) by inserting after paragraph (9), as so redesignated, the following:

    "(10) A 'preexisting satellite digital audio radio service' is a subscription
satellite digital audio radio service provided pursuant to a satellite digital audio
radio service license issued by the Federal Communications Commission on or before
July 31, 1998, and any renewal of such license to the extent of the scope of the
original license, and may include a limited number of sample channels representative
of the subscription service that are made available on a nonsubscription basis in
order to promote the subscription service.

    "(11) A 'preexisting subscription service' is a service that performs sound re-
cordings by means of noninteractive audio-only subscription digital audio transmis-
sions, which was in existence and was making such transmissions to the public for a
fee on or before July 31, 1998, and may include a limited number of sample channels
representative of the subscription service that are made available on a nonsubscrip-
tion basis in order to promote the subscription service."; and

    (F) by adding at the end the following:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

"(15) A 'transmission' is either an initial transmission or a retransmission.".

(5) The amendment made by paragraph (2)(B)(i)(III) of this subsection shall be
deemed to have been enacted as part of the Digital Performance Right in Sound Re-
cordings Act of 1995, and the publication of notice of proceedings under section
114(f)(1) of title 17, United States Code, as in effect upon the **42** effective date
of that Act, for the determination of royalty payments shall be deemed to have been
made for the period beginning on the effective date of that Act and ending on Decem-
ber 1, 2001.

(6) The amendments made by this subsection do not annul, limit, or otherwise im-
pair the rights that are preserved by section 114 of title 17, United States Code,
including the rights preserved by subsections (c), (d)(4), and (i) of such section.

(b) Ephemeral Recordings.—Section 112 of title 17, United States Code, is
amended-

(1) by redesignating subsection (e) as subsection (f); and

(2) by inserting after subsection (d) the following:

"(e) Statutory License.—(1) A transmitting organization entitled to transmit to
the public a performance of a sound recording under the limitation on exclusive
rights specified by section 114(d)(1)(C)(iv) or under a statutory license in accord-
ance with section 114(f) is entitled to a statutory license, under the conditions
specified by this subsection, to make no more than 1 phonorecord of the sound re-
cording (unless the terms and conditions of the statutory license allow for more),
if the following conditions are satisfied:

"(A) The phonorecord is retained and used solely by the transmitting organiza-
tion that made it, and no further phonorecords are reproduced from it.

"(B) The phonorecord is used solely for the transmitting organization's own
transmissions originating in the United States under a statutory license in accord-
ance with section 114(f) or the limitation on exclusive rights specified by section
114(d)(1)(C)(iv).

"(C) Unless preserved exclusively for purposes of archival preservation, the
phonorecord is destroyed within 6 months from the date the sound recording was first
transmitted to the public using the phonorecord.

"(D) Phonorecords of the sound recording have been distributed to the public un-
der the authority of the copyright owner or the copyright owner authorizes the
transmitting entity to transmit the sound recording, and the transmitting entity
makes the phonorecord under this subsection from a phonorecord lawfully made and ac-
quired under the authority of the copyright owner.

"(3) Notwithstanding any provision of the antitrust laws, any copyright owners
of sound recordings and any transmitting organizations entitled to a statutory li-
cense under this subsection may negotiate and agree upon royalty rates and license
terms and conditions for making phonorecords of such sound recordings under this
section and the proportionate division of fees paid among copyright owners, and may
designate common agents to negotiate, agree to, pay, or receive such royalty pay-
ments.

"(4) No later than 30 days after the date of the enactment of the Digital Mil-
lennium Copyright Act, the Librarian of Congress shall cause notice to be published
in the Federal Register of the initiation of voluntary negotiation proceedings for
the purpose of determining reasonable terms and rates of royalty payments for the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

activities specified by paragraph (2) of this subsection during the period beginning
on the date of the enactment of such Act and ending on December 31, 2000, or such
other date as the parties may agree. Such **\*43** rates shall include a minimum fee for
each type of service offered by transmitting organizations. Any copyright owners of
sound recordings or any transmitting organizations entitled to a statutory license
under this subsection may submit to the Librarian of Congress licenses covering such
activities with respect to such sound recordings. The parties to each negotiation
proceeding shall bear their own costs.

"(5) In the absence of license agreements negotiated under paragraph (3), during
the 60-day period commencing 6 months after publication of the notice specified in
paragraph (4), and upon the filing of a petition in accordance with section
803(a)(1), the Librarian of Congress shall, pursuant to chapter 8, convene a copy-
right arbitration royalty panel to determine and publish in the Federal Register a
schedule of reasonable rates and terms which, subject to paragraph (6), shall be
binding on all copyright owners of sound recordings and transmitting organizations
entitled to a statutory license under this subsection during the period beginning on
the date of the enactment of the Digital Millennium Copyright Act and ending on
December 31, 2000, or such other date as the parties may agree. Such rates shall in-
clude a minimum fee for each type of service offered by transmitting organizations.
The copyright arbitration royalty panel shall establish rates that most clearly rep-
resent the fees that would have been negotiated in the marketplace between a willing
buyer and a willing seller. In determining such rates and terms, the copyright ar-
bitration royalty panel shall base its decision on economic, competitive, and pro-
gramming information presented by the parties, including—

"(A) whether use of the service may substitute for or may promote the sales of
phonorecords or otherwise interferes with or enhances the copyright owner's tradi-
tional streams of revenue; and

"(B) the relative roles of the copyright owner and the transmitting organization
in the copyrighted work and the service made available to the public with respect to
relative creative contribution, technological contribution, capital investment,
cost, and risk.

In establishing such rates and terms, the copyright arbitration royalty panel
may consider the rates and terms under voluntary license agreements negotiated as
provided in paragraphs (3) and (4). The Librarian of Congress shall also establish
requirements by which copyright owners may receive reasonable notice of the use of
their sound recordings under this section, and under which records of such use shall
be kept and made available by transmitting organizations entitled to obtain a stat-
utory license under this subsection.

"(6) License agreements voluntarily negotiated at any time between 1 or more
copyright owners of sound recordings and 1 or more transmitting organizations en-
titled to obtain a statutory license under this subsection shall be given effect in
lieu of any determination by a copyright arbitration royalty panel or decision by
the Librarian of Congress.

"(7) Publication of a notice of the initiation of voluntary negotiation proceed-
ings as specified in paragraph (4) shall be repeated, in accordance with regulations
that the Librarian of Congress shall prescribe, in the first week of January 2000,
and at 2-year intervals **\*44** thereafter, except to the extent that different years

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

for the repeating of such proceedings may be determined in accordance with paragraph
(4). The procedures specified in paragraph (5) shall be repeated, in accordance with
regulations that the Librarian of Congress shall prescribe, upon filing of a peti-
tion in accordance with section 803(a)(1), during a 60-day period commencing on July
1, 2000, and at 2-year intervals thereafter, except to the extent that different
years for the repeating of such proceedings may be determined in accordance with
paragraph (4). The procedures specified in paragraph (5) shall be concluded in ac-
cordance with section 802.

"(8)(A) Any person who wishes to make a phonorecord of a sound recording under a
statutory license in accordance with this subsection may do so without infringing
the exclusive right of the copyright owner of the sound recording under section
106(1)-

"(i) by complying with such notice requirements as the Librarian of Congress
shall prescribe by regulation and by paying royalty fees in accordance with this
subsection; or

"(ii) if such royalty fees have not been set, by agreeing to pay such royalty
fees as shall be determined in accordance with this subsection.

"(B) Any royalty payments in arrears shall be made on or before the 20th day of
the month next succeeding the month in which the royalty fees are set.

"(9) If a transmitting organization entitled to make a phonorecord under this
subsection is prevented from making such phonorecord by reason of the application by
the copyright owner of technical measures that prevent the reproduction of the sound
recording, the copyright owner shall make available to the transmitting organization
the necessary means for permitting the making of such phonorecord as permitted under
this subsection, if it is technologically feasible and economically reasonable for
the copyright owner to do so. If the copyright owner fails to do so in a timely man-
ner in light of the transmitting organization's reasonable business requirements,
the transmitting organization shall not be liable for a violation of section
1201(a)(1) of this title for engaging in such activities as are necessary to make
such phonorecords as permitted under this subsection.

"(10) Nothing in this subsection annuls, limits, impairs, or otherwise affects
in any way the existence or value of any of the exclusive rights of the copyright
owners in a sound recording, except as otherwise provided in this subsection, or in
a musical work, including the exclusive rights to reproduce and distribute a sound
recording or musical work, including by means of  a digital phonorecord delivery,
under section 106(1), 106(3), and 115, and the right to perform publicly a sound re-
cording or musical work, including by means of a digital audio transmission, under
sections 106(4) and 106(6).".

(c) Scope of Section 112(a) of Title 17 Not Affected.-Nothing in this section or
the amendments made by this section shall affect the scope of section 112(a) of
title 17, United States Code, or the entitlement of any person to an exemption
thereunder.

(d) Procedural Amendments to Chapter 8.-Section 802 of title 17, United States
Code, is amended-

(1) in subsection (f)-

**\*45** (A) in the first sentence by striking "60" and inserting "90"; and

(B) in the third sentence by striking "that 60-day period" and inserting  "an

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

additional 30-day period"; and

     (2) in subsection (g) by inserting after the second sentence the following:
"When this title provides that the royalty rates or terms that were previously in
effect are to expire on a specified date, any adjustment by the Librarian of those
rates or terms shall be effective as of the day following the date of expiration of
the rates or terms that were previously in effect, even if the Librarian's decision
is rendered on a later date.".

     (e) Conforming Amendments.-(1) Section 801(b)(1) of title 17, United States
Code, is amended in the second sentence by striking "sections 114, 115, and 116" and
inserting "sections 114(f)(1)(B), 115, and 116".

     (2) Section 802(c) of title 17, United States Code, is amended by striking "sec-
tion 111, 114, 116, or 119, any person entitled to a compulsory license" and insert-
ing "section 111, 112, 114, 116, or 119, any transmitting organization entitled to a
statutory license under section 112(f), any person entitled to a statutory license".

     (3) Section 802(g) of title 17, United States Code, is amended by striking "sec-
tions 111, 114" and inserting "sections 111, 112, 114".

     (4) Section 802(h)(2) of title 17, United States Code, is amended by striking
"section 111, 114" and inserting "section 111, 112, 114".

     (5) Section 803(a)(1) of title 17, United States Code, is amended by striking
"sections 114, 115" and inserting "sections 112, 114, 115".

     (6) Section 803(a)(5) of title 17, United States Code, is amended-
     (A) by striking "section 114" and inserting "section 112 or 114"; and
     (B) by striking "that section" and inserting "those sections".

SEC. 406. ASSUMPTION OF CONTRACTUAL OBLIGATIONS RELATED TO TRANSFERS OF RIGHTS IN
MOTION PICTURES.

     (a) In General.-Part VI of title 28, United States Code, is amended by adding at
the end the following new chapter:
   "CHAPTER 180-ASSUMPTION OF CERTAIN CONTRACTUAL OBLIGATIONS
   "Sec. 4001. Assumption of contractual obligations related to transfers of rights
in motion pictures.

"S 4001. Assumption of contractual obligations related to transfers of rights in mo-
tion pictures

     "(a) Assumption of Obligations.-(1) In the case of a transfer of copyright own-
ership under United States law in a motion picture (as the terms 'transfer of copy-
right ownership' and 'motion picture' are defined in section 101 of title 17) that
is produced subject to 1 or more collective bargaining agreements negotiated under
the laws of the United States, if the transfer is executed on or after the effective
date of this chapter and is not limited to public performance rights, the transfer
instrument shall be deemed to incorporate the **\*46** assumption agreements applicable
to the copyright ownership being transferred that are required by the applicable
collective bargaining agreement, and the transferee shall be subject to the obliga-
tions under each such assumption agreement to make residual payments and provide re-
lated notices, accruing after the effective date of the transfer and applicable to
the exploitation of the rights transferred, and any remedies under each such assump-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

tion agreement for breach of those obligations, as those obligations and remedies
are set forth in the applicable collective bargaining agreement, if-

"(A) the transferee knows or has reason to know at the time of the transfer that
such collective bargaining agreement was or will be applicable to the motion pic-
ture; or

"(B) in the event of a court order confirming an arbitration award against the
transferor under the collective bargaining agreement, the transferor does not have
the financial ability to satisfy the award within 90 days after the order is issued.

"(2) For purposes of paragraph (1)(A), 'knows or has reason to know' means any
of the following:

"(A) Actual knowledge that the collective bargaining agreement was or will be
applicable to the motion picture.

"(B)(i) Constructive knowledge that the collective bargaining agreement was or
will be applicable to the motion picture, arising from recordation of a document
pertaining to copyright in the motion picture under section 205 of title 17 or from
publication, at a site available to the public on-line that is operated by the rel-
evant union, of information that identifies the motion picture as subject to a col-
lective bargaining agreement with that union, if the site permits commercially reas-
onable verification of the date on which the information was available for access.

"(ii) Clause (i) applies only if the transfer referred to in subsection (a)(1)
occurs-

"(i) after the motion picture is completed, or

"(ii) before the motion picture is completed and-

"(I) within 18 months before the filing of an application for copyright regis-
tration for the motion picture under section 408 of title 17, or

"(II) if no such application is filed, within 18 months before the first pub-
lication of the motion picture in the United States.

"(C) Awareness of other facts and circumstances pertaining to a particular
transfer from which it is apparent that the collective bargaining agreement was or
will be applicable to the motion picture.

"(b) Scope of Exclusion of Transfers of Public Performance Rights.-For purposes
of this section, the exclusion under subsection (a) of transfers of copyright owner-
ship in a motion picture that are limited to public performance rights includes
transfers to a terrestrial broadcast station, cable system, or programmer to the ex-
tent that the station, system, or programmer is functioning as an exhibitor of the
motion picture, either by exhibiting the motion picture on its own network, system,
service, or station, or by initiating the transmission of an exhibition that is car-
ried on another network, system, service, or station. When a terrestrial broadcast
station, cable system, or programmer, or other transferee, is also functioning **47**
otherwise as a distributor or as a producer of the motion picture, the public per-
formance exclusion does not affect any obligations imposed on the transferee to the
extent that it is engaging in such functions.

"(c) Exclusion for Grants of Security Interests.-Subsection (a) shall not apply
to-

"(1) a transfer of copyright ownership consisting solely of a mortgage, hypo-
thecation, or other security interest; or

"(2) a subsequent transfer of the copyright ownership secured by the security

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

interest described in paragraph (1) by or under the authority of the secured party,
including a transfer through the exercise of the secured party's rights or remedies
as a secured party, or by a subsequent transferee.

The exclusion under this subsection shall not affect any rights or remedies un-
der law or contract.

"(d) Deferral Pending Resolution of Bona Fide Dispute.-A transferee on which ob-
ligations are imposed under subsection (a) by virtue of paragraph (1) of that sub-
section may elect to defer performance of such obligations that are subject to a
bona fide dispute between a union and a prior transferor until that dispute is re-
solved, except that such deferral shall not stay accrual of any union claims due un-
der an applicable collective bargaining agreement.

"(e) Scope of Obligations Determined by Private Agreement.-Nothing in this sec-
tion shall expand or diminish the rights, obligations, or remedies of any person un-
der the collective bargaining agreements or assumption agreements referred to in
this section.

"(f) Failure To Notify.-If the transferor under subsection (a) fails to notify
the transferee under subsection (a) of applicable collective bargaining obligations
before the execution of the transfer instrument, and subsection (a) is made applic-
able to the transferee solely by virtue of subsection (a)(1)(B), the transferor
shall be liable to the transferee for any damages suffered by the transferee as a
result of the failure to notify.

"(g) Determination of Disputes and Claims.-Any dispute concerning the applica-
tion of subsections (a) through (f) shall be determined by an action in United
States district court, and the court in its discretion may allow the recovery of
full costs by or against any party and may also award a reasonable attorney's fee to
the prevailing party as part of the costs.

