**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 06-cv-22942-GRAHAM

|  |  |
|---|---|
| TRACFONE WIRELESS, INC., | ) |
|  | ) |
| Plaintiff, | ) |
| vs. | ) |
|  | ) |
| JAMES H. BILLINGTON, Librarian of Congress, and | ) |
| MARYBETH PETERS, Register of Copyrights, | ) |
|  | ) |
| Defendants | ) |

**DEFENDANTS' SUPPLEMENTAL SUBMISSION ON THE LEGISLATIVE HISTORY OF THE DIGITAL MILLENNIUM COPYRIGHT ACT**

**PRELIMINARY STATEMENT**

Defendants James H. Billington, Librarian of Congress, and Marybeth Peters, Register of Copyrights, pursuant to the Court's order from the bench on April 11, 2007, hereby file a supplemental submission addressing the legislative history of the Digital Millennium Copyright Act (DMCA), Pub. L. No. 105-304, 112 Stat. 2680 (1998), as it pertains to the legal issues raised in this case.[1] The legislative history makes clear that the exclusive focus of the Digital Millennium Copyright Act and the anticircumvention provision, 17 U.S.C. § 1201, is to protect

---

[1] At the hearing, the parties agreed to file supplemental submissions on the same day 7 days after the hearing, and the Court adopted that schedule. Based on Rule 6(a) of the Federal Rules of Civil Procedure, which provides that intermediate Saturdays and Sundays are excluded in the computation of time periods shorter than 11 days, the defendants understood that the parties' submissions were to be filed on April 20, 2007. However, the plaintiff filed its submission on the evening of April 18, 2007. If the Court understood that the filings were to be submitted on April 18, 2007, then the defendants hereby request leave to file this submission out of time. The defendants have conferred with the plaintiff, and the plaintiff indicated it has no objection to the defendants' filing of this submission.

interests related to copyright. Any incidental benefits that might flow to private parties from application of the anticircumvention provision were outside Congress's purpose in enacting the statute. The legislative history further makes clear that Congress did not intend to confer standing on parties in TracFone's position; nothing in the legislative history indicates that Congress intended to authorize lawsuits challenging determinations made by the Librarian of Congress in the § 1201 rulemaking. Thus, the plaintiff cannot establish procedural-injury standing, and the Court should dismiss this case or grant summary judgment in favor of the defendants.

## ANALYSIS OF LEGISLATIVE HISTORY

A.     **The inquiry into legislative history should examine the substantive purpose of the statute and examine whether Congress intended to authorize private lawsuits challenging determinations made under the statute.**

To establish procedural-injury standing, a plaintiff must show that Congress intended to expand standing by granting persons in the plaintiff's position a special right to sue to challenge alleged violations of statutory procedures.[2] The analysis of Congressional intent must examine two related factors: First, it must examine whether the injury the plaintiff complains of is the kind of injury Congress meant the statute to redress. See Massachusetts v. EPA, 127 S. Ct. 1438, 1453 (2007) ("Congress must at the very least identify the injury it seeks to vindicate and relate the injury to the class of persons entitled to bring suit."); Sierra Club v. Johnson, 436 F.3d 1269, 1278 (11th Cir. 2006) (holding that procedural-interest standing requires an injury to an interest

---

[2]A plaintiff asserting procedural-injury standing must further show a concrete injury separate from the alleged procedural violation and a causal relationship linking that injury to the outcome of the allegedly flawed proceedings. (See Reply Mem. in Supp. of Defs.' Mot. to Dismiss or, in the Alternative, for Summ. J. at 3.) The defendants continue to maintain that TracFone has failed to establish either of these elements. However, legislative history is not relevant to these elements.

"that the statute was designed to protect"); id. at 1279 (examining whether the plaintiffs had asserted interests related to the environment). Second, the analysis should examine whether a provision of the statute confers a special right to sue on a particular class of persons and, if so, what class of persons. See Massachusetts v. EPA, 127 S. Ct. at 1453 ("Congress has authorized this type of challenge to EPA action. See 42 U.S.C. § 7607(b)(1). That authorization is of critical importance to the standing inquiry. . . ."); cf. Bennett v. Spear, 520 U.S. 154, 162–66 (1997) (finding that even though the "overall subject matter" of the Endangered Species Act was the environment, an expansive "citizen-suit provision" at 16 U.S.C. § 1540(g)(1) authorized suit based on interests unrelated to the environment).