"(h) Study.-The Comptroller General, in consultation with the Register of Copy-
rights, shall conduct a study of the conditions in the motion picture industry that
gave rise to this section, and the impact of this section on the motion picture in-
dustry. The Comptroller General shall report the findings of the study to the Con-
gress within 2 years after the effective date of this chapter.".

(b) Conforming Amendment.-The table of chapters for part VI of title 28, United
States Code, is amended by adding at the end the following:

     4001".

SEC. 407. EFFECTIVE DATE.

Except as otherwise provided in this title, this title and the amendments made
by this title shall take effect on the date of the enactment of this Act.

            **\*48** TITLE V-PROTECTION OF CERTAIN ORIGINAL DESIGNS

SEC. 501. SHORT TITLE.

This Act may be referred to as the "Vessel Hull Design Protection Act".

SEC. 502. PROTECTION OF CERTAIN ORIGINAL DESIGNS.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796, 1998 U.S.C.C.A.N. 639)**


     Title 17, United States Code, is amended by adding at the end the following new
chapter:

                    "CHAPTER 13-PROTECTION OF ORIGINAL DESIGNS

  "Sec.
  "1301. Designs protected.
  "1302. Designs not subject to protection.
  "1303. Revisions, adaptations, and rearrangements.
  "1304. Commencement of protection.
  "1305. Term of protection.
  "1306. Design notice.
  "1307. Effect of omission of notice.
  "1308. Exclusive rights.
  "1309. Infringement.
  "1310. Application for registration.
  "1311. Benefit of earlier filing date in foreign country.
  "1312. Oaths and acknowledgments.
  "1313. Examination of application and issue or refusal of registration.
  "1314. Certification of registration.
  "1315. Publication of announcements and indexes.
  "1316. Fees.
  "1317. Regulations.
  "1318. Copies of records.
  "1319. Correction of errors in certificates.
  "1320. Ownership and transfer.
  "1321. Remedy for infringement.
  "1322. Injunctions.
  "1323. Recovery for infringement.
  "1324. Power of court over registration.
  "1325. Liability for action on registration fraudulently obtained.
  "1326. Penalty for false marking.
  "1327. Penalty for false representation.
  "1328. Enforcement by Treasury and Postal Service.
  "1329. Relation to design patent law.
  "1330. Common law and other rights unaffected.
  "1331. Administrator; Office of the Administrator.
  "1332. No retroactive effect.

"S 1301. Designs protected

   "(a) Designs Protected.-
   "(1) In general.-The designer or other owner of an original design of a useful
article which makes the article attractive or distinctive in appearance to the pur-
chasing or using public may secure the protection provided by this chapter upon com-
plying with and subject to this chapter.
   "(2) Vessel hulls.-The design of a vessel hull, including a plug or mold, is
subject to protection under this chapter, notwithstanding section 1302(4).


© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

"(b) Definitions.-For the purpose of this chapter, the following terms have the following meanings:

"(1) A design is 'original' if it is the result of the designer's creative endeavor that provides a distinguishable variation over prior work pertaining to similar articles which is more than merely trivial and has not been copied from another source.

**\*49** "(2) A 'useful article' is a vessel hull, including a plug or mold, which in normal use has an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information. An article which normally is part of a useful article shall be deemed to be a useful article.

"(3) A 'vessel' is a craft, especially one larger than a rowboat, designed to navigate on water, but does not include any such craft that exceeds 200 feet in length.

"(4) A 'hull' is the frame or body of a vessel, including the deck of a vessel, exclusive of masts, sails, yards, and rigging.

"(5) A 'plug' means a device or model used to make a mold for the purpose of exact duplication, regardless of whether the device or model has an intrinsic utilitarian function that is not only to portray the appearance of the product or to convey information.

"(6) A 'mold' means a matrix or form in which a substance for material is used, regardless of whether the matrix or form has an intrinsic utilitarian function that is not only to portray the appearance of the product or to convey information.

"S 1302. Designs not subject to protection

"Protection under this chapter shall not be available for a design that is-
"(1) not original;
"(2) staple or commonplace, such as a standard geometric figure, a familiar symbol, an emblem, or a motif, or another shape, pattern, or configuration which has become standard, common, prevalent, or ordinary;
"(3) different from a design excluded by paragraph (2) only in insignificant details or in elements which are variants commonly used in the relevant trades;
"(4) dictated solely by a utilitarian function of the article that embodies it; or
"(5) embodied in a useful article that was made public by the designer or owner in the United States or a foreign country more than 1 year before the date of the application for registration under this chapter.

"S 1303. Revisions, adaptations, and rearrangements

"Protection for a design under this chapter shall be available notwithstanding the employment in the design of subject matter excluded from protection under section 1302 if the design is a substantial revision, adaptation, or rearrangement of such subject matter. Such protection shall be independent of any subsisting protection in subject matter employed in the design, and shall not be construed as securing any right to subject matter excluded from protection under this chapter or as extending any subsisting protection under this chapter.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**


"S 1304. Commencement of protection

    "The protection provided for a design under this chapter shall commence upon the
earlier of the date of publication of the registration under section 1313(a) or the
date the design is first made public as defined by section 1310(b).

**\*50** "S 1305. Term of protection

    "(a) In General.-Subject to subsection (b), the protection provided under this
chapter for a design shall continue for a term of 10 years beginning on the date of
the commencement of protection under section 1304.
    "(b) Expiration.-All terms of protection provided in this section shall run to
the end of the calendar year in which they would otherwise expire.
    "(c) Termination of Rights.-Upon expiration or termination of protection in a
particular design under this chapter, all rights under this chapter in the design
shall terminate, regardless of the number of different articles in which the design
may have been used during the term of its protection.

"S 1306. Design notice

    "(a) Contents of Design Notice.-(1) Whenever any design for which protection is
sought under this chapter is made public under section 1310(b), the owner of the
design shall, subject to the provisions of section 1307, mark it or have it marked
legibly with a design notice consisting of-
    "(A) the words 'Protected Design', the abbreviation 'Prot'd Des.', or the letter
'D' with a circle, or the symbol *D*;
    "(B) the year of the date on which protection for the design commenced; and
    "(C) the name of the owner, an abbreviation by which the name can be recognized,
or a generally accepted alternative designation of the owner.
    Any distinctive identification of the owner may be used for purposes of subpara-
graph (C) if it has been recorded by the Administrator before the design marked with
such identification is registered.
    "(2) After registration, the registration number may be used instead of the ele-
ments specified in subparagraphs (B) and (C) of paragraph (1).
    "(b) Location of Notice.-The design notice shall be so located and applied as to
give reasonable notice of design protection while the useful article embodying the
design is passing through its normal channels of commerce.
    "(c) Subsequent Removal of Notice.-When the owner of a design has complied with
the provisions of this section, protection under this chapter shall not be affected
by the removal, destruction, or obliteration by others of the design notice on an
article.

"S 1307. Effect of omission of notice

    "(a) Actions With Notice.-Except as provided in subsection (b), the omission of
the notice prescribed in section 1306 shall not cause loss of the protection under
this chapter or prevent recovery for infringement under this chapter against any
person who, after receiving written notice of the design protection, begins an un-
dertaking leading to infringement under this chapter.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)

**(Cite as: H.R. CONF. REP. 105-796, 1998 U.S.C.C.A.N. 639)**

"(b) Actions Without Notice.-The omission of the notice prescribed in section
1306 shall prevent any recovery under section 1323 against a person who began an un-
dertaking leading to infringement under this chapter before receiving written notice
of the design protection. No injunction shall be issued under this chapter **51** with
respect to such undertaking unless the owner of the design reimburses that person
for any reasonable expenditure or contractual obligation in connection with such un-
dertaking that was incurred before receiving written notice of the design protec-
tion, as the court in its discretion directs. The burden of providing written notice
of design protection shall be on the owner of the design.

"S 1308. Exclusive rights

"The owner of a design protected under this chapter has the exclusive right to-
"(1) make, have made, or import, for sale or for use in trade, any useful art-
icle embodying that design; and
"(2) sell or distribute for sale or for use in trade any useful article embody-
ing that design.

"S 1309. Infringement

"(a) Acts of Infringement.-Except as provided in subjection (b), it shall be in-
fringement of the exclusive rights in a design protected under this chapter for any
person, without the consent of the owner of the design, within the United States and
during the term of such protection, to-
"(1) make, have made, or import, for sale or for use in trade, any infringing
article as defined in subsection (e); or
"(2) sell or distribute for sale or for use in trade any such infringing art-
icle.
"(b) Acts of Sellers and Distributors.-A seller or distributor of an infringing
article who did not make or import the article shall be deemed to have infringed on
a design protected under this chapter only if that person-
"(1) induced or acted in collusion with a manufacturer to make, or an importer
to import such article, except that merely purchasing or giving an order to purchase
such article in the ordinary course of business shall not of itself constitute such
inducement or collusion; or
"(2) refused or failed, upon the request of the owner of the design, to make a
prompt and full disclosure of that person's source of such article, and that person
orders or reorders such article after receiving notice by registered or certified
mail of the protection subsisting in the design.
"(c) Acts Without Knowledge.-It shall not be infringement under this section to
make, have made, import, sell, or distribute, any article embodying a design which
was created without knowledge that a design was protected under this chapter and was
copied from such protected design.
"(d) Acts in Ordinary Course of Business.-A person who incorporates into that
person's product of manufacture an infringing article acquired from others in the
ordinary course of business, or who, without knowledge of the protected design em-
bodied in an infringing article, makes or processes the infringing article for the
account of another person in the ordinary course of business, shall not be deemed to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

have infringed the rights in that design under this chapter except under a condition
contained in paragraph (1) or (2) of subsection (b). Accepting an order or reorder
from the source of **\*52** the infringing article shall be deemed ordering or reordering
within the meaning of subsection (b)(2).

"(e) Infringing Article Defined.-As used in this section, an 'infringing art-
icle' is any article the design of which has been copied from a design protected un-
der this chapter, without the consent of the owner of the protected design. An in-
fringing article is not an illustration or picture of a protected design in an ad-
vertisement,  book, periodical, newspaper, photograph, broadcast, motion picture, or
similar medium. A design shall not be deemed to have been copied from a protected
design if it is original and not substantially similar in appearance to a protected
design.

"(f) Establishing Originality.-The party to any action or proceeding under this
chapter who alleges rights under this chapter in a design shall have the burden of
establishing the design's originality whenever the opposing party introduces an
earlier work which is identical to such design, or so similar as to make prima facie
showing that such design was copied from such work.

"(g) Reproduction for Teaching or Analysis.-It is not an infringement of the ex-
clusive rights of a design owner for a person to reproduce the design in a useful
article or in any other form solely for the purpose of teaching, analyzing, or eval-
uating the appearance, concepts, or techniques embodied in the design, or the func-
tion of the useful article embodying the design.

"S 1310. Application for registration

"(a) Time Limit for Application for Registration.-Protection under this chapter
shall be lost if application for registration of the design is not made within two
years after the date on which the design is first made public.

"(b) When Design Is Made Public.-A design is made public when an existing useful
article embodying the design is anywhere publicly exhibited, publicly distributed,
or offered for sale or sold to the public by the owner of the design or with the
owner's consent.

"(c) Application by Owner of Design.-Application for registration may be made by
the owner of the design.

"(d) Contents of Application.-The application for registration shall be made to
the Administrator and shall state-

"(1) the name and address of the designer or designers of the design;

"(2) the name and address of the owner if different from the designer;

"(3) the specific name of the useful article embodying the design;

"(4) the date, if any, that the design was first made public, if such date was
earlier than the date of the application;

"(5) affirmation that the design has been fixed in a useful article; and

"(6) such other information as may be required by the Administrator.

The application for registration may include a description setting forth the sa-
lient features of the design, but the absence of such a description shall not pre-
vent registration under this chapter.

"(e) Sworn Statement.-The application for registration shall be accompanied by a
statement under oath by the applicant or the **\*53** applicant's duly authorized agent

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796, 1998 U.S.C.C.A.N. 639)**

or representative, setting forth, to the best of the applicant's knowledge and be-
lief-
    "(1) that the design is original and was created by the designer or designers
named in the application;
    "(2) that the design has not previously been registered on behalf of the applic-
ant or the applicant's predecessor in title; and
    "(3) that the applicant is the person entitled to protection and to registration
under this chapter.
    If the design has been made public with the design notice prescribed in section
1306, the statement shall also describe the exact form and position of the design
notice.
    "(f) Effect of Errors.-(1) Error in any statement or assertion as to the utility
of the useful article named in the application under this section, the design of
which is sought to be registered, shall not affect the protection secured under this
chapter.
    "(2) Errors in omitting a joint designer or in naming an alleged joint designer
shall not affect the validity of the registration, or the actual ownership or the
protection of the design, unless it is shown that the error occurred with deceptive
intent.
    "(g) Design Made in Scope of Employment.-In a case in which the design was made
within the regular scope of the designer's employment and individual authorship of
the design is difficult or impossible to ascribe and the application so states, the
name and address of the employer for whom the design was made may be stated instead
of that of the individual designer.
    "(h) Pictorial Representation of Design.-The application for registration shall
be accompanied by two copies of a drawing or other pictorial representation of the
useful article embodying the design, having one or more views, adequate to show the
design, in a form and style suitable for reproduction, which shall be deemed a part
of the application.
    "(i) Design in More Than One Useful Article.-If the distinguishing elements of a
design are in substantially the same form in different useful articles, the design
shall be protected as to all such useful articles when protected as to one of them,
but not more than one registration shall be required for the design.
    "(j) Application for More Than One Design.-More than one design may be included
in the same application under such conditions as may be prescribed by the Adminis-
trator. For each design included in an application the fee prescribed for a single
design shall be paid.

"S 1311. Benefit of earlier filing date in foreign country

    "An application for registration of a design filed in the United States by any
person who has, or whose legal representative or predecessor or successor in title
has, previously filed an application for registration of the same design in a for-
eign country which extends to designs of owners who are citizens of the United
States, or to applications filed under this chapter, similar protection to that
provided under this chapter shall have that same effect as if filed in the United
States on the date on which the application was first filed in such foreign country,
if the application in the United States **\*54** is filed within 6 months after the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**


earliest date on which any such foreign application was filed.

"S 1312. Oaths and acknowledgments

    "(a) In General.-Oaths and acknowledgments required by this chapter-
    "(1) may be made-
    "(A) before any person in the United States authorized by law to administer
oaths; or
    "(B) when made in a foreign country, before any diplomatic or consular officer
of the United States authorized to administer oaths, or before any official author-
ized to administer oaths in the foreign country concerned, whose authority shall be
proved by a certificate of a diplomatic or consular officer of the United States;
and
    "(2) shall be valid if they comply with the laws of the State or country where
made.
    "(b) Written Declaration in Lieu of Oath.-(1) The Administrator may by rule pre-
scribe that any document which is to be filed under this chapter in the Office of
the Administrator and which is required by any law, rule, or other regulation to be
under oath, may be subscribed to by a written declaration in such form as the Admin-
istrator may prescribe, and such declaration shall be in lieu of the oath otherwise
required.
    "(2) Whenever a written declaration under paragraph (1) is used, the document
containing the declaration shall state that willful false statements are punishable
by fine or imprisonment, or both, pursuant to section 1001 of title 18, and may
jeopardize the validity of the application or document or a registration resulting
therefrom.