This means that in the context of this case, the Court's analysis of legislative intent requires two subsidiary inquiries: First, the Court should examine whether Congress, in enacting the DMCA and the § 1201 exemption provision, sought to benefit businesses who employ technological "locks" for reasons unrelated to copyright and the illegal consumption and duplication of digital media. Second, the Court should examine whether Congress intended to specially authorize lawsuits to challenge determinations made by the Librarian in the § 1201 rulemaking.

The statutory text conclusively answers both questions in favor of the defendants. Nothing in the statutory text suggests that Congress sought to promote or protect the use of technological "locks" for purposes unrelated to copyright, and no provision of the DMCA confers a special right to challenge exemptions issued by the Librarian in court, even on persons who obtained an advantage from the protection of § 1201 before the exemptions were issued. The legislative history of the statute further confirms what the statutory text reveals—that Congress's purpose in enacting the DMCA was to protect copyrighted works.

**B.     Congress, in enacting the DMCA and the § 1201 exemption provision, did not seek to promote or protect the use of technological "locks" for purposes unrelated to copyright.**

      **1.     The WIPO copyright treaties**

The exclusive substantive purpose of the Digital Millennium Copyright Act—as revealed by the very title of the statute—is to promote interests related to copyright and protection against copyright infringement. Congress passed the Act to implement two multilateral treaties developed by the World Intellectual Property Organization, the WIPO Copyright Treaty (WCT) and the WIPO Performances and Phonograms Treaty (WPPT). See H.R. Rep. No. 105-796, at 63 (1998) (Conf. Rep.), available at 1998 WL 703961; WIPO Copyright Treaty (WCT), Dec. 20, 1996, S. Treaty Doc. 105-17, 36 I.L.M. 65; WIPO Performances and Phonograms Treaty (WPPT), Dec. 20, 1996, S. Treaty Doc. 105-17, 36 I.L.M. 76. When President Clinton submitted these treaties to the Senate for ratification, he explained that the purpose of the treaties was to "ensure that international copyright rules will keep pace with technological change, thus affording important protection against piracy for U.S. rightsholders. . . ." Message to the Senate Transmitting World Intellectual Property Organization Treaties with Documentation, 2 Pub. Papers 1022 (July 28, 1997). He also explained that legislation was necessary to implement the treaties. Id.

The House and the Senate separately considered bills that would implement the two WIPO treaties. H.R. 2281, 105th Cong. (1998); S. 2037, 105th Cong. (1998). Both these bills were substantially different from the final statute as enacted by both Houses, but the paths these early bills took through their respective houses of Congress is illuminating.

      **2.     The Senate**

The Senate Judiciary Committee described the Senate's proposal, Senate Bill 2307, as

uniformly focused on copyright-related interests. See Digital Millennium Copyright Act of 1998, S. Rep. No. 105-190, at 1–2 (1998), available at 1998 WL 239623 (laying out four objectives, each related to the copyright law and the protection of copyrighted works); id. at 2 ("Copyright laws have struggled through the years to keep pace with emerging technology . . . . With this constant evolution in technology, the law must adapt in order to make digital networks safe places to disseminate and exploit copyrighted materials"); see also 144 Cong. Rec. S4884 (1998), available at 1998 WL 241056 (statement of Sen. Hatch) (describing the objectives of the bill as protecting copyright owners against unlawful copying and promoting the sale of creative works in digital format).

The bill included an anticircumvention provision analogous to the provision now located at 17 U.S.C. § 1201. See S. Rep. No. 105-190 at 11, 28–29. The Senate Judiciary Committee described this proposed provision as designed to thwart "unauthorized access to a copyrighted work," for example, by circumventing password protection. Id. at 11. The bill proposed no mechanism for regulatory exemptions, but it did propose a number of statutory exemptions designed to relieve the burdens the proposed anticircumvention provision could have placed on activities unrelated to copyright infringement. Id. at 13–16, 31–34 (describing provisions creating exemptions from the proposed anticircumvention provision).

The Senate bill ultimately passed the Senate on May 14, 1998. The bill was not approved by the House, but its contents informed development of the compromise bill that later emerged from the conference between the two houses.