"S 1313. Examination of application and issue or refusal of registration

    "(a) Determination of Registrability of Design; Registration.-Upon the filing of
an application for registration in proper form under section 1310, and upon payment
of the fee prescribed under section 1316, the Administrator shall determine whether
or not the application relates to a design which on its face appears to be subject
to protection under this chapter, and, if so, the Register shall register the
design. Registration under this subsection shall be announced by publication. The
date of registration shall be the date of publication.
    "(b) Refusal To Register; Reconsideration.-If, in the judgment of the Adminis-
trator, the application for registration relates to a design which on its face is
not subject to protection under this chapter, the Administrator shall send to the
applicant a notice of refusal to register and the grounds for the refusal. Within 3
months after the date on which the notice of refusal is sent, the applicant may, by
written request, seek reconsideration of the application. After consideration of
such a request, the Administrator shall either register the design or send to the
applicant a notice of final refusal to register.
    "(c) Application To Cancel Registration.-Any person who believes he or she is or
will be damaged by a registration under this **\*55** chapter may, upon payment of the
prescribed fee, apply to the Administrator at any time to cancel the registration on
the ground that the design is not subject to protection under this chapter, stating

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

the reasons for the request. Upon receipt of an application for cancellation, the
Administrator shall send to the owner of the design, as shown in the records of the
Office of the Administrator, a notice of the application, and the owner shall have a
period of 3 months after the date on which such notice is mailed in which to present
arguments to the Administrator for support of the validity of the registration. The
Administrator shall also have the authority to establish, by regulation, conditions
under which the opposing parties may appear and be heard in support of their argu-
ments. If, after the periods provided for the presentation of arguments have ex-
pired, the Administrator determines that the applicant for cancellation has estab-
lished that the design is not subject to protection under this chapter, the Adminis-
trator shall order the registration stricken from the record. Cancellation under
this subsection shall be announced by publication, and notice of the Administrator's
final determination with respect to any application for cancellation shall be sent
to the applicant and to the owner of record.

"S 1314. Certification of registration

    "Certificates of registration shall be issued in the name of the United States
under the seal of the Office of the Administrator and shall be recorded in the offi-
cial records of the Office. The certificate shall state the name of the useful art-
icle, the date of filing of the application, the date of registration, and the date
the design was made public, if earlier than the date of filing of the application,
and shall contain a reproduction of the drawing or other pictorial representation of
the design. If a description of the salient features of the design appears in the
application, the description shall also appear in the certificate. A certificate of
registration shall be admitted in any court as prima facie evidence of the facts
stated in the certificate.

"S 1315. Publication of announcements and indexes

    "(a) Publications of the Administrator.-The Administrator shall publish lists
and indexes of registered designs and cancellations of designs and may also publish
the drawings or other pictorial representations of registered designs for sale or
other distribution.
    "(b) File of Representatives of Registered Designs.-The Administrator shall es-
tablish and maintain a file of the drawings or other pictorial representations of
registered designs. The file shall be available for use by the public under such
conditions as the Administrator may prescribe.

"S 1316. Fees

    "The Administrator shall by regulation set reasonable fees for the filing of ap-
plications to register designs under this chapter and for other services relating to
the administration of this chapter, taking into consideration the cost of providing
these services and the benefit of a public record.

**\*56** "S 1317. Regulations

    "The Administrator may establish regulations for the administration of this

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796, 1998 U.S.C.C.A.N. 639)**


chapter.

"S 1318. Copies of records

    "Upon payment of the prescribed fee, any person may obtain a certified copy of
any official record of the Office of the Administrator that relates to this chapter.
That copy shall be admissible in evidence with the same effect as the original.

"S 1319. Correction of errors in certificates

    "The Administrator may, by a certificate of correction under seal, correct any
error in a registration incurred through the fault of the Office, or, upon payment
of the required fee, any error of a clerical or typographical nature occurring in
good faith but not through the fault of the Office. Such registration, together with
the certificate, shall thereafter have the same effect as if it had been originally
issued in such corrected form.

"S 1320. Ownership and transfer

    "(a) Property Right in Design.-The property right in a design subject to protec-
tion under this chapter shall vest in the designer, the legal representatives of a
deceased designer or of one under legal incapacity, the employer for whom the de-
signer created the design in the case of a design made within the regular scope of
the designer's employment, or a person to whom the rights of the designer or of such
employer have been transferred. The person in whom the property right is vested
shall be considered the owner of the design.
    "(b) Transfer of Property Right.-The property right in a registered design, or a
design for which an application for registration has been or may be filed, may be
assigned, granted, conveyed, or mortgaged by an instrument in writing, signed by the
owner, or may be bequeathed by will.
    "(c) Oath or Acknowledgement of Transfer.-An oath or acknowledgment under sec-
tion 1312 shall be prima facie evidence of the execution of an assignment, grant,
conveyance, or mortgage under subsection (b).
    "(d) Recordation of Transfer.-An assignment, grant, conveyance, or mortgage un-
der subsection (b) shall be void as against any subsequent purchaser or mortgagee
for a valuable consideration, unless it is recorded in the Office of the Adminis-
trator within 3 months after its date of execution or before the date of such sub-
sequent purchase or mortgage.

"S 1321. Remedy for infringement

    "(a) In General.-The owner of a design is entitled, after issuance of a certi-
ficate of registration of the design under this chapter, to institute an action for
any infringement of the design.
    "(b) Review of Refusal To Register.-(1) Subject to paragraph (2), the owner of a
design may seek judicial review of a final refusal of the Administrator to register
the design under this chapter by bringing a civil action, and may in the same ac-
tion, if the **\*57** court adjudges the design subject to protection under this chapter,
enforce the rights in that design under this chapter.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

"(2) The owner of a design may seek judicial review under this section if-
"(A) the owner has previously duly filed and prosecuted to final refusal an ap-
plication in proper form for registration of the design;
"(B) the owner causes a copy of the complaint in the action to be delivered to
the Administrator within 10 days after the commencement of the action; and
"(C) the defendant has committed acts in respect to the design which would con-
stitute infringement with respect to a design protected under this chapter.
"(c) Administrator as Party to Action.-The Administrator may, at the Adminis-
trator's option, become a party to the action with respect to the issue of regis-
trability of the design claim by entering an appearance within 60 days after being
served with the complaint, but the failure of the Administrator to become a party
shall not deprive the court of jurisdiction to determine that issue.
"(d) Use of Arbitration To Resolve Dispute.-The parties to an infringement dis-
pute under this chapter, within such time as may be specified by the Administrator
by regulation, may determine the dispute, or any aspect of the dispute, by arbitra-
tion. Arbitration shall be governed by title 9. The parties shall give notice of any
arbitration award to the Administrator, and such award shall, as between the parties
to the arbitration, be dispositive of the issues to which it relates. The arbitra-
tion award shall be unenforceable until such notice is given. Nothing in this sub-
section shall preclude the Administrator from determining whether a design is sub-
ject to registration in a cancellation proceeding under section 1313(c).

S 1322. Injunctions

"(a) In General.-A court having jurisdiction over actions under this chapter may
grant injunctions in accordance with the principles of equity to prevent infringe-
ment of a design under this chapter, including, in its discretion, prompt relief by
temporary restraining orders and preliminary injunctions.
"(b) Damages for Injunctive Relief Wrongfully Obtained.-A seller or distributor
who suffers damage by reason of injunctive relief wrongfully obtained under this
section has a cause of action against the applicant for such injunctive relief and
may recover such relief as may be appropriate, including damages for lost profits,
cost of materials, loss of good will, and punitive damages in instances where the
injunctive relief was sought in bad faith, and, unless the court finds extenuating
circumstances, reasonable attorney's fees.

"S 1323. Recovery for infringement

"(a) Damages.-Upon a finding for the claimant in an action for infringement un-
der this chapter, the court shall award the claimant damages adequate to compensate
for the infringement. In addition, the court may increase the damages to such
amount, not exceeding $50,000 or $1 per copy, whichever is greater, as the court de-
termines to be just. The damages awarded shall constitute compensation **58 and not a
penalty. The court may receive expert testimony as an aid to the determination of
damages.
"(b) Infringer's Profits.-As an alternative to the remedies provided in subsec-
tion (a), the court may award the claimant the infringer's profits resulting from
the sale of the copies if the court finds that the infringer's sales are reasonably

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

related to the use of the claimant's design. In such a case, the claimant shall be
required to prove only the amount of the infringer's sales and the infringer shall
be required to prove its expenses against such sales.

"(c) Statute of Limitations.-No recovery under subsection (a) or (b) shall be
had for any infringement committed more than 3 years before the date on which the
complaint is filed.

"(d) Attorney's Fees.-In an action for infringement under this chapter, the
court may award reasonable attorney's fees to the prevailing party.

"(e) Disposition of Infringing and Other Articles.-The court may order that all
infringing articles, and any plates, molds, patterns, models, or other means spe-
cifically adapted for making the articles, be delivered up for destruction or other
disposition as the court may direct.

"S 1324. Power of court over registration

"In any action involving the protection of a design under this chapter, the
court, when appropriate, may order registration of a design under this chapter or
the cancellation of such a registration. Any such order shall be certified by the
court to the Administrator, who shall make an appropriate entry upon the record.

"S 1325. Liability for action on registration fraudulently obtained

"Any person who brings an action for infringement knowing that registration of
the design was obtained by a false or fraudulent representation materially affecting
the rights under this chapter, shall be liable in the sum of $10,000, or such part
of that amount as the court may determine. That amount shall be to compensate the
defendant and shall be charged against the plaintiff and paid to the defendant, in
addition to such costs and attorney's fees of the defendant as may be assessed by
the court.

"S 1326. Penalty for false marking

"(a) In General.-Whoever, for the purpose of deceiving the public, marks upon,
applies to, or uses in advertising in connection with an article made, used, dis-
tributed, or sold, a design which is not protected under this chapter, a design no-
tice specified in section 1306, or any other words or symbols importing that the
design is protected under this chapter, knowing that the design is not so protected,
shall pay a civil fine of not more than $500 for each such offense.

"(b) Suit by Private Persons.-Any person may sue for the penalty established by
subsection (a), in which event one-half of the penalty shall be awarded to the per-
son suing and the remainder shall be awarded to the United States.

**\*59** "S 1327. Penalty for false representation

"Whoever knowingly makes a false representation materially affecting the rights
obtainable under this chapter for the purpose of obtaining registration of a design
under this chapter shall pay a penalty of not less than $500 and not more than
$1,000, and any rights or privileges that individual may have in the design under
this chapter shall be forfeited.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**


"S 1328. Enforcement by Treasury and Postal Service

    "(a) Regulations.-The Secretary of the Treasury and the United States Postal
Service shall separately or jointly issue regulations for the enforcement of the
rights set forth in section 1308 with respect to importation. Such regulations may
require, as a condition for the exclusion of articles from the United States, that
the person seeking exclusion take any one or more of the following actions:
    "(1) Obtain a court order enjoining, or an order of the International Trade Com-
mission under section 337 of the Tariff Act of 1930 excluding, importation of the
articles.
    "(2) Furnish proof that the design involved is protected under this chapter and
that the importation of the articles would infringe the rights in the design under
this chapter.
    "(3) Post a surety bond for any injury that may result if the detention or ex-
clusion of the articles proves to be unjustified.
    "(b) Seizure and Forfeiture.-Articles imported in violation of the rights set
forth in section 1308 are subject to seizure and forfeiture in the same manner as
property imported in violation of the customs laws. Any such forfeited articles
shall be destroyed as directed by the Secretary of the Treasury or the court, as the
case may be, except that the articles may be returned to the country of export
whenever it is shown to the satisfaction of the Secretary of the Treasury that the
importer had no reasonable grounds for believing that his or her acts constituted a
violation of the law.

"S 1329. Relation to design patent law

    "The issuance of a design patent under title 35 for an original design for an
article of manufacture shall terminate any protection of the original design under
this chapter.

"S 1330. Common law and other rights unaffected

    "Nothing in this chapter shall annul or limit-
    "(1) common law or other rights or remedies, if any, available to or held by any
person with respect to a design which has not been registered under this chapter; or
    "(2) any right under the trademark laws or any right protected against unfair
competition.

"S 1331. Administrator; Office of the Administrator

    "In this chapter, the 'Administrator' is the Register of Copyrights, and the 'Of-
fice of the Administrator' and the 'Office' refer to the Copyright Office of the
Library of Congress.

**\*60** "S 1332. No retroactive effect

    "Protection under this chapter shall not be available for any design that has
been made public under section 1310(b) before the effective date of this chapter.".

SEC. 503. CONFORMING AMENDMENTS.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

    (a) Table of Chapters.-The table of chapters for title 17, United States Code,
is amended by adding at the end the following:

    1301".
    (b) Jurisdiction of District Courts Over Design Actions.-(1) Section 1338(c) of
title 28, United States Code, is amended by inserting ", and to exclusive rights in
designs under chapter 13 of title 17," after "title 17".
    (2)(A) The section heading for section 1338 of title 28, United States Code, is
amended by inserting "designs," after "mask works,".
    (B) The item relating to section 1338 in the table of sections at the beginning
of chapter 85 of title 28, United States Code, is amended by inserting "designs,"
after "mask works,".
    (c) Place for Bringing Design Actions.-(1) Section 1400(a) of title 28, United
States Code, is amended by inserting "or designs" after "mask works".
    (2) The section heading for section 1400 of title 28, United States Code is
amended to read as follows:

"S Patents and copyrights, mask works, and designs".

    (3) The item relating to section 1400 in the table of sections at the beginning
of chapter 87 of title 28, United States Code, is amended to read as follows:
    "1400.Patents and copyrights, mask works, and designs.".
    (d) Actions Against the United States.-Section 1498(e) of title 28, United
States Code, is amended by inserting ", and to exclusive rights in designs under
chapter 13 of title 17," after "title 17".

SEC. 504. JOINT STUDY OF THE EFFECT OF THIS TITLE.

    (a) In general.-Not later than 1 year after the date of the enactment of this
Act, and not later than 2 years after such date of enactment, the Register of Copy-
rights and the Commissioner of Patents and Trademarks shall submit to the Committees
on the Judiciary of the Senate and the House of Representatives a joint report eval-
uating the effect of the amendments made by this title.
    (b) Elements For Consideration.-In carrying out subsection (a), the Register of
Copyrights and the Commissioner of Patents and Trademarks shall consider-
    (1) the extent to which the amendments made by this title has been effective in
suppressing infringement of the design of vessel hulls;
    (2) the extent to which the registration provided for in chapter 13 of title 17,
United States Code, as added by this title, has been utilized;
    (3) the extent to which the creation of new designs of vessel hulls have been
encouraged by the amendments made by this title;
    **\*61** (4) the effect, if any, of the amendments made by this title on the price of
vessels with hulls protected under such amendments; and
    (5) such other considerations as the Register and the Commissioner may deem rel-
evant to accomplish the purposes of the evaluation conducted under subsection (a).

SEC. 505. EFFECTIVE DATE.

    The amendments made by sections 502 and 503 shall take effect on the date of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**


enactment of this Act and shall remain in effect until the end of the 2-year period
beginning on such date of enactment. No cause of action based on chapter 13 of title
17, United States Code, as added by this title, may be filed after the end of that
2-year period.

   Amend the title so as to read: "A bill to amend title 17, United States Code, to
implement the World Intellectual Property Organization Copyright Treaty and Perform-
ances and Phonograms Treaty, and for other purposes.".

   And the Senate agree to the same.

     From the Committee on Commerce, for consideration of the House bill, and the
Senate amendment, and modifications committed to conference:

     Tom Bliley,

     Billy Tauzin,

     John D. Dingell,

     From the Committee on the Judiciary, for consideration of the House bill, and
the Senate amendment, and modifications committed to conference:

     Henry J. Hyde,

     Howard Coble,

     Bob Goodlatte,

     John Conyers, Jr.,

     Howard L. Berman,

     Managers on the Part of the House.

     Orrin G. Hatch,

     Strom Thurmond,

     Patrick J. Leahy,

     Managers on the Part of the Senate.

     **\*63 \*\*640** JOINT EXPLANATORY STATEMENT OF THE COMMITTEE OF CONFERENCE


   The managers on the part of the House and the Senate at the conference on the dis-
agreeing votes of the two Houses on the amendment of the Senate to the bill (H.R.
2281) to amend title 17, United States Code, to implement the World Intellectual
Property Organization Copyright Treaty and Performances and Phonograms Treaty, and
for other purposes, submit the following joint statement to the House and the Senate
in explanation of the effect of the action agreed upon by the managers and recommen-
ded in the accompanying conference report:

   The Senate amendment struck all of the House bill after the enacting clause and
inserted a substitute text.