### 3.	The House of Representatives

House Bill 2281 was initially reported by the House Judiciary Committee, which, like the Senate Judiciary Committee, viewed the legislation as strictly focused on copyright-related

interests. See WIPO Copyright Treaties Implementation and Online Copyright Infringement

Liability Limitation, H.R. Rep. No. 105-551 pt. 1, at 9–10 (1998), available at 1998 WL 261605

("The digital environment now allows users of electronic media to send and retrieve perfect

reproductions of copyrighted material easily and nearly instantaneously, to or from locations

around the world. With this evolution in technology, the law must adapt in order to make digital

networks safe places to disseminate and exploit copyrighted works."). The bill, as reported by

the House Judiciary Committee, would be enacted within title 17 of the U.S. Code, which

governs copyright. It contained an anticircumvention provision analogous to the provision now

contained at 17 U.S.C. § 1201, again aimed at thwarting unauthorized consumption, copying,

and redistribution of digital media. See id. at 17–18 ("The act of circumventing a technological

protection measure put in place by a copyright owner to control access to a copyrighted work is

the electronic equivalent of breaking into a locked room in order to obtain a copy of a book.").

Like the Senate bill, the House bill contained provisions aimed at alleviating the burdens the

anticircumvention provision could impose on activities unrelated to copyright infringement. See

id. at 20 (describing a provision enabling fair use recognized under the copyright law and an

exemption for libraries, archives, and educational institutions).

    The bill was then referred to the House Commerce Committee, which revised the bill.

The House Commerce Committee, like the House and Senate Judiciary Committees, still viewed

the bill as primarily focused on copyright-related interests. Digital Millennium Copyright Act of

1998, H.R. Rep. No. 105-551 pt. 2, at 20–21 (1998), available at 1998 WL 414916 (describing

the purpose of the bill as "balanc[ing] the interests of content owners, on-line and other service

providers, and information users in a way that will foster the continued development of

electronic commerce and the growth of the Internet"). However, the House Commerce

6

Committee's proposal further sought to advance interests ancillary to the protection of intellectual property, such as promoting electronic commerce more generally. Id. at 22. Accordingly, the House Commerce Committee's proposed bill would have placed the provisions of the statute outside title 17 of the U.S. Code to reflect their broader focus. Id. at 23–24. The House Commerce Committee's bill did not contain a statutory provision prohibiting circumvention of technological locks; instead, it would have directed the Secretary of Commerce to promulgate regulations prohibiting such circumvention. Id. at 36. The bill also would have directed the Secretary of Commerce to issue exemptions to the regulations through a process similar to the manner in which the Librarian of Congress now issues exemptions under § 1201. Id. Still, even though the House Commerce Committee appears to have envisioned a broader purpose for the statute than the House Judiciary Committee or the Senate had, the House Commerce Committee never suggested that it intended to promote the interests of a party in TracFone's position, that is, a company that employs technological "locks" for reasons not ultimately rooted in copyright or the distribution and sale of copyrighted works in digital form. See id. at 25 ("The Committee . . . seeks to protect the interests of copyright owners in the digital environment, while ensuring that copyright law remain technology neutral.")

The bill eventually considered by the full House incorporated some, but not all, of the features of the bill reported by the House Commerce Committee. The bill presented to the House placed the substantive provisions of the bill within title 17 of the U.S. Code, the title that houses the copyright law. H.R. 2281, 105th Cong. (as passed by House, Aug. 4, 1998), available at http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=105_cong_bills&docid=f:h2281eh.txt.pdf. It also prohibited circumvention of technological locks by statute rather than by regulation, but it preserved the House Commerce Committee's proposed scheme for exemptions

7

to be issued by the Secretary of Commerce. Id. Rep. Tom Bliley, the Chairman of the House

Commerce Committee, made clear in floor statements that the exemption process was designed

to favor consumers and information users, not businesses that employ technological locks for

purposes unrelated to copyright. 144 Cong. Rec. H7904 (1998), available at 1998 WL 439576

(statement of Rep. Bliley) ("[T]he showing that must be made in this process is not intended to

be unduly burdensome for either institutions or the public. Indeed, the Committee took pains to

make clear that evidence of loss of access to a 'particular class of works'—intended to be gauged

narrowly—would result in relief from the prohibition otherwise imposed on access to

information by this legislation."); see also id. H7902 (statement of Rep. Frank) ("What we

wanted to do was to come up with ways to adapt the protection of intellectual property to a

modern technological era without unduly diminishing people's rights to enjoy things. We do not

want to prevent the public from having the enjoyment of these products.").