   The House recedes from its disagreement to the amendment of the Senate with an

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

amendment that is a substitute for the House bill and the Senate amendment. The dif-
ferences between the House bill, the Senate amendment, and the substitute agreed to
in conference are noted below, except for clerical corrections, conforming changes
made necessary by agreements reached by the conferees, and minor drafting and cler-
ical changes.

### TITLE I-WIPO TREATIES IMPLEMENTATION

This title implements two new intellectual property treaties, the WIPO Copyright
Treaty and the WIPO Performances and Phonograms Treaty, signed in Geneva, Switzer-
land in December 1996.

### SECTION 101. SHORT TITLE

The House recedes to the Senate section 101. This section sets forth the short
title of the Act. As between the short titles in the House bill and the Senate
amendment, it is believed that the title in Section 101 of the Senate amendment more
accurately reflects the effect of the Act.

### SECTION 102. TECHNICAL AMENDMENTS

The Senate recedes to House section 102. This section makes technical and conform-
ing amendments to the U.S. Copyright Act in order to comply with the obligations of
the two WIPO treaties.

### SECTION 103. COPYRIGHT PROTECTION SYSTEMS AND COPYRIGHT MANAGEMENT INFORMATION

The Senate recedes to House section 103 with modification. The two new WIPO Treat-
ies include substantively identical provisions on technological measures of protec-
tion (also commonly referred to as the "black box" or "anticircumvention" provi-
sions). These provisions require contracting parties to provide "adequate **\*64** legal
protection and effective legal remedies against the circumvention of effective tech-
nological measures that are used by authors in connection with the exercise of their
**\*\*641** rights under this Treaty or the Berne Convention and that restrict acts, in
respect of their works, which are not authorized by the authors concerned or permit-
ted by law."

Both of the new WIPO treaties also include substantively identical provisions re-
quiring contracting parties to protect the integrity of copyright management inform-
ation. The treaties define copyright management information as "information which
identifies the work, the author of the work, the owner of any right in the work, or
information about the terms and conditions of use of the work, and any numbers or
codes that represent such information, when any of these items of information is at-
tached to a copy of a work or appears in connection with the communication of a work
to the public."

Legislation is required to comply with both of these provisions. To accomplish
this, both the House bill and the Senate amendment, in section 103, would add a new
chapter (chapter twelve) to title 17 of the United States Code. This new chapter
twelve includes five sections-(1) section 1201, which prohibits the circumvention of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**


technological measures of protection; (2) section 1202, which protects the integrity
of copyright management information; (3) section 1203, which provides for civil rem-
edies for violations of sections 1201 and 1202; (4) section 1204, which provides for
criminal penalties for violations of sections 1201 and 1202; and (5) section 1205,
which provides a savings clause to preserve the effectiveness of federal and state
laws in protecting individual privacy on the Internet. The House bill and the Senate
amendment differ in several respects, primarily related to the scope and availabil-
ity of exemptions from the prohibitions under section 1201.

   Section 1201(a)(1)-Rulemaking by the Librarian of Congress. Section 1201(a)(1)(C)
provides that the determination of affected classes of works described in subpara-
graph (A) shall be made by the Librarian of Congress "upon the recommendation of the
Register of Copyrights, who shall consult with the Assistant Secretary for Communic-
ations and Information of the Department of Commerce and report and comment on his
or her views in making such recommendation." The determination will be made in a
rulemaking proceeding on the record. It is the intention of  the conferees that, as
is typical with other rulemaking under title 17, and in recognition of the expertise
of the Copyright Office, the Register of Copyrights will conduct the rulemaking, in-
cluding providing notice of the rulemaking, seeking comments from the public, con-
sulting with the Assistant Secretary for Communications and Information of the De-
partment of Commerce and any other agencies that are deemed appropriate, and recom-
mending final regulations in the report to the Librarian.

   Section 1201(a) and 1202-technological measures. It is the understanding of the
conferees that technological measures will most often be developed through con-
sultative, private sector efforts by content owners, and makers of computers, con-
sumer electronics and telecommunications devices. The conferees expect this consul-
tative approach to continue as a constructive and positive method. **\*65** One of the
benefits of such consultation is to allow testing of proposed technologies to de-
termine whether there are adverse effects on the ordinary performance of playback
and display equipment in the marketplace, and to take steps to eliminate or substan-
tially mitigate those effects before technologies are introduced. The public in-
terest is well-served by such activities.

   **\*\*642** Persons may also choose to implement a technological measure without vetting
it through an inter-industry consultative process, or without regard to the input of
affected parties. Under such circumstances, such a technological measure may materi-
ally degrade or otherwise cause recurring appreciable adverse effects on the author-
ized performance or display of works. Steps taken by the makers or servicers of con-
sumer electronics, telecommunications or computing products used for such authorized
performances or displays solely to mitigate these adverse effects on product per-
formance (whether or not taken in combination with other lawful product modifica-
tions) shall not be deemed a violation of sections 1201(a) or (b).

   However, this construction is not meant to afford manufacturers or servicers an
opportunity to give persons unauthorized access to protected content, or to exercise
the rights under the Copyright Act of copyright owners in such works, under the
guise of "correcting" a performance problem that results from the implementation of
a particular technological measure. Thus, it would violate sections 1201(a) or (b)
for a manufacturer or servicer to take remedial measures if they are held out for or
undertaken with, or result in equipment with only limited commercially significant


© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

use other than, the prohibited purpose of allowing users to gain unauthorized access
to protected content or to exercise the rights under the Copyright Act of copyright
owners in such works.

   With regard to section 1202, product adjustments made to eliminate recurring ap-
preciable adverse effects on the authorized performance or display of works caused
by copyright management information will not be deemed a violation of section 1202
unless such steps are held out for or undertaken with a prohibited purpose, or the
requisite knowledge, of inducing, enabling, facilitating or concealing infringement
of rights of copyright owners under the Copyright Act.

   Section 1201(e) and 1202(d)-Law enforcement, intelligence, and other government
activities. Sections 1201(e) and 1202(d) create an exception to the prohibitions of
sections 1201 and 1202 for the lawfully authorized investigative, protective, or in-
telligence activities of an officer, agent, or employee of, the United States, a
State, or a political subdivision of a State, or of persons acting pursuant to a
contract with such an entity. The anticircumvention provisions of this legislation
might be read to prohibit some aspects of the information security testing that is
critical to preventing cyber attacks against government computers, computer systems,
and computer networks. The conferees have added language to sections 1201(e) and
1202(d) to make it clear that the anticircumvention prohibition does not apply to
lawfully authorized information security activities of the federal government, the
states, political subdivisions of states, or persons acting within the scope of
their government information security contract. In this way, the bill will **\*66** per-
mit the continuation of information security activities that protect the country
against one of the greatest threats to our national security as well as to our eco-
nomic security.

   At the same time, this change is narrowly drafted so that it does not open the
door to the very piracy the treaties are designed to prevent. For example, the term
"information security" activities is intended to include presidential directives and
executive orders concerning the vulnerabilities of a computer, computer system, or
computer network. By this, the conferees intend to include the recently-issued Pres-
idential Decision Directive 63 on Critical Infrastructure Protection. PDD-63 con-
tains a number of initiatives to ensure **\*\*643** that the United States takes all ne-
cessary measures to swiftly eliminate any significant vulnerability to both physical
and cyber attacks on the nation's critical infrastructures, including especially our
cyber systems.

   The Term "computer system" has the same definition for purposes of this section as
that term is defined in the Computer Security Act, 15 U.S.C. S 278q-3(d)(1).

   Subsection 1201(g)-Encryption Research. Subsection (g) permits the circumvention
of access control technologies in certain circumstances for the purpose of good
faith encryption research. The conferees note that section 1201(g)(3)(A) does not
imply that the results of encryption research must be disseminated. There is no re-
quirement that legitimate encryption researchers disseminate their findings in order
to quality for the encryption research exemption in section 1201(g). Rather, the
subsection describes circumstances in which dissemination, if any, would be weighed
in determining eligibility.

   Section 1201(j)-Security Testing. Subsection (j) clarifies the intended effect of
the bill with respect to information security. The conferees understand this act to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

prohibit unauthorized circumvention of technological measures applied to works pro-
tected under title 17. The conferees recognize that technological measures may also
be used to protect the integrity and security of computers, computer systems or com-
puter networks. It is not the intent of this act to prevent persons utilizing tech-
nological measures in respect of computers, computer systems or networks from test-
ing the security value and effectiveness of the technological measures they employ,
or from contracting with companies that specialize in such security testing.

   Thus, in addition to the exception for good faith encryption research contained in
Section 1201(g), the conferees have adopted Section 1201(j) to resolve additional
issues related to the effect of the anti-circumvention provision on legitimate in-
formation security activities. First, the conferees were concerned that Section
1201(g)'s exclusive focus on encryption-related research does not encompass the en-
tire range of legitimate information security activities. Not every technological
means that is used to provide security relies on encryption technology, or does so
to the exclusion of other methods. Moreover, an individual who is legitimately test-
ing a security technology may be doing so not to advance the state of encryption re-
search or to develop encryption products, but rather to ascertain the effectiveness
of that particular security technology.

   **\*67** The conferees were also concerned that the anti-circumvention provision of
Section 1201(a) could be construed to inhibit legitimate forms of security testing.
It is not unlawful to test the effectiveness of a security measure before it is im-
plemented to protect the work covered under title 17. Nor is it unlawful for a per-
son who has implemented a security measure to test its effectiveness. In this re-
spect, the scope of permissible security testing under the Act should be the same as
permissible testing of a simple door lock: a prospective buyer may test the lock at
the store with the store's consent, or may purchase the lock and test it at home in
any manner that he or she sees fit-for example, by installing the lock on the front
door and seeing if it can be picked. What that person may not do, however, is test
the lock once it has been installed on someone else's door, without the consent of
the person whose property is protected by the lock.

   In order to resolve these concerns, Section 1201(j) creates an exception for  "se-
curity testing." Section 1201(j)(1) defines "security testing" as obtaining access
to a computer, **\*\*644** computer system, or computer network for the sole purpose of
testing, investigating, or correcting a security flaw or vulnerability, provided
that the person engaging in such testing is doing so with the consent of the owner
or operator of the computer, computer system, or computer network. Section 102(j)(2)
provides that, notwithstanding the provisions of Section 1201(a), a person may en-
gage in such testing, provided that the act does not constitute infringement or vi-
olate any other applicable law. Section 1201(j)(3) provides a non-exclusive list of
factors that a court shall consider in determining whether a person benefits from
this exception.

   Section 1201(j)(4) permits an individual, notwithstanding the prohibition con-
tained in Section 1201(a)(2), to develop, produce, distribute, or employ technolo-
gical means for the sole purpose of performing acts of good faith security testing
under Section 1201(j)(2), provided the technological means do not otherwise violate
section 1201(a)(2). It is Congress' intent for this subsection to have application
only with respect to good faith security testing. The intent is to ensure that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796, 1998 U.S.C.C.A.N. 639)**

parties engaged in good faith security testing have the tools available to them to
complete such acts. The conferees understand that such tools may be coupled with ad-
ditional tools that serve purposes wholly unrelated to the purposes of this Act.
Eligibility for this exemption should not be precluded because these tools are
coupled in such a way. The exemption would not be available, however, when such
tools are coupled with a product or technology that violates section 1201(a)(2).

Section 1201(k)-Certain Analog Devices and Certain Technological Measures. The
conferees included a provision in the final legislation to require that analog video
cassette recorders must conform to the two forms of copy control technology that are
in wide use in the market today-the automatic gain control copy control technology
and the colorstripe copy control technology. Neither are currently required elements
of any format of video recorder, and the ability of each technology to work as in-
tended depends on the consistency of design of video recorders or on incorporation
of specific response elements in video recorders. Moreover, they do not employ en-
cryption or scrambling of the content being protected.

**\*68** As a consequence, these analog copy control technologies may be rendered inef-
fective either by redesign of video recorders or by intervention of "black box"
devices or software "hacks". The conferees believe, and specifically intend, that
the general circumvention prohibition in Section 1201(b)(2) will prohibit the manu-
facture and sale of "black box" devices that defeat these technologies. Moreover,
the conferees believe and intend that the term "technology" should be read to in-
clude the software "hacks" of this type, and that such "hacks" are equally prohib-
ited by the general circumvention provision. Devices have been marketed that claim
to "fix" television picture disruptions allegedly caused by these technologies.
However, as described in more detail below, there is no justification for the exist-
ence of any intervention device to "fix" such problems allegedly caused by these
technologies, including "fixes" allegedly related to stabilization or clean up of
the picture quality. Such devices should be seen for what they are-circumvention
devices prohibited by this legislation.

The conferees emphasize that this particular provision is being included in this
bill in order to deal with a very specific situation involving the protection of
analog television programming and prerecorded movies and other audiovisual works in
relation to **\*\*645** recording capabilities of ordinary consumer analog video cassette
recorders. The conferees also acknowledge that numerous other activities are under-
way in the private sector to develop, test, and apply copy control technologies,
particularly in the digital environment. Subject to the other requirements of this
section, circumvention of these technologies may be prohibited under this Act.
Moreover, in some cases, these technologies are subject to licensing arrangements
that provide legally enforceable obligations. The conferees applaud these undertak-
ings and encourage their continuation, including the inter-industry meetings and
working groups that are essential to their success. If, as a result of such activit-
ies, the participants request further Congressional action, the conferees expect
that the Congress, and the committees involved in this Conference specifically, will
consider whether additional statutory requirements are necessary and appropriate.

Before agreeing to include this requirement in the final legislation, the confer-
ees assured themselves in relation to two critical issues-that these analog copy
control technologies do not create "playability" problems on normal consumer elec-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

tronics products and that the intellectual property necessary for the operation of
these technologies will be available on reasonable and non-discriminatory terms.

In relation to the playability issue, the conferees have received authoritative
assurances that playability issues have already been resolved in relation to the
current specifications for these technologies and that an inter-industry forum will
be established to resolve any playability issues that may arise in the future in re-
lation to either revisions to the copy control specifications or development of new
consumer technologies and products.

As further explanation on the playability issue, the conferees understand that the
existing technologies were the subject of extensive testing that included all or
virtually all of the major consumer electronics manufacturers and that this testing
resulted in modification **\*69** of the specifications to assure that the technologies
do not produce noticeable adverse effects on the normal display of content that is
protected utilizing these technologies. Currently, all manufacturers are effectively
"on notice" of the existence of these technologies and their specifications and
should be able to design their products to avoid any adverse effects.

In relation to the intellectual property licensing issues, the owner of the analog
copy control intellectual property-Macrovision Corporation-has written a letter to
the Chairman of the Conference Committee to provide the following assurances in re-
lation to the licenses for intellectual property necessary to implement these analog
copy control technologies: (1) that its intellectual property is generally available
on reasonable and non-discriminatory terms, as that phrase is used in normal in-
dustry parlance; (2) that manufacturers of the analog video cassette recorders that
are required by this legislation to conform to these technologies will be provided
royalty-free licenses for the use of its relevant intellectual property in any
device that plays back packaged, prerecorded content, or that reads and responds to
or generates or carries forward the elements of these technologies associated with
such content; (3) in the same circumstances as described in (2), other manufacturers
of devices that generate, carry forward, or read and respond to these technologies
will be provided licenses carrying only modest fees (in the range of $25,000-in cur-
rent dollars-initial payment and lesser amounts as recurring **\*\*646** annual fees); (4)
that manufacturers of other products, including set-top-boxes and devices that per-
form similar functions (including integrated devices containing such functionality),
will receive licenses on reasonable and non-discriminatory terms, including royalty
terms and other considerations; and (5) that playability issues will not be the sub-
ject of license requirements but rather will be handled through an inter-industry
forum that is being established for this purpose. The conferees emphasize the need
for the technology's proprietor to adhere to these assurances in all future licens-
ing.