     The bill was passed by voice vote in the House and referred to the Senate. The Senate,

however, rejected the bill in favor of its own bill. Because neither house of Congress had

assented to the other's proposed bill, Congress appointed a conference committee to agree on a

compromise bill.

     **4.**    **The Conference Committee**

     The conference committee produced the bill that eventually became the DMCA. The

conference committee retained the statutory anticircumvention provision proposed in the House

bill and established a system for creating exemptions to that provision. Digital Millennium

Copyright Act, H.R. Rep. No. 105-796, at 64 (1998) (Conf. Rep.), available at 1998 WL 703961.

However, instead of placing the duty to promulgate exemptions in the hands of the Secretary of

Commerce, the conference committee placed that duty in the hands of the Librarian of Congress

and the Register of Copyrights, "in recognition of the expertise of the Copyright Office" in copyright-related matters. Id.

The conference report confirms that that the primary purpose of the statute was to implement the WIPO copyright treaties and enact the required provisions protecting copyright owners. Id. at 63–64. Floor statements in both houses of Congress likewise indicate that Congress intended the provisions of the DMCA to protect only copyright-related interests, and that Congress included the § 1201 exemption provision for the specific purpose of alleviating the burdens that the § 1201 prohibition would place on activities unrelated to copyright infringement. See, e.g., 144 Cong. Rec. H10617 (1998), available at 1998 WL 708482 (statement of Rep. Conyers) ("We are strengthening domestic copyright law and providing global leadership so that this great Nation can continue to impress upon other nations the importance of strong copyright protection."); 144 Cong. Rec. S11887 (1998), available at 1998 WL 716423 (statement of Sen. Kohl) ("[W]e need this measure to stop an epidemic of illegal copying of protected works—such as movies, books, musical recordings, and software. . . ."); id. (statement of Sen. Ashcroft) ("Under the compromise embodied in the conference report, the Librarian of Congress would have authority to address the concerns of libraries, educational institutions, and other information consumers potentially threatened with a denial of access to categories of works in circumstances that otherwise would be lawful today. I trust that the Librarian of Congress will implement this provision in a way that will ensure information consumers may exercise their centuries-old fair use privilege to continue to gain access to copyrighted works.").

The conference bill passed both the House and the Senate, and the President signed it into law.

**C.     The legislative history reveals that Congress did not intend to authorize lawsuits challenging the issuance of exemptions by the Librarian of Congress.**

The legislative history further makes clear that Congress did not intend to authorize a special category of lawsuits to challenge determinations made by the Librarian of Congress in the § 1201 rulemaking.[3] The conference committee's report does not indicate any intent to authorize lawsuits challenging the Librarian's determinations under 17 U.S.C. § 1201. Moreover, the conference report contains no mention of the Administrative Procedure Act and no suggestion that Congress intended that parties would be able to bring suit challenging the Librarian's determinations under the APA. See H.R. Rep. No. 105-796 (1998) (Conf. Rep.), available at 1998 WL 703961.

The fact that Congress omitted an explicit statutory provision authorizing suit—and indeed, any discussion of such a provision in the legislative history—is telling, because just five years before it enacted the DMCA, Congress had enacted a similar regulatory structure in which the Librarian performed administrative functions upon the recommendation of the Register of Copyrights. See Copyright Royalty Tribunal Reform Act of 1993, Pub. L. No. 103-198, sec. 2, § 802(f), 107 Stat. 2304, 2306 (amended 2004). In that earlier statute, however, Congress had included an explicit statutory provision permitting suits challenging the Librarian's actions. Id. sec. 2, § 802(g), 107 Stat. at 2306–07. If Congress had intended to authorize lawsuits challenging exemptions issued in the § 1201 rulemaking process, it presumably would have included a like provision in the DMCA, and the legislative history would contain some indication of Congress's intent to authorize lawsuits.