With regard to the specific elements of this provision:

First, these technologies operate within the general NTSC television signal envir-
onment, and the conferees understand that this means that they work in relation to
television signals that are of the 525/60 interlaced type, i.e., the standard defin-
ition television signal that has been used in the United States. The S-video and
Hi-8 versions of covered devices are, of course, included within the coverage. Fur-
ther, the new format analog video cassette recorders that are covered by paragraph
(1)(A)(v) are those that receive the 525/60 interlaced type of input.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

Second, it is the conferees understanding that not all analog video signals will
utilize this technology, and, obviously, a device that receives a signal that does
not contain these technologies need not read and respond to what might have been
there if the signal had utilized the technology.

Third, a violation of paragraph (1) is a form of circumvention under Section
1201(b)(1). Accordingly, the enforcement of this provision is through the penalty
provisions applicable to Section 1201 generally. A violation of paragraph (2) is
also a violation of Section 1201 and hence subject to those penalty provisions. The
inclusion **70** of paragraph (5) with regard to enforcement of paragraph (2) is inten-
ded merely to allow the particular statutory damage provisions of Section 1203 to
apply to violations of this subsection.

Fourth, the conferees understand that minor modifications may be necessary in the
specifications for these technologies and intend that any such modifications (and
related new "revised specifications") should not negate in any way the requirements
imposed by this subsection. The modifications should, however, be sufficiently minor
that manufacturers of analog video cassette recorders should be free to continue to
design products to conform to these technologies on the basis of the specifications
existing, or actually implemented by manufacturers, as of the date of enactment of
this Act.

Fifth, the provisions of paragraph (2) are intended to operate to allow copyright
owners to use these technologies to prevent the making of a viewable copy of a pay-
per-view, near video on demand, or video on demand transmission or prerecorded tape
or disc containing one or more motion pictures or other audiovisual works, at the
same time as consumers are afforded their customary ability to make analog copies of
programming offered through other channels or services. Copyright owners may utilize
these technologies to prevent the making of a "second generation" copy where the
original transmission was through a pay television service (such as HBO, Showtime,
or the like). The basic and extended basic tiers of programming services, whether
provided through cable or other wireline, satellite, or future over the air ter-
restrial systems, may not be encoded with these technologies at all. The inclusion
of paragraph (2)(D) is not intended to be read to authorize the making of a copy by
consumers or others in relation to pay-**647** per-view, near video on demand or
video-on-demand transmissions or prerecorded media.

Sixth, the exclusion of professional analog video cassette recorders is necessary
in order to allow the motion picture, broadcasting, and other legitimate industries
and individual businesses to obtain and use equipment that is essential to their
normal, lawful business operations. As a further explanation of the types of equip-
ment that are to be subject to this exception, the following factors should be used
in evaluating whether a specific product is a "professional" product:

    (1) whether, in the preceding year, only a small number of the devices that are
of the same kind, nature, and description were sold to consumers other than profes-
sionals employing such devices in a lawful business or industrial use;

    (2) whether the device has special features designed for use by professionals
employing the device in a lawful business or industrial use;

    (3) whether the advertising, promotional and descriptive literature or other ma-
terials used to market the device were directed at professionals employing such
devices in a lawful business or industrial use;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,   1998 U.S.C.C.A.N. 639)**

(4) whether the distribution channels and retail outlets through which the
device is distributed and sold are ones used primarily to make sales to profession-
als employing such devices in a lawful business or industrial use; and

**\*71** (5) whether the uses to which the device is most commonly put are those as-
sociated with the work of professionals employing the device in a lawful business or
industrial use.

Seventh, paragraph (1)(B) contains a number of points worthy of explanation. In
general, the requirement in paragraph (1)(B) is that manufacturers not materially
reduce the responsiveness of their existing products and is also intended to be car-
ried forward in the introduction of new models. This is particularly important in
relation to the four-line colorstripe copy control technology, where the basic re-
quirement in the statute is that a model of a recorder not be modified to eliminate
conformance with the four-line colorstripe technology and where the standard for
"conformance" is simply that the lines be visible and distracting in the display of
a copy of material that was protected with the technology when the copy is played
back, in normal viewing mode, by the recorder that made the copy and displayed on a
reference display device. Specific elements of that requirement include:

(1) "Normal viewing mode" is intended to mean the viewing of a program in its
natural sequence at the regular speed for playback  and is not intended to allow
"AGC-stripping viewing modes" to be developed. It is intended to exclude still frame
or slow motion viewing from this definition.

(2) The "reference display device" concept is used in the legislation to acknow-
ledge that manufacturers of analog video cassette recorders may use a specific dis-
play device to test their responsiveness to the colorstripe technology and then may
use the level of such responsiveness as their baseline to achieve compliance. The
reference display device for manufacturers that make televisions is intended to be a
television set also made by that manufacturer. Where an analog video cassette re-
corder manufacturer does not make display devices, that manufacturer may choose a
display device made by another manufacturer to serve as a reference. In general, a
**\*\*648** reference display device should be one that is generally representative of
display devices in the U.S. market at the time of the testing.

(3) The conferees intend that the word "model" should be interpreted broadly and
is not to be determined exclusively by alphabetic, numeric, name, or other label.
Courts should look with suspicion at "new models" that reduce or eliminate conform-
ance with this technology, as compared with that manufacturer's "previous models."
Further, a manufacturer should not replace a previous model that showed intense
lines with a model that shows weak lines in the played back picture.

For any new entrant into the VHS format analog video cassette recorder manufactur-
ing business, the legislation provides that such a manufacturer will build its ini-
tial devices so as to be in conformance with the four-line colorstripe copy control
technology based on the playback on a reference display device and thereafter not
modify the design so that its products no longer conform to this technology.

Finally, the proprietor of the colorstripe copy control technology has supplied
the Committee with a description of how the technology should work so as to provide
the desired copy protection **\*72** benefits. That description is as follows: the color-
stripe copy control technology works as intended if a recorder records a signal
that, when played back by the playback function of that recorder in the normal view-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

ing mode, exhibits on a reference display device a significant distortion of color
on the lines which begin with a colorstripe colorburst, or a complete or intermit-
tent loss of color throughout at least 50% of the visible image. While the conferees
realize that there may be variations among recorders in relation to this technology,
the conferees expect the affected manufacturers to work with the proprietor of
the technology to ensure that the basic goal of content protection through this techno-
logy is achieved. The conferees understand that content protection through this
technology is to the manufacturers' benefit, as well, since it encourages content
providers to release more valuable content than they might otherwise release without
such protection. The conferees further intend that manufacturers should seek to re-
spond to the colorstripe technology at the highest feasible level and should not
modify their recorder designs, or substitute weaker responding recorders for
stronger responding recorders in order to avoid the requirements of this subsection.

Eighth, the type of colorstripe copy control technology to which the legislation
requires conformance is the four-line "half burst" type version of this technology.
The content provider may shift, in an adaptive fashion, from no colorstripe encoding
to the two-line version to the four-line version, in order to balance the copy con-
trol features of the technology against the possible playback distortion that the
four-line technology occasionally creates. This legislation requires conformance
only to the four-line version, but prohibits any effort to eliminate or reduce ma-
terially the effectiveness of the two-line version in relation to any particular
analog video cassette recorder that, in fact, provides a response to the two-line
version. The legislation also applies the "encoding rules" in paragraph (2) to
either the two-line or four-line versions of this technology.

**\*\*649** SECTION 104. EVALUATION OF IMPACT OF COPYRIGHT LAW AND AMENDMENTS ON
ELECTRONIC COMMERCE AND TECHNOLOGICAL DEVELOPMENT

The Senate recedes to House section 105 with modification.

SECTION 105. EFFECTIVE DATE

The Senate recedes to House section 106. This section sets forth the effective
date of the amendments made by this title. The corresponding sections of the House
bill and the Senate amendment are substantively identical.

TITLE II-ONLINE COPYRIGHT INFRINGEMENT LIABILITY LIMITATION

Title II preserves strong incentives for service providers and copyright owners to
cooperate to detect and deal with copyright infringements that take place in the di-
gital networked environment. At the same time, it provides greater certainty to ser-
vice providers concerning their legal exposure for infringements that may occur in
the course of their activities.

**\*73** SECTION 201. SHORT TITLE

The Senate recedes to House section 201. This section sets forth the short title
of the Act. The Senate accepts the House formulation.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796, 1998 U.S.C.C.A.N. 639)**

SECTION 202. LIMITATIONS ON LIABILITY FOR COPYRIGHT INFRINGEMENT

The Senate recedes to House section 202 with modification. This section amends
chapter 5 of the Copyright Act (17 U.S.C. 501, et seq.) to create a new section 512,
titled "Limitations on liability relating to material online." New Section 512 con-
tains limitations on service providers' liability for five general categories of
activity set forth in subsections (a) through (d) and subsection (g). As provided in
subsection (l), Section 512 is not intended to imply that a service provider is or
is not liable as an infringer either for conduct that qualifies for a limitation of
liability or for conduct that fails to so qualify. Rather, the limitations of liab-
ility apply if the provider is found to be liable under existing principles of law.
This legislation is not intended to discourage the service provider from monitoring
its service for infringing material. Courts should not conclude that the service
provider loses eligibility for limitations on liability under section 512 solely be-
cause it engaged in a monitoring program.

The limitations in subsections (a) through (d) protect qualifying service pro-
viders from liability for all monetary relief for direct, vicarious and contributory
infringement. Monetary relief is defined in subsection (k)(2) as encompassing dam-
ages, costs, attorneys' fees, and any other form of monetary payment. These subsec-
tions also limit injunctive relief against qualifying service providers to the ex-
tent specified in subsection (j). To qualify for these protections, service pro-
viders must meet the conditions set forth in subsection (i), and service providers'
activities at issue must involve a function described in subsection (a), (b), (c),
(d) or (g), respectively. The liability limitations apply to networks "operated by
or for the service provider," thereby protecting both service providers who offer a
service and subcontractors who may operate parts of, or an entire, system or network
for another service provider.

**650** Subsection (b) provides for a limitation on liability with respect to cer-
tain acts of "system caching". Paragraphs (5) and (6) of this subsection refer to
industry standard communications protocols and technologies that are only now in the
initial stages of development and deployment. The conferees expect that the Internet
industry standards setting organizations, such as the Internet Engineering Task
Force and the World Wide Web Consortium, will act promptly and without delay to es-
tablish these protocols so that subsection (b) can operate as intended.

Subsection (e) is included by the conferees in order to clarify the provisions of
the bill with respect to the liability of nonprofit institutions of higher learning
that act as service providers. This provision serves as a substitute for section
512(c)(2) of the House bill and for the study proposed by section 204 of the Senate
amendment.

**74** In general, Title II provides that a university or other public or nonprofit
institution of higher education which is also a "service provider" (as that term is
defined in title II) is eligible for the limitations on liability provided in title
II to the same extent as any other service provider.

However, the conferees recognize that the university environment is unique. Ordin-
arily, a service provider may fail to qualify for the liability limitations in Title
II simply because the knowledge or actions of one of its employees may be imputed to
it under basic principles of respondeat superior and agency law. The special rela-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796, 1998 U.S.C.C.A.N. 639)**

tionship which exists between universities and their faculty members (and their
graduate student employees) when they are engaged in teaching or research is differ-
ent from the ordinary employer-employee relationship. Since independence-freedom of
thought, word and action-is at the core of academic freedom, the actions of uni-
versity faculty and graduate student teachers and researchers warrant special con-
sideration in the context of this legislation. This special consideration is embod-
ied in new subsection (e), which provides special rules for determining whether uni-
versities, in their capacity as a service provider, may or may not be liable for
acts of copyright infringement by faculty members or graduate students in certain
circumstances.

Subsection (e)(1) provides that the online infringing actions of faculty members
or graduate student employees, which occur when they are "performing a teaching or
research function," will not be attributed to an institution of higher education in
its capacity as their employer for purposes of section 512, if certain conditions
are met. For the purposes of subsections (a) and (b) of section 512, such faculty
member or graduate student shall be considered to be a person other than the insti-
tution, and for the purposes of subsections (c) and (d) of section 512 the faculty
member's or graduate student's knowledge or awareness of his or her infringing
activities will not be attributed to the institution, when they are performing a
teaching or research function and the conditions in paragraphs (A)-(C) are met.

When the faculty member or the graduate student employee is performing a function
other than teaching or research, this subsection provides no protection against li-
ability for the institution if infringement occurs. For example, a faculty member or
graduate student is performing a function other than teaching or research when the
faculty member or graduate student is exercising institutional administrative re-
sponsibilities, or is carrying out operational responsibilities that relate to the
institution's function  as a service provider. Further, for the exemption to apply
on the basis of research activity, the **651 research must be a genuine academic ex-
ercise-i.e. a legitimate scholarly or scientific investigation or inquiry-rather
than an activity which is claimed to be research but is undertaken as a pretext for
engaging in infringing activity.

In addition to the "teaching or research function" test, the additional liability
protections contained in subsection (e)(1) do not apply unless the conditions in
paragraphs (A) through (C) are satisfied. First, paragraph (A) requires that the in-
fringing activities must not involve providing online access to instructional mater-
ials that are "required or recommended" for a course taught by the infringing *75
faculty member and/or the infringing graduate student within the last three years.
The reference to "providing online access" to instructional materials includes the
use of e-mail for that purpose. The phrase "required or recommended" is intended to
refer to instructional materials that have been formally and specifically identified
in a list of course materials that is provided to all students enrolled in the
course for credit; it is not intended, however, to refer to the other materials
which, from time to time, the faculty member or graduate student may incidentally
and informally bring to the attention of students for their consideration during the
course of instruction.

Second, under paragraph (B) the institution must not have received more than two
notifications of claimed infringement with respect to the particular faculty member

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

or particular graduate student within the last three years. If more than two such
notifications have been received, the institution may be considered to be on notice
of a pattern of infringing conduct by the faculty member or graduate student, and
the limitation of subsection (e) does not apply with respect to the subsequent in-
fringing actions of that faculty member or that graduate student. Where more than
two notifications have previously been received with regard to a particular faculty
member or graduate student, the institution will only become potentially liable for
the infringing actions of that faculty member or that graduate student. Any notific-
ation of infringement that gives rise to a cause of action for misrepresentation un-
der subsection (f) does not count for purposes of paragraph (B).

Third, paragraph (C) states that the institution must provide to the users of its
system or network-whether they are administrative employees, faculty, or students-
materials that accurately describe and promote compliance with copyright law. The
legislation allows, but does not require, the institutions to use relevant informa-
tional materials published by the U.S. Copyright Office in satisfying the condition
imposed by paragraph (C).

Subsection (e)(2) defines the terms and conditions under which an injunction may
be issued against an institution of higher education that is a service provider in
cases to which subsection (e)(1) applies. First, all the factors and considerations
taken into account by a court under 17 U.S.C. S 502 will apply in the case of any
application for an injunction in cases covered by this subsection. In addition, the
court is also required to consider the factors of particular significance in the di-
gital environment listed in subsection (j)(2). Finally, the provisions contained in
(j)(3), concerning notice to the service provider and the opportunity to appear, are
also applicable in cases to which subsection (e)(1) applies.

The conferees also want to emphasize that nothing contained in subsection (e)
should be interpreted to establish new liability for institutions  of higher educa-
tion, including **652 under the doctrines of respondeat superior, or of contributory
liability, where liability does not now exist. Further, subsection (e) does not al-
ter any of the existing limitations on the rights of copyright owners that are
already contained in the Copyright Act. So, for example, subsection (e) has no im-
pact on the fair use (section 107) doctrine or the availability of fair use in a
university setting; similarly, section 110 of the Copyright Act dealing with
classroom performance and distance **76 learning is not changed by subsection (e). In
this regard, subsection (e) is fully consistent with the rest of section 512, which
neither creates any new liabilities for service providers, nor affects any defense
to infringement available to a service provider. Finally, subsection (e) has no ap-
plicability to any case asserting that a university is liable for copyright in-
fringement in any capacity other than as a service provider.