As explained above, an early bill passed in the House of Representatives— but not

---

[3]As the defendants have explained, the Librarian of Congress is not an "agency" under the Administrative Procedure Act (see Mot. to Dismiss for Lack of Subject Matter Jurisdiction or for Failure to State a Claim or, in the Alternative, for Summ. J. at 18–20), so a plaintiff cannot bring suit to challenge his determinations under the APA unless Congress provides by statute that the APA applies to the Librarian or specific actions taken by the Librarian.

approved by the Senate—would have instead placed the exemption authority in the hands of the Secretary of Commerce, whose actions are subject to the Administrative Procedure Act. <u>See</u> Digital Millennium Copyright Act of 1998, H.R. Rep. 105-551 pt. 2, at 37 (1998), <u>available at</u> 1998 WL 414916. However, there is no indication that the House ever contemplated the specific possibility of lawsuits challenging the Secretary's decisions. Furthermore, the legislative history contains no indication that the House intended to authorize lawsuits challenging the Secretary's decisions by force of the DMCA itself. Finally, and most importantly, because the Senate never assented to this early bill, it never became law.

In 1999, Congress amended 17 U.S.C. § 1201(a)(1)(C) to lift the requirement of a formal hearing on the record before adoption of exemptions, and thereby relaxed the procedures to be used in the § 1201 rulemaking. Intellectual Property and Communications Omnibus Reform Act of 1999, Pub. L. No. 106-113 app. I, § 5006, 113 Stat. 1501, 1501A-594. Once again, Congress did not take any steps to authorize lawsuits challenging the Librarian's determinations.

Thus, the legislative history of § 1201 uniformly indicates that Congress did not intend to provide statutory authorization of lawsuits in which private parties could challenge exemptions issued by the Librarian.

<u>**CONCLUSION**</u>

A thorough review of the legislative history of the Digital Millennium Copyright Act shows that Congress did not design the DMCA to promote or protect the use of technological locks for purposes not ultimately rooted in copyright. It further shows that Congress did not intend to provide special authorization for lawsuits challenging the Librarian's determinations under 17 U.S.C. § 1201. Thus, TracFone cannot show procedural-injury standing, and the Court should dismiss this case or grant summary judgment in favor of the defendants.

11

Dated: April 19, 2007                              Respectfully submitted,

                                                   PETER D. KEISLER
                                                   Assistant Attorney General

                                                   R. ALEXANDER ACOSTA
                                                   United States Attorney

                                                   THEODORE C. HIRT
                                                   Assistant Branch Director

                                                   /s/ JAMES C. LUH
                                                   JAMES C. LUH
                                                   Trial Attorney
                                                   United States Department of Justice
                                                   Civil Division, Federal Programs Branch
                                                   20 Massachusetts Ave NW
                                                   Washington DC 20530
                                                   Tel: (202) 514-4938
                                                   Fax: (202) 616-8460
                                                   E-mail: James.Luh@usdoj.gov
                                                   Attorneys for Defendants

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on April 19, 2007, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.


/s/ JAMES C. LUH
JAMES C. LUH

# SERVICE LIST

Case No. 06-cv-22942-GRAHAM

Steven J. Brodie
Carlton Fields
4000 International Place
100 SE 2nd St
Miami FL 33131-2114
Tel: (305) 530-0050
Fax: (305) 530-0055
E-mail: sbrodie@carltonfields.com

John A. Camp
Carlton Fields
4000 International Place
100 SE 2nd St
Miami FL 33131-2114
Tel: (305) 530-0050
Fax: (305) 530-0055
E-mail: jcamp@carltonfields.com

James B. Baldinger
Carlton Fields
222 Lakeview Ave Ste 1400
West Palm Beach FL 33401-6149
Tel: (561) 659-7070
Fax: (561) 659-7368
E-mail: jbaldinger@carltonfields.com

Sylvia H. Walbolt
Carlton Fields
4221 W Boy Scout Blvd Ste 1000
Tampa FL 33607
Tel: (813) 223-7000
Fax: (813) 229-4133
E-mail: swalbolt@carltonfields.com
Attorneys for Plaintiff TracFone Wireless,
Inc.

James C. Luh
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave NW
Washington DC 20530
Tel: (202) 514-4938
Fax: (202) 616-8460
E-mail: James.Luh@usdoj.gov
Attorney for Defendants James H.
Billington and Marybeth Peters