SECTION 203. EFFECTIVE DATE


The Senate recedes to House section 203. This section sets forth the effective
date of the amendments made by this title. The corresponding sections of the House
bill and the Senate amendment are substantively identical.


TITLE III-COMPUTER MAINTENANCE OR REPAIR COPYRIGHT EXEMPTION


© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**


SECTIONS 301-302

   The Senate recedes to the House sections 301-302. These sections effect a minor,
yet important clarification in section 117 of the Copyright Act to ensure that the
lawful owner or lessee of a computer machine may authorize an independent service
provider-a person unaffiliated with either the owner or lessee of the machine-to ac-
tivate the machine for the sole purpose of servicing its hardware components. When a
computer is activated, certain software or parts thereof is automatically copied in-
to the machine's random access memory, or "RAM". A clarification in the Copyright
Act is necessary in light of judicial decisions holding that such copying is a "re-
production" under section 106 of the Copyright Act (17 U.S.C. 106), [FN1]  thereby
calling into question the right of an independent service provider who is not the
licensee of the computer program resident on the client's machine to even activate
that machine for the purpose of servicing the hardware components. This section does
not in any way alter the law with respect to the scope of the term "reproduction" as
it is used the Copyright Act. Rather, this section it is narrowly crafted to achieve
the objectives just described-namely, ensuring that an independent service provider
may turn on a client's computer machine in order to service its hardware components,
provided that such service provider complies with the provisions of this section de-
signed to protect the rights of copyright owners of computer software. The corres-
ponding sections of the House bill and the Senate amendment are substantively
identical.

**653 TITLE IV-MISCELLANEOUS PROVISIONS

SEC. 401. PROVISIONS RELATING TO THE COMMISSIONER OF PATENTS AND TRADEMARKS AND
THE REGISTER OF COPYRIGHTS

   The Senate recedes to the House sections 401-402 with modification. This section
provides parity in compensation between the Register of Copyrights and the Commis-
sioner of Patent and Trademarks **77 and clarifies the duties and functions of the
Register of Copyrights.
   The new subsection to be added to 17 U.S.C. S 701 sets forth in express statutory
language the functions presently performed by the Register of Copyrights under her
general administrative authority under subsection 701(a). Like the Library of Con-
gress, its parent agency, the Copyright Office is a hybrid entity that historically
has performed both legislative and executive or administrative functions. Eltra
Corp. v. Ringer, 579 F.2d 294 (4th Cir. 1978). Existing subsection 701(a) addresses
some of the latter functions. New subsection 701(b) is intended to codify the other
traditional roles of the Copyright Office and to confirm the Register's existing
areas of jurisdiction.
   Paragraph (1) of new subsection 701(b) reflects the Copyright Office's longstand-
ing role as advisor to Congress on matters within its competence. This includes
copyright and all matters within the scope of title 17 of the U.S. Code. Such ad-
vice, which often takes the form of testimony of pending legislation, is separate
from testimony or other recommendations by the Administration pursuant to the Pres-
ident's concurrent constitutional power to make recommendations to Congress.


© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

Paragraph (2) reflects the Copyright Office's longstanding role in advising feder-
al agencies on matters within its competence. For example, the Copyright Office ad-
vises the U.S. Trade Representative and the State Department on an ongoing basis on
the adequacy of foreign copyright laws, and serves as a technical consultant to
those agencies in bilateral, regional and multilateral consultations or negotiations
with other countries on copyright-related issues.

Paragraph (3) reflects the Copyright Office's longstanding role as a key parti-
cipant in international meetings of various kinds, including as part of U.S. delega-
tions as authorized by the Executive Branch, serving as substantive experts on mat-
ters within the Copyright Office's competence. Recent examples of the Copyright Of-
fice acting in the capacity include its central role on the U.S. delegation that ne-
gotiated the two new WIPO treaties at the 1996 Diplomatic Conference in Geneva, and
its ongoing contributions of technical assistance in the TRIPS Council of the World
Trade Organization and the Register's role as a featured speaker at numerous WIPO
conferences.

Paragraph (4) describes the studies and programs that the Copyright Office has
long carried out as the agency responsible for administering the copyright law and
other chapters of title 17. Among the most important of these studies historically
was a series of comprehensive reports on various issues produced in the 1960's as
the foundation of the last general revision of U.S. copyright law, enacted as the
1976 Copyright Act. Most recently the Copyright Office has completed reports on the
cable and satellite compulsory licenses, legal protection for databases, and the
economic and policy implications of term extension. Consistent with the Copyright
Office's role as a legislative branch agency, **654 these studies have often in-
cluded specific policy recommendations to Congress. The reference to "programs" in-
cludes such projects as the conferences the Copyright Office cosponsored in 1996-97
on the *78 subject of technology-based intellectual property management, and the In-
ternational Copyright Institutes that the Copyright Office has conducted for foreign
government officials at least annually over the past decade, often in cooperation
with WIPO.

Paragraph (5) makes clear that the functions and duties set forth in this subsec-
tion are illustrative, not exhaustive. The Register of Copyrights would continue to
be able to carry out other functions under her general authority under subsection
701(a), or as Congress may direct. The latter may include specific requests by Com-
mittees for studies and recommendations on subjects within the Copyright Office's
area of competence. It may also include, when appropriate or required for constitu-
tional reasons, directions to the Office in separate legislation.

SEC. 402. EPHEMERAL RECORDINGS

The Senate recedes to House section 411 with modification. This section amends
section 112 of the Copyright Act (17 U.S.C. 112) to address two issues concerning
the application of the ephemeral recording exemption in the digital age. The first
of these issues is the relationship between the ephemeral recording exemption and
the Digital Performance Right in Sound Recordings Act of 1995 ("DPRA"). The DPRA
granted sound recording copyright owners the exclusive right to perform their works
publicly by means of digital audio transmission, subject to certain limitations,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796, 1998 U.S.C.C.A.N. 639)**

particularly those set forth in section 114(d). Among those limitations is an exemp-
tion for nonsubscription broadcast transmissions, which are defined as those made by
terrestrial broadcast stations licensed as such by the FCC. 17 U.S.C. S S
114(d)(1)(A)(iii) and (j)(2). The ephemeral recording exemption presently privileges
certain activities of a transmitting organization when it is entitled to transmit a
performance or display under a license or transfer of copyright ownership or under
the limitations on exclusive rights in sound recordings specified by section 114(a).
The House bill and the Senate amendment propose changing the existing language of
the ephemeral recording exemption (redesignated as 112(a)(1)) to extend explicitly
to broadcasters the same privilege they already enjoy with respect to analog broad-
casts.

The second of these issues is the relationship between the ephemeral recording ex-
emption and the anticircumvention provisions that the bill adds as section 1201 of
the Copyright Act. Concerns were expressed that if use of copy protection technolo-
gies became widespread, a transmitting organization might be prevented from engaging
in its traditional activities of assembling transmission programs and making ephem-
eral recordings permitted by section 112 for purposes of its own transmissions with-
in its local service area and of archival preservation and security. To address this
concern, the House bill and the Senate amendment propose adding to section 112 a new
paragraph that permits transmitting organizations to engage in activities that oth-
erwise would violate section 1201(a)(1) in certain limited circumstances when neces-
sary for the exercise of the transmitting organization's privilege to make ephemeral
recordings under redesignated section 112(a)(1). By way of example, if a radio sta-
tion could not make a permitted ephemeral recording from a commercially available
phonorecord without **79 **655 violating section 1201(a)(1), then the radio station
could request from the copyright owner the necessary means of making a permitted
ephemeral recording. If the copyright owner did not then either provide a phonore-
cord that could be reproduced or otherwise provide the necessary means of making a
permitted ephemeral recording from the phonorecord already in the possession of the
radio station, the radio station would not be liable for violating section
1201(a)(1) for taking the steps necessary for engaging in activities permitted under
section 112(a)(1). The radio station would, of course, be liable for violating sec-
tion 1201(a)(1) if it engaged in activities prohibited by that section in other than
the limited circumstances permitted by section 112(a)(1).

House section 411 is modified in two respects. First, the House provision is modi-
fied by adding a new paragraph (3) to include specific reference to section 114(f)
in section 112(a) of the Copyright Act. The addition to section 112(a) of a refer-
ence to section 114(f) is intended to make clear that subscription music services,
webcasters, satellite digital audio radio services and others with statutory li-
censes for the performance of sound recordings under section 114(f) are entitled to
the benefits of section 112(a) with respect to the sound recordings they transmit.

Second, the House provision is modified in paragraph (4). This amendment to sec-
tion 112(a) is intended to clarify the application of section 112(a) to FCC-licensed
broadcasters with respect to digital nonsubscription broadcast transmissions. Not-
withstanding this clarification, neither the amendment in paragraph (4) of section
411 nor the creation of a statutory license in section 112(e) is in any manner in-
tended to narrow the scope of section 112(a) or the entitlement of any transmitting

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

entity to the exemption provided thereunder with respect to copies made for other
transmissions.

SECTION 403. LIMITATIONS ON EXCLUSIVE RIGHTS; DISTANCE EDUCATION

The Senate recedes to House section 412. The corresponding sections of the House
bill and the Senate amendment are substantively identical.

SECTION 404. EXEMPTION FOR LIBRARIES AND ARCHIVES

The Senate recedes to House section 413. The corresponding sections of the House
bill and the Senate amendment are substantively identical.

SECTION 405. SCOPE OF EXCLUSIVE RIGHTS IN SOUND RECORDINGS; EPHEMERAL
RECORDINGS

The Senate recedes to section 415 of the House bill with modification.
The amendments to sections 112 and 114 of the Copyright Act that are contained in
this section of the bill are intended to achieve two purposes: first, to further a
stated objective of Congress when it passed the Digital Performance Right in Sound
Recordings Act of 1995 ("DPRA") to ensure that recording artists and record compan-
ies will be protected as new technologies affect the ways in which their creative
works are used; and second, to create fair and **80 **656 efficient licensing mechan-
isms that address the complex issues facing copyright owners and copyright users as
a result of the rapid growth of digital audio services. This section contains amend-
ments to sections 112 and 114 of Title 17 as follows:
Section 114(d)(1). Exempt Transmissions and Retransmissions. Section 114(d)(1)(A)
is amended to delete two exemptions that were either the cause of confusion as to
the application of the DPRA to certain nonsubscription services (especially web-
casters) or which overlapped with other exemptions (such as the exemption in subsec-
tion (A)(iii) for nonsubscription broadcast transmissions). The deletion of these
two exemptions is not intended to affect the exemption for nonsubscription broadcast
transmissions.
Section 114(d)(2). Statutory Licensing of Certain Transmissions. The amendment to
subsection (d)(2) extends the availability of a statutory license for subscription
transmissions to cover certain eligible nonsubscription transmissions. "Eligible
nonsubscription transmission" are defined in subsection (j)(6). The amendment sub-
divides subsection (d)(2) into three subparagraphs ((A), (B), and (C)), each of
which contains conditions of a statutory license for certain nonexempt subscription
and eligible nonsubscription transmissions.
The conferees note that if a sound recording copyright owner authorizes a trans-
mitting entity to take an action with respect to that copyright owner's sound re-
cordings that is inconsistent with the requirements set forth in section 114(d)(2),
the conferees do not intend that the transmitting entity be disqualified from ob-
taining a statutory license by virtue of such authorized actions.
The conferees intend that courts considering claims of infringement involving vi-
olation of the requirements set forth in section 114(d)(2) should judiciously apply
the doctrine of de minimis non curat lex. A transmitting entity's statutory license

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998, 1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796, 1998 U.S.C.C.A.N. 639)**

should not be lost, and it become subject to infringement damages for transmissions that have been made as part of its service, merely because, through error, it has committed nonmaterial violations of these conditions that, once recognized, are not repeated. Similarly, if a service has multiple channels, the transmitting entity's statutory license should not be lost, and it become subject to infringement damages for transmissions that have been made on other channels, merely because of a violation in connection with one channel. Conversely, courts should not apply such doctrine in cases in which repeated or intentional violations occur.

Subparagraph (A) sets forth three conditions of a statutory license applicable to all nonexempt subscription and eligible nonsubscription transmissions. These three conditions are taken from previous subsection (d)(2).

Subparagraphs (B) and (C) are alternatives: a service is subject to the conditions in one or the other in addition to those in subparagraph (A). Subparagraph (B) contains conditions applicable only to nonexempt subscription transmissions made by a preexisting subscription service in the same transmission medium as was used by the service on July 31, 1998 or a preexisting satellite digital audio radio service. A preexisting subscription service is defined in subsection (j)(11); a preexisting satellite digital audio radio service is defined in (j)(10). The purpose of distinguishing preexisting **81 **657 subscription services making transmissions in the same medium as on July 31, 1998, was to prevent disruption of the existing operations by such services. There was only three such services that exist: DMX (operated by TCI Music), Music Choice (operated by Digital Cable Radio Associates), and the DiSH Network (operated by Muzak). As of July 31, 1998, DMX and Music Choice made transmissions via both cable and satellite media; the DiSH Network was available only via satellite. The purpose of distinguishing the preexisting satellite digital audio radio services is similar. The two preexisting satellite digital audio radio services, CD Radio and American Mobile Radio Corporation, have purchased licenses at auction from the FCC and have begun developing their satellite systems.

The two conditions contained in subparagraph (B) are taken directly from previous subsection (d)(2). Thus, preexisting satellite digital audio radio services and the historical operations of preexisting subscription services are subject to the same five conditions for eligibility for a statutory license, as set forth in subparagraphs (A) and (B), as have applied previously to these services.

Subparagraph (C) sets forth additional conditions for a statutory license applicable to all transmissions not subject to subparagraph (B), namely all eligible nonsubscription transmissions, subscription transmissions made by a new subscription service, and subscription transmissions made by a preexisting subscription service other than those made in the same transmission medium. Subparagraph (C) contains nine conditions.

Subparagraph (C)(i) requires that transmissions subject to a statutory license cannot exceed the sound recording performance complement defined in subsection (j)(13), which is unchanged by this amendment. Subparagraph (C)(i) eliminates this requirement for retransmissions of over-the-air broadcast transmissions by a transmitting entity that does not have the right or ability to control the programming of the broadcast station making the initial broadcast transmission, subject to two limitations.

First, the retransmissions are not eligible for statutory licensing if the re-

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998, 1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)

**(Cite as: H.R. CONF. REP. 105-796, 1998 U.S.C.C.A.N. 639)**

transmitted broadcast transmissions are in digital format and regularly exceed the sound recording performance complement. Second, the retransmissions are not eligible for statutory licensing if the retransmitted broadcast transmissions are in analog format and a substantial portion of the transmissions, measured on a weekly basis, violate the sound recording performance complement. In both cases, however, the re-transmitter is disqualified from making its transmissions under a statutory license only if the sound recording copyright owner or its representative notifies the re-transmitter in writing that the broadcast transmissions exceed the sound recording performance complement. Once notification is received, the transmitting entity making the retransmissions must cease retransmitting those broadcast transmissions that exceed the sound recording performance complement.

Subparagraph (C)(ii) imposes limitations on the types of prior announcements, in text, video or audio, that may be made by a service under the statutory license. Services may not publish advance program schedules or make prior announcements of the titles of specific sound recordings or the featured artists to be performed **\*82 \*\*658** on the service. Moreover, services may not induce or facilitate the advance publication of schedules or the making of prior announcements, such as by providing a third party the list of songs or artists to be performed by the transmitting entity for publication or announcement by the third party. The conferees do not intend that the term "prior announcement" preclude a transmitting entity from identifying specific sound recordings immediately before they are performed.

However, services may generally use the names of several featured recording artists to illustrate the type of music being performed on a particular channel. Subparagraph (C)(iii) addresses limitations for archived programs and continuous programs, which are defined in subsections (j)(2) and (j)(4), respectively. Subparts (I) and (II) address archived programs. Archived programs often are available to listeners indefinitely or for a substantial period of time, thus permitting listeners to hear the same songs on demand any time the visitor wishes. Transmissions that are part of archived programs that are less than five hours long are ineligible for a statutory license. Transmissions that are part of archived programs more than five hours long are eligible only if the archived program is available on the webcaster's site or a related site for two weeks or less. The two-week limitation is to be applied in a reasonable manner to achieve the objectives of this subparagraph, so that, for example, archived programs that have been made available for two weeks are not removed from a site for a short period of time and then made available again. Furthermore, altering an archived program only in insignificant respects, such as by replacing or reordering only a small number of the songs comprising the program, does not render the program eligible for statutory licensing.

Subparagraph (C)(iii) also limits eligibility for a statutory license to transmissions that are not part of a continuous program of less than three hours duration (subparagraph (C)(iii)(III)). A listener to a continuous program hears that portion of the program that is being transmitted to all listeners at the particular time that the listener accesses the program, much like a person who tunes in to an over-the-air broadcast radio station.

Finally, subparagraph (C)(iii)(IV) limits eligibility for a statutory license to transmissions that are not part of an identifiable program in which performances of sound recordings are rendered in a predetermined order that is transmitted at (a)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

more than three times in any two week period, which times have been publicly an-
nounced in advance, if the program is of less than one hour duration, or (b) more
than four times in any two week period, which times have been publicly announced in
advance, if the program is one hour or more. It is the conferee's intention that the
two-week limitation in subclause (IV) be applied in a reasonable manner. consistent
with its purpose so that, for example, a transmitting entity does not regularly make
all of the permitted repeat performances within several days.

Subparagraph (C)(iv) states that the transmitting entity may not avail itself of a
statutory license if it knowingly performs a sound recording, as part of a service
that offers transmissions of visual images contemporaneous with transmissions of
sound recordings, **\*83 \*\*659** in a manner that is likely to cause a listener to be-
lieve that there is an affiliation or association between the sound recording copy-
right owner or featured artist and a particular product or service advertised by the
transmitting entity. This would cover, for example, transmitting an advertisement
for a particular product or service every time a particular sound recording or
artist is transmitted; it would not cover more general practices such as targeting
advertisements of particular products or services to specific channels of the ser-
vice according to user demographics. If, for example, advertisements are transmitted
randomly while sound recordings are performed, this subparagraph would be satisfied.

Subparagraph (C)(v) provides that, in order to qualify for a statutory license, a
transmitting entity must cooperate with sound recording copyright owners to prevent
a transmission recipient from scanning the transmitting entity's transmissions to
select particular sound recordings. In the future, a device or software may be de-
veloped that would enable its user to scan one or more digital transmissions to se-
lect particular sound recordings or artists requested by its user. Such devices or
software would be the equivalent of an on demand service that would not be eligible
for the statutory license. Technology may be developed to defeat such scanning, and
transmitting entities taking a statutory license are required to cooperate with
sound recording copyright owners to prevent such scanning, provided that such co-
operation does not impose substantial costs or burdens on the transmitting entity.
This requirement does not apply to a satellite digital audio service, including a
preexisting satellite digital audio radio service, that is in operation, or that is
licensed by the FCC, on or before July 31, 1998.

Subparagraph (C)(vi) requires that if the technology used by the transmitting en-
tity enables the transmitting entity to limit the making by the transmission recipi-
ent of phonorecords in a digital format directly of the transmission, the transmit-
ting entity sets such technology to limit such making of phonorecords to the extent
permitted by such technology. The conferees note that some software used to "stream"
transmissions of sound recordings enables the transmitting entity to disable such
direct digital copying of the transmitted data by transmission recipients. In such
circumstances the transmitting entity must disable that direct copying function.
Likewise, a transmitting entity may not take affirmative steps to cause or induce
the making of any copies by a transmission recipient. For example, a transmitting
entity may not encourage a transmission recipient to make either digital or analog
copies of the transmission such as by suggesting that recipients should record copy-
righted programming transmitted by the entity.

Subparagraph (C)(vii) requires that each sound recording transmitted by the trans-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

mitting entity must have been distributed to the public under authority of the copy-
right owner or provided to the transmitting entity with authorization that the
transmitting entity may perform such sound recording. The conferees recognize that a
disturbing trend on the Internet is the unauthorized performance of sound recordings
not yet released for broadcast or sale to the public. The transmission of such pre-
released sound recordings is not covered by the statutory license unless the sound
recording copyright owner has given explicit authorization to the **\*84 \*\*660** trans-
mitting entity. This subparagraph also requires that the transmission be made from a
phonorecord lawfully made under the authority of the copyright owner. A phonorecord
provided by the copyright owner or an authorized phonorecord purchased through com-
mercial distribution channels would qualify. However, the transmission of bootleg
sound recordings (e.g., the recording of a live musical performance without the au-
thority of the performer, as prohibited by Chapter 11) is ineligible for a statutory
license.

Subparagraph (C)(viii) conditions a statutory license on whether a transmitting
entity has accommodated and does not interfere with technical measures widely used
by sound recording copyright owners to identify or protect their copyrighted works.
Thus, the transmitting entity must ensure that widely used forms of identifying in-
formation, embedded codes, encryption or the like are not removed during the trans-
mission process, provided that accommodating such measures is technologically feas-
ible, does not impose substantial costs or burdens on the transmitting entity, and
does not result in perceptible degradation of the digital audio or video signals be-
ing transmitted. This requirement shall not apply to a satellite digital audio ser-
vice, including a preexisting satellite digital audio radio service, that is in op-
eration, or that is licensed under the authority of the Federal Communications Com-
mission, on or before July 31, 1998, to the extent that such service has designed,
developed or made commitments to procure equipment or technology that is not compat-
ible with such technical measures before such technical measures are widely adopted
by sound recording copyright owners.

Subparagraph (C)(ix) requires transmitting entities eligible for the statutory li-
cense to identify in textual data the title of the sound recording, the title of the
album on which the sound recording appears (if any), and the name of the featured
recording artist. These titles and names must be made during, but not before, the
performance of the sound recording. A transmitting entity must ensure that the
identifying information can easily be seen by the transmission recipient in visual
form. For example, the information might be displayed by the software player used on
a listener's computer to decode and play the sound recordings that are transmitted.
Many webcasters already provide such information, but in order to give those who do
not an adequate opportunity to do so this obligation does not take effect until one
year after the effective date of the amendment. This requirement does not apply to
the retransmission of broadcast transmissions by a transmitting entity that does not
have the right or ability to control the programming  of the broadcast station mak-
ing the broadcast transmission, or where devices or technology intended for receiv-
ing the service that have the capability to display the identifying information are
not common in the marketplace.

Section 114(f). Licenses for Certain Nonexempt Transmissions. Section 114(f) is
amended to set forth procedures for determining reasonable rates and terms for those

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

transmissions that qualify for statutory licensing under section 114(d)(2). Section 114(f) is divided into two parts: one applying to transmissions by preexisting subscription services and preexisting satellite digital audio radio services (subsection (f)(1)), and the other applying to transmissions by **85 **661 new subscription services (including subscription transmissions made by a preexisting subscription service other than those that qualify under subsection (f)(1)) as well as eligible nonsubscription transmissions (subsection (f)(2)).

Subsection (f)(1) provides for procedures applicable to subscription transmission by preexisting subscription services and preexisting satellite digital audio radio services. The conferees note that this subsection applies only to the three services considered preexisting subscription services, DMX, Music Choice and the DiSH Network, and the two services considered preexisting satellite digital audio radio services, CD Radio and American Mobile Radio Corporation. The procedures in this subsection remain the same as those applicable before the amendment, except that the rate currently in effect under prior section 114(f) is extended from December 31, 2000 until December 31, 2001. That rate currently applies to the three preexisting subscription services, and the Conferees take no position on its applicability to the two preexisting satellite digital audio radio services. Likewise, the initiation of the next voluntary negotiation period shall take place in the first week of January 2001 instead of January 2000 (subsection (f)(1)(C)(i)). These extensions are made purely to facilitate the scheduling of proceedings.

Subsection (f)(1)(B), which sets forth procedures for arbitration in the absence of negotiated license agreement, continues to provide that a copyright arbitration royalty panel should consider the objectives set forth in section 801(b)(1) as well as rates and terms for comparable types of subscription services.

Subsection (f)(2) addresses procedures applicable to eligible nonsubscription transmissions and subscription transmissions by new subscription services. The first such voluntary negotiation proceeding is to commence within 30 days after the enactment of this amendment upon publication by the Librarian of Congress of a notice in the Federal Register. The terms and rates established will cover qualified transmissions made between the effective date of this amendment and December 31, 2000, or such other date as the parties agree.

Subsection (f)(2) directs that rates and terms must distinguish between the different types of eligible nonsubscription transmission services and new subscription services then in operation. The conferees recognize that the nature of qualified transmissions may differ significantly based on a variety of factors. The conferees intend that criteria including, but not limited to, the quantity and nature of the use of sound recordings, and the degree to which use of the services substitutes for or promotes the purchase of phonorecords by consumers may account for differences in rates and terms between different types of transmissions.

Subsection (f)(2) also directs that a minimum fee should be established for each type of service. A minimum fee should ensure that copyright owners are fairly compensated in the event that other methodologies for setting rates might deny copyright owners an adequate royalty. For example, a copyright arbitration royalty panel should set a minimum fee that guarantees that a reasonable royalty rate is not diminished by different types of marketing practices or contractual relationships. For example, if the base royalty **86 for a service were a percentage of revenues, the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

minimum fee might be a flat rate per year (or a flat rate per subscriber per year
for a new subscription service).

**\*\*662** Also, although subsection (f)(1) remains silent on the setting of a minimum
fee for preexisting subscription services and preexisting satellite digital audio
radio services, the Conferees do not intend that silence to mean that a minimum fee
may or may not be established in appropriate circumstances when setting rates under
subsection (f)(1) for preexisting subscription services and preexisting satellite
digital audio radio services. Likewise, the absence of criteria that should be taken
into account for distinguishing rates and terms for different services in subsection
(f)(1) does not mean that evidence relating to such criteria may not be considered
when adjusting rates and terms for preexisting subscription services and preexisting
satellite digital audio radio services in the future.

Subsection (f)(2)(B) sets forth procedures in the absence of a negotiated license
agreement for rates and terms for qualifying transmissions under this subsection.
Consistent with existing law, a copyright arbitration proceeding should be empaneled
to determine reasonable rates and terms. The test applicable to establishing rates
and terms is what a willing buyer and willing seller would have arrived at in mar-
ketplace negotiations. In making that determination, the copyright arbitration roy-
alty panel shall consider economic, competitive and programming information presen-
ted by the parties including, but not limited to, the factors set forth in clauses
(i) and (ii).

Subsection (f)(2)(C) specifies that rates and terms for new subscription and eli-
gible nonsubscription transmissions should be adjusted every two years, unless the
parties agree as to another schedule. These two-year intervals are based upon the
conferees' recognition that the types of transmission services in existence and the
media in which they are delivered can change significantly in a short period of
time.

Subsection (j)(2)-"archived program." A program is considered an "archived pro-
gram" if it is prerecorded or preprogrammed, available repeatedly on demand to the
public and is performed in virtually the same order from the beginning.

The exception to the definition of "archived program" for a recorded event or
broadcast transmission is intended to allow webcasters to make available on demand
transmissions of recorded events or broadcast shows that do not include performances
of entire sound recordings or feature performances of sound recordings (such as a
commercially released sound recording used as a theme song), but that instead use
sound recordings only in an incidental manner (such as in the case of brief musical
transitions in and out of commercials and music played in the background at sporting
events). Some broadcast shows may be part of series that do not regularly feature
performances of sound recordings but that occasionally prominently include a sound
recording (such as a performance of a sound recording in connection with an appear-
ance on the show by the recording artist). The recorded broadcast transmission of
the show should not be considered an "archived program" merely because of such a
prominent performance in a show that is part of a series that does not regularly
feature performances of sound recordings. **\*87** The inclusion of this exception to the
definition of "archived program" is not intended to impose any new license require-
ment where the broadcast programmer or syndicator grants the webcaster the right to
transmit a sound recording, such as may be the case where the sound recording has

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

been specially created for use in a broadcast show.

Subsection 114(j)(4)-"continuous program." A "continuous program" is one that is
continuously performed in the same predetermined order. Such a program generally
takes **663 the form of a loop whereby the same set of sound recordings is performed
repeatedly; rather than stopping at the end of the set, the program automatically
restarts generally without interruption. In contrast to an archived program (which
always is accessed from the beginning of the program), a transmission recipient typ-
ically accesses a continuous program in the middle of the program. Minor alterations
in the program should not render a program outside the definition of "continuous
program."

Subsection 114(j)(6)-"eligible nonsubscription transmission". An "eligible nonsub-
scription transmission" is one that meets the following criteria. First, the trans-
mission must be noninteractive and nonsubscription in nature. Second, the transmis-
sion must be made as part of a service that provides audio programming consisting in
whole or in part of performances of sound recordings. Third, the purpose of the
transmission service must be to provide audio or entertainment programming, not to
sell, advertise or promote particular goods or services. Thus, for example, an or-
dinary commercial Web site that was primarily oriented to the promotion of a partic-
ular company or to goods or services that are unrelated to the sound recordings or
entertainment programming, but that provides background music would not qualify as a
service that makes eligible nonsubscription transmissions. The site's background mu-
sic transmissions would need to be licensed through voluntary negotiations with the
copyright owners. However, the sale or promotion of sound recordings, live concerts
or other musical events does not disqualify a service making a nonsubscription
transmission. Furthermore, the mere fact that a transmission service is advertiser-
based or may promote itself or an affiliated entertainment service does not disqual-
ify it from being considered an eligible nonsubscription transmission service.

Subsection 114(j)(7)-"interactive service." The definition of  "interactive ser-
vice" is amended in several respects. First, personalized tranmissions-those that
are specially created for a particular individual-are to be considered interactive.
The recipient of the transmission need not select the particular recordings in the
program for it to be considered personalized, for example, the recipient might
identify certain artists that become the basis of the personal program. The confer-
ees intend that the phrase "program specially created for the recipient" be inter-
preted reasonably in light of the remainder of the definition of "interactive ser-
vice." For example, a service would be interactive if it allowed a small number of
individuals to request that sound recordings be performed in a program specially
created for that group and not available to any individuals outside of that group.
In contrast, a service would not be interactive if it merely transmitted to a large
number of recipients of **88 the service's transmissions a program consisting of
sound recordings requested by a small number of those listeners.

Second, a transmission of a particular sound recording on request is considered
interactive "whether or not [the sound recording is] part of a program." This lan-
guage clarifies that if a transmission recipient is permitted to select particular
sound recordings in a prerecorded or predetermined program, the transmission is con-
sidered interactive. For example, if a transmission recipient has the ability to
move forward and backward between songs in a program, the transmission is interact-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

ive. It is not necessary that the transmission recipient be able to select the actu-
al songs that comprise the program. **664** Additionally, a program consisting only of
one sound recording would be considered interactive.

Third, the definition of "interactive service" is amended to clarify that certain
channels or programs are not considered interactive provided that they do not sub-
stantially consist of requested sound recordings that are performed within one hour
of the request or at a designated time. Thus, a service that engaged in the typical
broadcast programming practice of including selections requested by listeners would
not be considered interactive, so long as the programming did not substantially con-
sist of requests regularly performed within an hour of the request, or at a time
that the transmitting entity informs the recipient it will be performed.

The last sentence of the definition is intended to make clear that if a transmit-
ting entity offers both interactive and noninteractive services then the noninter-
active components are not to be treated as part of an interactive service, and thus
are eligible for statutory licensing (assuming the other requirements of the stat-
utory license are met). For example, if a Web site offered certain programming that
was transmitted to all listeners who chose to receive it at the same time and also
offered certain sound recordings that were transmitted to particular listeners on
request, the fact that the latter are interactive transmissions would not preclude
statutory licensing of the former.

Subsection 114(j)(8)-"new subscription service." A "new subscription service" is
any service that is not a preexisting subscription service as defined in subsection
(j)(11) or a preexisting satellite digital audio radio service as defined in subsec-
tion (j)(10).

Subsection 114(j)(10)-"preexisting satellite digital audio radio service." A
"preexisting satellite digital audio service" is a subscription digital audio radio
service provided pursuant to a satellite digital audio radio service license issued
by the Federal Communications Commission on or before July 31, 1998. Subscription
services offered by these licensed entities do not qualify as "preexisting subscrip-
tion services" under section 114(j)(11) because they had not commenced making trans-
missions to the public for a fee on or before July 31, 1998. Only two entities re-
ceived these licenses: CD Radio and American Mobile Radio Corporation.

A "preexisting satellite digital audio radio service" and "preexisting subscrip-
tion service" may both include a limited number of sample channels representative of
the subscription service that are made available on a nonsubscription basis in order
to promote the subscription service. Such sample channels are to be treated as part
of the subscription service and should be considered in determining **89** the royalty
rate for such subscription service. The conferees do not intend that the ability to
offer such sample channels be used as a means to offer a nonsubscription service un-
der the provisions of section 114 applicable to subscription services. The term "lim-
ited number" should be evaluated in the context of the overall service. For example,
a service consisting of 100 channels should have no more than a small percentage of
its channels as sample channels.

Subsection 114(j)(11)-"preexisting subscription service." A "preexisting subscrip-
tion service" is a noninteractive subscription service that was in existence and was
making transmissions to the public on or before July 31, 1998, and which is making
transmissions similar in character to such transmissions made on or before July 31,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**


1998. Only three services qualify as a preexisting subscription service-DMX, Music
Choice and the DiSH **665 Network. As of July 31, 1998, DMX and Music Choice made
transmissions via both cable and satellite media; the DiSH Network was available
only via satellite.

In grandfathering these services, the conferee's objective was to limit the grand-
father to their existing services in the same transmission medium and to any new
services in a new transmission medium where only transmissions similar to their ex-
isting service are provided. Thus, if a cable subscription music service making
transmissions on July 31, 1998, were to offer the same music service through the In-
ternet, then such Internet service would be considered part of a preexisting sub-
scription service.

If, however, a subscription service making transmissions on July 31, 1998, were to
offer a new service either in the same or new transmission medium by taking advant-
ages of the capabilities of that medium, such new service would not qualify as a
preexisting subscription service. For example, a service that offers video program-
ming, such as advertising or other content, would not qualify as a preexisting ser-
vice, provided that the video programming is not merely information about the ser-
vice itself, the sound recordings being transmitted, the featured artists, composers
or songwriters, or an advertisement to purchase the sound recording transmitted.

Section 114 in General. These amendments are fully subject to all the existing
provisions of section 114. Specifically, these amendments and the statutory licenses
they create are all fully subject to the safeguards for copyright owners of sound
recordings and musical works contained in sections 114(c), 114(d)(4) and 114(i), as
well as the other provisions of section 114. In addition, the conferees do not in-
tend to affect any of the rights in section 115 that were clarified and confirmed in
the DPRA.

Section 112(e)-Statutory License. Section 112(e) creates a statutory license for
the making of an "ephemeral recording" of a sound recording by certain transmitting
organizations. The new statutory license in section 112(e) is intended primarily for
the benefit of entities that transmit performances of sound recordings to business
establishments pursuant to the limitation on exclusive rights set forth in section
114(d)(1)(C)(iv). However, the new section 112(e) statutory license also is avail-
able to a transmitting entity with a statutory license under section 114(f) that
chooses to avail itself of the section 112(e) statutory license to make more than
the one phonorecord **90 it is entitled to make under section 112(a). For example,
the conferees understand that a webcaster might wish to reproduce multiple copies of
a sound recording to use on different servers or to make transmissions at different
transmission rates or using different transmission software. Under section 112(a),
as amended by this bill, a webcaster with a section 114(f) statutory license is en-
titled to make only a single copy of the sound recording. Thus, the webcaster might
choose to obtain a statutory license under section 112(e) to allow it to make such
multiple copies. The conferees intend that the royalty rate payable under the stat-
utory license may reflect the number of phonorecords of a sound recording made under
a statutory license for use in connection with each type of service.

Ephemeral recordings of sound recordings made by certain transmitting organiza-
tions under section 112(e) may embody copyrighted musical compositions. The making
of an ephemeral recording by such a transmitting organization of each copyrighted

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

musical composition embodied in a sound recording it transmits is governed by exist-
ing section 112(a) (or section 112(a)(1) as revised by the Digital Millennium Copy-
right Act), and, **\*\*666** pursuant to that section, authorization for the making of an
ephemeral recording is conditioned in part on the transmitting organization being
entitled to transmit to the public the performance of a musical composition under a
license or transfer of the copyright.

The conditions listed in section 112(e)(1), most of which are also found in sec-
tion 112(a), must be met before a transmitting organization is eligible for stat-
utory licensing in accordance with section 112(e). First, paragraph (1)(A) provides
that the transmitting organization may reproduce and retain only one phonorecord,
solely for its own use (unless the terms and conditions of the statutory license al-
low for more). Thus, trafficking in ephemeral recordings, such as by preparing
prerecorded transmission programs for use by third parties, is not permitted. This
paragraph provides that the transmitting organization may reproduce and retain more
than one ephemeral recording, in the manner permitted under the terms and conditions
as negotiated or arbitrated under the statutory license. This provision is intended
to facilitate efficient transmission technologies, such as the use of phonorecords
encoded for optimal performance at different transmission rates or use of different
software programs to receive the transmissions.

Second, paragraph (1)(B) requires that the phonorecord be used only for the trans-
mitting organization's own transmissions originating in the United States, and such
transmissions must be made under statutory license pursuant to section 114(f) or the
exemption in section 114(d)(1)(C)(iv). Third, paragraph (1)(C) mandates that, un-
less preserved exclusively for archival purposes, the phonorecord be destroyed with-
in six months from the time that the sound recording was first performed publicly by
the transmitting organization. Fourth, paragraph (1)(D) limits the statutory license
to reproductions of sound recordings that have been distributed to the public and
that are made from a phonorecord lawfully made and acquired under the authority of
the copyright owner.

Subsection (e)(3) clarifies the applicability of the antitrust laws to the use of
common agents in negotiations and agreements relating **\*91** to statutory licenses and
other licenses. Under this subsection, the copyright owners of sound recordings and
transmitting organizations entitled to obtain the statutory license in this section
may negotiate collectively regarding rates and terms for the statutory license or
other licenses. This subsection provides that such copyright owners and transmitting
organizations may designate common agents to represent their interests to negotiate
or administer such license agreements. This subsection closely follows the language
of existing antitrust exemptions in copyright law, including the exemption found in
the statutory licenses for transmitting sound recordings by digital audio transmis-
sion found in section 114(f).

Subsections (e)(4) and (5) address the procedures for determining rates and terms
for the statutory license provided for in this section. These procedures are paral-
lel to the procedures found in section 114(f)(2) for public performances of sound
recordings by digital audio transmission by new subscription services and services
making eligible Nonsubscription transmissions.

Subsection (e)(4) provides that the Librarian of Congress should publish notice of
voluntary negotiation proceedings 30 days after enactment of this amendment. Such

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)

**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

voluntary negotiation proceedings should address rates and terms for the making of
**\*\*667** ephemeral recordings under the conditions of this section for the period be-
ginning on the date of enactment and ending on December 31, 2000. This subsection
requires that a minimum fee be established as part of the rates and terms.

   In the event that interested parties do not arrive at negotiated rates and terms
during the voluntary negotiation proceedings, subsection (e)(5) provides for the
convening of a copyright arbitration royalty panel to determine reasonable rates and
terms for the making of ephemeral recordings under this subsection. This paragraph
requires the copyright arbitration royalty panel to establish rates that reflect the
fees that a willing buyer and seller would have agreed to in marketplace negoti-
ations. In so doing, the copyright arbitration royalty panel should base its de-
cision on economic, competitive and programming information presented by the
parties, including, but not limited to, such evidence as described in subparagraphs
(A) and (B).

   Subseciton (e)(7) states that rates and terms either negotiated or established
pursuant to arbitration shall be effective for two-year periods, and the procedures
set forth in subsections (e)(4) and (5) shall be repeated every two years unless
otherwise agreed to by the parties.

   The conferees intend that the amendments regarding the statutory licenses in sec-
tions 112 and 114 contained in section 415 of this bill apply only to those stat-
utory licenses.

   SECTION 406. ASSUMPTION OF CONTRACTUAL OBLIGATIONS RELATED TO TRANSFERS OF
                        RIGHTS IN MOTION PICTURES

   The Senate recedes to House section 416 with modification.
   Paragraph (a)-Assumption of obligations. The conferees have added to paragraph (a)
language that defines more specifically the meaning of the "knows or has reason to
know" standard in subsection (a)(1). There are three ways to satisfy this standard.
The **\*92** first is actual knowledge that a motion picture is or will be covered by a
collective bargaining agreement. Subparagraph (ii) provides for constructive know-
ledge, established through two alternative mechanisms: recordation with the Copy-
right Office or identification of the motion picture on an online web site main-
tained by the relevant Guild, where the site makes it possible for users to verify
their access date in a commercially reasonable way. In order to ensure that the
transferee has a reasonable opportunity to obtain the relevant information, these
mechanisms for providing constructive notice apply with respect to transfers that
take place after the motion picture is completed. They also apply to transfer that
take place before the motion picture is completed, but only if the transfer is with-
in eighteen months prior to the filing of an application for copyright registration
for the motion picture or, if there is no application for registration, within
eighteen months of its first publication in the United States.

   The constructive notice established by recordation for purposes of application of
this section is entirely separate and independent from the constructive notice es-
tablished by recordation under section 205(c) of the Copyright Act. This section
does not condition constructive notice on prior registration of the motion picture
with the Copyright Office, and does not have any hearing on the issue of priority

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**

between conflicting transfers as described in section 205(d) of the Copyright Act.

  Subparagraph (iii) provides a more general standard for circumstances where the
transferee does not have actual knowledge or constructive knowledge through one of
the **668 two mechanisms set out in subparagraph (ii), but is aware of facts and
circumstances about the transfer that make it apparent that the motion picture is
subject to a collective bargaining agreement. Such facts and information might in-
clude, for example, budget, location of principal photography, the identity of the
talent associated with a project, or the existence of a personal service contract
that references terms or conditions of collective bargaining agreements.

  Paragraph (b)-Scope of exclusion of transfer of public performance rights.-New
paragraph (b) clarifies that the "public performance" exclusion from the operation
of paragraph (a) is intended to include performances described in paragraph (b) that
reach viewers through transmission or retransmission of programming or program ser-
vices via satellite, MMDS, cable, and other means of carriage. This paragraph does
not expand or restrict in any way what constitutes a "public performance" for any
other purpose. The public performance exclusion would not be rendered inoperable
simply because a transfer of public performance rights is accompanied by a transfer
of limited, incidental other rights necessary to implement or facilitate the exer-
cise of the performance rights.

  Paragraph (c)-Exclusion for grants of security interests.-The purpose of this
paragraph is to ensure that banks and others providing financing for motion pictures
will not be made subject to the assumption of obligations required by this section
merely because they obtain a security interest in the motion picture. Because the
term "transfer of copyright ownership" is defined in section 101 of the Copyright
Act to include a "mortgage . . . or hypothecation" of any exclusive copyright right,
this could be the unintended result *93 of the statutory language. Under this exclu-
sion, a bank or other party would not be subject to the application of paragraph (a)
based solely on the acts of taking a security interest in a motion picture, fore-
closing on that interest or otherwise exercising its rights as a secured party, or
transferring or authorizing transfer of copyright ownership rights secured by its
security interest to a third party. Neither would any subsequent transferee down-
stream from the initial secured party be subject to paragraph (a). The exclusion
would apply irreespective of the form or language used to grant or create the secur-
ity interest.

  It should be clear that the only agreements whose terms are enforced by this sec-
tion are collective bargaining agreements and assumption agreements. In the course
of financing a motion picture, a lender, other financier or completion guarantor may
execute an inter-creditor or subordination agreement with a union including obliga-
tions with respect to the payment of residuals or the obtaining of assumption agree-
ments. Such agreements are not within the scope of this section, and nothing in this
section obligates lenders, other financiers or completion guarantors to enter into
these agreements, enforces any terms thereof or diminishes any rights that the
parties may have under these agreements.

  Paragraph (d)-Deferral pending resolution of bona fide dispute. Paragraph (d) al-
lows a remote transferee obligated under paragraph (a)(1) to stay enforcement of
this section while there exists a bona fide dispute between the applicable union and
a prior transferor regarding obligations under this section. It contemplates that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

union claims not subject to bona fide dispute will be payable when due under the ap-
plicable collective bargaining agreement or through application of this section.
Such disputes may be manifested **669 through grievance or arbitration claims, lit-
igation, or other claims resolution procedures in effect between the applicable
parties.

Paragraph (e)-Scope of obligations determined by private agreement. Paragraph (e)
states explicitly the basic principle of operation  of this section. It makes clear
that the section simply provides an enforcement mechanism for obligations that have
already been agreed to in a collective bargaining agreement. It is not intended to
affect in any way the scope or interpretation of the provisions of, or the acts re-
quired by, any collective bargaining agreement. The rights and obligations them-
selves, as well as the remedies for breach, are those that have been agreed to among
the parties. Accordingly, they can be changed at any time by agreement.

The collective bargaining agreements contemplate that producers will obtain as-
sumption agreements from distributors in certain circumstances. The statute states
that where a producer does not comply with the obligation and obtain an assumption
agreement where required, the law will act as though the producer has in fact done
so. Thus, it removes the possibility of noncompliance with the obligation to obtain
an assumption agreement. It does not require assumption agreements to be obtained in
circumstances where the collective bargaining agreement would not require it. If
there is a dispute over the meaning and applicabiity of provisions in the collective
bargaining agreement, for example over the question of which distributors must be
required to execute an assumption *94 agreement, the statue does not resolve the
dispute. It only requires whatever the collective bargaining agreement would re-
quire, and relegates the parties to the dispute mechanisms set out in that agree-
ment.

This section does not expand or diminish rights or obligations under other laws
that might regulate contractual obligations beyond the purpose of enforcing assump-
tion agreements required by applicable collective bargaining agreements. Nor does
this section prevent a person or entity that is subject to obligations under an as-
sumption agreement (whether through application of this section or otherwise) from
transferring any such obligations to a subsequent transferee of the applicable copy-
right rights, and thereby being relieved of its own obligations under the assumption
agreement, to the extent permitted by, and under the conditions established in, the
applicable assumption agreements.

        **670 TITLE V-PROTECTION OF  CERTAIN ORIGINAL DESIGNS

   Sections 501-505. The Senate recedes to House sections 601-602 with modification.
   From the Committee on  Commerce for consideration of the House bill,  and the
Senate amendment, and modifications committed to conference:

   Tom Bliley,

   Billy Tauzin,

   John D. Dingell,
   From the Committee on the Judiciary for consideration of the House bill, and the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998,
1998 U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 105-796,  1998 U.S.C.C.A.N. 639)**


Senate amendment, and modifications committed to conference:

    Henry J. Hyde,

    Howard Coble,

    Bob Goodlatte,

    John Conyers, Jr.,

    Howard L. Berman,

    Managers on the Part of the House.

    Orrin G. Hatch,

    Strom Thurmond,

    Patrick J. Leahy,

    Managers on the Part of the Senate.

  FN1 See MAI Sys. Corp. v. Peak Computer, 991 F.2d 511 (9th Cir. 1993), cert.
denied, 114 S.Ct. 671 (1994).

 H.R. CONF. REP. 105-796, H.R. Conf. Rep. No. 796, 105TH Cong., 2ND Sess. 1998, 1998
U.S.C.C.A.N. 639, 1998 WL 703961 (Leg.Hist.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.